William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

Garret S. DeReus (LA # 35105)*
Andrew D. Bizer (LA # 30396)*
*Admitted *pro hac vice*
BIZER & DEREUS, LLC
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
gdereus@bizerlaw.com
andrew@bizerlaw.com
jhammack@bizerlaw.com

*Attorneys for Plaintiffs Scott Crawford
and Jarvis Jernigan, Jr.*

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT CRAWFORD and JARVIS JERNIGAN, JR., | Case No.: 3:17-cv-02664-RS |
| Plaintiff, | PLAINTIFFS' FIRST AMENDED COMPLAINT |
| vs. | |
| UBER TECHNOLOGIES, INC. and RAISER, LLC, | |
| Defendant | |

Dated this 14th day of May, 2020

PLAINTIFFS' FIRST AMENDED COMPLAINT - 1

## I.    INTRODUCTION

1.      Scott Crawford and Jarvis Jernigan, Jr., are persons with disabilities who are deeply involved in the community of Jackson, Mississippi and its surrounding suburbs. Both Dr. Crawford and Mr. Jernigan have multiple sclerosis and use wheelchairs to get from place to place. They can do practically everything a non-disabled person can do with the appropriate accommodations for their disabilities – work, travel, and enjoy their lives.  Neither of them, however, is able to drive. As a result, they rely on buses, taxis, and other services to get around the Jackson metro area.

2.      Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber") provide a mobile-phone app service that allows users to call a car to drive them from point A to point B for a fee. The app also allows people who own cars to sign up as drivers to provide those rides.

3.      In some cities, Uber has options for disabled users. For example, if a user is in San Francisco, Portland, or Washington, D.C., they are shown an icon in the Uber app for "Uber Access." By selecting that icon, those users shown options – UberASSIST and/or UberWAV. UberASSIST allows a person with a disability to hail a driver who has been specifically trained to assist riders into vehicles and who can accommodate folding wheelchairs, walkers, and scooters. UberWAV allows a person with a disability to hail a driver with a wheelchair-accessible vehicle.

4.      But Uber does not make *any* Uber Access program available to Jackson users – even though Jackson has a metro area population nearly as large as Portland or Washington, D.C.

5.      Unfortunately, Uber has refused to make the UberWAV program available to Jackson metro users.

6.      As a result of Uber's refusal to make UberWAV available, persons with disabilities in Jackson have no ability to call a wheelchair accessible vehicle or a specially trained driver through the Uber app. Even if there are drivers on the road who have such a vehicle or training, there is no way for Jackson users with a disability to find a trained driver or accessible vehicle through the app. For this reason, Dr. Crawford and Mr. Jernigan are excluded from Uber's services.

7.      Under the Americans With Disabilities Act, Uber is required to make reasonable modifications/accommodation to accommodate persons with disabilities. Uber is plainly able to do these things – as evidenced by the fact that they offer Uber Access elsewhere. Furthermore, Uber's ability to revise their app is evident by their periodic special promotions in which they alter the app to connect users to puppies, cake, and donuts for a single day.  Despite their clear ability to alter the app, defendants have chosen not to provide any wheelchair-accessible services in Jackson, Mississippi.

8.      As such, Uber has violated their legal obligations under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*

9.      According to the U.S. Department of Justice, Title III lawsuits over inaccessible transportation go "to the very heart of the ADA's goals 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency' for individuals with disabilities."[1] Scott and Jarvis seek here to vindicate the promises of federal and state law.

**II.      JURISDICTION AND PARTIES**

10.     Jurisdiction: This is an action for relief pursuant to Title III of the Americans With Disabilities Act, 42 U.S.C. § 12181 *et seq.* This Court is vested with original jurisdiction pursuant

---

[1] *National Federation of the Blind of California v. Uber Technologies, Inc*., N. D. Cal. 14-cv-4086, R. Doc. 29 at 4.

PLAINTIFFS' FIRST AMENDED COMPLAINT - 3

to 28 U.S.C. § 1331 and 1343. This court is vested with supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as this claim arises out of the same case or controversy as the federal claim.

11.     <u>Intradistrict Assignment</u>: Because the claims described *infra* arose in the County of San Francisco, this case should be assigned to the San Francisco or Oakland Division of the Northern District of California per Local Rule 3-2(d).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants are headquartered in San Francisco, California.

13.     **Plaintiff SCOTT CRAWFORD** is a citizen and resident of Jackson, Mississippi. He uses a wheelchair for mobility. He is disabled within the meaning of the ADA. He requires wheelchair accessible vehicles for transportation or other reasonable accommodations such as assistance with storing his wheelchair. He uses a motorized wheelchair that cannot be folded into the trunk of a car.

14.     **Plaintiff JARVIS JERNIGAN, JR.** was a citizen and resident of Clinton, Mississippi, in the Jackson metro area at the time this action was originally filed on May 9, 2017. Since that time, MR. JERNIGAN has moved to Memphis, Tennessee. However, MR. JERNIGAN frequently returns to Jackson, Mississippi to visit friends and family, attend medical appointments, and to conduct business and advocacy efforts.

15.     **MR. JERNIGAN** uses a wheelchair or a scooter for mobility. He is disabled within the meaning of the ADA. To independently obtain transportation, he requires wheelchair accessible vehicles for transportation.

16.     **Defendant UBER TECHNOLOGIES, INC.** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San

Francisco, California. Uber Technologies, Inc.'s subsidiary, Rasier, LLC is registered with the Mississippi Secretary of State as business ID number 1050810.

17.     **Defendant RASIER, LLC** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Rasier, LLC is registered with the Mississippi Secretary of State as business ID number 1050810.

18.     Together, Defendants provide an extremely popular vehicles-for-hire service whereby Uber drivers pick up customers and provide them with transportation in an automobile. Defendants do not provide vehicles-for-hire services to mobility-impaired consumers in Jackson who require wheelchair-accessible transportation vehicles or other accommodating services.

### III.     FACTS

**A.     Plaintiffs Are Unable to Use Defendants' Jackson App in Its Current Form**

19.     Defendants pioneered the vehicle-for-hire market across the United States. Anyone with access to a smartphone can request travel services from Defendants. Defendants' customers use a smartphone application to locate, schedule, and pay for their travel. Consumers enter into contracts and business relationships by contacting Defendants via electronic notification using an application downloaded to their smartphone (hereinafter known as the "Uber Application"). Upon receipt of a request from a customer, Defendants then dispatch a driver and vehicle to pick up the customer for transport to their desired location. Through use of the Uber Application, consumers agree to pay for the services with a credit card via their smartphone. These charges may include safety fees, municipal fees, and other fees.

20.     Unlike taxi vehicles in Jackson, where the fare rate is set by local ordinance, the fare rates for Uber customers is set by Uber according to Uber's confidential and secret algorithm. Pursuant to Uber's confidential and secret algorithm, Uber can charge more for its services

depending on the time of day, number of drivers, or estimated profitability. The decision on the price displayed on the Uber Application is set solely by Uber (and not the drivers).

21.     Upon information and belief, Uber can deduct fare from a driver if a rider complains about his/her safety, the professionalism of the driver, cleanliness of the vehicle, or incorrect designation and/or charges, among other issues.

22.     Upon information and belief, Uber does, or in the past has, required that riders provide a "rating" of their driver prior to the next trip; Uber requests that drivers provide a "rating" of their rider prior to the next trip. These rating facilitate the transportation experience and provide valuable data and information to Uber.

23.     Uber has the option and ability to temporarily or permanently deactivate a rider's account.

24.     Uber has the option and ability to temporarily or permanently deactivate a driver's account.

25.     Uber has the ability to charge a rider a "post-ride" fee (*i.e.* a cleaning fee) at the request of a driver.

26.     In nearby geographic markets—such as New Orleans, Louisiana—Uber has the ability to "geo-lock" certain locations and prevent drivers from visiting those geographic areas.

27.     Upon information and belief, in the New Orleans area Uber has utilized its ability to "geo-lock" certain locations.

28.     Upon information and belief, Uber has the ability to assert control over its transportation services in the Jackson metro area by geo-locking certain locations.

29.     Upon information and belief, Uber has the ability to exclude drivers based on personal features – such as how many years they have had a driver's license in the United States.

30.    Upon information and belief, Uber has (or had in the past) a policy in some markets against allowing individuals who have had a driver's license in the United States for less than one year from driving for Uber.

31.    As part of its operation of a transportation service, in certain markets, such as New Orleans, Louisiana, Uber provides "Hotspots" and heat maps that direct and encourage Uber drivers to make pickups in those locations. This further indicates that Uber is operating a transportation system.

32.    Similarly, under the "Drivers" tab of its website, Uber provides "Safety pro-tips." These tips include the statement that "Our team is ready to help! With 24/7 phone support, you can speak to one of our support specialists in the Uber Driver app. Just tap 'HELP' and select the phone icon in the top-right corner."

33.    Upon information and belief, Uber has (or had in the recent past) a policy against allowing individuals with non-Louisiana license plates from driving for Uber in the New Orleans area.

34.    Upon information and belief, Uber assists, or has assisted, drivers with purchasing new cars via co-signing leases and/or ownership agreements (*i.e.* https://www.youtube.com/watch?v=5-Jx6G68Wpo).

35.    Upon information and belief, Uber employs "Law Enforcement Liaison"— including at least one individual who was retired from the U.S. Marshal Services—and whose responsibilities include engaging with cities and municipalities so that Uber can work with said entities and their law enforcement.

36.    Uber's prior CEO wrote on Uber's official blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a transportation system in a city near you."

37.     Upon information and belief, would-be drivers are required to pass a "city knowledge test" and attend a brief interview with an employee of Uber. Upon information and belief, Uber has previously referred to itself as an "On– Demand Car Service."

38.     As one court summed it up:

> Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring their performance, disciplining (or terminating) those who fail to meet standards, and setting prices. [2]

39.     Uber has explicitly declared itself to be a "transportation system" over and over again. A few examples:

A.     December 5, 2011: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a **transportation system** in a city near you." [3]

B.     March 8, 2012: "So today could eventually be considered historical for the city of Angels because it is today that **Uber LA** **is officially rolling out its transportation system** in this fine city.  Now, how is some on-demand town car service calling itself a **transportation system**? And how are a bunch of limos going to make this city better?  We've got a bunch of examples for you, but let me start with this: for every well utilized UberCar on the road, we're taking 6 cars off the road and out of parking garages." [4]

C.     June 8, 2012: Uber seeks to deliver the "World's Finest **Transportation System**" [5]

D.     August 2, 2013: "We're finally giving this city the **transportation system** that it deserves." [6]

E.     Uber engineers' code "will contribute to accelerating the growth of a **transportation system** that will directly affect the lives of more than three million people every single day." [7]

F.     August 22: 2014: Uber "provides the city with a more efficient

[2] *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015).
[3] https://newsroom.uber.com/take-ubers-new-logo-for-a-spin/
[4] https://newsroom.uber.com/us-california/uber-la-officially-launched/
[5] https://newsroom.uber.com/us-california/san-diego-launch/
[6] https://newsroom.uber.com/mexico/uber-has-launched-in-mexico-city/
[7] https://join.uber.com/engineering

transportation system."[8]

G.   December 14, 2014: "Uber platform allows for safe and reliable rides, supporting and extending New Jersey's public **transportation system**."[9]

H.   June 17, 2015: "Uber is proud to support the Taxi and Limousine Commission's revised rules which allow tech innovation to continue making New York City's **transportation system** more progressive for all riders and drivers and ensure that drivers and passengers are protected."[10]

I.   July 22, 2015: "Together, we can build an even better, more reliable **transportation system**. This is great news for all New Yorkers, including Uber riders and drivers."[11]

40.   Given Paragraphs 19 through 39, Uber is a transportation system and is engaged in the provision of a transportation service and is therefore obligated to comply with the transportation statutes and regulations of the ADA, found at 42 U.S.C § 12184 and 49 C.F.R. §§ 37.1-105.

41.   Given Paragraphs 19 through 39, as the provider of a transportation system, Uber is obligated to comply with the equivalent service standard set forth at 49 C.F.R. § 37.105.

**B.   Plaintiffs Are Unable to Use Defendants' Transportation Services Due to Uber's Refusal to Provide a Reasonable Modification**

42.   SCOTT CRAWFORD and JARVIS JERNIGAN, JR. desire service from vehicles for hire to run errands, attend community meetings, reach medical appointments, access medical services, engage in recreational activities, and to participate in civic engagement events. Sometimes, Plaintiffs are able to utilize public transportation services or private medical

---

[8] https://newsroom.uber.com/indonesia/delivering-a-new-choice-to-jakarta/
[9] https://www.uber.com/blog/new-jersey/uber-improves-public-transportation-in-new-jersey/
[10] https://newsroom.uber.com/us-new-york/statement-on-revised-tlc-rules/
[11] https://newsroom.uber.com/us-new-york/statement-from-uber-nyc-general-manager-josh-mohrer/

PLAINTIFFS' FIRST AMENDED COMPLAINT - 9

transportation services. Taxi services in the Jackson metro area are generally not accessible to wheelchair users such as Plaintiffs.

43.     Neither SCOTT CRAWFORD nor JARVIS JERNIGAN, JR. can successfully use Defendants' application because Uber has completely failed to provide a button, option, or icon on its Uber Application for the Jackson metro market which would allow a wheelchair user to summon an accessible vehicle.

44.     Plaintiffs SCOTT CRAWFORD and JARVIS JERNIGAN, JR. are presently aware that if they tried to install and use the Uber Application that they would experience serious difficulty accessing the goods and utilizing the services offered by that service as a result of Defendants' (1) failure to provide a button, option, or icon which provides access to an accessible vehicle, (2) failure to provide a reasonable accommodation/modification so that Plaintiffs can fully use and enjoy Uber's transportation services, and (3) failure to ensure that a minimum number of accessible vehicles in Defendants' fleet are wheelchair-accessible.

45.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. have personal knowledge and are presently aware that Uber is not providing WAV service in Jackson, Mississippi. Indeed, the continued inaccessible nature of Uber's transportation services was confirmed to SCOTT CRAWFORD and JARVIS JERNIGAN, JR. on April 1, 2020 in correspondence sent by Uber to Plaintiffs.

46.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. desire to use the Uber Application, but fear that they will experience serious difficulty in utilizing the application due to the discrimination detailed herein.

47.     Plaintiffs' decisions to go out and participate in public life are based, in part, on whether they will be able to get back home, especially for events after dark. An accessible

transportation option through the Uber app would make SCOTT CRAWFORD and JARVIS JERNIGAN, JR. more independent.

48.     The ADA violations detailed herein exclude SCOTT CRAWFORD and JARVIS JERNIGAN, JR. from the programs, services, and accommodations offered by Defendants to the public.

49.     Both SCOTT CRAWFORD and JARVIS JERNIGAN, JR. plan to and will attempt to use the Uber Application and Defendants' programs, services, and accommodations in the future as patrons should those programs, services, and accommodations become wheelchair-accessible.

50.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. plan on utilizing Uber's transportation services by downloading and utilizing the application, when taking a ride with friends, colleagues, or associates, or by requesting that a friend, colleague, or associate request a ride on their behalf.

51.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. presently fear that they will encounter the mobility-related impediments which exist within Uber's application and transportation services.

52.     Both SCOTT CRAWFORD and JARVIS JERNIGAN, JR. continue to desire to utilize Uber's application and transportation services, but will continue to be denied access until the ADA violations detailed herein are remedied.

53.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. intend to and will attempt to utilize Defendants' programs, services, and accommodations in the future, but fear that Defendants will continue to discriminate against them by failing to bring the Uber Application and transportation services into compliance with the requirements of the ADA.

54.     Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible to persons with mobility-related disabilities is reasonably feasible, easily accomplished, and would not place an undue burden on Defendants.

55.     Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible would provide SCOTT CRAWFORD and JARVIS JERNIGAN, JR. with an equal opportunity to participate in, or benefit from, the programs, services, and accommodations which Defendant offers to the general public.

56.     SCOTT CRAWFORD and JARVIS JERNIGAN, JR. have been obligated to retain the undersigned counsel for the filing and prosecution of this action. SCOTT CRAWFORD and JARVIS JERNIGAN, JR. are entitled to have their reasonable attorneys' fees, costs, and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205.

**C.    Plaintiffs Requested that Uber Modify its Policies, Procedures, and Practices to Provide them With Access to Uber's Services and Uber Failed to Modify its Policies, Procedures, and Practices.**

57.     General Order 56 of the Northern District of California requires that parties in an ADA action conduct a meeting at which plaintiffs must "specify all claimed access violations and the corrective actions requested of defendant."

58.     On August 15, 2017, the parties conducted a G.O. 56 meeting. At that meeting, Plaintiffs specified the corrective actions they request of Uber. To date, Uber's service remains inaccessible to wheelchair users. Plaintiffs' request at this meeting that Uber take corrective action constituted a request for reasonable accommodation/modification under the ADA.

59.     On October 4, 2018, DR. CRAWFORD and MR. JERNIGAN, through their undersigned counsel sent Uber a letter / request entitled "Request for Reasonable Modification / Reasonable Accommodation in Jackson, Mississippi."

60.     This document was received by Uber, through its counsel, on October 4, 2018. The request for reasonable accommodation / reasonable modification is attached hereto as Exhibit "A" (hereinafter "October 4 Request"). Plaintiffs incorporate the entirety of the October 4 Request into this First Amended Complaint by reference.

61.     In the October 4 Request, DR. CRAWFORD explained that he lives and resides in Jackson. MR. JERNIGAN explained that he lives in Memphis, but regularly and frequently travels to Jackson for business, family occasions, medical appointments, and to visit friends. Plaintiffs explained that they are persons with disabilities, along with the nature of their disabilities and their usage of motorized wheelchairs.

62.     DR. CRAWFORD and MR. JERNIGAN re-explained in the October 4 Request that their motorized wheelchairs cannot be folded and stored in the trunk of a car. Instead, to utilize vehicular transportation, DR. CRAWFORD and MR. JERNIGAN require a Wheelchair Accessible Vehicle ("WAV").

63.     DR. CRAWFORD and MR. JERNIGAN re-explained in the October 4 Request that in Jackson, Mississippi Uber offers services including UberX and UberXL. DR. CRAWFORD and MR. JERNIGAN explained that they cannot hail a WAV through Uber's application. DR. CRAWFORD and MR. JERNIGAN explained that have assembled a substantial body of evidence that shows that Uber Technologies, Inc. and Rasier, LLC are operating a transportation network and exert control over their drivers. The more Uber Technologies, Inc. and Rasier, LLC are operating a transportation network and are controlling their drivers, then the more the drivers are operating "as an extension of Uber." *See Crawford v. Uber Technologies, Inc.*, No. 3:17-cv-02664-RS, R. Doc. 80, pp. 7. Further, "nothing in Section 12184 requires that an entity own or lease its

own vehicles in order to qualify as a private entity providing taxi services within the meaning of the statute." *Id*."

64.    DR. CRAWFORD and MR. JERNIGAN explained in the October 4 Request that they have amassed substantial evidence that Uber Technologies, Inc. and/or Rasier, LLC are providing WAV service or other reasonable accommodations in other cities, but not in Jackson. For example, in San Francisco an individual can easily open the Uber Application, select the option "UberWAV" and hail an UberWAV. While the wait time might be longer, there are vehicles available on demand. Indeed, even undersigned counsel Garret DeReus took a screenshot of this service on September 20, 2018.[12] The same service is being provided by Uber in Chicago, Illinois; in New York, New York; and Washington, D.C., among others.

65.    DR. CRAWFORD and MR. JERNIGAN explained in the October 4 Request that in other locations, Uber has utilized a variety of methodologies to provide WAV service. It would



PLAINTIFFS' FIRST AMENDED COMPLAINT - 14

appear from public records that in Chicago, Illinois Uber has run promotions seeking the retention of drivers with WAVs; according to news reports, Uber has been working with drivers and rental and leasing partners over the past year to expand its fleet and now has 65 WAVs on the road available through the app.[13] According to other reports, Uber has dispatched a fleet of more than 60 WAVs onto the streets of Philadelphia.[14] Clearly, Uber has the ability to utilize its nearly infinite resources to develop accessibility options that make its service meaningfully accessible to individuals with disabilities.

66.    DR. CRAWFORD and MR. JERNIGAN explained in the October 4 Request that Uber has been under an obligation to change its policies/practices without sending a letter such as this one. Uber should have already changed its operational policy and made its services accessible to persons with disabilities.

67.    Following all this explanation, in the October 4 Request DR. CRAWFORD and MR. JERNIGAN requested that Uber Technologies, Inc. and Rasier, LLC cease violating the ADA and utilize their resources, internal knowledge, and business know-how to change their operational policies and provide WAV service in Jackson, Mississippi and its surrounding areas.

68.    DR. CRAWFORD and MR. JERNIGAN then stated that they expected that, within seven (7) days of receipt of this letter, that Uber will begin providing WAV service in Jackson, Mississippi.

69.    In the October 4 Request DR. CRAWFORD and MR. JERNIGAN requested that, within seven days of Uber receipt of the letter, that Uber would ensure that a fleet of approximately 20-60 WAVs are available in Jackson.

---

[13] http://www.chicagotribune.com/news/local/breaking/ct-uber-handicapped-accessibility-0720-20170719-story.html

[14] https://www.phillymag.com/business/2017/07/06/uber-lyft-wheelchair-accessible-wav/

PLAINTIFFS' FIRST AMENDED COMPLAINT - 15

70.     In the October 4 Request DR. CRAWFORD and MR. JERNIGAN explained that this fleet size is less than the fleet size of accessible vehicles Uber provides in Chicago and Philadelphia.

71.     In the October 4 Request DR. CRAWFORD and MR. JERNIGAN explained that Uber has had sufficient of time, opportunity, and notice of the need to provide WAV service in Jackson, Mississippi.

72.     In the October 4 Request DR. CRAWFORD and MR. JERNIGAN explained that they do not possess the expertise to tell Uber how it must change its internal business practices and operations to provide WAV service in Jackson. Plaintiffs further explained that ADA does not require them to tell Uber how to run its business.

73.     In the October 4 Request, DR. CRAWFORD and MR. JERNIGAN requested, as an interim step, that Uber "immediate turn on the 'UberWAV' option in Jackson, Mississippi."

74.     In the October 4 Request DR. CRAWFORD and MR. JERNIGAN requested that any UberWAV service Uber provide in Jackson meet the equivalency standard of 49 C.F.R. § 37.105.

75.     In the October 4 Request DR. CRAWFORD and MR. JERNIGAN explained that, given Uber's recent $72 billion valuation, they were confident that Uber could use its resources and problem-solving abilities to bring itself into compliance with the law without further delay.

76.     Despite the October 4 Request, Uber did not make its service accessible on October 11, 2018.

77.     Upon information and belief, Uber services in Jackson remains in the same condition as it was when Plaintiffs made the October 4 Request.

78.     To date, five hundred and ninety (590) days after receiving the October 4 Request, and one thousand and five (1,005) days after the G.O. 56 meeting, Uber has not made its service accessible in Jackson, Mississippi or otherwise complied with Plaintiffs' request for reasonable accommodation / reasonable modification.

79.     On October 11, 2018, Uber's attorney sent Plaintiffs correspondence stating that Uber "is considering Mr. Crawford and Mr. Jernigan's requests."

80.     According to Uber, "That process will take some time, particularly in light of the sweeping nature of the requests.  Once Uber has had sufficient time to look into these issues and make decisions, we will follow up with a detailed, substantive response.  We expect this process to take a few weeks, but we will get back to you as soon as possible."

81.     By failing to make its service accessible within seven days, Uber denied Plaintiffs' request for reasonable accommodation / request for reasonable accommodation.

82.     Uber completely failed to explain why it would need "a few weeks" to consider whether to bring itself into compliance with the ADA and stop discriminating against individuals with disabilities. This failure is especially egregious given that this lawsuit was originally filed on May 9, 2017 and, therefore, Uber has had one thousand and ninety-five (1,095) days since the original complaint was filed to "consider" how to make its service accessible in Jackson, Mississippi.

83.     As of the time of the filing of this First Amended Complaint, Uber has now had five hundred and ninety (590) days to provide DR. CRAWFORD and MR. JERNIGAN's requested reasonable accommodation/modification.

84.     On May 1, 2020, Uber responded to DR. CRAWFORD and MR. JERNIGAN's request for reasonable accommodation/modification. *See* Exhibit "B."

PLAINTIFFS' FIRST AMENDED COMPLAINT - 17

85.     In its response letter, Uber states that it "aspires to be able to enable a WAV option in even more markets, including Jackson, in the future, if it makes sense from a business perspective…"

86.     At no point in its letter did Uber state that it had or would be turning on the UberWAV option in Jackson, Mississippi.

87.     At no point in its letter did Uber state that it had or would be changing its policies or that it would provide WAV service in Jackson, Mississippi and its surrounding areas.

88.     Uber failed to provide any sort of reasonable accommodation. Uber simply provided a list of other transportation providers that have taken steps to provide some level of accessible service to persons with disabilities.

89.     One of these providers is "Taxi Tim" who, upon information and belief, is a one or two-person operation.

90.     If a one or two-person company can provide wheelchair accessible service, it is clearly reasonable for Uber—a transportation company with a multibillion-dollar valuation and thousands of employees—to make its service accessible.

91.     In fact, as is set below, Uber has a variety of methodologies, practices, and procedures that it could be utilizing in Jackson to make its service accessible – but Uber has completely failed to implement these services in Jackson.

92.     Even worse, the evidence shows that Uber's failure to make its service accessible in "secondary markets" such as Jackson is the result of Uber's focus on other, non-accessibility related challenges.

### D.   Uber's History of App Modifications

93.     Upon information and belief, modification of the programs, services, and accommodations offered through the Uber Application could be easily accomplished, as is evidenced by the various promotions and modifications which are commonly made by Defendants during the regular course of their operations.

94.     On January 5, 2015, Defendants ran a promotion in New Orleans known as "Uber King Cakes." During this promotion, the Uber Application would display a small King Cake.[15] Customers could select this "King Cake" icon and have drivers deliver a King Cake to them for a fee. This change to Defendants' Uber Application was only present for one day. At the conclusion of the promotion, Defendants restored the Uber Application to its original state.

95.     On Thursday, August 27, 2015, in Philadelphia, Pennsylvania Defendants ran a promotion known as "UberPUPPIES."[16] During this promotion customers could utilize the Uber Application to have drivers deliver a live Puppy to their office for "15 minutes of puptastic playtime." Upon information and belief, at the end of the "UberPUPPIES" promotion, the Uber Application returned to its original state.

96.     On April 13, 2016, in New Orleans, Defendants ran a promotion known as "UberDONUTS."[17] From 10:00am to 12:00pm, users could select a donut icon in their Uber app to have a driver deliver two free donuts to their door. At the end of the "UberDONUTS" promotion, the Uber Application returned to its original state.

---

[15] See Exhibit "C."
[16] See Exhibit "D."
[17] https://newsroom.uber.com/us-louisiana/uberversary-donuts-on-demand/

PLAINTIFFS' FIRST AMENDED COMPLAINT - 19

97.     The above examples demonstrate how easy it would be for Defendants to provide a wheelchair-accessible icon or button on its Uber Application for the Jackson metro market, as it does in other cities. Despite the ease with which Defendants could make its service available to persons in a wheelchair, Defendants have intentionally chosen to not provide services to persons in wheelchairs in Jackson.

98.     In some limited locations, Defendants have installed an icon on its Uber Application in an attempt to comply with the ADA. In some cities, including San Francisco, Los Angeles, Portland, and Washington D.C., Defendants have installed on its Uber Application an icon known as Uber Access. (*See* Figure One, *infra*.).



**Fig. 1**:   An image of Uber Access, available in some cities – but not Jackson, MS.

(*Source*: https://newsroom.uber.com/canada/uberwav/)

99.     Once a user selects the Access icon, one or two of two options appear: UberASSIST and UberWAV.

100.    UberASSIST, according to Defendants, "is designed to provide additional assistance to seniors and people with disabilities. Driver-partners are specifically trained by Open

Doors Organization to assist riders into vehicles and can accommodate folding wheelchairs, walkers, and scooters."[18]

101.    However, according to Defendants, "Note: ASSIST vehicles do not have accessible ramps."[19]

102.    Persons who use an electric wheelchair are unable to use UberASSIST as they require a vehicle equipped with a ramp or a lift.

103.    Further, according to a Technical Assistance Manual published by the Department of Justice, carrying a person with a disability is contrary to the goals of the ADA.[20] Thus, the "extra hand" provided by Defendants' UberASSIST service merely perpetuates paternalistic discrimination instead of providing independent access.

104.    Upon information and belief, in San Francisco, Los Angeles, and other cities, Defendants offers UberWAV, which provides wheelchair accessible vehicles.

105.    Upon information and belief, Defendants can remove their accessible icons at any time, thereby creating a significant need for injunctive relief. On September 2, 2014, Defendants issued a press release stating that it was offering disabled accessible services in Houston, Texas.

106.    Upon information and belief, Defendants began offering service in Houston, Texas called UberACCESS.

107.    As of May 6, 2017, the Uber Application for Houston, Texas does not feature or display UberACCESS. (*See* Figure 2, *Infra*).

---

[18] See Exhibit "E."
[19] *Id*.
[20] See The Americans with Disabilities Act, Title II Technical Assistance Manual, http://www.ada.gov/taman2.html "Carrying is contrary to the goal of providing accessible programs, which is to foster independence." Last accessed on 1/21/2016.



**Fig. 2**:   An image of Uber's app available in Houston, Texas as of May 6, 2017.

(*Source*: Screenshot taken by plaintiff's counsel)

108.    Upon information and belief, Defendants either discontinued its UberACCESS service in Houston, Texas or no longer publicly displays the UberACCESS option. This demonstrates that Defendants have the capability to reduce or eliminate its accessibility options at will, and evidences the need for injunctive relief.

109.    On information and belief, when a driver with a wheelchair-accessible vehicle in a city without UberWAV contacts Uber, they are told that they cannot participate in UberWAV.

**E.    Uber's Accessibility Efforts in Other Markets Demonstrates that it would be Reasonable for Uber to Make its Service in Jackson Accessible. Uber has Chosen Not to Do So as a Result of its Focus on Other Business Issues.**

110.    In other cities, there is a wide range of ways Uber works with the owners of WAVs to integrate said vehicles into its transportation system.

111. ██████████████████████████████████████████████
██████████████

112. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████

113. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

114. Uber could make a public "request for providers" in Jackson and see what companies apply.

115. Upon information and belief, Uber has not made a public posting for providers in Jackson area.

116. In addition to directly entering into contract with WAV providers, Uber also provides incentives to the drivers of WAVs in other cities.

117. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████

118. In at least one market in October of 2017, Uber was offering $18 per WAV trip to drivers.

119. In at least one market in October of 2017, Uber was offering $10 to $12 per trip, plus the driver could keep all fees.

120.    In an electronic communication believed to be dated August 5, 2016, Julia Winkler Jacobson of Uber documented that Uber has many business incentives to provide WAV service, stating "Launching WAV proactively can help us get ahead of costly regulations, facilitate airport agreements, and pave the way for ridesharing regulations Waiting to launch WAV increases the chances of % fleet mandates, required 24/7 service and accessibility surcharges."

121.    According to a July 20, 2017 public post on the website UberPeople.NET, an uber driver received a promotional email from Uber stating the following:

**Why drive with uberWAV?**

When driving with uberWAV in Chicago, you'll:*

- Keep the Uber Service Fee with uberWAV
- Receive $1,000 after you complete your first trip in a qualifying wheelchair-accessible vehicle
- Receive an additional $95 per week, when you complete 40 trips and are online for 35 hours in that week
- Gain access to a wheelchair-accessible vehicle through our lease partnerships.
- Receive uberX and uberWAV trip requests.

122.    Upon information and belief, Uber sent the above promotional email to drivers and/or other persons in the Chicago area.

123.    Further, based on a screenshot of Uber's website taken on or about April 16, 2018, at the URL www.uber.com/driver/services/uberwav, Uber has advertised that individuals who drive a WAV in New Orleans can "Earn $1000 for your first 150 trips guaranteed in New Orleans.XXXXX"[21]

---

[21] *See* Exhibit "F" (There is a superscript on the exhibit, but the superscript is unreadable due to pixelization).

124.    In totality, the aforementioned emails, incentive programs, contracts, and service agreement demonstrate that Uber has numerous incentives and methodologies for the provision of WAV service. Uber's utilization of these incentives and methodologies in Jackson would be a natural, consistent, and cohesive part of its overall strategy. Uber's failure to adopt the policies, procedures, and practices necessary for the provision of WAV service in Jackson constitutes facial discrimination.

125.    An internal Uber team or group was formed with the name "WC UberWAV Strike Team."

126.    Despite knowing that making its service accessible is reasonable and required, Uber has prioritized its focus on other business interests.

127.    For example, according to an electronic communication on the "WC UberWAV Strike Team", on what is believed to be dated November 16, 2015, Christopher Ballard of Uber stated "Given all of the other issues we're dealing with during this regulatory session, it appears that WAV will be addressed next year. I'll address the group if this thinking changes."

128.    Upon information and belief, Mr. Ballard was discussing Uber's WAV service generally.

129.    Despite saying that WAV would be addressed "next year," almost three years later WAV service is still not available in Jackson.

130.    Indeed, on what is believed to be August 5, 2016, Julia Winkler Jacobson of Uber sent out an email stating: "WAV is consistently unreliable, there's no standardized launch approach across cities."

131.    ██████████████████████████████████████
████████████████████████
                    ████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

132.   [REDACTED]

[REDACTED]

[REDACTED].

**F.    Uber is Obligated to Provide an Equivalent Level of Service to Individuals who Use Wheelchairs.**

133.   From approximately 2015 until January 30, 2018 Uber operated in various markets in conjunction with a subsidiary company known as Xchange Leasing, LLC.

134.   Through this company, Uber worked with drivers to help said individuals obtain a new vehicle.

135.   In response to a request for production of documents asking Uber to provide "Any documents showing the range of vehicles which Xchange Leasing, LLC has entered into leading agreement with drivers since October 1, 2015." In response, Uber produced a document, attached as Exhibit "G", which shows that Xchange Leasing entered into leasing agreements with approximately 130 "new vans."

136.   These new vans were leased in the following states: Virginia, Texas, Pennsylvania, Illinois, and Maryland.

137.   By having new vans in its transportation system, Uber triggered the requirements of 49 C.F.R. § 37.103(d), including the requirement that these new vans either be accessible or that Uber's overall transportation service meet the equivalent service requirement.

138.   Upon information and belief, even if Xchange Leasing, LLC was not controlled by

Uber, Uber's partnership with Xchange Leasing, LLC demonstrates that Uber has reasonable options it can utilize put WAVs on the road and make its service meaningfully accessible.

139.    On or about January 30, 2018, Uber, Xchange Leasing, and a company known as Fair announced that the portfolio of Xchange Leasing had been purchased by Fair.[22]

140.    According to the press release "Fair will be the exclusive long-term vehicle solutions partner to Uber in the U.S. for drivers seeking vehicle access for 30 days or longer, and together the companies will work to develop customized new offerings that fit the needs of drivers, as well as integrations into Uber's products for drivers."

141.    Upon information, despite the fact that Uber could be working with its exclusive partner Fair, Uber has not taken steps to make its service in Jackson meaningfully accessible.

142.    Upon information and belief, even if there is no regulatory requirement that explicitly requires Uber to meet the equivalency standard, providing an equivalent level of service for individuals with disabilities who use wheelchair would be a reasonable accommodation/modification.

## IV.    CAUSE OF ACTION

### <u>VIOLATION OF TITLE III</u><br><u>OF THE AMERICANS WITH DISABILITIES ACT</u>

143.    Plaintiffs re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

144.    Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and by private entities providing certain services, including specified public transportation services. *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128

---

[22] https://www.prnewswire.com/news-releases/fair-and-uber-announce-strategic-partnership-fair-acquires-xchange-leasing-portfolio-300589935.html (last accessed October 8, 2018).

(2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."); 42 U.S.C. § 12182 ("Prohibition of discrimination by public accommodations"); 42 U.S .C. § 12184 ("Prohibition of discrimination in specified public transportation services provided by private entities").

145.    "The term 'specified public transportation' means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10). Public transportation services include "demand responsive systems," which means "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3).

146.    In addition, regulations promulgated by the United States Secretary of Transportation provide that: "No entity shall discriminate against an individual with a disability in connection with the provision of transportation service." 49 C.F.R. § 37.5(a).

147.    Defendants provide a demand responsive transportation system as defined by 42 U.S.C. § 12181. Defendants have been held to be a covered entity under Title III of the ADA. *See, e.g., Ramos v. Uber Technologies*, 2015 WL 758087 at *5-6 (W.D. Tex., Feb. 20, 2015).

148.    Under Section 12184(a)(2) of the ADA, discrimination includes the failure of an entity to:

(A)    make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title;

149.    Under Section 12182(b)(2)(C)(i) of the ADA, discrimination can also include: "a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities."

150.    "Equivalent" is defined under the ADA's regulations at 49 CFR § 37.105 to mean "equivalent to the service provided other individuals with respect to the following service characteristics:

(a)      (1) Schedules/headways (if the system is fixed route);
         (2) Response time (if the system is demand responsive);
(b) Fares;
(c) Geographic area of service;
(d) Hours and days of service;
(e) Availability of information;
(f) Reservations capability (if the system is demand responsive);
(g) Any constraints on capacity or service availability;
(h) Restrictions priorities based on trip purpose (if the system is demand responsive).

151.    Defendants and their service providers have failed to provide any mechanism by which to adequately serve individuals with mobility-related disabilities such as Plaintiffs or others similarly situated. Moreover, Defendants have refused to make reasonable accommodations in policies, practices, and procedures to allow full use and enjoyment of their transportation services by Plaintiffs.

152.    Defendants have discriminated and are discriminating against Plaintiffs in violation of the ADA by failing to provide accessible transportation services.

153.    Defendants continue to discriminate against the Plaintiffs by failing to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford accessible transportation services to individuals with disabilities;.

154.     Plaintiffs have been injured by the discrimination they encountered when they were excluded from using Defendants' transportation services and they continue to be injured by their inability to patronize Defendants' services. They have additionally been injured by the stigma of Defendants' discrimination.

155.     Plaintiffs' injuries are traceable to Defendants' discriminatory conduct, policies, or lack of policies alleged herein and will be redressed by the relief requested. Plaintiffs have been injured and will continue to be injured by Defendants' failure to comply with the ADA and Defendants' ongoing, continued acts of discrimination.

156.     Defendants have control over their drivers' ADA compliance. For example, a term of the contract between Uber and its drivers bars drivers from denying users who have service animals:

> You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

157.     The Uber contract with drivers does *not*, however, have a provision barring drivers from denying service to wheelchair users.

158.     As a result of their inability to use Defendants' services, Plaintiffs are suffering irreparable harm.

159.     Although Plaintiffs have not downloaded or used the Uber Application, Title III of the ADA does not "require a person with a disability to engage in a futile gesture if such person

has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188; *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1136–37 (9th Cir.2002) ("under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues").

160.   Here, Plaintiffs have been excluded from Defendants' services as a result of Defendants' refusal to provide a reasonable accommodation/modification, as is outlined above. Defendants' refusal to provide service to people with disabilities in Jackson is a topic of conversation among Plaintiffs' community. Plaintiffs have researched online and found that UberACCESS, UberASSIST, and UberWAV are offered in other cities but not in Jackson.

161.   Plaintiffs possess smart phones, credit cards, and money such that they could sign up as Uber users. However, Plaintiffs have experienced the humiliation of past denials of services, including transportation services, in other contexts, and so chose not to engage in a process they know to be futile with Uber.

162.   Pursuant to 42 U.S.C. § 12188, this Court has authority to grant Plaintiffs' injunctive relief, including an Order that Defendants' transportation services are in violation of the ADA and requiring Defendants' to alter the Uber Application to make it accessible to and useable by individuals with mobility disabilities to the full extent required by Title III of the ADA.

## VI.   RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against Defendants, and request the following relief:

A.    That this Court declare that Defendants' policies, procedures, and services have been

       provided in a discriminatory manner which violates the ADA;

B.    That this Court declare that Defendants failed to provide Plaintiffs with a reasonable

       accommodation/modification;

C.    That this Court Order injunctive relief to require Defendants to bring their application

       and transportation services into compliance and remain in compliance with the

       requirements of the ADA;

D.    That this Court supervise the injunctive relief entered and ensure that Uber complies with

       the requested injunctive relief within a reasonable period of time, to be determined by

       this Court;

E.    That this Court award reasonable attorneys' fees and costs (including expert fees) and other

       expenses of suit; and

F.    That this Court award such other and further relief as it deems necessary, just, proper, and

       appropriate.


                              Respectfully submitted, this the twenty-first day of May, 2020,

                              By Plaintiffs, by and through their counsel,


                                            /s/ Garret S. DeReus
                                            Bizer & DeReus, LLC
                                            Garret S. DeReus (LA # 35105)*
                                            gdereus@bizerlaw.com
                                            Andrew D. Bizer (LA # 30396)*
                                            andrew@bizerlaw.com
                                            *Admitted *pro hac vice*
                                            3319 St. Claude Ave.
                                            New Orleans, LA 70117
                                            T: 504-619-9999; F: 504-948-9996

PLAINTIFFS' FIRST AMENDED COMPLAINT - 32

***AND***

/s/ William Most
William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (916) 202-3018
Email: williammost@gmail.com