1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

11

12

13

14

15

16

17

SCOTT CRAWFORD,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., *et al.*,

Defendants.

Case No-3:17-cv-02664-RS

**DECLARATION OF
STEPHANIE SCHUSTER IN SUPPORT
OF DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY OF MEERA
JOSHI UNDER FRE 702**

18

19

20

21

22

23

24

25

26

27

28

STEPHAN NAMISNAK, *et al.*,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,  *et al.*,

Defendants.

Case No-3:17-cv-06124-RS

**DECLARATION OF
STEPHANIE SCHUSTER IN SUPPORT
OF DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY OF MEERA
JOSHI UNDER FRE 702**

1    I, Stephanie Schuster, hereby declare as follows:

2    1.    I am over eighteen years old.  I submit this declaration based on my personal

3    knowledge.

4    2.    I am a partner at Morgan, Lewis & Bockius, LLP, and I represent Defendants Uber

5    Technologies, Inc. and Rasier, LLC in the above-referenced cases.

6    3.    I submit this declaration in support of Defendants' Motion to Exclude Testimony of

7    Meera Joshi Under FRE 702.

8    4.    Attached as Exhibit A is a true and correct copy of Plaintiffs' "Notice of

9    Non-Retained Expert Disclosure Pursuant to Rule 26(a)(2)(C) and of Supplementation Pursuant to

10   Rule 26(e)," dated October 22, 2020, disclosing Meera Joshi as a non-retained expert.

11   5.    Attached as Exhibit B is a true and correct copy of Plaintiffs' "Notice of Subpoena

12   for Deposition," dated October 23, 2020 noticing the deposition of Meera Joshi.

13   6.    Attached as Exhibit C is a true and correct excerpt of the transcript of the November

14   11, 2020 deposition of Meera Joshi.

15   7.    Attached as Exhibit D is a true and correct copy of Plaintiffs' "Notice of

16   Non-Retained Expert Disclosure Pursuant to Rule 26(a)(2)(C) and of Supplementation Pursuant to

17   Rule 26(e)," dated January 18, 2021.

18

19   I declare under penalty of perjury that the foregoing is true and correct.

20

21

22   Executed on April 19, 2021                                    Stephanie Schuster

23                                                                 Stephanie Schuster

24

25

26

27

28

# EXHIBIT A

**BIZER & DEREUS, LLC**
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

AQUA TERRA AERIS LAW GROUP
William Brock Most
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

PUBLIC JUSTICE, P.C.
Karla Gilbride
Stephanie K. Glaberson
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

*Attorneys for Plaintiffs*

| | |
|---|---|
| SCOTT CRAWFORD and JARVIS JERNIGAN, JR., | Case No.: 3:17-cv-02664-RS |
| Plaintiff, | |
| vs. | **NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(a)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(e)** |
| UBER TECHNOLOGIES, INC. and RAISER, LLC, | |
| Defendant | |

*AND*

NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF
SUPPLEMENTATION PURSUANT TO RULE 26(E) - 1

STEPHAN NAMISNAK, *ET AL.*,

      Plaintiff,

vs.

UBER TECHNOLOGIES, INC. and RASIER, LLC,

      Defendant

Case No.: 3:17-cv-06124-RS

**NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(E)**

## NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(a)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(e)

NOW INTO COURT, through undersigned counsel, comes Plaintiffs in the above numbered cases, who respectfully provides the following disclosure of a non-retained expert, Ms. Meera Joshi, in accordance with the requirements F.R.C.P. 26(a)(2)(C). Further, pursuant to Rule 26(e), Plaintiffs further supplement that Ms. Joshi may be in possession of facts that are relevant to this action. Plaintiffs reserve the right to designate additional retained and non-retained experts within the deadlines set forth by the Scheduled Orders. Plaintiffs reserve the right to supplement this disclose when/if additional information is learned about Ms. Joshi's factual knowledge and expert opinions.

1.      Ms. Meera Joshi, Sam Schwartz Engineering, 322 Eighth Avenue, 5th Floor New York, NY 10001, p. 212-598-9010.

<u>Summary of Information</u>: The subject matters on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705, and a summary of the facts and opinions to which the witness is expected to testify are provided are reasonably believed to be as follows, given the preliminary information available to Plaintiffs' counsel:

Ms. Meera Joshi was the Chair and CEO of the New York City Taxi and Limousine Commission (TLC), a 600-person agency and nine-member Commission. Undersigned reasonably

anticipates that Ms. Joshi will testify that she set and ensured compliance with the regulatory framework that governs daily transportation of over one million people, performed in over 130,000 vehicles, ranging from taxis to Uber and Lyft, local car services and luxury limousines, driven by over 200,000 drivers During her time at the TLC, Ms. Joshi spearheaded novel regulations, resolving challenges brought on by the rapid growth of rideshare services while simultaneously enhancing passengers' safe access to transportation. Under her tenure, New York became the first city in the nation to mandate the reporting of granular trip data from large app operators like Uber and Lyft.

Under her tenure at the TLC, Ms. Joshi led the nation's largest accessibility initiative, providing passengers who use wheelchairs reliable travel options in taxi and app services. Undersigned's understanding is that Ms. Joshi negotiated and litigated extensively with Uber on the TLC's behalf and ultimately forced Uber to provide and/or expand Wheelchair Accessible Vehicle ("WAV") service in New York. Undersigned reasonably anticipates that Ms. Joshi will testify that while at the TLC she ensured that new market entrants such as Uber and Lyft adhered to core consumer protections such as adequate insurance, price transparency, access for the disabled, and fingerprint background checks for all drivers. Undersigned reasonably anticipates that Ms. Joshi will testify that her office used data to establish the highest levels of accountability among app-based car services, including Uber and Lyft. And that through existing regulatory powers mandated these companies to provide daily submission of detailed trip records providing the City, policy makers and the public visibility into trip density and scarcity, vehicle utilization and overall use of shared City streets.

Additional facts that undersigned believes Ms. Joshi possess is that before serving as the Commissioner for the TLC, Ms. Joshi was the TLC's Deputy Commissioner for Legal Affairs and

General Counsel.  Prior to that, she served as the first Deputy Executive Director of the New York City Civilian Complaint Review Board, the agency tasked with investigating complaints of police misconduct.  She also served as an Inspector General for the New York City Department of Investigation and was responsible for overseeing New York City's Department of Correction, Probation, Juvenile Justice, and the TLC. Ms. Joshi is believed to have received her B.A. and J.D. from the University of Pennsylvania

Undersigned reasonably anticipates that Ms. Joshi will testify that it is her opinion that Uber has the capacity to provide WAV service, but that Uber's failure / refusal to provide WAV service stems from a desire to avoid the issue, not from an inability to provide said service. Undersigned reasonably anticipates that Ms. Joshi will testify that she stated that she said "Many of the app companies came in and [said], 'We're completely different. We're a whole new way of doing business, and we don't need regulation and we can function without it, and we shouldn't even be considered transportation,'" Joshi said. "And from our perspective, it hasn't taken that long for them to look very much like many of the people that we've regulated for decades." [1] Undersigned reasonably anticipates that Ms. Joshi will testify that data on wheelchair accessible vehicles (both fleet size and response time) allows TLC to monitor customer service levels and impose penalties on companies such as Uber not providing sufficient coverage within customer service benchmarks. Undersigned reasonably anticipates that Ms. Joshi will testify as to her opinion, based on her time at the TLC, about what industry Uber is in and whether it is her opinion that Uber operates in the transportation industry.

---

[1] https://www.politico.com/states/new-york/city-hall/story/2019/03/19/outgoing-taxi-commissioner-distances-herself-one-last-time-from-de-blasio-921933 (last accessed 2020/10/20).

NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(E) - 4

Respectfully Submitted,


By:/s/ Garret S. DeReus_____
            BIZER & DEREUS, LLC
            Attorneys for Plaintiff
            Andrew D. Bizer, Esq. (LA # 30396)
            Admitted *Pro Hac Vice*
            andrew@bizerlaw.com
            Garret S. DeReus, Esq. (LA # 35105)
            Admitted *Pro Hac Vice*
            gdereus@bizerlaw.com
            3319 St. Claude Ave.
            New Orleans, LA 70117
            T: 504-619-9999; F: 504-948-9996


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been delivered to all counsel of record on October 22, 2020, by email.

By:/s/ Garret S. DeReus__
            **Garret S. DeReus**

# EXHIBIT B

**BIZER & DEREUS, LLC**
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

AQUA TERRA AERIS LAW GROUP
William Brock Most
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

PUBLIC JUSTICE, P.C.
Karla Gilbride
Stephanie K. Glaberson
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

*Attorneys for Plaintiffs*

| | |
|---|---|
| SCOTT CRAWFORD and JARVIS JERNIGAN, JR.,<br><br>Plaintiff,<br><br>vs.<br>UBER TECHNOLOGIES, INC. and RAISER, LLC,<br><br>Defendant | Case No.: 3:17-cv-02664-RS<br><br><br>**NOTICE OF SUBPOENA FOR DEPOSITION** |

*AND*

| | |
|---|---|
| STEPHAN NAMISNAK, *ET AL.*, | Case No.: 3:17-cv-06124-RS |
| Plaintiff, | |
| vs. | **NOTICE OF SUBPOENA FOR DEPOSITION** |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | |
| Defendant | |

## NOTICE OF SUBPOENA FOR DEPOSITION

To:    MORGAN, LEWIS & BOCKIUS LLP
Anne Marie Estevez
Stephanie Schuster
Patrick Harvey
Clara Kollm
Kathy H. Gao
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.3000
F: 202.739.3001
Annemarie.estevez@morganlewis.com
Stephanie.schuster@morganlewis.com
Patrick.harvey@morganlewis.com
Clara.kollm@morganlewis.com
Kathy.gao@morganlewis.com

**PLEASE TAKE NOTICE** that plaintiffs, Pursuant to Federal Rule of Civil Procedure 45, intends to serve a subpoena upon the following individual(s) and/or institution(s) listed below, and will have them appear at a deposition at the date and time listed below. The deposition will occur via ZOOM and will be recorded by zoom recording and by stenographic means. A copy of the subpoena will be provided to Defendants prior or concurrent with service of the subpoena.

1)    **Wednesday, November 11, 2020, at 9:00 a.m. EST**

Ms. Meera Joshi
Sam Schwartz Engineering

NOTICE OF SUBPOENA FOR DEPOSITION - 2

322 Eighth Avenue, 5th Floor
New York, NY 10001
p. 212-598-9010


You are invited to attend and participate as you deem appropriate.


Respectfully Submitted,


By:/s/ Garret S. DeReus
      BIZER & DEREUS, LLC
      Attorneys for Plaintiff
      Andrew D. Bizer, Esq. (LA # 30396)
      Admitted *Pro Hac Vice*
      andrew@bizerlaw.com
      Garret S. DeReus, Esq. (LA # 35105)
      Admitted *Pro Hac Vice*
      gdereus@bizerlaw.com
      3319 St. Claude Ave.
      New Orleans, LA 70117
      T: 504-619-9999; F: 504-948-9996


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been delivered to all counsel of record on October 23, 2020, by email.

By:/s/ Garret S. DeReus
      **Garret S. DeReus**

# EXHIBIT C

Page 1

                UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA


****************************************************
SCOTT CRAWFORD and
JARVIS JERNIGAN,
JR.,
      Plaintiff,

VERSUS                  CASE NO: 3:17-cv-02664-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
      Defendants.

                        AND

STEPHAN NAMISNAK,
et al,
      Plaintiff,

VERSUS                  CASE NO: 3:17-cv-06124-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
      Defendants.
****************************************************




              DEPOSITION OF MEERA JOSHI


          TAKEN VIA ZOOM VIDEOCONFERENCE
        ON WEDNESDAY, NOVEMBER 11, 2020
             AT OR ABOUT 8:08 A.M. CST

      AT COURT REPORTERS OF LOUISIANA, LLC
       9522 BROOKLINE AVENUE - SUITE 217
          BATON ROUGE, LOUISIANA 70809


         REPORTED BY:  Janie J. Darby
            Certified Court Reporter
             Certificate No. 85140

**Page 2**

```
 1              A P P E A R A N C E S
 2
    Representing Scott Crawford, Jarvis Jernigan,
 3  Jr., and Stephan Namisnak:
 4       BIZER & DEREUS
           By:  Garret S. DeReus, Esq.
 5         3319 St. Claude Avenue
           New Orleans, Louisiana 70117
 6         Telephone:  (504) 619-9999
           Gdereus@bizerlaw.com
 7
 8       PUBLIC JUSTICE, PC
           By:  Karla Gilbride, Esq.
 9         1620 L Street, NW, Suite 630
           Washington, DC 20036
10         Telephone:  (202) 797-8600
11
    Representing Uber Technologies, Inc.:
12
         MORGAN, LEWIS & BOCKIUS, LLP
13         By:  Stephanie Schuster, Esq.
           and Patrick Harvey, Esq.
14         1111 Pennsylvania Avenue, NW
           Washington, DC 20004
15         Telephone:  (202) 739-3000
           Stephanie.schuster@morganlewis.com
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1               I N D E X
 2                     Page
 3  Caption               1
 4  Appearances           2
 5  Agreement of Counsel  4
 6  Witness' Certificate  80
 7  Reporter's Certificate 82
 8
 9         E X A M I N A T I O N
10
    EXAMINATION BY MR. DEREUS:          5
11
    EXAMINATION BY MS. SCHUSTER:        53
12
13
14         E X H I B I T S
15
    Exhibit 51 - NYC Taxi and Limousine    23
16      Commission Memo
17
    Exhibit 52 - Statement on Revised TLC  29
18      Rules
19  Exhibit 58 - E-Mails              55
20  Exhibit 59 - E-Mails              66
21  Exhibit 61 - Notice of Nonretained  71
        Expert Disclosure
22
23
24
25
```

**Page 4**

```
 1            S T I P U L A T I O N
 2      It is stipulated and agreed by and
 3  between counsel for the parties hereto that
 4  the deposition of the aforementioned witness
 5  is hereby being taken under the Federal Rules
 6  of Civil Procedure, for all purposes, in
 7  accordance with law;
 8      That the formalities of sealing,
 9  certification, and filing are specifically
10  waived;
11      That the formalities of reading and
12  signing are specifically not waived;
13      That all objections are hereby reserved
14  until such time as this deposition, or any
15  part thereof may be used or sought to be used
16  in evidence.
17
18            * * * * *
19
20      Janie J. Darby, Certified Court Reporter,
21  in and for the State of Louisiana, officiated
22  in administering the oath to the witness.
23            * * * * *
24
25
```

**Page 5**

```
 1              MEERA JOSHI,
 2      after first having been duly sworn, was
 3  examined and did testify as follows:
 4  EXAMINATION BY MR. DEREUS:
 5      Q.  Ms. Joshi, can you please go ahead
 6  and start by just stating your name for the
 7  record.
 8      A.  Meera Joshi.
 9      Q.  Okay.  Ms. Joshi, you are here
10  today because Plaintiff --
11      A.  I'm losing you.
12      MS. SCHUSTER:
13      Me too.
14      THE WITNESS:
15      Is he frozen for everybody else?
16      THE COURT REPORTER:
17      Yes, he is frozen.
18      MS. SCHUSTER:
19      Yes.
20  EXAMINATION BY MR. DEREUS:
21      Q.  And as we go if there are any
22  questions --
23      THE COURT REPORTER:
24      Garret.
25      MR. DEREUS:
```

6

1       Yes.
2    THE COURT REPORTER:
3       You froze.
4    MR. DEREUS:
5       Okay.  Can you hear me now?
6    THE WITNESS:
7       The last thing I heard was you are
8    here today.
9    EXAMINATION BY MR. DEREUS:
10      Q.  You are here today as a nonretained
11   expert and so I'm going to take your
12   deposition.  If at any point you need to take
13   a break, feel free to let me know.  The only
14   thing I would ask is that if there is a
15   question on the floor that you answer that
16   question and then we can take a break, okay?
17      A.  Okay.
18      Q.  As we go along if there are any
19   questions that don't make sense or you have
20   difficulty understanding, feel free to ask me
21   to rephrase it and I'll be happy to do so.
22   Fair enough?
23      A.  Yes.
24      Q.  All right.  And is there any reason
25   you couldn't answer my questions truthfully

7

1    today, any use of alcohol, drugs, medication,
2    or anything like that?
3       A.  No.
4       Q.  Okay.
5       A.  I had to think for a minute how you
6    phrased the question.  Sorry.
7       Q.  It's all good.  All right.  Could
8    we start off by you just briefly explaining
9    what is your educational background?
10      A.  My highest degree is a JD from
11   University of Pennsylvania Law School.
12      Q.  Okay.  And when did you graduate
13   from there?
14      A.  I believe 1995.
15      Q.  Okay.  And where did you go before
16   that?
17      A.  University of Pennsylvania for
18   undergraduate.
19      Q.  What kind of degree did you get
20   there?
21      A.  It's a BA in social -- Sociology, I
22   believe, was the major.
23      Q.  And after you got your JD, what did
24   you do after that?  What was your first
25   position out of law school?

8

1       A.  I clerked for the Third Circuit
2    proces, proces court.  I believe it's called
3    the proces office.
4       Have we lost Garret again?
5    MS. SCHUSTER:
6       I think we may have.
7    THE COURT REPORTER:
8       Garret, you're frozen.
9    EXAMINATION BY MR. DEREUS:
10      Q.  Sorry.  I think I froze there.  Was
11   that like a law clerk sort of position?
12      A.  Yes.
13      Q.  Okay.  And I have here your CV.  I
14   found it online actually.  So it looks like
15   you actually worked for a few other positions
16   from 1995 until about 2002 for various law
17   firms and courts; is that right?
18      A.  That's correct.
19      Q.  Okay.  And then it looks like from
20   the CV that I downloaded online that in 2002
21   you started with the New York City,
22   Department of Investigations?
23      A.  That's correct.
24      Q.  Okay.  What is that?
25      A.  The Department of Investigations is

9

1    a city agency that has oversight authority
2    over every New York City agency excluding the
3    police department.
4       Q.  Okay.  And what did you do there?
5    What were your primary roles?
6       A.  I ran an office called the Office
7    of -- the Inspector General's Office for
8    Correctional Services where we had oversight
9    over Department of Corrections, Department of
10   Probations, and at times OEM, Office of
11   Emergency Management and Fire.
12      Q.  Okay.  Did your role relate to
13   transportation in that job?
14      A.  Not directly.  Although, you know,
15   the issues of transporting inmates comes up.
16      Q.  Okay.  Did you do a lot of work,
17   you know, investigating various issues and
18   that sort of thing?
19      A.  It was an investigative position.
20   So we received complaints, allegations of
21   corruption and criminality, and our duty was
22   to investigate them.
23      Q.  Okay.  Great.  And from looking at
24   the CV I've got, it looks like in 2008 to
25   2011 you went to the Civilian Complaint

10

1  Review Board?
2      A.  Correct.
3      Q.  Okay.  And what does that encompass
4  just briefly?
5      A.  The Civilian Complaint Review Board
6  is a mayoral agency.  Actually maybe it's not
7  mayoral.  Non-mayoral agency that
8  investigates certain allegations of police
9  misconduct.  They fall into four categories
10  having to do primarily with stop and frisk,
11  discourtesy, harassment, and some assault.
12      Q.  Wouldn't you agree that's a very
13  research intensive sort of position?
14      A.  It's an investigative position.
15      Q.  Okay.  And then it looks like in
16  2011 that's when you transitioned over to the
17  New York City TLC?
18      A.  Correct.
19      Q.  Okay.  And for the record what does
20  the TLC stand for?
21      A.  The New York City Taxi and
22  Limousine Commission.
23      Q.  Okay.  And what was your first
24  position at the TLC?
25      A.  I was hired as the TLC general

11

1  counsel.
2      Q.  Okay.  So what were your roles and
3  obligations as the general counsel?
4      A.  Your role is to advise the
5  commission as a whole on legal issues, and
6  you also report to the New York City Law
7  Department.  So as general counsel you have
8  two bosses essentially.  One is the agency
9  head that you work for and the second is the
10  head of the Law Department.  So you advise on
11  all legal matters, both proactively and
12  reactively.
13      Q.  And did that involve a lot of
14  transportation issues?
15      A.  All transportation issues.
16      Q.  Okay.  And in that first job were
17  you researching, you know, issues related to
18  taxis and companies such as Uber?
19      A.  You know, the job entails
20  understanding the landscape within which you
21  are either drafting regulation or defending
22  regulation.  So that's a natural consequence
23  of doing that work.
24      Q.  And so you started doing that in
25  2011 and you continued through 2014 as the

12

1  general counsel, right?
2      A.  I left in early 2014 as a small
3  break in my city service about two to three
4  months in January 2014, I believe, until
5  about April 2014 when I left for the -- I
6  worked at NYU running security for NYU's
7  campuses and then came back to TLC as chair
8  in April 2014.
9      Q.  And what were your responsibilities
10  as the chair?
11      A.  You're chair and CEO.  So you're
12  chair of the commission as a whole which
13  decides all decisions that rise to the level
14  of needing a commission approval, that the
15  large majority of those are rules.  You are
16  also CEO.  So you are the chief operating --
17  chief executive officer and you are
18  responsible for day-to-day management of the
19  agency, which is about 600 people with a
20  licensing division, an enforcement division,
21  an inspections division, a legal division,
22  HR, policy, operations, all the sort of
23  normal divisions within a full-service
24  agency.
25      Q.  Okay.  And to get that position as

13

1  chair and CEO, was there like an application
2  process?  I assume you didn't just land it by
3  happenstance, right?
4      A.  You get that position at request of
5  the administration.  So the new
6  administration came in and contacted me and
7  asked me if I was interested in the position.
8      Q.  And did they vet your background
9  before, you know, you went undertook that
10  position?
11      A.  Yes.  You have a -- an
12  administration -- The administration does a
13  background check.  DOI, the investigative arm
14  of the city does a background check.  There
15  is also a city council vetting process.  So
16  before you are appointed you have to go
17  through a hearing with New York City Council.
18  So in addition to the public hearing, the New
19  York City Council does their own background
20  check.
21      Q.  Okay.  While you were at the TLC,
22  did you do any sort of, you know, on-the-job
23  training that equipped you for your role as
24  commissioner?
25      A.  I think every day was on-the-job

14
1  training.
2      Q.  Okay.  What do you mean by that?
3      A.  Every day you are making decisions
4  and assessing the landscape and, you know,
5  determining what the prudent path forward is.
6  It's a large industry in a quick city.  So
7  that's every day.
8      Q.  Okay.  Perfect.  And none of these
9  are trick questions, you know.  I'm just
10  trying to flesh out your background for the
11  record, you know, because the judge doesn't
12  really know who you are.  So we are just
13  trying to lay the framework.
14          While you were at the TLC, did you
15  participate in any seminars or anything like
16  that related to transportation?
17      A.  Many.
18      Q.  Okay.  And why do you say that?
19      A.  Because these are timely topics and
20  New York is a big city.  So people often look
21  to New York to see either what's happening or
22  not happening.  So either members of the TLC
23  are called to join on panels or we, you know,
24  listen in and observe them because they're
25  topical.

15
1      Q.  In your time at TLC, did you
2  participate in any panels or speaking events
3  related to transportation?
4      A.  Often, yes.
5      Q.  How frequently just generally
6  speaking?
7      A.  I'm going off of my memory.  I
8  would say probably once a month we did
9  something or I did something.  It ebbs and
10  flows.
11      Q.  Okay.  And while you were at the
12  TLC, did you conduct any research related to
13  transportation?
14      A.  I don't think I quite understand
15  the question.  Every day you have to research
16  everything before you make a decision.  So if
17  that qualifies as research, yes, every day.
18      Q.  Did you review say, you
19  know, briefings or research memos, etc., that
20  your staff had prepared at various times?
21      A.  Yes.  That's part of
22  decisionmaking.
23      Q.  And would you agree that your time
24  at the TLC primarily related to
25  transportation and transportation-related

16
1  issues?
2      A.  Yes.
3      Q.  Okay.  Do you consider yourself an
4  expert related to transportation and
5  transportational issues?
6      MS. SCHUSTER:
7          Objection, calls for a legal
8  conclusion.
9      THE WITNESS:
10          Yes.
11  EXAMINATION BY MR. DEREUS:
12      Q.  Okay.  And could you just -- Why is
13  that?
14      A.  I have intimate knowledge of a
15  large sector of the industry and how it
16  operates in New York and how it -- and it
17  similarly operates across other large cities
18  and across the world.
19      Q.  Is it fair to say that at your time
20  at the TLC that you set and ensured
21  compliance with the regulatory framework that
22  governs the daily transportation of over a
23  million people?
24      A.  Yes.
25      Q.  Is it fair to say that you helped

17
1  set the regulations for over 130,000 vehicles
2  ranging from taxis to Uber and Lyft vehicles?
3      A.  Yes.
4      Q.  All right.  Your responsibilities
5  at the TLC, how did they relate specifically
6  to how for-hire transportation companies
7  operate in New York?  Can you give us a
8  general understanding of what that framework
9  is like in New York?
10      A.  The charter mandate for the city --
11  the charter mandate for the agency is to set
12  the ground rules for for-hired
13  transportation, which includes in New York
14  City several categories:  Yellow taxi, green
15  taxi, paratransit, Ambulette, luxury limo,
16  black car, and Liberty.  So for-hire vehicles
17  are considered -- they fall -- the two
18  categories, Liberty, black -- actually three,
19  Liberty, black car, and luxury limousine fall
20  under the for-hire vehicle category.
21      Q.  And what do you mean by a for-hire
22  vehicle?  Just break that down.
23      A.  It means that the driver is paid to
24  use a vehicle to transport a passenger from
25  point A to point B.

18

1    Q.   So that wouldn't include, for
2  example, you know, a friend just giving
3  another friend a ride, you know, just
4  casually, right?  That's not within the
5  regulation?
6    A.   No.  What it covers is when you're
7  paid a fee for service.  So there is a fee
8  involved for transportation using a vehicle.
9    Q.   So it sort of covers a commercial
10  enterprise essentially?
11    A.   Yes.
12    Q.   And what about Uber?  Did that
13  company fall under your jurisdiction at the
14  TLC?
15    A.   Several bases in New York City do
16  business under the name Uber, and they fall
17  under delivery category, the black car
18  category, and the luxury limousine category.
19    Q.   Now, when you say several bases,
20  what do you mean by that?
21    A.   All for-hire vehicles need to be
22  affiliated with a base, and their -- the base
23  is the dispatching entity.  It's the entity
24  that's responsible for sending trips to the
25  driver, passenger requests.  And so under the

19

1  New York City regulations, every vehicle is
2  attached to the base, and there is probably
3  about 900 bases in existence in New York
4  City.
5    Q.   So if I'm understanding you
6  correctly, in New York someone can't just
7  fire up an Uber app and start driving.  They
8  have to in some way become associated with
9  one of these bases?
10    MS. SCHUSTER:
11      Objection, leading.
12    THE WITNESS:
13      Can you repeat the question.
14  EXAMINATION BY MR. DEREUS:
15    Q.   Sure.  So I guess I'm trying to
16  understand how these bases work.  I mean is
17  there like one sort of company that's
18  associated with other transportation
19  companies?
20    A.   So in New York City everybody who
21  provides for-hire service has to be licensed
22  by the TLC.  So the driver has to be licensed
23  and they get a TLC driver's license.  The
24  vehicle has to be licensed.  They get a
25  for-hire vehicle license.  And then the

20

1  entity that's sending them trips is called
2  the base, and they also have to be licensed
3  by the TLC and they get a TLC base license.
4    Q.   And did Uber have some of these TLC
5  base licenses?
6    A.   Yes.
7    Q.   How many in -- When you became
8  commissioner and from your time you were
9  commissioner until the time you left,
10  approximately how many did --
11    A.   It varied.  You know, it varied and
12  grew over time.  I can't -- you know, they
13  started with one and probably are up to, you
14  know, 25 now.  I don't have an exact number.
15    Q.   Okay.  And the various vehicles
16  that were actually on the road, they would be
17  associated with those bases?  Is that how it
18  worked?
19    A.   Yes.  But it's a little more
20  complicated because you can send trips to
21  cars that are not affiliated with your base
22  as well.  So the number of cars affiliated
23  with a particular base doesn't necessarily
24  tell you the scope of service that a company
25  can offer.

21

1    Q.   Okay.  And at the TLC how would --
2  Was there a way that y'all could determine
3  the scope of a service being provided by a
4  company such as Uber?
5    A.   Absolutely.  We required the
6  companies to provide us trip records with the
7  vehicle information, the driver information,
8  and the dispatching base information so that
9  we understood the scope of service.
10    Q.   Okay.  When did you first start
11  interacting with anyone working on Uber's
12  behalf?  I mean would that have been when you
13  first started in 2011 or did your interaction
14  with Uber really start when you became
15  commissioner in 2014 or '15, I believe it
16  was?
17    A.   I don't remember the exact year,
18  but it was probably 2012.
19    Q.   And what form would those
20  interactions take?  I mean was it -- Were you
21  interacting with employees of Uber or with
22  the drivers themselves?
23    A.   With the owners, employees, and
24  lawyers for the company.
25    Q.   Okay.  And would you say these were

22
1  frequent interactions or very infrequently
2  that you spoke with folks at Uber?
3       A.  These conversations come and go.
4  So if there is a pressing issue, you speak
5  with someone a lot, and then as the issue
6  dissipates, you may not speak to them for
7  months.
8       Q.  Okay.  When you interacted with
9  Uber, were there instances where Uber held
10  itself out, someone working on behalf of Uber
11  the company, where they held themselves out
12  as a specific type of company --
13       MS. SCHUSTER:
14            Objection to the leading.
15  EXAMINATION BY MR. DEREUS:
16       Q.  -- and they said we are this type
17  of company?
18       MS. SCHUSTER:
19            Objection, leading.
20       THE WITNESS:
21            They were licensed by the TLC as
22       for-hire vehicle providers.  That's the
23       type of company they are in New York
24       City.  They provide for-hire vehicle
25       service.

23
1  EXAMINATION BY MR. DEREUS:
2       Q.  I'm going to show you what I
3  previously marked as Exhibit 51.
4            Are you able to see this?
5       A.  Yes.
6       Q.  Okay.  And if you see here it says
7  NYC Taxi and Limousine Commission, Meera
8  Joshi.  Does this look like a memo that was
9  produced by y'all's office?
10       A.  Yes.
11       Q.  And you see it says Federal Trade
12  Commission Sharing Workshop Project Number
13  P15-1200, and it appears to be a six-page
14  long document.
15            Do you remember this document?
16       A.  I have a memory of us submitting
17  comments, but I haven't looked at this
18  document for probably years.
19       Q.  Okay.  No problem.  I want to
20  scroll down on the first page, kind of the
21  last paragraph.  It bleeds over onto the next
22  page.  You see that this paragraph starts,
23  "Companies that offer peer-to-peer
24  transportation services argue that they are
25  just a matching tool and don't actually

24
1  operate the for-hire service that is
2  solicited and offered via their platforms,
3  thus should not be subject to important
4  regulations that exist governing for-hire
5  service and can operate using drivers and
6  vehicles that are not commercially licensed."
7            Do you see that?
8       A.  Yes.
9       Q.  Okay.  Is that a position that Uber
10  held out to you at your time at the TLC?
11       A.  There were times where they would
12  take this position, yes.
13       Q.  Okay.  And if you could read the
14  remainder of this paragraph, and then let me
15  know and I'll scroll down to the next page.
16  You can read it to yourself.
17       A.  Okay.  I've done that.
18            "This is not to negate true -- "
19            Okay.
20       Q.  First of all, just would you agree
21  these are the positions that the TLC took in
22  its submission to the Federal Trade
23  Commission?
24       A.  Yes.
25       Q.  Okay.  Was it your opinion at the

25
1  time?  Was your opinion concurrent with the
2  opinion of the TLC?
3       A.  Yes.
4       Q.  Okay.  And so you see here it says,
5  "At the TLC, we recognize that this is a
6  fallacy.  These companies set the price for
7  trips, set standards for service, allocate
8  rides according to proprietary algorithms,
9  which may include or exclude certain drivers
10  based on past performance, vet and monitor
11  driver and passenger performance, and even
12  remove participants from the system," right?
13       A.  Right.
14       Q.  Were all of those factors and other
15  information that y'all used to gather to form
16  the opinion that these companies are actually
17  providing for-hire transportation service?
18       MS. SCHUSTER:
19            Objection, leading.
20       THE WITNESS:
21            Yes.  Combined with the very clear
22       and obvious fact that there was
23       transportation being paid for a fee,
24       which is the fundamental tenet of
25       for-hire service.

26

1  EXAMINATION BY MR. DEREUS:
2     Q.  So it's fair to say that was your
3  opinion at the time as the Commissioner of
4  the TLC?
5     A.  Yes.
6     MS. SCHUSTER:
7        Objection, leading.
8  EXAMINATION BY MR. DEREUS:
9     Q.  Did you ever convey this to the
10  folks working at Uber?
11     A.  Either myself or my staff in
12  conversations.  If this position -- if a
13  position opposite of this was raised, we
14  would clearly convey our position.
15     Q.  All right.  And in forming this
16  opinion that is outlined in this letter, I
17  mean what -- I know it's been many years, but
18  what went into that?  I mean was there
19  research that was being done at the TLC or
20  anything like that?  I mean how did that
21  process work?
22     A.  It was a review of our
23  responsibilities as a regulator.  So when
24  anyone, any business is providing
25  transportation for a fee, regardless of

27

1  whether that's happening through an app or a
2  hail on the street or a telephone or walking
3  into your local car service, there's
4  responsibilities we as the regulator have to
5  the riding public and to the driver who's
6  providing that work.  And so when that
7  business model is before us, we have to
8  regulate it.  We have to make sure that those
9  standards are met.
10     Q.  Just to clarify, when it says these
11  companies, would Uber be one of those
12  companies?
13     MS. SCHUSTER:
14        Objection, leading.
15     THE WITNESS:
16        Yes.
17  EXAMINATION BY MR. DEREUS:
18     Q.  Okay.  And was that your opinion at
19  the time this document was written?
20     A.  Yes.
21     MS. SCHUSTER:
22        Objection, leading.
23     THE WITNESS:
24        And it was, in fact, true because
25  Uber was a licensed and still is a

28

1        licensed for-hire vehicle provider in
2        New York City demonstrating that they
3        are paying -- you know, passengers are
4        paying a fee for service and are subject
5        to all the regulations attendant with
6        that.
7  EXAMINATION BY MR. DEREUS:
8     Q.  And I think you mentioned before
9  that y'all had about 600 employees; is that
10  right?
11     A.  Yes.  I don't know with budget cuts
12  if that's less now, but yes.
13     Q.  But I guess what I'm getting at is
14  that this opinion here, it wasn't just some
15  sort of slapdash opinion, right?  I mean
16  there were folks that were researching this
17  and investigating before this memorandum was
18  drafted, right?
19     MS. SCHUSTER:
20        Objection, leading.
21     THE WITNESS:
22        Yes.  This is based on expertise
23        and practical knowledge and experience.
24  EXAMINATION BY MR. DEREUS:
25     Q.  I want to show you what I've

29

1  previously marked as Exhibit 52.  This is a
2  document titled "Statement on Revised TLC
3  Rules.  You see on the top left-hand corner
4  it says June 18th, 2015.  If you could just
5  read this to yourself and let me know when
6  you have had an opportunity to read it.
7     A.  Okay.
8     Q.  Who is -- To the extent you
9  remember, who was Josh Mohrer?
10     A.  Josh Mohrer was the general manager
11  for Uber New York City.
12     Q.  Okay.  Did you interact with him
13  frequently?
14     A.  When he had that position, yes.
15     Q.  And do you remember when he had the
16  position approximately?  I mean certainly in
17  2015.  Do you remember otherwise?
18     A.  He may have been in it from 2013
19  and then he left -- I apologize.  I don't
20  remember the year.  But I'm sure by 2016 he
21  was no longer there or I'm guessing by 2016
22  he was no longer there.
23     Q.  No problem.  And this is not a
24  memory competition.  If you don't remember,
25  you don't remember is perfectly fine.

30
1        But have you seen this statement
2    before today's deposition?
3        A.  I may have seen it around the time
4    it was issued.  I don't recall.
5        Q.  Okay.  Are you able to provide us
6    any insight as to what Mr. Mohrer was
7    referencing here?
8        A.  If my recollection is correct, we
9    proposed a series of rules to increase
10   consumer protections around what the
11   consuming-facing app for companies like Uber
12   and Lyft and Via and any other ones operating
13   in that space would be required to disclose
14   for customers, and like with any rule making,
15   there is a process.  The rules are proposed.
16   There is written comment.  There is public
17   testimony.  There is a hearing.  And then
18   there may be revisions to the rules and then
19   there is a final vote.  So I believe this is
20   in response to that process.
21       Q.  And you see he says, "We thank
22   Mayor Bill de Blasio and Commissioner Meera
23   Joshi for making this a collaborative
24   process."  Do you know what he is referencing
25   there?

31
1        A.  He is probably referencing the rule
2    making process where we take in public
3    comment, written and verbal, and to the
4    extent we think it's relevant, we incorporate
5    it into ruling it.
6        Q.  Was Mr. Mohrer regularly
7    interacting with you on Uber's behalf?  I
8    mean were they advocating for various
9    positions, things like that?
10       A.  Yes.
11       Q.  Is it fair to say that they were
12   actively involved with the process?
13       A.  Yes.
14       Q.  Okay.  Do you know -- and if you
15   don't know, that's perfectly fine.  Do you
16   know how many employees Uber had in New York
17   at that time?
18       A.  I don't know.
19       Q.  Did you ever have any conversations
20   with Mr. Mohrer about whether to expand the
21   availability of something called UberWAV?
22       A.  I don't recall.  I may have.
23       Q.  Okay.  And when I say UberWAV, I
24   mean a wheelchair accessible -- wheelchair
25   accessible vehicle.  Does that make sense?

32
1        A.  Yes.
2        Q.  Okay.  When you were Commissioner
3    of the TLC, were there any steps that you
4    took to try to -- Well, first of all, let's
5    back up.  When you started as commissioner,
6    was there an UberWAV offering in New York?
7        A.  I don't recall on their app whether
8    they had that offering.
9        Q.  And while you were the
10   commissioner, did you seek to expand the
11   provision of UberWAV service?
12       A.  So as commissioner my focus is on
13   the industry as a whole, not a particular
14   company.  And there was industry lack of
15   wheelchair accessible vehicles in the
16   for-hire vehicle sector.  Companies like Uber
17   had a large half and still have a large
18   market presence in that sector.
19       Q.  And so did you seek to expand the
20   provision of wheelchair accessible vehicle
21   service for, you know, companies such as Uber
22   or Lyft, etc.?
23       A.  Yes.  To understand the landscape
24   and then take corrective action where it
25   needed to be taken.

33
1        Q.  Okay.  And when you first started,
2    what did you understand the landscape to be?
3        A.  Our understanding, and also I
4    believe looking at TLC vehicle records, was
5    that there were very few wheelchair
6    accessible vehicles in the entire for-hire
7    vehicle fleet.
8        Q.  And what steps did you take to
9    correct that issue?
10       A.  So let me clarify.  For wheelchair
11   accessible vehicles, under the TLC definition
12   that is vehicles that can accommodate a
13   motorized wheelchair.  So that a vehicle can
14   accommodate a foldable wheelchair does not
15   mean it meets the requirements of a
16   wheelchair accessible vehicle because many
17   users of wheelchairs use motorized
18   wheelchairs.  They don't use foldable.  Some
19   use foldable, but there is a large portion
20   that don't.
21          So one understanding from review of
22   our own vehicle records what the number was
23   and my recollection -- it could be wrong --
24   it was very, very low.  Probably around 70
25   vehicles.  And then we also wanted to

MEERA JOSHI

34

1  understand that even though there may be a
2  low number of vehicles were requests for
3  service being responded to.
4        So I believe, and I can't recall
5  the year, we did an initiative where we
6  contacted every base.  I think there's about
7  between 850 -- around 850 bases, to find out
8  whether they could be respond to a request
9  for wheelchair accessible service and
10 probably upwards of 95 percent of them could
11 not.
12    **Q.   And what did you do with that
13 information once you learned that 95 percent
14 or so approximately could not respond to
15 service?**
16    A.   Then we understood as our -- as the
17 TLC's mandate, as part of our mandate that we
18 would have to take corrective action to
19 ensure that people who used motorized
20 wheelchairs in New York City could avail
21 themselves of for-hire vehicle service.
22    **Q.   And what sort of actions did you
23 take?**
24    A.   Ultimately, we passed a rule
25 requiring all for-hire vehicle providers to

35

1  provide wheelchair accessible service in
2  accordance with service standards set forth
3  in the rule, which are somewhat detailed, not
4  too detailed, but I can go into them if
5  that's what you are interested in.
6    **Q.   Can you just give me the general
7  summary of what those rules were?**
8    A.   Sure.  So under the rules, every
9  wheelchair -- every for-hire vehicle base has
10 to meet one of two sets of standards in order
11 to meet -- to provide wheelchair accessible
12 service in accordance with TLC rules.
13       One is called the trip mandate, and
14 over the course of, I believe, four years
15 they have to gradually increase the number of
16 trips that they dispatch using a wheelchair
17 accessible vehicle till they reach the point
18 where 25 percent of their trips are
19 dispatched in a wheelchair accessible vehicle
20 or they can meet what's called the trip
21 mandate and that -- I'm sorry, the dispatch
22 mandate and that instead of a percentage of
23 trips being provided in a wheelchair
24 accessible vehicle requires that companies
25 meet specified response times that over the

36

1  years get increasingly shorter.  The ultimate
2  goal is to provide equivalent service.
3        So someone who is requesting, say,
4  Uber or Lyft and doesn't need a wheelchair is
5  able to get it -- the response time and rates
6  for that passenger are the same as someone
7  who is requesting a wheelchair accessible
8  vehicle.
9    **Q.   All right.  And so if I'm
10 understanding correctly, there are
11 essentially two paths. There is make a
12 certain percentage accessible or go down this
13 accelerating response time path?**
14    A.   Yes.
15    **Q.   Okay.  I've looked up some stuff
16 online.  Was there initially -- Is that what
17 y'all initially passed or was there
18 originally a 25 percent mandate that resulted
19 in some sort of lawsuit?**
20    MS. SCHUSTER:
21       Objection, leading.
22    THE WITNESS:
23       So originally the rule was passed
24    alongside -- the rule was passed with a
25    25 percent trip mandate along with a

37

1  simultaneous pilot, which allowed
2  companies to opt out of the trip mandate
3  and instead join a pilot from which they
4  could reach -- They would be considered
5  in compliance with the wheelchair
6  accessible requirements of the TLC by
7  participating in a pilot where they
8  would be judged on their ability to
9  respond to requests according to a
10 framework of response times that got
11 increasing shorter as years went by.
12       There was a lawsuit filed by the --
13 I'm using app companies to say it was
14 Uber, Lyft, may have been Via as well as
15 some other traditional black car company
16 challenging that rule.  In essence, they
17 wanted the pilot to be memorialized as
18 part of the rule so that it became I
19 think -- I think their understanding was
20 that it would be then harder to change
21 because there are more administrative
22 processes to changing a rule versus
23 changing a pilot.
24    MR. DEREUS:
25       Hold on one second.

MEERA JOSHI

11/11/2020
Pages  38 to 41

38

1      (DISCUSSION HELD OFF THE RECORD.)
2   EXAMINATION BY MR. DEREUS:
3      **Q.   All right.  So this lawsuit is**
4   **filed.  What was the lawsuit about just**
5   **generally?**
6      A.   I don't remember the specific legal
7   claims.  I do remember that the goal of the
8   lawsuit was to convert the pilot part of the
9   rule into a permanent rule.
10     **Q.   Okay.  Were the companies that were**
11  **suing trying to stop the WAV mandate from**
12  **going into place or do you not recall?**
13     A.   They wanted the -- They did not
14  want the WAV mandate to go ahead in the form
15  that it was passed.  They -- You know what?
16  I would have to look at the actual claim.  I
17  know their concern was that the pilot did not
18  have as many procedural steps to change -- to
19  be amended and they sought that it be
20  memorialized as a permanent rule.
21     **Q.   Gotcha.  And to the best of your**
22  **ability to recall, I mean what happened in**
23  **response to that?  Was there ultimately some**
24  **sort of resolution or agreement that was**
25  **reached?**

39

1      A.   There was a settlement, an ironic
2   settlement because I think the TLC made out
3   better in the settlement, which isn't usually
4   the case.  There was a settlement and the
5   agreement was that the pilot would be
6   converted into part of the permanent rule as
7   well as the companies would have to provide
8   the TLC with response time information not
9   only for wheelchair accessible trips, but for
10  standard non-wheelchair accessible trip
11  requests too, so that the TLC could monitor
12  the delta between the two response time
13  groups.  And I believe that the requirement
14  to provide service was extended for an
15  additional year, and there were -- the
16  response time requirements were also made
17  more stringent.
18     **Q.   Okay.  So under this settlement**
19  **were the companies that were suing, were they**
20  **obligated to provide WAV service?**
21     A.   Yes.
22     MS. SCHUSTER:
23        Objection.
24  EXAMINATION BY MR. DEREUS:
25     **Q.   Okay.  Why do you say that?**

40

1      A.   Because that's what the rule --
2   Yes.  Because there was a rule passed that
3   said you must provide WAV service.  They
4   settled and agreed to withdraw a lawsuit
5   challenging that rule in exchange for a
6   proposed rule that I believe the draft -- we
7   did the drafting as part of the settlement --
8   would not only require them to provide
9   wheelchair accessible service, but it also
10  had additional service requirements making a
11  higher level of service, a higher level of
12  transparency and adding another year of their
13  obligation to provide service.
14     **Q.   Was Uber one of the companies that**
15  **was at the table for these negotiations?**
16     A.   Yes.
17     **Q.   And do you recall if they were part**
18  **of this, you know, sort of resolution at that**
19  **time?**
20     A.   Yes.
21     **Q.   Okay.  When did that occur?  Do you**
22  **recall?**
23     A.   It occurred probably late 2017,
24  early 2018.
25     **Q.   So that was when you were still at**

41

1   the commission?
2      A.   Yes.
3      **Q.   Okay.  Did you at your time at the**
4   **commission ever identify any information that**
5   **would suggest that it would be technically**
6   **infeasible for Uber or companies like Uber to**
7   **provide WAV service?**
8      MS. SCHUSTER:
9         Objection, leading.
10     THE WITNESS:
11        No.
12  EXAMINATION BY MR. DEREUS:
13     **Q.   Why do you say that?**
14     A.   There was nothing that was ever
15  presented to me or that I ever found on my
16  own that would suggest they were incapable of
17  providing this service.
18     **Q.   Was there anything that y'all's**
19  **office with 600 approximate employees found**
20  **suggesting it was infeasible?**
21     MS. SCHUSTER:
22        Objection, leading.
23  EXAMINATION BY MR. DEREUS:
24     **Q.   Sorry.  I didn't hear that.**
25     A.   Could you repeat the question.  I

MEERA JOSHI

42

1  didn't hear the end of it.
2      **Q.   Sure.  Was there anything that**
3  **y'all's -- the TLC with its approximate 600**
4  **employees ever found suggesting that it would**
5  **be technically infeasible for companies such**
6  **as Uber and Lyft to provide WAV service?**
7      MS. SCHUSTER:
8          Objection, leading.
9      THE WITNESS:
10         No.
11  EXAMINATION BY MR. DEREUS:
12     **Q.   Under your tenure as commissioner,**
13  **was New York the first city in the nation to**
14  **mandate the reporting of trip data from large**
15  **companies such as Uber and Lyft?**
16     A.   Yes.  Chicago also required it
17  around the same time, but different data
18  points.
19     **Q.   And what was the purpose of getting**
20  **that data from those companies?**
21     A.   Accountability.
22     **Q.   What do you mean by that?**
23     A.   As we talked about earlier, they
24  dispatched trips to multiple -- To cars
25  affiliated with many bases, not just their

43

1  own.  So in order to understand who was
2  ultimately responsible for a trip, you needed
3  trip data identifying the dispatching base,
4  the vehicle, and the driver.
5      **Q.   And by getting trip data on**
6  **vehicles, was the TLC able to monitor the**
7  **performance of companies such as Uber and**
8  **impose penalties or other consequences when,**
9  **you know, they didn't comply with the**
10  **requirements?**
11     A.   Yes.
12     MS. SCHUSTER:
13         Objection, leading, compound.
14         Ms. Joshi, if you would just give
15     me a moment to state my objection just
16     so I'm not talking over you, but that
17     way I can preserve it for the record.
18     THE WITNESS:
19         Sure.  Would you like to repeat it
20     and I'll --
21     MS. SCHUSTER:
22         Sure.  Thank you.
23     THE WITNESS:
24         -- then answer.
25     MS. SCHUSTER:

44

1          Thank you.
2          Objection, leading, compound.
3          Thank you.
4      THE WITNESS:
5          Yes.
6  EXAMINATION BY MR. DEREUS:
7      **Q.   Ms. Joshi, do you recall if there**
8  **were any instances where Uber told the**
9  **commission that it would not be feasible to**
10  **expand the provision of WAV service?**
11     MS. SCHUSTER:
12         Objection, leading.
13     THE WITNESS:
14         I can't recall specifically, but I
15     do have a general recollection that they
16     opposed the expansion of WAV service.
17  EXAMINATION BY MR. DEREUS:
18     **Q.   But would you agree ultimately they**
19  **did agree to expand WAV service, them and**
20  **other companies, through the settlement,**
21  **right?**
22     A.   They were required to in order to
23  operate in New York City.
24     **Q.   Okay.  And between the time that**
25  **they agreed to that requirement and by the**

45

1  time that you left, to your knowledge were
2  **they in compliance with that requirement?**
3      A.   Yes.  I think they increased the --
4  I don't have the specific numbers, but my
5  recollection is that they were actively
6  increasing the number of accessible vehicles
7  that they brought on and actively increasing
8  the number of trips that they were providing
9  to people that used wheelchairs.
10     **Q.   When you were Commissioner of the**
11  **TLC, what opinions did you reach as to what**
12  **type of business companies such as Uber and**
13  **Lyft were operating?**
14     MS. SCHUSTER:
15         Objection, calls for a legal
16     conclusion.
17     THE WITNESS:
18         They're operating for-hire vehicle
19     transportation.
20  EXAMINATION BY MR. DEREUS:
21     **Q.   When you were at the TLC, did you**
22  **reach any opinion as to whether Uber was**
23  **primarily engaged in the business of**
24  **transporting people?**
25     MS. SCHUSTER:

46

1        Objection, calls for a legal
2    conclusion.
3    THE WITNESS:
4        I regarded Uber as in the business
5    of transporting people for hire and
6    regulated them in accordance with that
7    opinion.
8    EXAMINATION BY MR. DEREUS:
9        Q.  Okay.  And was the reason for that
10   conclusion what we discussed earlier today at
11   this deposition or were there other reasons?
12       A.  Yes, the reasons that we discussed.
13       Q.  When you were at the TLC, what
14   opinion did you reach, if any, as to whether
15   Uber was providing adequate service to
16   individuals with mobility-related
17   disabilities prior to the settlement?
18   MS. SCHUSTER:
19       Objection, calls for a legal
20   conclusion.
21   THE WITNESS:
22       They were not providing adequate
23   service to people who use wheelchairs
24   and need wheelchair accessible vehicles
25   for transportation.

47

1    EXAMINATION BY MR. DEREUS:
2        Q.  Okay.  And was that based on that
3    trip data and other information that y'all's
4    office was able to gather?
5        A.  It was based on -- and this is a
6    non-exhaustive list.  It was based on our
7    understanding of the vehicles being used that
8    they dispatched for passengers.  It was based
9    on information from those seeking wheelchair
10   accessible trips from Uber and unable to
11   access them.  It was based on hours of public
12   testimony surrounding the rules.  It was
13   based on customer complaints.  It was based
14   on the -- the sort of cold calling we did to
15   bases to see if they could provide it.  So it
16   was, you know, cumulative based on
17   information from multiple sources.
18       Q.  Okay.
19       A.  I would say there was no debate.
20       Q.  When you were at the TLC, what
21   opinion did you reach, if any, as to whether
22   Uber could provide a better service for
23   individuals with mobility-related
24   disabilities?
25   MS. SCHUSTER:

48

1        Objection, calls for a legal
2    conclusion, vague.
3    THE WITNESS:
4        I was of the opinion that they
5    could provide that service for people
6    who needed wheelchair accessible
7    vehicles.  They had a history of -- not
8    just Uber, but Lyft as well and Via of
9    providing customized service for other
10   needs, car seats, high-end vehicles,
11   shared rides, and they're clearly
12   sophisticated and had the means to
13   provide wheelchair accessible service as
14   well.
15   EXAMINATION BY MR. DEREUS:
16       Q.  And we generally discussed this,
17   but when you were at the TLC, did Uber ever
18   provide you with any conclusive evidence that
19   providing wheelchair accessible service was
20   infeasible?
21   MS. SCHUSTER:
22       Objection, leading.
23   THE WITNESS:
24       I don't believe so.  They may have
25   taken that position, but I never saw,

49

1    you know -- It's an odd position to
2    take.  It's an obligation under the ADA
3    to provide accessible service.  You are
4    licensed by a regulatory agency that
5    requires you to provide it.  So to do
6    business in public -- in the for-hire
7    vehicle space, you must provide
8    accessible service.
9    EXAMINATION BY MR. DEREUS:
10       Q.  Would you agree that Uber's
11   expansion of WAV service was a result of the
12   -- ultimately a result of that settlement or
13   the regulation and then attendant settlement
14   that followed?
15       A.  It was a result of TLC rulemaking,
16   yes.
17       Q.  Okay.  Ms. Joshi, prior to this
18   deposition, have you received any
19   compensation from Plaintiffs?
20       A.  Plaintiffs?  Sorry.  That would be
21   you?
22       Q.  Myself.
23       A.  Okay.  No.
24       Q.  Okay.  And other than your normal
25   hourly rate for appearing at this deposition,

MEERA JOSHI

11/11/2020
Pages  50 to 53

50

1   are you anticipating any other compensation?
2       A.   No.
3       Q.   Okay.  The opinions that you
4   expressed earlier, are those a result of your
5   past interactions and experiences of the TLC?
6       A.   Yes.
7       Q.   Okay.  Are they a result of any --
8   Are any of those opinions a result of any
9   documents I provided to you or any
10  conversations that we have had?
11      A.   No.
12      Q.   Is it fair to say that the opinions
13  you expressed today at this deposition are
14  the opinions that you have formed as a result
15  of your education, background, and your
16  experience and work at the TLC?
17      MS. SCHUSTER:
18         Objection, leading.
19      THE WITNESS:
20         Yes.
21         I apologize.  Would you like to
22  repeat the objection?
23      MS. SCHUSTER:
24         Objection, leading.
25         Thank you.

51

1       THE WITNESS:
2          Yes.
3       MR. DEREUS:
4          Okay.  If I could just take a
5       moment and confer with my co-counsel,
6       I'm almost done.
7          (At this time a recess was taken.)
8       MR. DEREUS:
9          I have actually one more question.
10         Before that, Karla, if you could
11      just -- Karla came in late, my
12      co-counsel.  If you could just make an
13      appearance for the record.
14      MS. GILBRIDE:
15         Sure.  I'm Karla Gilbride with
16      Public Justice and I'm also representing
17      the Plaintiffs.
18      MR. DEREUS:
19         Okay.
20      MS. GILBRIDE:
21         Do you need more or is that
22      sufficient?
23      MR. DEREUS:
24         I think that's fine.
25      EXAMINATION BY MR. DEREUS:

52

1       Q.   One last question, Ms. Joshi,
2   before I tender you as a witness.  Based on
3   your time at the TLC after Uber entered into
4   the settlement, was it your experience that
5   Uber was able to meet its obligations under
6   the settlement to provide wheelchair
7   accessible service in New York --
8       MS. SCHUSTER:
9          Objection, leading.
10      EXAMINATION BY MR. DEREUS:
11      Q.   -- under those terms?
12      MS. SCHUSTER:
13         Apologies.  Objection, leading.
14      THE WITNESS:
15         And I think even exceed some of the
16      response times.  So they -- my
17      understanding is they performed very
18      well under the new requirement.
19      MR. DEREUS:
20         Okay.  Great.  Thank you so much
21      for being here.  I'm going to tender you
22      as a witness.
23         It's 9:20.  I'll note that,
24      Stephanie, it's Plaintiffs' position
25      that if Uber chooses to ask questions

53

1   that any -- Uber will be responsible for
2   any expert time associated after 9:20
3   p.m. -- or a.m.
4       MS. SCHUSTER:
5          For the witness you've called?
6       MR. DEREUS:
7          Yes.  If you choose to ask
8       questions.
9       MS. SCHUSTER:
10         Okay.  Well, I object and disagree
11      for the record, and we can have that out
12      afterwards.
13      MR. DEREUS:
14         Fine.
15      MS. SCHUSTER:
16         But our position is that this is
17      your witness.  You called the witness.
18      Your obligation.
19      EXAMINATION BY MS. SCHUSTER:
20      Q.   Okay.  Ms. Joshi, I will have not
21  too many questions for you.  We will start
22  with this case.  Actually it's two cases.  Do
23  you have a general understanding of what
24  these two lawsuits are about?
25      A.   Very general understanding that

54

1  they relate to the ability -- or I guess two
2  things.  Whether they are providing --
3  Whether Uber is providing accessible services
4  in the relevant jurisdictions and their
5  ability to provide accessible service in the
6  relevant jurisdictions.
7      Q.  And have you reviewed any documents
8  relating to this case whether filed in or
9  about this case?
10     A.  No.
11     Q.  Do you know who the Plaintiffs in
12  these cases are?
13     A.  I don't know who the Plaintiffs
14  are.
15     Q.  And you know that Mr. DeReus who
16  was questioning you previously represents the
17  Plaintiffs in these cases?
18     A.  Yes, I do.
19     Q.  And you've spoken with Mr. DeReus
20  before today; is that right?
21     A.  Yes.
22     Q.  Have you spoken with any other
23  attorneys that is represent Plaintiffs before
24  today?
25     A.  No.

55

1      Q.  And Mr. DeReus reached out to you
2  about potentially obtaining your testimony
3  for these cases, correct?
4      A.  Correct.
5      Q.  Okay.  I'm going to show you a
6  document I believe we have marked, let's see,
7  as Exhibit 58.
8      MS. SCHUSTER:
9          Pat, are you able to pull that up.
10         Thank you.
11  EXAMINATION BY MS. SCHUSTER:
12     Q.  Okay.  The document I'm showing you
13  -- Can you see it all right?
14     A.  Yes.  Can you -- or I'll lean in.
15  "Have you time next week?  I'm available to
16  discuss."  Yes.
17     Q.  Okay.  So this is the document that
18  was produced to the Defendants in this case
19  starting with the Bates Number
20  P_Crawford_Namisnak 002075.  Do you recognize
21  this document?
22     A.  I recognize the Sam Schwartz logo.
23  So I assume it is an e-mail chain, but I'm
24  looking at excerpts of the document.
25     Q.  Okay.  Why don't we just take a

56

1  minute to review and then you can tell me if
2  you recognize it.
3      A.  Sure.
4      Q.  And we can scroll down at your
5  request.
6      A.  Yes.  That's what I was going to
7  ask.  Do you mind scrolling down a bit.
8          Okay.  Is there more to it?
9          Okay.
10         Okay.  Could you scroll down a bit.
11         Could you scroll down.
12         Could you scroll down.
13         Okay.  Could you -- Let me see.
14         Okay.  Could you scroll down.
15         Could you scroll up again.  I think
16  I missed a little bit of it.
17         Could you scroll down, please.
18  Yes.  Stop there.  Could you scroll up.
19  Thank you.
20         Can you scroll down, please.
21     Q.  I believe that's the end.
22     A.  Okay.  Yes, I recognize this.
23     Q.  Okay.  And what is it?
24     A.  It is e-mail correspondence between
25  me and Plaintiffs' attorneys about scheduling

57

1  a time to speak.
2      MS. SCHUSTER:
3          And then, Pat, if you can just
4      scroll up a bit so we can see the
5      beginning of this e-mail.
6  EXAMINATION BY MR. DEREUS:
7      Q.  It looks like on August 7, 2020,
8  Mr. DeReus e-mailed to you explaining he was
9  searching for an expert who can opine on
10  whether it would be feasible for Uber to add
11  wheelchair accessible vehicles to its fleet;
12  is that right?
13     A.  That's correct.  I mean I have to
14  reread.  Let's see.  "We are searching for an
15  expert who can opine on whether it would be
16  feasible for Uber to add wheelchair
17  accessible vehicles to its fleets -- to its
18  fleet."
19     Q.  That's what the document says.
20  Okay.  And then on August 8 you responded
21  that you were available to speak with Mr.
22  DeReus?
23     A.  I respond on August 8, "Yes, I'm
24  available and knowledgeable about how it can
25  be done."  I can continue to read or you can

MEERA JOSHI

---

58

1  let the record reflect what it says.
2      Q.  That's fine.  And then on Monday,
3  August 10th.
4      MS. SCHUSTER:
5          Patrick, if you can scroll up.
6  EXAMINATION BY MS. SCHUSTER:
7      Q.  So you told Mr. DeReus you were
8  available for a call, let's see, the
9  following Wednesday.  So that would have been
10  August 13th, correct?
11      A.  The e-mail reads Wednesday at 9:30
12  EST works for me.  I have asked my colleague
13  Francine who can assist with scheduling if
14  you need.
15      Q.  Okay.  So it's correct you told Mr.
16  DeReus you were available for a call on
17  August 13?
18      A.  I don't have the calendar in front
19  of me.  Yes, what I wrote in the e-mail is
20  correct.
21      Q.  Okay.  I will represent to you that
22  the Wednesday following Monday, August 10,
23  was August 13th or 12th.  It could have been
24  12th.  Did that follow-up conversation occur?
25      A.  I assume so.

---

59

1      Q.  Do you have a recollection of it?
2      A.  I do have a recollection of
3  speaking to Plaintiffs' counsel, yes.  So I
4  assume that that conversation happened, but I
5  can't say for sure.
6      Q.  All right.  How many times have you
7  spoken with Plaintiffs' counsel over the
8  phone?
9      A.  I would say based on this I've
10  probably spoken to Plaintiffs' counsel twice.
11      Q.  Okay.  And is that based on your
12  recollection or just the document?
13      A.  That's based on my recollection.
14      Q.  Okay.  And do you recall when the
15  first conversation was?
16      A.  I would assume based on this
17  document the first conversation was in and
18  around the times -- the dates referenced in
19  the document.
20      Q.  And do you have a recollection of
21  that call?
22      A.  I do have a vague recollection of
23  that call, yes.
24      Q.  Who was on the call?
25      A.  I believe it would be myself and

---

60

1  Plaintiffs' counsel.  There may have been
2  others, but I don't recall.
3      Q.  By Plaintiffs' counsel, you mean
4  Mr. DeReus?
5      A.  Yes.
6      Q.  How long did the call last?
7      A.  I don't recall it being lengthy at
8  all.
9      Q.  Maybe ten minutes?
10      A.  I don't know.  I mean it was months
11  ago now.
12      Q.  Is it less than 15 minutes?
13      MR. DEREUS:
14          Objection, calls for speculation.
15      THE WITNESS:
16          I couldn't say.  I don't remember
17  it being a long call.
18  EXAMINATION BY MS. SCHUSTER:
19      Q.  Okay.  Do you recall what you
20  discussed?
21      A.  To the best of my recollection, he
22  gave me some specifics, gave me like the gist
23  of the complaint, and I think that was it.  I
24  mean we may have discussed -- I'm sure we may
25  have discussed other things.  I can't recall

---

61

1  now.  But I do recall him giving me the gist
2  of the complaint.
3      Q.  What do you mean when you say he
4  gave you the gist of the complaint?
5      A.  What the primary allegations in the
6  complaint that he was representing Plaintiffs
7  in was.
8      Q.  Did you discuss potentially giving
9  testimony in this case?
10      A.  He did call and ask about giving
11  testimony, yes.  So, yes, we did.
12      Q.  Did you discuss the nature of the
13  testimony you would give in this case?
14      A.  I believe he was looking for
15  opinions on the feasibility of companies like
16  Uber to provide accessible service.  That was
17  the nature of the testimony he was looking
18  for.
19      Q.  And did you request any further
20  information from Plaintiffs' counsel either
21  before or during that call?
22      A.  Not that I recall.  I may have
23  asked to see the complaint, but that's the
24  most I can recall.
25      Q.  Do you recall reviewing the

---

62

1  complaint?
2      A.  I don't.  I apologize.  I may have.
3  I may not have.  But, you know, it's been
4  busy.
5      Q.  Do you know whether it was provided
6  to you?
7      A.  I don't know.  I can't recall.
8      Q.  When was the second discussion you
9  had about this case?
10     A.  Prior to this deposition?
11     Q.  Yes.
12     A.  Yes.  Within like a week or so of
13  this deposition.
14     Q.  Okay.  And who was on that call?
15     A.  I believe it was just myself and
16  Plaintiffs' counsel.
17     Q.  Mr. DeReus?
18     A.  Yes.
19     Q.  Do you recall how long that call
20  lasted?
21     A.  It was a brief call.  Maybe 15, 20
22  minutes.
23     Q.  And what did you discuss?
24     A.  He explained what a nonretained
25  expert witness is.  And then I know he

63

1  requested something about service, accepting
2  electronic service, I think, and then
3  logistics, you know, scheduling.
4      Q.  What did he explain about
5  nonretained expert witnesses?
6      A.  That I would basically, you
7  know, testify about what I know on the
8  subject.
9      Q.  Okay.  And other than those two
10  phone calls, you've had no further
11  communications with Mr. DeReus via telephone?
12     A.  I don't believe so.
13     Q.  Okay.  If you had reviewed any
14  documents relevant to this case, would you
15  have records of that?
16     A.  I can't under -- Could you repeat
17  the question.
18     Q.  You said earlier that you don't
19  recall whether you reviewed the complaint,
20  correct?
21     A.  Right.
22     Q.  If you had reviewed it, would there
23  be a record of that somewhere?
24     A.  If I had reviewed it and I had
25  gotten it from Plaintiffs' counsel, I assume

64

1  it may have been an e-mail referencing that,
2  but again I don't know that I reviewed the
3  complaint.
4      Q.  Did you do any independent research
5  about this litigation?
6      A.  No, not that I recall.
7  MS. SCHUSTER:
8      Okay.  Pat, can you scroll up to
9  2076.
10  EXAMINATION BY MS. SCHUSTER:
11     Q.  Okay.  Ms. Joshi, here shown on the
12  screen and this is on page Bates stamp ending
13  2076.  It appears to be an August 25, 2020,
14  e-mail from you to Mr. DeReus.  Do you see
15  that?
16     A.  Yes.
17     Q.  And you say, "Hope all is well.
18  Just checking in and confirming that you had
19  a chance to speak to Jeremiah."  Is that
20  right?
21     A.  Correct.
22     Q.  Who is Jeremiah?
23     A.  Jeremiah is an attorney who has
24  retained me to provide expert testimony and
25  reports in a litigation relating to pay of

65

1  Papa John's drivers.
2      Q.  And why did you want Mr. DeReus to
3  speak with Jeremiah?
4      A.  I believe that Mr. DeReus mentioned
5  something about Jeremiah on the phone and
6  that he was going to speak to him.  I can't
7  recall the relationship or the reason that
8  Jeremiah's name came up or even if I'm the
9  one who raised it.  But I know that when --
10  that this e-mail, you know, as it indicates
11  there was an open question of him connecting
12  with Jeremiah before us speaking again.
13     Q.  And what is Jeremiah's last name?
14     A.  Frei, F-r-e-i, Pierson, I believe.
15  There's a hyphen there.
16     Q.  Do you know what law firm Jeremiah
17  is with?
18     A.  Not offhand.  It's probably his
19  last name.
20     Q.  Okay.  And you referenced a matter
21  with Jeremiah where you were retained as an
22  expert in a matter involving Papa John's.
23  Did I get that right?
24     A.  Correct.
25     Q.  Okay.  What is that suit about at a

66

1  very high level?
2      A.  It is the adequacy of pay for Papa
3  John's drivers who are entitled to minimum
4  wage but are also responsible for paying all
5  their vehicle expenses and the effect that
6  that vehicle expense responsibility has on
7  their actual pay rate.
8      Q.  And were you retained by the
9  plaintiff or the defendant?
10     A.  Plaintiff.
11     Q.  Does that case involve the
12  Americans with Disabilities Act?
13     A.  No, it does not.
14     Q.  Does it involve wheelchair
15  accessible vehicles?
16     A.  No, it does not.
17     Q.  All right.  I'm going to show you a
18  document that we have previously marked as
19  Exhibit 59.  This is a document beginning
20  Bates Stamp P_Crawford_ Namisnak_002090.
21     A.  Okay.
22     Q.  Do you recognize this document?
23     A.  I would have to have time to read
24  it. I see the --
25     Q.  Take your time.

67

1      A.  Yes.  So if you could scroll up to
2  the top.  "Quick phone call.  Less than 15
3  minutes."  Okay.  You can scroll down.  Okay.
4  If you could scroll slowly because I can't
5  follow it that quickly.  You've got to start
6  at the top again.  Could you scroll down
7  slowly so I -- Okay.  Thank you.
8          Okay.  Could you scroll down slowly
9  a little bit more.
10         Could you slow down slowly a little
11  bit more.  Okay.  Stop.  Could you scroll up
12  because I think I'm missing some part.
13  Scroll up, please.  "In terms of --"  Okay.
14  Yes.  Now, if you scroll down slowly.  I just
15  want to make sure I'm getting the continuous
16  conversation.
17         Okay.  Scroll down, please.  Scroll
18  down, please.  Okay.
19  MS. SCHUSTER:
20         Pat, if you could go to the October
21  5 e-mail.
22  EXAMINATION BY MS. SCHUSTER:
23     Q.  Before we look at that, do you
24  recognize this document?
25     A.  Yes, I do.

68

1      Q.  What is it?
2      A.  It's an e-mail, which I can read to
3  you.  It says, Garret, I --
4      Q.  I don't need you to read it.  I
5  just want to make sure you recognize it.
6      A.  Okay.  I recognize it as an e-mail.
7      Q.  An e-mail between whom?
8      A.  Seems to be between me and Garret
9  DeReus.
10     Q.  In this e-mail you write,
11  "Preparation for deposition is $400 and
12  actual deposition hour is $450."  Do you see
13  that?
14     A.  Yes, I do.
15     Q.  Okay.  And so that $400 for
16  preparation, is than an hourly rate or flat
17  rate?
18     A.  It's an hourly rate.
19     Q.  Okay.  How did you come up with the
20  amount $400 per hour for time spent preparing
21  for the deposition?
22     A.  I consulted with -- I work for the
23  firm of Sam Schwartz who is the entity
24  charging for my hourly time.  It's in my
25  capacity as a -- you know, extension of my

69

1  job as a Sam Schwartz employee.  So it's in
2  consultation with the standard rates that we
3  charge for public, private, and expert
4  testimony.
5      Q.  Okay.  And did you come up with the
6  $450 rate for your testimony the same way?
7      A.  Yes.
8      Q.  And really quick, what is Sam
9  Swartz?
10     A.  Transportation consultant firm.
11     Q.  And what is your role there?
12     A.  I'm general manager of the New York
13  office.
14     Q.  And what do you do in that role?
15     A.  I run the New York office.
16     Q.  Anything else?
17     A.  That's a lot.
18     Q.  Does that involve providing
19  testimony?  What sort of consulting work do
20  you personally do?
21     A.  We do transportation planning,
22  traffic engineering, environment planning,
23  outreach strategic communications, expert
24  testimony, research and report writing, white
25  papers, a variety of services related to

MEERA JOSHI

70

1  transportation and landings.
2      Q.  And do you have an ownership
3  interest in Sam Swartz?
4      A.  No, I do not.
5      Q.  Okay.  And how many hours did you
6  spend preparing for this deposition?
7      A.  Probably less than an hour.  Maybe
8  about 45 minutes.
9      Q.  What did you do in that 45 minutes
10  to prepare?
11      A.  I refreshed my recollection on the
12  rules that were passed and read a June 2019
13  report that came out of the TLC about the
14  accessibility program.
15      Q.  What was the name of that report?
16      A.  I don't know the name.  I think
17  it's called the June 2019 Accessibility
18  Report.
19      Q.  Did you do anything else?
20      A.  No.
21      Q.  And have you invoiced Plaintiffs
22  for that preparation time yet?
23      A.  No, I have not.
24      Q.  Do you intend to?
25      A.  Yes.

71

1      Q.  All right.  In this same e-mail
2  from October 5, 2020, you say, "I do have
3  availability the last week of October.
4  However, I would need some time to brush up
5  beforehand."  Do you see that?
6      A.  Yes.
7      Q.  What did you mean by brush up?
8      A.  I meant refreshing my recollection
9  about the actual accessibility rules.
10      Q.  So the brushing up is the
11  preparation we just discussed that you did
12  for this deposition?
13      A.  Absolutely.
14      Q.  Who was JoAnn Panton?
15      A.  She is my colleague and assistant
16  at Sam Schwartz.
17      Q.  Did anyone at Sam Schwartz assist
18  you in your preparation for the deposition?
19      A.  No.
20      Q.  I want to show you a document we
21  have marked previously as Exhibit 61.
22      MS. SCHUSTER:
23          Can you scroll to the title,
24      please, Pat.
25  EXAMINATION BY MS. SCHUSTER:

72

1      Q.  So do you see this is a Notice of
2  Nonretained Expert Disclosure pursuant to
3  Rule 26(a)(2)(c) and a supplementation
4  pursuant to Rule 26(e) in the Scott Crawford
5  and Jarvis Jernigan versus Uber Technologies
6  case?  Do you see that?
7      A.  Yes, I do.
8      Q.  Have you seen this document before?
9      A.  No, I have not.
10      Q.  Are you aware of a disclosure being
11  made about your testimony in this litigation?
12      A.  I am not aware of it.
13      Q.  Okay.  When you were the general
14  counsel at the TLC, did your role involve
15  overseeing any ongoing litigation in which
16  the TLC was involved?
17      A.  As a City agency, our counsel is
18  the New York City Law Department.  So they
19  represent the City in all litigation.  As
20  agency general counsel, I worked with them to
21  support their efforts in representing the
22  City in litigation.
23      Q.  Would you have been supporting any
24  litigation involving the TLC or just the
25  subset?

73

1      A.  What do you mean the subset?
2      Q.  Would it be all cases involving the
3  TLC or fewer than all?
4      A.  When the Law Department needs
5  assistance, they will reach out.  But
6  essentially, you know, the City defends its
7  position in all litigation filed against it.
8  Primarily the Law Department leads that and
9  wherever they need resources within the city,
10  they lean on those agencies to get them.
11      Q.  Do you recall a litigation called
12  Noel, N-o-e-l, versus New York City Taxi and
13  Limousine Commission?
14      A.  Yes, I do.
15      Q.  Did you have any role in that
16  litigation?
17      A.  The Law Department represented the
18  New York City Taxi and Limousine Commission,
19  and I worked with the Law Department whenever
20  necessary to help them prepare in that
21  litigation.
22      Q.  And that litigation involved
23  allegations that the TLC had violated the
24  Americans with Disabilities Act by failing to
25  require taxis to provide wheelchair

74
1  accessible vehicle service; is that correct?
2      A.  I would have to look at the
3  complaint to refresh my recollection of the
4  exact claims within the Noel litigation.
5      Q.  Do you have a general recollection
6  of what the case was about?
7      MR. DEREUS:
8          Objection, calls for speculation.
9      THE WITNESS:
10         The case involved accessible taxis.
11     I would actually have to look at the
12     complaint.  There were several
13     complaints filed, so.
14  EXAMINATION BY MS. SCHUSTER:
15     Q.  Do you recall the outcome of that
16  litigation?
17     A.  This was a complex litigation
18  history.  So why don't -- and I believe there
19  was two different versions of the lawsuit.  I
20  do recall a settlement at the end and that
21  may be what you are referencing, but I'm not
22  certain because it wasn't a singular lawsuit
23  if I recall correctly.  It was a while ago.
24  I think it was almost seven or eight years
25  ago now.

75
1      MR. DEREUS:
2          I'm getting some feedback here.
3      MS. SCHUSTER:
4          I am too.
5      THE WITNESS:
6          Do you want me to log off and log
7      back on again?
8      MS. SCHUSTER:
9          It worked last time.
10     THE WITNESS:
11         Okay.
12     MS. SCHUSTER:
13         Thanks.
14     THE WITNESS:
15         No problem.
16     MS. SCHUSTER:
17         We can go off the record until she
18     returns.
19     (At this time a recess was taken.)
20  EXAMINATION BY MS. SCHUSTER:
21     Q.  So you recall that part of the Noel
22  litigation was resolved via settlement,
23  right?
24     A.  I believe so.  I would have to look
25  at the actual court documents to give you a

76
1  more exact response.  But that's my general
2  recollection.
3      Q.  Okay.  Do you have a general
4  recollection about the terms of that
5  settlement?
6      A.  The general recollection, it was an
7  agreement to over time convert a portion of
8  the yellow taxi fleet to accessible yellow
9  taxis.
10     Q.  Do you currently hold any other
11  positions than your position with Sam
12  Schwartz?
13     A.  I am an advisor for a company
14  called Remix.  I think that's it.  You
15  know, sometimes you obligate yourself to
16  other stuff and don't remember, but --
17     Q.  What is Remix?
18     A.  Remix is a tech company that
19  provides data management tools for public
20  transit agencies and departments of
21  transportation.
22     Q.  And what do you do in your role as
23  advisor for Remix?
24     A.  Help them understand a city's
25  perspective in terms of data needs and

77
1  visibility of various segments of the
2  transportation industry within a city.
3      Q.  Do you also hold a position with
4  the New York University?
5      A.  I was until early 2020 a visiting
6  scholar at the NYU Rudin Center for
7  Transportation policy.
8      Q.  Did you teach courses in that role?
9      A.  No.  I led a research -- a group of
10  -- I led a group of students doing a research
11  project.
12     Q.  And what was that research project?
13     A.  It was a study of e-hail
14  regulations in large global cities.
15     Q.  Do you recall which cities?
16     A.  No, not off the top of my head.
17  But I believe it's publically available.
18     Q.  Do you recall if New Orleans,
19  Louisiana, was one of those cities?
20     A.  I don't believe it was.
21     Q.  Do you recall if Jackson,
22  Mississippi, was one of those cities?
23     A.  I don't believe it was.
24     Q.  Your interaction with Uber that you
25  testified to today all concerned interactions

78

1  you had with respect to Uber's operations in
2  New York City, correct?
3      A.  Correct.
4      Q.   Your role at the TLC concerned only
5  for-hire vehicle services and other
6  transportation issues for New York City,
7  correct?
8      A.  Correct.
9      Q.   You never had a regulatory position
10 governing transportation or anything else in
11 the City of New Orleans?
12     A.  No, I have not.
13     Q.   And you never held a regulatory
14 position governing transportation or anything
15 else in the City of Jackson, Mississippi?
16     A.  Correct. I have not.
17     Q.   Would you agree that New York City
18 is the largest for-hire market in the nation?
19     A.  I would agree that New York City is
20 the largest for-hire vehicles in the service
21 market in the nation, yes.
22     Q.   At your time at the TLC, did you
23 form any opinion as to the relative size of
24 the for-hire vehicle market in New Orleans,
25 Louisiana?

79

1      A.  No, I did not.
2      Q.   At your time at the TLC, did you
3  form any opinion as to the relative size of
4  the for-hire vehicle market in Jackson,
5  Mississippi?
6      A.  No, I did not.
7      Q.   Did you bring any notes with you
8  today to review during the deposition?
9      A.  No, I did not.
10     Q.   I just want to take a five-minute
11 break if that's all right.
12     A.  Sure.  Can we just go on mute and
13 video off?
14     Q.  Yes.
15 MS. SCHUSTER:
16     We will go off the record for five
17 minutes and come back around 11:00.
18 (At this time a recess was taken.)
19 MS. SCHUSTER:
20     I have no further questions.
21 MR. DEREUS:
22     I have no additional questions.
23          * * * * * * * *
24 (Whereupon, the testimony of the witness
25 was completed at 10:03 a.m.)

80

1              WITNESS' CERTIFICATE
2
3
4
5      I, MEERA JOSHI, have read, or have had
6  read to me, the foregoing testimony, and
7  hereby certify that it is a true and correct
8  transcription of my testimony, with the
9  exception of any corrections or changes
10 attached hereto.
11
12
13 (CHECK ONE)
14 [  ] WITHOUT CORRECTIONS.
15 [  ] WITH CORRECTIONS AND/OR ADDITIONS
              ATTACHED HERETO.
16
17
18 SIGNATURE:
19           MEERA JOSHI
20 DATE:
21
22
23
24     Reported by:  Janie J. Darby, CCR
25

81

1              REPORTER'S PAGE
2
3      I, JANIE J. DARBY, Certified Court
4  Reporter in and for the State of Louisiana,
5  the officer as defined in Rule 28 of the
6  Federal Rules of Civil Procedure and/or
7  Article 1434(B) of the Louisiana Code of
8  Civil Procedure, before whom this proceeding
9  was taken, do hereby state on the record:
10     That due to the interaction in the
11 spontaneous discourse of this proceeding
12 dashes (--) have been used to indicate
13 pauses, changes in thought, and/or talkovers;
14 that same is the proper method for a Court
15 Reporter's transcription of a proceeding, and
16 that dashes (--) do not indicate that words
17 or phrases have been left out of this
18 transcript;
19     That any words and/or names which
20 could not be verified through reference
21 material have been denoted with the phrase
22 "(phonetically spelled)."
23
24
25

82

1           C E R T I F I C A T E
2       This certification is valid only for a
   transcript accompanied by my original
3   signature and original required seal on this
   page.
4       I, Janie J. Darby, Certified Court
   Reporter, in and for the State of Louisiana,
5   as the officer before whom this testimony was
   taken, do hereby certify that MEERA JOSHI,
6   after having been duly sworn by me upon the
   authority of R.S. 37:2554, did testify as
7   hereinbefore set forth in the foregoing 81
   pages; that the testimony was reported by me
8   in the stenotype reporting method, was
   prepared or transcribed by me or under my
9   personal direction and supervision, and is a
   true and correct transcript to the best of my
10  ability and understanding; that the
   transcript has been prepared in compliance
11  with the transcript format guidelines
   required by statute or by rules of the board,
12  that I have acted in compliance with the
   prohibition on contractual relationships, as
13  defined by Louisiana Code of Civil procedure
   Article 1434 and in rules and advisory
14  opinions of the board, and that I am not
   related to counsel or the parties herein, nor
15  am I otherwise interested in the outcome of
   this matter.
16
       I hereby certify that the foregoing
17  transcript has been signed and stamped by me
   on December 6, 2020.
18
19
20
21
22              JANIE J. DARBY
                CERTIFIED COURT REPORTER
23              CERTIFICATE NUMBER 85140
24
25

# EXHIBIT D

**BIZER & DEREUS, LLC**
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

AQUA TERRA AERIS LAW GROUP
William Brock Most
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

PUBLIC JUSTICE, P.C.
Karla Gilbride
Stephanie K. Glaberson
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

*Attorneys for Plaintiffs*

| | |
|---|---|
| SCOTT CRAWFORD, | Case No.: 3:17-cv-02664-RS |
| Plaintiff, | |
| vs. | **NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(a)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(e)** |
| UBER TECHNOLOGIES, INC. and RAISER, LLC, | |
| Defendant | |

*AND*

NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF
SUPPLEMENTATION PURSUANT TO RULE 26(E) - 1

STEPHAN NAMISNAK, *ET AL.*,

      Plaintiff,

vs.

UBER TECHNOLOGIES, INC. and RASIER, LLC,

      Defendant

Case No.: 3:17-cv-06124-RS

**NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(E)**

## <u>NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(a)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(e)</u>

NOW INTO COURT, through undersigned counsel, comes Plaintiffs in the above numbered cases, who respectfully provides the following disclosure of a non-retained expert, Ms. Meera Joshi, in accordance with the requirements F.R.C.P. 26(a)(2)(C). Further, pursuant to Rule 26(e), Plaintiffs further supplement that Ms. Joshi may be in possession of facts that are relevant to this action. Plaintiffs reserve the right to designate additional retained and non-retained experts within the deadlines set forth by the Scheduled Orders. Plaintiffs reserve the right to supplement this disclose when/if additional information is learned about Ms. Joshi's factual knowledge and expert opinions.

    1.    Ms. Meera Joshi, Sam Schwartz Engineering, 322 Eighth Avenue, 5th Floor New York, NY 10001, p. 212-598-9010.

<u>Summary of Information</u>: The subject matters on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705, and a summary of the facts and opinions to which the witness is expected to testify are provided are reasonably believed to be as follows, given the preliminary information available to Plaintiffs' counsel:

Ms. Meera Joshi was the Chair and CEO of the New York City Taxi and Limousine Commission (TLC), a 600-person agency and nine-member Commission. Undersigned reasonably

anticipates that Ms. Joshi will testify that she set and ensured compliance with the regulatory framework that governs daily transportation of over one million people, performed in over 130,000 vehicles, ranging from taxis to Uber and Lyft, local car services and luxury limousines, driven by over 200,000 drivers During her time at the TLC, Ms. Joshi spearheaded novel regulations, resolving challenges brought on by the rapid growth of rideshare services while simultaneously enhancing passengers' safe access to transportation. Under her tenure, New York became the first city in the nation to mandate the reporting of granular trip data from large app operators like Uber and Lyft.

Under her tenure at the TLC, Ms. Joshi led the nation's largest accessibility initiative, providing passengers who use wheelchairs reliable travel options in taxi and app services. Undersigned's understanding is that Ms. Joshi negotiated and litigated extensively with Uber on the TLC's behalf and ultimately forced Uber to provide and/or expand Wheelchair Accessible Vehicle ("WAV") service in New York. Undersigned reasonably anticipates that Ms. Joshi will testify that while at the TLC she ensured that new market entrants such as Uber and Lyft adhered to core consumer protections such as adequate insurance, price transparency, access for the disabled, and fingerprint background checks for all drivers. Undersigned reasonably anticipates that Ms. Joshi will testify that her office used data to establish the highest levels of accountability among app-based car services, including Uber and Lyft. And that through existing regulatory powers mandated these companies to provide daily submission of detailed trip records providing the City, policy makers and the public visibility into trip density and scarcity, vehicle utilization and overall use of shared City streets.

Additional facts that undersigned believes Ms. Joshi possess is that before serving as the Commissioner for the TLC, Ms. Joshi was the TLC's Deputy Commissioner for Legal Affairs and

General Counsel.  Prior to that, she served as the first Deputy Executive Director of the New York City Civilian Complaint Review Board, the agency tasked with investigating complaints of police misconduct.  She also served as an Inspector General for the New York City Department of Investigation and was responsible for overseeing New York City's Department of Correction, Probation, Juvenile Justice, and the TLC. Ms. Joshi is believed to have received her B.A. and J.D. from the University of Pennsylvania

Undersigned reasonably anticipates that Ms. Joshi will testify that it is her opinion that Uber has the capacity to provide WAV service, but that Uber's failure / refusal to provide WAV service stems from a desire to avoid the issue, not from an inability to provide said service. Undersigned reasonably anticipates that Ms. Joshi will testify that she stated that she said "Many of the app companies came in and [said], 'We're completely different. We're a whole new way of doing business, and we don't need regulation and we can function without it, and we shouldn't even be considered transportation,'" Joshi said. "And from our perspective, it hasn't taken that long for them to look very much like many of the people that we've regulated for decades." [1] Undersigned reasonably anticipates that Ms. Joshi will testify that data on wheelchair accessible vehicles (both fleet size and response time) allows TLC to monitor customer service levels and impose penalties on companies such as Uber not providing sufficient coverage within customer service benchmarks. Undersigned reasonably anticipates that Ms. Joshi will testify as to her opinion, based on her time at the TLC, about what industry Uber is in and whether it is her opinion that Uber operates in the transportation industry.

---

[1] https://www.politico.com/states/new-york/city-hall/story/2019/03/19/outgoing-taxi-commissioner-distances-herself-one-last-time-from-de-blasio-921933 (last accessed 2020/10/20).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SUPPLEMENTATION:**

Based on the deposition of Ms. Meera Joshi on November 11, 2020, Plaintiffs reasonably anticipate that, in addition to much of what is set forth above, Ms. Meera Joshi will provide testimony consistent with the below at trial. By and through this supplementation, Plaintiffs do not suggest, concede or agree that their prior disclosure was insufficient or that the below disclose was not subsumed by the previous disclose provided as to Ms. Joshi. Nonetheless, based on the November 11, 2020 deposition, out of an abundance of caution, and for the avoidance of all doubt, Plaintiff provide the following supplement:

Ms. Joshi testified that she considers herself an expert in transportation and transportation related issues. Ms. Joshi has "intimate knowledge of a large sector of the industry and how it operates in New York and how it -- and it similarly operates across other large cities and across the world."

Ms. Joshi explained that her responsibilities at the TLC specifically related to the-hire transportation companies in New York because "The charter mandate for the city --the charter mandate for the agency is to set the ground rules for for-hired transportation, which includes in New York City several categories: Yellow taxi, green taxi, paratransit, Ambulette, luxury limo, black car, and Liberty. So for-hire vehicles are considered -- they fall -- the two categories, Liberty, black -- actually three, Liberty, black car, and luxury limousine fall under the for-hire vehicle category." Ms. Joshi testified that several bases in New York City do business under the name Uber, and they fall under delivery category, the black car category, and the luxury limousine category. Ms. Joshi explained how the bases work in New York City and is anticipated to provide equivalent testimony at trial.

Ms. Joshi described that she had various interactions at Uber. Ms. Joshi explained that while at the TLC it was the TLC's position—and it was her opinion—that companies that offer peer-to-peer transportation services argued that they are just a matching tool and don't actually operate the for-hire service that is solicited and offered via their platforms, thus should not be subject to important regulations that exist governing for-hire service and can operate using drivers and  vehicles that are not commercially licensed.  Ms. Joshi testified that it was the TLC opinion— and her opinion—that "At the TLC, we recognize that this is a fallacy.  These companies set the price for trips, set standards for service, allocate rides according to proprietary algorithms,   which may include or exclude certain drivers  based on past performance, vet and monitor driver and passenger performance, and even  remove participants from the system[.]" Another factor that resulted in this opinion is "the very clear and obvious fact that there was  transportation being paid for a fee, which is the fundamental tenet of for-hire service."

Ms. Joshi testified that, in forming the above opinion, some of what went into that included "a review of our responsibilities as a regulator.  So when anyone, any business is providing transportation for a fee, regardless of whether that's happening through an app or a hail on the street or a telephone or walking into your local car service, there's responsibilities we as the regulator have to the riding public and to the driver who's providing that work.  And so when that business model is before us, we have to regulate it.  We have to make sure that those standards are met." This opinion was formed based on expertise and practical knowledge and experience.

Ms. Joshi is expected to testify that she sought to expand the provision of wheelchair accessible vehicle service for companies such as Uber and Lyft. Ms. Joshi is expected to testify that she sought to understand the landscape and then take corrective action where it needed to be taken. When she first started, their understanding, and the TLC vehicle records, demonstrated that

there were very few wheelchair accessible vehicles in the entire for-hire vehicle fleet. Ms. Joshi is

anticipated to state that "Ultimately, we passed a rule requiring all for-hire vehicle providers to

provide wheelchair accessible service in accordance with service standards set forth in the rule,

which are somewhat detailed, not too detailed…" "[U]nder the rules, every wheelchair -- every

for-hire vehicle base has to meet one of two sets of standards in order  to meet -- to provide

wheelchair accessible service in accordance with TLC rules. One is called the trip mandate, and

over the course of, I believe, four years they have to gradually increase the number of  trips that

they dispatch using a wheelchair accessible vehicle till they reach the point where 25 percent of

their trips are dispatched in a wheelchair accessible vehicle or they can meet what's called the trip

mandate and that -- I'm sorry, the dispatch mandate and that instead of a percentage of trips being

provided in a wheelchair accessible vehicle requires that companies meet specified response times

that over the years get increasingly shorter.  The ultimate goal is to provide equivalent service. So

someone who is requesting, say, Uber or Lyft and doesn't need a wheelchair is able to get it -- the

response time and rates for that passenger are the same as someone who is requesting a wheelchair

accessible vehicle." Ms. Joshi also stated "the rule was passed with a 25 percent trip mandate along

with a simultaneous pilot, which allowed companies to opt out of the trip mandate and instead join

a pilot from which they could reach -- They would be considered in compliance with the

wheelchair accessible requirements of the TLC by participating in a pilot where they would be

judged on their ability to respond to requests according to a framework of response times that got

increasing shorter as years went by." In response to this "a lawsuit filed by the -- I'm using app

companies to say it was Uber, Lyft, may have been Via as well as some other traditional black car

company challenging that rule.  In essence, they wanted the pilot to be memorialized as  part of

the rule so that it became I think -- I think their understanding was  that it would be then harder to

change because there are more administrative processes to changing a rule versus changing a pilot." In response to the lawsuit, "There was a settlement, an ironic settlement because I think the TLC made out better in the settlement, which isn't usually the case.  There was a settlement and the agreement was that the pilot would be converted into part of the permanent rule as well as the companies would have to provide the TLC with response time information not only for wheelchair accessible trips, but for standard non-wheelchair accessible trip requests too, so that the TLC could monitor the delta between the two response time groups.  And I believe that the requirement  to provide service was extended for an additional year, and there were -- the  response time requirements were also made more stringent." "They settled and agreed to withdraw a lawsuit challenging that rule in exchange for a proposed rule that I believe the draft – we did the drafting as part of the settlement --would not only require them to provide wheelchair accessible service, but it also  had additional service requirements making a higher level of service, a higher level of transparency and adding another year of their obligation to provide service." Uber was one of the companies table at the table for those negotiations and were part of this resolution.

From the time the new requirement went into effect and until the time of Ms. Joshi's departure from the TLC, Uber was in compliance with the expanded WAV requirement. According to Ms. Joshi "I think they increased the -- I don't have the specific numbers, but my recollection is that they were actively increasing the number of accessible vehicles that they brought on and actively increasing the number of trips that they were providing to people that used wheelchairs." Ms. Joshi form the "opinion that they could provide that service for people who needed wheelchair accessible vehicles.  They had a history of -- not just Uber, but Lyft as well and Via of  providing customized service for other needs, car seats, high-end vehicles, shared rides, and they're clearly sophisticated and had the means to provide wheelchair accessible service as well." Uber's

expansion of WAV service in New York was a result of TLC rulemaking. Uber was able to meet its obligation under the settlement agreement to provide wheelchair accessible service in New York, and according to Ms. Joshi "I think even exceed some of the response times.  So they -- my understanding is they performed very well under the new requirement."

When she was the Commissioner of the TLC, Ms. Joshi reached the opinion that Uber is operating for-hire vehicle transportation. Ms. Joshi "regarded Uber as in the business of transporting people for hire and regulated them in accordance with that opinion."

At her time at the TLC, Ms. Joshi did not ever identify any information that would suggest that it would be technically infeasible for Uber or companies like Uber to provide WAV service. Ms. Joshi never found anything that would suggest Uber was incapable of providing WAV service. And the TLC with its approximate 600 employer never found anything suggesting it would be technically infeasible for companies such as Uber and Lyft to provide WAV service.

Respectfully Submitted,

By:/s/ Garret S. DeReus
BIZER & DEREUS, LLC
Attorneys for Plaintiff
Andrew D. Bizer, Esq. (LA # 30396)
Admitted *Pro Hac Vice*
andrew@bizerlaw.com
Garret S. DeReus, Esq. (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been delivered to all counsel of record on January 18, 2021, by email.

By:/s/ Garret S. DeReus

NOTICE OF NON-RETAINED EXPERT DISCLOSURE PURSUANT TO RULE 26(A)(2)(C) AND OF SUPPLEMENTATION PURSUANT TO RULE 26(E) - 9

**Garret S. DeReus**