1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCOTT CRAWFORD,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., *et al.*,

Defendants.

Case No-3:17-cv-02664-RS

**DECLARATION OF STEPHANIE SCHUSTER IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. JAMES M. COOPER UNDER FRE 702**

STEPHAN NAMISNAK, *et al.*,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,  *et al.*,

Defendants.

Case No-3:17-cv-06124-RS

**DECLARATION OF STEPHANIE SCHUSTER IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. JAMES M. COOPER UNDER FRE 702**

1    I, Stephanie Schuster, hereby declare as follows:

2    1.    I am over eighteen years old.   I submit this declaration based on my personal

3    knowledge.

4    2.    I am a partner at Morgan, Lewis & Bockius, LLP, and I represent Defendants Uber

5    Technologies, Inc. and Rasier, LLC in the above-referenced cases.

6    3.    Defendants' Motion to Exclude Testimony of Dr. James M. Cooper Under FRE 702.

7    4.    Attached as Exhibit A is a true and correct copy of the expert report of Dr. James

8    M. Cooper, dated January 14, 2021.

9    5.    Attached as Exhibit B is a true and correct excerpt of the transcript of the November

10   20, 2020 deposition of Niraj Patel as corporate designee for Defendants Uber Technologies, Inc.

11   and Rasier, LLC.

12   6.    Attached as Exhibit C is a true and correct excerpt of the transcript of the December

13   18, 2020 deposition of Plaintiff Stephan Namisnak.

14   7.    Attached as Exhibit D is a true and correct excerpt of the transcript of the December

15   11, 2020 deposition of Plaintiff Scott Crawford.

16   8.    Attached as Exhibit E is a true and correct excerpt of the transcript of the January 5,

17   2021 deposition of Plaintiff Francis Falls.

18

19   I declare under penalty of perjury that the foregoing is true and correct.

20

21

22   Executed on April 19, 2021

_Stephanie Schuster_
Stephanie Schuster

23

24

25

26

27

28

# EXHIBIT A

# FILED UNDER SEAL

**Dr. James M. Cooper**
Accessibility in Uber services in New Orleans, Louisiana and Jackson, Mississippi
Opinion of Dr. James. M. Cooper

## I.        Witness qualifications

Dr. James M. Cooper is a transportation professional specialized in ground transport, taxi and for hire vehicle analysis, accessible and social transportation, operation and policy development. His experience encompasses policy development, application and review across three continents as demonstrated through studies and analyses for national, regional and local governments worldwide.

Recent Career:
- 2013 - present, Director Transport Research Partners
- 2014 - 2016, Visiting Professor of Urban Transportation Regulation, University of Missouri St Louis;
- 2006 - 2010, Director, T2E Transport to Employment;
- 2001 - 2013, Head of Taxi Studies, Edinburgh Napier University

Qualifications:
- PhD Taxi Licensing and Control. Awarded 2007, Napier University
- MSc (Cymru), Transport. Awarded 1991 University of Wales, Cardiff
- MCIT Transport, Awarded 1989 Chartered Institute of Transport
- CPC Certificate of Professional Competence, Road Passenger Transport, Awarded 1987

Professional Roles
- Committee member: TRB AV050 Airport Terminals and Ground Access
- Director, Taxi Research Network
- Immediate past chairman, TRB Joint Taxi Sub-committee AP060(2)
- Board Member, Transport Research Institute
- Past Director and former board Member, Accessible Transport Forum
- Past Director and former board Member, Community Transport Association,
- Advisor, UK Department for Transport, Whitehall placement scheme
- Member of policy panel, Commission for Taxi Regulation, Republic of Ireland
- Committee member, Larne Borough Council, Larne Alive Committee
- Education Officer, Chartered Institute of Transport
- Controller, Emergency Voluntary Service

Select Project Experience:
- District of Columbia Department of For Hire Vehicles, Price Elasticity of Demand analysis for hire vehicles;
- European Commission INTERREG VA projects, SEUPB Sustainable transport project evaluation
- Donegal County Council, Ireland: User predictive modelling, demand assessment and economic impact appraisal, NWG Greenways route 1 (to September 2020)
- Washington DC Department of For Hire Vehicles: Taxi and TNC demand and price elasticity study (to August 2020)
- Charlotte Douglas International Airport (CLT), Assessment of operations landslide transportation, CLT Airport
- Glasgow City Council, Scotland: Taxi market demand and bottom up model.

- Province of British Columbia, Canada: Passenger Transportation Board, review of market economics and fares in the BC FHV market.
- Edinburgh Airport, Ground Transport access model, completed for Edinburgh taxi trade
- Washington DC Department of For Hire Vehicles: 4-stage transportation model development,
- DC Taxicab Commission, co-lead for taxi company compliance audit (PSPs),
- Canadian Competition Authority. Expert advisor, interaction between taxis and PTCs/TNCs,
- Nevada Taxicab Authority, Clark County Taxicab Rate, Demand and Supply Analysis,
- Corporation of the City of Windsor, Expert advisor, rewrite of taxi ordinance to reflect entry of TNCs to the market,
- Scotland and Northern Ireland Forum for Environmental Research: Impact of climate change on airport use and access,
- Scottish Parliament: Expert witness, impacts of TNCs on the taxi market
- City of Houston, Department of Administrative and Regulatory Affairs, Accessible Demand Analysis
- Office of the Attorney General of the District of Columbia, Expert Report Role: Subject
  Expert, Taxi Regulation and technology application,
- Charlotte Douglas International Airport, Ground Transportation Review Role,
- Metropolitan Taxicab Commission, City of St Louis, Taxi Review, Specialist data collection,
- Scottish Government/Scottish Executive, Research Lead and author: Taxi and Private Hire Car Market and Local Licensing Regimes,
- San Diego Metropolitan Transit System, Fare Standardization Study,
- City of Chicago, Taxi Economic Review and fare study,
- City of Toronto, Vehicle Accessibility study
- City of Seattle and King County, Seattle Taxi Demand Study
- City of Houston, Taxi Public Perception Study,
- European Commission, COMPASS - Optimized co-modal passenger transport for reducing carbon emissions


Publications
In preparation:
For Hire Vehicle Regulation, misunderstanding, mismatch, control and capture: the case of Controls across the European Union, edited chapter to appear in: Handbook on Public Private Partnerships and Deregulation in Transportation that will be part of our book series on Competitive Government: Public Private Partnerships with Springer Science

Current and past publications:
3 Published books and book chapters
14 Refereed journal articles and book chapters
33 Published project reports and conference presentations

Publications and Conference Presentations:

Cooper, J., Mundy, R. et al (2009) Taxi! Urban Economies and the Social and Transport Impacts of the Taxicab. Ashgate 216 pp, ISBN: 978-0-7546-7628-7

Steve Wright, John D. Nelson, James M. Cooper, Stephanie Murphy (2009): An evaluation of the transport to employment (T2E) scheme in Highland Scotland using social return on

investment (SROI) Journal of Transport Geography 01/2009; DOI:10.1016

Wright, S., J.D. Nelson, and J.M. Cooper (2008): Development and Evaluation of the Transport to Employment (T2E) service: Overcoming transport barriers to job opportunities leading to more sustainable rural communities in Highland Scotland. In Local Economy, Vol 23, No 3 pp 181 - 195

Cooper, J.M., Nelson, J.D. and Wright, S.D. (2006) The delivery of rural flexible transport: experiences from Highland Scotland. In Traffic and Transportation Studies, Mao B., Tian Z., Gao. Z. and Huang, H. (Eds), pp 157-167. The Science Press

James Cooper, John D. Nelson, Steve D. Wright, Kenneth MacInnes, Robert Edwards (2006) Community-based flexible transport as a method for addressing community inclusion: developing and evaluating specialist DRT in Highland Scotland Social Research in Transport (SORT) 01/2006;

Cooper, J. M., Claywell, R., McCleery, A., Carreno, M., and McKay, S. (2004) Taxicab, specialized mode or the key to integrated transit? In Traffic and Transportation Studies (4) pp28-35 The Science Press

McQuaid, R. W., Cooper, J.M., Lindsay, C., and Greig, M. (2004) EMIRES, matching job search and transport information in a rural area, World Review of Science, Technology and Sustainable development. Edinburgh 8 – 10 November 2004.

Cooper, J., Ryley, T., and Smyth, A. (2002) Contemporary Lifestyles and the implications for sustainable development policies: lessons from the UK's most car dependant cities – Belfast. In Cities 18 (2) pp103-113

Cooper, J. Donegan, K., Granzow, E.F., Ryley, T. and Smyth, A. (2002) Densification and urban compaction: reinforcing the drive for sustainability. Transportation Research Record, Vol 1817, pp 102-109.

Scott, M., Cooper, J., Ryley, T., and Smyth, A. (2002) Achieving convergence in land use, regeneration and transport policy, Belfast, Northern Ireland. In Traffic and Transportation Studies, Vol 1(1) pp 138-145, ASCE

Cooper, J., T. Ryley, and A. Smyth (2001) Contemporary lifestyles and the implications for sustainable development policy: lessons from the UK's most car dependent city, Belfast. In Cities, 18 (2) pp 103-113

Cooper, J., Ryley, T., Smyth, A. and Granzow, E. (2001) Energy use and transport correlation: linking personal and travel related energy uses to urban structure. Environmental Science and Policy, 4 (6), pp 307-318

Cooper, J., Granzow, E., Ryley, T. and Smyth, A. (2001). Energy trade-offs and market responses in transport and residential land use patterns: Promoting sustainable development policy and pitfalls. Urban Studies, 38(9), pp 1573 - 1588.

Adair, A., Cooper, J., McGreal, S., Ryley, T. and Smyth, A. (2000). House prices and accessibility: the testing of relationships within the Belfast urban area. Housing Studies, 15(5), pp 699 - 716.

REPORTS Not including project reports

McQuaid, R. W., Greig, M., Smyth, A., and Cooper, J. (2004) The importance of transport in business location decisions. Report to the UK Department for Transport

Cooper, J. (2004) Taxi market regulation, industry employment and the identification of data toward informed policy decisions. Report to Scotecon.

Ormston, R., Hamilton, K., Vance, C., York, I., Emmerson, P., Cooper, J., Rye, T. and Stradling, S.G. (2004). Integrated ticketing in Scotland- needs analysis and options. Edinburgh, Scottish Executive Social Research.

Cooper, J., Claywell, R., and McCleery, A.(2003) The regulation of licensed taxi and PHV services in the UK, response to the OFT report, Scottish Taxi Federation

McQuaid, R., Greig, M., Baird, A., and Cooper, J. (2003) Economic Impact Assessment of the Corran Ferry. Report to the Highland Council

Cooper, J., Carreno, M., Saleh, W. and Smyth, A. (2002) Edinburgh Taxi Tariff Review. Report 1 - Technical Report Cost Model; Report 2 - Analytical Report, Economic Analysis, Quality Review; Report 3 - Project Report, Tariff Table Recommendations; Executive Summary. Report to City of Edinburgh Council, May.

Cooper, J. and Smyth, A. (2002). Buses - the future. Paper presented to the General Consumer Council for Northern Ireland on the future development of bus services in Northern Ireland, October.

Cooper, J (2013) Taxi Demand applications, apps benefit and app challenge. Poster. IATR 2013

Cooper, J. (2012) Using Models to meet the demands of transportation planning in the 21st century, the case for taxi models. Transportation Research Board 2012, 136, W11-135

Cooper, J., Farrell, S., and Simpson, P (2010), Identifying demand and optimal location for taxi ranks in a liberalized market. Transportation Research Board annual meeting, January 2010

Cooper, J. (2010) Taxi Demand Modelling, to ensure appropriate taxi supply, do both open access and model based restrictions fail? Accepted for presentation at the International Conference of Traffic and Transportation Studies, Beijing, China 2010

Cooper, U., Nelson, J.D., Wright, S.D. and Cooper, J.M. (2008) Achieving access to work, improved social inclusion and reducing rural access costs. Accepted for presentation at the PTRC Scottish Transport Applications in Research (STAR) conference, April 2008.

Cooper, J., Nelson, J.D., Wright, S.D., and Cooper, U. (2008) Rural Access Gain, an economic and social analysis of access to work schemes in rural communities of Scotland. (Abstract accepted). ICTTS, August 2008.

Wright, S.D., Nelson, J.D., Cooper, J. M., and Murphy, S. (2008) An economic analysis of the Transport to Employment (T2E) scheme in Highland Scotland using Social Return on Investment. TRB Paper, presented at TRB Session 702, paper 08-0729, January 2008.

Cooper, J. (2008) Applying Sensing and Monitoring: Policy Implications. TRB Paper, presented at TRB session 129, paper 08-0738. January 2008

Cooper, J., J. Nelson and S.D. Wright (2007) Parataxi! The potential for focused taxi services to satisfy new demands for travel. Symposium du Taxi. Institut pour la ville en mouvement, Paris.

Cooper, J., J.D. Nelson, S.D. Wright, K. MacInnes, R. Edwards (2006) Community based flexible transport as a method for addressing community inclusion. European Transport Conference, Strasbourg.

Cooper, J. (2004). Taxi pricing. Paper presented at Landor conference: Getting the Price Right, charging practice for bus and rail services, London, 1 July 2004.

Cooper, J., Nelson, J.D., and Wright, S.D.,(2004). Ground transportation, airports and external regulation conflict; worldwide question? Paper presented at 84th Annual TRB Meeting, Shoreham, 10 January 2004.

McQuaid, R.W., Cooper, J. M., Lindsay, C., and Greig, M. (2004) EMIRES, matching job search and transport information in a rural area. Paper presented at the World Review of Science, Technology and Sustainable Development Conference, Edinburgh 8 – 10 November 2004

Carreno,, M., Stradling, S.G, Cooper, J. and Willis, A. (2004). Evaluating the needs of vulnerable pedestrian groups for city centre walking environments. Proc. 10th International Conference on Mobility for Elderly and Disabled People (TRANSED), Hamamatsu, Japan, 23-26 May 2004.

Wigan, M., Polak, J., Cooper, J. and Schmoeker, J. (2003). Addressing gaps in the availability of travel behaviour data. Proc. European Transport Conference, convened by Association for European Transport, Strasbourg, France, 8-10 October 2003. PTRC, London CD-ROM.

Cooper, J. Effective delivery of Taxi services, models of spatial and administrative structure. American Association of Geographers Annual Meeting, Philadelphia

Granzow, E.F., Schmidt, J.W., Cooper, J., Ryley, T. and Smyth, A. (2001). Promoting reduced private car dependency under conditions of sprawl: a pragmatic strategy for the near term. Paper presented at the 80th Annual Meeting of the Transportation Research Board, Washington DC, 7-11 January 2001.

Cooper, J., Donegan, K., Ryley, T. and Smyth, A. (2000) Consumer response to sustainable planning and transport policy initiatives. Proc. European Transport Conference, Seminar C, Homerton College, Cambridge, 11 - 13 September 2000. PTRC Education & Research Services, London. P438, pp 193 - 207

Cooper, J., Ryley, T., Smyth, A. and Granzow, E. (2000). Energy trade-offs and market responses in transport and residential land-use patterns. Poster presentation at the 79th Annual Meeting of the Transportation Research Board, Washington DC, 9 - 13 January 2000

McGreal, W. S., A. Adair, B. Norton, A. Smyth, T. Ryley and J. Cooper (1999). Relationships between House Price and Accessibility in the Belfast Urban Area. Paper presented at the Joint International Conference of the American Real Estate and Urban Economics Association and the Asian Real Estate Society, Maui, 6-8 May 1999.

Wright, S., J.D. Nelson, and J.M. Cooper (2008) Development and evaluation of the Transport to Employment (T2E) service: overcoming transport barriers to job opportunities leading to more sustainable rural communities in Highland Scotland. Local Economy.

Cooper, J. (2008) Just the ticket, uptake of integrated ticketing for public transport. Public Service Review: Scottish Executive.

Wright, S. J.D. Nelson, J.M. Cooper and S. Murphy (2008) An evaluation of the Transport to Employment scheme in Highland Scotland using Social Return on Investment (SROI). Journal of Transport Geography.


## II.      A LIST OF ALL OTHER CASES IN WHICH, DURING THE PREVIOUS 4 YEARS, THE WITNESS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION

Court of Queens Bench for Saskatchewan, S-I Management Ltd v. City of Saskatoon QB No 1022 2019


## III.     A STATEMENT OF THE COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY IN THE CASE

The following opinion has been prepared as an independent expert. I have received payment for the development of this testimony to the value of US$8,000. Additional work beyond this testimony will be based on a rate of $200 per hour.


## IV.     A COMPLETE STATEMENT OF ALL OPINIONS THE WITNESS WILL EXPRESS AND THE BASIS AND REASONS FOR THEM

### 1.0     Scope of this document

This document is provided to detail facts and opinion associated with wheelchair accessibility of Uber, a Transportation Network Company (TNC) with headquarters in California USA; both in general and specific to the US cities of New Orleans, Louisiana; and Jackson, Mississippi USA.

The document includes an analysis of Uber's products, including corporate structure; the approaches to and requirements for the provision of wheelchair accessibility; and an opinion in respect of the ability for such provision to be made by Uber in New Orleans and Jackson[1]. To the extent appropriate and pertinent to this analysis, I also cite experiences and decisions in other locations where relevant to the opinion being expressed.

The opinions expressed in this document are my own, based on research in the field of accessibility in the transport market gained in the past 30 years; the analysis of evidence and research specific to the subject, as detailed in this document; and my own research and experiences including my PhD research, addressing for hire vehicle regulation, and multiple

---

[1] The description of New Orleans may include the wider conurbation including the neighbouring Jefferson Parish, (combined population c. 800,000). The description of Jackson MS may include the wider conurbation of 5 metropolitan counties included in the Jackson MS metropolitan area (combined population c. 580,000). It is common for many TNC area descriptions to include wider metropolitan areas, an example of which being the Uber definition of Washington DC to include areas of Maryland and Virginia (https://www.uber.com/global/en/cities/washington-DC/). The use of differing spatial definitions are addressed on a case by case basis in the following sections.

research projects for government departments worldwide as set out in my Curriculum Vitae, attached above.

The work detailed in this document is predicated on the actions of Scott Crawford & Jarvis Jernigan Jr., and of Stephan Namisnak & Francis Falls, against Uber Technologies Inc. and Rasier LLC; but will apply in respect of any and all similar service providers in similar markets to those described below.


2.0     Definitions

Transportation Network Companies (TNCs) provide transportation services, including those described below, through the use of computerised dispatch, primarily focused and dependent on smartphone technologies, in particular the use of a smartphone application (app).

The term TNC is in common use in the USA, as well as in other countries, and is notable in that it relates to the company rather than the definition of any one regulated service, such as a taxi or limousine service. It can be observed that TNCs can, and often do, provide a range of (differing) regulated service types using the same app regardless of the regulatory frameworks and requirements applied to each. Examples of this include the 'product' distinction between UberX and UberXL, being a distinction in vehicle size; compared to the distinction between UberX and UberBLACK, reflecting distinctly different regulations in some locations.

It is also appropriate to note that differences exist in regulatory authority scope and scale. A concerted effort across TNCs has led to an observed move from the regulation of TNCs at city level to TNC regulation at state level in the USA, though this is not true in all locations.


_Passenger Transport Services_

Passenger transport services relate to commercial transportation, whether provided in the public or private market, or in any combination of private / public partnerships including subsidised, contracted or public service obligation provision. The term may also include medical transport, being the transport of patients to and from medical facilities, though this category may also be split between Non Emergency Medical Transport (NEMT), often provided as passenger transport alongside Emergency Transport, more typically provided by specialist emergency ambulances, and categorised as such.

The practice of providing lifts as personal private arrangements are broadly excluded from the category of passenger transport, examples of this being, 'football runs', family trips, school trip sharing etc., as most of these activities occur without or with minimal exchange of payment[2]. Commercial passenger transport does not require profit to be made, and will include transport provided where paid for in part or in its entirety by a third party, whether public of private.

The term 'ride-share' is used in some documentation to refer to some aspects of TNC operations, including in documentation of the TNCs themselves, but is misleading as it originates in the non-commercial sector, where lifts are shared between private individuals without commercial intent (eg: school trip sharing) and thus does not fall within the definition of passenger transport service. TNC services are not ride-sharing trips under this definition.

---

[2] Some countries and locations define maximum contributions, toward fuel etc., at minimal rates per mile driven.

TNC services provide a form of Demand Responsive passenger transportation via a smartphone app[3]. Intending users make bookings, most frequently for immediate use (as soon as possible)[4], via the TNC app, and are provided with transport from specified origin to specified destination as a result. Pre-booking does not reduce the demand responsive nature of a service, in that the transport service continues to be provided to the demand of the passenger, rather than passengers planning trips around the constraints of a defined timetable, as would be the case in line based bus or railway travel[5].

Minor variations to Pick Up (PU) and Drop Off (DO) points[6] - including the definition of precise meeting points (PUDOs)[7], pooling opportunities and vehicle types may be a 'feature' of some 'products' offered via the app in some locations, but the principle remains of *"everyone's private driver"*[8] at a click.

The use of an app in booking is an integral part of TNC services in the vast majority of locations, and a prerequisite in most cases. The use of an app provides a regulatory / definitional separation from traditional taxi services in most instances[9], but does not impact on the nature of services being provided, which are based on the engagement of a Vehicle For Hire (VFH) with driver, for money.

In traditional parlance an app booking is a form of 'engagement' broadly consistent with dispatch taxis, and is one of three methods of vehicle engagement in the 'taxi market'; the others being hailed and stand engagements. For clarity I have used the term 'taxi market' for simplicity to refer to the wider market for VFH, that will include (variously) taxis, private hire vehicles and TNCs[10], dependent on the prevailing terminologies of the locations being reported. It is also significant to note that the 'pure' taxi market[11] can include app services provided by the traditional taxi market, of which the New York market is a good example where taxi apps are marketed as 'e-hailing' and are intended for immediate use.

TNC services in the USA are often referred to by the corporate identities of their providers which include, but are not limited to: Uber and Lyft.

The corporate structure of the app provider, Uber Technologies Inc. in this instance, will often include subsidiaries with separate legal identities, such as Rasier LLC, a wholly owned subsidiary of Uber Technologies Inc., and registered in Delaware; Uber BV, registered in the Netherlands, and a significant number of subsidiaries responsible for, a range of, activities by country and/or region. While it is convenient to use the global term: 'Uber' to refer to any activity thus branded, the actual structure of ownership and responsibility is of interest and will be addressed as appropriate to the discussion.

---

[3] Excludes Uber Eats, a restaurant meal delivery service, but includes UberWAV and UberHEALTH, see subsequent sections
[4] The concept of immediate and pre-booked services are discussed under section 2, subsection: Demand Responsive Transport.
[5] Timetables include the practice of 'headway' scheduling as well as precise point based time schedules.
[6] Collectively termed PUDOs in some documentation
[7] Defined meeting points (PUDOs) may result from operating efficiencies to the company, a venue or city including regular use of defined PUDOs during festival and exhibition events in New Orleans. See: Email chain Wes Pfeiffer (NOLA) and Wooler (Uber) dated 20 - 25th Jun 2019 (CRAWFORD-UBER000637)
[8] "Everyone's private driver" is a trademark of Uber Technologies, an example of the term being used in advertising in 2013 is available at: https://vimeo.com/72916773.
[9] In some US locations, including cities in Arizona, Uber has launched a call centre based booking system that avoids the need for a passenger to use the Uber app, though this service is likely to be in breach of the regulations in a majority of locations. Reported by the Financial Times: https://www.ft.com/content/5a2fc076-4e14-11ea-95a0-43d18ec715f5, accessed October 23, 2020
[10] A detailed review of services, types and nomenclature are set out in Cooper et al. 2010: Taxi! Urban Economies and the social and transport impacts of the taxicab. Ashgate, London
[11] Being the market sector supplied by taxis / Hackney Carriages. Def: Hackney Carriage is the legal term for a 'taxi' in some locations, including the UK.

It is also appropriate to note that despite the single unified apps (one passenger facing the other driver facing) the range of services being offered will often fall under differing regulatory regimes. Services offered via the app are controlled, and may be introduced and discontinued with relative ease, by the TNC company, and may also be limited by location to specific service types dependent on location and user.

Limitations on passengers, including an ability to blacklist or decline service requests, also exist under the control of the TNC, with a series of reported instances of abuse associated with Uber's use of a "God View" feature available to the company and subject to FTC actions in 2014[12], and "Greyball", a feature reported as hiding Uber services from government employees looking to catch Uber vehicles operating in violation of local regulations[13].

In many cases an intending passenger will be unaware of the regulatory differences between the service types ('products') being offered.

### *Demand Responsive Transport*

TNC services in the USA are typically offered on demand, ie: that a transport service will be provided in response to an individual request[14]. This form of engagement is sometimes called Demand Responsive Transportation (DRT), being a form of Flexible Transport (FT), equivalent to taxis operating in a dispatched market. Uber highlights that it provides DRT in its own documentation[15]. DRT services are not limited to services available for immediate use, and can include pre-booked services, being those planned and booked for use at a defined time in the future.

The extent to which a service **requires** pre-booking, the amount of notice necessary, is documented as its 'responsiveness' and is of particular significance to wheelchair users for whom a knowledge of both outward and return trip are significant to the choice to travel at all[16]. An individual's choice NOT to travel on the basis of market uncertainty, including the lack of confidence in a return trip, is referred to as Suppressed Demand, acknowledged in Uber WAV Rider Research[17]. Suppressed demand is an indication of a larger underlying wish to travel than can be observed from the number of individuals actually travelling, and is particularly acute amongst wheelchair users.

### *Accessible Transport*

The terms 'Accessible Transport' and 'accessibility' should also be defined in the context of transport provision. The obligation to provide accessible transport services to individuals with disabilities, are, in the vast majority of instances, written in to law, including in the USA under the Americans with Disabilities Act (ADA), and various similar forms of legislation internationally.

---

[12] Federal Trade Commission complaint in the matter of Uber Technologies Inc., Docket C1523054. Available at: https://www.ftc.gov/system/files/documents/cases/1523054_uber_technologies_complaint.pdf. Accessed October 21, 2020

[13] New York Times, March 3, 2017. Available at: https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html. Accessed October 21 2020

[14] This is true of all Uber services, including passenger transportation, UberHEALTH (a form of Non-Emergency Medical Transportation (NEMT)) and meal delivery.

[15] https://www.uber.com/us/en/about/accessibility/ accessed: 23 October 2020

[16] See: Nelson et al. (2010) Recent developments in Flexible Transport Services, for a more detailed description of DRT service types. Research in Transportation Economics, Volume 29 (1) 25 Aug 2010. Available at: https://www.sciencedirect.com/science/article/abs/pii/S0739885910000600?via%3Dihub, accessed Oct 21, 2020

[17] WAV Rider Research document September 2018: Authored by  Rider UX Research, Uber Able and Uber Ops. (UBER00018861)

The ADA links 'accessibility' to a defined disability, ie: the ability of a person with a disability to access (the same) goods and services as for an able bodied person.

In the case of defined disabilities, transport, in common with other service providers, must make reasonable accommodation to *"assure equality of opportunity, full participation, independent living and economic self sufficiency"*[18]. In practical terms, where access can be reasonably made available, it must be made so. This will include, but is not limited to: Wheelchair Accessible Vehicles (WAVs), as well as the provision of driver assistance and support for any form of ambulant or cognitive disability[19].

Section 37.105 of the ADA also defines a requirement for an equivalence in service standards, effectively that the transport providers, including DRT providers, must ensure equivalence in response time; fares; geographic areas of service; hours of service; availability; and reservations capability[20]. The absence of these where provision is possible constitutes a breach of disability legislation, and provides a focus on the 'reasonable-ness' of provision.


## 2.1    Challenges faced by wheelchair users

Wheelchair users, as with any other passenger 'type', face a range of challenges in the use of transportation. The individual items are no different from those of an able bodied traveller: that a vehicle can physically accommodate them; that a driver is knowledgeable in the operation of that vehicle, and in the safety of that passenger; and that the journey be completed in a timely and efficient manner. Any and all users of a transport service should have the right of equal treatment on all of the aspects of that use.


### 2.1.1   Vehicle Type

Despite the underlying rights of the individual, it is also true to underline that wheelchair users may require a vehicle suited to the carriage of the passenger remaining in their wheelchair. Wheelchair sizes and designs may also differ, with reference amongst some documentation, including Uber documents, highlighting the issues of motorised wheelchairs, being the most demanding of space within a vehicle and thus the most difficult to accommodate. Disability discrimination legislation may differ in this respect, with some locations and countries applying the concept of a reference wheelchair size as a minimum requirement (UK: Disability Discrimination Act), while others leave it to the states and local regulatory authorities to define minimum standards. This difference can lead to what may be considered disingenuous arguments that to meet the most demanding motorised wheelchair dimensions is a justification for not meeting the needs of any wheelchair type[21]. This said, many of the vehicles that are available to meet the needs of wheelchair transportation are able to accommodate a majority

---

[18]  Title 42. THE PUBLIC HEALTH AND WELFARE Chapter 126. EQUAL OPPORTUNITY FOR INDIVIDUALS WITH DISABILITIES Section 12101. Findings and purpose (a) Congress findings section (7).
[19] A review of accessibility requirements is included in the Uber document "Accessibility at Uber" (2017) (Slide 5, link) (UBER00014649)
[20] e-CFR Title 49, Chapter A, Part 37
[21] Daniel Ward / BC Passenger Transportation Branch (No date) Transportation Network Companies and accessibility, p15

of wheelchair sizes and types, including those used by UberWAV wet lease[22] partners MVTransit[23].

Having established that a number of vehicle types, but not all, are able to carry wheelchair users remaining in their wheelchair a further question arises in terms of their supply, and in terms if the cost of provision. Options in supply include the engagement of drivers already owning or able to rent/lease WAVs to supply trips on a trip-by-trip basis, mirroring the most common approach to UberX; to contract individual trips to a local taxi or commercial WAV operator, including the provision of both vehicle and driver on a trip-by-trip basis; or to engage taxi or commercial WAV supply with driver in a contract basis for an defined period (wet lease). Other options also exist through the development of strategic partnerships, including the collaborative provision of agency transit (as a partnership), or other trip types including NEMT, such as UberHEALTH, alongside UberWAV, both of which contribute vehicles to a local WAV fleet.

The use of vehicle leasing and rental without driver, a practice that is sometimes referred to as 'dry leasing', is typified by car rental companies including Uber and Hertz; and leasing specific companies, such as Xchange Leasing (XCL)[24] [25] [26], and appears to be in current use elsewhere in the Uber fleet. It is noted that Xchange Leasing (XCL) is stated as being an Uber company, and this under the control of the parent, Uber Technologies Inc (Uber 2017)[27].

Each of the approaches described above differ in the extent to which the TNC is exposed to cost risks. The wet lease approach requiring an hourly payment per vehicle, the subject of a number of negotiations[28]; while the driver supply option, whether through a rented vehicle or using a WAV vehicle already owned by the driver, moves the cost risk to the driver[29].



It is appropriate to note that none of the methods of assuring supply discussed above are unique, but can, rather, be used in combination. The method of assuring supply adopted will, necessarily, reflect the on the ground conditions at the time of application and may, or are indeed likely, to develop over time. A relationship exists both between nascent demand, surpassed demand and developing supply. It can be further illustrated that the TNC's own

---

[22] Wet Lease refers to the concept of sub-contracting a vehicle with driver to provide a service on behalf of the service provider.The term is widely used in the aviation industry, where aircraft are contracted to provide a specific route or flight, though the concept can apply equally to other forms of transport. MVTransit (aka: MV Transportation) is a wet lease partner to Uber and provides sub-contracted WAV services to the company across multiple US and Canadian cities. (Reference: Email chain between Megan Zoback (Uber) and Amy Barry (MVTransit), dated 12/7/2017)(UBER0000788)

[23] Paratransit service details: https://www.mvtransit.com/services/paratransit

[24] All of: Avis, Hertz and XCL provide leasing and rental vehicles to Uber drivers, These include the use of dedicated Uber branded platforms in some instances.

[25] A reference to the Uber partnership with AVIS is given in respect to Electric Vehicle (EV) provision as part of a driver facing incentivization programme to promote green vehicle technologies: Dara Khosrowshahi ; Driving a Green Revolution (2020) p4

[26] See: Uber 2017 for detailed description of XCL engagement with Uber: Uber slide presentation: Vehicle Solutions and Xchange leasing, US & Canada GM Summit 2017 (UBER00014611-25)

[27] Uber slide presentation: Vehicle Solutions and Xchange leasing, US & Canada GM Summit 2017, slide 7 (UBER00014617)

[28] Evidence of negotiations between Uber and wet lease partners for WAV supply are contained in: Email chain, Barry (MVT) and Zoback (Uber) 12/7/2017 (UBER0000788);

[29] Uber document: Vehicles XfN Meeting slide deck, 6/10/2020, slide 65 (UBER00005550) in notes re slide 65, states *"we want to pass the full cost* [of the vehicle] *to the driver"*.

[30] Uber slide show with notes: Launching UberWAV in Louisiana, 9/7/2018, slide 4 (UBER00010161)

relationships with rental and leasing companies, including its own company XCL can be used to provide such vehicle supply as may be necessary where the desire to do so exists.

WAV supply may also be assured through the use of partnership agreements with a city's transit department, and in particular in partnerships for the provision of 'Paratransit'[31], a concept that increases the potential profitability of WAV operations, estimated at around $3billion in NEMT alone[32]. Communications between Uber and the New Orleans Paratransit service provider Transdev[33], suggests that this may be an option for that city; while a number of Uber documents suggest a corporate view that partnering with transit agencies is a *"makes a lot of sense"[34]*.

### 2.1.2   Can the operator provide the service in a safe and dignified manner

Having established a number of methods by which appropriate vehicle types may indeed be supplied, the question follows whether an operator can provide the service demanded. In this instance the 'operator' may be classified as any (all) of: the transportation company (Uber), its sub-contractor (wet lease partner), and/or driver.

TNCs, in general, have made much of their training and safety records, not least to counter claims by other market participants and some regulators that these have not been fit for purpose. A raft of documents support the suggestion that the training requirements demanded of Uber for general service have been met[35].

Training is also required to meet the needs of wheelchair users[36], though this appears to be acknowledged in most official and internal Uber documents seen to address the issue. It is also noted that wet leases include provision of appropriately trained drivers, though it is noted in Uber documentation that training is *"…actually different for drivers in our MV Transit partnership vs. the various forms of WAV that we are using for some of the drivers out there"[37]*. Though equally the statement may also be read to relate to an issue of differing training requirements by vehicle type (model); and, separately, by differing disability type[38].

---

[31] The term Paratransit is generally used to relate to 'ADA services' provided by transit authorities. These can include, but are not limited to: bus equivalent services; NEMT transport, and human service / elderly transportation. A TNC partnering with a transit authority in the provision of Paratransit, or its collaboration on vehicle supply, can be reduced / offset the cost of vehicles to the TNC, while total cost of Paratransit may be reduced to the authority. Example: Transport DC (https://dfhv.dc.gov/service/transport-dc), and the Boston On-Demand Paratransit Pilot Program, provided by Uber, and other TNCs, on behalf of the city. https://www.mbta.com/accessibility/the-ride/on-demand-pilot. An evaluation of savings using WAV versus bus is contained in UberWav product development and launch strategy for Louisinana in comments to slide 4 (UBER00011904), suggesting a minimum saving of 90%: $200K subsidy (bus) compared to $20K (WAV).

[32] $3Billion figure quoted in Uber document: UberWAV, Product development and launch strategy for Louisiana; June 12, 2018, notes to slide 4. (UBER00011903) The unit of measurement, time period and geographical spread of this benefit are not explicit.

[33] Email chain including Juliano, Brightman, McNary and others (Uber) dated Jun 30 - 12 July 2017 (UBER00004906)

[34] Comment by Nirveek De (Uber)  dated 10/10/2018, to slide 31: Uber WAV Rider Research, slide deck, September 2018, by Rider UX Research, Uber Able and Ops

[35] See: https://www.uber.com/us/en/drive/requirements/regulatory/ for a description of regulatory standards

[36] Uber slide deck: UberWAV program overview, June 2017, Central Ops - producer experience; slide 6, ▓▓▓▓▓▓▓▓▓▓▓▓

[37] Uber WAV Rider Research, September 2018; authors: Rider UX Research, UberABLE, Ops. Notes to slide 21. He same notes continue to suggest that limited transparency may be an opportunity. (UBER00018887)

[38] National federation of the blind class action settled April 2016 https://nfb.org/groundbreaking-settlement-end-discrimination-against-blind-uber-riders-who-use-guide-dogs. An evaluation by the Uber beethoven-hearing-impaired-drivers-a00171-20161014 See: https://www.uber.com/en-CA/newsroom/a-new-way-to-explore-the-uber-app-for-our-deaf-or-hard-of-hearing-partners/ demonstrating ability to deliver features on the driver side: https://www.spot.ph/newsfeatures/the-latest-news-features/68115/uber-beethoven-hearing-impaired-drivers-a00171-20161014

### 2.1.3   Trip pricing and use economics

The third barrier to use relates to the price of provision, and associated market economics. Equitable treatment, for a wheelchair user, would appear to be served where the wheelchair user receives the same service level at the same price as an able bodied user. In preceding sections we have discussed the need to supply (sufficient) accessible vehicles and trained drivers, in this section we address the need to charge equitably between use types.

A number of arguments exist around the additional cost of a WAV when compared to those that are not accessible to wheelchairs. The purchase cost of a vehicle is a headline figure that is easily illustrated by reference to dealership prices that may suggest a company, in this instance the TNC or their drivers, can not provide an accessible service because it is beyond the income that it would produce. This is an attractive argument that may be easily illustrated. It is not, however, a complete picture for a number of reasons, summarised as including:

- That the cost of vehicle purchase is only a part of the total bundle of costs,
- An incorrect view that the market is static, where no additional trips would result from the provision of accessible vehicles, and
- That mechanisms exist and are in regular use to support purchase and operating costs, including incentivization within TNC companies, and by cross-subsidy from external sources including Paratransit, health etc.

A number of internal documents also suggest a number of non-financial benefits associated with the development of UberWAV that include reputational benefits, including those associated with positive relationships with local regulators. The Uber policy document addressing green recovery (Khosrowshahi, 2020[39]), sets out the concept of driver trip incentives, of up to $1.50 per trip, for the purchase of EVs; while a range of other reporting demonstrate methods of offsetting the cost of such incentives against pubic agency partnerships[40], global per trip accessibility charges, and directly from city based funds[41].

The reconciliation of costs against external grants, support incomes and additional trip counts is likely to significantly reduce any cost burden of WAV provision if not create a profit in its own right.


### 3.0    Opinion Summary

In stating this opinion I underline that my knowledge is based on my experience as a transportation professional, researcher and analyst. I make no claim to legal training and am not qualified in any area of law. Any statement related to legal decisions, precedents or their interpretation are based purely on their reporting and application to the transport operations and policy of which I am aware.

In the context of an individual with disability, the concept of accessibility relates, or should relate, to the equity with which that individual can access the same goods and services as other members of their community. The concept talks to an equality of treatment and esteem that is, in real terms, based on a comparative position vis-a-vis the community in which an individual is active.

---

[39] Khosrowshahi, 2020, Driving a green recovery, Sep 8,2020, p4
[40] Uber Accessibility monthly business review, Jan 22,2020, slide 25 illustrates the range and form of transit agency partnerships, stated as 26 active partnerships (slide 24) ███████████████████ (UBER00012545)
[41] Uber Accessibility monthly business review, Jan 22,2020, slide 12

Comparability is significant insofar as it relates to a standard based on a parity between individuals that underlies and is written into the most basic tenets of jurisprudence. In an ideal society there should be no difference between the able bodied and disabled in the services they access, nor in the levels of services received. To take this one step further, as a service level or expectation changes in one group its comparability also changes in the other. In short, if an able bodied traveller experiences an improvement in service levels, so too should the disabled traveller.

In the USA, this right is legislated under the Americans with Disabilities Act (ADA), the need for such legislation itself an indicator of the existence of disparity, with similar legislation in effect in the vast majority of other jurisdictions.

It is also notable that many places have updated the terminologies as applied to distinct groups, to remove stigmas or implications of handicap, though not all locations address the same issues with the same fastidiousness. For clarity I do not assume dated terms of handicap are meant negatively, but I will seek to apply less controversial terms of disability in this document.

For the transport user disabilities can exist across a number of physical or cognitive senses, all with specific needs. While many can be addressed with minor change, including in the training of the operator or vehicle driver, some require physical adjustments particularly to physical infrastructure developed in an era prior to a detailed consideration of the needs of all, and to vehicle design.

In the USA the interpretation of equality contained within the ADA includes the concepts of equivalent service standard, interpreted in some locations as parallel service provision, especially in respect of line based bus transit, though it is relatively easily demonstrated that many such 'paratransit services' are neither parallel nor equivalent.

For the sake of this opinion I will concentrate on the equity of and experience of a wheelchair user seeking to use Uber for point to point transportation. In particular the absence of appropriate vehicle types, being Wheelchair Accessible Vehicles (WAVs), where a wheelchair user would be unable to use, or be subject to discrimination arising from use of, a service that would require they transfer out of their wheelchair.

In developing an opinion it is appropriate to address a number of fundamentals of the market in which the TNC operates. Notwithstanding the view that providing accessibility for all is a matter of equality, nor that in so doing the company (Uber) would stand to benefit, not least in its reputation, a fact set out in a number Uber's own documents; the question remains whether Uber has an obligation to do so. Any such obligation would, it appears, follow from both the local, state and federal legislation under which the company operates, significantly the interpretation of the Americans with Disabilities Act, and its application to TNC companies by type and circumstance.

It is my understanding that demand responsive transportation providers, do have an obligation to make reasonable accommodation for the needs of wheelchair users and those of others with differing disabilities. This gives rise to the question as to whether Uber, or indeed any TNC, is in fact a transport company, and thus subject to this requirement.

In the letter from Anne Marie Estevez, on behalf of her client, Uber, dated May 1st 2020[42] it is stated that Uber *develops smartphone applications, software, and other technological*

---

[42] Email letter with subject title 'Re: Dr Scott Crawford and Jarvis Jernigan' (P Crawford Namisnak 002545-7)

*solutions for various industries including the restaurant industry (Uber Eats), the commercial trucking industry (Uber Freight), the healthcare industry (Uber Health), public transit systems (Uber Transit), the shift/temp work industry (Uber Works), the delivery industry (Uber Connect), the shared mobility industry (JUMP), and the ridesharing industry[43]"…* The implication being made appears to be that Uber provides technology, rather than transport. Later sections of the Estevez letter also address contractual relationships and the role the company has played in supporting and championing the role out of WAV services, both issues I will return to in subsequent sections of this document. The first point, however, whether Uber is a transport company or simply a technology provider is significant and has been exercised in various forums and courts before.

It is also appropriate to ask to what solutions the Estevez letter refers. It is accurate that Uber does indeed offer solutions across a range of client bases, Estevez listing eight in her letter, the company offering transport solutions to each of seven 'industries', the eighth, UberWORKS, associated with temporary employment may also be argued to contribute transport demand, but even where this is excluded, the vast majority of Uber's business is indeed that of transportation. The issue of company classification is discussed in the case of Association Professional Elite Taxi v. Uber Systems Spain SL in the Commercial Court 3 of Barcelona (2017)[44], and its subsequent referral to the European Court of Justice (ECJ)[45], in which the status of Uber as a transport company at all was adjudicated.

Associated with this are the issues of corporate structure (of the companies that, in combination, produce an "Uber product"). The definition of Uber as a transport company carries with it the duty to support equal access that applies equally to Uber as a corporate entity, and to the constituent parts, including its subsidiaries. The distinction(s), between Uber as a transport and an IT service provider, Uber as a corporate entity and its multiple subsidiaries appear to carry the intent to divide and confuse opinions across a range of actions, especially in the definitions as to who is doing what, on whose behalf, and why.

It is also significant to note that legal actions against an Uber entity operating in one country (eg: Uber Systems Spain SL, as applied to the ECJ case[46]) may appear to frustrate an action against another Uber entity (ECJ: Uber BV, of the Netherlands), additional entity(ies) (Rasier BV, Rasier LLC); and its/their corporate owner (Uber Technologies Inc., CA, USA), while the intent may be to affect the behaviours of 'Uber' as a single brand. In short the presence of multiple 'Uber' companies confuses and misdirects efforts to seek equitable access to the transport services provided from the Uber App.

### 3.1    Is Uber a transport company?

It appears pointless to argue against the fundamental truism that, at the end of an Uber app, is a transport journey[47]. This does not, however, preclude discussion on the nature of the service

---

[43] Given my contention that Uber passenger transport services are NOT ride-share in the traditional sense, I have interpreted this category to mean commercial transportation provided by non-professional drivers and typified by UberX, UberComfort, UberXL, amongst others, as a category that has been discussed under the banner of "rideshare". The Estevez statement may also include other Uber passenger transport services, including services with licensed professional drivers that include, but are not limited to: Limousines (eg: UberBlack) and Taxis (UberTaxi), amongst others, under this definition, but this is not clear from the original statement.
[44] *Ibid*
[45] Judgement of the Grand Chamber of the European Court of Justice, 20 December 2017
[46] *ibid*
[47] The term 'Uber App' relates to the smartphone application carrying the branding 'Uber' without additional categorisation. Other applications that include the Uber name are specifically branded and include: Uber Eats, Uber Driver, amongst others, though it should be noted that these examples are also specific to the provision of transportation.

being delivered, including the distinctions between what is, effectively, a transport product, and its alternatives.

Uber Technologies Inc., the ultimate owner of the Uber app, based in California, delivers its services through a series of subsidiary companies, often also badged as 'Uber' (across, and often local to, differing jurisdictions), as well as Rasier LLC, employing and contracting to drivers. Rasier being a wholly owned subsidiary of Uber Technologies Inc.[48, 49], with a series of its own subsidiary 'Rasier' companies across differing jurisdictions.

At the centre of this argument appears to be the relationship between the act of transportation, being movement from point a to point b, and the technologies that enable it. Additionally - the question as to which legal entity is responsible for the transport service and the actors that support that activity; though all, ultimately, report to Uber - as the owner of the app, including contracted self employed drivers.

The company itself has contributed to the ambiguity of definition. The use of specific terms in its advertising, as *"Everyones Private Driver",* a Trademarked slogan appearing in Uber advertising campaigns in and around 2013, certainly suggests the provision of transport services while its current activities to increase use of the Uber 'product' in transit also appears to tie Uber to the provision of transportation.

Further ties are apparent in the route to market in a number of locations, not least in the UK, where Uber services are licensed as Private Hire Cars (PHCs)[50], and fall under the same legislative framework as in place for taxis and VFH[51]. Uber vehicles are required to hold Private Hire licenses, registered premises, insurance, and comply with the licensing requirements of the licensing authority areas in which they operate.

Uber also draws direct comparisons between itself and other transport companies, including with Addison Lee, a London based Private Hire Company in a 2015 Uber Blog[52] presenting the use of surge pricing, being a fare multiplier imposed on top of the calculated transport fare and requiring acceptance by the passenger before transport is provided.

In the case of Elite Taxi vs. Uber Systems Spain SL, the ECJ judged that Uber (globally) acted as an 'intermediation service', providing a platform for the engagement of services, and this activity should be considered an integral part of the transport product[53]. That despite the technological nature of the platform (EU Eng: ISS), and the differing domiciles of Uber BV and Rasier BV, in the Netherlands.

The ECJ concluding that the Uber service subject of the complaint was a transport product and governed by the domestic and local regulation of the location of its use, in this instance Barcelona.

It should be noted that the ECJ ruling did not contradict the classification of the platform as being an ISS (sect 34), but concluded that the intermediation service *'must be regarded as*

---

[48] https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=guidelines-for-third-party-data-requests
[49] https://www.ridesharingforum.com/t/who-and-what-is-rasier-or-raiser-llc/456
[50] UK legislation uses the terms: Private Hire Car (PHC), Private Hire Vehicle (PHV) and Minicab to refer to the same vehicle type dependent on jurisdiction within the UK.
[51] Civic Government (Scotland) Act 1982, section 10 defines two tiers of VFH transport: Taxi and Private Hire Cars.
[52] https://www.uber.com/en-GB/blog/london/tube-strike
[53] In section 40 of the judgement of the Grand Chamber of the European Court of Justice (ECJ), 20 December 2017 the ECJ concludes that "intermediation services"…"must be regarded as forming an integral part of an overall service whose main component is a transport service and, accordingly, must be classified not as 'an information society service' "…"but as a service in the field of transport".

forming an integral part of the overall service whose main component is a transport service' (sect 40). The same judgement highlighting (sect 39) the extent of 'decisive influence over the the conditions under which that service is provided'.

The ECJ judgement gives rise to a range of further regulatory issues, where Uber is confirmed as a transport company that it falls to the "[EU] Member States to regulate the conditions under which intermediation services such as that at issue [Uber]"…"are to be provided in conformity with the general rules of the FEU treaty.[54]"

### 3.1.1 Decisive Influence

In line with the "decisive influence" conclusion of the ECJ, it is apparent that Uber, corporately, controls the operational parameters of service provision to the extent permitted under law. This includes the setting of fares, including the use of 'dynamic pricing', described in a communication between the Uber General Manager for Scotland and the Legal Manager for Licensing in Glasgow City Council, dated 4 March 2016[55], and subsequent extension of a booking office license, as a Private Hire Car company, to the company (Uber Britannia Limited), referenced in a letter from the Chief Executive's Office at Glasgow City Council to Uber dated September 2016[56].

The only deviation from an Uber determined fare appears to be that made available to California drivers first reported in an Uber Driver Blog, 8th January 2020[57], though this does not in and of itself remove control of baseline prices from Uber, but rather gives drivers the option to apply multipliers to the Uber determined fare, thus precluding the absolute ability of the driver to define fares.

The option for 'driver set pricing' was made available to CA drivers as reported in the Uber Blog of June 25, 2020[58]. The scheme derogation, whereby a driver can determine a multiplier to be applied to the Uber calculated fare, does not provide the freedom for the driver to set a fare outside the Uber tariff altogether[59].

It is also notable that the driver set pricing option follows after, and potentially because of, a ruling that Uber Drivers in California should be classified as employees, rather than contractors[60] [61]. The definition of Uber drivers as self employed, rather than employees of Uber, was re-established in a ballot under proposition 22, November 2020, though this appears to be a redefinition, from employees, rather than a reconfirmation of a previous position.

---

[54] Consolidated versions of the Treaty on European Union and the Treaty on the Functioning of the European Union - Consolidated version of the Treaty on the Functioning of the European Union - Protocols - Annexes - Declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, signed on 13 December 2007
[55] https://www.whatdotheyknow.com/request/382732/response/941220/attach/4/Uber%20Licensing%20File.pdf?cookie_passthrough=1
[56] ibid
[57] https://www.uber.com/blog/california/keeping-you-in-the-drivers-seat-2/
[58] https://www.uber.com/blog/california/set-your-fares/
[59] Taxi and VFH fares are typically based on a calculation of time and/or distance, commonly known as a tariff. The amount paid as a fare being the summation of these elements on conclusion or an agreed approximation defined and set prior to transport. The publication of a tariff table is commonplace, including by Uber prior to the introduction of Dynamic Pricing and the associated use of 'Upfront Pricing', on or around 2013 (the exact date varies by location). See: https://www.uber.com/ur-PK/blog/introducing-upfront-pricing/ for a current description of Upfront pricing.
[60] O'Connor v. Uber Techs. - 82 F. Supp. 3d 1133 (N.D. Cal. 2015)
[61] California Assembly Bill 5 reclassifies Uber Drivers from independent contractors to Employees. (Passed) 2019-09-18 - Chaptered by Secretary of State - Chapter 296, Statutes of 2019.

The arguments as to driver classification also follow from the extent of decisive influence that the company has on its drivers. A similar conclusion to that in California, that Uber drivers should be classified as workers (employees) rather than self-employed (contractors), was ruled in the case of Uber BV (and others[62]) v Aslam[63], having concluded and had upheld judgement that: "*Uber is in business as a supplier of transportation services*" and "*The drivers fell full square within the terms of the 1996 Act, s 230(3)(b)[64]*" qualifying as workers for Uber, upheld in appeals court on October 22nd 2020[65].

Similar arguments, that Uber has a decisive influence over its drivers, appear in other jurisdictions as well, not least in the findings of the ECJ, but also including the decision in the Canadian Supreme Court (Uber Technologies Inc. v. Heller, 2020) in respect of compulsory arbitration, finding against Uber to conclude "*the arbitration clause to be invalid for unconscionability*" allowing Heller to continue his lawsuit, that he and other drivers were employees of the company, in Ontario court.

In their own statements the company(ies), including its representatives, Uber Technologies Inc., its board members and its subsidiaries, have described the company as a transport provider; and described various elements of control under which the company exerts decisive influence, to wit: in terms of determining pricing (2019 blog(s) on pricing[66], critical reviews[67], and academic research[68] [69]); defining and enforcing driver requirements such as the driver background checks, a subject of controversy in their own right and including '*Uber's internal safety standards'*[70] in addition to locally defined legally required standards.


### 3.1.2   Customer interaction

In much the same way as Uber can exert decisive influence on its drivers, passengers are also confined by the controls applied by Uber. Specifically, that engagement through the app, being the only extant method of accepting an offer of transport, is controlled directly by Uber. This includes the determination of price[71], operating conditions and terms of service.

Uber can, at its discretion, exclude passengers from the app, including in the well publicized application of its greyball program, and in applying incentivization and disincentivization algorithms via pricing including the GodView programme and the more common dynamic pricing (surge pricing) algorithms.

---

[62] Uber BV; Uber London Ltd., and Uber Britannia Ltd.
In respect of the Local Government (Miscellaneous Provisions) Act 1976, which applies to England and Wales outside London, Uber Britannia is the holder of the relevant PHV operator's licence in each of the district councils (**other than the Metropolitan Police District and the City of London**) in which it operates. In respect of the 1998 Act, Uber London is the holder of the relevant PHV operator's licence (**specific to the Metropolitan Police District and the City of London**).
[63] Case number:  UKEAT 0056_17_1011 Appeal No. UKEAT/0056/17 Uber BV v Aslam [2018] EWCA Civ 2748; appeals to Court of Appeal 2018 [2018] EWCA Civ 2748 Case No: A2/2017/3467, and to the UK Supreme Court 2020 Case ID: UKSC 2019/0029 currently under appeal at the UK Supreme Court.
[64] Employment Rights Act 1996, available at: https://www.legislation.gov.uk/ukpga/1996/18/contents, accessed 22 October 2020
[65] https://www.cnn.com/2020/10/23/tech/uber-lyft-california-appeal/index.html
[66] https://www.uber.com/en-GB/blog/uber-dynamic-pricing/.; and https://www.uber.com/en-NL/blog/how-ubers-dynamic-pricing-model-works/ accessed 22 October 2020
[67] https://www.forbes.com/sites/nicolemartin1/2019/03/30/uber-charges-more-if-they-think-youre-willing-to-pay-more/#4977db437365
[68] http://www.columbia.edu/~ww2040/8100F16/Riquelme-Johari-Banerjee.pdf
[69] https://arxiv.org/pdf/2003.07736.pdf
[70] https://help.uber.com/driving-and-delivering/article/what-does-the-background-check-look-for?nodeId=ee210269-89bf-4bd9-87f6-43471300ebf2
[71] See section 3.1.1, above, in relation to CA driver fare multipliers

Greyball is an Uber program reported in the New York Times on March 2, 2017[72], with the reported functions of identifying and circumventing officials truing to clamp down on the service. The programme reportedly operates by identifying, then blocking individual users (individual targeting), alongside blocking specific addresses (Geo-blocking) known to include officials with an interest in investigating Uber, as part of a wider 'Violation of Terms of Service' (VTOS) program.

The New York Times article contains reference to a series of further approaches deployed in VTOS to identify and block individuals, that include, but are not limited to: Mining Credit Card databases; flagging devices (smartphones) associated with an individual; and various social media searches.

## 3.2    The provision of accessibility

Having considered many of the factors specific to the operational structure of Uber, it is now appropriate to ask how these affect the plaintiffs' desire to receive equitable access to Uber services.

In both instances, in New Orleans and in Jackson, the plaintiffs: Crawford & Jernigan, and Namisnak & Falls respectively, sought to make use of Uber on the same basis as any able bodied individual. In both instances the plaintiffs have ambulant disabilities that require the use of mechanical and powered wheelchairs.

It can reasonably be argued that, to achieve equity of access (in both instances), would require the provision of a Wheelchair Accessible Vehicle (WAV). Furthermore, the transport provider would be required to achieve service equivalence in speed of delivery, parity in terms of reservation availability and treatment, though the latter, speed of delivery as measured by comparison of ETAs, is rarely achieved in practice by any transit or commercial transportation provider outside cities where WAVs are a major part of the VFH fleet.

As the transport provider, Uber, whether at a corporate level or via any of its subsidiary companies, has a duty under the ADA to avoid discrimination through a denial of participation, participation in unequal or separate benefit, through the application of *'reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities'…'unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations'.[73]*

Based on the forgoing, it is my conclusion that Uber does offer a transportation service.  This leads to the question whether as to 'achievability' of accessible provision, which I explore in detail below.

### 3.2.1    Wheelchair User needs and requirements

In both instances, the plaintiffs have a stated desire to use Uber on an equitable basis compared to able bodied users. To achieve this Uber would need to offer WAVs on a similar basis as non-WAV vehicles.

---

[72] https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html
[73] ADA 42 USC S12181 et seq

Section 12184[74] defines, as a general rule, that… '*No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce.*'

Effectively that to provide a service that would not discriminate against the plaintiffs, or any user of a mechanical or powered wheelchair or similar device that could not be accommodated in the vehicle in another way, Uber would need/be required, to:

- Make reasonable modifications consistent with the carriage of wheelchair users,
- Provide auxiliary aids and services consistent with the needs of the passenger, and
- Ensure that service provided be equivalent to that received by other users of Uber.

Uber confirms, in its own publicity specific to accessibility, that it provides both Demand Responsive Transport, and operates anti-discrimination policies to reduce '*opportunities for unlawful discrimination to interfere with the  process of securing reliable, affordable transportation.*'[75]

### 3.2.2   Reasonable Accommodation

The ability and willingness of Uber to provide reasonable accommodation is visible in a number of locations across the US. The company publicizes a variety of wheelchair accessible transport options throughout the USA under the (various) banners of UberAssist, and UberWAV, available in Boston, Chicago, Los Angeles, New York, Philadelphia, San Francisco, and Washington, DC, amongst others[76].

The presence of the UberWAV product in other US cities demonstrates both a willingness and an ability of the company to provide accessibility in line with the requirements of the ADA in those cities, though it is also notable that actual number of cities reported as offering UberWAV service has declined[77], this may relate as much to a definition of minimum standards as an intentional reduction in supply.

It appears likely, therefore, that the company can demonstrate that there is no underlying or systematic objection to the provision of WAVs, or indeed to meeting the obligations of the ADA, but rather a pragmatic approach to, and reason why, such services have not (yet) been provided in a city. Internal Uber documents continue to highlight prioritisation of cities for WAV roll out[78]; supply and supply cost issues[79], though the issue of costs appear to be contradicted in statements of differing access to pubic funds, per trip supplements and income from transit, health and Paratransit involvement that would only be possible where WAVs were available. These are discussed in more detail below.

---

[74] U.S. Code Title 42, Chapter 126, Section 4, Prohibition of discrimination by public accommodations

[75] https://www.uber.com/us/en/about/accessibility/

[76] At the time of writing UberWAV is being described as a 'pilot' scheme, see: https://www.uber.com/us/en/drive/services/uberwav/

[77] https://wheelchairtravel.org/cities-wheelchair-accessible-uber-lyft/

[78] UberWAV program overview, June 2017, Uber Central Ops, slide 3 (UBER00014322); Uber WAV product development and launch strategy - Louisiana, Jun 12 2018 (UBER00011900) amongst others

[79] Internal Uber Email chain dated Apr 3 - 12, 2017, between Juliano, Agent, Schaechter, Harvish et al (Uber) outlining delay in supply; Statement of costs for wet lease hourly rates from MVTransit (UBER00019377); and ███████████████████████████████████████ (UBER00004906)

I would add at this point that although willingness may be demonstrated this is not synonymous to the provision of equity, as the provision of a WAV service does not ensure the service equivalence - also a requirement of the ADA.

If we take the presence of UberWAV (in some cities) at face value, that the company is not opposed to the provision of wheelchair accessibility, this leads to the questions:

- What methods could Uber use to make its services accessible in New Orleans and in Jackson;
- What barriers exist to this provision / are the barriers sufficient to qualify as unreasonable; and
- Do current conditions, including fleet availability, affect the future provision of WAV services?

## 3.3     Methods available to promote accessibility

In common with many transport companies, Uber does not, itself, own the vehicles that provide its services. In the case of the UberX service, vehicles are owned or leased by their drivers, with similar 'distributed ownership' across other Uber service brands. WAV services in a number of locations are provided to Uber in partnership with a specialist third party supplier, most frequently, but not exclusively, MVTransit (MVT). The relationship with MVT is broadly that if wet lease, described in previous sections, in which MVT provides an on call service at the direction of Uber through its own network of drivers and vehicles. For clarity MVT is owned and managed independently of Uber, and acts as a sub-contractor in locations where it provides UberWAV services.

Uber has also developed relationships with leasing and car hire companies to support and encourage the supply of WAVs to individual drivers on a rental or lease basis. Known relationships exist with Avis, Hertz and XCL in this supply, described in section 2, though others may also exist. The relationship allows for preferential rates and/or booking to Uber drivers and can be seen as a method of increasing supply of WAVs.

A number of methods of promoting accessibility exist, broadly grouped in to compulsion or persuasion, though a series of secondary categories including subvention and authority intervention may also be considered. Compulsion is usually a requirement of the licensing authority, while persuasion may flow from a series of sources, including those that can provide practical or financial support.

### 3.3.1   Compulsory Provision

Examples from the taxi market demonstrate methods of compulsion, in which the licensing authority defines and requires use of WAVs, of which the London Black Taxi market is a very widely quoted example. Similar regulations apply across the UK in a large number of cities, generally under the auspices of Metropolitan Conditions of Fitness (MCF)[80], being an Act and Regulation pertaining to vehicle design. The result of compulsion has been that a majority of taxis are operated by WAVs in larger UK cities.

Compulsory provision, such as the MCF, can dictate vehicle type, 100% supply (ie: all vehicles be WAVs) and may extend to defined fares etc.

---

[80] http://content.tfl.gov.uk/taxi-conditions-of-fitness-update-2019.pdf

### 3.3.2   Persuasive provision

It may reasonably be argued that TNCs in the US would be better served by a persuasion model, rather than a compulsion model, though this will in itself raise questions in relation to the interpretation and application of the ADA. This approach places the onus on the transport company to determine the operating parameters in which it provides accessible services, provided such services are delivered, the company, rather than the state, determining vehicle number and logistics. A reasonable hybrid exists in locations where supply has been historically low or uncertain, where a defined percentage of WAVs is set, leaving up to the supplier to determine the methods and logistics of reaching such a percentage. Examples of locations where this has been applied include Washington DC (20%), New York (25%)[81].

Some cities appear to operate a hybrid, between compulsion and persuasion, such as the case of Portland, OR; which permits supply through the Uber app to include *"contracting with a permitted operator of wheelchair-accessible PFHT vehicles" …"within a reasonable time"* but also defines the maximum time that may be considered reasonable with the presumption that … *"any time beyond 30 minutes is unreasonable".* The legislated requirement shifting from a percentage to a service standard, while it remains within the power of the company to determine how to satisfy this standard[82].

To its credit Uber can demonstrate both generic and city specific exercises to recruit WAV drivers[83] [84], though WAV provision remains a small part of the company's transport business. The company also appears willing to promote alternatives to individual drivers owning their own WAVs through its wet lease relationships and promoted rental and lease partners, detailed above.

### 3.3.3   Collaborative provision

A further example of a persuasive model includes that of collaborative. This generally follows where an accessible taxi mandate exists and is observed where TNCs have linked their app to accessible services providers, including UberTaxi options seen in some cities. This will, in effect, pass on accessible transport needs to a mandated provider, including taxi companies, and may form an alternative to a mandated percentage, as is the case in New Orleans.

Some locations with established collaborative models  appear to be in the process of moving to an interventionist approach, including in locations with proactive licensing authorities such as Washington DC, Boston and Chicago.

The New Orleans neighbour of Baton Rouge provides an example of potential collaborative routes, having announced a city contract with MV Transportation in 2013[85], while the New Orleans Transit provider, Transdev, operates a standard Paratransit service that might also be able to follow the Uber MV Transportation model, and has been engaged in discussion with

---

[81] Washington State Joint Transportation Committee January 2019, Regulation of Transportation Network Companies, summary report p32 Available at: https://leg.wa.gov/JTC/Documents/Final%20Studies/RegulationofTNCs_SummaryReportFinal.pdf
[82] City of Portland Code, Chapter 16.40 Private For-Hire Transportation Regulations, section 16.40.290.C.3 Available at: https://www.portlandoregon.gov/citycode/28593#cid_689637 Accessed 12 Jan 2021
[83] https://www.uber.com/us/en/drive/services/uberwav/
[84] Utah specific form: https://docs.google.com/forms/d/e/1FAIpQLSdXCiKkFdEirPPyGdTt6eX4MzYArOUcpP2HdNv9-0vtd3RtYA/viewform?c=0&uclick_id=10d1e5ca-8a21-476f-8792-2f1cf0115661&w=1 Accessed 23rd October 2020
[85] https://www.mvtransit.com/news/baton-rouge-transit-contract, accessed Nov 12, 2020

Uber, see preceding comments. Transdev itself is noted as providing leading 'mobility' services through its 'my Mobi' product[86], and is seeking to develop the concept of an 'on demand micro-transit' service internationally, suggesting the potential may exist for a collaborative approach in other Transdev cities.


### 3.3.4   Intervention

The fourth model relates to a partnership with a licensing authority, building on the Paratransit themes initially identified under collaborative provision. The precise nature of the partnership is likely to differ to reflect the priorities of the authorities, but include:

- In Boston, the inclusion of Uber into the authority Paratransit programme 'The Ride",
- In Chicago, the integration of Uber Access (WAVs) into the city's Open Doors Organization training,
- In Washington DC, the inclusion of both UberWAV and TaxiWAV on a single platform, with taxi mandates requiring a defined supply of WAVs in the traditional taxi fleet.

While no single approach may be appropriate for all locations, the lessons of each, and the relatively positive responses to each of the initiatives discussed, suggests that both willingness and methodologies exist for their supply.


### 3.4   Application

Having established a relatively strong response to and favour for WAV development, the question of application to both New Orleans and Jackson remain. In short do current conditions on the ground, including fleet availability, affect the future provision of WAV services in these cities?

It is apparent that neither Uber, or indeed any other TNC, have chosen to provide fully accessible vehicles in either New Orleans nor Jackson. This being the focus of the complaint and the request for reasonable accommodation under the Americans with Disabilities Act.


### 3.4.1   Regulatory requirements

Notwithstanding the duties and responsibilities of the ADA, which appear clear, each local administration has the right to pass additional individual and/or multiple instruments governing (some aspects of) the operation of TNCs and other vehicles for hire in their jurisdiction[87].

In the case of New Orleans these include Louisiana House Bill 527 (passed May 2017) affecting TNCs, including definitions of non-discriminatory policy, though it stops short of defining wheelchair service standards, stating (section 222) rather that TNC drivers shall comply with '*all applicable nondiscrimination laws*'[88]; the City of New Orleans Administrative Rule 17-05 Departmental Regulations for Transportation Network Companies[89], and article XV of chapter 162 of the New Orleans City Code, though no local ordinance exists in Jackson.

---

[86] https://www.transdev.com/en/our-solutions/on-demand-connected-transport/ accessed Nov 12, 2020
[87] The extent to which a local authority may, or do, define local standards reflect the presence and impact of state regulation. In some instances such local powers are limited and may extend to general traffic management, while other locations define and require significant compliance on a local level.
[88] https://www.legis.la.gov/legis/ViewDocument.aspx?d=1042911
[89] https://www.nola.gov/nola/media/One-Stop-Shop/Safety%20and%20Permits/Dept-Regulations-for-TNCs.pdf

Counter to House Bill 527, section 162-1707 c, 1,2 and 3 (accessibility) of the New Orleans City Code does define an accessible vehicle requirement where the TNC has '*at least 50 vehicles operating*' to provide

… '*(1) No less than three percent of all TNC vehicles in its network shall comply with vehicle guidelines set forth in the Americans with Disabilities Act (ADA) with the average time available per week for such vehicles being reasonably within the average time available per week of all TNC vehicles on its TNC digital network;*

*(2) No less than three percent of the total time available per week of all TNC vehicles in its network shall be achieved by TNC vehicles that comply with vehicle guidelines set forth in the Americans with Disabilities Act (ADA); or*

*(3) The TNC shall make its TNC digital network available to all accessible taxicab CPNC holders to allow passengers to book rides on the TNC digital network with accessible taxicabs. The TNC shall make available the same or substantially the same software TNC digital network functionality as it provides for TNC vehicles, but is not required to accept payment through the TNC digital network. The TNC shall provide this service to accessible taxicabs at its own expense.*

The code providing an opportunity, but not an obligation, to form a strategic partnership with accessible taxi services in order to reach a minimum compliance in WAV availability.



While it is apparent that New Orleans has an increased national visibility as a visitor destination, and the a lucrative market for transport suppliers, including Uber, the rights of, and provision to, wheelchair users in Jackson, Mississippi, are equally important and can be served using many of the same approaches visible in its Louisiana neighbour. Not least that the same commercial opportunities exist for the successful provision of collaborative WAV supply and may benefit in the same way from partnerships, with authority paratransit; and from the effective cross subsidies that may be associated with an accessibility fund, or an accessibility surcharge. These elements are detailed, in respect of both communities in the review section, below.

## 4.0    Review and conclusions

In developing the review as set out above, and the development of an opinion, it is necessary to express views that apply to differing aspects of the market separately. I address the fundamental questions defined in section 2, being the duties to supply accessibility, the

---

90 Internal email chain Apr 4 2017 between Utley and Schaechter (UBER00005079)
91 Internal email chain Jun 30 - Jul 12 2017 between Juliano and Brightman (UBER00004907)
92 Internal email chain Jul 13 2017 between Fagent and Tsai (UBER00005073), states reason to be the reduction of H2 budget cost

practicalities of such supply, and the economic impacts that arise therefrom. These are expressed in terms of headline and conclusion in this section.


4.1    Validity of opinion to the cities of New Orleans and Jackson
        Whether singularly or collectively.

My conclusions and opinions expressed apply equally to both the Cities of New Orleans and Jackson unless indicated otherwise.

Both cities operated, at the time of complaint, a range of Uber services that excluded accessible vehicle types. While New Orleans may be seen as a well known destination with significant visitor traffic, both cities, New Orleans and Jackson, have a significant population, particularly where measured on the basis of their metropolitan area, with the potential for a significant demand, including suppressed demand, for accessible transport. In both instances a demonstrable desire for accessible services to be provided via the Uber app has been expressed but not provided.

It is also appropriate to note that Uber provides a range of non-accessible services in both cities, and may thus be defined as having an existing infrastructure suitable to support the supply of passenger transport in both cities.


4.2    Company purpose and form

It is my opinion that Uber is a transport company, being primarily engaged in the business of transporting people. The company provides a Demand Responsive Transportation product in both Jackson MS and New Orleans LA. It follows and can be argued separately or in tandem with the definition of product, that Uber is a transportation company offering services in both cities.


4.3    Duties under the Americans with Disabilities Act

Notwithstanding the necessity of a TNC to make a profit it is my opinion that the company does have a duty to provide accessibility under the meanings of the Americans with Disabilities Act.

This duty brings with it costs associated with such provision, that need to be borne by the company in exactly the same way that a workplace need accommodate costs of accessibility, new buildings accommodate the cost of accessible ramps and so on. This should, in my opinion, be classified as a cost of doing business that should have been apparent and clear to the company from its early development, and not an additional cost imposed to do something that is considered an unreasonable demand.

While the actual 'duty' may be limited in law to making reasonable accommodation it appears that such accommodation can be honoured relatively easily by the full and equitable supply of a WAV service in both cities. Indeed the company's own documentation illustrate methods by which this may be achieved in both practical terms, and on a cost efficient basis.

It is also important to note that, given the existing operating practices, the inclusion of UberWAV does not fundamentally alter the nature of Uber's goods / services.

4.4     The provision and availability of underlying infrastructure

In section 4.1 I highlighted the observable fact that Uber operates passenger transport services in both Jackson and New Orleans. This can be verified using the Uber website and was accurate at the time of writing. It follows therefore that the company has in place the infrastructure that may be required for the provision of that service. This includes, but need not be limited to:

-   Passenger and Driver apps suitable to use in both locations;
-   A structure for the recruitment, certification and payment of drivers; and
-   A public communications team appropriate to support users in both cities.

Given the active supply of passenger transport services in both cities it may reasonably be suggested that the underlying infrastructure is both present and operational.

In the separate complaints, related to New Orleans and Jackson[93], it was requested that Uber made reasonable accommodation to permit access to their services for Wheelchair users. This included the request that Uber 'turn on the UberWAV option', a request requiring the company to provide access to UberWAV in both cities.

In practical terms I do not believe there to be any technological reason why the app should not thus be enabled in either city, though it is appropriate to match an operational app with an adequate supply of vehicles, which I address below.


4.5     The provision of WAV vehicles

The preceding sections of this document have set out a number of options by which the company, Uber, may provide WAV vehicles. These are discussed in detail in Uber internal documents as well in the sections above, and may be summarised as a combination of (any of): Taxi WAV operators; Commercial WAV operators; personally-owned WAV operators, and/or WAV Leasing / Renting partners[94]. The mechanisms thus described provide a method by which a WAV fleet may be established, but stops short of addressing costs and financial issues of each.

In the responses from Estevez[95] on behalf of Uber to DeReus a list of transport companies providing wheelchair accessible services was provided (5 in the case of New Orleans, 3 in Jackson). In both instances a demonstrable partner was identified that would also support the Uber routes to market for Taxi WAV WAV options. Leasing options were also detailed, with significant and advanced, though delayed, discussions in the case of New Orleans, using XCL, while the potential use of Avis and/or Hertz would likely exist in either city. Commercial WAV options, including the wet lease approach common to contracts operated by MVTransit also appear to be in advanced discussion with TransDev for supply to the New Orleans market.

In light of the above observations it is my opinion that a potential supply of vehicles can exist in both New Orleans and Jackson markets. Not only is it likely that supply will be encouraged as the observed demand for WAVs becomes apparent, actual use replacing its suppression, but also that Uber has available such mechanisms as may be needed to support and encourage

---

[93]Email Letter 22 Sept, and 4 Oct 2018 (respectively) from DeReus to Estevez (for Uber)
[94] Heavily redacted Uber document without title or date, believed to be authored around January 2017, and appearing to define a route to market for UberWAV. Slide 7 (UBER00013733)
[95] Letters from Estevez (for Uber) to DeReus, Nov 3rd, 2019 (P Crawford Namisnak 00803) and May 1, 2020 (P Crawford Namisnak 002547)

that supply. This includes, but is not limited to: rental and leasing options, including its own company XCL; potential strategic partners, including those companies listed in the Estevez responses, existing and new wet lease options; and strategic partnership options with local authority agencies in both locations. Reliance on one option alone, or its presentation as lacking sufficient supply (supply shortage) in one of multiple options, would under-estimate the potential supply available to the company.

## 4.6    Cost of provision

The final 'hurdle' appears to relate to the cost of supplying the accessible service. Notwithstanding my view, expressed above, that the duty to supply requires any such cost to be treated as a cost of doing business, the underlying fact remains that WAV supply has a cost met, in the first instance, by the supplier.

A number of statements appear through the Uber documentation seen that address costs, though some contradictions are apparent the general direction appears to be that the need to invest in WAVs, whether through driver incentives, leasing or purchase support, or direct payment to wet lease commercial partners can be met from a number of potential sources. These include cross-subsidies from accessibility fees levied on all Uber users; gaining access to accessibility funds that may include fees levied on all vehicle for hire users etc. Separate discussions, mainly those seeking to encourage WAV development, highlight the additional benefits of partnerships with transit and paratransit agencies and from the NEMT health sector. Some calculations of the overall size and value of these sectors are included and have been discussed above, but none of the documents seen monetise this benefit per vehicle, despite the fact that many such trips require WAVs. It is also notable that no calculation is apparent that identified the added income that may arise from the suppressed demand market, being individuals, with wheelchairs, who have made a decision not to travel as a result of a lack of realistic travel options, though it is clear that such a market exists.

As a final note, the Uber document "Accessibility at Uber"[96] states, at slide 17, that *"investment now will mitigate significant long-term costs"*, suggesting that a cost benefit analysis of investment versus costs of non investment support investment in WAV now. In short, developing UberWAV is cheaper than the cost of not developing it.

## 4.7    Conclusions

The assessment of the duty and role of a TNC in the provision of accessible transport pits the desirable and equitable against the practicalities of the achievable and the reasonable.

In drawing the conclusions set out here above, it appears necessary to reaffirm the view that equality is best served by applying the same rights to any and all individuals regardless of any disability, or indeed any other 'difference'. The need to say this underlines the fact that access is not equal, and the need to legislate for it underlines the willingness of some not to provide it.

The conclusions above relate to a situation where equality in access is clearly not being provided. The question therefore need establish whether Uber is a transport company, which I believe it can be demonstrated as being, and whether it is subject to equality legislation, in this instance the Americans with Disabilities Act, which I believe it is.

---

[96] Undated document but containing notes dated 8 May 2017, slide 17 (UBER004665)

Having stated my conclusions to both questions, it remains to demonstrate that reasonable accommodation can be made in the case of both complainants, in the interest of other wheelchair users, the wider community, and indeed to Uber itself. In this respect and specific to Jackson MS, and New Orleans LA, it would appear that all of infrastructure, potential supply and demand exist. I conclude that the reasonable approach for Uber would indeed be to provide UberWAV in both cities.

## V.     THE FACTS OR DATA CONSIDERED BY THE WITNESS IN FORMING THE ABOVE OPINIONS. AND ANY EXHIBITS THAT WILL BE USED TO SUMMARIZE OR SUPPORT MY OPINIONS.

The facts and data I utilized are set forth above by reference, either in the body of the text or in a footnote reference. In addition, I advise that I have reviewed the following documents, data, and source materials[97] [98]:

1. Second Amended Complaint in Namisnak v. Uber Technologies, Inc., and all attachments.
2. First Amended Complaint in Crawford v. Uber Technologies, Inc., and attachments.
3. République de France 2014: Law 2014-1104 October 1 2014 (Loi Thevenoud)
4. Judgement of the court 20 Dec 2017: European Court of Justice, Grand Chamber, ruling ECLI:EU:C:2017:981, available at: http://curia.europa.eu/juris/document/document.jsf?text=&docid=198047&pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=172505
5. Constitutional council of France, 2015. Decision no. 2015-468/469/472 QPC of 22 May 2015 the company UBER France SAS and another [Chauffeured vehicles - prohibition on "electronic cruising" - charging terms - obligation to return to base], available at: https://www.conseil-constitutionnel.fr/en/decision/2015/2015468_469_472QPC.htm, Uber slide presentation: Uber's WAV dispatch solution, May 2017. (UBER0012361)
6. Email chain 11 - 29 Mar 20, between Paige Tsai and Andrew Salzberg (Uber) (UBER00019072)
7. Email chain 6 Oct 2016 - 12 Jan 2017, between WC UberWAV strike team members (UBER0000591)
8. Uber slide presentation: Title redacted, internal review of WAV routes to market (UBER00013727)
9. Uber internal document: Future of WAV update (Undated, believed to be Mar 1 2017) (UBER00014943)
10. Email chain 3 - 12 April 2017, between Juliano, Harvish and others (Uber) (UBER00005077)
11. Uber slide presentation: Accessibility at Uber, May 2017 (UBER00014642)
12. Email 23 May 2017 from Rufo (Uber) to Hendrick (XCL) (UBER0000490)
13. Uber slide presentation, UberWAV Program Overview, 1 Jun 2017 (UBER00014322)
14. Email chain 30 Jun - 12 Jul 2017 between Juliano, Brightman and others (Uber) (UBER00004906)
15. Email 13 Jul 2017 from Fagent to Tsai (Uber) (UBER00005073)
16. Uber slide presentation: NYC TLC WAV proposal, industry counter proposal + Uber role, Oct 2017 (UBER00008900)
17. Email chain 3 Nov - 7 Dec 2017 between Barry (MVT) and Zoback, and others (Uber) (UBER0000788)
18. Uber internal document: Louisiana 2018 H1 Coms plan, undated (believed to be around: 1 Dec 2017) (UBER00012265)

---

[97] Materials that include a reference commencing '(UBER…' in this list are stated using the reference set out on the first/cover page of that document. Unless otherwise described all pages in the document have been included in this review.
[98] Unless otherwise indicated all web links were believed to be live on the 10th January 2020

19. Email chain 7 - 16 Feb 2018 between Barry (MVT) and Harvish and others (Uber) (UBER00000697)
20. Email chain 8 - 12 Feb 2018 between Barry (MVT) and Zoback (Uber) (UBER00001609)
21. Uber slide presentation: UberWAV product development and launch strategy - Louisiana, Ayush Dahiya Jun 12 2018 (UBER00011900)
22. Uber slide presentation: UberWAV Louisiana Launch, Chelsea Corell, 17 July 2018
23. Uber slide show with notes: Launching UberWAV in Louisiana, 7 Aug 2018, slide 4 (UBER00010161)
24. Uber slide presentation: WAV Rider Research, Rider UX Research, UberABLE and Ops, Sept 2018 (UBER00018861)
25. Email 22 Sep 2018 from DeReus to Estevez (for Uber) (P Crawford Namisnak 00796)
26. Email 4 Oct 2018 from DeReus to Estevez (for Uber) (P Crawford Namisnak 002541)
27. Email chain 22 - 27 Oct 2018 between Pfeiffer (NOLA) and Wooler (Uber) (P Crawford Namisnak 00698)
28. Email chain 22 - 31 Oct 2018 between Pfeiffer and Wooler (P Crawford Namisnak 00686)
29. Uber slide presentation: TRIPAD Weekly Marketplace Meeting, Dec 19 2018 (UBER00009232)
30. Uber slide presentation and notes: Philly WAV, 22 Jan 2019 (UBER00008975)
31. Email chain 18 Feb - 1 Mat 2019 between Pfeiffer (NOLA) and Wooler, and others (Uber) (P Crawford Namisnak 00666)
32. Email 16 Apr 2019 From Pfeiffer (NOLA) to Neptune and others (Uber) (P Crawford Namisnak 00656)
33. Presentation:Uber wheelchair accessible vehicle (WAV) study proposal, 4Square, April 19 2019 (UBER00008548)
34. Email chain 26 Apr 2019 between Pfeiffer (NOLA) and Kemp, and others (Uber) (P Crawford Namisnak 00650)
35. Email chain 29 Apr - 3 May 2019 between Cecil (NOLA) and Kemp, and others (Uber) (P Crawford Namisnak 00643)
36. City of New Orleans statement of regulatory requirements for Transportation Network Companies (undated)
37. Email chain 20 - 25 Jun 2019 between Pfeiffer (NOLA) Wooler and others (Uber) (P Crawford Namisnak 00636)
38. Email chain 6 July 2019 between Sgt. Palumbo (NOPD), Cecil (NOLA) and LA DOT, (P Crawford Namisnak 00630)
39. Email chain 8 - 17 Oct 2019 between Pfeiffer (NOLA) and Wooler (Uber) (P Crawford Namisnak 00614)
40. Email chain 14 Oct 2019 between Chadbourne (MCCNO) and Pfeiffer (NOLA) (P Crawford Namisnak 00618)
41. Email letter 13 Nov 2019 from Estevez to DeReus (P Crawford Namisnak 00801)
42. Uber slide presentation: Accessibility Monthly Business Review, Dec 16 2019 (UBER00012558)
43. Uber slide presentation: Accessibility Monthly Business Review, Jan 22 2020 (UBER00012519)
44. MVTransit slide presentation: Uber & MV Contract Extension 14 Apr 2020 (UBER00019377)
45. Uber statement: Uber community guidelines, 22 April 2020 (P Crawford Namisnak 00273)
46. Email letter 1 May 2020 from Estevez to DeReus (P Crawford Namisnak 002645)
47. 4square report: WAV Study (UBER00006932)
48. Uber slide presentation: Vehicles XfN Meeting, 10 June 2020 (UBER00005524)
49. Uber paper: Driving a Green Recovery. Dara Khosrowshahi 8 Sep 2020
50. Uber statement: Surge Pricing (https://marketplace.uber.com/pricing/surge-pricing) accessed 19 Nov 2020. (P Crawford Namisnak 002588)
51. Washington State Joint Transportation Committee January 2019, Regulation of Transportation Network Companies, summary report p32 Available at: https://leg.wa.gov/JTC/Documents/Final%20Studies/RegulationofTNCs_SummaryReportFinal.pdf

52. City of Portland Code, Chapter 16.40 Private For-Hire Transportation Regulations, section 16.40.290.C.3 Available at: https://www.portlandoregon.gov/citycode/28593#cid_689637
53. Uber statement: Delivering on our safety commitments, 4 Dec 2020 (P Crawford Namisnak 002709)
54. Uber slide presentation with notes: WAV Launch Louisiana, William Bishop, undated (UBER00011636)
55. Uber slide presentation with notes: Vehicle Solutions and Xchange leasing, US & Canada GM Summit 2017 (UBER00014611-25)


## VI.    SIGNATURE

Signed electronically:

*January 14th, 2021*
        */s/ James M. Cooper PhD*

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
SCOTT CRAWFORD and
JARVIS JERNIGAN,
JR.,
     Plaintiff,

VERSUS               CASE NO: 3:17-cv-02664-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
     Defendants.

                     AND

STEPHAN NAMISNAK,
et al,
     Plaintiff,

VERSUS               CASE NO: 3:17-cv-06124-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
     Defendants.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



DEPOSITION OF NIRAJ PATEL


TAKEN VIA ZOOM VIDEOCONFERENCE
ON FRIDAY, NOVEMBER 20, 2020
AT OR ABOUT 8:01 A.M. CST

AT COURT REPORTERS OF LOUISIANA, LLC
9522 BROOKLINE AVENUE - SUITE 217
BATON ROUGE, LOUISIANA 70809


REPORTED BY:  Janie J. Darby
Certified Court Reporter
Certificate No. 85140

```
 1                    NIRAJ PATEL,

 2        after first having been duly sworn, was

 3   examined and did testify as follows:

 4   EXAMINATION BY MR. DEREUS:

 5        Q.    Thank you for being here this

 6   morning, sir.  Could you go ahead and start

 7   by just stating your name for the record.

 8        A.    Yes.  My name is Niraj Patel.

 9        Q.    Okay, Mr. Patel.  My name is Garret

10   DeReus.  I'm an attorney.  I represent some

11   plaintiffs in two different cases that have

12   been filed against Uber.  I'm here to ask a

13   number of questions.

14              Have you ever given a deposition

15   before?

16        A.    I have not.

17        Q.    Okay.  So basically what we are

18   going to be doing over today's deposition is

19   I'm going to be asking questions and you are

20   obligated having sworn to tell the truth to

21   provide your answer.  But I'm not asking you

22   at any point to guess or to speculate or

23   anything like that.  So if you don't know a

24   question, you know, just provide the truthful

25   answer to the full extent that you know.  But
```

1          I can just say it again.

2     MS. ESTEVEZ:

3          That's fine.

4  EXAMINATION BY MR. DEREUS:

5     **Q.   To what extent is, you know, has**

6  **"How does UberWAV make a profit for Uber?" is**

7  **that a primary concern by Uber as to the Uber**

8  **product?**

9     A.   I guess I would frame that a little

10 bit differently, which is there is no primary

11 concern around making a profit.  There is --

12 The question is how does WAV not be a

13 substantial loss.  And so like before you

14 talk about making a profit you have to not be

15 burning a whole lot of money.

16          So I would say our focus is on, you

17 know, if you think about the lifecycle of a

18 given service that's available through our

19 marketplace, first it needs to not lose money

20 and then we can talk about what happens after

21 that.

22    **Q.   Is it your position or Uber's**

23 **position that if UberWAV was operating at**

24 **break even that Uber would be providing the**

25 **UberWAV service?**

```
 1                    WITNESS' CERTIFICATE

 2

 3

 4

 5        I, NIRAJ PATEL, have read, or have had

 6   read to me, the foregoing testimony, and

 7   hereby certify that it is a true and correct

 8   transcription of my testimony, with the

 9   exception of any corrections or changes

10   attached hereto.

11

12

13   (CHECK ONE)

14   [  ]   WITHOUT CORRECTIONS.

15   [  ]   WITH CORRECTIONS AND/OR ADDITIONS
                    ATTACHED HERETO.
16

17

18   SIGNATURE:

19                      NIRAJ PATEL

20   DATE:

21

22

23

24        Reported by:  Janie J. Darby, CCR

25
```

```
 1                    REPORTER'S PAGE

 2

 3           I, JANIE J. DARBY, Certified Court

 4    Reporter in and for the State of Louisiana,

 5    the officer as defined in Rule 28 of the

 6    Federal Rules of Civil Procedure and/or

 7    Article 1434(B) of the Louisiana Code of

 8    Civil Procedure, before whom this proceeding

 9    was taken, do hereby state on the record:

10               That due to the interaction in the

11    spontaneous discourse of this proceeding

12    dashes (--) have been used to indicate

13    pauses, changes in thought, and/or talkovers;

14    that same is the proper method for a Court

15    Reporter's transcription of a proceeding, and

16    that dashes (--) do not indicate that words

17    or phrases have been left out of this

18    transcript;

19               That any words and/or names which

20    could not be verified through reference

21    material have been denoted with the phrase

22    "(phonetically spelled)."

23

24

25
```

1              C E R T I F I C A T E

2        This certification is valid only for a
   transcript accompanied by my original
3    signature and original required seal on this
   page.
4        I, Janie J. Darby, Certified Court
   Reporter, in and for the State of Louisiana,
5    as the officer before whom this testimony was
   taken, do hereby certify that NIRAJ PATEL,
6    after having been duly sworn by me upon the
   authority of R.S. 37:2554, did testify as
7    hereinbefore set forth in the foregoing 264
   pages; that the testimony was reported by me
8    in the stenotype reporting method, was
   prepared or transcribed by me or under my
9    personal direction and supervision, and is a
   true and correct transcript to the best of my
10   ability and understanding; that the
   transcript has been prepared in compliance
11   with the transcript format guidelines
   required by statute or by rules of the board,
12   that I have acted in compliance with the
   prohibition on contractual relationships, as
13   defined by Louisiana Code of Civil procedure
   Article 1434 and in rules and advisory
14   opinions of the board, and that I am not
   related to counsel or the parties herein, nor
15   am I otherwise interested in the outcome of
   this matter.

16
        I hereby certify that the foregoing
17   transcript has been signed and stamped by me
   on December 16, 2020.

18

19

20

21

22                 JANIE J. DARBY
                 CERTIFIED COURT REPORTER
23                 CERTIFICATE NUMBER 85140

24

25

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


STEPHAN NAMISNAK, ET AL    * NO.: 3:17-CV-06124-RS

VERSUS                     *

UBER TECHNOLOGIES, INC.    *
AND RASIER, LLC
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


      The continued videotaped deposition of

STEPHAN NAMISNAK, appearing remotely via

videoconference from New Orleans, Louisiana,

taken in connection with the captioned cause,

pursuant to the following stipulations before

Cynthia M. Hare, Certified Court Reporter,

appearing remotely from Metairie, Louisiana, on

the 18th day of December 2020, beginning at

2:06 p.m.

1    the plaintiffs, Stephan Namisnak and Francis Falls.

2    And I consent to the remote swearing in.

3         THE VIDEOGRAPHER: Will you please swear in the

4    witness.

5                        STEPHAN NAMISNAK,

6    after having been duly sworn, was examined and did

7    testify as follows:

8    EXAMINATION BY MS. SCHUSTER:

9    Q    Good afternoon, Mr. Namisnak, welcome back.

10   A    Good afternoon.

11   Q    And we're going to jump right in, so thanks for

12        -- for being here a second day.  Since you were

13        last deposed, have you spoken to anyone about

14        your testimony?

15   A    Yes.

16   Q    Who did you speak to?

17   A    I spoke with my attorney, Andrew Bizer.

18   Q    And when was that?

19   A    We spoke twice -- we spoke briefly yesterday,

20        and we had spoken briefly subsequently to the

21        first part of the deposition.

22   Q    The same day?

23   A    Yes, I believe it was the same day.

24   Q    And how long was that call?

25   A    Approximately ten minutes, fifteen minutes.

```
 1                  I'd like there to be a sufficient
 2             number of vehicles so that at any time that
 3             I am looking to call a vehicle, I can get a
 4             ride with Uber in an accessible vehicle in
 5             a roughly similar time to what any other
 6             customer expects.
 7   MS. SCHUSTER:
 8   Q    And in your estimation, is that 30 to 60 WAVs?
 9   A    Thirty to 60 was a suggestion of, you know,
10        what might be a sufficient number.  But
11        therein, I'm, you know, I defer to Uber as to
12        how, you know, to run the business of how to
13        get the vehicles and how many are required at
14        different times based upon, you know, volume of
15        ridership and volume of vehicles available.
16        The 30 to 60 was a suggestion of what be
17        sufficient.
18             But I'd like to underscore that what I'm
19        looking for is to get Uber, you know,  to be
20        able to, you know, from wherever I am in the
21        New Orleans area, to be able to get on the
22        phone and for something that's similar to what
23        any other Uber customer would enjoy in terms of
24        service and response time, to be able to get a
25        ride.  And if there's, you know, not as many
```

1       accessible vehicles out there as there are

2       accessible ones, if my ride takes a few minutes

3       longer, then as a disabled person, that's the

4       kind of thing that I have to deal with.  Should

5       I have to?  Not necessarily, but I do.  And I'm

6       not unreasonable if it's going to take a few

7       minutes longer because there's not quite as

8       many.  So it's not about the exact number, it's

9       about the equivalency of service that within a

10      roughly similar time that I can reliably get a

11      car and get, you know, from where I am to where

12      I need to be.

13  Q   Sure.  So let's say Uber was able to somehow

14      ensure that, you know, 60 drivers with

15      wheelchair accessible vehicles were signed up

16      to use Uber app in New Orleans, but when you

17      wanted to get a ride none of them were logged

18      on that would still be insufficient, correct?

19              MR. BIZER:

20                  Object to the form of the question.

21              You may answer.

22              THE WITNESS:

23                  Yes.

24  MS. SCHUSTER:

25  Q   So the number of drivers isn't what you're

1      after, it's the level of service at any time

2      when you log on, correct?

3  A   Yes.  Thank you, that was very succinct.

4  Q   Okay, on the same page, again, this is page 3

5      on Exhibit 117, the last paragraph at the

6      bottom of the page says, "Further, Mr. Namisnak

7      asks that defendants take action such that the

8      outcome is that the UberWAV service Uber

9      provides in New Orleans meets the equivalency

10     standard of 49 C.F.R. Section 37.105." You see

11     that?

12 A   Yes.

13 Q   What is your understanding of the equivalency

14     standard?

15        MR. BIZER:

16           Object to the form of the question.

17     You may answer.

18        THE WITNESS:

19           This is going to be, you know, my own

20     layman's terms.  But it's, you know,

21     equivalent service under the law is

22     required under the law.

23        MS. SCHUSTER:

24           Okay, Pat, could we do Exhibit 118,

25     please.

REPORTER'S PAGE

1

2

3         I, Cynthia M. Hare, Certified Court Reporter, in

4   and for the State of California, the officer, as defined in

5   Rule 28 of the Federal Rules of Civil Procedure, before whom

6   this proceeding was taken, do hereby state on the Record:

7         That due to the spontaneous nature of the

8   interaction and discourse of this proceeding, double-dashes

9   (--) have been used to indicate pauses, changes of thought

10  and/or talkovers; that such is the universally accepted

11  method for a court reporter's transcription of a proceeding;

12  that double-dashes (--) do not indicate that words or

13  phrases have been left out of this transcript;

14        And that any the spelling of any words and/or

15  names which could not be verified through reference

16  resources have been denoted with the parenthetical phrase

17  "(spelled phonetically)."

18

19

20

21                              Cynthia M. Hare, CCR
                                Certified Court Reporter
22                              Louisiana License #2010007

23

24

25

```
 1                      CERTIFICATE
 2        This certification is valid only for a
 3   transcript accompanied by my original signature and
 4   original required seal on this certificate.
 5        I, CYNTHIA M. HARE, Certified Court Reporter in
 6   and for the State of California, as the officer
 7   before whom this testimony was taken REMOTELY via
 8   videoconferencing, do hereby certify that STEPHAN
 9   NAMISNAK, after having been duly sworn by me upon
10   authority of R.S. 37:2554, did testify on the 18th
11   day of December 2020, at New Orleans, Louisiana, as
12   hereinbefore set forth in the foregoing 63 pages;
13   that this testimony was reported by me in the
14   Voicewriting reporting method, was prepared and
15   transcribed by me or under my personal direction and
16   supervision, and is true and correct to the best of
17   my ability and understanding; that the transcript
18   has been prepared in compliance with the transcript
19   format guidelines required by statute and rules of
20   the board; that I am informed about the complete
21   arrangement, financial or otherwise, with the person
22   or entity making arrangements for deposition
23   services; that I have acted in compliance with the
24   prohibition on contractual relationships, as defined
25   by Louisiana Code of Civil Procedure Article 1434
```

1   and rules of the board; that I have no actual

2   knowledge of any prohibited employment or

3   contractual relationship, direct or indirect,

4   between a court reporting firm and any party

5   litigant in this matter, nor is there any such

6   relationship between myself and a party litigant in

7   this matter; that I am not related to counsel or to

8   any of the parties hereto, I am in no manner

9   associated with counsel for any of the interested

10   parties to this litigation, and I am in no way

11   concerned with the outcome thereof.

12        This 26th day of December 2020, Metairie,

13   Louisiana.

14

15

16

17

18                         Cynthia M. Hare, CCR
                           Certified Court Reporter
19                         Louisiana License #2010007

20

21

22

23

24

25

# EXHIBIT D

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5     SCOTT CRAWFORD, ET AL.,    * CASE NO-3:17-CV-02664-RS

              PLAINTIFFS         *

6                                *

      VERSUS                     *

7                                *

      UBER TECHNOLOGIES, INC.    *

8     AND RAISER, LLC,           *

              DEFENDANTS         *

9                                *

      * * * * * * * * * * * * * * * * * * * * * * * * *

10

11              The deposition of Scott Crawford, taken in

12         connection with the captioned cause, pursuant

13         to the following stipulations before Mary

14         LeJeune-Kephart, Certified Court Reporter, via

15         videoconference ZOOM, on the 11th day of

16         December 2020, beginning at 9:22 a.m.

17

18

19

20

21

22

23

24

25

```
 1              THE WITNESS:
 2                  Yes, I do.
 3              MADAME COURT REPORTER:
 4                  Thank you.
 5                  SCOTT MATTHEW CRAWFORD,
 6         after having been duly sworn, was examined and
 7    did testify as follows:
 8    DIRECT EXAMINATION BY MS. SCHUSTER:
 9    Q    Good morning.  Please state your name for the
10         Record.
11    A    Scott Matthew Crawford.  Do you need me to
12         spell it?
13    Q    No, thank you.  All right.  Good morning, Dr.
14         Crawford.  It is nice to see you again.  As you
15         heard, I'm Stephanie Schuster.  I represent the
16         Defendants.  Before we get started, is this the
17         first time you've been deposed?
18    A    No.
19    Q    How many other times have you had your
20         deposition taken?
21    A    Once.
22    Q    And when was that?
23    A    Several years ago.
24    Q    Do you recall which case it was in connection
25         with?
```

Page 62

```
 1     A     Yes, I see it.

 2     Q     Okay.  In part of your response, you state, I'm

 3           gonna quote, "Dr. Crawford demands that Uber be

 4           ordered to take meaningful effort to ensure

 5           that between approximately 20 and 50 drivers

 6           with wheelchair accessible vehicles are

 7           participating in Uber's transportation service

 8           in Jackson, Mississippi and its surrounding

 9           areas." Do you see that?

10     A     Yes.

11     Q     Okay.  What did you mean by that?

12     A     That's one of the ways Uber could meet the

13           equivalent service standard.

14     Q     Okay.  And what do you mean by meaningful

15           effort here?

16     A     Well, I'm reasonably certain if between 20 and

17           50 drivers with WAVs worked for Uber, I'm

18           pretty sure that you could provide wrap-around

19           equivalent service in the metro area.

20     Q     Sure.  But you stated to -- to take meaningful

21           efforts to ensure that there are 20 to 50

22           drivers with WAVs.  What did you mean by

23           meaningful efforts in that context?

24     A     To make it happen.  To --

25     Q     To make it happen?
```

1    Q    I don't wanna know what you discussed with your
2         attorney.  Outside of your conversations with
3         your attorney, was there something on which you
4         based the range of 20 to 50 WAVs?
5    A    Not really.
6    Q    Okay.  If you look at the same response, but I
7         believe on -- if you look, it's the bottom of
8         page 3 of Exhibit 120, the final paragraph, it
9         states -- you state further, Dr. Crawford ask
10        the defendants take actions such that the
11        outcome is that the Uber WAV service, Uber
12        provides in Jackson meet the equivalence --
13        equivalency standard of 49 CFR Section 37.105.
14        Do you see that?
15   A    At the bottom of page 3; is that correct?
16   Q    Yes.
17   A    Yes, I see it.
18   Q    Okay.  What did you mean by that?
19   A    The equivalent service standard is written in
20        the regulations.  I could read it to you.  Do
21        you want me to look it up?
22   Q    No, I -- I guess, let me put it this way.  Did
23        you mean that you want defendant to take
24        actions such that it complies with this
25        equivalent service standard in the regulation

Page 68

1           cited?

2       A   Yes.

3       Q   Okay.  So you don't just want Uber to turn on

4           the WAV option in the Uber app in Jackson?

5       A   It would be meaningless to turn on the button

6           if by pushing by button, a vehicle didn't come

7           when it was requested.

8       Q   Right.  So you would only want the WAV option

9           if there were drivers signed up with WAVs to

10          provide rides?

11      A   Well, one -- one would have to trust -- one

12          would have to trust that the system worked.

13          It's very stressful if one is out at night and

14          one is stranded in a power wheelchair.  So the

15          trustworthiness of the system is extremely

16          important.

17      Q   Okay.  And -- and I understand that, what I was

18          getting at is you wouldn't be satisfied with

19          just a WAV option if it wasn't trustworthy, as

20          you've described it; is that right?

21      A   That's right.

22              MS. SCHUSTER:

23                  Okay.  Okay.  I've just introduced the

24          document now, marked as Exhibit 123.

25          Please let me know when you have it.

1                     CERTIFICATE

2

3          This certification is valid only for a

4      transcript accompanied by my original signature and

5      original required seal on this certificate.

6          I, Mary LeJeune-Kephart, Certified Court

7      Reporter in and for the State of Louisiana, as the

8      officer before whom this testimony was taken, do

9      hereby certify that Scott Crawford, after having

10     been duly sworn by me upon authority of R.S.

11     37:2554, did testify on the 11th day of December

12     2020, at New Orleans, Louisiana, as hereinbefore set

13     forth in the foregoing 75 pages; that this testimony

14     was reported by me in the voice-reporting method, was

15     prepared and transcribed by me or under my personal

16     direction and supervision, and is true and correct to

17     the best of my ability and understanding; that the

18     transcript has been prepared in compliance with the

19     transcript format guidelines required by statute and

20     rules of the board; that I am informed about the

21     complete arrangement, financial or otherwise, with

22     the person or entity making arrangements for deposition

23     services; that I have acted in compliance with the

24     prohibition on contractual relationships, as defined

25     by Louisiana Code of Civil Procedure Article 1434

Page 77

1       and rules of the board; that I have no actual

2       knowledge of any prohibited employment or

3       contractual relationship, direct or indirect,

4       between a court reporting firm and any party

5       litigant in this matter, nor is there any such

6       relationship between myself and a party litigant in

7       this matter; that I am not related to counsel or to

8       any of the parties hereto, I am in no manner

9       associated with counsel for any of the interested

10      parties to this litigation, and I am in no way

11      concerned with the outcome thereof.

12              This 30th day of December 2020, New Orleans,

13      Louisiana.

14

15

16

17                          /s/ Mary LeJeune-Kephart

18                      _____

19                       Certified Court Reporter

20

21

22

23

24

25

# EXHIBIT E

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                SAN FRANCISCO DIVISION
3             CASE NO.:  3:17-cv-06124-RS
4

   STEPHAN NAMISNAK, et al.,
5
              Plaintiffs,
6
   vs.
7
   UBER TECHNOLOGIES, INC.
8  and RASIER, LLC,
9             Defendants.
   _____
10
11
                        Tuesday, January 5, 2021
12                      Videoconference
                        2:04 p.m. EST - 3:43 p.m. EST
13
14
15     VIDEOCONFERENCE DEPOSITION OF FRANCIS FALLS
16
17
18        Taken via videoconference before Carol Ann
19  Kridos, Shorthand Reporter and Notary Public in
20  and for the State of Florida at Large, pursuant to
21  Notice of Taking Deposition filed in the above
22  cause.
23
24
25

```
                                              Page 4
 1                P R O C E E D I N G S
 2   Thereupon:
 3                  FRANCIS FALLS
 4        was called as a witness, and having been
 5   first duly sworn and responding "Yes," was
 6   examined and testified as follows:
 7                  DIRECT EXAMINATION
 8   BY MR. HARVEY:
 9        Q    Mr. Falls, as I indicated earlier, I am
10   Patrick Harvey of the law firm Morgan, Lewis &
11   Bockius and I represent the defendants Uber
12   Technologies, Incorporated and Rasier, LLC.
13             Can you please state your name for the
14   record.
15        A    Francis Falls.
16        Q    Have you been deposed before?
17        A    Yes.
18        Q    When was that?
19        A    I think it was -- it was a couple of
20   years ago.
21        Q    Do you remember what case it was for?
22        A    It was for the streetcar case and bus
23   stop case.
24        Q    You said the "bus stop case."  What was
25   the bus stop case about?
```

Page 57

1   transportation, I mean, I would be able to get

2   where I need to go and everybody else that's in a

3   wheelchair or disabled could get where they need

4   to go.

5        Q    I had a little trouble hearing that.   I

6   don't know if the court reporter caught it, but

7   I'll ask some follow-up.

8        A    I said that if they was to have that

9   many, at least I know I would be able to get to

10  where I need to go and other people with

11  disabilities would be able to get where they need

12  to go, you know.

13       Q    Okay.  You provided a specific number of

14  drivers.  Does that mean you think Uber needs to

15  have at least 30 drivers with WAV available on the

16  Uber app at all times?

17       A    No, I can't answer.  I don't know

18  nothing -- I mean, I don't know nothing about

19  however they do it, leasing it or whatever they

20  gonna do.  As long as they could, you know,

21  provide services for me to, you know, be

22  independent, it's okay.

23       Q    Okay.  Does that mean you're not

24  particularly concerned about the number of

25  drivers, you're concerned about how reliable the

Page 58

1    service is; is that right?

2        A    Yes.

3        Q    And how would you know if the service is

4    reliable or not that you'd be able to use?

5        A    Well, I wouldn't know yet.

6        Q    And why is that?

7        A    Because ain't nothing going on right now

8    in New Orleans, you know, as far as the WAV, you

9    know.  One of my friends say ain't nothing going

10   on.  But I would love for that to be, you know.

11   Whenever you-all do get it together I would love

12   to be a part of that, where I could move around

13   like I want.

14       Q    You mentioned your friend said something

15   about WAVs right now.  What in particular was he

16   speaking about?

17       A    He was just speaking if they had it we'd

18   be able to, you know, get around like we want to,

19   you know.

20       Q    All right.  And what level of service

21   would have to be available on the Uber app for you

22   to be able to use it?

23           MR. BIZER:  Object to the form of the

24       question.

25           You may answer.

1           THE WITNESS:  Anything that's accessible

2       for me to be able to get in my mobile chair,

3       you know.

4   BY MR. HARVEY:

5       Q    I'm sorry to kind of speak about this in

6   kind of hypotheticals.

7           If the Uber app had a WAV option but you

8   couldn't actually request any WAV, would you use

9   the Uber app then?

10      A    No, not if I can't request it.

11      Q    All right.  You're not interested in

12  just a change to the app where the only change is

13  the appearance of the app, you actually want to be

14  able to use it to request WAVs; right?

15      A    Yes.

16      Q    Okay.  What if there was a WAV option on

17  the Uber app but the wait time was an hour before

18  a car would come.  Would you use the Uber app

19  then?

20      A    Yes.

21      Q    In your interrogatory response -- I'm

22  looking at the last paragraph on page 3 that goes

23  into page 4 -- you say, "Mr. Falls asks that

24  defendants take action such that the outcome is

25  that the Uber WAV service Uber provides in

Page 62

```
 1            THE WITNESS:  Repeat it again because I
 2       didn't understand clearly what you said.
 3   BY MR. HARVEY:
 4       Q    Do you think -- well, scratch that.
 5   I'll ask a different question.
 6            Do you think Uber should make an Uber
 7   WAV option available 24 hours a day, seven days a
 8   week?
 9       A    Yes.
10       Q    And you think that should be throughout
11   New Orleans?
12       A    Yes.  I'll be able to go to bars, I'll
13   be able to go to parties and I could have them
14   come pick me up and I could get back home safely,
15   you know.
16       Q    And should that WAV service have the
17   same wait times as nondisabled users?
18       A    Yes.
19       Q    Okay.  Does that mean you would not
20   download the app if, say, UberX wait times were
21   five minutes but Uber WAV wait times were an hour?
22       A    I would still download the app.  I'm
23   just trying to get where I need to be at.  And I
24   know I could get dropped off at the place and I
25   could call him and he could pick me up and bring
```

Page 72

1

2                    CERTIFICATE OF OATH

3

4    STATE OF FLORIDA   )

5    COUNTY OF BROWARD )

6

7            I, Carol Ann Kridos, Notary Public in

8    and for the State of Florida at Large, certify

9    that the witness, FRANCIS FALLS, personally

10   appeared before me via videoconference on

11   January 5, 2021, and was duly sworn by me.

12

13           WITNESS my hand and official seal this

14   19th day of January, 2021.

15

16

17

18

19           _____

             Carol Ann Kridos

20           Notary Public - State of Florida

             Commission No.:  GG974281

21           My Commission Expires:  4/24/24

22

23

24

25

Page 73

1              REPORTER'S DEPOSITION CERTIFICATE

2          I, Carol Ann Kridos, do hereby certify that I

3     was authorized to and did stenographically report

4     the deposition of FRANCIS FALLS; the witness

5     herein; that a review of the transcript was not

6     requested; that the foregoing pages numbered from

7     1 to 70, inclusive, is a true and correct

8     transcription of my shorthand notes of the

9     deposition by said witness.

10         I further certify that I am not a relative,

11    employee, attorney or counsel of any of the

12    parties, nor am I a relative or employee of any of

13    the parties' attorney or counsel connected with

14    the action, nor am I financially interested in the

15    action.

16         The foregoing certification of this

17    transcript does not apply to any reproduction of

18    the same by any means unless under the direct

19    control and/or direction of the certifying

20    reporter.

21         Dated this 19th day of January, 2021.

22

23

24    _____

      Carol Ann Kridos, Shorthand Reporter

25    Notary Public - State of Florida