MORGAN, LEWIS & BOCKIUS LLP
Anne Marie Estevez (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T:  305.415.3000
F:  305.415.3001
annemarie.estevez@morganlewis.com

Stephanie Schuster (*pro hac vice*)
Patrick A. Harvey (*pro hac vice*)
1111 Pennsylvania Avenue NW
Washington, DC 20004
T: 202.739-3000
stephanie.schuster@morganlewis.com
patrick.harvey@morganlewis.com

Kathy H. Gao (CA Bar No. 259019)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
T:  (213) 612-2500
F:  (213) 612-2501
kathy.gao@morganlewis.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT CRAWFORD,<br><br>                    Plaintiff,<br><br>          v.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>                    Defendants. | Case No. 3:17-cv-02664-RS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: July 1, 2021, 1:30 p.m.<br>Judge: Hon. Richard Seeborg<br>Courtroom #3, 17th Floor |
| STEPHAN NAMISNAK and FRANCIS FALLS,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>                    Defendants. | Case No. 3:17-cv-06124-RS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: July 1, 2021, 1:30 p.m.<br>Judge: Hon. Richard Seeborg<br>Courtroom #3, 17th Floor |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case No-3:17-cv-02664-RS
Case No. 3:17-cv-06124-RS

DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

1

## **NOTICE OF MOTION**

2      PLEASE TAKE NOTICE that, in the courtroom of the Honorable Richard Seeborg, located

3 at 450 Golden Gate Avenue, San Francisco, CA 94102, or via a remote hearing as directed by the

4 Court, on July 1, 2021 at 1:30 p.m., or as soon thereafter as counsel may be heard, Defendants Uber

5 Technologies, Inc. and Rasier, LLC will and do hereby move the Court for summary judgment

6 under Federal Rule of Civil Procedure 56 in each of these related cases.  As explained in detail in

7 the accompanying Memorandum of Points and Authorities, based on the undisputed facts and as a

8 matter of law (1) Plaintiffs Scott Crawford, Stephan Namisnak, and Francis Falls each lack

9 Article III standing; (2) Plaintiffs' claims are legally deficient and not cognizable under 42 U.S.C.

10 § 12184(b); and (3) each of the "modifications" Plaintiffs have demanded is unreasonable and

11 would result in a fundamental alteration to Defendants' business models and service offerings.

12

13                                                      Respectfully submitted,

14                                                      MORGAN, LEWIS & BOCKIUS LLP

Dated: April 19, 2021

15                                                      By: s/ Anne Marie Estevez
                                                        _____

16                                                           Anne Marie Estevez
                                                           Stephanie Schuster

17                                                           Patrick Harvey
                                                           Kathy H. Gao

18                                                           *Attorneys for Defendants*

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2   MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

3   BACKGROUND ........................................................................................................................ 2

4   ARGUMENT ............................................................................................................................. 4

     I.      PLAINTIFFS LACK STANDING. ............................................................................ 5

5       II.     SECTION 12184 DOES NOT REQUIRE DEFENDANTS TO PROVIDE
             WAV SERVICE AS A MATTER OF LAW.......................................................... 10

6             A.    Section 12184 Does Not Contain A "Trigger" That Compels
7                   Covered Entities To Provide Equivalent Service....................................... 10

8             B.    Section 12184 Neither Requires Covered Entities To Purchase Or
                Lease WAVs Nor Compels Them To Provide Or Guarantee
                System-Wide WAV Service .................................................................. 13

9             C.    Plaintiffs Seek New Outcomes, Not Any "Modification" To
10                  Defendants' Policies, Practices, Or Procedures. ....................................... 18

11      III.    PLAINTIFFS CANNOT PROVE THAT THEIR REQUESTED
             OUTCOMES ARE "REASONABLE" AT TRIAL.............................................. 19

12            A.    Plaintiffs' Disclaimed Demand That Uber Simply "Turn On" A
13                  WAV Request Option In The Uber Apps In New Orleans and
                Jackson Is Not Reasonable.................................................................... 21

14            B.    Plaintiffs' Demand For Equivalent Service Is Not Possible, Let
                Alone Reasonable................................................................................ 23

15            C.    Plaintiffs' Demands For Fleets Of 20-60 WAVs In Jackson And
                30–60 WAVs In New Orleans Are Not Reasonable. ................................ 24

16  CONCLUSION .......................................................................................................................... 31

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

i

1

2

## **<u>TABLE OF AUTHORITIES</u>**

3

**Cases**

4

*D.L. ex rel. A.L. v. Walt Disney Parks & Resorts, Inc.,*
  469 F. Supp. 3d 1280 (M.D. Fla. 2020) ................................................................. 31

5

*Access Living v. Uber Techs., Inc.,*
6
  958 F.3d 604 (7th Cir. 2020) ................................................................................... 5

7
*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................................ 4, 20

8

9
*Auer v. Robbins,*
  519 U.S. 452 (1991) ................................................................................................ 14

10

*Baughman v. Walt Disney World Co.,*
11
  685 F.3d 1131 (9th Cir. 2012) ............................................................................... 20

12
*Bragdon v. Abbott,*
  524 U.S. 624 (1998) .................................................................................................. 4
13

*Carney v. Adams,*
14
  141 S. Ct. 493 (2020) ......................................................................................... 5, 6, 9

15
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .................................................................................................. 4
16

*Chapman v. Pier 1 Imports, Inc.,*
17
  631 F.3d 939 (9th Cir. 2011) ................................................................................... 5

18
*Chevron, Inc. v. NRDC,*
19
  467 U.S. 837 (1984) ................................................................................................ 14

20
*City of Los Angeles v. Santa Monica Baykeeper,*
  254 F.3d 882 (9th Cir. 2001) ................................................................................. 15
21

*Doran v. 7-Eleven, Inc.,*
22
  524 F.3d 1034 (9th Cir. 2008) ................................................................................. 5

23
*Fortyune v. Am. Multi-Cinema, Inc.,*
24
  364 F.3d 1075 (9th Cir. 2004) ............................................................................... 20

25
*Indep. Living Res. Ctr. v. Lyft, Inc.,*
  2020 WL 6462390 (N.D. Cal. Nov. 3, 2020) ................................................... 30, 31
26

27
*Jama v. I.C.E.,*
  543 U.S. 335 (2005) ................................................................................................ 16
28

*Karczewski v. DCH Mission Valley LLC*,
    862 F.3d 1006 (9th Cir. 2017).................................................................................. 18

*Lopez v. Catalina Channel Express, Inc.*,
    974 F.3d 1030 (9th Cir. 2020).................................................................................. 19

*Maine Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020)............................................................................................. 12

*Matsushita Elec. Indus. v. Zenith Radio Co.*,
    475 U.S. 574 (1986)................................................................................................... 4

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004).......................................................................... 18, 19

*Namisnak v. Uber Techs., Inc.*,
    971 F.3d 1088 (9th Cir. 2020)................................................................................ 5, 6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000).................................................................................. 20

*Noel v. NYC TLC*,
    687 F.3d 63 (2d Cir. 2012)...................................................................................... 14

*In re Optical Disk Drive Antitrust Litig.*,
    2017 WL 1153316 (N.D. Cal. 2017)....................................................................... 13

*Pickern v. Holiday Quality Foods Inc.*,
    293 F.3d 1133 (9th Cir. 2002).................................................................................... 5

*RadLAX Gateway Hotel v. Amalgamated Bank*,
    566 U.S. 639 (2012)................................................................................................. 15

*Republic of Sudan v. Harrison*,
    139 S. Ct. 1048 (2019)............................................................................................. 12

*Roberts ex rel. Roberts v. KinderCare Learning Ctrs.*,
    896 F. Supp. 921 (D. Minn. 1995).......................................................................... 23

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................................................... 16

*Sandison v. Mich. High Sch. Athletic Ass'n*,
    64 F.3d 1026 (6th Cir. 1995).................................................................................... 18

*Sonora Diamond Corp. v. Super. Ct.*,
    99 Cal. Rptr. 2d 824 (Ct. App. 2000)...................................................................... 13

*Tennessee v. Lane*,
    541 U.S. 509 (2004)................................................................................................. 30

*Toomer v. City Cab*,
    443 F.3d 1191 (10th Cir. 2006)..................................................................... 14

*United States v. Corrales-Vazquez*,
    931 F.3d 944 (9th Cir. 2019)........................................................................ 15

*United States v. Esquivel*,
    88 F.3d 722 (9th Cir. 1996).......................................................................... 28

*United States v. Thompson*,
    728 F.3d 1011 (9th Cir. 2013)...................................................................... 16

*Vande Zande v. State of Wis. Dep't of Admin.*,
    44 F.3d 538 (7th Cir. 1995)........................................................... 20, 30, 31

*Weyer v. Twentieth Century Fox Film Corp.*,
    198 F.3d 1104 (9th Cir. 2000)...................................................................... 19

*Wisc. Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018).................................................................................. 16

*Wright v. Giuliani*,
    230 F.3d 543 (2d Cir. 2000).......................................................................... 18

**Statutes**

42 U.S.C. § 12143(a) ........................................................................................ 8, 16

42 U.S.C. § 12181(10) ........................................................................................... 13

42 U.S.C. § 12182(b)(2)(A)(ii) .................................................................. 18, 19, 21

42 U.S.C. § 12182(b)(2)(B)(ii) ............................................................................... 12

42 U.S.C. § 12184 .......................................................................................... *passim*

42 U.S.C. § 12184(a) ............................................................................................. 11

42 U.S.C. § 12184(b) ...................................................................................... 12, 16

42 U.S.C. § 12184(b)(2) ........................................................................... 14, 15, 17

42 U.S.C. § 12184(b)(2)(A) ........................................................... 18, 19, 21, 31

42 U.S.C. § 12184(b)(3) ................................................................................. 13, 14

42 U.S.C. § 12184(b)(5) ........................................................................... 11, 12, 17

Cal. Pub. Util. Code § 5440(f) ........................................................................... 22

1

**Regulations**

2

49 C.F.R. § 37.29(b) ............................................................................................... 14

3

49 C.F.R. § 37.103(d) ................................................................................. 10, 11, 12

4

49 C.F.R. § 37.105 ..........................................................................................*passim*

5

**Legislative History & Regulatory Guidance**

6

28 C.F.R. § Pt. 36, App. C ..................................................................................... 19

7

49 C.F.R. § Pt. 37, App. D ..................................................................................... 14

8

9

H. Rep. No. 101-485(I), 101st Cong., 2d Sess...................................................... 16, 17

*Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01 (Sept. 6, 1991)................ 14, 17

10

**Rules**

11

Fed. R. Civ. P. 54(b) ............................................................................................. 15

12

Fed. R. Civ. P. 56(a)............................................................................................... 4

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Scott Crawford demands that Uber provide or otherwise guarantee that others provide equivalent wheelchair-accessible vehicle ("WAV") service in and around Jackson, Mississippi.  Plaintiffs Stephan Namisnak and Francis Falls demand the same result in and around New Orleans, Louisiana.  These demands are not required by law and are unreasonable.  As matter of undisputed fact and law, Defendants Uber Technologies, Inc. ("Uber") and Rasier, LLC are entitled to summary judgment for three, independently sufficient reasons.

*First*, based on their own testimony, each Plaintiff lacks standing.  Plaintiffs *alleged* that using Uber's smartphone application for riders ("Uber Rider App") was futile and that they want to and will use it just as soon as they could request and obtain a WAV ride through the app.  It turns out Namisnak and Crawford had multiple opportunities to use the Uber Rider App to request WAV rides when they were in cities where such rides may be obtained, but they failed to do so.  Namisnak even took a ride in a standard (non-WAV) vehicle requested using the Lyft app when in San Francisco, even though he knew he could request and obtain a WAV ride through the Uber Rider App in that city.  Crawford has been on multiple trips to cities where a WAV ride may be requested using the Uber Rider App and obtained but never so much as downloaded the Uber Rider App, confessing that he prefers taxis and public transportation.  All three Plaintiffs appear to share that preference, as they rarely or never use for-hire transportation options and are not aware of what for-hire WAV transportation options are available in their home cities.  All three Plaintiffs failed to even investigate the Uber Rider App, learning only at deposition that the app is free to download.  Plaintiffs' assertions that they want to and would use the Uber Rider App if they prevail stand alone, contrary to all the actual evidence, and is therefore insufficient as a matter of law to demonstrate standing.

*Second*, Plaintiffs have clarified that despite the various "modifications" they requested of Defendants to avoid dismissal at the pleading stage, they are only after one: equivalent service.  As a matter of law, Section 12184 does not require Defendants to provide or guarantee equivalent service.  This conclusion follows from the text of the statute, applicable regulations, the Department of Transportation's interpretations of the statute and its own regulations, and  legislative history.

1

And even under Plaintiffs' erroneous interpretation of the statute, this conclusion also follows from the facts: the record includes zero evidence (because there is none) that Defendants have purchased or leased vehicles, let alone vans, that are used by the drivers who provide transportation.

*Finally*, Plaintiffs have not requested any "modification," as contemplated by the ADA; they have requested outcomes only.  But even still, the undisputed facts show that no reasonable factfinder could conclude that the outcomes Plaintiffs have requested (including equivalent service) or the steps necessary to achieve those outcomes are "reasonable."  It is undisputed that Uber has developed a WAV pilot program in certain cities.  It is undisputed that Uber has tried a variety of options to financially encourage third parties to supply and provide WAV trips that can be requested through the Uber Rider App and that, ████████████████████████████████████ ████████████████████████████████████ in the pilot cities—some of the largest and most densely populated cities in the country.  It is undisputed that New Orleans and Jackson have significantly smaller populations, and are far less densely populated, than even the smallest pilot city.  It is undisputed that the administrative and financial burdens to Uber of supporting supply in WAV marketplaces in New Orleans and Jackson would be at least as great as—and very likely significantly greater than—in the pilot cities.  And it is undisputed that such costs would not result in a sustainable and reliable WAV marketplace, let alone "equivalent service." On these undisputed facts, Plaintiffs' demands for robust, equivalent service in New Orleans and Jackson are unreasonable as a matter of law.

## BACKGROUND

The undisputed facts material to Defendants' motion are set out in detail in the Argument below, but Defendants summarize those facts here.

Defendants offer popular apps that support well-known ridesharing marketplaces. Declaration of Niraj Patel ("Patel Decl.") ¶¶ 4–5.  The Uber Driver App is for third-party transportation providers ("Drivers") looking to sell rides , and the Uber Rider App is for individuals looking to buy rides.  *Id.* ¶ 5.  Both apps are free to download, and any Driver or rider with an account and license to use the apps can use them to access the ridesharing marketplaces at any time they choose.  *Id.* ¶¶ 5, 11, 13.  These marketplaces, like most marketplaces, are most successful

when robust supply and demand find equilibrium. *Id.* ¶¶ 11–15, 59. Plaintiffs have not downloaded the Uber Rider App, and there is no evidence that they have a serious intent of ever doing so, regardless of what relief the Court could order and what WAV availability may result. *See infra*, pp. 6–9.

The most popular rideshare marketplace supported by Defendants' technology is called "UberX," in which third-party transportation providers ("Drivers") sell and riders buy trips in standard, four-door vehicles. Patel Decl. ¶ 6. The X marketplace thrives in large part because many rideshare Drivers use their personal vehicles—assets they already own for other purposes— to sell X rides; in practically every city, there is a ready and robust supply of Drivers who are interested in selling their services in the X marketplace and who already have the tools they need to do so. *Id.* ¶¶ 5, 12, 21–22, 24, 30.

Very few people own or desire to own WAVs, and very few people want WAV rides. *Id.* ¶¶ 20, 25–30. For the past several years, Defendants have expended significant effort and resources to support supply in WAV marketplaces, in various heavily and densely-populated U.S. cities. Patel Decl. ¶¶ 41–45, 73–89. Uber has used a variety of techniques and combinations of techniques to encourage Drivers to acquire WAVs and use them when selling rides on the Uber platform, and to work with commercial fleet operators. *Id.*

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *See*

Exs. 2 & 3; Patel Decl. ¶¶ 50, 53.[1] Notwithstanding these efforts, investments,

██████ Defendants have yet to find a sustainable way to encourage robust and reliable WAV

marketplaces in even the most heavily-populated cities: ████████████████████████

██████████████████████████████████████████████████████████.

Patel Decl. ¶ 64.

Based on Defendants' experience with WAV marketplaces in major cities around the country, Defendants expect that attempting to support WAV marketplaces in Jackson, Mississippi

---

[1]     In this brief, all cited exhibits denoted by numbers are exhibits to the Declaration of Niraj Patel, and all cited exhibits denoted by letters are exhibits to the accompanying Declaration of Stephanie Schuster.

1  and New Orleans, Louisiana—much smaller and less densely-populated cities without any

2  meaningful existing supply of WAV Drivers—will be at least as, and probably far more, taxing

3  financially and administratively than in the pilot cities, to the extent it would even be possible to

4  partner with an at-scale third party commercial fleet operator who was available and willing to

5  partner with Defendants.  *Id.* ¶ 63. ███████████████████████████████

6  ███████████████████████████████████████████████ is a floor for the cost

7  per WAV trip that Defendants expect to incur in Jackson and New Orleans, again, assuming the

8  necessary third party fleet operator began operating in those cities and agreed to partner with Uber.

9  *Id.*; Ex. 3.

10       The outcomes Plaintiffs have demanded of Defendants—large fleets of (up to 60) WAVs

11  available to accept ride requests in each city at any given time *and* equivalent service in terms of

12  response times, availability of service, and other metrics listed in 49 C.F.R. § 37.105—are not

13  achievable at all.  *See* Patel Decl. ¶¶ 63–64.  And even if they were achievable, Uber would devote

14  significantly greater effort and spend and lose significantly more money, by several orders of

15  magnitude, trying to achieve Plaintiffs' demanded outcomes.  *Id.* ¶¶ 63–65; *see id.* ¶¶ 35–37.

16  **ARGUMENT**

17       Summary judgment is appropriate when there are no genuine issues of material fact and the

18  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty*

19  *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  After the moving party "point[s] out" the absence of

20  evidence supporting the opposing party's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986),

21  the opposing party must demonstrate that there is a genuine issue of material fact,  *see Anderson*,

22  477 U.S. at 248.  "[I]f the factual context renders [the non-movant's] claim implausible … [it] must

23  come forward with more persuasive evidence to support their claim than would otherwise be

24  necessary."  *Matsushita Elec. Indus. v. Zenith Radio Co.*, 475 U.S. 574, 587 (1986).  The evidence

25  provided by the non-movant cannot be "merely colorable or not significantly probative" to survive

26  summary judgment.  *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998).  At bottom, if "a rational trier

27  of fact" cannot "find for the non-moving party, there is no 'genuine issue for trial,'" and summary

28  judgment should be granted.  *Matsushita*, 475 U.S. at 587.

I.     **PLAINTIFFS LACK STANDING.**

Standing to pursue injunctive relief (the only relief available to Plaintiffs under the ADA) requires injury-in-fact, including a "real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports, Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc).   Under the Ninth Circuit's "deterrent effect doctrine," a plaintiff has the requisite injury if "the plaintiff was deterred from attempting to visit a location or use a service because of alleged ADA noncompliance." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020).   To demonstrate this deterrence, a plaintiff must show that attempting to visit the location or use the service is a "futile gesture," *id.*, and that the plaintiff intends to patronize the defendant's business once the alleged noncompliance has been removed, *Chapman*, 631 F.3d at 949–50; *see, e.g.*, *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040–41 (9th Cir. 2008).

The Seventh Circuit has held that attempting to use the Uber Rider App is not a futile gesture for WAV plaintiffs in Chicago because the Uber Rider App in Chicago includes a WAV request option.  *Access Living v. Uber Techs., Inc.*, 958 F.3d 604, 614–15 (7th Cir. 2020).   In these cases, at the pleading stage, Plaintiffs' allegations that using the Uber Rider App was futile and that they intend to use the Uber Rider App when they are able to use it to request WAV rides were held sufficient to plausibly allege the necessary injury. *Namisnak*, 971 F.3d at 1092–93.  Yet, consistent with the Seventh Circuit's decision in *Access Living*, the Ninth Circuit recognized that "evidence that Plaintiffs had the opportunity to use uberWAV in a city where it is offered—such as Chicago— and failed to so … could undermine the futility analysis." *Id.* at 1093.

Since the Seventh Circuit's decision in *Access Living* and the Ninth Circuit's decision in *Namisnak*, the Supreme Court provided further guidance on the types of evidence necessary to show futility and future intent, in *Carney v. Adams*, 141 S. Ct. 493 (2020).   In that case, Adams challenged Delaware's eligibility requirements for judicial office, claiming they unconstitutionally excluded him from becoming a judge.  *Id.* at 497.  Adams had never applied for a judgeship; he argued that applying was futile—the prevailing eligibility requirements excluded him—but claimed he "would apply" if his challenged succeeded.  *Id.* at 500.

On the summary judgment record, the Supreme Court held Adams lacked standing. His *assertion* that applying for a judgeship was futile was not enough to demonstrate injury-in-fact unless Adams was "able and ready" to apply if his lawsuit was successful. *Id.* Adams's testimony that he "would apply" was, on its own, insufficient; ruling otherwise, the Court explained, "would significantly weaken longstanding" Article III standing doctrines. *Id.* at 501–02. Rather, the Court examined the record for something else to show that Adams's professed "intent" to apply was "concrete." *Id.* at 502. The Court found nothing: Adams's assertions stood "alone without any actual past injury, without reference to an anticipated timeframe, without prior judgeship applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence." *Id.* at 501.

Indeed, several facts cut against Adams's claim that he would apply for a judgeship. Adams "did not apply for any" one of several judgeships for which he *was* eligible under Delaware law and, therefore, for which an application *was not* futile. *Id.* at 500. Adams testified that he was ineligible for those positions, but the record showed "[h]e was wrong about that." *Id.* Adams also testified "that his failure to apply for available judgeships at the time when he was eligible reflected his lack of interest in being a judge at that time" and that he was "then content to work at the Department of Justice" instead. *Id.* at 501. And Adams had not looked into available judgeships, stating in response to interrogatories that he "has no knowledge of what judicial positions may become open in the next year." *Id.* Thus, Adams's general statements of intent to apply, "without more and against all contrary evidence," were insufficient to carry his burden of proving injury-in-fact at summary judgment. *Id.*

Applying these principles to the facts of these cases shows that Plaintiffs lack standing even under the "deterrent effect doctrine."

**Stephan Namisnak.** As the Ninth Circuit suggested might be the case, Namisnak "had the opportunity to use uberWAV in a city where it is offered … and failed to do so," *Namisnak*, 971 F.3d at 1093, just as Adams had failed to apply for judgeships for which he was eligible, *see Adams*, 141 S. Ct. at 500. In October 2018, Namisnak traveled to San Francisco, and he knew at

6

the time that the Uber Rider App in San Francisco included a WAV request option. Ex. A at 44:19–45:1; *see Namisnak* SAC ¶ 65. But Namisnak did not use, download, or even consider using the Uber Rider App to request rides during his San Francisco trip. Ex. A at 45:19–25.

To the contrary, Namisnak opted to travel from the airport in a taxicab. *Id.* at 49:16–20. During the trip, he mostly traveled by bus and never considered hiring a private driver by any means. *Id.* at 49:12–13, 50:6–12. At the end of the trip, Namisnak and his wife traveled to the airport by using the *Lyft* app to request ride in a *standard vehicle*, not a WAV. *Id.* at 42:10–43:19; *see* Ex. B. According to Namisnak, it "required considerable heroics on [his wife's] part" to assist him in transferring in and out of that standard vehicle to and from the non-motorized wheelchair he was using. Ex. A at 44:4–7. That effort likely would not have been necessary had Namisnak and his wife instead used the Uber Ride App to request a WAV ride. Using the Uber Rider App was *not futile* for Namisnak during his San Francisco trip.

The San Francisco trip is not the only example of Namisnak failing to avail himself of an opportunity to use the Uber Rider App to request a ride. Namisnak usually uses a manual (folding) wheelchair when traveling to the New Orleans airport (because airplanes cannot accommodate a motorized wheelchair). *Id.* at 22:2–3. On these trips, if Namisnak is not driven to the airport by his wife in the WAV they own, he travels in a standard vehicle with "people [who] are able to transfer him" to and from the manual wheelchair. *Id.* He has never requested rides in standard vehicles using the Uber Rider App to get to the New Orleans airport (the way he requested such a ride using the Lyft app to get to the San Francisco airport).

Namisnak's failure to use the Uber Rider App to request rides is not surprising, though. The record also shows that he lacks an interest in for-hire transportation generally and the for-hire transportation he could otherwise request using the Uber Rider App specifically. Namisnak has not used for-hire transportation to travel in and around New Orleans since before 2010. *Id.* at 26:4–11. He is not aware of any taxi companies or other for-hire transportation providers in New Orleans that offer WAV transportation. *Id.* at 26:14–21. Indeed, his counsel filed a DOJ complaint about one taxi company's alleged lack of WAV service and threatened to sue that company for failure to provide WAV service; though that matter was not resolved, Namisnak never followed upon the

1    DOJ complaint or followed through on the threat to file *Id.* at 9:1–10:3, 12:17–13:2.  And until

2    defense counsel informed him during his deposition, Namisnak did not know that the Uber Rider

3    App is free to download; he simply never looked into it.  *Id.* at 32:18–33:1; *see* Patel Decl. ¶ 5.

4         **Scott Crawford.**  Crawford also has failed to use or even consider using the Uber Rider

5    App in circumstances where it was not futile for him to do so.  Crawford travels to Washington,

6    D.C., "[a]t least every other year."  Ex. C at 31:6–19.  There is a WAV request option in the Uber

7    Rider App in Washington, D.C.  *See, e.g.*, Patel Decl. ¶¶ 50, 53.  But Crawford didn't know that,

8    stating: "I haven't really checked."  Ex. C at 32:7–13.[2]  Crawford explains that because there are

9    "[l]ots of accessible taxis" in Washington, D.C., and because "the taxis work," he has no need for

10   the Uber Rider App: "I don't, you know, just don't – need it."  *Id.* at 32:7–13, 36:3–12.  Crawford

11   said he "would be motivated to use" the Uber Rider App if he could use it to request WAV rides

12   that cost less than taxi WAV rides in Washington, D.C., but he has never investigated how the ride

13   prices compare.  *Id.* at 36:14–20.  (WAV rides on Uber's platform typically cost less than standard

14   D.C. taxi fares.  Patel Decl. ¶ 86.)

15        Crawford has traveled to San Francisco, where the Uber Rider App includes a WAV request

16   option, but he never used or considered using the Uber Rider App to request WAV rides while

17   there.  Ex. C at 37:7–38:1.  Crawford explains his reasons for not using, or even considering using,

18   the Uber Rider App when a WAV option was available to him as follows: "I generally prefer public

19   transit if it's available and if it's accessible."  *Id.* at 37:7–11.  (The ADA mandates that public transit

20   agencies provide wheelchair-accessible transportation.  *See* 42 U.S.C. § 12143(a).)

21        **Francis Falls.**  Falls has never hired any transportation provider for rides in WAVs; the

22   "only wheelchair-accessible vehicle" he has "been in was the bus."  Ex. D at 24:4–5.  Falls has no

23   knowledge of whether there are providers of for-hire WAV service in New Orleans.  Ex. D at

24   38:19–39:2.  He has never searched the internet or otherwise investigated WAV transportation

25   options.  *Id.*  Falls never did any research to see if WAV rides can be requested via the Uber Rider

26

27   [2]      It is curious, to say the least, that in December 2020, Crawford didn't know that there was
     a WAV option in the app in Washington, D.C., given that in May 2020, he alleged three separate
28   times in his amended complaint that the app includes a WAV option in Washington D.C.  *Crawford*,
     FAC ¶¶ 3, 64, 98.

1  App or the Lyft app.  *Id.* at 47:7–11, 50:25–51:5.  Falls did not know that the Uber Rider App is

2  free to download and never looked to investigate the costs:  "I never even looked at – I mean, I

3  never – you know, I never even got into it." *Id.* at 45:18–25.  When asked about his understanding

4  of Lyft and the services it provides, Falls responded: "My understanding is I think it's a

5  transportation service, but I never even – you know, I never paid it no mind." *Id.* at 51:6–10.

6        In short, Namisnak and Crawford have declined to use (or even consider using) the Uber

7  Rider App to request trips while in places where a WAV request option is available.  Crawford is

8  content to rely on taxis and otherwise prefers public transit over for-hire transportation options.

9  Namisnak and Falls do not use any for-hire transportation options in New Orleans, nor have they

10  investigated what options might be available.  And Namisnak, Crawford, and Falls have not looked

11  into the costs of rides requested through the Uber Rider App, even though all three Plaintiffs live

12  on fixed incomes.  Ex. C at 11:24–12:5; Ex. D at 10:4–8; 13:24–14:3; Ex. O at 12:12–14:5.  Thus,

13  as the Ninth Circuit predicted, the actual facts undermine Plaintiffs' allegations of futility and

14  deterrence.  Rather, as in *Carney*, Plaintiffs' conclusory assertions that they want to and would use

15  the Uber Rider App stand alone, contrary to all other evidence.  Just like Adams in *Carney*, each

16  Plaintiff here therefore lacks standing.

17        Falls lacks standing for an additional reason.  Beginning in February 2020 through at least

18  his January 5, 2021 deposition, Falls was hospitalized and "totally bedbound." Ex. D at 11:17; *see*

19  *id.* at 11:13–15, 12:23–25, 13:10–24.  During that time, he could only travel in a vehicle that could

20  accommodate a stretcher.  *Id.* at 15:5–25.  Falls explained that a WAV option in the Uber Rider

21  App in New Orleans would be of no use to him during this period "because I can't get in my

22  wheelchair." *Id.* at 50:4–8.  For this extended period of time, a WAV request option and WAV

23  supply would not benefit—and so its absence did not injure—Falls, depriving him of standing.  It

24  is well settled that a plaintiff "bears the burden of establishing standing as of the time he brought

25  this lawsuit *and maintaining it thereafter*." *Carney*, 141 S. Ct. at 499 (emphasis added).  Falls's

26  condition from February 2020 through at least January 5, 2021 make it impossible for him to meet

27  that burden.

28

## II.   SECTION 12184 DOES NOT REQUIRE DEFENDANTS TO PROVIDE WAV SERVICE AS A MATTER OF LAW.

In the operative complaints, Plaintiffs claim Defendants violated the ADA by not acceding to their requests to use Defendants' "resources, internal knowledge, and business know-how" to (i) modify the Uber Rider App in Jackson and New Orleans to include a WAV request option; (ii) ensure that fleets of 30–60 WAVs and 20–60 WAVs were available to respond to ride requests on the Uber platform in New Orleans and Jackson, respectively; and (iii) provide WAV service in New Orleans and Jackson that meets the equivalency standard of 49 C.F.R. § 37.105. *Crawford* FAC, ¶¶ 69, 73, 74 (ECF No. 135); *Namisnak,* SAC ¶¶ 70, 75 & Ex. E (ECF No. 92). Plaintiffs identified the same three desired outcomes in their interrogatory responses. Ex. E (Namisnak Resp. to Interrog. No. 2); Ex. F (Falls Resp. to Interrog. No. 2); Ex. G (Crawford Resp. to Interrog. No. 2). In deposition, however, Plaintiffs made clear that they are not interested in (i) or (ii) unless Uber ensures (iii)—equivalent service. Ex. A at 56:18–58:3; Ex. C at 62:12–13, 67:22–68:2; Ex. D at 57:13–58:2, 59:7–15, 62:6–18. As one Plaintiff put it, the Uber Rider App would be "meaningless" without equivalent service. Ex. A at 53:4–54:11. Thus, if they have standing at all, Plaintiffs only have standing to demand "equivalent service." And, as explained below, Plaintiffs demand for WAV service of any kind fails as a matter of law.

### A.   Section 12184 Does Not Contain A "Trigger" That Compels Covered Entities To Provide Equivalent Service.

Plaintiffs' pleaded theory of the case is that Defendants have "triggered" an obligation to provide "equivalent service" under 42 U.S.C. § 12184 and 49 C.F.R. § 37.103(d) because they allegedly have "new vans" in their so-called transportations system. *See Crawford*, FAC ¶ 137; *Namisnak*, SAC ¶ 143. Defendants argued this construction is wrong in their motion to dismiss (*Namisnak*, ECF No. 98 at 8–11), but the Court did not squarely address it in its ruling. *See Namisnak*, ECF No. 102. At summary judgment, this Court should put to rest Plaintiffs' erroneous construction.

Section 12184 applies to entities that are "primarily engaged in the business of transporting people" and prohibits "discrimination" in transportation "provided by" such entities.[3] 42 U.S.C. § 12184(a). Section 12184(b)'s various subsections define "discrimination" for purposes of Section 12184(a), and Congress specifically addressed WAV issues in this definition. Under Section 12184(b)(3) and (b)(5), "discrimination" includes the "purchase or lease" of a "new van" or "new vehicle[] other than an automobile" to "be used to provide specified public transportation" and that new van or vehicle other than an automobile is not a WAV. 42 U.S.C. § 12184(b)(3), (b)(5). But even if an entity purchases a "new van" or "new vehicle (other than an automobile)," the purchase is not discrimination if the covered entity can show that its transportation system "provides a level of service to such individuals equivalent to the level of service provided to the general public." *Id.* Thus, a covered entity that acquires a new WAV van and uses it to provide transportation services has no obligation to provide *equivalent* service, even if that WAV van is the only accessible vehicle in its fleet. A covered entity that purchases or leases a new non-WAV van (and uses it to provide transportation services) may raise as a *defense* to an allegation that such *purchase or lease* was discriminatory that its service is otherwise equivalent. *Id.* Providing transportation in used vehicles or in new automobiles is not discrimination.

The regulation Plaintiffs invoke in an effort to posit a basis for triggering equivalent service, 49 C.F.R. § 37.103(d), just tracks Section 12184(b)(5). It confirms that the purpose of these provisions is to ensure that new vans that are purchased or leased are accessible, not to impose an equivalent service obligation on any entity subject to Section 12184:

> **(d) Vans with a capacity of fewer than 8 persons.** If the entity operates either a fixed route or demand responsive system, and *purchases or leases a new van* with a seating capacity of fewer than eight persons including the driver (the solicitation for the vehicle being made after February 25, 1992), *the entity shall ensure that the vehicle is readily accessible* to and usable by individuals with disabilities, including

---

[3]     This Court has held that whether Defendants are entities "primarily engaged in the business of transporting people" turns on "whether Uber exerts sufficient control over its drivers such that drivers operate as an extension of Uber when they transport riders," which "is a mixed question of law and fact." *Crawford*, ECF No. 80 at 7. Defendants do not concede, and indeed refute, that either of them is an entity "primarily engaged in the business of transporting people." Under this Court's ruling, however, that question turns on fact issues that are in dispute. For this reason, and because it is not necessary for Defendants to prevail, Defendants do not seek summary judgment on this issue.

individuals who use wheelchairs, *unless the system, when viewed in its entirety, meets the standard for equivalent service* of § 37.105 of this part.

49 C.F.R. § 37.103(d) (emphases added). Plainly read, the references to "equivalent service" in Sections 12184(b) and 49 C.F.R. § 37.103(d) concern a potential *defense* to liability for covered entities who choose to purchase a "new van" that is not a WAV and use it to provide transportation.

That 42 U.S.C. § 12184(b)(3) and (b)(5) lack a trigger for a duty to provide WAV service is even more apparent when compared to Section 12182 (which concerns places of public accommodation) and *does* include such a trigger.[4] If an entity subject to Section 12182 which is *not also* subject to Section 12184 purchases or leases an inaccessible vehicle for use on a "fixed route system," Section 12182(b)(2)(B)(ii) declares that entity's failure to provide equivalent service is itself discrimination. 42 U.S.C. § 12182(b)(2)(B)(ii). So, for instance, if a hotel purchased an additional inaccessible van for transporting guests to the airport, the entire airport shuttle *system* the hotel operates is discriminatory under 42 U.S.C. § 12182(b)(2)(B)(ii) unless it provides equivalent service. *See id.*

This difference between Section 12182(b)(2)(B)(ii), on the one hand, and Section 12184(b)(3) and (b)(5), on the other, is significant. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019). This Court should therefore presume that "Congress intended a difference in meaning" between the two sections. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020). The plain text of Section 12184(b)(3) and (b)(5), as harmonized with the rest of the ADA, shows Congress did not intend to include a convoluted triggering mechanism in which the purchase of a single van can make a private entity providing transportation responsible for the massive burden of providing equivalent service.

In any event, Plaintiffs lack evidence that Defendants have purchased or leased *any* vehicles—new or used, WAVs or automobiles—used to provide specified public transportation.

---

[4]     Plaintiffs no longer have any claims against Defendants under Section 12182. Crawford disclaimed that he was bringing any such claim. *Crawford*, ECF No. 80 at 6 n.1 (noting "plaintiffs deny asserting a claim under [section 12182] and will be held to that representation"). Namisnak and Falls did press a Section 12182 claim, and the Court dismissed it because the Uber Rider App is not a place of public accommodation. *Namisnak*, ECF No. 84 at 6–10.

1   Ex. E (Namisnak Resp. to Interrog. No. 5) ("Uber states that none of the vehicles it owns or leases

2   are used to provide public transportation services"); Ex. G (Crawford Resp. to Interrog. No. 9)

3   (same).  The best evidence they think they have is that some of Defendants' subsidiaries or affiliates

4   have purchased vehicles, but that is irrelevant.[5]  Defendants are distinct and separate entities from

5   the subsidiaries or affiliates, and Plaintiffs have neither pleaded an alter-ego theory nor adduced

6   any evidence that would justify disregarding the corporate form.  *See, e.g.*, *In re Optical Disk Drive*

7   *Antitrust Litig.*, 2017 WL 1153316, at *7 (N.D. Cal. 2017) (Seeborg, J.) (applying California law)

8   ("Public policy dictates that the corporate form be disregarded only in narrowly defined

9   circumstances."); *Sonora Diamond Corp. v. Super. Ct.*, 99 Cal. Rptr. 2d 824, 836 (Ct. App. 2000)

10  ("Alter ego is an extreme remedy, sparingly used.").  Perhaps even more to the point, there is zero

11  evidence that any of Defendants' subsidiaries or affiliates uses any vehicles, much less new vans,

12  to provide specified public transportation—*i.e.*, transportation to the general public on a regular

13  and continuing basis.  42 U.S.C. § 12181(10).

14      **B.**     **Section 12184 Neither Requires Covered Entities To Purchase Or Lease**
            **WAVs Nor Compels Them To Provide Or Guarantee System-Wide WAV**
15           **Service.**

16      Section 12184(b)(3) also explains why Section 12184 as a whole does not require WAV

17  service at all.   This provision, which specifically addresses WAVs, makes clear that providing

18  transportation in "automobiles" that are inaccessible to passengers in wheelchairs (*i.e.*, that are not

19  WAVs), is *not* discrimination.   42 U.S.C. § 12184(b)(3).   As a result of this provision, the

20  Department of Transportation and courts have interpreted Section 12184 as *not* requiring covered

21  entities to purchase or lease *any* WAVs.

22      DOT, to which Congress delegated authority to promulgate regulations to implement

23  Section 12184, 42 U.S.C. § 12186(a)(1), has issued regulations crystalizing the implication

24

---

[5]      Xchange Leasing, LLC, a subsidiary of Uber and affiliate of Rasier, LLC, at one point
25  owned vehicles and leased them to Drivers; Xchange leasing has sold all of its assets and is no
longer operating a leasing business.  Patel Decl. ¶ 81.  UATC, LLC, another Uber subsidiary and
26  affiliate of Rasier, LLC, which focused on researching and developing self-driving vehicle
technology, at one point (prior to 2018) owned vehicles and used some to provide rides, for research
27  and development purposes, in Tempe, Arizona.  UATC has been sold; its R&D vehicles were never
used to provide transportation to the general public on a regular and continuing basis; and no such
28  vehicles are used to provide rides to riders today.

Sections 12184(b)(3) has on Section 12184 generally: "[p]roviders of taxi service are not required to purchase or lease accessible automobiles," or "to purchase vehicles other than automobiles in order to have a number of accessible vehicles in [their] fleet[s]."  49 C.F.R. § 37.29(b);[6] *see* 49 C.F.R. § Pt. 37, App. D ("Under the ADA no private entity is required to purchase an accessible automobile.").   And, in explaining the regulation, DOT opined that "if a taxi company acquires only automobiles, it need never obtain an accessible vehicle."  *Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45590 (Sept. 6, 1991).

DOT's reasonable interpretations of Section 12184 and of its own regulations are due deference.  *See Chevron, Inc. v. NRDC*, 467 U.S. 837, 844 (1984); *Auer v. Robbins*, 519 U.S. 452, 461 (1991).  No Court has rejected the validity or reasonableness of the agency's interpretations. To the contrary, courts have agreed that a for-hire vehicle service may maintain a "fleet consisting entirely of non-accessible vehicles [and] be in accord with the ADA." *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) (emphasis added) (citing 42 U.S.C. § 12184(b)(3)); *Noel v. NYC TLC*, 687 F.3d 63, 73–74 (2d Cir. 2012) ("[T]he ADA, *as a whole*, does not require the ... taxi industry to provide accessible taxis.") (emphasis added).  On that point, this Court has fully agreed: "an entity may maintain a fleet of exclusively non-accessible vehicles without violating the ADA." *Crawford*, ECF No. 80 at 8.

Nevertheless, at the pleading stage, the Court held that Plaintiffs may still seek to compel Defendants to provide WAV service on the theory that failure to do so constitutes a failure to make "reasonable modifications" to its policies, practices, and procedures under the general provisions of 42 U.S.C. § 12184(b)(2), which are not specific to WAV-related issues.  *Crawford*, ECF No. 80 at 8; *accord Namisnak*, ECF No. 102 at 8.  Specifically, the Court concluded that Defendants may be obligated to provide WAV service under the general obligation in subsection (b)(2) to make reasonable modifications.   *Crawford*, ECF No. 80 at 8; *see id.* ("A covered entity under Section 12184 is subject not to just to the narrow requirements associated with the purchase of new vehicles, but the statute's broader anti-discrimination mandate."); *Namisnak*, ECF No. 102 at 8.

---

[6]    DOT has explained that for purposes of this regulation, "taxi service" means any for-hire vehicle service.  49 C.F.R. § Pt. 37, App. D.

14

1   This Court possesses inherent and express authority to revisit that interlocutory conclusion at any

2   time before judgment is entered.  Fed. R. Civ. P. 54(b); *City of Los Angeles v. Santa Monica*

3   *Baykeeper*, 254 F.3d 882, 888–89 (9th Cir. 2001).

4       The Court should revisit that interlocutory ruling and conclude that a claim for WAV

5   service, let alone equivalent service, is not cognizable under Section 12184(b)(2).  This conclusion

6   is correct because Section 12184's specific provisions relating to WAVs and WAV service

7   (subsections (b)(3) and (b)(5)) trump the statute's general provisions (subsection (b)(2)).  This

8   construction follows from the "well established canon of statutory interpretation" that "the specific

9   governs the general."  *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

10  When "a general permission or prohibition is contradicted by a specific prohibition or

11  permission, ... the specific provision is construed as an exception to the general one."  *Id.*  The

12  "general language of a statutory provision, although broad enough to include it, will not be held to

13  apply to a matter specifically dealt with in another part of the same enactment."  *Id.* at 646.  This

14  specific/general canon eliminates contradictions and superfluities.  *Id.* at 645–46.  While not "an

15  absolute rule," the canon provides "a strong indication of statutory meaning, especially when, as

16  here, the two provisions are interrelated and closely positioned, both in fact being parts of the same

17  statutory scheme."  *United States v. Corrales-Vazquez*, 931 F.3d 944, 950–51 (9th Cir. 2019).

18  Applying the specific/general canon, subsection (b)(2)'s general requirement that covered entities

19  make "reasonable modifications" yields to the specific provisions of subsections (b)(3) and (b)(5)

20  when it comes to WAV-related requirements.

21      Had Congress intended to compel private entities that do not purchase or lease new vans to

22  provide WAV service, it would not have done so by drafting specific WAV provisions (subsections

23  (b)(3) and (b)(5)) that do not require WAV service and, instead, rely on a general provision that

24  says nothing about WAVs (subsection (b)(2)) to nevertheless compel WAV service.  This is clear

25  based on what Congress said in Title II of the ADA.  Title II expressly and affirmatively requires

26  public entities to provide WAV service by defining the failure to do so as "discrimination":  "It

27  shall be considered discrimination … for a public entity which operates a fixed route system … to

28  fail  to  provide …  paratransit  and  other  special  transportation  services  to  individuals  with

disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12143(a).  Title II shows that Congress knows how to require WAV service, but Congress did not do so in Section 12184.  *See* 42 U.S.C. § 12184(b).  It is a well-settled rule of statutory interpretation that textual differences in related or parallel statutes—especially statutes enacted by the same Congress and the same Act— are meaningful and must be respected.  *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071–72 (2018).  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Jama v. I.C.E.*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  Thus, that Congress specifically included in Title II an express requirement for covered entities to provide equivalent service confirms that Congress's decision to omit such a requirement from Section 12184, in the same Act, was intentional.[7]

Defendants' interpretation of Section 12184 also avoids absurd results.  *See United States v. Thompson*, 728 F.3d 1011, 1018 (9th Cir. 2013).  It would be incongruous for Section 12184 to both require covered entities to guarantee WAV service and, simultaneously, not require them to acquire WAVs.  There is no indication in the statute's text, the regulations, or legislative history, nor in any case law, that Congress intended to require covered entities to provide WAV service indirectly, even though they are not required to provide such service directly unless they do what the statute expressly contemplates: raise equivalent service as a defense to the acquisition of a new inaccessible van.

In fact, the opposite is true.  Legislative history confirms that Congress intended the specific provisions in subsections (b)(3) and (b)(5) to govern the general provisions of subsection (b)(2):

---

[7]	Congress has explained that it treated public and private entities differently with regard to accessible transportation in the ADA because private entities "do not receive the high levels of federal subsidies that publicly provided services do," and so the requirements applicable to private entities "vary according to the size and type of vehicle, as well as according to the type of system on which the vehicle operates."  H. Rep. No. 101-485(I), 101st Cong., 2d Sess., 1990 WL 10079987, at *2 (May 14, 1990).

16

[Section] 304(b)(2) lists further examples of discrimination, including: a failure such entity to make reasonable modifications consistent with those required under section 302(b)(2)(A)(ii); a failure to provide auxiliary aids and services consistent with the requirements of section 302(b)(2)(A)(iii); and a failure to remove barriers consistent with the requirements of section 302(b)(2)(A)(iv), (v), and (vi).

*The examples of discrimination contained in section 304(b) are intended to address situations that are not covered in the specific vehicle and system requirements for private entities primarily engaged in the business of transporting people included in sections 304(b)(3), 304(b)(4), 304(b)(5) and 306. The general rule contained in paragraph (a) and the examples of discrimination contained in paragraph (b) are not intended to override the specific requirements contained in the sections referenced in the previous sentence.* For example, an individual with a disability could not make a successful claim under section 304(a) that he or she had been discriminated against in the full and equal enjoyment of public transportation services on the grounds that an over-the-road bus was not wheelchair lift-equipped, if a lift was not required under 304(b)(4) or 306(a)(2).

H. Rep. No. 101-485(I), 101st Cong., 2d Sess., 1990 WL 10079987, at *16 (May 14, 1990) (emphasis added).

Like Congress, DOT has interpreted Section 12184 as not requiring covered entities to provide WAV service at all. When promulgating regulations to implement Section 12184, DOT specifically considered, and specifically rejected, a rule requiring taxi companies to at least "have access to accessible vehicles (either in its own fleet *or through arrangements with other entities*)." *Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45590, 1991 WL 171006 (Sept. 6, 1991) (emphasis added). Such a rule was inappropriate, DOT explained, because of "the absence of specific statutory language requiring a mix of accessible vehicles in taxi fleets." *Id.*

In sum, the rules of statutory construction show, unambiguously, that neither the specific prohibitions in Section 12184(b)(3) and (b)(5) nor the general prohibition in (b)(2) require the provision of WAV service absent the purchase or lease of a new van. And were the statute ambiguous on this point, DOT regulations and guidance (entitled to deference), as well as legislative history resolve that ambiguity in Defendants' favor. Thus, Plaintiffs' claim that Defendants are obligated to provide or make others provide WAV service as a "reasonable modification" under Section 12184(b)(2) fails as a matter of law.

**C.     Plaintiffs Seek New Outcomes, Not Any "Modification" To Defendants' Policies, Practices, Or Procedures.**

There is another reason why Plaintiffs' claim is not cognizable under a "reasonable modification" theory.   Plaintiffs' demands for equivalent service are not requests for a "modification" to a "policy, practice, or procedure."   42 U.S.C. § 12184(b)(2)(A); *id.* § 12182(b)(2)(A)(ii).  The relevant statutory provision is concerned with *existing* business policies, practices, or procedures and with the provision of individualized exceptions—"modifications"—to them.  *See, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1266–67 (9th Cir. 2004) ("[T]he crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced.").  That is why, as this Court has recognized, under Title III a covered entity must only make those reasonable and necessary modifications that the particular plaintiff *requested*. *Namisnak*, ECF No. 84 at 4–5.  Indeed, "the word 'modification' connotes *moderate* change." *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1036–37 (6th Cir. 1995) (emphasis added); *see, e.g.*, *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1012 (9th Cir. 2017) (request that dealership add hand-controls for plaintiff's test drive was a request for a "modification" to the test-driving practice because it sought a "temporary" change to accommodate the individual plaintiff); *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (holding disability rights statutes require "reasonable accommodations to assure access to an existing program" but do not require the provision of "additional or different substantive benefits").

The examples of "policies, practices, and procedures" and "modifications" to them detailed by the Department of Justice illustrate the sorts of business policies and moderate, individualized accommodations with respect to such policies with which the statute is concerned.  As DOJ explains: (i) where a parking facility has a "rule barring all vans or all vans with raised roofs," that facility may need to "modify" that rule "if an individual who uses a wheelchair-accessible van wishes to park in that facility; (ii) "[a] department store may need to modify a policy of only permitting one person at a time in a dressing room, if an individual with [a cognitive impairment] needs and requests assistance in dressing from a companion"; and (ii) "a hotel may need to adopt a

1   policy of keeping an accessible room unoccupied until an individual with disability arrives at the

2   hotel, assuming the individual has properly reserved the room."  28 C.F.R. § Pt. 36, App. C.

3          None of these examples resembles the case here.  Plaintiffs have not identified a "policy,

4   practice, or procedure" at all, and they do not seek moderate change to any existing policy necessary

5   to accommodate their disabilities.  What Plaintiffs seek are outcomes or results: a number of WAVs

6   and "equivalent service."  An order requiring Defendants to provide "equivalent service" and/or up

7   to 60 WAVs in New Orleans and Jackson would be an order to achieve an outcome that would not

8   command any specific acts necessary for an enforceable injunction.  Nor would such an order

9   require Defendants to make an exception to any existing business practice, much less a moderate

10  exception for these individuals.   Achieving Plaintiffs' requested outcomes would compel

11  Defendants to offer a new service and enter a new line of business, or compel third parties to do so,

12  in New Orleans and Jackson.  Neither the "reasonable modification" provision nor any other

13  provision of Title III requires such actions by private entities.

14         On the contrary, it is well-settled that Title III "does not require provision of different goods

15  or services, just nondiscriminatory enjoyment of those that are provided.  Thus, a bookstore cannot

16  discriminate against disabled people in granting access, but need not assure that the books are

17  available in Braille as well as print."  *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104,

18  1115 (9th Cir. 2000).  Yet, on Plaintiffs' view, this settled rule could easily be circumvented by

19  casting a demand that bookstores stock Braille books as a request to "modify" a "policy, practice,

20  or procedure" of not selling Braille books.  Plaintiffs cannot misuse the "reasonable modification"

21  to swallow that rule.

22  **III.   PLAINTIFFS CANNOT PROVE THAT THEIR REQUESTED OUTCOMES ARE "REASONABLE" AT TRIAL.**

23         If Plaintiffs' claim is cognizable, they will have to prove that the outcomes they request and

24  the acts necessary to achieve them are "reasonable" to make out a *prima facie* case.  42 U.S.C.

25  § 12184(b)(2)(A);  42 U.S.C.   § 12182(b)(2)(A)(ii);  *Lopez v. Catalina Channel Express, Inc.*,

26  974 F.3d 1030, 1036 (9th Cir. 2020).  In the ADA, "reasonable" is a term of limitation.  *McGary*,

27  286 F.3d at 1270.   The ADA does not require covered entities "to make any and all

28

accommodations"; it requires only those "accommodations that are reasonable." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). "A modification is not reasonable if it imposes 'undue financial and administrative burdens." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004) (quoting *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 n.17 (1987)). Reasonableness turns on, among other things, "the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Id.*; *see Baughman*, 685 F.3d at 1135 (other relevant factors include "disruption of [the defendant's] business and safety"). Key to this inquiry is whether the cost is "disproportionate to the benefit." *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995) (Posner, J.). If it is, the requested modification is not "reasonable." *Id.*

Because Plaintiffs bear the burden of proving "reasonableness," summary judgment is warranted so long as Defendants demonstrate that that there are no genuine issues of material fact and "either produce evidence negating [this] essential element" of Plaintiffs' claim *or* show that Plaintiffs "do[] not have enough evidence" of reasonableness "to carry [their] ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A fact dispute is "genuine" only if there is sufficient evidence from which a reasonable factfinder could find for the non-movant. *Anderson*, 477 U.S. at 248–49. These standards are met here, and Defendants are entitled to summary judgment.

As noted, Plaintiffs demand that Defendants add a "WAV" request option to the Uber Rider App, ensure that fleets of 30–60 and 20–60 WAVs are available to respond to ride requests in New Orleans and Jackson, respectively, *and* that these WAVs provide equivalent service under 49 C.F.R. § 37.105. *See supra*, p. 10. Plaintiffs have never explained how they want Defendants to meet these demands, nor have they suggested any means that would actually accomplish the outcomes they seek. Instead, Plaintiffs seek these outcomes and defer to Defendants' "internal knowledge" and "business know-how." *Id.*

As explained below, Defendants' knowledge and business-know have proven that it is not possible to meet Plaintiffs' demands, at least not without a departure from Defendants' business model and service offerings. The record is devoid of admissible evidence from which a reasonable

1  factfinder could conclude that it would be reasonable to require Uber to attempt to meet Plaintiffs'
2  demands.   Indeed, to the contrary, Defendants' uncontroverted evidence demonstrates that
3  Plaintiffs' demands are unreasonable.  Moreover, even if Plaintiffs could carry their burden, their
4  claim still fails because the demands they request would require Defendants to fundamentally alter
5  their business and the services they provide.   42 U.S.C. § 12184(b)(2)(A); 42 U.S.C.
6  § 12182(b)(2)(A)(ii).

7     **A.    Plaintiffs' Disclaimed Demand That Uber Simply "Turn On" A WAV Request Option In The Uber Apps In New Orleans and Jackson Is Not Reasonable.**
8

9     Defendants cannot cause a successful ridesharing marketplace simply by adding a new
10  request option to the Uber Apps.  Demand for ridesharing services is necessary but not sufficient.
11  Critical to any ridesharing marketplace's success is the supply of drivers operating the types of
12  vehicles riders demand.  Patel Decl. ¶¶ 11, 14–15, 19–20, 59.  Neither adding a request option nor
13  or a rider having used that option to request a ride means that a Driver will be logged on, available,
14  and nearby in a WAV and then choose to accept that particular request and provide the ride.  *Id.*
15  ¶¶ 19–20.

16     Whether Drivers provide supply depends upon choices made by Drivers, not by
17  Uber.  Defendants do not employ drivers, and they do not choose, own, sell, rent, lease, maintain,
18  or control the vehicles independent Drivers use to provide rides.  *Id.* ¶¶ 7, 13, 21–24, 34, 39.  One
19  of the most important choices Drivers make, for their own profit-generating potential, is which
20  vehicle or vehicles to use to provide rides.  *Id.* ¶ 21.  Defendant Rasier, LLC licenses the Uber
21  Driver App to these Drivers by contract, and that contract governs Defendants' relationship with
22  Drivers.  *Id.* ¶ 8; *see* Ex. 1 at § 1.1.  Under that contract, Drivers are free to choose which vehicle
23  or vehicles to use to provide rides, so long as the vehicle chosen is "suitable" for providing
24  rides.  Ex. 1 § 2.5(c).  Based in large part on local regulatory requirements, Uber has basic standards
25  for what constitutes a suitable vehicle (such as a vehicle that is not older than ten years and has four
26  doors).  Patel Decl. ¶ 21.  Those basic standards allow Drivers to choose dozens, if not hundreds,
27  of different makes models.  *Id.*  Many Drivers choose to provide rides using a vehicle they already
28  own and would own irrespective of ridesharing—a critical factor in the growth, density, and success

1    of ridesharing marketplaces.  *Id.* ¶¶ 22–23.  The ubiquity of four-door sedans and SUVs that

2    Drivers already own allows for a ready supply of Drivers to offer rides requested on the Uber

3    platform using the UberX, Pool, and XL options in nearly every city.  *Id.* ¶ 24.

4            By contrast, WAVs are not ubiquitous.  Few Drivers already have WAVs for reasons

5    unrelated to ridesharing, and acquiring WAVs for ridesharing and using them to provide WAV ride

6    requests does not make financial sense for Drivers.  *Id.* ¶¶ 26, 30–31.  This is because WAVs cost

7    significantly more than standard vehicles to acquire, maintain, and operate.  *Id.* ¶¶ 26–

8    27.  Insurance premiums are higher for WAVs.  *Id.* ¶ 27.  Drivers must obtain expensive and time-

9    consuming training and certification to safely operate WAVs.  *Id.*  And because of the time

10   necessary to onboard and offboard a rider, WAV trips take longer to complete, reducing a Driver's

11   earning potential in any given day.  *Id.*  The California legislature has found that, "[i]n comparison

12   to standard vehicles available via TNC [Transportation Network Company] technology

13   applications, WAVs have higher purchase prices, higher operating and maintenance costs, higher

14   fuel costs, and higher liability insurance, and require additional time to serve riders who use

15   nonfolding motorized wheelchairs."  Cal. Pub. Util. Code § 5440(f).  Thus, there is not a ready

16   supply of Drivers to offer WAV rides requested on the Uber platform in any city.  Patel Decl.

17   ¶¶ 30–32.

18           At the same time, demand for WAV rides is low, ███████████████████████████████

19   ███████████████████████████████████████, even though offering WAV rides is a significantly

20   more expensive proposition for Drivers ████████████████.  *Id.* ¶ 29.  Given the high-costs and

21   low-earning potential for Drivers of selling WAV rideshare services, few Drivers rationally would

22   choose (and few do choose) to use WAVs when selling rides on the Uber platform.  *Id.* ¶¶ 30–

23   31.  For these reasons, simply adding a WAV request option to the Uber Apps and opening WAV

24   marketplaces to riders and Drivers on the Uber platform will not result in WAV rides actually being

25   bought and sold on any regular or reliable basis because there would be no meaningful supply.  *Id.*

26   ¶ 32.

27           Indeed, by disclaiming their request for Uber to simply "turn on" a "WAV" option in the

28   Uber Driver App in New Orleans and Jackson, Plaintiffs appear to recognize and embrace this

1   reality.  Insofar as Plaintiffs try and are permitted to resurrect this demand, it is unreasonable

2   because merely adding a WAV request option to the Uber Apps will result in a poor rider

3   experience.  *Id.* ¶¶ 14–15, 19–20, 28, 32.

### B.   Plaintiffs' Demand For Equivalent Service Is Not Possible, Let Alone Reasonable.

The "equivalent service" Plaintiffs demand flows from the legally inapplicable standard set

forth in 49 C.F.R. § 37.105.  (As discussed, the plain language of Section 12184 dictates that this

standard does not apply here.)  Where that standard applies, service to persons who require WAV

transportation must be as available (in terms of hours of operation and place of service) and with

equivalent wait times and other metrics, as the service to persons who do not require WAV

transportation.  *See id.*  Insofar as Plaintiffs demand availability and wait times to be exactly the

same for WAV and non-WAV trips, the only way to meet that demand in the context of ridesharing,

where availability and wait times fluctuate constantly and in real time, is for *all* ridesharing vehicles

to be WAVs.  There are only two hypothetical ways for Defendants to ensure that all vehicles

operating on the Uber platform are WAVs.  Patel Decl. ¶¶ 34–35.  One way would be for

Defendants to, themselves, acquire the vehicles, acquire the real estate to warehouse them, hire

personnel to maintain them, and employ drivers to provide rides requested via the Uber Rider App

in vehicles controlled and selected by Uber or otherwise make those vehicles available to Drivers.

*Id.* ¶ 35.  The other way would be for Defendants to prohibit each Driver from accessing the Uber

platform unless he or she has a WAV.  *Id.*

Those are not reasonable options.  Indeed, it would fundamentally alter Defendants'

business if they were ordered to acquire fleets of vehicles, maintain them, and employ people to

drive them.  *See id.* ¶ 36.  Such an order would compel Defendants to adopt a business model totally

different than the one they have and to enter a sector of a market they have not entered, and which

they never intended to enter.  *See, e.g.*, *Roberts ex rel. Roberts v. KinderCare Learning Ctrs.*, 896 F.

Supp. 921, 926 (D. Minn. 1995) (forcing provider of group childcare services to provide one-on-

one childcare services for an individual with a disability would fundamentally alter provider's

business because it would force the provider "into a child care market it did not intend to enter"),

*aff'd*, 86 F.3d 844 (8th Cir. 1996).  And forcing Defendants to mandate that Drivers provide rides in WAVs, as opposed to any one of the dozens or hundreds of vehicle makes and models that satisfy Defendants' basic vehicle requirements, would fundamentally alter Defendants' business—from a business where Drivers currently choose from among dozens or hundreds of vehicles to one where Drivers can chose only a WAV.  *See* Patel Decl. ¶ 8; Ex. 1 § 2.6(a).  In reality, given the barriers and disincentives to WAV ownership for Drivers, discussed above, if Drivers are prohibited from accessing the Uber platform unless they have WAVs, a significant majority of rideshare Drivers would simply cease being rideshare Drivers.  Patel Decl. ¶ 37.  It would decimate Defendants' revenue base, decimate the supply of Drivers using and eligible to use the platform, and would cause all of the marketplaces—UberX, Pool, and WAV—to fail.  *Id.*  Therefore, it would not be "reasonable" or even "possible" for Defendants to satisfy Plaintiffs' demand for "equivalent service."

### C.  Plaintiffs' Demands For Fleets Of 20-60 WAVs In Jackson And 30–60 WAVs In New Orleans Are Not Reasonable.

Plaintiffs' demands for the outcome of a range of numbers of WAVs available in Jackson and New Orleans are also not attainable through any reasonable means.  For one thing, these demands fail to recognize Defendants' business model and would require a significant departure from it.  To truly guarantee the result demanded, Defendants would have to acquire WAVs themselves and employ persons to drive them, but Defendants do not have fleets of vehicles used to provide rideshare services.  *Id.* ¶¶ 39, 41.  They do not own WAVs.  *Id.* ¶ 39.  And, as discussed, Drivers acting rationally in their own economic self-interest select their own rideshare vehicles, often vehicles they already own.[8]

---

[8]     It is unclear what Plaintiffs meant by their demands for fleets of up to 60 WAVs in each city: they have conceded that these demands were essentially arbitrary (see Ex. D at 56:20–58:2; Ex. A at 55:20–58:2; Ex. C at 62:2–18, 67:1–5); they were unable to clarify them (see Ex. C at 62:2–23; Ex. D at 57:13–22; Ex. A at  55:20–56:6); and they have disclaimed their demands for any number of WAVs that does not provide equivalent service. Ex. A at 56:18–58:3; Ex. C at 62:12–13, 67:22–68:2; Ex. D at 57:13–58:2, 59:7–15, 62:6–18.  Still, if Plaintiffs intended to demand that up to 60 Drivers with WAVs are logged on, all day every day, and available to accept WAV ride requests, ███████████████████████████████████████████████████████████ ██████ Patel Decl. ¶ 40. ██████████████████████████████████████████████

1  Plaintiffs' demands in reality would require Defendants to cause a third party to deliver the

2  demanded results.  Based on Defendants' experience and know-how, there is only one plausible

3  way for Defendants to cause a third party to deliver the demanded 20–60 WAVs in Jackson and

4  30–60 WAVs in New Orleans, and that is for Defendants to partner with a commercial fleet

5  operator— ███████████████████████████████████████████████████████████████

6  ███████████████████████████████████.  Patel Decl. ¶¶ 41, 46, 90.[9]  Of course, this

7  option requires that there be a commercial fleet operator that is willing to participate, but in Jackson

8  and New Orleans, there are no such operators.  *Id.* ¶¶ 57, 61, 63, 68; *see also* Ex. C at 26:2–30:14.

9  But even if there were operators of commercial fleets in these cities who had the numbers

10  of WAVs Plaintiffs demand, and even assuming that such operators would be ready and willing to

11  partner with Uber, Plaintiffs' demands would still be unreasonable.  That is because it is Uber's

12  actual experience that these arrangements are extraordinarily costly and do not yield the sorts of

13  results Plaintiffs are after.

14  Uber has real-world experience from which to gauge the costs of the steps that would need

15  to be taken.  Patel Decl. ¶¶ 42–44, 47.  In 2018, Uber began a partnership with MV Transportation

16  Inc. ("MVT"), a sophisticated commercial fleet operator with a WAV-focused fleet and multi-city

17  presence.  *Id.* ¶ 44.  ██████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████.

19  *Id.* ¶ 45.  ████████████████████████████████████████████████████████████

20  ███████████████.  *Id.*  ███████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████.  *Id.*

24

25  _____

26  ████████████████████████.  *Id.* ¶ 65.

27  [9]  There are other methods to encourage individual Drivers to provide WAV trips, which
    would also be used, but by themselves and without the scale of a commercial fleet operator, they

28  would not be sufficient.  Patel Decl. ¶¶ 73–90

*Id.* ¶ 47; Ex. 2

. Patel Decl. ¶ 47; Ex. 3.                                                                                    . *Id.* ¶¶ 66–68.

. *Id.*; Ex. 4.  Indeed, MVT recently ended the partnership in San Francisco and Boston

Ex. H at 117:15–21; *see* Patel Decl. ¶ 68.  MVT, moreover, does not operate in New Orleans or Jackson at all.  Patel Decl. ¶ 57.

If Uber were to attempt to cause third parties to provide 60 WAVs in Jackson and 60 WAVs in New Orleans,

. Patel Decl. ¶¶ 41, 73, 90.  Uber has experience with these techniques as well and has knowledge of their costs and benefits.  *Id.* ¶¶ 73–89.[10]

Uber

.

, *id.* ¶ 50; Ex. 2,                                                    . Patel Decl. ¶ 53; Ex. 3.

---

[10]                                                                        Patel Decl. ¶ 73.                                                    *Id.* ¶¶ 86–87.   *Id.* ¶¶ 74–77.  For these reasons,                         . *Id.* ¶¶ 46, 73.

1   ███████████████████████████████████████, Patel Decl. ¶ 55; Exs. 2 & 3.  As shown in the tables

2   below, █████████████████████████████████████.[11]

3

4   

5

6

7

8

9

10

11

12

13   

14

15

16

17

18

19

20

21

22

23

24   _____

25   [11]    The per-WAV-trip calculation approximates, but likely *understates*, the amount Uber
spends to support a WAV trip for individuals who actually require WAV rides.  Uber is unable to
verify whether any particular requesting rider actually requires a WAV for transportation.

26   ██████████████████████████████████████████████████████████████████████████████████

27   ███████████████ Patel Decl. ¶ 55. ████████████████████████████.  In addition, the
cost-per-WAV-trip calculation does not reflect overhead costs, such as the salaries of Uber

28   employees who work on WAV. *Id.* ¶ 49.

These costs dwarf the average WAV ride price. ████████████
████████████████████████████████████. Patel Decl. ¶ 56; Ex. 3.
████████████████████████████████.

Uber's costs (and losses) would be at least as high—and in all probability, much higher—were Uber to replicate its efforts in an attempt to meet Plaintiffs' demands in New Orleans and Jackson, assuming a commercial fleet partner were available. As noted, MVT does not operate in either city. Patel Decl. ¶¶ 57–58. But even if MVT or some other commercial fleet operator opened shop in New Orleans and Jackson and was willing to partner with Uber, there is no evidence to suggest that Uber's WAV-related costs would be lower there. *See id.* ¶¶ 58–61. The pilot cities are some of the largest, most densely populated cities in the country. *Id.* ¶ 59. The WAV marketplace (like all ridesharing marketplaces) performs best in dense, well-populated areas. *Id.* New Orleans is smaller, and less densely populated than even Washington, D.C., the pilot city with the smallest population (it's about half the size).[4] And Jackson, Mississippi is a smaller than even New Orleans: its population is not even a quarter of Washington, D.C.'s and is significantly less dense.[6] Both New Orleans and Jackson currently lack a taxi WAV presence as well. *See* Ex. A at 22:14–23:15; Ex. C at 33:24–34:7; Ex. D at 38:13–39:5; Patel Decl. ¶ 87.

Indeed, ████████████████████████████████████. Patel Decl. ¶ 62.



_____

[4]     According to U.S. Census data, as of July 1, 2019, New Orleans had an estimated population of 390,144, while Washington, D.C. had an estimated population of 705,749. Ex. I; Ex. J. As of 2010, New Orleans only had 2,029 people per square mile, while Washington, D.C. had 9,856. Ex. I; Ex. J. The Court may take judicial notice of U.S. Census data. *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996).

[6]     According to U.S. Census data, Jackson, Mississippi had an estimated population of 160,628 as of July 1, 2019, and a population density (as of 2010) of only 1,562.5 people per square mile. Ex. K.

1　　████████████████████████████████████████████████████. Patel

2　Decl. ¶ 87.

3　　　　Nothing about either New Orleans or Jackson suggests it would be less burdensome,

4　financially or administratively, for Uber to launch and support WAV marketplaces in those cities

5　than in the pilot cities.　To the contrary, given these facts, and based on Uber's experience,

6　knowledge, and business know-how, Uber expects it would be significantly more difficult and cost

7　significantly more.　Patel Decl. ¶¶ 58, 63.　The highest per-WAV-trip cost discussed above—

8　████████████████████████████—is the probable floor for what it

9　would cost Uber, per WAV trip, to attempt to achieve the outcomes Plaintiffs demand in New

10　Orleans or Jackson. *Id.* ¶ 63.　At a minimum, Uber expects such efforts to cost as least as much as

11　████████████████████████████████████████████████████

12　████████████. *Id.* ¶ 63.

13　　　　Further, even if a willing commercial fleet partner became available and Uber incurred these

14　costs, the results would not be the sorts of outcomes Plaintiffs have demanded, and which they have

15　asserted must be achieved before they will even download the Uber Rider App.　Ex. A at 56:18–

16　58:3; Ex. C at 43:7–12; Ex. D at 57:13–58:2, 59:7–15, 62:6–18.　Even in cities where Uber has

17　partnered with MVT to put its significant WAV fleets and Drivers on Uber's platform, the WAV

18　marketplaces remain less robust and reliable than the other Uber marketplaces, like UberX, XL,

19　and Pool.　Patel Decl. ¶ 64.　████████████████████████████

20　████████████████████████████████████████████████████

21　████████████████████. Patel Decl. ¶ 64.████████████

22　████████████████████████████████████████. *Id.*　It follows,

23　*a fortiori*, that if it were even possible for Uber to guarantee equivalent service (it is not), doing so

24　would result in costs (and losses) to Uber that outstrip the company's current WAV-related costs

25　(and losses) by many orders of magnitude. Patel Decl. ¶¶ 63–64, 90.

26　　　　The ████████████████████████████████ on WAV efforts and ████

27　████████████████████████████ on each WAV trip are documented in Uber's business

28　records (Exs. 2 & 3) and supported by the Declaration of Niraj Patel.　Mr. Patel is the Uber director

1   who oversees the company's WAV program and efforts.  Patel. Decl. ¶ 2.  Plaintiffs deposed

2   Mr. Patel twice in his capacity as corporate designee.  Exs. H & N.  Yet, Plaintiffs have not elicited

3   or adduced any testimony or other evidence that controverts Defendants' evidence.  There is not,

4   and cannot be, any genuine dispute as to the financial and administrative burdens of Uber's WAV

5   efforts.  Nor have Plaintiffs elicited or adduced any evidence to show that these financial and

6   administrative burdens are proportionate to the benefits.  All Plaintiffs have on this critical element

7   of their claim is the inadmissible *ipse dixit* of their expert, Dr. James Cooper, that it is "reasonable"

8   for Uber to guarantee WAV service.  That unsupported, improper opinion is inadmissible for the

9   reasons explained in Defendants' concurrently filed motion to exclude and, therefore, is insufficient

10  to permit Plaintiffs to withstand summary judgment.

11       On this record, no reasonable factfinder could conclude that Plaintiffs' demands are

12  reasonable.  Indeed, Judge Alsup recently held in a similar case asserted against Lyft that

13  per-WAV-trip costs of hundreds of dollars are not reasonable.  *Indep. Living Res. Ctr. v. Lyft, Inc.*,

14  2020 WL 6462390 at *4 (N.D. Cal. Nov. 3, 2020) (holding at summary judgment that a $925

15  subsidy nearly 57 times the ride price is paying is unreasonable).  Judge Alsup rightly understood

16  that it is unreasonable to force a company to sustain such losses—even a company, like Lyft, that

17  had $8.1 billion in gross bookings.  *Id.*  Judge Alsup's decision is consistent with the principle that

18  a modification cannot be "reasonable" if the burden on the defendant are disproportionate to the

19  benefit to the plaintiff.  *Vande*, 44 F.3d at 542.

20       The same result obtains here.  Congress did not require, via Title III of the ADA, even "large

21  or wealthy" entities to "expend enormous sums in order to bring about a trivial improvement" to

22  the lives of individuals with disabilities.  *Id.* at 542–43.  A requirement to make reasonable

23  modifications or accommodations is "a limited one" that does not require covered entities "to

24  employ any and all means" to accommodate persons with disabilities.  *Tennessee v. Lane*, 541 U.S.

25  509, 531–32 (2004).  The amount Uber loses (and would lose in New Orleans and Jackson) on each

26  WAV trip approximates how much Uber spends to support one WAV ride for a rider on the

27  platform who needs one.  It is disproportionate in the extreme to mandate that Uber to spend and

28  lose ████████████████████ to support each individual WAV trip.

1    Uber, moreover, ████████████████████████████████████

2    cities.  Declaration of Kevin Nolan ¶¶ 4–8.  Uber ███████████████████████, *see id.*,

3    much less all over the country, *see* Patel Decl. ¶¶ 16, 69–72.  Yet if it is "reasonable" for Uber to

4    guarantee equivalent service or a large number of WAVs in cities like New Orleans and Jackson,

5    then it likely is "reasonable" for Uber to do so throughout the country. *See, e.g.*, *D.L. ex rel. A.L. v.*

6    *Walt Disney Parks & Resorts, Inc.*, 469 F. Supp. 3d 1280, 1313–14 (M.D. Fla. 2020) (rejecting

7    argument that reasonableness of a demand for an individual modification can be viewed in isolation

8    when other individuals with disabilities will make the same demand).  Perpetual losses ████████

9    ███████████████████████████████████, are not sustainable for any business.  That is

10   why Congress did not mandate that private entities provide WAV service, and instead imposed that

11   duty on public entities that receive federal subsidies.

12                                   *        *        *

13   Title III of the ADA does not require unreasonable efforts.  42 U.S.C. § 12184(b)(2)(A).

14   An injunction requiring Defendants to guarantee that third parties provide any kind of reliable

15   WAV service in New Orleans and Jackson and their respective suburbs—let alone equivalent

16   service—would require Defendants to spend ████████████████████ to support each

17   individual WAV ride, if it were even possible.  A modification dooming Defendants to absorb this

18   disproportionate expense is unreasonable as a matter of law.  *Lyft, Inc.*, 2020 WL 6462390 at *4;

19   *Vande Zande*, 44 F.3d at 542.

20                                 **CONCLUSION**

21   Summary judgment should be entered in Defendants' favor.

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated: April 19, 2021

By:  s/ Anne Marie Estevez

Anne Marie Estevez
Stephanie Schuster
Patrick Harvey
Kathy H. Gao

*Attorneys for Defendants*