MORGAN, LEWIS & BOCKIUS LLP
Anne Marie Estevez (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T:  305.415.3000
F:  305.415.3001
annemarie.estevez@morganlewis.com

Stephanie Schuster (*pro hac vice*)
Patrick A. Harvey (*pro hac vice*)
1111 Pennsylvania Avenue NW
Washington, DC 20004
T: 202.739-3000
stephanie.schuster@morganlewis.com
patrick.harvey@morganlewis.com

Kathy H. Gao (CA Bar No. 259019)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
T:  (213) 612-2500
F:  (213) 612-2501
kathy.gao@morganlewis.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT CRAWFORD, | Case No. 3:17-cv-02664-RS |
| Plaintiff, | |
| v. | **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | |
| Defendants. | Hearing Date: July 15, 2021, 1:30 p.m. Judge: Hon. Richard Seeborg Via Zoom |
| STEPHAN NAMISNAK and FRANCIS FALLS, | Case No. 3:17-cv-06124-RS |
| Plaintiffs, | |
| v. | **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | |
| Defendants. | Hearing Date: July 15, 2021, 1:30 p.m. Judge: Hon. Richard Seeborg Via Zoom |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case No. 3:17-cv-02664-RS
Case No. 3:17-cv-06124-RS

DEFENDANTS' BRIEF IN
OPPOSITION TO PLAINTIFFS' MSJ

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

SUMMARY OF MATERIAL FACTS IN GENUINE DISPUTE ................................................. 4

ARGUMENT ...................................................................................................................... 8

I.      PLAINTIFFS LACK STANDING. ............................................................................ 8

II.     PLAINTIFFS LACK EVEN A COLORABLE CLAIM FOR "EQUIVALENT SERVICE." ................................................................................ 13

III.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR PLEADED THEORY—FAILURE TO MAKE "REASONABLE MODIFICATIONS." ......................................................................................... 16

       A.     Defendants' WAV Pilots In Major Cities Do Not Show That It Is Reasonable For Defendants To Support WAV Marketplaces In Jackson And New Orleans. ................................................................. 18

       B.     Compelling Defendants To Get Into The Vehicle Leasing Business Is Not Reasonable. ..................................................................... 19

       C.     Adding a "WAV" Button and Offering Monetary Incentives To Drivers is Ineffective, and Therefore, Not Reasonable. ......................... 20

       D.     Compelling Defendants Partner With Commercial WAV Fleet Operators In New Orleans And Jackson Is Not Reasonable. ................... 21

IV.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR UNPLEADED THEORY THAT DEFENDANTS SCREEN OUT WAV DRIVERS. ................................................................................... 25

V.     PLAINTIFFS FAIL TO CARRY THEIR BURDEN ON THE QUESTION OF WHETHER DEFENDANTS ARE SUBJECT TO SECTION 12184. ........... 27

       A.     Only Entitles That Are "Primarily Engaged in the Business of Transporting People" Can Be Subject to Section 12184. ........................ 27

       B.     There Are Genuine Disputes Of Fact Material To Whether Defendants Are "Primarily Engaged In The Business Of Transporting People." ................................................................. 29

            1.     Defendants' primary business is technology, not transportation. ............................................................. 30

            2.     Defendants are not in the business of transporting people. ........... 31

            3.     Whether Drivers are merely an extension of Defendants is genuinely disputed. ................................................... 32

CONCLUSION ................................................................................................................ 35

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Living v. Uber Techs., Inc.,*
  958 F.3d 604 (7th Cir. 2020) ........................................................................................... 9

*ACLU v. City of Las Vegas,*
  466 F.3d 784 (9th Cir. 2006) ........................................................................................... 8

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ......................................................................................................... 8

*Baughman v. Walt Disney World Co.,*
  685 F.3d 1131 (9th Cir. 2012) ....................................................................................... 17

*Bullard v. Wastequip Mfg. Co.,*
  2015 WL 12766467 (C.D. Cal. 2015) ........................................................................... 26

*Carney v. Adams,*
  141 S. Ct. 493 (2020) ............................................................................................... 10, 11

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ......................................................................................................... 8

*Chapman v. Pier 1 Imports, Inc.,*
  631 F.3d 939 (9th Cir. 2011) (en banc) .......................................................................... 9

*Coleman v. Quaker Oats Co.,*
  232 F.3d 1271 (9th Cir. 2000) ....................................................................................... 26

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ....................................................................................................... 27

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001) ..................................................................................... 24

*District of Columbia v. Murphy,*
  314 U.S. 441 (1941) ....................................................................................................... 10

*Doran v. 7-Eleven, Inc.,*
  524 F.3d 1034 (9th Cir. 2008) ......................................................................................... 9

*Dunlap v. Ass'n of Bay Area Gov'ts,*
  996 F. Supp. 962 (N.D. Cal. 1998) ............................................................................... 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Fortyune v. Am. Multi-Cinema, Inc.*,
    364 F.3d 1075 (9th Cir. 2004) ................................................................... 17, 20

*Francis v. Town of Brookneal*,
    2007 WL 1472065 (W.D. Va. 2007) ................................................................. 34

*ICTSI, Inc. v. Int'l Longshore & Warehouse Union*,
    442 F. Supp. 3d 1329 (D. Or. 2020) ................................................................ 25

*Indep. Living Res. Ctr. v. Lyft, Inc.*,
    2020 WL 6462390 (N.D. Cal. 2020) ....................................................... 18, 21, 23

*Int'l, Ltd v. Anga Supply, LLC*,
    118 F. Supp. 3d 1172 (N.D. Cal. 2015) ........................................................... 30

*Jorisch v. Rhythm Festival, Inc.*,
    544 S.E.2d 459 (Ga. 2001) ............................................................................ 15

*Long v. Ingenio, Inc.*,
    2011 WL 13143442 (N.D. Cal. 2011) .............................................................. 14

*Lopez v. Catalina Channel Express, Inc.*,
    974 F.3d 1030 (9th Cir. 2020) ....................................................................... 16

*Namisnak v. Uber Techs., Inc.*,
    971 F.3d 1088 (9th Cir. 2020) ................................................................ *passim*

*Nelson v. Salt Lake Cty.*,
    2021 WL 1063236 (D. Utah 2021) .................................................................. 27

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ....................................................................... 30

*Noel v. NYC Taxi & Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012) ........................................................................... 32

*In re Optical Disk Drive Antitrust Litig.*,
    2017 WL 11513316 (N.D. Cal. 2017) (Seeborg, J.) ........................................... 14

*Pickern v. Holiday Quality Foods Inc.*,
    293 F.3d 1133 (9th Cir. 2002) ......................................................................... 9

*Pokorney v. Miami Vall. Career Tech. Ctr. Sch. Dist.*,
    1995 WL 1671909 (S.D. Ohio 1995) ............................................................... 27

*Roberts ex rel. Roberts v. KinderCare Learning Ctrs.*,
    896 F. Supp. 921 (D. Minn. 1995) .................................................................. 20

*Rookaird v. BNSF Ry.*,
    908 F.3d 451 (9th Cir. 2018) ...................................................................... 8, 16

*Sandison v. Mich. High Sch. Athletic Ass'n*,
   64 F.3d 1026 (6th Cir. 1995) ................................................................... 24

*Scott v. Harris*,
   550 U.S. 372 (2007) .................................................................................. 11

*Sonora Diamond Corp. v. Super. Ct.*,
   99 Cal. Rptr. 2d 824 (Ct. App. 2000) ...................................................... 14

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) .............................................................................. 11

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021) ................................................................................ 13

*Vande Zande v. Wis. Dep't of Admin.*,
   44 F.3d 538 (7th Cir. 1995) ................................................................ 17, 23

*Wasco Prod., Inc. v. Southwall Techs.*,
   435 F.3d 989 (9th Cir. 2006) .................................................................... 26

**Statutes**

42 U.S.C. § 12181(10) .................................................................... 15, 16, 34

42 U.S.C. § 12182(b)(2) .................................................................................. 5

42 U.S.C. § 12182(b)(2)(A)(ii) .............................................................. 16, 17

42 U.S.C. § 12182(b)(2)(B)–(C) .................................................................. 28

42 U.S.C. § 12184 ............................................................................... *passim*

42 U.S.C. § 12184(a) .................................................................................... 27

42 U.S.C. § 12184(b)(1) ........................................................................... 7, 25

42 U.S.C. § 12184(b)(2) ............................................................................... 17

42 U.S.C. § 12184(b)(2)(A) .................................................................... 16, 17

42 U.S.C. § 12184(b)(3) ............................................................................... 13

42 U.S.C. § 12184(b)(3) and (b)(5) ............................................... 2, 5, 16, 17

42 U.S.C. § 12184(b)(5) ............................................................................... 13

42 U.S.C. § 12186 ........................................................................................ 29

42 U.S.C. § 12188 ........................................................................................ 16

La. Stat. Ann. § 45:201.6 ........................................................................................... 33

La. Stat. Ann. § 48:2192 ............................................................................................. 31

La. Stat. Ann. § 48:2199 ............................................................................................. 33

La. Stat. Ann. § 48:2201 ............................................................................................. 33

La. Stat. Ann. § 48:2205 ............................................................................................. 33

Miss. Code. Ann. § 77-8-3 ......................................................................................... 31

Miss. Code Ann. § 77-8-15 ......................................................................................... 33

Miss. Code. Ann. § 77-8-21 ....................................................................................... 33

Miss. Code. Ann. § 77-8-25 ....................................................................................... 33

Miss. Code. Ann. § 77-8-31 ....................................................................................... 33

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 8, 30

Fed. R. Evid 802 ......................................................................................................... 20

**Regulations**

23 C.F.R. § 1340.3 ...................................................................................................... 15

40 C.F.R. § 86.1803-01 .............................................................................................. 15

49 C.F.R. § 37.23(d) ................................................................................................... 28

49 C.F.R. § 37.37(f) .................................................................................................... 30

49 C.F.R. § 523.2 ........................................................................................................ 15

49 C.F.R. § pt. 37, Appendix D .................................................................................. 30

*Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45737 (Sept. 6, 1991) ....................................................................................................................... 28

## INTRODUCTION

Plaintiffs have not carried their demanding summary judgment burden.  Nor could they do so.  As explained in Defendants' cross-motion (i) no reasonable factfinder could conclude that Plaintiffs have the intent to the use the Uber Rider App necessary to demonstrate standing; and (ii) Plaintiffs' sole remaining theory of liability—an alleged failure to make "reasonable modifications" to "policies, practices, and procedures"—is deficient as a matter of law and uncontroverted fact.  Nothing in Plaintiffs' motion undermines Defendants' entitlement to summary judgment.

Despite the bulk of their filing, Plaintiffs fail to grapple with the actual, material facts of these cases or the governing legal principles.  Nor do Plaintiffs stay within the bounds of their own complaints; they seek summary judgment on unpleaded theories of liability for which Defendants had no notice or opportunity to engage in discovery.  Plaintiffs' motion fails in multiple respects and should be denied.

*First*, Plaintiffs' assertion that they have Article III standing ignores recent, on-point Supreme Court precedent, ignores the Ninth Circuit's decision in the *Namisnak* case, and ignores their own testimony.  Stephan Namisnak and Scott Crawford both conceded that they had multiple opportunities to use the Uber Rider App in cities where they could use it to request WAV rides and failed to even consider doing so—the exact circumstance the Ninth Circuit predicted would undermine Plaintiffs' standing.  Crawford confessed that he prefers public transportation—a preference Namisnak and Francis Falls appear to share, for Namisnak and Falls do not use for-hire transportation services of any sort and lack knowledge of what for-hire WAV transportation options exist in their city.  All three Plaintiffs, moreover, have failed to even investigate basic facts about the Uber Rider App, like whether it is free to download.  These actual facts and others—which Plaintiffs wholly ignore—are incompatible with Plaintiffs' self-serving assertions that they intend to use the Uber Rider App in the future and, therefore, with their claim to standing.  There is no

1   indication that Plaintiffs are anything but bystanders.

2   But if Plaintiffs have standing at all, that standing extends no further than pursuit of an order

3   compelling Defendants to provide or otherwise guarantee equivalent WAV service in Jackson,

4   Mississippi (Crawford) and New Orleans, Louisiana (Namisnak and Falls).   That is because

5   Plaintiffs have testified that, of the outcomes they requested, "equivalent service" is the only

6   outcome they are after, the only outcome that would remedy their purported harms, and the only

7   outcome that would lead to them to actually download and use the Uber Rider App.

8   *Second*, Plaintiffs claim for equivalent service under 42 U.S.C. § 12184(b)(3) and (b)(5) is

9   meritless.  Plaintiffs correctly recognize that Section 12184 does not compel covered entities to

10   provide equivalent service if they have not purchased or leased new inaccessible vans.   Yet,

11   Plaintiffs insist that Defendants have purchased such vehicles because two *other*, distinct

12   companies—Uber subsidiaries that are no longer operating—had purchased vehicles.  Plaintiffs

13   overlook settled law, which forbids disregarding the corporate form unless entities are proven to be

14   alter egos.  Plaintiffs have neither pleaded, argued, nor substantiated a claim that Uber Technologies

15   and Rasier are these other companies' alter egos, and the record is devoid of the sort of evidence

16   necessary to pierce the corporate veil in any event.   Plaintiffs' equivalent service argument should

17   be summarily rejected.

18   *Third*, Plaintiffs fail to demonstrate that their requested "modifications" are "reasonable" as

19   a matter of law.   Plaintiffs pursue a variation of only one of the three vague and shifting

20   "modifications" they demanded of Defendants: they want Defendants to turn on the WAV option

21   in the Uber Rider App in Jackson and New Orleans and ensure some unstated measure of service,

22   less than equivalent service, is provided by WAV Drivers.  As discussed, Plaintiffs lack standing

23   to pursue an order for less-than-equivalent service because they testified that only equivalent

24   service will cause them to use the Uber Rider App and redress their claimed injuries.

25   That aside, Plaintiffs' demand is not "reasonable," as Defendants demonstrated in and with

26   their motion for summary judgment.  Individually and collectively, the steps Plaintiffs insist Uber

2

must take to reach their desired outcome are unreasonable.

- Requiring Defendants to go into the vehicle leasing business to meet Plaintiffs' demand is not reasonable; it is a fundamental alteration of Defendants' business, and it runs headlong into the settled rule that Section 12184 does not require covered entities to purchase WAVs.

- Requiring Defendants to add a WAV button to the Uber Rider App and offer monetary incentives to Drivers is not reasonable because, based on Defendants' actual experience, incentives are an expensive and ineffective means of attracting a supply of WAV Drivers. Adding a WAV option without sufficient supply would harm Defendants' business and would not redress Plaintiffs' asserted injuries.

- Requiring Defendants to partner with a commercial WAV fleet operator in Jackson and New Orleans is not reasonable both because Plaintiffs have adduced zero evidence that such an entity exists in either city and because, even if there were such an entity, the demanded partnership would work an extraordinary—and undue—financial burden on Defendants. In major, densely-populated cities, where ridesharing marketplaces work best, Defendants ███████████████████████████████████████████████████████████ supporting WAV marketplaces. Plaintiffs' suggestion that Defendants simply raise prices, across the board, to pay for these extraordinary losses is self-defeating, ignores basic economic principles, and has no support in the law.

*Fourth*, for the first time in these cases, Plaintiffs assert that Defendants violate the ADA by imposing vehicle requirements that screen out WAV Drivers. This unpleaded theory of liability comes far too late; Plaintiffs lack standing to pursue it (none claims to be a potential WAV Driver); and it is meritless in any event. This case is not about vehicle eligibility, and Defendants' minimum vehicle requirements do not, in fact, screen out WAV Drivers.

*Finally*, Plaintiffs fail to demonstrate that Defendants are, as a matter of law, subject to Section 12184. The statute applies only to transportation "provided by" entities that are "primarily engaged in the business of transporting people." Via their suggested "modification," Plaintiffs

necessarily admit that the transportation provided to riders who use the Uber Rider App is not "provided by" Defendants, for Plaintiffs seek to force Defendants to ensure that other persons and entities provide transportation. They also erroneously contend that the statute applies to entities, like Defendants, that merely enter into contracts with entities that are "primarily engaged in the business of transporting people." This argument is foreclosed by the statute's plain language and lacks any support in the regulation Plaintiffs rely upon. (Not that a regulation could expand the scope of a statute.) And there are myriad disputes of fact material to the inquiry this Court explained was relevant to whether Section 12184 applies here—whether Defendants' so control Drivers that Drivers operate as an extension of Defendants.

For these reasons, discussed in detail below, Plaintiffs' motion for summary judgment should be denied.

## SUMMARY OF MATERIAL FACTS IN GENUINE DISPUTE

Defendants identify material factual disputes throughout this brief in the Argument section. For the Court's convenience, however, some of the key material facts that are asserted in Plaintiffs' brief, but which Defendants' genuinely dispute, are highlighted in the table below.[1]

| Article III Standing | |
|---|---|
| **Plaintiffs' Asserted Fact** | **Summary of Contrary Evidence** |
| Plaintiffs intend to "use Uber if it were accessible to them." PSJ Br. 13. | Namisnak traveled to San Francisco, where WAV is a request option in the Uber Rider App, but he did not use, download, or consider using the Uber Rider App to request rides during his trip. DSJ Ex. A at 45:19–25. Instead, Namisnak took a ride in a standard vehicle requested using the Lyft app, requiring "considerable heroics" on his wife's part to assist him. *Id.* at 44:4–7; DSJ Ex. B. |
| | Crawford traveled to San Francisco and |

---

[1]     Exhibits filed with Defendants' motion for summary judgment are cited as "DSJ Ex. __." Exhibits filed with Plaintiffs' motion for summary judgment are cited as "PSJ Ex. __." Exhibits filed with this opposition brief are cited as "D. Opp'n Ex. __," with exhibits denoted by letters being those appended to the accompanying Declaration of Stephanie Schuster, and exhibits denoted by numbers being those appended to the Declarations of Brad Rosenthal and Robert Wu.

| | Washington, D.C., where WAV is a request option in the Uber Rider App, but he did not use, download, or consider using the Uber Rider App to request rides during these trips. DSJ Ex. C at 32:7–13, 36:3–12.  Crawford generally prefers public transportation. *Id.* at 37:7–11.<br><br>Falls has never used for-hire transportation of any kind for WAV rides; the "only wheelchair-accessible vehicle" he has "been in was the bus."  DSJ Ex. D at 24:4–5. From February 2020 through at least January 5, 2021, Falls was unable to ride in a standard vehicle or a WAV. *Id.* at 11:17; *see id.* at 11:13–15, 12:23–25, 13:10–24. |
|---|---|
| **Equivalent Service (42 U.S.C. § 12184(b)(3), (b)(5))** ||
| **Plaintiffs' Asserted Fact** | **Summary of Contrary Evidence** |
| "Uber has owned tens of thousands of vehicles" (PSJ Br. 5), including "new, inaccessible vans" (*id.* at 46). | Defendants do not own and have not acquired new vans or other vehicles that are used to provide rides requested via the Uber Rider App.   Some of Uber Technologies' other subsidiaries have owned vehicles, but Uber Technologies and Rasier have not.  DSJ Ex. A at 52:14–18; *see also* Declaration of Niraj Patel in Support of Defendants' Motion for Summary Judgment ("Patel Decl.") ¶ 81. |
| **"Reasonable" Modifications (42 U.S.C. § 12182(b)(2))** ||
| **Plaintiffs' Asserted Fact** | **Summary of Contrary Evidence** |
| "UberWAV offers significant potential financial benefit to Uber."  PSJ Br. 36 | WAV does not offer net financial benefit to Uber.  Supporting Uber's WAV pilot in major population centers ██████████████ ██████████████.  Patel Decl. ¶¶ 48–55; DSJ Exs. 2–3. |
| Uber could cover its WAV costs by raising prices 3–4 cents per trip.  PSJ Br. 35, 39, and 44. | Plaintiffs' assertion ██████████ ████████████████████████████ ████████████████████████████ ████████████████████PSJ Ex. VV at 14329. ██████████████████. Patel Decl. ¶¶ 48–55; DSJ Exs. 2–3.  A unilateral across-the-board price increase also risks harm |

| | |
|---|---|
| | to Uber's business and ability to generate revenue. Declaration of Niraj Patel in Opposition to Plaintiffs' Motion for Summary Judgment ("Patel Opp'n Decl.") ¶ 9. |
| In the context of Uber's partnership with Xchange Leasing, LLC, "Uber would lease the WAV to a driver." PSJ Br. 38. | Uber has not leased any vehicles, including WAVs, to Drivers. Declaration of Robert Rupp ("Rupp. Decl.") ¶ 9. Xchange Leasing, a company separate and distinct from Uber Technologies and Raiser, leased vehicles to Drivers, including WAVs, in some cities, before it ceased operating. Patel Decl. ¶ 79. |
| Uber could "reinstat[e] the leasing model" involving a partnership between Uber and Xchange Leasing. PSJ Br. 38 (decapitalized). | Xchange Leasing went out of business in 2018. Rupp Decl. ¶ 6; Patel Decl. ¶ 81. Uber searched for but did not find another leasing company to partner with. Rupp. Decl. ¶ 8. Neither Uber Technologies nor Rasier is or ever has been in the vehicle leasing business. *Id.* ¶ 9. Vehicle leasing is a complex business, and Xchange Leasing was able to offer WAV leases because it already had the operational infrastructure that existed for its primary business of leasing standard vehicles (*e.g.*, regulatory permits, lease management functions, vehicle showrooms, etc.). *Id.* ¶¶ 4–5. |
| "Uber could have introduced UberWAV in New Orleans using its incentive programs, such as sign-up bonuses and reduced commissions." PSJ Br. 38. | Incentive programs would not have caused a scalable, efficient, or reliable WAV trip marketplace in New Orleans (or Jackson). Patel Decl. ¶¶ 73–77. Based on Uber's significant experience, "simply adding a WAV request feature to the Rider App, and also allowing Drivers to onboard with a WAV, alone would not lead to a situation wherein riders can actually see their WAV trip requests be accepted on a sufficiently reliable basis. There would be no meaningful supply." *Id.* ¶ 32. Incentives are costly to Uber and have proven largely ineffective at improving the reliability of WAV marketplaces. *Id.* ¶¶ 75–76. Incentives are especially unlikely to work in smaller, less densely-populated cities, like New Orleans and Jackson. *See id.* ¶¶ 59–62. |

| Driver Eligibility Criteria (42 U.S.C. § 12184(b)(1)) | |
|---|---|
| **Plaintiffs' Asserted Fact** | **Summary of Contrary Evidence** |
| Uber's vehicle requirements prohibiting "vans" and "aftermarket seating modifications" screen out WAV Drivers. PSJ Br. 49. | Uber's vehicle requirements in New Orleans would not prohibit a driver from using a WAV to sell rides in the UberX marketplace. D. Opp'n Ex. A at 31:24–32:12.  Nor do the similar vehicle requirements in place for Jackson prohibit drivers from using WAVs. Rupp Decl. ¶ 11. |
| **Covered Entities Under Section 12184** | |
| **Plaintiffs' Asserted Fact** | **Summary of Contrary Evidence** |
| Uber advertises itself as a "transportation system." PSJ Br. 16. | Uber is and holds itself out as a "technology platform." *See, e.g.*, PSJ Ex. B at 1639 ("Uber is a technology platform that uses a massive network, leading technology, operational excellence and product expertise to power movement from point A to point B. Uber develops and operates proprietary technology applications supporting a variety of offerings on its platform"); PSJ Ex. RR ("Uber develops smartphone applications, software, and other technological solutions for various industries."); PSJ Ex. SS  (same).<br><br>Defendants inform all Riders, and obtain all riders' agreement prior to activation of a Rider account, that Uber does not provide transportation.   D. Opp'n Ex. 2 ("You acknowledge that your ability to obtain transportation, logistics and/or delivery services from third party providers through the use of the Uber marketplace platform and services does not establish Uber as a provider of transportation, logistics or delivery services or as a transportation or property carrier") (decapitalized). |
| Defendants control Drivers.  PSJ Br. 18–25. | Defendants do not control Drivers.  Drivers enter into agreements with Rasier to gain access to the Uber platform, and by contract, it is made clear that Defendants have no right to "direct or control" Drivers.  PSJ. Ex. II § 1.2.  Drivers decide "when, where, and whether" to go online, and if they do go online, to accept, decline, ignore, or cancel a ride request.  *Id.* |

|  | Drivers are not required "to accept any minimum number of Rides." *Id.* Drivers are contractually free to use methods other than the Uber Driver App to connect with customers, including "other platforms and applications." *Id.* Drivers select which vehicles to drive, out of hundreds of eligible makes, models, and years. Patel Decl. ¶ 21. While on trip, Drivers decide how to conduct themselves, which route to take, and the level and type of service to provide to their customers, subject only to broad guidelines that apply equally to riders and Drivers. Declaration of Brad Rosenthal ("Rosenthal Decl.") ¶¶ 22–23 |
|--|--|

## **ARGUMENT**

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the parties file cross-motions for summary judgment, the Court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To prevail, Plaintiffs must affirmatively demonstrate that no reasonable factfinder could rule in Defendants' favor about any of the essential elements of their claims for which they bear the burden of proof. *Rookaird v. BNSF Ry.*, 908 F.3d 451, 459 (9th Cir. 2018). Plaintiffs have failed to carry that burden, and their motion should be denied.

## I.    **PLAINTIFFS LACK STANDING.**

Plaintiffs contend their mere "pre-suit knowledge" that the Uber Rider App did not include a WAV request option in Jackson and New Orleans and Jackson alone establishes injury-in-fact. PSJ Br. 12–13. More than mere knowledge is necessary under the Ninth Circuit's "deterrent effect doctrine." A plaintiff demonstrates an injury-in-fact if he "was deterred from attempting to visit a

1    location or use a service because of alleged ADA noncompliance." *Namisnak v. Uber Techs., Inc.*,

2    971 F.3d 1088, 1092 (9th Cir. 2020).  To demonstrate this deterrence, the plaintiff must show both

3    that attempting to visit the location or use the service is a "futile gesture," *id.*, and that she intends

4    to patronize the defendant's business once the alleged noncompliance has been removed, *Chapman*

5    *v. Pier 1 Imports, Inc.*, 631 F.3d 939, 949–50 (9th Cir. 2011) (en banc); *see, e.g.*, *Pickern v. Holiday*

6    *Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034,

7    1040–41 (9th Cir. 2008).

8        Nor does Plaintiffs' "pre-suit knowledge" demonstrate that downloading and using the Uber

9    Rider App would be futile for them.  The Uber Rider App is useful, not futile, to persons who use

10   motorized wheelchairs in cities where the App includes a WAV request option, like Chicago, San

11   Francisco, and Washington, D.C.  *See Access Living v. Uber Techs., Inc.*, 958 F.3d 604, 614–15

12   (7th Cir. 2020).  As the Ninth Circuit explained, "evidence that Plaintiffs had the opportunity to

13   use uberWAV in a city where it is offered—such as Chicago—and failed to so … could undermine

14   the futility analysis." *Namisnak*, 971 F.3d at 1092–93.

15       That explanation was prescient.  Discovery revealed that Namisnak and Crawford have both

16   failed to avail themselves of such opportunities.  Crawford has never used or considered using the

17   Uber Rider App to request WAV rides during his regular trips to Washington, D.C.; he prefers taxis

18   and public transit, and has no need to request rides using the Uber Rider App.  DSJ Ex. C at 31:6–

19   19, 32:7–13, 36:3–12, 37:7–11.  While in San Francisco, neither Crawford nor Namisnak used or

20   considered using the Uber Rider App to request WAV rides, even though they knew at the time

21   that a WAV request option was available there.  *Id.* at 37:7–38:1; DSJ Ex. A at 44:19–45:25.

22   Indeed, Namisnak opted for a ride in a *standard* vehicle (not a WAV) requested using the *Lyft* app

23   while in San Francisco, requiring his wife to engage in "considerable heroics" to assist him.   DSJ

24   Ex. A at 42:10–43:19, 44:4–7; *see* DSJ Ex. B.  In addition, Namisnak sometimes travels in a manual

25   wheelchair and obtains non-WAV rides in New Orleans, but he has never considered using the

26   Uber Rider App to request a ride in a standard vehicle, even though he could do so.  DSJ Ex. A at

27   22:2–13.

28       Nor have Plaintiffs demonstrated that they intend to use the Uber Rider App in the future.

1  Plaintiffs' conclusory *allegations* of future intent were presumed true at the pleading stage, but

2  Plaintiffs' conclusory, self-serving testimony about their future intent is not sufficient at summary

3  judgment. *See* PSJ Br. 13 & nn. 68 and 70. On the contrary, Plaintiffs' say-so stands alone and is

4  contrary to all the evidence. *See* DSJ Br. 5–9.

5  The Supreme Court's recent decision in *Carney v. Adams*, 141 S. Ct. 493 (2020), is

6  instructive. There, the Court held that a plaintiff who challenged Delaware's eligibility

7  requirements for judicial office lacked standing at summary judgment, even though he claimed

8  applying for a judgeship was futile and testified that he "would apply" if his suit succeeded. *Id.* at

9  497, 500. The plaintiff's self-serving testimony stood "alone without any actual past injury, without

10 reference to an anticipated timeframe, without prior judgeship applications, without prior relevant

11 conversations, without efforts to determine likely openings, without other preparations or

12 investigations, and without any other supporting evidence." *Id.* at 501. The plaintiff had failed to

13 apply for judgeships for which he was eligible, failed to investigate judgeships for which he might

14 be eligible, and confessed a lack of interest in applying until he decided to commence his lawsuit.

15 *Id.* at 500–01; *see also District of Columbia v. Murphy*, 314 U.S. 441, 456 (1941) ("One's testimony

16 with regard to his intention is of course to be given full and fair consideration, but is subject to the

17 infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be

18 contradicted or negatived by other declarations and inconsistent acts.").

19 The same principles that doomed standing for the plaintiff in *Carney* doom standing for

20 Plaintiffs here:

21 • As discussed, Crawford and Namisnak did not use or consider using the Uber Rider App

22 while in cities where a WAV request option was available.

23 • All three Plaintiffs appear interested in for-hire transportation for purposes of this lawsuit

24 only. Namisnak hasn't used any form of for-hire transportation in New Orleans since before

25 2010, and he lacks knowledge of whether any for-hire transportation providers in the city

26 offer WAV service. DSJ Ex. A at 26:4–21. Falls has never used for-hire transportation for

27 WAV rides, has no knowledge of whether there are any for-hire WAV transportation

28 providers in New Orleans, and has never investigated WAV transportation options. DSJ

1    Ex. D at 24:4–5, 38:19–39:2.  Crawford confessed that he "generally prefer[s] public

2    transportation."  DSJ Ex. C at 37:7–11.

3    • All three Plaintiffs lack basic knowledge one would reasonably expect from a person who

4       claims to be genuinely interested in using the Uber Rider App.  Plaintiffs all live on fixed

5       incomes, yet Plaintiffs did not even bother to investigate the costs of downloading or using

6       the Uber Rider App.  DSJ Ex. A at 32:18–33:1; DSJ Ex. C at 11:24–12:5, 36:14–20; DSJ

7       Ex. D at 45:18–2, 10:4–8; 13:24–14:3, DSJ Ex. O at 12:12–14:5.

8        Plaintiffs ignore all of this evidence, and it shows that they have failed to carry their burden

9    on the question of standing.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties

10   tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

11   jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

12   motion for summary judgment.").  As explained in Defendants' motion, and consistent with the

13   Supreme Court's holding in *Carney* and the Ninth Circuit's prediction in *Namisnak*, the record

14   shows that no reasonable factfinder could find that Plaintiffs have standing, so Defendants are

15   entitled to summary judgment.  *See* DSJ Br. 5–9.  Moreover, Falls lack standing for the additional

16   reason that, for at least a year, he was "totally bedbound" and unable to travel in any a WAV (or

17   any vehicle that could not accommodate a stretcher).  *Id.* at 9; *see Carney*, 141 S. Ct. at 499

18   (plaintiff bears the burden of establishing standing as of the time he brought this lawsuit and

19   maintaining it thereafter").

20       But if Plaintiffs have standing, it can only be standing to pursue an order compelling

21   Defendants to provide or guarantee "equivalent service."  *See, e.g.*, *Town of Chester v. Laroe*

22   *Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross.  To the contrary,

23   a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief

24   that is sought.").  That is because, though they initially requested additional relief, Plaintiffs have

25   testified that they are not interested in anything short of equivalent service.

26   • Crawford testified that "[i]t would be meaningless to turn on the [WAV] button if by

27      pushing the button, a vehicle didn't come when it was requested."  D. Opp'n Ex. C  at

28      68:5–7.  He will not download the Uber Rider App unless and until it "function[s] as

well for a wheelchair users as it does for everyone else," *id.* at 44:2–6, with the same or "close" to the same response times (even if not "spot-on perfect"), *id.* at 45:7–12, with the same hours of operation, *id.* at 45:25–46:2. Crawford wants equivalent service, and he explains that "equivalent means the same as everyone else." *Id.* at 46:8–9. He testified that "how many vehicles, that's not—it's—that's not really relevant." *Id.* at 44:20–45:2. The number of WAVs doesn't matter, according to Crawford, so long as there are enough WAVs to provide "wrap-around equivalent service in the [Jackson] metro area," *id.* at 62:16–19, and enable him to get "close to the same response time as everyone else," *id.* at 64:22–65:5; *see also* DSJ Ex. C at 62:12–13; *id.* at 67:22–68:2.

- Namisnak testified that he is "not interested in downloading an app that [he] can't use," and that it would be "a meaningless gesture for an app to offer an option that doesn't work." DSJ Ex. A at 53:11–54:11. He is not concerned about the "number of drivers" with WAVs on the road, but with "the level of service at any time when [he] log[s] on." *Id.* at 57:25–58:3. The level of service he wants is "equivalent service to what others have." D. Opp'n Ex. E at 48:2–9. Namisnak "underscore[ed] that what I'm looking for is to get Uber, you know, to be able to, you know, from wherever I am in the New Orleans area, to be able to get on the phone and for something that's similar to what any other Uber customer would enjoy in terms of service and response time, to be able to get a ride." DSJ Ex. A at 56:18–25. While Namisnak would accept response times for WAV ride requests that are "a few minutes longer," he explains that "it's not about the exact number, it is about the equivalency of the service." *Id.* at 57:5–12.

- Falls likewise testified that he seeks to be able to use the Uber Rider App to request WAV rides "24 hours a day, seven days a week," "throughout New Orleans," with "the same wait times as" users without disabilities. Ex. D at 62:6–18. Falls is focused on that level of service, not with the number of WAV Drivers that are available to accept ride requests via the Uber Apps. *Id.* at 57:13–53:18. Falls also is not interested in Uber simply adding a WAV button to the Uber Rider App if he is unable to use it to actually obtain WAV rides. *Id.* at 59:7–15.

Thus, by Plaintiffs' own admissions, only an order for equivalent service would redress Plaintiffs' purported injuries. So if they have standing at all, it can only be to pursue such an order. Stated differently, Plaintiffs do not have standing to seek relief that would not cause them to download the Uber Rider App, create a rider account, and request rides. *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[N]o federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury.").

## II.   PLAINTIFFS LACK EVEN A COLORABLE CLAIM FOR "EQUIVALENT SERVICE."

Equivalent service is a defense an entity subject to Section 12184 may raise in response to a charge that it purchased or leased a new, inaccessible "van" *and* uses that van to provide "specified public transportation" in violation of 42 U.S.C. § 12184(b)(3) or (b)(5). The statute does not otherwise compel covered entities to provide equivalent service, and even an entity that purchased a new van may simply cease using it to provide specified public transportation instead of relying on an equivalent service defense. *See* DSJ Br. 10–17.[2]

At the pleading stage, Plaintiffs did not allege that Defendants unlawfully purchased or leased any new, inaccessible vans used to provide specified public transportation. Rather, Plaintiffs pleaded that Defendants have an affirmative obligation to provide equivalent service—an obligation allegedly "triggered" by the fact that Drivers with "new vans" sell rides using Uber's platform. *Crawford*, ECF No. 135 ¶ 137; *Namisnak*, ECF No. 92 ¶ 143.

At summary judgment, Plaintiffs modify their "trigger" theory. Now, Plaintiffs contend that Defendants themselves have purchased new vans, and that these supposed purchases triggered an obligation for Defendants to either "make the vans wheelchair accessible" or "achieve equivalent service across the whole system." PSJ Br. 47. This slightly-different "trigger" theory fails as a

---

[2]      The statute further limits the circumstances in which equivalent service is a defense to a covered entity's purchase or lease of a new, inaccessible van, depending on the van's seating capacity and the type of "specific public transportation" at issue. If the new van seats 8 or more persons, equivalent service is a defense only if that van "is to be used solely in a demand responsive system." 42 U.S.C. § 12184(b)(3). But if the new seats fewer than 8 persons, equivalent service is a defense regardless of whether the van is used to provide demand-responsive transportation, fixed-route transportation, or both. 42 U.S.C. § 12184(b)(5).

1   matter of law for the same reasons Plaintiffs' original theory fails. *See* DSJ Br. 10–12. It also fails,

2   profoundly, as a matter of fact.

3       Plaintiffs lack any evidence from which a reasonable factfinder could conclude that

4   Defendants have purchased or leased new vans, let alone used them to provide specified public

5   transportation. *See, e.g.*, D. Opp'n Ex. A at 53:11–22 ("Q. So let's just take, first, you said, Uber

6   itself, aside from these subsidiaries, does not own any vehicles that are used for transportation in

7   its products, correct? A. That's correct."). The only evidence Plaintiffs have is that (i) one separate

8   company, Xchange Leasing LLC bought and leased minivans; and (ii) another separate company,

9   UATC LLC (also known as "ATG") bought SUVs in which some rides were given before 2018.

10  *See* PSJ Br. 46 (claiming Uber Technologies "has owned tens of thousands of vehicles *through its*

11  *subsidiaries* Xchange Leasing and ATG," including "new vans that were not accessible")

12  (emphasis added); *id.* at 5–7, 26 (same). This evidence is irrelevant for several reasons.

13      *First*, Xchange Leasing and ATG and are not Uber Technologies, and they are not Rasier.

14  They are Uber Technologies' subsidiaries, Rupp Decl. ¶¶ 4, 10, but they remain distinct companies.

15  It is well settled that the corporate form must be respected unless distinct entities are alter egos—

16  an extraordinary remedy that requires extraordinary evidence. *See, e.g.*, *In re Optical Disk Drive*

17  *Antitrust Litig.*, 2017 WL 11513316, at *7 (N.D. Cal. 2017) (Seeborg, J.) (applying California law)

18  ("Public policy dictates that the corporate form be disregarded only in narrowly defined

19  circumstances."); *Sonora Diamond Corp. v. Super. Ct.*, 99 Cal. Rptr. 2d 824, 836 (Ct. App. 2000)

20  ("Alter ego is an extreme remedy, sparingly used.").

21      Plaintiffs have never alleged any alter-ego or veil-piercing theory. *See Long v. Ingenio,*

22  *Inc.*, 2011 WL 13143442, at *3–4 & n.4 (N.D. Cal. 2011) (Seeborg, J.) (theory that defendant was

23  a mere "shell" for other entity, asserted for the first time at summary judgment, amounted to

24  "unpleaded speculation" and thus "not a sufficient basis to forestall summary judgment"), *aff'd in*

25  *relevant part*, 542 F. App'x 654 (9th Cir. 2013). They do not articulate such a theory in their brief.

26  Nor have they adduced a single piece of the overwhelming evidence necessary to disregard the

27  corporate form. *See, e.g.*, *Optical Disk Drive*, 2017 WL 11513316, at *7 (detailing the various

28

1    facts that must be proven to have even a colorable alter-ego claim).[3]

2        *Second*, the "vans" Plaintiffs claim XCL purchased are not vans; they are minivans.  *See*

3    PSJ Ex. DDD.  Plaintiffs' contrary view is merely an assumption, for they fail to address this issue

4    at all.  And that assumption is without support.  To the contrary, definitions of the term "van" under

5    various federal laws confirm that a minivan is not a "van."  *See, e.g.*, 49 C.F.R. § 523.2 ("Van

6    means a vehicle with a body that fully encloses the driver and *a cargo carrying or work performing*

7    *compartment*.  The distance from the leading edge of the windshield to the foremost body section

8    of vans is typically shorter than that of pickup trucks and sport utility vehicles.") (emphasis added);

9    40 C.F.R. § 86.1803-01 ("Van means a light-duty truck or complete heavy-duty vehicle having an

10   integral enclosure, fully enclosing the driver compartment and load carrying device, and having no

11   body sections protruding more than 30 inches ahead of the leading edge of the windshield.");

12   23 C.F.R. § 1340.3 (distinguishing between "passenger car, pickup truck, van, minivan or sport

13   utility vehicle).

14       *Third*, there is no evidence Xchange Leasing or ATG ever used any vehicles to provide

15   "specified public transportation," which is transportation "that provides the general public with

16   general or special service (including charter service) on a regular and continuing basis."  42 U.S.C.

17   § 12181(10).  Xchange Leasing leased vehicles, just like many other leasing companies.  Leasing

18   a vehicle, however, is not providing transportation, even in the WAV context.  *See Jorisch v.*

19   *Rhythm Festival, Inc.*, 544 S.E.2d 459, 462–63 (Ga. 2001) (company that "leases and rents modified

20   vehicles for use by commercial entities in transporting disabled passengers" provides vehicles, not

21   "specified public transportation").  And ATG put autonomous vehicles on the road, with a safety

22   driver, in Tempe, Arizona, and Pittsburgh, Pennsylvania, for a limited time, on a promotional basis,

23

---

24   [3]      Plaintiffs' assertion that "Uber has been lying," has "lied to this Court, and other courts,"
     and has "lied to Plaintiffs" (PSJ Br. 5) is false, bizarre, and as explained above, contrary to basic
25   legal principles.  Moreover, Uber's relationship with Xchange Leasing and the fact that Xchange
     Leasing owned and leased vehicles, as well as Uber's relationship with ATG and the fact that it
26   engaged in the self-driving vehicle research are and have been well known and public facts at all
     times.  Plaintiffs' alleged facts about these very relationships in their complaints and argued about
27   them in filings in this Court.  *See, e.g.*, *Crawford*, ECF No. 135 ¶¶ 133–35; *Namisnak*, ECF No. 92
     ¶¶ 139–41.
28

1    and exclusively for research and development purposes.  D. Opp'n Ex. A at 57:24–58:11.  Plaintiffs

2    do not even try to explain how such temporary, promotional, research transportation qualifies as

3    transportation "on a regular and continuing basis."  *See* 42 U.S.C. § 12181(10).  It doesn't.

4          *Finally*, both Xchange Leasing's assets and ATG were sold, rendering the core of Plaintiffs'

5    meritless argument irrelevant.  Rupp Decl. ¶¶ 6, 10.  Because there is no requirement to provide

6    equivalent service unless newly acquired vans are *used to provide specified public transportation*,

7    42 U.S.C. § 12184(b)(3), (b)(5), and because Title III of the ADA only permits suits for prospective

8    relief, 42 U.S.C. § 12188, what either of these non-defendant, distinct, and former-subsidiary

9    companies did in the past cannot entitle Plaintiffs to any relief.

10   **III.   PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR
            PLEADED THEORY—FAILURE TO MAKE "REASONABLE
11          MODIFICATIONS."**

12         Of the many theories of liability Plaintiffs pleaded, the only theory to survive beyond the

13   pleading stage is Plaintiffs' claim, under 42 U.S.C. § 12184(b)(2)(A), that Defendants failed to

14   make "reasonable modifications in policies, practices, or procedures, when such modifications are

15   necessary" to accommodate persons with disabilities.   42 U.S.C. § 12182(b)(2)(A)(ii);  *see*

16   *Crawford*, ECF No. 80 at 6 n.1; *Namisnak*, ECF No. 84 at 6–10; *Namisnak*, ECF No. 102 at 8–12.

17   Plaintiffs bear the burden of proving that Defendants denied requested modifications that were both

18   "reasonable" and "necessary."  *See Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1036

19   (9th Cir. 2020).  Plaintiffs do not address whether the "modifications" at issue are "necessary" and,

20   therefore have failed to carry their burden as to all essential elements of their claim, which is reason

21   alone to deny their motion.  *See e.g.*, *Rookaird* 908 F.3d at 459.

22         Plaintiffs requested and pleaded an entitlement to three purported "modifications" from

23   Defendants: (i) a WAV button; (ii) up to 60 WAVs in each city; and (iii) equivalent service.

24   *Crawford*, ECF No. 135 ¶¶ 69, 73, 74; *Namisnak*, ECF No. 92 ¶¶ 70, 75 & Ex. E.  But in their

25   motion, the only "modification" Plaintiffs claim they are entitled to is a WAV button and apparently

26   some measure of WAV supply available for requests—but not up to 60 WAVs and not "equivalent

27   service."  *See, e.g.*, PSJ Br. 1 (asserting Plaintiffs are asking the Court to determine that it is

28   reasonable "for Uber to make UberWAV available in their city").  Plaintiffs abandon the request

1    for up to 60 WAVs altogether.  And Plaintiffs do not contend that they are entitled to "equivalent

2    service" as a "reasonable modification" under 42 U.S.C. § 12184(b)(2)(A).  They argue a different

3    theory, under 42 U.S.C. § 12184(b)(3) and (b)(5), for equivalent service, near the very end of their

4    brief.  PSJ Br. 46–47.[4]  Because Plaintiffs lack standing to sue for anything short of equivalent

5    service (if they have standing at all), *see supra*, pp.  11–13, they lack standing to press this claim

6    for a "modification" yielding something less than equivalent service—another reason to deny to

7    Plaintiffs' motion.

8          In all events, Plaintiffs have failed to demonstrate that, as a matter of law, it would be

9    reasonable to compel Defendants "to provide UberWAV in New Orleans and Jackson."  PSJ

10   Br. 33.[5]  A modification is not reasonable if it imposes "undue financial and administrative

11   burdens."   *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004).

12   Reasonableness turns on, among other things, "the effectiveness of the modification in light of the

13   nature of the disability in question and the cost to the organization that would implement it."  *Id.*;

14   *see Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (other relevant

15   factors include "disruption of [the defendant's] business and safety").  Key to this inquiry is whether

16   the cost is "disproportionate to the benefit."  *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538,

17   542 (7th Cir. 1995) (Posner, J.).   If it is, the requested modification is not "reasonable."  *Id.*  Even

18   if otherwise reasonable, Title III does not require modifications when a defendant can show the

19   modifications "would fundamentally alter" its business or the services it provides.  42 U.S.C.

20   § 12182(b)(2)(A)(ii).

21         In their motion, Defendants demonstrated that supporting WAV marketplaces in major,

22   densely-populated cities has cost them tens of millions of dollars annually and hundreds of dollars

23   per WAV ride, with unreliable results, and that it would cost significantly more money for

24

25   [4]     Defendants agree that a claim for equivalent service is not cognizable under 42 U.S.C.
     § 12184(b)(2), as explained in their motion.  *See* DSJ Br. 13–19.  However, as discussed *supra*,
26   Section II, Plaintiffs' claim for equivalent service fails as a matter of fact and law.

27   [5]     Plaintiffs' demand that Defendants "provide WAV service" also fails because it is a vague
     directive for a new outcome and service offering, not a request for "modification" of a "policy,
28   practice, or procedure"  *See* DSJ Br. 18–19.

1   Defendants to replicate those efforts in the much smaller, less densely-populated cities at issue
2   here—Jackson, Mississippi and New Orleans, Louisiana.  DSJ Br. 19–31.  The record shows that
3   no reasonable factfinder could conclude that Plaintiffs' demanded outcomes are reasonable.  *Id.*  At
4   a minimum, however, the record includes sufficient evidence from which a reasonable factfinder
5   could conclude that Plaintiffs' demanded outcomes are *not* reasonable and, therefore, that Plaintiffs
6   are not entitled to summary judgment.  Plaintiffs' arguments to the contrary are not persuasive, as
7   explained below.

8          **A.    Defendants' WAV Pilots In Major Cities Do Not Show That It Is Reasonable
              For Defendants To Support WAV Marketplaces In Jackson And New
9              Orleans.**

10         Plaintiffs insist that it is reasonable for "Uber to change its operational policies and provide
11  UberWAV in New Orleans and Jackson … because it is already something Uber does in other
12  cities."  PSJ Br. 33–34.  Thus, as Plaintiffs see it, what they're asking for is easy: "All Plaintiffs are
13  asking Uber to do is bring an already-existing accommodation to their city."  *Id.* at 34.  Plaintiffs
14  offer no authority for such a sweeping proposition—a proposition Judge Alsup rejected last year.
15  *Indep. Living Res. Ctr. v. Lyft, Inc.*, 2020 WL 6462390, at *5 (N.D. Cal. 2020) ("As to achieving
16  the necessary supply and demand, it is true that a modification cannot merely be reasonable because
17  it has been made in other geographic regions.").

18         That is especially true because Jackson and New Orleans are not comparable to the major
19  cities where Defendants have invested in a pilot to support WAV marketplaces.  The pilot cities are
20  some of the largest, most densely-populated cities in the country, like New York City.  Patel Decl.
21  ¶ 59.  In terms of population, the smallest pilot city, Washington, D.C., is twice the size of New
22  Orleans and four times the size of Jackson.  *See* DSJ Exs. I–K.  Both cities are significantly less
23  densely-populated than D.C. as well.  *Id.*  These differences matter because WAV marketplaces,
24  like all of the marketplaces available via Uber's technologies, works best in dense, well-populated
25  areas.  Patel Decl. ¶ 59; *accord Lyft, Inc.*, 2020 WL 6462390, at *5 (recognizing that population
26  density is "an important factor given that Lyft's wait times are dependent on demand and supply").

27         Plaintiffs' argument also ignores the incredible expense and attendant (and substantial)
28  losses associated with Defendants' efforts to support WAV marketplaces in these other, more

1    efficient (in terms of supply and demand) cities.  *See* DSJ Br. 24–31. ████████████

2    ██████████████████████████████████████████████████████████████████████████

3    ██████.  Patel Decl. ¶¶ 50–51, 53–54; DSJ Exs. 2–3.  Just because Uber has tried something—and lost

4    a lot of money in the process—does not make it reasonable to try the same thing elsewhere.

5              **B.     Compelling Defendants To Get Into The Vehicle Leasing Business Is Not
                        Reasonable.**

6
              Plaintiffs say it is "reasonable" for Defendants to "reinstat[e]" prior efforts of leasing WAVs
7
     to Drivers.  PSJ Br. 38.  At the threshold, this argument rests on a demonstrably false premise: that
8
     Uber ever leased vehicles to Drivers.  *See id.* (asserting, falsely and without any factual support,
9
     that "*Uber* would lease the WAV to a driver") (emphasis added).  In reality, Xchange Leasing
10
     leased WAVs to Drivers.  Patel Decl. ¶ 79.  *Xchange Leasing* was an auto leasing company, and
11
     *Xchange Leasing* leased vehicles to Drivers.  Rupp Decl. ¶ 7.  Xchange was able to do so because
12
     it already had an existing leasing business, with all attendant infrastructure, that allowed it to lease
13
     a small number of WAVs.  Rupp Decl. ¶ 4.  Neither Uber Technologies nor Rasier has ever been
14
     in the vehicle leasing business or leased vehicles to Drivers, let alone a WAV-only leasing business.
15
     *Id.*
16
              Xchange Leasing went out of business in 2018.  D. Opp'n Ex. A at 82:4–7; *accord* Rupp
17
     Decl. ¶ 6.  To the extent Plaintiffs contend Uber is required by law to form a business relationship
18
     with another leasing company, Uber searched for, but never found, another national leasing
19
     company ready and willing to provide financially attractive WAV leases to Drivers and potential
20
     Drivers.  Patel Decl. ¶ 82.  Plaintiffs present no evidence that such an entity exists nationally, or in
21
     New Orleans or Jackson.
22
              To the extent Plaintiffs contend Defendants themselves must buy WAVs and lease them to
23
     Drivers, Section 12184 plainly does not require them to do that.  *See e.g.*, *Crawford*, ECF No. 80
24
     ("[A]n entity may maintain a fleet of exclusively non-accessible vehicles without violating the
25
     ADA.").  And Plaintiffs' suggestion that Defendants get into the vehicle leasing business is patently
26
     not reasonable.  Indeed, compelling Defendants to enter an entirely different industry—auto
27
     leasing—or to otherwise create a new company are, indisputably, fundamental alterations to
28

1    Defendants' business and the services they provide.  *See, e.g.*, *Roberts ex rel. Roberts v. KinderCare*

2    *Learning Ctrs.*, 896 F. Supp. 921, 926 (D. Minn. 1995) (forcing provider of group childcare

3    services to provide one-on-one childcare services for an individual with a disability would

4    fundamentally alter provider's business because it would force the provider "into a child care

5    market it did not intend to enter"), *aff'd*, 86 F.3d 844 (8th Cir. 1996).[6]

6    **C.    Adding a "WAV" Button and Offering Monetary Incentives To Drivers is Ineffective, and Therefore, Not Reasonable.**

7

8    A modification must be effective to be reasonable.  *E.g.*, *Fortyune*, 364 F.3d at 1083.

9    Plaintiffs suppose that a viable WAV marketplace could exist if Uber only modified the app to

10    make the "UberWAV option available."  Plaintiffs "if you build it, they will come" theory is wholly

11    unsupported by any evidence.  In fact, the record evidence shows that simply adding a "WAV"

12    button, with or without incentives, is ineffective and would not redress Plaintiffs' claimed injuries.

13    As Uber demonstrated, simply turning on the WAV button will not result in any significant

14    or meaningful supply of WAV Drivers.  DSJ Br. 21–23.  Few Drivers already possess a WAV, and

15    Drivers have little incentive to purchase them for ridesharing purposes because WAVs cost

16    significantly more than standard vehicles to acquire, maintain, and operate.  Patel Decl. ¶¶ 26–

17    27.  The demand for WAV rides is also low.  *Id.* ¶ 28.[7]  Given the high-costs and low-earning

18    potential for Drivers of selling WAV rideshare services, few, if any, Drivers choose to use WAVs

19    when selling rides on the Uber platform.  *Id.* ¶¶ 30–31.

20    Despite these obstacles, Plaintiffs insist that Uber should just "turn on" the WAV option

21    [6]    As demonstrated in Defendants' motion, other methods of achieving Plaintiffs' desired

22    outcomes eluded to (but not developed) in Plaintiffs' brief—like limiting the platform to Drivers selling WAV rides—also would require Defendants to fundamentally alter their business.  DSJ

23    Br. 21–24.  Plaintiffs are not entitled to summary judgment on Defendants' fundamental alteration defense.

24    [7]    Based on a PowerPoint presentation (PSJ Ex. CCC) produced in discovery, Plaintiffs claim

25    that Uber estimated that there were 14,000 individuals who may use WAVs in New Orleans.  PSJ Br. 43.  This presentation was not prepared by Uber.  As shown on the very first page of the

26    document, it was part of a "pre-interview project."  Pl. Ex. CCC at 19304.  The applicant who prepared the presentation was never hired by Uber in any capacity.  Declaration of Jonathan Reyes

27    ¶ 5.  Plaintiffs rely on another copy of the same document (PSJ Ex. G) elsewhere in their brief.  *See*

28    PSJ Br. 3 & nn. 13–14.  Both copies are inadmissible hearsay as neither is a statement by Uber Technologies, Raiser, or one of their agents.  *See* Fed. R. Evid 802.

and see what happens, even though Plaintiffs have testified that they simply turning on the WAV option in their cities would be a meaningless gesture. *See supra*, pp. 11–13. This approach won't work. It is not Uber's business to add an option without confidence that there is a meaningful supply of potential Drivers. D. Opp'n Ex. B at 62:22–25 ("We wouldn't enable a request … that wasn't able to request anything."); *accord* Patel Opp'n Decl. ¶ 5. This is because an ineffective request option would be harmful to Uber's brand and disappoint riders. Patel Opp'n Decl. ¶¶ 6, 8.

Adding monetary incentives to the mix would not change this fundamental problem because, based on Uber's significant and real-word experience, incentives are "largely ineffective at improving the reliability of the WAV marketplace." Patel Decl. ¶ 75; *see id.* ¶¶ 74–77.

*Id.* ¶ 76. Plaintiffs do not offer any evidence to the contrary.

In short, adding a WAV button and offering incentives to entice Drivers to sell WAV rides on the Uber platform is an expensive—and proven-ineffective—means of supporting a viable WAV marketplace. That means it is unreasonable to compel Defendants to take these steps. *See Lyft*, 2020 WL 6462390, at *3 ("Given the fact that WAVs, according to plaintiffs, can cost over $50,000, such incentives would not, on their own, be effective at ensuring a sufficient supply of WAV drivers. The ineffectiveness of this proposed procedure makes this modification, at least on its own, unreasonable.").

**D.  Compelling Defendants Partner With Commercial WAV Fleet Operators In New Orleans And Jackson Is Not Reasonable.**

Plaintiffs contend that it would be reasonable for Defendants to partner with a commercial fleet operator, like MV Transportation, Inc. ("MVT"), to ensure that the fleet operator's WAVs and employee-drivers are logged and selling WAV rides on the Uber platform in New Orleans and Jackson. PSJ Br. 34. This argument is conclusory and contrary to the actual facts.

As an initial matter, Plaintiffs have not demonstrated that it would even be possible for Defendants to partner with such an entity in New Orleans or Jackson. A necessary ingredient to such a partnership is the existence of a commercial fleet operator who has operations in Jackson or

New Orleans, has available WAVs in its fleet, has employee-drivers to drive them, and is willing to partner with Uber.  No such entity exists in Jackson or New Orleans, and Plaintiffs have not produced any evidence demonstrating otherwise.  MVT does not operate in either city, Patel Decl. ¶ 57, and thus MVT would have to expand its operations to even be a potential partner in New Orleans and Jackson.  Plaintiffs did not seek evidence from MVT to determine whether it has plans to do so, and the record shows that when Uber asked MVT for a quote concerning a small number of WAVs in New Orleans, MVT never provided it.  *See* PSJ Ex. UU.  Plaintiffs also fail to identify any other potential fleet operator for Uber to partner with in these cities (there are none), and they do not even attempt to articulate what the terms of such a deal would be.

Regardless, were such a partnership *possible* in New Orleans and Jackson, Plaintiffs have still failed to show that such a partnership is *reasonable*.  To date, the MVT deal is the pinnacle of Uber's efforts to identify a reliable and scalable model for supporting WAV marketplaces.  Patel Decl. ¶¶ 44–46. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  D. Ex. Opp'n B at 117:18–21; *see* Patel Decl. ¶¶ 66–68; PSJ Ex. I at 19381 (████████████████████████████████████████████████

█████████████████████████████████████████████████

████.  PSJ Ex. I at 19378.

The partnership is also extraordinarily expensive.  *See* DSJ Br. at 24–31. █████████

████████████████████████████████████.  Patel Decl. ¶ 47.  And the MVT partnership is, on its own, insufficient to support a viable WAV marketplace.  *See id.* ¶¶ 64, 73.  Uber supplements the MVT partnership with additional techniques to encourage WAV Driver supply.  *See id.* ¶¶ 73–90. ████████████████████████████████████

████████████████████████████████████████.  Patel Decl. ¶¶ 50, 53; DSJ Exs. 2–3.

████████████████████████████████████████████████

████████████████████████████████████████.  *See* Patel Decl. ¶¶ 51, 54. ████████████████████████████████.  *Id.*

22

1

2
████████████████████████████ *Id.*; DSJ Exs. 2–3.

3

4

5
█. Patel Decl. ¶ 56.

6    Requiring Uber to incur even these disproportionate costs is unreasonable as a matter of

7 law.  *Lyft*, 2020 WL 6462390 at *4 (holding at summary judgment that a $925 subsidy nearly

8 57 times the ride price is unreasonable).  But these actual costs are based on pilot cities that are far

9 more heavily and densely-populated and, therefore, more efficient ridesharing marketplaces, than

10 New Orleans and Jackson.  *See supra*, p. 18.  Based on Uber's experience with WAV in other cities,

11 similar efforts in New Orleans and Jackson would cost at least as much as ███████████

12 ████████████████████████, and probably more.  Patel Decl. ¶¶ 56–58.

13    Plaintiffs' "cost is no obstacle" argument fails to grapple with basic economic principles

14 and business realities.  Plaintiffs say Uber can pay these extraordinary costs because of the

15 substantial amount of gross bookings associated with the Rides platform.[8]  But that is not enough

16 for Plaintiffs to carry their burden of proof.  *See Vande*, 44 F.3d at 542 (even employers "so large

17 or wealthy" are not required to "expend enormous sums" under the ADA); *Lyft*, 2020 WL 6462390,

18 at *4 (holding disproportionate subsidies were still unreasonable despite Lyft's $8.1 billion in

19 bookings and $2.2 billion in revenue).  Whatever the gross bookings (let alone revenue) figure, the

20 fact remains that Uber has yet to turn a profit, and every dollar spent on money-losing experiments

21 is a dollar not contributing to profitability.  *See, e.g.*, PSJ Ex. A at 1239; PSJ Ex. B at 1726;

[8]    Plaintiffs erroneously conflate gross bookings with Uber's "revenue." PSJ Br. 2, 36. They incorrectly assert that, per Uber's SEC filings, "gross bookings 'generate substantially all of [Uber's] revenue.'"  *Id.* at 28 n.167 (purportedly quoting PSJ Ex. A at 1336) (alteration by Plaintiffs).  The cited SEC filing actually says: "We generate substantially all of our revenue *from fees paid by Drivers and restaurants for use of our platform*."  PSJ Ex. A at 1336 (emphasis added).  Gross bookings reflect what Uber collects from platform users (on Drivers and restaurants' behalf).  Uber's *revenue* is a much smaller figure—$50 billion in gross bookings vs. $11 billion in revenue.  *See id.* at 1339.  This disparity not only shows that Plaintiffs are significantly overstating the amount of Uber's revenues, but it also underscores that Uber is not a transportation provider.  *See infra*, Section V.  Uber's revenue does not come close to meeting gross bookings, whereas an actual transportation company's gross bookings are *equal to* its revenues.

Declaration of Kevin Nolan in Support of Defendants' Motion for Summary Judgment ("Nolan Decl.") ¶ 4; Patel Decl. ¶ 16.  Uber is a public company in a highly competitive industry.  *See, e.g.*, PSJ Ex. A at 1239.  Uber and its subsidiaries had to eliminate thousands of positions last year.  Rosenthal Decl. ¶ 6; D. Opp'n Ex. 4  at 9.  ████████████████████████████

████.  Patel Decl. ¶ 69–72; Nolan Decl. ¶ 7.  It is unreasonable to compel Uber, or any company, to absorb such losses—and the even greater losses Uber would sustain to support WAV marketplaces in Jackson and New Orleans—on even a temporary basis, much less in perpetuity.

Plaintiffs' response that Uber can simply raise prices to cover these WAV costs is similarly meritless.  ████████████████████████████████████████

████████████████████████████████████.  PSJ Br. 2, 35–36, 44.  But Plaintiffs ignore the actual data.  ████████████████████

████████████████████████████████████████

████████████.  PSJ Ex. VV at 14329.  ██████████████████████

████████████████████████████████████████.  Patel Decl. ¶¶ 50, 53.

More fundamentally, Plaintiffs' just-raise-prices argument undermines any notion that their demanded outcome is reasonable.  A modification that requires an across-the-board price increase is proof that it is *unreasonable* because it shows the defendant cannot afford it.  A modification so severe that it necessitates such price increases cannot be the sort of "moderate change" the ADA requires.  *See Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1036–37 (6th Cir. 1995).

Mandating an across-the-board price increase is especially unreasonable here.  For one thing, an across-the-board price increase to support WAV marketplaces in two relatively small cities, is patently unreasonable.  For another, riders have alternatives to requesting trips on the Uber platform.  PSJ Ex. A at 1239.  A unilateral price increase would risk decreasing demand for rides requested using Uber's platform and, therefore, risk decreasing Uber's revenue from the service fees it collects on completed rides.  *Id.*  Plaintiffs' assumption that a unilateral price increase would not harm Uber is unsupported by the evidence and inconsistent with basic economic principles.  *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001) ("[C]onsumers will almost always purchase fewer units of a product at a higher price

24

than at a lower price, possibly substituting other products."); *ICTSI, Inc. v. Int'l Longshore & Warehouse Union*, 442 F. Supp. 3d 1329, 1362 (D. Or. 2020) (deeming expert's testimony unreliable because he ignored the economic principle that "as the price of a good or service increases, the demand for that good or service generally decreases").

Not that it would somehow make a new mandated price increase reasonable, but Plaintiffs also are wrong that Uber already charges per-trip fees similar to the price increase they propose. *See* PSJ Br. 44. Specifically, Uber Green is a request option in the Uber Apps in certain cities, which enables riders to "request a ride in an EV or hybrid vehicle" for a $1 more per trip. PSJ Ex. JJ at 2760. Only the rider who requests the Uber Green ride pays this extra dollar. On the other side of the ridesharing equation, Drivers receive greater amounts when they complete an Uber Green trip. *See id.* (explaining that Uber Green gives "[m]ore earnings for Drivers" in that Drivers with a "battery EV" vehicle will receive a $1.50 incentive per trip while hybrid drivers will receive an extra $0.50 per Uber Green Trip). The Uber Green fee is not, in any way, an across-the-board price increase.

## IV.  PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR UNPLEADED THEORY THAT DEFENDANTS SCREEN OUT WAV DRIVERS.

Plaintiffs contend Uber's vehicle requirements "explicitly screen out WAVs" and, therefore, constitute eligibility criteria that screen out persons with disabilities in violation of 42 U.S.C. § 12184(b)(1). PSJ Br. 47–49. This argument fails, for the reasons explained below. But there is a more fundamental problem with this theory of liability: it's brand new. Plaintiffs failed to plead this theory in any of their five complaints—none of which cites Section 12184(b)(1) or otherwise mentions eligibility criteria or the vehicle requirements Plaintiffs now challenge. *See Namisnak*, ECF Nos. 1, 54, 92; *Crawford*, ECF Nos. 1, 135. They failed to raise this theory in any prior filings with this Court or the Ninth Circuit. And they failed to provide Defendants with any notice whatsoever of their intent to pursue this theory before now. Defendants first learned of Plaintiffs' new charge of discrimination upon reading the summary judgment motion itself—even though, as Plaintiffs concede, the vehicle requirements at issue "have been in place since the inception of this lawsuit." PSJ Br. 48.

1    That is improper sandbagging and is reason alone to deny summary judgment. "It is

2    well-settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time

3    at the summary judgment stage." *Bullard v. Wastequip Mfg. Co.*, 2015 WL 12766467, at *10 (C.D.

4    Cal. 2015) (collecting cases); *accord Wasco Prod., Inc. v. Southwall Techs.*, 435 F.3d 989, 992 (9th

5    Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate

6    pleadings."); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000) (unpleaded

7    theory improperly raised in motion for summary judgment filed after discovery because defendant

8    had no opportunity to develop a response or defense in discovery).

9    In all events, Plaintiffs' new theory of discrimination fails. For one thing, Plaintiffs lack

10   standing to challenge a rule prohibiting *Drivers* from using WAVs while selling rides in the UberX

11   marketplace (if such a rule existed), for Plaintiffs would not be among the Drivers screened out by

12   the rule. Plaintiffs have no interest in signing up to use the Uber platform to sell WAV rides.

13   Plaintiffs are not able to drive. *Crawford*, ECF No. 135 ¶ 1; *Namisnak*, ECF No. 92 ¶ 3; D. Opp'n

14   Ex. C at 13:9–10; D. Opp'n Ex. D at 21:2–4; D. Opp'n Ex. E at 17:12–15. And Plaintiffs have

15   conceded that, absent a WAV request option in the Uber Rider App, they cannot benefit from any

16   Drivers selling WAV rides on the platform. *Namisnak*, ECF No. 92 ¶ 9 ("As a result of Uber's

17   refusal to make UberWAV available in New Orleans, persons with disabilities in New Orleans have

18   no ability to call an accessible vehicle through the Uber app that will accommodate their needs.

19   Even if there are drivers on the road who have such a vehicle or training, there is no way for a New

20   Orleans user to find an UberWAV vehicle through the app."); *Crawford*, ECF No. 135 ¶ 6 (same,

21   for Jackson). So, by Plaintiffs' own admissions, a no-WAV rule (again, if it existed) would not

22   harm them.

23   But the no-WAV rule Plaintiffs imagine does not exist. None of Uber's minimum vehicle

24   requirements "explicitly screens out WAVs." PSJ Br. 47. Nor do the rules prohibiting "vans" and

25   vehicles with "after-market seating modifications" implicitly screen out WAVs. Those rules do

26   not prohibit Drivers from using WAVs to sell rides in the UberX marketplace, for example. Rupp.

27   Decl. ¶ 11; *see* D. Opp'n Ex. A at 31:24–32:12. That is because most WAVs are minivans, and

28   minivans are not vans (*see supra*, p. 15), and Uber does not regard them as vans, Rupp Decl. ¶ 11.

1    Although many WAVs are retrofitted after-market, not all WAVs are.  These limitations—on actual

2    "vans" and vehicles with after-market seating modifications—exist to ensure the safety of riders

3    and Drivers, not to screen out WAV Drivers.  *Id.*; D. Opp'n Ex. A at 24:12–18.   Plaintiffs,

4    moreover, offer no evidence about any Driver in New Orleans or Jackson (or anywhere else, for

5    that matter) who was ineligible to sell rides on the Uber platform because her vehicle was a WAV.

6    **V.    PLAINTIFFS FAIL TO CARRY THEIR BURDEN ON THE QUESTION OF**
     **       WHETHER DEFENDANTS ARE SUBJECT TO SECTION 12184.**

7

8            **A.    Only Entitles That Are "Primarily Engaged in the Business of Transporting**
                     **People" Can Be Subject to Section 12184.**

9            By its terms, Section 12184 applies to entities "primarily engaged in the business of

10   transporting people."    42 U.S.C.  § 12184(a).   Plaintiffs  seem  to  think  that  Section 12184

11   nevertheless applies to entities "primarily engaged in the business of transporting people" *and* other

12   entities who have contracts of some unspecified scope with entities so primarily engaged.  PSJ

13   Br. 27.  That argument fails for the simple reason that it violates the cardinal rule of statutory

14   interpretation: Congress "says in a statute what it means and means in a statute what it says there."

15   *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

16           Plaintiffs urge the Court to expand the statute's reach based upon the so-called "stand in the

17   shoes" regulation.  PSJ Br. 26.  That does not purport to expand the scope of the ADA's reach to

18   entities that are not covered by the statute's plain terms.   Statutory limits cannot be erased by

19   regulation.  And an entity not covered by the ADA—or any other law, for that matter—cannot

20   nevertheless become covered by contract alone.  *See, e.g.*, *Nelson v. Salt Lake Cty.*, 2021 WL

21   1063236, at *2 (D. Utah 2021); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 968 (N.D.

22   Cal. 1998); *Pokorney v. Miami Vall. Career Tech. Ctr. Sch. Dist.*, 1995 WL 1671909, at *4 (S.D.

23   Ohio 1995).   Indeed, if Plaintiffs' reading of the regulation were correct, the regulation would be

24   invalid.  Congress makes laws, and if Congress subjects one set of entities to a statute, an agency

25   may not subject another set of entities to the same statute.

26

27           But Plaintiffs' badly misread the regulation at issue, which is primarily focused on the

28

1   effects of contracts between public entities and private entities, which are subject to different

2   provisions of the ADA (Titles II and III, respectively) with different obligations.  Subsection (d)

3   addresses contracts between two private entities, stating that "a private entity that provides fixed

4   route or demand responsive transportation service under contract or arrangement (including, but

5   not limited to, a grant, subgrant, or cooperative agreement) with another private entity shall be

6   governed, for purposes of the transportation service involved, by the provisions of this part

7   applicable to the other entity."  49 C.F.R. § 37.23(d).  By its terms, subsection (d) dictates the

8   obligations    that    apply    when    one    Title-III-covered-entity    contracts    with    another

9   Title-III-covered-entity to provide transportation.  This is because Title III imposes different rules

10  for transportation provided by entities that own, lease, or operate places of public accommodation

11  (42 U.S.C. § 12182(b)(2)(B)–(C)) than for transportation provided by entities primarily engaged in

12  the business of transporting people (42 U.S.C. § 12184).

13

14        The Department of Transportation recognized that one type of covered entity (public

15  accommodation, but not primarily engaged) may contract with another type of covered entity

16  (primarily engaged) to provide transportation services on its behalf, and the agency promulgated

17  the "stand in the shoes regulation" to make clear which of the two sets of rules apply to the primary

18  engaged entity in that instance.  To illustrate how this works, DOT explained as follows:

19

20        [S]uppose a taxi company (a private entity primarily engaged in the business of
          transporting people) contracts with a hotel to provide airport shuttle van
21        service.  With respect to that service, the taxi company would be subject to the
          requirements for private entities not primarily engaged in the business of
22        transporting people, since it would be "standing in the shoes" of the hotel for that
          purpose.

23  *Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45737 (Sept. 6, 1991).

24        Both entities in that illustration—the hotel providing airport shuttle service and the taxi

25  company—are subject to Title III of the ADA and have transportation-related obligations.  The

26  illustration    shows    that    when    two    such    entities    contract    with    one    another,    the

27  subcontractor-covered-entity    (the    taxi    company)    stands    in    the    shoes    of    the

28

contractor-covered-entity (the hotel).  Nowhere did DOT express the invalid intent to subject to Section 12184 by regulation entities that Congress did not subject to Section 12184 in the statute itself.

In support of their contrary view, Plaintiffs cite a statement of interest filed by the Department of Justice.  PSJ Br. 27.  That statement does not actually support Plaintiffs' argument. DOJ did not purport to interpret the regulation as expanding Section 12184's reach.  And, even if DOJ's statement were somehow helpful to Plaintiffs' argument, Plaintiffs cite no authority that would merit deference to the *Department of Justice's* interpretation of a regulation promulgated by *the Department of Transportation*.  There is none.  Congress carefully divided its delegation of rulemaking authority under Title III among the two agencies, *see* 42 U.S.C. § 12186, and the "stand in the shoes" regulation is DOT territory.

Thus, the "stand in the shoes" regulation does not make Defendants "covered by Title III" merely because "Uber has a contractual relationship with drivers" who "provide transportation." PSJ Br. 27.  Defendants, moreover, do not contract with Drivers to provide transportation.  The PAA conveys the license to use the Uber Driver App and sets out the terms of that license.  *See* PSJ Ex. II § 2.1.  The PAA also makes clear that Drivers do not provide transportation services on Uber's behalf.  *Id.* § 1.1.  And even if the PAA were fairly read as Defendants engaging Drivers to provide transportation, per the "stand in the shoes" regulation, Drivers would stand in Defendants' shoes, not the other way around.  All of which is to say that Defendants' contracts with Drivers do not excuse Plaintiffs of their burden of proving that Defendants are themselves subject to Section 12184—a burden they fail to carry, as explained below.

### B.     There Are Genuine Disputes Of Fact Material To Whether Defendants Are "Primarily Engaged In The Business Of Transporting People."

Plaintiffs' argument that *Defendants* are "primarily engaged in the business of transporting people" is focused only on *Uber Technologies*.  Plaintiffs wholly fail to articulate any argument as to why Rasier is "primarily engaged in the business of transporting people."  This is another example of Plaintiffs failing to recognize the corporate form or offer any argument or evidence that

1   merits piercing the corporate veil, even though Plaintiffs understood that the entities were

2   sufficiently distinct when they named *both* as defendants.  For this reason alone, Plaintiffs have

3   failed to carry their burden with respect to Rasier.  *See* Fed. R. Civ. P. 56(a) (requiring party to

4   identify "each claim or defense" for which summary judgment is sought); *Nissan Fire & Marine*

5   *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("If a moving party fails to carry its

6   initial burden of production, the nonmoving party has no obligation to produce anything"); *Int'l,*

7   *Ltd v. Anga Supply, LLC*, 118 F. Supp. 3d 1172, 1176 (N.D. Cal. 2015) (denying motions for

8   summary judgment because of "inadequate briefing").

9       This failure mandates denial of summary judgment with respect to Uber Technologies as

10   well.  That is because it is Rasier, not Uber Technologies, that contracts with and licenses the Uber

11   Driver App to Drivers in New Orleans and Jackson, and it is Rasier, not Uber Technologies, that is

12   the permitted transportation network company in Louisiana and Mississippi. *See* PSJ Ex. II;

13   D. Opp'n Ex. F at 50:2–7.  Uber Technologies, therefore, is significantly more removed from

14   passenger transportation than even Rasier.  *See* 49 C.F.R. § 37.37(f); 49 C.F.R. § Pt. 37, App. D

15   ("The rule looks to the private entity actually providing the transportation service in question in

16   determining whether the 'private, primarily' or 'private, not primarily' rules apply.").

17       Plaintiffs otherwise fail to show that the only conclusion a reasonable factfinder could reach

18   is that Defendants are primarily engaged in the business of transporting people, as explained below.

19       **1.    Defendants' primary business is technology, not transportation.**

20       Plaintiffs' own evidence, including Uber's public filings, shows that Uber is, and holds

21   itself out to be, a "technology platform," not a transportation provider.  *See, e.g.*, PSJ Ex. B at 1639

22   ("Uber is a technology platform that uses a massive network, leading technology, operational

23   excellence and product expertise to power movement from point A to point B. Uber develops and

24   operates proprietary technology applications supporting a variety of offerings on its platform"); Pl.

25   Ex. RR ("Uber develops smartphone applications, software, and other technological solutions for

26   various industries."); Pl. Ex. SS  (same); *see also* D. Opp'n Ex. 2 ("Uber is not a common or motor

27   carrier, does not transport you, and use of the Uber marketplace platform is only open to registered

28   users of the uber marketplace platform and not to the general public.") (decapitalized).

In short, Uber's platforms and the technology that powers them "connect consumers … with independent providers of ride services … for ridesharing services, as well as with other forms of transportation including public transit"; connect "Riders and other consumers … with restaurants, grocers and other stores … with delivery service providers … for food, grocery and other delivery services"; and "connect shippers with carriers in the freight industry."  D. Opp'n Ex. 4 at 4.   A reasonable factfinder can (and in Defendants' view, would) conclude that the common thread of Uber's various business ventures is *technology and platform services*, not transporting people.[9]

### 2.     Defendants are not in the business of transporting people.

Plaintiffs fail to show that Defendants are engaged in the business of transporting people at all.[10]  There is no dispute that Defendants provides technology and services to people who are engaged in the business of transporting people, but that does not mean that Defendants are so engaged.[11]  *See, e.g.*, La. Stat. Ann. § 48:2192 (a transportation network company or driver "shall not be considered a common carrier, contract carrier, or motor carrier, and shall not provide taxi or for hire vehicle service"); Miss. Code. Ann. § 77-8-3 ("Transportation network companies or transportation network company drivers are not common carriers by motor vehicle, contract carriers by motor vehicle, or restricted motor carriers ... nor do they provide taxicab or limousine services. A transportation network company driver shall not be required to register the vehicle the driver uses to provide prearranged rides as a commercial vehicle.").

Even Plaintiffs' "reasonable modification" arguments are premised on the (correct) proposition that *Defendants* do not transport anyone—that is why, as Plaintiffs concede, Defendants

---

[9]     Plaintiffs rely heavily on Judge Alsup's holding that Lyft is subject to Title III of the ADA. But Lyft did not oppose Plaintiffs' motion for summary judgment on that issue.  *See* Lyft's Opp'n to Summary Judgment, Case No. 3:19-cv-01438, ECF No. 75 at 8 n.4 ("Lyft does not oppose Plaintiffs' present Motion on the ground that it is not subject to Title III of the ADA").  So Judge Alsup's conclusion that Lyft is subject to Section 12184 was based on a stipulation, and is not explained in any event.  Accordingly, the conclusion has no bearing on this case.

[10]    While Plaintiffs claim their experts have opined that Uber is primarily engaged in the business of transporting people, those opinions are inadmissible legal conclusions, as Defendants demonstrated in their motions to exclude the testimony of Dr. James Cooper and Meera Joshi.  *See Crawford*, ECF Nos. 152 & 154.

[11]    Plaintiffs assert that Uber actually owns a fleet of tens of thousands of vehicles used to provide rides, but as already discussed, *see supra*, Section II, Plaintiffs are wrong.

31

cannot provide any level of WAV service in Jackson and New Orleans without partnering with a commercial fleet operator (an actual transportation provider), PSJ Br. 34–36; adding a WAV button and incentivizing its use by Drivers (actual transportation providers), *id.* at 36–38; or getting into a new business of purchasing and leasing vehicles to Drivers (something an actual transportation provider might or might not do), *id.* at 38–40.  At a minimum, these distinctions create a genuine issue of material fact.

### 3. Whether Drivers are merely an extension of Defendants is genuinely disputed.

This Court has held that Defendants may exercise such control over the Drivers who use Uber's platform that such Drivers are operating as "an extension of" Defendants.  *Crawford*, ECF No. 80 at 7.[12]  Facts material to whether Defendants exercise such a degree of control over Drivers are genuinely disputed.

Individuals who want to seek and accept ride requests using the Uber Driver App do not fill out a "job application."   Rosenthal Decl. ¶ 11.  They enter into a contract that gives them access to the Uber platform (the Platform Access Agreement, or PAA).  *Id.* ¶ 7.  Drivers expressly confirm that the PAA "is not an employment agreement" and that Defendants are not "hiring or engaging" any Driver to provide any service.  PSJ Ex. II § 1.1. The PAA makes clear that Defendants have no right to "direct or control" Drivers.  *Id.* § 1.2. Drivers can decide "when, where, and whether" to accept, decline, ignore, or cancel a ride request.  *Id.*  Drivers are not required "to accept any minimum number of Rides."  *Id.*

As a practical matter, this means Defendants do not require Drivers to notify Uber when they, for example, wish to take vacation, are sick, have car trouble, have doctor's appointments, simply stop logging on for the day, etc.  Rosenthal Decl. ¶ 18.  Nor do Drivers take "leaves of absences" when they cannot or do not want to log on to Uber's Driver App or sell their transportation services to riders in the Uber marketplaces.  *Id.* Drivers may take days, months, or

---

[12]     Uber disagrees and expressly preserves its argument to the contrary because even "pervasive control" of an entity subject to the ADA does not make the controlling party itself subject to the ADA or responsible for the controlled party's conduct that violates the ADA.  *Noel v. NYC Taxi & Limousine Comm'n*, 687 F.3d 63, 72 (2d Cir. 2012).

1    longer between logging on to Uber's Driver App and seeking and accepting ride requests from their

2    customers who use Uber's Rider App. *Id.*

3           Drivers are also contractually free to use methods other than the Uber Driver App to connect

4    with riders, including "other platforms and applications" offered by Defendants' competitors.

5    Pl. Ex. II at § 1.2.  This means that Drivers can "multi-app" by using other applications such as

6    Lyft, Grubhub, Doordash, and Instacart at the same time they are using Uber Driver App.  Rosenthal

7    Decl. ¶ 25.  As a result, Drivers can transition from using Uber's Driver App to other applications

8    simply by swiping their phones. *Id.*[13]  Drivers can work part-time or full-time—the choice is theirs.

9    *Id.*

10          To be sure, Defendants have certain rules to ensure the marketplaces they support are safe

11   and fair.  But many of the rules Plaintiffs ascribe to Defendants are actually required by state law:

12   - Both Louisiana and Mississippi require background checks for Drivers.  La. Stat. Ann.
     § 48:2199; Miss. Code. Ann. § 77-8-25.

13
14   - Drivers in both states must comply with all non-discrimination laws and "all applicable laws
     relating to transporting service animals.  La. Stat. Ann. § 48:2201; Miss. Code. Ann.
     § 77-8-31.

15
16   - Louisiana and Mississippi include particular insurance requirements for TNCs and Drivers.
     La. Stat. Ann. § 45:201.6; Miss. Code Ann. § 77-8-15.

17          Other requirements stem at least in part from local laws, such as vehicle requirements and

18   inspections   NOLA Code of Ordinances §§ 162-1715–162-1717 (Driver vehicle inspections); *id.*

19   § 162-1714 (maximum age of Driver vehicles).[14]  Still other aspects of "control," like Defendants'

20   use of geo-fencing to prohibit riders from making ride requests in certain areas, can stem from not

21   only local regulations, but contractual requirements with airport authorities as well.  D. Opp'n

22

23

24

---

25   [13]    Because of these collective contractual conditions, Drivers are independent contractors
     rather than employees under Mississippi law.  Miss. Code. Ann. § 77-8-21.

26   [14]    The New Orleans ordinances have been preempted by state law.  *See* La. Stat. Ann.
27   § 48:2205. Defendants cite them because they are illustrative of the requirements local law imposes
     on Defendants, and they were in effect (and not yet preempted) for a period of time during the
28   pendency of this lawsuit.

1    Ex. G § 6.7 (requiring Uber to use geo-fencing technology).[15]  All of this is to say, much of the

2    "control" Defendants purportedly exercise over Drivers is, in fact, control by governmental bodies,

3    and Defendants are merely taking actions that the law requires.

4         The "Community Guidelines" likewise do not demonstrate control.  These are guidelines

5    Uber has for *all* platform users—Riders and Drivers—for a safe and positive experience. D. Opp'n

6    Ex. 3.  They set baseline expectations on all market participants, prohibiting behaviors such as

7    unwelcome physical contract, sexual assault and misconduct, threatening and rude behavior,

8    damaging property, or unlawful discrimination. *See id.* Likewise, mandatory sexual assault and

9    misconduct education, as a condition to continued use of Uber's technology is hardly a dispositive

10   exercise of control.  *Cf., e.g.*, *Francis v. Town of Brookneal*, 2007 WL 1472065, at *6 (W.D. Va.

11   2007) (finding temporary workers were not employees under agency principles despite being

12   required to "attend sexual harassment training").

13        Moreover, because the Community Guidelines apply to *all* users of Uber's platform, if they

14   make Drivers an extension of Uber they necessarily make *riders* an extension of Uber as well.  That

15   is precisely what Plaintiffs argue: that Uber controls *riders* via the Community Guidelines.  PSJ

16   Br. 24.  That argument proves too much.  If both riders and Drivers are extensions of Uber, as

17   Plaintiffs necessarily contend, *see id.*, Plaintiffs cannot possibly prove that Defendants provide

18   "specified public transportation"—transportation "that *provides the general public* with general or

19   special service."  42 U.S.C. § 12181(10) (emphasis added).

20        Plaintiffs' other arguments have nothing to do with whether Drivers are an "extension" of

21   Defendants.  Sure, Defendants choose the cities where the Uber platform is made available (PSJ

22   Br. 19), help Drivers and potential Drivers connect with third parties that rent vehicles (like Hertz

23   and Avis) (*id.* at 22), and occasionally deploy personnel to airports and large events to assist riders

24   in using the Uber Rider App to comply with new local and airport regulations (*id.* at 24–25).  But

25   Plaintiffs do not (and cannot) explain how any of those acts relates to whether Defendants exercise

26

27   [15]

28                                                                          *See* D Opp'n Ex. H at 100:5–16.

1    control over Drivers.

2         Finally, Plaintiffs argue that "Uber sets the price of rides."  PSJ Br. 21.  But it's not that

3    simple, and that fact is not proof of control in any event.  Drivers agree to pay a service fee "for

4    services connecting you to Riders and related services, including payment processing."  D. Opp'n

5    Ex. 1 at 2.  Among the services Defendants provide to Drivers in exchange for that fee are rider

6    price calculation and collection. *See id.* at 1 ("Uber enables you, through the Driver App, to charge

7    your Rider(s) a 'Fare' for each Ride").   But the same service benefits riders who are subject to

8    Uber's role in pricing just as are Drivers.  That Uber is paid for providing these services does not

9    demonstrate that Uber is controlling Drivers, much less to such a degree that Drivers are an

10   extension of Uber.  This is especially true when Drivers determine when and where to enter the

11   marketplace and can simply decline to accept requests and cancel trips.

12                                      **CONCLUSION**

13        Plaintiffs' motion for summary judgment should be denied.

14

15                                              Respectfully submitted,

16                                              MORGAN, LEWIS & BOCKIUS LLP

17   Dated: May 19, 2021                  By:  s/ Anne Marie Estevez

18                                              Anne Marie Estevez
                                                Stephanie Schuster
19                                              Patrick Harvey
                                                Kathy H. Gao
20
                                                *Attorneys for Defendants*
21

22

23

24

25

26

27

28