**BIZER & DEREUS, LLC**
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

AQUA TERRA AERIS LAW GROUP
William Brock Most
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

PUBLIC JUSTICE, P.C.
Karla Gilbride
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

*Attorneys for Plaintiffs*

| | |
|---|---|
| SCOTT CRAWFORD<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC. and RAISER, LLC,<br><br>Defendants | Case No.: 3:17-cv-02664-RS<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   July 15, 2021, at 1:30pm<br>Judge:  Hon. Richard Seeborg |
| STEPHAN NAMISNAK, *ET AL.*,<br><br>Plaintiffs,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>Defendants | Case No.: 3:17-cv-06124-RS<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   July 15, 2021, at 1:30pm<br>Judge:  Hon. Richard Seeborg |

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iv

I.      INTRODUCTION.......................................................................................... 1

II.     PLAINTIFFS HAVE STANDING ............................................................... 1

    A. Plaintiffs Have Established Their Standing at the Summary Judgment Stage .......... 2

    B. Uber's Credibility Attacks Are Insufficient as a Matter of Law. ................................. 3

    C. Defendants Cannot Pigeonhole What Relief this Court Enters Through a Standing
        Argument ............................................................................................................ 8

III.    PLAINTIFFS HAVE PROVEN THAT DEFENDANTS ARE SUBJECT TO
        § 12184............................................................................................................ 9

    A. Uber is Primarily Engaged in the Business of Transporting People.......................... 10

    B. Plaintiffs' "Stand in the Shoes" Argument Reflects the Law ................................... 12

IV.     PLAINTIFFS HAVE PROVEN THEIR EQUIVALENT SERVICE
        ARGUMENT............................................................................................... 14

    A. Uber is Responsible for the Actions of its Subsidiaries Under the ADA
        Regulations ........................................................................................................ 14

    B. There is No "Mini Van" and "Actual Van" Distinction. .............................................. 15

        1.  The Plain Meaning of "Van," as Supported by Dictionary Definitions, Common
            Parlance, Judicial Usage, and Other Regulations Encompasses Minivans within the
            Definition of "Van."........................................................................................... 16

        2.  The ADA's Legislative History and Purpose Confirm that Minivans are Vans........... 19

    C. Plaintiffs Offered Evidence that the Vans Were Used in Providing Transportation 20

    D. Once the Equivalent Service Requirement is Triggered, the Obligation is Ongoing 21

V.      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE
        DEFENDANTS FAILED TO ESTABLISH THAT A "REASONABLE
        MODIFICATION" IS NOT POSSIBLE ..................................................... 22

**A. Uber Could Reasonably Provide UberWAV Through** ███████████ **. . 22**

   1. ███████████████████████████████████ 22

   2. UberWAV Would Not be Too Costly for Uber on an Overall Basis ........................... 23

   3. UberWAV Is Not Too Costly on an Individual Basis .................................................. 25

**B. Uber Could Also Reinstate its** ███████████ ................................................................ 27

**VI.**    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE DEFENDANTS SCREEN OUT WAVs.** .......................................................... 27

**VII.**    **CONCLUSION** ............................................................................................ 29

**VIII.**    **CERTIFICATE OF SERVICE** ............................................................... 30

## II.    TABLE OF AUTHORITIES

**Cases**

*Agredano v. Mutual of Omaha Companies*,
    75 F.3d 541 (9th Cir. 1996) .................................................................. 18

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................................. 4

Anderson v. Liberty Lobby,
    477 U.S. 242 (1986) ............................................................................. 4

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ..................................................... 12, 15

*Brooke v. Kashl Corp.*,
    362 F. Supp. 3d 864 (S.D. Cal. 2019) .................................................. 4

*Brown v. Bd. of Educ. of Topeka, Kans.*,
    349 U.S. 294 (1955) ........................................................................... 21

*Carney v. Adams*,
    141 S. Ct. 493 (2020) .......................................................................... 8

*Civil Beat Law Center for the Public Interest, Inc. v. Centers for Disease Control & Prevention*,
    929 F.3d 1079 (9th Cir., 2019) .......................................................... 19

*Cohen v. City of Culver City*,
    754 F.3d 690 (9th Cir. 2014) ............................................................. 20

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir.2000) ............................................................ 28

*Doran v. 7-Eleven Inc.*,
    524 F.3d 1034 (9th Cir. 2008) ............................................................. 3

*Environmental Def. v. Duke Energy Corp.*,
    549 U.S. 561 (U.S. 2007) ................................................................... 18

*Far Out Prods., Inc. v. Oskar*,
    247 F.3d 986 (9th Cir. 2001) ............................................................... 4

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................. 2

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014) ............................................................................. 28

*LA All. for Hum. Rts. v. City of Los Angeles*,
    2021 WL 1546235 (C.D. Cal. Apr. 20, 2021) ............................................... 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 2, 3

*Medina v. Multaler, Inc.*,
    547 F. Supp. 2d 1099 (C.D. Cal. 2007) ........................................................ 28

*Namisnak v. Uber Techs., Inc.*,
    971 F.3d 1088 (9th Cir. 2020) ............................................................. 1, 2, 7, 11

*Pakootas v. Teck Cominco Metals, LTD.*,
    830 F.3d 975 (9th Cir. 2016) ........................................................................ 18

*Pickern v. Holiday Quality Foods Inc.*,
    293 F.3d 1133 (9th Cir. 2002) ................................................................... 3, 5

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) ..................................................................................... 19

*Smith v. U.S.*,
    508 U.S. 223 (1993) ..................................................................................... 16

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
    402 U.S. 1 (1971) ......................................................................................... 21

*U.S. v. Arvizu*,
    534 U.S. 266 (2002) ..................................................................................... 17

*U.S. v. Olafson*,
    203 F.3d 560 (9th Cir. 2000) ........................................................................ 17

*United States v. Carter*,
    421 F.3d 909 (9th Cir. 2005) ........................................................................ 16

*United States v. Pacheco*,
    977 F.3d 764 (9th Cir. 2020) ........................................................................ 19

*United States v. Torres*,
    995 F.3d 695 (9th Cir. 2021) ........................................................................ 16

*Wilkinson v. Torres*,
    610 F.3D 546 (9th Cir. 2010) ........................................................................ 17

## Statutes

23 C.F.R. § 1340 ................................................................................................ 18

28 C.F.R. § 36 .................................................................................................... 29

28 C.F.R. § 37 .................................................................................................... 14

40 C.F.R. § 600 .................................................................................................. 18

40 C.F.R. § 86 .................................................................................................... 18

42 U.S.C. § 12184 .................................................................................. 15, 18, 20

42 U.S.C. § 12201 .............................................................................................. 12

49 C.F.R. § 37 .................................................................................................... 13

49 C.F.R. § 523 ............................................................................................ 16, 18

## Other Authorities

H.R. Rep. 101-485 .............................................................................................. 19

## I.    INTRODUCTION.

In their opposition to Plaintiffs' motion for summary judgment, Uber objects to Plaintiffs' standing. But Plaintiffs have repeatedly proven their standing. Plaintiffs have also established and proven that they are individuals with disabilities, that they requested a modification from Uber Technologies, Inc. and Raiser, LLC (collectively "Uber"), that Uber failed to provide the modification, and that provision of the modification would have been reasonable. Under the established facts, partial summary judgment should issue for Plaintiffs.

## II.   PLAINTIFFS HAVE STANDING.

Uber argues that Plaintiffs' standing is "doomed." The primary focus of Uber's argument is that Mr. Namisnak could have downloaded the Uber app while briefly in California and Dr. Crawford could have downloaded the Uber app while traveling in California or Washington, D.C. However, what Uber overlooks is that this case is not about Uber's services in California or Washington, D.C. and the fleeting moments when Mr. Namisnak and Dr. Crawford were in said locales. This case solely relates to Uber's service in New Orleans and Jackson. Moreover, the Ninth Circuit explained in *Namisnak* that evidence that a plaintiff had the opportunity to use UberWAV in a city where it is offered—such as Chicago—and failed to do so _might_ undermine the futility analysis.[1] But at no point did the Circuit say that it "doomed" a plaintiff's standing. Critically, the Supreme Court has already explained that testimony by a plaintiff that they are avoiding a certain activity because of an ongoing violation by the defendant can be sufficient for

---

[1] *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1093 (9th Cir. 2020) ("But the same is not true where, as here, uberWAV is not offered at all in New Orleans. Moreover, there was no jurisdictional discovery and therefore no evidence that Plaintiffs had the opportunity to use uberWAV in a city where it is offered—such as Chicago—and failed to do so. Such evidence could undermine the futility analysis here.")

standing at the summary judgment stage.[2] And as described here, the undisputed evidence shows that Plaintiffs would use UberWAV if it became available in their cities.

### A.  Plaintiffs Have Established Their Standing at the Summary Judgment Stage.

Each Plaintiff testified about the specific purposes for which they would use Uber's transportation services if a WAV option became available, *i.e.*, going to the grocery store, outings with friends, doctor's appointments, etc. *See* Namisnak Depo. 35-36 (would use Uber to travel to grocery store, library across the river, and airport);[3] Falls Depo. 50 (would use Uber for trips to grocery store and other daily errands); Crawford Depo. 33 (would use Uber to get to doctor's appointments for shopping trips outside of Jackson, and "going out to eat in the evenings with my friends"). Each of the three Plaintiffs also testified about their deterrence from downloading and using Uber's smartphone application to obtain transportation in their respective city because said service is inaccessible.[4] In *Namisnak v. Uber Techs., Inc.*, the Ninth Circuit held that Plaintiffs' allegation that they had actual knowledge that Uber does not provide UberWAV service in New Orleans was sufficient to constitute an injury in fact.[5] Plaintiffs have put forward evidence to

---

[2] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184, 120 S. Ct. 693, 705, 145 L. Ed. 2d 610 (2000) ("Nor can the affiants' conditional statements—that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it—be equated with the speculative " 'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in *Defenders of Wildlife*. 504 U.S., at 564, 112 S.Ct. 2130.").

[3] Mr. Namisnak further testified that if Uber provided WAVs, he would use said service to get around town independently in his motorized wheelchair, without needing to rely on his wife to facilitate transportation. Namisnak Depo. 47 ("what I'm looking to do is to be able to get places by myself just like anybody else, you know, to run my own errands, to make my own groceries, attend my own functions.").

[4] Ex. RRR (R. Doc. 171-8), Crawford Depo. at 33:2-9 (Crawford has not used Uber because it is not accessible in Jackson, but would if it were); Ex. O (R. Doc. 148-16), at 47:16-48:6 (Falls has not used Uber because he was told Uber was not "handicap accessible"); Ex. P (R. Doc. 148-17), at 34:21-25 (Namisnak has not used Uber because he "can't use it to request WAV rides in New Orleans").

[5] 971 F.3d 1088, 1093 (9th Cir. 2020) ("Plaintiffs have actual knowledge that Uber does not provide its uberWAV service in New Orleans. That barrier to entry makes downloading the Uber App and creating an account a futile gesture, which Plaintiffs need not engage in to show injury in fact.").

2

substantiate these allegations and, having done this, they have established their standing for purposes of summary judgment.

The sworn testimony of Plaintiffs is not like the vague, "someday" intentions found insufficient in *Lujan v. Defenders of Wildlife*, where the plaintiffs attested that they wanted to observe endangered Elephants in war torn Sri Lanka at an undetermined date in the future.[6] Here, the specificity of Plaintiffs' testimony surpasses the statements of other plaintiffs in ADA cases that have been found sufficient to establish standing at the summary judgment stage. *In Doran v. 7-Eleven Inc.*, the plaintiff testified he would patronize defendant's store once a year during an annual trip to Disneyland once barriers were removed.[7] And in *Pickern v. Holiday Quality Foods Inc.*, the plaintiff stated in a declaration that he prefers to shop at Holiday markets and would return to the store in question once it becomes accessible.[8] There is nothing implausible about Plaintiffs' sworn statements that they are currently deterred from using Uber's service, but intend on using Uber's service once it is made accessible in the cities where they live. Indeed, the entire thrust of Plaintiffs' lawsuits are that UberWAV would dramatically improve their lives in the cities in which they live – and it is for that reason that they have brought suit.

**B.    Uber's Credibility Attacks Are Insufficient as a Matter of Law.**

In opposing Plaintiffs' motion for summary judgment, Uber repeats the same credibility attacks against Plaintiffs that Uber raised in its own summary judgment motion.[9] Uber's credibility

---

[6] 504 U.S. 555, 564 (1992).
[7] 524 F.3d 1034, 1040-41 (9th Cir. 2008).
[8] 293 F.3d 1133, 1138 (9th Cir. 2002).
[9] *See, e.g.*, Defendants' Opposition to Plaintiffs' Summary Judgment Motion (R. Doc. 174), at p. 9 (arguing that Dr. Crawford "prefers taxis and public transit"), p. 10 (attacking Mr. Namisnak for not using "any form of for-hire transportation in New Orleans since before 2010" ), and p. 10 (criticizing all plaintiffs for living "on fixed incomes, yet … not even bother[ing] to investigate the cost of downloading or using the Uber Rider App.").

attacks are insufficient as a matter of law at the summary judgment stage.[10] Defendants have failed to present evidence to contradict Plaintiffs' sworn testimony that they would use Uber's service in New Orleans if it was accessible.

Defendants suggest that Plaintiffs do not have concrete, particularized injuries traceable to Uber's inaccessible service because they currently use other methods of transportation. But all three Plaintiffs explained the limitations of those other transportation methods, and why Uber would be a more desirable alternative.[11] A person with a disability does not lose standing to sue for access to their local CVS because they currently shop at the Walgreens down the street; the Plaintiffs have Article III standing to pursue their ADA claims because they are legally entitled to, and are currently being denied, the same range of transportation alternatives, including Uber, that is available to nondisabled residents of Jackson and New Orleans.[12] Moreover, even a dignitary harm would be sufficient to confer standing.[13]

Defendants characterize Mr. Namisnak as "lack[ing] an interest in for-hire transportation," pointing to the fact that he has not used any for-hire transportation in New Orleans since before

---

[10] *Anderson v. Liberty Lobby*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that the party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) ("A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment.").

[11] Ex. PPP (R. Doc. 171-6), Namisnak Depo. 24:3-25:22; 28:7-19 (Paratransit services must be requested 48 to 72 hours in advance and can involve long wait times while other passengers are picked up, and buses are often late); Ex. QQQ (R. Doc. 171-7), Falls Depo. 27:3-28:1 (Paratransit must be requested two days in advance); Falls Depo. 37-38 (buses are often late and streetcars are more reliable but have limited routes and are "only for the tourists"); Ex. RRR (R. Doc. 171-8), Crawford Depo. 33:6-21 (discussing need for spontaneous transportation service without advance lead time, and the fact that Paratransit does not operate in the evening).

[12] *Brooke v. Kashl Corp.*, 362 F. Supp. 3d 864, 875 (S.D. Cal. 2019) (denying summary judgment to the defendant even though the plaintiff had sued "605 hotels . . . in the Californian district courts" and had professed an intent to visit each of those hotels).

[13] See *Allen v. Wright*, 468 U.S. 737, 754-55, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (recognizing that dignitary harm or stigmatic injury can confer standing).

4

2010.[14] But Mr. Namisnak testified at his deposition that Uber has largely supplanted taxi companies as the primary means of for-hire transportation in New Orleans, that Uber "has the most vehicles on the road" and "with the exception of not having accessible vehicles, seems to provide the best and the most popular service."[15] That other transportation options might exist—or could exist if Mr. Namisnak were to subject himself to additional grueling litigation[16]—is not germane to whether Mr. Namisnak intends on using Uber's service when it is made accessible.

Nor does the fact that Mr. Namisnak was transported via a Lyft and taxicab when traveling in San Francisco for the mediation in this case undermine the concreteness of his injury. Mr. Namisnak explained that he was "focused on the mediation conference" and that he left the decisions concerning logistics to his wife.[17] Mr. Namisnak relied on his wife to make arrangements for transportation and deferred to what she chose.[18] Mr. Namisnak needed her assistance during the trip to San Francisco as she is the one who assists him with transferring from his manual wheelchair into a conventional seat.[19] Quite simply, how Mr. Namisnak was transported in San

---

[14] R. Doc. 174, Defendants' Summary Judgment Opposition, at p. 10.

[15] Ex. PPP (R. Doc. 171-6), Namisnak Depo. 39:2-10; *see also* Namisnak Depo. 34:25-35:6 (testifying that he understands Uber fares to be less expensive than what taxis charge). Mr. Namisnak's desire to use UberWAV to travel around New Orleans, and the injury he experiences from being unable to do so currently, is concrete and particularized. *See Pickern*, 293 F.3d at 1135 (plaintiff stating in declaration that Holiday is his "favorite grocery store chain").

[16] Mr. Namisnak attempted to get United Cab in New Orleans to voluntarily come into compliance with the ADA by filing a Complaint with the U.S. Department of Justice. Unfortunately, the DOJ did not respond to Mr. Namisnak's Complaint. *See* R. Doc. 126-3, at 9:14-16. Mr. Namisnak's decision not to pursue costly and time-consuming litigation against every entity that refuses to comply with the law does not bear on his intent to use Uber's service when said service is made accessible.

[17] Ex. PPP (R. Doc. 171-6), Namisnak Depo. 46:14-25.

[18] *Id*. at 47:1-9.

[19] *Id*. at 17:6-8 (explaining situations when he would need to be lifted and carried, and his inability to transfer from a wheelchair to another seat without assistance). Mr. Namisnak had to use a manual wheelchair for the mediation because he was unable to bring his electric wheelchair on the plane. Only with his electric wheelchair can Mr. Namisnak navigate independently.

5

Francisco is not reflective of Mr. Namisnak's intentions in New Orleans because the decisions about travel while in San Francisco were not made by Mr. Namisnak.

Uber similarly attacks Dr. Crawford's testimony because he typically uses public transportation when in Washington, D.C. and San Francisco and has not used the Uber app.[20] Dr. Crawford explained that in Washington, D.C. the taxis are accessible, public transportation is available, and he prefers to "keep it simple and use the taxis cause I know it works."[21] Unlike San Francisco or Washington, there are few accessible taxis in Jackson and public transportation does not provide service in the evenings.[22] If there was a WAV option available in the Uber app in Jackson, Dr. Crawford would download the Uber app.[23] Dr. Crawford would use the Uber app when he has a need for spontaneity, that is, transportation without a lot of lead time.[24]

As to Mr. Falls, Uber complains that he has "never investigated WAV transportation options."[25] Uber suggests that Mr. Falls has no knowledge concerning the availability of WAVs in New Orleans.[26] But Mr. Falls testified in stark terms about the personal costs of not being able to hail an Uber like his able-bodied friends. He described an instance in 2017 or 2018 when he went to the French Quarter with some friends who were visiting from out of town.[27] At the end of the evening his friends requested an Uber to return to their hotel, but when they asked the driver if there were any wheelchair-accessible vehicles that could transport Mr. Falls, they were told no Uber vehicles were "handicap accessible."[28] As a result, Mr. Falls attempted to roll himself home

---

[20] R. Doc. 174, Defendants' Summary Judgment Opposition, pp. 9-10.
[21] Ex. RRR (R. Doc. 171-8), Crawford depo., 31:22-32:25.
[22] *Id*. at 33:17-34:7.
[23] *Id*. at 33:2-9.
[24] *Id*. at 33:10-16.
[25] R. Doc. 174, Defendants' Summary Judgment Opposition, p.10.
[26] *Id*.
[27] Ex. QQQ (R. Doc. 171-7), Falls Depo. 46:16-47:14.
[28] *Id.*

in his wheelchair.[29] During this journey, he was hit by a car, his wheelchair was "totaled," and he wound up in the hospital for two months.[30] Mr. Falls unequivocally testified at his deposition that if Uber provided an accessible service, he would use it.[31]

Uber critiques Plaintiffs for "not investigating the price," but the Plaintiffs knew that downloading the app would be futile regardless of cost. Uber cites no case—because there is no case—that says that a plaintiff must investigate all subsequent steps before the threshold accessibility barrier is removed. If a person with a disability cannot get into a restaurant, must she demonstrate that she investigated the cost of the steamed mussels? Instead, as the Ninth Circuit noted, "Uber, and Uber alone, can rectify any alleged violation of the ADA by providing an uberWAV option. Plaintiffs' alleged injury is therefore directly traceable to Uber's refusal to offer uberWAV in New Orleans."[32] Plaintiffs had no legal obligation to investigate the cost of a service that is completely inaccessible due to Defendants' actions.

Uber's critique of Plaintiffs' "fixed income" fares no better. Individuals of limited means still have an acute need for transportation services and can still pay for services. Uber presents no evidence that Plaintiffs cannot afford Uber's service. Here, the price of the app (free) was decidedly not the impediment. Given that the Uber app is free, there are no impediments to Plaintiffs being "able and ready" to download it as soon as the accessibility barriers are removed.[33]

---

[29] *Id.*

[30] *Id.*

[31] Ex. QQQ (R. Doc. 171-7), Falls Depo. 50 (would use Uber for trips to grocery store and other daily errands).

[32] *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020)

[33] Ex, PPP (R. Doc. 171-6), Namisnak Depo. 31, 34; Ex. QQQ (R. Doc. 171-7), Falls Depo. 41-42, 49; Ex. RRR (R. Doc. 171-8), Crawford Depo. 16, 43 (all three plaintiffs testifying that they have smartphones and credit cards, and are willing to agree to Uber's Terms of Service once UberWAV is available where they live).

Uber cites to *Carney v. Adams*, but the facts of that case are not comparable to the instant actions.[34] In *Carney*, the plaintiff did not become interested in the issue of Delaware's judicial qualification criteria until he read a law review article on the topic, shortly thereafter he changed his political party affiliation, and eight days later he filed suit claiming that he wanted to run for judicial office.[35] but unlike the fanciful judicial aspirations of the Plaintiff in *Carney*,[36] Plaintiffs' sworn intent to use UberWAV in their city is firmly rooted in reality. All three plaintiffs here have been disabled for years, have been deterred from using Uber's service because it is inaccessible in their city, and desire to use Uber for articulable day-to-day purposes.[37] This is sufficient to establish standing at the summary judgment stage under the Ninth Circuit precedent of *Namisnak*, *Pickern* and *Doran*.

## C. Defendants Cannot Pigeonhole What Relief this Court Enters Through a Standing Argument

In their brief, Uber argues that Plaintiffs "only" desire equivalent service and thus only have standing to seek equivalent service.[38] First, Uber's representation to this Court is wrong. The Plaintiffs did not ever, at any point, say that they would only accept equivalent service.[39] Second,

---

[36] 141 S. Ct. 493, 500 (2020). Indeed, the Supreme Court explained that *Carney* was "a highly fact-specific case." *Id.* at 501.

[36] 141 S. Ct. 493, 500 (2020). Indeed, the Supreme Court explained that *Carney* was "a highly fact-specific case." *Id.* at 501.

[37] To the extent Defendants also rely on *Carney* for its holding that a plaintiff challenging a qualification standard must show that they are able and ready to apply, all three plaintiffs have satisfied this standard as to the Uber app, as all three testified that they have smartphones and credit cards and would download the Uber app and agree to its Terms of Use once Uber begins providing wheelchair-accessible service in their home cities. Ex, PPP, Namisnak Depo. 31, 34; Ex. QQQ (R. Doc. 171-7), Falls Depo 41-42, 49; Ex. RRR (R. Doc. 171-8), Crawford Depo. 16, 43.

[38] R. Doc. 174, Defendants' Summary Judgment Opposition Brief, pp. 11-12.

[39] Ex. QQQ (R. Doc. 171-7), Falls depo., 62:19-63:5 (explaining that he would download the app for UberWAV even if the wait time was longer for disabled people than non-disabled people because "I'm just trying to get where I need to be at." and further explaining that he would prefer this to having to "push down the street and wind up either getting robbed or get hit by a car"); Ex.

and more importantly, it is not the Plaintiffs' job to decide what the law requires. Deciding Uber's legal obligations is this Court's purview. Plaintiffs are "just trying to get where [they] need to be at."[40] For standing purposes, the question is whether Plaintiffs' injuries are redressable by this Court. Plaintiffs' injuries, as alleged in their complaint and explained during their depositions, involve the lack of UberWAV transportation in New Orleans and Jackson. Plaintiffs are confident that this Court can fashion injunctive relief that will redress those injuries.

## III.   PLAINTIFFS HAVE PROVEN THAT DEFENDANTS ARE SUBJECT TO § 12184.

Plaintiffs presented evidence that Uber is a private entity primarily engaged in the business of transporting people and whose operations affect commerce. Uber responds by arguing that its primary business is technology and that whether drivers are an extension of Uber is "genuinely disputed." Uber also argues that Plaintiffs' "stand in the shoes" argument is mistaken.

As a threshold matter, Uber makes a throwaway argument that Plaintiffs briefing only applies to Uber Technologies, Inc., not Raiser, LLC.[41] Throughout their motion for summary judgment, however, Plaintiffs refer to defendants as "Uber" which they define on page one of their motion as "Uber Technologies, Inc. and Raiser, LLC (collectively "Uber")…"[42] All of Plaintiffs briefing and evidence pertains to both defendants.[43]

---

PPP (R. Doc. 171-6), Namisnak depo., 56:25-57:12 (explaining that he is flexible "[a]nd if there's, you know, not as many accessible vehicles out there as there are accessible ones, if my ride takes a few minutes longer, then as a disabled person, that's the kind of thing that I have to deal with. Should I have to? Not necessarily, but I do. And I'm not unreasonable if it's going to take a few minutes longer because there's not quite as many. So it's not about the exact number, it's about the equivalency of service within a roughly similar time that I can reliable get a car and get, you know, from where I am to where I need to be.").; Ex. RRR, Crawford depo, 43:7-12 (explaining that he would use Uber's service if "it were reliable, and mostly equivalent").
[40] Ex. QQQ (R. Doc. 171-7), Falls depo., 62:19-63:5.
[41] R. Doc. 174, Defendants' Summary Judgment Opposition Brief, pp. 29-30.
[42] R. Doc. 148, Plaintiffs' Motion for Summary Judgment, p. 1.
[43] See, e.g., *Namisnak*, Dkt. No. 17-6124, R. Doc. 140-3 at pp. 2 and 4 (Notice of 30(b)(6) deposition that covered both Uber Technologies, Inc. and Raiser, LLC).

9

### A.   Uber is Primarily Engaged in the Business of Transporting People.

In their motion for summary judgment, Plaintiffs presented evidence that Uber exerts broad and sweeping control over the transportation that its drivers provide—everything from ███████ ████████████████████████████████████████████████. In response, Uber claims that its primary business is "technology" and it points to a disclaimer.[44] Uber's insertion of a disclaimer does not change the actual facts. The evidence shows that Uber (1) has held itself out as providing transportation and (2) provides transportation.

Uber argues that its contract with drivers says that drivers can decide "when, where, and whether" to accept, decline, ignore, or cancel a ride request.[45] First, this is incorrect. As Plaintiffs established, ██████████████████████████████████████[46] Second, for Defendants to control their drivers, Uber need not dictate every term. The term "control" suggests that the controlling entity is exercising some level of restraining or directing influence.[47] That the "controlled individual" retains some decision-making abilities █████████████████does not mean that the individual is not subject to control. Uber controls its drivers because it exerts influence over their conduct and functioning. Uber need not "fully control and micro-manage" its drivers in order to be primarily engaged in the business of transporting people.

Ultimately, Uber makes no attempt to show that it is "just an app." Uber presents no evidence that it is an intermediary akin to Craigslist where individuals can make posts concerning

---

[44] R. Doc. 174, Defendants' Summary Judgment Opposition Brief, p. 30.
[45] *Id*. at p. 32.
[46] R. Doc. 148, Plaintiffs' Motion for Summary Judgment, pp. 19-20 ████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████.
[47] "Control." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/control. Accessed 4 Jun. 2021.

a service without being involved in the underlying transaction. The reality is that Uber fundamentally controls every step of the underlying transportation transactions.

In this regard, Uber claims that its "community guidelines" do not evidence control because these rules exist so that riders and drivers have "a safe and positive experience."[48] But Uber proves Plaintiffs' point. Uber wants to ensure that riders have a "safe and positive experience" and, to achieve that desired outcome, Uber has voluminous rules and enforces those rules through driver screening, feedback monitoring, minimum ratings requirements, and even deactivation. Setting a desired outcome, setting rules, and enforcing those rules to obtain the desired outcome is in all ways indicative of control.

Plaintiffs proved that Uber deploys personnel to airports and decides which cities will have specific Uber services. Uber responds that these facts are not indicative of "control" over drivers.[49] But this Court did not say that control of drivers was the <u>only</u> fact to be assessed to determine whether Uber is "primarily engaged in the business of transporting people." For example, in *Namisnak* this Court held that what Uber advertises itself as providing is relevant.[50] What steps Uber is taking in the physical world that are akin to that of a taxi company are highly germane and material.

Here, Plaintiffs have established that Uber controls not only its drivers, but an overall transportation network. Uber deploying personnel to assist riders at airport queues is closely akin to a taxi company. Likewise, Uber aiding its drivers with obtaining new vehicles is indicative of a company operating a transportation service. Uber contends that its pricing of rides is irrelevant, but Uber's control over pricing further evidences that Uber is engaged in the provision of transportation. Uber further controls the price of rides its drivers provide. ████████████

---

[48] R. Doc. 174, Defendants' Summary Judgment Opposition Brief, p. 34.
[49] *Id.* at p. 34.
[50] *Namisnak v. Uber*, 17-cv-06124-RS, R. Doc. 102 at pg. 7 (N.D. Cal., March 13, 2020).

████████████████████████████████████████████

████████████████████████████  That Uber is "primarily engaged in the business of transporting people" is evidenced by the fact that Uber sets the price of rides.

Uber's CEO correctly stated that "[t]he unique aspect of Uber is that **we exist in the physical world.**"[51] At its core, Uber is a massive transportation company with a sophisticated hailing function. Uber has failed to demonstrate there is a dispute of material fact as to whether it is primarily engaged in the business of transporting people.

**B.    Plaintiffs' "Stand in the Shoes" Argument Reflects the Law.**

Uber rails against Plaintiffs' "stand in the shoes" argument claiming that Plaintiffs misread the statute, misread the DOJ's statement of interest, and that the DOJ's statement of interest is invalid because "Plaintiffs cite no authority that would merit deference to the *Department of Justice's* interpretation of a regulation promulgated by *the Department of Transportation*."[52] But Plaintiffs' reference to the DOJ's statement of interest merely tracks what the DOJ previously stated as to Uber. In terms of the Court not giving "deference" to the DOJ, Uber seems to forget that the Department of Justice represents the official position of the United States and its "departments and agencies[.]"

Uber's second argument—that Plaintiffs' interpretation is beyond the statute's plain text—fails because the regulation is a reasonable interpretation of the statute. In the construction language of the ADA, Congress specifically provided that "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title."[53] As the Ninth Circuit stated in *Armstrong v. Schwarzenegger*:

---

[51] Ex. EE (R. Doc. 149-4) (Travis Kalanick, *Celebrating Cities: A New Look and Feel for Uber*, Feb. 3, 2016) at 000487.
[52] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 29 (emphasis original).
[53] 42 U.S.C. § 12201.

> The bar in the Title II regulation, 28 C.F.R. § 35.130(b)(1), on discrimination "through contractual, licensing, or other arrangements" is fully consistent with the regulations implementing Section 504: those regulations state, and have stated since their original promulgation in 1978, that a recipient of federal financial assistance may not discriminate "directly or through contractual, licensing, or other arrangements, on the basis of handicap." 28 C.F.R. § 41.51; *see also* 43 Fed.Reg. 2132, 2134 (Jan. 13, 1978); 46 Fed.Reg. 40686 (Aug. 11, 1981).

> 622 F.3d 1058, 1067 (9th Cir. 2010)

This is to say: The Department of Transportation was not exceeding Congressional intent when it implemented 49 C.F.R. § 37.23(d). It was merely following Congressional mandate as set forth in 42 U.S.C. § 12201.

Finally, Uber argues that 49 C.F.R. § 37.23(d) is a "one way street" that only applies to places of public accommodation.[54] But Uber is mistaken. Looking at advisory materials for the regulation, the DOT first provides a general explanation as to § 37.23 that "[t]his section requires private entities to 'stand in the shoes' of public entities with whom they contract to provide transportation services. It ensures that, while a public entity may contract out its service, it may not contract away its ADA responsibilities."[55] The DOT then goes on to explain, as to subpart (d), that "[t]his rule applies the 'stand in the shoes' principle to transactions wholly among private entities as well."[56] Only then does the DOT provide the taxi example cited by Uber with the qualifier "for example" (which Uber omits from its quotation).[57]

The "stand in the shoes doctrine" provides that an entity may contract out its service, but it may not contract away its ADA responsibilities. Plaintiffs' interpretation finds support in the DOJ interpretation and advisory materials. The DOT's interpretation is a valid construction of 42 U.S.C. § 12201. Through the stand in the shoes doctrine, if Uber's drivers are primarily engaged

---

[54] R. Doc. 174, Defendants' Summary Judgment Opposition, pp. 27-29.
[55] 49 C.F.R. Pt. 37, App. D.
[56] *Id.*
[57] *Id.*

in the business of providing transportation, then Uber is primarily engaged in the business of providing transportation.  Summary judgment should issue for Plaintiffs.

## IV.  PLAINTIFFS HAVE PROVEN THEIR EQUIVALENT SERVICE ARGUMENT.

In their motion for summary judgment, Plaintiffs argue that Uber purchased new, inaccessible vans in violation of 42 U.S.C. § 12184(b)(5), triggering the obligation to provide equivalent service. In response, Uber argues that it is not responsible for the actions of its subsidiaries. Uber next argues that "vans" do not encompass "mini vans." Uber follows up by arguing that there is "no evidence" that the vehicles were used to provide "specified public transportation." And finally, Uber argues that the assets of Xchange Leasing and ATG were sold, rendering Plaintiffs' arguments "irrelevant."

### A. Uber is Responsible for the Actions of its Subsidiaries Under the ADA Regulations.

The transportation regulations for the ADA do not permit entities to engage in shell games to avoid liability. The regulations cover the provision of transportation service even when done "under contract or other arrangement[.]"[58] Here, Uber Technologies, Inc. and Raiser, LLC certainly had an "other arrangement" with Xchange Leasing and ATG: Uber was the owner of both entities. ███████████████████████████████████████████

███████████████████████████████████████████[59] And during the

---

[58] 28 C.F.R. §37.23(d) ("A private entity that provides fixed route or demand responsive transportation service under contract or other arrangement (including, but not limited to, a grant, subgrant, or cooperative agreement) with another private entity shall be governed, for purposes of the transportation service involved, by the provisions of this part applicable to the other entity.").
[59] See Ex. UUU (R. Doc. 171-11) (████████████████████████████████████████████
█████████ █████████████████████████); see also, Ex. VVV (R. Doc. 171-12) (█████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████).

14

pendency of this case, Uber provided a corporate designee to offer testimony concerning the operations of Xchange Leasing and Uber's other subsidiaries.[60]

Here, under 28 C.F.R. §37.23(d), Uber is responsible for the actions of its subsidiaries that it has used to effectuate its business model. For example, in *Armstrong v. Schwarzenegger* the Ninth Circuit held that the State of California was responsible for discrimination that occurred in county jails because the contracting "for the provision or occurrence of such services, programs and activities seems sufficient to make them 'the services, programs, or activities' of that entity."[61] Here, far from a mere contractual arrangement, ███████████████████████████████████ ████████████████████████. At a minimum, there was an "other arrangement" between Uber and Xchange Leasing and ATG. The "alter egos" case law presented by Uber is not germane to this action which must be evaluated within the context of the ADA and its regulations.

**B.     There is No "Mini Van" and "Actual Van" Distinction.**

Uber conclusorily states that the new vehicles Xchange Leasing bought and leased were not vans but minivans.[62] It offers no evidence to support this assertion. More importantly, it gives no explanation for why the general term "van," as used in 42 U.S.C. § 12184(b)(5) does not also encompass minivans. To the contrary, the plain meaning of the term "van," and the context of its use within the ADA, support Plaintiffs' position that the ████████████████████████████ █████████████████████████████████████████████████████.

Uber points to two definitions of "van," one in regulations promulgated by the National Highway Transportation Safety Administration and one in regulations promulgated by the Environmental Protection Agency on vehicle emissions. Neither regulatory definition cross-references, or is mentioned in, the ADA or its implementing regulations. Nor do either of the

---

[60] Ex. D (R. Doc. 148-5), Rupp depo., 52:2-25.
[61] 622 F.3d 1058, 1066 (9th Cir. 2010).
[62] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 15.

regulatory definitions offered by Uber provide a contrasting definition of "minivan," the term Uber is seeking to distinguish from the term "van." *See* 49 C.F.R. § 523.2 (noting that the hoods of "vans" are "typically shorter" than those of "pickup trucks and sport utility vehicles" but making no reference to minivans). To the contrary, the plain meaning of "van" as well as the ADA's legislative history and purpose demonstrate that minivans *are* vans.

> 1. The Plain Meaning of "Van," as Supported by Dictionary Definitions, Common Parlance, Judicial Usage, and Other Regulations Encompasses Minivans within the Definition of "Van."

"When a word is not defined by statute, [courts] normally construe it in accord with its ordinary or natural meaning." *Smith v. U.S.*, 508 U.S. 223, 228 (1993); *see also United States v. Torres*, 995 F.3d 695, 703 (9th Cir. 2021) ("Our interpretation of a statute begins with the statutory text, and unless otherwise defined, terms are generally given their ordinary meaning.").

To determine a word's ordinary meaning, courts often begin by consulting dictionaries. *Smith*, 508 U.S. at 228–29; *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005). "Van" is defined as "a multipurpose enclosed motor vehicle having a boxlike shape, rear or side doors, and side panels often with windows." *Merriam-Webster's Collegiate Dictionary* 1382 (11th ed. 2013); *see also Oxford Dictionary of English* 5078 (Angus Stevenson ed., 3d ed. 2010) ("a covered motor vehicle, typically without side windows, used for transporting goods or people").[63] A minivan certainly falls within these definitions. Furthermore, dictionaries classify minivans as a subtype of vans, rather than a distinct type of vehicle. *See, e.g.*, *Merriam-Webster's Collegiate Dictionary*, *supra*, at 971 (defining "minivan" as "a small passenger van").

---

[63] Dictionary definitions of "van" from the time of the ADA's enactment in 1990 are in accord with current definitions, as the term's meaning has not appreciably changed. *See, e.g.*, *New Webster's Dictionary* 476 (1990) (defining van as "a large covered vehicle"); *see also The American Heritage Concise Dictionary* 888 (3d ed. 1994) (defining van as "[a] roomy motor vehicle with rear doors and often side panels").

The usage of "van" in common parlance also sheds light on its intended meaning. News articles from the time of the ADA's enactment used the word "minivan" and "van" interchangeably, *see, e.g.*, Marshall Schuon, *A Multi-Purpose Way to Harmony*, N.Y. Times (Jan. 29, 1989)[64], (describing a particular Mazda vehicle, referring to it as both a "minivan" and "van"), hosts and guests on the popular radio talk show "Car Talk" used the terms interchangeably, *see, e.g.*, *My Mini-van Goes Forward When It Should Go Backwards...*, Car Talk: Dear Car Talk (Jan. 1, 1990)[65], (caller refers to her "Plymouth Voyager mini-van" as "the van," and hosts refer to vehicle as "a van"), and automobile manufacturers marketed minivans as vans, *see, e.g.*, *1990 Dodge Vans Commercial*, YouTube (Mar. 23, 2013)[66], (1990 television advertisement proclaiming "your Dodge dealer still has great deals on loads of vans, like Dodge Caravan, still the best-selling minivan around"). In 1990, as is true today, the ordinary meaning of "van" included "minivan," and often, "minivan" was treated as synonymous with "van."

Evidence of the term's usage in judicial opinions further supports this conclusion. The word "van" is used interchangeably with "minivan" by the courts, indicating that a minivan is considered a van. *See, e.g.*, *U.S. v. Arvizu*, 534 U.S. 266, 271–72 (2002) (referring to a vehicle as "the minivan" as well as "the van"); *Wilkinson v. Torres*, 610 F.3D 546, 552 (9th Cir. 2010) (calling a vehicle "the minivan" and "the van" in subsequent sentences); *U.S. v. Olafson*, 203 F.3d 560, 565 (9th Cir. 2000) (using "minivan" and "van" in the same sentence to refer to the same vehicle).

Defendants' reliance on definitions of "van" provided in a few federal regulations is unpersuasive for two reasons. First, it is not in accord with general principles of statutory interpretation. Not only may a given term in the same statute have different meanings,

---

[64] https://timesmachine.nytimes.com/timesmachine/1989/01/29/148789.html?pageNumber=355.
[65] https://www.cartalk.com/content/my-mini-van-goes-forward-when-it-should-go-backwards.
[66] https://www.youtube.com/watch?v=XPQ5WDy-7oc.

*Environmental Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007), but this is particularly true when the term is found across *different* statutes, as "[w]e do not presume that when Congress legislates it has firmly in mind every term of every pre-existing statute," *Agredano v. Mutual of Omaha Companies*, 75 F.3d 541, 544 (9th Cir. 1996); *see also Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975, 984 n.9 (9th Cir. 2016) (emphasizing that context matters when considering the same word used in different statutes). Here, Uber relies on definitions of "van" found in regulations promulgated by the National Highway Traffic Safety Administration and Environmental Protection Agency. 49 C.F.R. § 523.2; 23 C.F.R. § 1340.3; 40 C.F.R. § 86.1803-01. Given the vastly different contexts of these laws, as well as the different times of enactment, any slight presumption of consistent usage across the entire code must yield.

Second, Uber cherry-picks its definitions from certain regulations while ignoring others. For example, Uber relies on one of the EPA's definitions of "van" from 40 C.F.R. § 86.1803-01 to say that minivans fall outside of the scope[67]. But other definitions provided by the EPA demonstrate definitively that a minivan *is* a van.[68] Not only does such definition of "minivan" utilize the same language as the definition of "van," but it even includes mention of the same number of passengers (eight or fewer) as does 42 U.S.C. § 12184(b)(5) when referring to vans. A plain-meaning analysis reveals that Defendants' assertion is without merit.

---

[67] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 15.
[68] *See* 40 C.F.R. § 600.002 ("Minivan means a light truck which is designed primarily to carry no more than eight passengers, having an integral enclosure fully enclosing the driver, passenger, and load-carrying compartments, and rear seats readily removed, folded, stowed, or pivoted to facilitate cargo carrying. A minivan typically includes one or more sliding doors and a rear liftgate. Minivans typically have less total interior volume or overall height than full sized vans and are commonly advertised and marketed as 'minivans.'").

2.   The ADA's Legislative History and Purpose Confirm that Minivans are Vans.

Context assists in understanding a term's meaning. *United States v. Pacheco*, 977 F.3d 764, 768 (9th Cir. 2020), citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Here, both legislative history and the overarching purpose of the ADA confirm that minivans are vans.

Legislative history demonstrates Congress' intent to include minivans within the scope of § 12184(b)(5). *See Civil Beat Law Center for the Public Interest, Inc. v. Centers for Disease Control & Prevention*, 929 F.3d 1079, 1088 (9th Cir., 2019) (stating that legislative history can "reinforce[]" the court's understanding of a term). First, the House Report accompanying the ADA refers specifically to the provision at issue, and then states:

> Under this subsection, minivans are treated the same whether they are operated in a fixed route system or a demand responsive system. Owning, or having access to, an accessible minivan or a portable boarding assistance device which can be used in concert with an otherwise inaccessible minivan that will meet the needs of disabled passengers on an on-call basis is required under this subsection.

H.R. Rep. 101-485(I), at 40. It is clear that those drafting the ADA understood vans to include minivans. Second, and more generally, the record reflects a strong desire to ensure accessible transportation, stating that "[t]ransportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. 101-485(II), at 37.

The ADA's purpose underscores the conclusion that minivans are vans. First, it narrows the scope of possible understandings of the word "van." Defendants would have the Court understand "van" as a vehicle with certain dimensions that is meant for carrying cargo or performing work.[69] But in the context of prohibiting discrimination in "specified public transportation services," Congress was undoubtedly referring to vans that transport people. 42 U.S.C. § 12184(a). The provision at issue specifically refers to vans that transport eight passengers

---

[69] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 15.

or less. *Id.* § 12184(b)(5). To exclude minivans, a type of van that transports relatively few passengers, would undermine Congress' objective.

Second, the ADA must be read broadly to effectuate its aims. The ADA's purpose is to guarantee a "broad scope of protection" to those with disabilities. ADA Amendments Act of 2008, Pub. L. 110-325, § 2(b)(1), 122 Stat. 3554. The 9th Circuit "construe[s] the language of the ADA broadly to advance its remedial purpose." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014). Defendants ask this Court to construe the term "van" narrowly, in contravention of plain meaning, legislative history, the ADA's purpose, and circuit precedent. Such a construction would belie the ADA and deny people with disabilities their rights. But only one understanding comports with plain meaning and common sense: that minivans are vans. More to the point, whatever these vehicles are called, the category enumerated by § 12184(b)(5) unequivocally includes the vehicles purchased by Uber partner Xchange Leasing for use by Uber drivers, triggering Uber's obligation to provide equivalent service under the ADA.

### C. Plaintiffs Offered Evidence that the Vans Were Used in Providing Transportation.

Uber claims that there is "no evidence" that the vehicles were used to provide "specified public transportation." But in their moving papers, Plaintiffs pointed out that ██████████ ████████████████████████████████████████████████████[70] Uber advises that individuals who don't have a vehicle "can get a car from one of our vehicle partners or from a fleet partner in select markets."[71]

Plaintiffs presented evidence that ██████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

---

[70] R. Doc. 148, Plaintiffs' Motion for Summary Judgment, p. 22 (citing Ex. D at 76:23-77:4).
[71] Ex. D (R. Doc. 148-5) at 95:18-25.

20

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████. Uber offers nothing to contradict this.

**D.    Once the Equivalent Service Requirement is Triggered, the Obligation is Ongoing.**

Uber's final argument in regard to equivalent service is that the assets of Xchange Leasing and ATG were sold during the pendency of this lawsuit, rendering Plaintiffs' arguments "irrelevant." However, as was explained in *LA All. for Hum. Rts. v. City of Los Angeles*:

> after a court identifies a right and a corresponding violation, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "In fashioning and effectuating the decrees, the courts will be guided by equitable principles." *Brown v. Bd. of Educ. of Topeka, Kans.*, 349 U.S. 294, 300 (1955). "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id.*[72]

While Uber ████████████████████████████████████████████, the underlying violation has already occurred – and Uber's past activities show what is possible for the company to achieve. This Court can draw upon the breadth and flexibility that are inherent in equitable remedies to fashion an appropriate injunctive relief order that will remediate Uber's past violation of the equivalent service requirement. Indeed, Plaintiffs' need for a remedy is just as acute as ever. Therefore, far from being "irrelevant," Uber's recent violation of federal civil rights law is highly germane.

---

[72] No. LACV2002291DOCKESX, 2021 WL 1546235, at *55 (C.D. Cal. Apr. 20, 2021).

**V.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE DEFENDANTS FAILED TO ESTABLISH THAT A "REASONABLE MODIFICATION" IS NOT POSSIBLE.**

The crux of Uber's arguments concerning Plaintiffs' reasonable modification claim pertains to costs. Uber dismisses its own assessments that UberWAV could be fully funded and, without actual evidence, states that adding an ██████████ might cause Uber's total sales to decrease. Uber simply ignores Plaintiffs' evidence that UberWAV confers other substantial ████████████████████████████████████████████████████████████ ██████████████████████████████ ████████████████████████████████ ██████████████████████████ ███████████████████████████████ ████████████████████████████████████████████████[75] In reality, there is no material dispute that the provision of UberWAV would be a reasonable modification.

**A. Uber Could Reasonably Provide UberWAV Through a ██████████████████**

In their summary judgment opposition, Uber claims that Plaintiffs have not demonstrated that "it would even be possible" for Defendants to partner with ████████████t. Uber further postulates that the cost of providing UberWAV through a partnership with ████████ is so high that it is not a reasonable modification. Finally, Uber argues that the imposition ████ ██████████████████████████████ ████████████████ ██████████████ ██████████████ would "risk decreasing Uber's revenue from the service fees it collects on completed rides."[76]

1.    <u>The Evidence Demonstrates that MV Transit Was Willing to Operate in New Orleans</u>.

Defendants state that MV Transit does not operate in New Orleans and, thus, argue that Plaintiffs have failed to prove that "it would even be possible" for Uber to partner with MV Transit

---

[73] *See id*. at 00014328.
[74] *See* Ex. VV (R. Doc. 149-22), at 00014326.
[75] See Ex. VV (R. Doc. 149-22), at 00014326.
[76] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 24.

in New Orleans. But as Plaintiffs pointed out in their moving papers, ███████████

███████████████[77]████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

   2.   <u>UberWAV Would Not be Too Costly for Uber on an Overall Basis.</u>

   Uber claims that in 2019, ████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████.[81] And considering that prior to the pandemic, Uber was providing "16 million trips a day,"[82] ███████████████████████████████████████.

   Furthermore, Uber says nothing about ████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[77] R. Doc. 148, Plaintiffs' Motion for Summary Judgment, p. 35.
[78] Ex. S. (R. Doc. 148-20), Patel depo., 159:9-25.
[79] *Id.* at 158:17-159:8.
[80] R. Doc. 156, Defendants' Motion for Summary Judgment, p. 26.
[81] ████████████████████████████████████████████████
[82] Uber.com, "A look back at 2020," available online at www.uber.com/newsroom/a-look-back-at-2020/



██████████████████████████████████████████████ Uber says

that a "price increase would risk decreasing demand[.]"[90] But Uber offers no tangible evidence

that such a risk actually exists or by what percentage its demand would be "decreased." ██ ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ultimately, however, Uber offers no economic reports; no studies; no affidavits. There is no

material dispute of fact: ████████████████████████████

███████████████████████████ But that occurrence

appears to be a consequence of Uber's decision to prioritize growth over revenue. There is no

provision in the ADA that says that o ██████████████ are obligated to accommodate

individuals with disabilities.

    3.  <u>UberWAV is Not Too Costly on an Individual Basis</u>.

      Uber also argues that the individual cost-per-WAV trip is not reasonable. But the evidence

cuts against Uber here as well. As a threshold matter, Uber's use of data from 2020 is highly flawed

because of the outsized impact of COVID-19—a unique, once-in-a-century occurrence. Uber

stated in its 2020 annual report that COVID-19 and attendant government orders, restrictions on

travel, etc. "have, and may continue to have, an adverse impact on our business and operations,

including, for example, reducing the demand for our Mobility offerings globally, and affecting

travel behavior and demand."[93] Additionally, Uber "announced and implemented several COVID-

related initiatives during the first quarter of 2020, including a financial assistance program for

Drivers, as well as a commitment to provide 10 million free rides and food deliveries to healthcare

---

[90] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 24.
[91] *Id*., at p. 24.
[92] R. Doc. 174, Defendants' Summary Judgment Opposition, pp. 23-24.
[93] Ex. WWW, Uber 2020 Report, Uber00019894.

██

workers, seniors, and others in need."[94] In late 2020, Uber committed to providing another 10 million free rides to get individuals to vaccination sites.[95] That is to say: In 2020, Uber's revenues plummeted because of reduced demand and Uber's costs increased because it was giving tens of millions of rides away for free. The restrictions in place because of COVID-19 are easing and the pandemic is coming to an end.[96] On May 5, 2021 Uber's CEO advised that Uber has "begun to fire on all cylinders."[97] Thus, the reasonableness of Plaintiffs' requested modification—which was requested in 2018, not 2020— should be judged based on pre-COVID data, not data pulled from a once-in-a-century pandemic. I █████████████████████████████████████████

████████████████████████████████████████████████████████████[98]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████ ████████████████████████████████ █████████████████████

███████████████████████████████████████ UberWAV is a reasonable modification.

Uber refers to *Indep. Living Res. Ctr. v. Lyft, Inc*, but Plaintiffs' facts are critically different from the facts of *Independent Living*: (1) there is no indication that Lyft determined that an

---

[94] *Id*. at Uber00019894-95.

[95] See also, Ex. YYY (10 million free rides for vaccination effort).

[96] See Centers for Disease Control and Prevention, "Guidance for Fully Vaccinated People," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (updates as of May 13, 2021 stating "that fully vaccinated people no longer need to wear a mask or physically distance in any setting, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance") (last accessed 2021/5/18).

[97] Ex. AAAA, (statement of Dara Khosrowshahi, Chief Executive Officer, during Uber's Q1 2021 earning call on May 05, 2021).

[98] R. Doc. 156, Defendants' Motion for Summary Judgment, p. 27.

[99] See Ex. F (R. Doc. 148-7) at 6958, 6962, and 6963 (among other metrics, finding that in Philadelphia the average time to reserve service for UberWAV was 8 minutes vs. 10.6 minutes for taxis; UberWAV outperforms on safe driving; UberWAV outperforms on vehicle quality).

[100] *See* H (R. Doc. 148-9) (Jan 2020 Uber Accessibility Review) at 00012523 (Uber concluding that it had "[d]eveloped a standardized approach to our fleet partnerships to optimize drivers performance and scale our ability to manage fleets[.]").

26

███████████████████████████; (2) there is no indication that Lyft identified that ████████████████████████████████████████████ ██████████████████████████████████████████████; and (3) the high marginal cost per ride in the *Independent Living* case was pre-COVID, but Uber's h████████████████████████ ██████████████████████████████████████████████. In the instant action, Plaintiffs have set forth a robust and favorable factual record establishing that UberWAV is highly effective and is a reasonable modification.

**B.    Uber Could Also Reinstate its ███████████████**

Uber claims that it cannot be "compelled" to enter i████████████████████.[101] As is set forth in their opening brief, however, ████████████████████████████████████ ████████████████████████. U████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████ Uber only has to comply with the ADA and make sure its services are available to persons with disabilities – however it chooses to do so.

**VI.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE DEFENDANTS SCREEN OUT WAVs.**

Plaintiffs' motion for summary judgment shows that Uber explicitly prohibits WAVs from operating in New Orleans and Jackson. Defendants argue that Plaintiffs "failed to plead this theory in any of their five complaints—none of which cites Section 12184(b)(1)…"[102] But Plaintiffs explicitly plead that Defendants were screening out WAV vehicles in their amended complaint, alleging "when a driver with a wheelchair-accessible vehicle in a city without UberWAV contacts

---

[101] *Id.* at pp. 19-20.
[102] *Id.* at p. 25.

Uber, they are told that they cannot participate in UberWAV."[103] Clearly, Plaintiffs alleged that Uber was not permitting WAVs to operate as part of its transportation system in New Orleans.

In discovery, Plaintiffs have proven that Uber has vehicle restrictions which bar most WAVs. This aligns with the allegation in the amended complaint that individuals with WAVs in New Orleans and Jackson "cannot participate in UberWAV." No doubt, Plaintiffs did not cite Section 12184(b)(1) in their amended complaint. But the law does not require Plaintiffs to allege legal theories in the complaint.[104] Moreover, courts will allow adjustments to pled theories based on facts obtained during discovery.[105] Here, Plaintiffs' argument that Uber has vehicle requirements that prohibit drivers with WAV from serving as drivers is "not [an] entirely different theory of liability" from the allegation in the second amended complaint that Uber tells drivers with WAVs that they cannot participate in UberWAV, and put Uber on notice.[106]

Uber also argues that Plaintiffs do not have standing to challenge a violation of 42 U.S.C. § 12184(b)(1) because the criteria are directed at drivers, not riders.[107] But the result of Uber's criteria is that individuals with disabilities are predictably excluded. The ADA does not provide a limitation on who the eligibility criteria is directed towards; it broadly prohibits the imposition of

---

[103] See, e.g., *Namisnak*, Case No. 17-6124, R. Doc. 86, ¶ 103.

[104] *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12, 135 S. Ct. 346, 347, 190 L. Ed. 2d 309 (2014)(reversing summary judgment ruling for city where plaintiff did not expressly invoke § 1983 and explaining that "[h]aving informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim.").

[105] *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1114 & n.57 (C.D. Cal. 2007) ("Unlike *Coleman*, Medina's allegations do not involve an entirely different theory of liability, nor do they require the development of different defenses. Medina's assertion that Pontacq removed her name from the list of attendees at a conference where she might have developed sales opportunities, merely lends factual support to her theory that defendants progressively denied her opportunities to perform, and ultimately forced her resignation.").

[106] *Id.* In *Coleman v. Quaker Oats Co.*, the court noted that "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiffs allegations." 232 F.3d 1271, 1292 (9th Cir.2000).

[107] *See* R. Doc. 174, Defendants' Summary Judgment Opposition, p. 26.

28

"eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities…"[108] It matter naught whom the criteria is directed—driver, rider, or someone else entirely—if the effect is that individuals with disabilities tend to be excluded.

Uber further argues that its policy does not result in exclusion because Uber "does not regard" minivans as "actual vans."[109] But Uber's website, without delineation or clarification, clearly states that "vans" are not acceptable vehicles.[110] Uber does not explain how members of the general public would intuitively know that Uber has an unpublished, internal distinction between "mini vans" and "actual vans." Moreover, Uber does not dispute that it prohibits "actual 'vans' and vehicles with after-market seating modifications[.]"[111]

Finally, Uber claims that its prohibition against "actual 'vans'" and aftermarket modifications exist "to ensure the safety of riders[.]"[112] Uber offers no explanation as to what purported "safety" concerns exists or why a safety inspection of modified vehicles could be insufficient (all Uber vehicles in New Orleans are already subject to a safety inspection). Uber's generalized reference to unidentified and unspecified "safety concerns" is wholly insufficient under the text of the regulation.[113]

## VII.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment should be granted.

---

[108] 28 C.F.R. § 36.301 (a).
[109] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 26-27.
[110] *See* Ex. FFF (R. Doc. 150-5) and Ex. GGG (R. Doc. 150-6)
[111] R. Doc. 174, Defendants' Summary Judgment Opposition, p. 27.
[112] *Id*. at p. 27.
[113] See 28 C.F.R. § 36.301(b) ("A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.").

29

By Plaintiffs, by and through their counsel,

/s/ *William Most*                          /s/ *Garret S. DeReus*
William Most (CA # 279100)          Bizer & DeReus, LLC
AQUA TERRA AERIS LAW GROUP   Garret S. DeReus (LA # 35105)*
4030 Martin Luther King Jr. Way   gdereus@bizerlaw.com
Oakland, CA 94609                       Andrew D. Bizer (LA # 30396)*
williammost@gmail.com               andrew@bizerlaw.com
(504) 509-5023                            *Admission *pro hac vice*

Karla Gilbride (CA # 264118)        3319 St. Claude Ave.
PUBLIC JUSTICE, P.C.                  New Orleans, LA 70117
1620 L St. NW, Ste. 630               T: 504-619-9999; F: 504-948-9996
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

## VIII.    CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2021, a copy of the foregoing was filed electronically

with the Clerk of Court via the CM/ECF system.  Notice of this filing will be sent to all counsel

of record by operation of the court's electronic filing system.

_____ */s/ William Most* _____
William Most