1   MORGAN, LEWIS & BOCKIUS LLP
    Anne Marie Estevez (*pro hac vice*)
2   600 Brickell Avenue, Suite 1600
    Miami, FL 33131
3   T:  (305) 415-3000
    F:  (305) 415-3001
4   annemarie.estevez@morganlewis.com

5   Stephanie Schuster (*pro hac vice*)
    Patrick A. Harvey (*pro hac vice*)
6   1111 Pennsylvania Avenue NW
    Washington, DC 20004
7   T: (202) 739-3000
    F: (202) 739-3001
8   stephanie.schuster@morganlewis.com
    patrick.harvey@morganlewis.com
9
    Kathy H. Gao (CA Bar No. 259019)
10  300 South Grand Avenue, 22nd Floor
    Los Angeles, CA 90071
11  T:  (213) 612-2500
    F:  (213) 612-2501
12  kathy.gao@morganlewis.com

13  *Attorneys for Defendants*

14                  IN THE UNITED STATES DISTRICT COURT
15            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                     SAN FRANCISCO DIVISION
16

17  SCOTT CRAWFORD,                          Case No. 3:17-cv-02664-RS

18              Plaintiff,
                                             **DEFENDANTS' REPLY IN FURTHER**
19        v.                                 **SUPPORT OF THEIR MOTION FOR**
                                             **SUMMARY JUDGMENT**
20  UBER TECHNOLOGIES, INC. and
    RASIER, LLC,                             Hearing Date: July 15, 2021, 1:30 p.m.
21                                           Judge: Hon. Richard Seeborg
                Defendants.                  Via Zoom
22
    STEPHAN NAMISNAK and FRANCIS
23  FALLS,                                   Case No. 3:17-cv-06124-RS

24              Plaintiffs,
                                             **DEFENDANTS' REPLY IN FURTHER**
25        v.                                 **SUPPORT OF THEIR MOTION FOR**
                                             **SUMMARY JUDGMENT**
26  UBER TECHNOLOGIES, INC. and
    RASIER, LLC,                             Hearing Date: July 15, 2021, 1:30 p.m.
27                                           Judge: Hon. Richard Seeborg
                Defendants.                  Via Zoom
28

## TABLE OF CONTENTS

ARGUMENT .................................................................................................................. 1

   I.    Plaintiffs Fail To Carry Their Burdon To Prove Standing. ............................ 1

   II.   Section 12184 Does Not Require Defendants To Provide "Equivalent Service" Or Any Measure Of WAV Service ............................................................. 7

      A.   Plaintiffs' Claim To "Equivalent Service" Or Any Other Relief Under Section 12184(b)(3) And (b)(5) Is Frivolous ......................................... 7

      B.   A Claim For WAV Service, Even Less-Than-Equivalent Service, Is Not Cognizable Under Section 12184(b)(2) As A Matter Of Law ........................... 10

      C.   Plaintiffs' Demanded Outcomes Are Not Requests For "Modifications" To Any "Policy, Practice, Or Procedure" .................................................... 12

   III.  Plaintiffs' "Reasonable Modification" Theory Fails Because Plaintiffs Abandon The Modifications They Requested ................................................................. 13

   IV.  Plaintiffs' Argument For A WAV Button Plus Some Unspecified Guarantee Is Unreasonable As A Matter Of Law ................................................................. 15

      A.   Requiring Defendants To Raise Prices Is Unreasonable ...................................... 15

      B.   Plaintiffs Fail To Demonstrate A Genuine Dispute Of Fact About The Disproportionate Amount Defendants Lose On Each WAV Trip ..................... 16

      C.   Plaintiffs' Speculation About Other Techniques To Support A WAV Marketplace Cannot Defeat Summary Judgment .................................. 19

          1.   No reasonable factfinder could conclude it is reasonable to compel Defendants to partner with a leasing or rental company .............................. 19

          2.   No reasonable factfinder could conclude it is reasonable to compel Defendants to partner with MV Transportation ............................................ 20

          3.   No reasonable factfinder could conclude it is reasonable to compel Defendants to compel Defendants to turn on WAV and offer incentives ..... 20

          4.   No reasonable factfinder could conclude it is reasonable to compel Defendants to offer a "dispatch" service ....................................................... 21

          5.   No reasonable factfinder could conclude it is reasonable to compel Defendants to deploy a "combination of methodologies" ............................ 22

   V.   Plaintiffs' Other Attempts To Avoid Summary Judgment Lack Merit ...................... 22

CONCLUSION .................................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**

*Adler v. Berg Harmon Assocs.*,
    892 F. Supp. 98 (S.D.N.Y. 1995)................................................................ 17

*Bailey v. Bd. of Comm'rs*,
    484 F. Supp. 3d 346 (E.D. La. 2020) ........................................... 13, 14, 15

*Bullard v. Wastequip Mfg. Co.*,
    2015 WL 12766467 (C.D. Cal. 2015) .............................................. 14

*Carney v. Adams*,
    141 S. Ct. 493 (2020) ..................................................................... 2

*City of Los Angeles v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) ........................................................ 10

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) ...................................................... 14

*District of Columbia v. Murphy*,
    314 U.S. 441 (1941) ....................................................................... 1

*Doran v. 7-Eleven, Inc.*,
    524 F.3d 1034 (9th Cir. 2008) ........................................................ 2

*Indep. Living Res. Ctr. v. Lyft, Inc.*,
    2020 WL 6462390 (N.D. Cal. 2020) .................................... 16, 18, 22

*Karczewski v. DCH Mission Valley LLC*,
    862 F.3d 1006 (9th Cir. 2017) ................................................. 12, 13

*Namisnak v. Uber Techs., Inc.*,
    971 F.3d 1088 (9th Cir. 2020) .................................................... 3, 4

*Pickern v. Holiday Quality Foods Inc.*,
    293 F.3d 1133 (9th Cir. 2002) ........................................................ 2

*RadLAX Gateway Hotel v. Amalgamated Bank*,
    566 U.S. 639 (2012) ....................................................................... 11

*Rai v. Santa Clara Vall. Transp. Auth.*,
    308 F.R.D. 245 (N.D. Cal. 2015) .................................................... 22

*Ramirez v. Ghilotti Bros.*,
    941 F. Supp. 2d 1197 (N.D. Cal. 2013) ........................................... 8

*Sandison v. Mich. High Sch. Athletic Ass'n*,
    64 F.3d 1026 (6th Cir. 1995)..................................................................................... 12

*Scott v. Harris*,
    550 U.S. 372 (2007) ....................................................................................................... 1

*Snapp v. United Transp. Union*,
    889 F.3d 1088 (9th Cir. 2018)..................................................................................... 23

*United States v. Esquivel*,
    88 F.3d 722 (9th Cir. 1996).......................................................................................... 19

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ..................................................................................................... 5

*Vande Zande v. Wis. Dep't of Admin*,
    44 F.3d 538 (7th Cir. 1995)................................................................................... 16, 22

**Statutes**

42 U.S.C. § 12182(b)(2)(B) ............................................................................................. 9

42 U.S.C. § 12182(b)(2)(C) ............................................................................................. 9

42 U.S.C. § 12184 ........................................................................................................... 9

42 U.S.C. § 12184(b)(3)................................................................................................... 8

42 U.S.C. § 12184(b)(5)................................................................................................... 8

**Other Authorities**

49 C.F.R. § 37.23(d) ........................................................................................................ 9

49 C.F.R. § 37.29(b) ...................................................................................................... 11

49 C.F.R. § Pt. 37, App. D ............................................................................................. 11

Chi. Muni. § Code 9-115-040(d) ................................................................................... 18

Fed. R. Civ. P. 54(b) ...................................................................................................... 10

Fed. R. Civ. P. 65(d)(1).................................................................................................. 12

Phoenix Muni. Code § 4-68.B-7 .................................................................................... 19

*Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01 (Sept. 6, 1991).............. 9, 11

### ARGUMENT

## I.   PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO PROVE STANDING.

Plaintiffs' standing fails for lack of both injury-in-fact and redressability.  As explained in greater detail below, Plaintiffs' standing fails for lack of injury-in-fact because Plaintiffs' professed intent to use the Uber Rider App in the future stands alone, contrary to all the evidence.  It fails for lack of redressability because Plaintiffs do not offer any evidence from which a reasonable factfinder could conclude that the steps Plaintiffs demand of Defendants would result in the level of service Plaintiffs say is necessary for them actually use the Uber Rider App—be it the "equivalent service" they claimed to want in their deposition or the similarly vague "reliable" and "accessible" levels of service they refer to in their briefing.

Regarding injury-in-fact, Plaintiffs wrongly insist that they need nothing more than their testimony that they would use the Uber Rider App to satisfy their burden at summary judgment. PSJ Opp'n 6–7.[1] Plaintiffs' claims of future intent are contrary to all the evidence, like Crawford and Namisnak's failure to use—*or even consider using*—the Uber Rider App when they could do so to request WAV rides, each Plaintiff's demonstrated lack of interest in for-hire transportation, and Plaintiffs' failures to even look up basic information about the Uber Rider App (like how much it costs).  *See* DSJ Br. 6–9; DSJ Opp'n 9–11.  None of this matters at summary judgment because, according to Plaintiffs, the veracity of their asserted intent to use the Uber Rider App cannot be questioned.  PSJ Opp'n 8.  Plaintiffs misunderstand the summary judgment standard.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A plaintiff's professed intent to undertake some action in the future is no less subject to the "no reasonable jury could believe it" rule.  *See, e.g.*, *District of Columbia v. Murphy*, 314 U.S.

---

[1]      In this brief (i) Defendants' motion for summary judgment is cited as "DSJ Br. __"; (ii) exhibits filed in support of Defendants' motion are cited as "DSJ Ex. __"; (iii) Plaintiffs' opposition to Defendants' motion is cited as "PSJ Opp'n __"; (iii) exhibits filed with Plaintiffs' opposition are cited as "PSJ Opp'n Ex. __"; (iv) Plaintiffs' motion for summary judgment is cited as "PSJ Br. __"; (v) exhibits filed with Plaintiffs' motion are cited as "PSJ Ex. __"; (vi) Defendants' opposition to Plaintiffs' motion is cited as "DSJ Opp'n __"; and (vii) exhibits filed in support of Defendants' opposition are cited as "DSJ Opp'n Ex. __."

441, 456 (1941) ("One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts.").  And as Defendants explained, the Supreme Court's decision in *Carney v. Adams*, 141 S. Ct. 493 (2020), shows that Plaintiffs' testimony regarding their intent to use the Uber Rider App is insufficient to demonstrate standing at summary judgment.  DSJ Br. 6–9; DSJ Opp'n 10–13.

Plaintiffs claim that *Carney* is "not comparable" to these cases because they "have been disabled for years, have been deterred from using Uber's service because it is inaccessible in their city, desire to use Uber for articulable day-to-day purposes," PSJ Opp'n 12, like "going to the grocery store, outings with friends, errands, etc.," *id.* at 6.  These are not distinctions.  For how long Plaintiffs have had disabilities says nothing about whether their professed intent to use the Uber Rider App is concrete.  And it is irrelevant that Plaintiffs *claim* they are deterred from using, but would use, the Uber Rider App for "articulable" purpose where the evidence shows otherwise.

Crawford and Namisnak failed to use the Uber Rider App on multiple occasions when doing so was not futile, including in circumstances when rides requested through the Uber Rider App would have been less expensive and more convenient.  DSJ Br. 6–8; *Carney*, 141 S. Ct. at 500. Crawford has confessed that he "prefers public transportation" and taxis over other options, like ridesharing, and he has demonstrated that preference.  DSJ Br. 8; *compare Carney*, 141 S. Ct. at 501. Namisnak and Falls share that preference—Falls has *never* used for-hire transportation and Namisnak hasn't done so in New Orleans in over than a decade.  All three Plaintiffs have admitted a lack of basic preparations or investigations concerning the Uber Rider App, including the costs to download and use it. DSJ Br. 8–9; *compare Carney*, 141 S. Ct. at 501. As in *Carney*, Plaintiffs' professed intent to use the Uber Rider App, "without more and against all contrary evidence," is insufficient to carry their burden of demonstrating standing at summary judgment.  *See Carney*, 141 S. Ct. at 501.[2]

---

[2]    Nor is *Carney* inconsistent with Ninth Circuit precedent, as Plaintiffs necessarily contend. *See* PSJ Opp'n 7.  In neither of the cases Plaintiffs cite did the plaintiff's professed intent to visit the public accommodation at issue stand alone and against all contrary evidence.  *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040–41 (9th Cir. 2008) (plaintiff had visited the store "on ten to twenty prior occasions" and even once since filing suit); *Pickern v. Holiday Quality Foods Inc.*,

Plaintiffs attempt to explain away their demonstrated lack of interest in using the Uber Rider App, but none of their explanations is persuasive.  *First*, Namisnak's demonstrated lack of interest in using the Uber Rider App or any other method of obtaining for-hire transportation is not evident merely from the fact that he failed to follow through on a threatened claim against a local taxi company.  *See* PSJ Opp'n 9.  Namisnak also (i) has not used for-hire transportation in New Orleans in more than a decade, DSJ Ex. A at 26:4–11; (ii) has no knowledge of any for-hire transportation providers in New Orleans that offer WAV transportation, *id.* at 26:14–21; (iii) never looked into the cost of downloading the Uber Rider App and did not know that it is free to download, *id.* at 32:18–33:1; and (iv) failed to use the Uber Rider App to request rides in New Orleans when traveling to and from the airport in a manual, folding wheelchair, *id.* at 22:2–3.

On top of all that, Namisnak failed to use the Uber Rider App to request WAV rides in San Francisco, even though he knew the app included a WAV option there and even though he could have used Uber's app to request a WAV ride.  Instead, he took a ride requested using a different ridesharing app and obtained a ride in a standard vehicle, which required his wife to engage in "considerable heroics" to assist him.  *Id.* at 42:10–43:19, 44:4–7; *see* DSJ Ex. B.  As the Ninth Circuit recognized, "evidence that Plaintiffs had the opportunity to use uberWAV in a city where it is offered—such as Chicago—and failed to so … could undermine the futility analysis." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1093 (9th Cir. 2020).  Namisnak fails to acknowledge, much less grapple with, this aspect of the Ninth Circuit's decision.  Instead, Namisnak deflects, arguing that "the travel choices in San Francisco are not reflective of [his] intentions in New Orleans" because he relied on "his wife to make arrangements for transportation" during the San Francisco trip.  PSJ Opp'n 9–10.  That deflection does not work.  Namisnak lamented the "considerable" physical efforts required of his wife to help him into and out of the non-WAV requested using Lyft's app, DSJ Ex. A at 44:4–7, so the fact that he did not even suggest using the Uber Rider App to request a WAV ride instead is indeed "reflective of Mr. Namisnak's

---

293 F.3d 1133, 1138 (9th Cir. 2002) (plaintiff had visited the store in the past and preferred that store over others).  And even if the Supreme Court's decision in *Carney* reflects a more demanding standard than this Court's earlier cases, *Carney* controls.

1  intentions."  Indeed, at no point during his San Francisco trip did Namisnak *so much as consider*

2  using the Uber Rider App.  *Id.* at 45:19–25.

3          *Second*, Crawford insists that his failure to use the Uber Rider App in Washington, D.C.

4  and San Francisco because he generally prefers public transportation and is content to use WAV

5  taxis rather than ridesharing, *see* DSJ Ex. C at 32:7–13, 36:3–12, 37:7–11, does not undermine his

6  standing because accessible public transportation and taxi options are limited in Jackson.  PSJ

7  Opp'n 10.  Crawford misses the point.  His actions in cities where the Uber Rider App includes a

8  WAV request option are indeed relevant to whether he intends to use the Uber Rider App in

9  Jackson, regardless of his complaints about public transportation and taxis in Jackson.  *See*

10  *Namisnak*, 971 F.3d at 1093.  For Crawford not only failed to avail himself, on multiple occasions,

11  of the opportunity to use the Uber Rider App to request WAV rides; he never "really checked"

12  whether the Uber Rider App in Washington, D.C. even includes a WAV option.  DSJ Ex. C 32:7–

13  13.  And despite testifying that he would use the Uber Rider App in D.C. if WAV rides cost less

14  than taxi WAV rides, he never looked into the costs, *id.* at 36:14–20, and thus never learned that

15  WAV rides requested via the Uber Rider App typically cost less than standard D.C. taxi fares.

16  Declaration of Niraj Patel in Support of Defendants' Motion for Summary Judgment ("Patel Decl."

17  ¶ 86.  All of these facts stand contrary to the sole evidence of Crawford's intent to use the Uber

18  Rider App: his say-so.

19          *Finally*, Falls contends that just because he has never used for-hire transportation services,

20  has never investigated for-hire transportation options in New Orleans, and cannot identify a single

21  for-hire WAV transportation option in New Orleans, that doesn't mean he has no interest in

22  ridesharing.  PSJ Opp'n 11.  That is just more of Falls's say-so, which still stands alone, contrary

23  to all the evidence.  In addition to the foregoing, Falls had no idea about whether he could request

24  WAV rides using Lyft, the other major ridesharing company operating in New Orleans; he "never

25  paid it no mind."  DSJ Ex. D at 51:6–10.  And he did not know or ever investigate the costs of

26  downloading and using the Uber Rider App; he "never even got into it."  *Id.* at 45:18–25.[3]

---

27    [3]     Through a supplemental declaration, Falls claims that, since April 2021, he has been able

28  to use a wheelchair, despite having been unable to do so for the past year.  PSJ Opp'n Ex. SSS
    ¶¶ 4–5.  This new testimony renders the question of whether Falls lacks standing for the additional

For all these reasons, all three Plaintiffs fail to demonstrate injury-in-fact and, therefore, lack standing.  But if they have demonstrated injury-in-fact, their standing fails for lack of redressability insofar as Plaintiffs seek anything other than "equivalent service."  The only relief a plaintiff has standing to seek, and which a court has power to grant, is relief that will redress the plaintiff's injury.  *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[N]o federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury.").  Plaintiffs' alleged injury is their supposed deterrence from using the Uber Rider App, so the relief that would redress that injury is relief that would cause Plaintiffs to cease being deterred and download and use the Uber Rider App to request trips.  Stated differently, if a requested component of relief (*e.g.*, "incentives") would not result in the level of service by third parties that Plaintiffs deem sufficient to bring them off the sidelines and make them Uber Rider App users, there is no jurisdiction to grant that relief.

In this regard, all three Plaintiffs testified that it will take "equivalent service" for them download and use the Uber Rider App:

- **Crawford** will not download the Uber Rider App unless and until it "function[s] as well for a wheelchair users as it does for everyone else," DSJ Opp'n Ex. C at 44:2–6, with the same or "close" to the same response times (even if not "spot-on perfect"), *id.* at 45:7–12, with the same hours of operation, *id.* at 45:25–46:2.  Crawford wants equivalent service, and he explains that "equivalent means the same as everyone else." *Id.* at 46:8–9.  The number of WAVs doesn't matter, according to Crawford, so long as there are enough WAVs to provide "wrap-around equivalent service in the [Jackson] metro area," *id.* at 62:16–19, and enable him to get "close to the same response time as everyone else," *id.* at 64:22–65:5; *see also* DSJ Ex. C at 62:12–13; *id.* at 67:22–68:2.

- **Namisnak** is not concerned about the "number of drivers" with WAVs on the road, but with "the level of service at any time when [he] log[s] on."  DSJ Ex. A at 57:25–58:3.  The level of service he wants is "equivalent service to what others have."  DSJ Opp'n

---

reason that he has failed to maintain standing throughout this litigation, as required under Supreme Court precedent, inappropriate for resolution at summary judgment.  Falls's standing nevertheless fails at this stage for the other reasons explained above, below, and in Defendants' other papers.

Ex. E at 48:2–9.  Namisnak "underscore[ed] that what I'm looking for is to get Uber, you know, to be able to, you know, from wherever I am in the New Orleans area, to be able to get on the phone and for something that's similar to what any other Uber customer would enjoy in terms of service and response time, to be able to get a ride." DSJ Ex. A at 56:18–25.  While Namisnak would accept response times for WAV ride requests that are "a few minutes longer," he explains that "it's not about the exact number, it is about the equivalency of the service."  *Id.* at 57:5–12.

- **Falls** seeks to be able to use the Uber Rider App to request WAV rides "24 hours a day, seven days a week," "throughout New Orleans," with "the same wait times as" users without disabilities.  Ex. D at 62:6–18.[4]

In *their brief*, Plaintiffs say Defendants are "wrong" that Plaintiffs will accept nothing short of equivalent service and then resort to undefined metrics, like "accessible" service or "reliable" service without explaining what those buzzwords mean or how these concepts differ from "equivalent service."  *See, e.g.*, PSJ Opp'n 13.  *Plaintiffs' testimonies*, however, speak for themselves.  Plaintiffs do not have standing to seek relief that would not redress their deterrence— *i.e.*, that would not cause them to download the Uber Rider App, create a rider account, and request rides.  And Plaintiffs' *testimonies* establish that only "equivalent service" will do so.

Put a slightly different way, the redressability inquiry at this stage is whether Plaintiffs have produced sufficient evidence from which a reasonable factfinder could conclude that the various actions they demand that Defendants take—like starting a new leasing company, offering Driver incentives, and partnering with a commercial fleet—would result in them being able to obtain WAV

---

[4]    All Plaintiffs agree that the other outcomes they demanded of Defendants—that they simply turn on the WAV option in Jackson and New Orleans and ensure there are up to 60 Drivers with WAVs settling rides on Uber's platform in each city—are not enough to cause them to download and use the Uber Rider App to request rides.  DSJ Ex. A at 53:11–54:11 (Namisnak: "not interested in downloading an app that I can't use"; it would be "a meaningless gesture for an app to offer an option that doesn't work"); *id.* at 57:25–58:3 (Namisnak is not concerned with the "number of drivers" with WAVs but with "the level of service at any time when [he] log[s] on"); DSJ Opp'n Ex. C at 68:5–7 (Crawford: "It would be meaningless to turn on the [WAV] button if by pushing the button, a vehicle didn't come when it was requested."); *id.* at 44:20–45:2 (Crawford: "how many vehicles, that's not—it's—that's not really relevant"); DSJ Ex. D at 59:7–15 (Falls is not interested in Defendants simply adding a WAV button to the Uber Rider App if he is unable to use it to actually obtain WAV rides); *id.* at 57:13–53:18 (Falls is focused on that level of service, not the number of WAV Drivers).

rides "24 hours a day, seven days a week," "throughout New Orleans," and with "the same wait times as" users without disabilities, DSJ Ex. D at 62:6–18 (Falls); "wrap-around equivalent service in the [Jackson] metro area," with "close to the same response time as everyone else," DSJ Opp'n Ex. C at  62:16–19, 64:22–65:5 (Crawford); and "equivalent service to what others have" even if the wait times are "a few minutes longer," DSJ Opp'n Ex. E at 48:2–9; DSJ Ex. A at 57:5–12 (Namisnak).  Defendants' evidence forecloses any possibility of Plaintiffs making that showing. *See* DSJ Br. 10; DSJ Opp'n 11–13

Plaintiffs have zero evidence to the contrary.  Instead, Plaintiffs rest on their supposed expert's assertion that "[a] relationship exists both between nascent demand, suppressed demand and developing supply."  PSJ Opp'n 2 n.2 (quoting PSJ Ex. NN at 11).  Neither Plaintiffs nor their expert endeavor to explain what this seemingly generalized assertion means, much less how it applies to these cases or controverts Defendants' actual evidence based on actual efforts to support WAV marketplaces.  At the very least, that statement does not explain how the steps Plaintiffs demand that Defendants take, if compelled by this Court, would transform Plaintiffs from bystanders to actual Uber Rider App users.  Which is to say, Plaintiffs cannot establish that any of those steps would redress their injuries and, therefore, they cannot establish that they have standing to seek an order compelling them.

## II.    SECTION 12184 DOES NOT REQUIRE DEFENDANTS TO PROVIDE "EQUIVALENT SERVICE" OR ANY MEASURE OF WAV SERVICE.

Plaintiffs insist that Defendants have "triggered" an obligation to provide "equivalent service" under Section 12184 (b)(3) and (b)(5) because a few years ago, a different, affiliated company, Xchange Leasing, LLC,  purchased minivans that it no longer owns.  Plaintiffs also insist that Section 12184(b)(2) may nevertheless require Defendants to provide some measure of WAV service, but not "equivalent service," as a "reasonable modification."  Plaintiffs are wrong on both counts, as explained below.

### A.    Plaintiffs' Claim To "Equivalent Service" Or Any Other Relief Under Section 12184(b)(3) And (b)(5) Is Frivolous.

Section 12184 specifically addresses covered entities' obligations related to the provision of WAV service, and it is not difficult to discern the policy decision Congress made: providing

specified public transportation in used vehicles or even new automobiles is not discrimination, while providing specified public transportation in a new, non-WAV van is. Thus, covered entities that provide transportation at the automobile scale need not obtain WAVs, and covered entities that provide transportation at the van scale must obtain accessible vans or, as an alternative, provide equivalent service. 42 U.S.C. § 12184(b)(3), (b)(5); *see* DSJ Br. 10–17.

Equivalent service is *not*, as Plaintiffs contend, an obligation "triggered" by the purchase or lease of a new, inaccessible van. *See* PSJ Opp'n 16, 24. As Defendants' explained, equivalent service is a potential defense—a contention grounded in the plain language of subsections (b)(3) and (b)(5), applicable regulations, and the way Congress drafted other ADA provisions (in Titles II and III) that *do* trigger WAV service obligations. DSJ Br. 10–12. Plaintiffs do not engage on this issue at all. Having failed to defend their "trigger" theory, Plaintiffs have abandoned it. *See, e.g.*, *Ramirez v. Ghilotti Bros.*, 941 F. Supp. 2d 1197 (N.D. Cal. 2013).

Regardless, Plaintiffs' trigger theory fails on its own terms, for Plaintiffs lack evidence that Defendants ever purchased or leased any new vans, let alone evidence that Defendants use such new vans to provide specified public transportation. Plaintiffs' only "evidence" are supposed "van" purchases by a former Uber subsidiary, Xchange Leasing, LLC—which Plaintiffs improperly attribute to Defendants Uber Technologies and Rasier.[5] *See* PSJ Opp'n 24–25; *and, again id.* at 43–45. As an initial matter, the vehicles Plaintiffs call "vans" are not "vans"; they are minivans. *See* DSJ Opp'n 15. And, as Uber has already explained, this argument fails for at least four additional reasons: (1) as a matter of settled law, the corporate veil cannot be pierced absent the extraordinary show necessary to demonstrate that distinct entities are mere alter egos; (2) Plaintiffs have neither pleaded, proved, nor even argued an alter ego theory; (3) Plaintiffs fail to demonstrate that Xchange Leasing ever used vehicles it purchased to provide specified public transportation; and (4) Xchange Leasing is out of business in any event, so it doesn't matter what vehicles it purchased in the past. DSJ Br. 12–13 & n.5; DSJ Opp'n 14–16.

---

[5]     Plaintiffs also discuss vehicles purchased by another former subsidiary, UATC, LLC (a/k/a ATG), but Plaintiffs do not contend that this entity purchased new vans. *See* PSJ Opp'n 24–25.

1    In their opposition brief, Plaintiffs address only (1), arguing that a DOT regulation,

2    49 C.F.R. § 37.23(d), pierces the corporate veil for them.  PSJ Opp'n 25.  Unsurprisingly, Plaintiffs

3    do not cite any authority adopting their misguided interpretation of that regulation, which states as

4    follows: "A private entity that provides fixed route or demand responsive transportation service

5    under contract or other arrangement (including, but not limited to, a grant, subgrant, or cooperative

6    agreement) with another private entity shall be governed, for purposes of the transportation service

7    involved, by the provisions of this part applicable to the other entity."  47 C.F.R. § 37.23(d).  To

8    Plaintiffs' way of thinking, "Uber Technologies, Inc. and Raiser, LLC certainly had an 'other

9    arrangement' with Xchange Leasing and ATG" simply because "Uber owned both entities."  PSJ

10   Opp'n 25.  That argument is doubly flawed (and it fails to address the four other reasons why

11   Plaintiffs' equivalent service argument lacks merit).

12   *First*, by its terms, the regulation dictates the obligations that apply when one

13   Title-III-covered-entity contracts with another Title-III-covered-entity to provide transportation.

14   Title III imposes different rules for transportation provided by "places of public accommodation"

15   (42 U.S.C. § 12182(b)(2)(B)–(C)) than for transportation provided by entities primarily engaged in

16   the business of transporting people (42 U.S.C. § 12184).  Because "places of public

17   accommodation" that are not "primarily engaged" may contract an entity that is "primarily

18   engaged" to provide transportation services for the "place of public accommodation," DOT

19   promulgated the regulation to make clear that the more stringent rules applicable to a "place of

20   public accommodation" would apply.  *Transp. for Individuals with Disabilities*, 56 Fed. Reg.

21   45584-01, 45737 (Sept. 6, 1991).  The regulation thus has no bearing on the situation here because

22   Plaintiffs have not even suggested that Xchange Leasing was any sort of Title-III-covered-entity in

23   the first instance.  (Nor could they credibly make such a suggestion.  *See* DSJ Opp'n 15–16.)

24   *Second*, the "other arrangement" the regulation is concerned with is one for the

25   "provi[sion of] fixed route or demand responsive transportation service."  47 C.F.R. § 37.23(d).

26   Plaintiffs offer no evidence by which Defendants entered an arrangement to have Xchange Leasing

27   provide transportation services.  Xchange Leasing was a vehicle leasing company.  It never

28

provided transportation services at all, much less under some arrangement with and on behalf of Uber Technologies or Rasier.  *See* DSJ Opp'n 15–16.

**B.    A Claim For WAV Service, Even Less-Than-Equivalent Service, Is Not Cognizable Under Section 12184(b)(2) As A Matter Of Law.**

Although the ADA has been on the books for three decades, Plaintiffs cannot identify a single case where a court found that a private company subject to Section 12184 had to provide WAV service as a "reasonable modification" under Section 12184(b)(2).  Plaintiffs themselves have made clear that many taxi companies do not offer WAV service that Plaintiffs deem sufficient, if they offer WAV service at all.  Yet, Plaintiffs cannot explain why it is that, until now, not a single covered entity has been ordered to provide WAV service as a "reasonable modification."  Plaintiffs likewise lack any rationale or support for the notion that Congress intended to leave an important public policy issue, like WAV transportation service offered by private entities, to the whims of an individual to make an individualized request for modification to be evaluated on an entity-by-entity basis (and thus with no effect on other covered entities or other persons with disabilities).

Properly interpreted, Section 12184 does not permit "reasonable modification" claims for WAV service under subsection (b)(2).[6]  In Section 12184, subsections (b)(3) and (b)(5) specifically concern specified public transportation in accessible vehicles—*i.e.*, WAV services—whereas subsection (b)(2) contains general provisions, including the provision requiring covered entities to make "reasonable modifications" to "policies, practices, and procedures" where necessary to accommodate an *individual* with a disability who requests a modification.   Defendants' interpretation of these provisions is straightforward.  Under the specific/general cannon, because subsections (b)(3) and (b)(5) address WAV service and specifically do not require the provision of

---

[6]    Plaintiffs urge the Court to summarily reject this interpretation, characterizing Defendants' motion as an improper motion for reconsideration and invoking the law-of-the-case doctrine.  PSJ Opp'n 14.  Plaintiffs are wrong.  Defendants do not seek reconsideration of the Court's prior orders declining to fully dismiss the *Namisnak* action and fully grant judgment on the pleadings in the *Crawford* action.  Defendants seek summary judgment based, in part, on their view of the proper interpretation of Section 12184.  At summary judgment (or any other stage of the case), the Court is free to revisit its preliminary interpretation of Section 12184.  *See* Fed. R. Civ. P. 54(b).  "*All rulings of a trial court are subject to revision at any time before the entry of judgment.*"  *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888–89 (9th Cir. 2001) (emphasis in original).  When it comes to a trial court revisiting its own interlocutory conclusions, "the law of the case doctrine is wholly inapposite."  *Id.*

1    WAV service absent the purchase or lease of a new van, the "reasonable modification" provision

2    in subsection (b)(2) cannot properly be read to nevertheless require the provision of WAV service

3    in additional circumstances.  DSJ Br. 15.  That is especially true in this context because, in the

4    ADA, Congress otherwise made very clear where it intended to mandate WAV service.  *See id.* at

5    12.  And that interpretation is consistent with applicable regulations, regulatory guidance, and on-

6    point legislative history.  *Id.* at 15–17.

7          Plaintiffs resist the specific/general canon on the untenable assertion that (b)(2), in requiring

8    WAV service as a "reasonable modification" does not conflict with (b)(3) and (b)(5).  PSJ

9    Opp'n 18–19.  Under subsections (b)(3) and (b)(5), an entity that purchases only used vehicles and

10   new automobiles—but not new vans—*never* has an obligation to provide WAV service.  Absent

11   the purchase or lease of a new van, a covered entity need not acquire accessible vehicles itself or

12   ensure that it otherwise has access to accessible vehicles for use in its transportation system.

13   49 C.F.R. § 37.29(b); 49 C.F.R. § Pt. 37, App. D; *Transp. for Individuals with Disabilities*, 56 Fed.

14   Reg. 45584-01, 45590 (Sept. 6, 1991).  If subsection (b)(2) is interpreted as requiring a covered

15   entity to nevertheless provide WAV service even if it has not purchased or leased a new van, then

16   the provisions conflict, and the specific/general canon requires that the provisions specific to WAV

17   issues, (b)(3) and (b)(5), trump the general provision, (b)(2).  *See RadLAX Gateway Hotel v.*

18   *Amalgamated Bank*, 566 U.S. 639, 645 (2012).

19         Plaintiffs also say there is no authority "stating that § 12184(b)(2)(A) is the 'general'

20   provision and § 12184(b)(3) is the statute's 'specific' provision."  PSJ Opp'n 18.  The provisions

21   themselves make clear which is specific and which is general.  The topic at issue is whether and in

22   what circumstances covered entities must provide WAV service.  Obviously the provision that deals

23   specifically with WAVs and the circumstances in which covered entities must provide specified

24   public transportation in WAVs (subsections (b)(3) and (b)(5)) are the specific provisions, whereas

25   the provision generally requiring covered entities to make "reasonable modifications"—and saying

26   nothing whatsoever about WAVs—is the general provision.   Indeed, this Court has previously

27   recognized that (b)(3) and (b)(5) are "narrow," while (b)(2) is "broad."  *Crawford*, ECF No. 80 at

28   8. ("A covered entity under Section 12184 is subject not to just to the narrow requirements

associated with the purchase of new vehicles, but the statute's broader anti-discrimination mandate.").

### C. Plaintiffs' Demanded Outcomes Are Not Requests For "Modifications" To Any "Policy, Practice, Or Procedure."

Even putting the correct interpretation of the statute aside, Plaintiffs' demands for outcomes that would require Defendants to pay third parties to offer new services and make them available for request on the Uber platform in both New Orleans and Jackson are not requests for "modifications" to "policies, practices, and procedures."  Precedent and DOJ guidance show that this provision is concerned with moderate changes to or individualized exceptions from existing business practices for the benefit of the requesting individual, not the major undertakings Plaintiffs seek to require of Defendants here and for the benefit of the equivalent on an uncertified class.  *See* DSJ Br. 18–19.  Demands for vague outcomes that require the defendant to compel others to offer a new service, enter a new line of business, or enter into contracts to ensure that other people do so, is not a not a moderate change to an existing policy and, therefore, is not a "modification" to a "policy, practice, or procedure."  *Id.*[7]

Plaintiffs' arguments to the contrary fail.  Plaintiffs cite some 2021 dictionaries (rather than those contemporaneous with Title III's enactment in 1990), *see* PSJ Opp'n 20–21, but they do not grapple with the meaning of the word "modification"— a word that "connotes *moderate* change." *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1036–37 (6th Cir. 1995) (emphasis added); *cf. Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1012 (9th Cir. 2017) (request that dealership add hand-controls for plaintiff's test drive was a request for a "modification" to the test-driving practice because it sought a "temporary" change to accommodate the individual plaintiff).  Nor do Plaintiffs grapple with DOJ guidance showing that the "modifications" to a "policy, practice, or procedure" referred to in the statute are moderate, individualized exceptions, like allowing a driver to park his van in a parking garage, even though the garage otherwise does not permit van parking.  *See* DSJ Br. 18–19.

---

[7]    Nor, for that matter, could Plaintiffs obtain an enforceable injunction for the vague outcomes they request.  An injunction must "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

Plaintiffs also say their demanded modification doesn't require something new from Defendants because, in their (erroneous) view, Defendants already provide "for-hire transportation."   PSJ Opp'n 22.   Defendants do not provide transportation, and for-hire transportation in automobiles is not the same business as for-hire transportation in WAVs, which requires different equipment (vehicle types and ramps), different driver training, and carries an entirely different profile in terms of costs, demand, and market size.

Perhaps more importantly, Plaintiffs miss the point that Defendants do not enable WAV ridesharing marketplaces in New Orleans and Jackson.  Plaintiffs seek to compel Defendants do just that, for the first time, in each city.  This is nothing remotely like an order requiring a store to add an entrance ramp—which is not a "reasonable modification" issue in any event.  A better example would be if Defendants already enabled WAV marketplaces in New Orleans and Jackson, and Plaintiffs were seeking some minor change in the operation of those marketplaces, such as a an exception to cancellation charges.  Plaintiffs' request is far afield from the requests for "modifications" to a "policy, practice or procedure" contemplated by the ADA.

## III.   PLAINTIFFS' "REASONABLE MODIFICATION" THEORY FAILS BECAUSE PLAINTIFFS ABANDON THE MODIFICATIONS THEY REQUESTED.

"[A] plaintiff seeking to make a reasonable modification claim must also identify a reasonable modification, a specific solution which would rectify the plaintiff's grievances."  *Bailey v. Bd. of Comm'rs*, 484 F. Supp. 3d 346, 432 (E.D. La. 2020).  This demand must happen outside of the context litigation because a party must ultimately show that a defendant failed to make a "*requested* reasonable modification."  *Karczewski*, 862 F.3d at 1010 (emphasis added).  Even if a plaintiff can make it to trial, a failure to prove that a party made a "request for a reasonable modification" in a pre-suit letter can require judgment for the defendant.  *E.g.*, *Bailey*, 484 F. Supp. at 432 (finding, after a bench trial, that pre-suit letter improperly attempted "to place the burden on Defendants to propose a reasonable modification" and, therefore, that plaintiff failed to show he requested a reasonable modification).

The Court recognized this when it dismissed the *Namisnak* First Amended Complaint because Plaintiffs failed to request a modification, but granted leave to amend to give Plaintiffs an

opportunity to make a specific request. *Namisnak*, ECF No. 84 at 5.  With that leave, rather than request "a specific solution," *Bailey*, 484 F. Supp. 3d at 432, Plaintiffs requested that Defendants use their "resources, internal knowledge, and business know-how" to (i) modify the Uber Rider App in Jackson and New Orleans to include a WAV request option; (ii) ensure that fleets of 30–60 WAVs and 20–60 WAVs were available to respond to ride requests on the Uber platform in New Orleans and Jackson, respectively; and (iii) provide WAV service in New Orleans and Jackson that meets the equivalency standard of 49 C.F.R. § 37.105. *Crawford* FAC, ¶¶ 69, 73, 74 (ECF No. 135); *Namisnak*, SAC ¶¶ 70, 75 & Ex. E (ECF No. 92).

Now, Plaintiffs abandon their demand for equivalent service as a "reasonable modification," arguing they are entitled to equivalent service under subsections (b)(3) and (b)(5) only, not under subsection (b)(2).  They disavowed in their depositions and abandoned in their briefing their demand for fleets of up to 60 WAVs. *See supra*, n.4.  That leaves only Plaintiffs' demand to "turn on" a WAV request option.  But they don't *just* want Defendants to "turn on" the WAV option.  Plaintiffs admitted a WAV button without the ability to actually complete a ride in a WAV would be useless for them. *See id.*  And they confirmed as much in opposing summary judgment by arguing that turning on the WAV request option would be a "necessary—but not sufficient—step for Uber to take to make its service accessible."  PSJ Opp'n 40.

Rather, in their briefing, Plaintiffs are demanding that Defendants "turn on" WAV *and also* guarantee some unspecified level of service that is less than "equivalent" but not tied to any metrics whatsoever.  Plaintiffs lack standing to bring this claim. *See supra*, pp. 5–7.  And it is an unpleaded request that is inconsistent with the demand Plaintiffs made in response to this Court's order granting leave to amend.  Plaintiffs never sought leave to amend their complaint, even though it "is well-settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage." *Bullard v. Wastequip Mfg. Co.*, 2015 WL 12766467, at *10 (C.D. Cal. 2015) (collecting cases); *accord Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000) (unpleaded theory improperly raised in motion for summary judgment filed after discovery because defendant had no opportunity to develop a response or defense in discovery).

Because Plaintiffs have abandoned all of the modifications they *requested*, they cannot show that Defendants "failed to make a reasonable *requested* modification." *Namisnak*, ECF No. 84 at 4 (emphasis added); *Bailey*, 484 F. Supp. at 432. The Court should accordingly award summary judgment in Defendants' favor.

## IV. PLAINTIFFS' ARGUMENT FOR A WAV BUTTON PLUS SOME UNSPECIFIED GUARANTEE IS UNREASONABLE AS A MATTER OF LAW.

Setting aside all of the above, Plaintiffs have not requested anything that would be reasonable. In their opening brief, Defendants showed that Plaintiffs do not have enough evidence to show that anything they requested is reasonable. DSJ Br. 19–32. Plaintiffs have failed to identify any genuine dispute of material fact that would avoid summary judgment.

### A.      Requiring Defendants To Raise Prices Is Unreasonable.

Plaintiffs have not claimed or put in any evidence that WAV trips could be profitable at the trip level, *i.e.,* that the rider price of a WAV trip could or would ever be the same or greater than the cost of providing that WAV trip. Instead, the keystone of Plaintiffs' reasonableness argument is their theory that Uber could just raise rider prices to generate more revenue to then have more money to pay others to sell WAV trips on the Uber platform. Defendants demonstrated in their opposition to Plaintiffs' motion for summary judgment that this theory fails as a matter of both fact and law. To recap, Plaintiffs failed to demonstrate as a factual matter that █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ And, as a legal matter, any modification that would require Uber to impose an across-the-board price increase in order to afford it is, by definition, unreasonable. *Id.* at 23–25.

In response, Plaintiffs simply double down on their position that Defendants have unlimited capacity to raise rider prices without consequence. They insist that Uber could easily be profitable and have tons of extra money if only it did not "charg[e] below market rates"[8] or support persons

---

[8]      Plaintiffs' position appears to be that the Washington D.C. taxi rates mandated by local government are "market rates" while the ride prices charged on the Uber platform are not. *But see*

getting vaccinated against the coronavirus (while also noting that the pandemic had a severe impact on Uber's ridesharing platform and that Uber should spend additional money to generate positive brand sentiment).  PSJ Opp'n 34–35. Plaintiffs' argument is pure speculation, unsupported by any evidence and contrary to the widely-understood economic truth that, in a highly competitive industry like the ridesharing industry, price increases negatively impact demand and result in less revenue.  *See* DSJ Opp'n 24–25.  In fact, Plaintiffs go so far as to claim that ███████ ████████████████████████████████████████████████████████████████████"  PSJ Opp'n 35 (emphasis in original).  This is a remarkable argument.  In effect, Plaintiffs are arguing that Uber should mislead Riders by calling fees something they are not so that Uber can make a "healthy profit."  This simply underscores that Plaintiffs have strayed far beyond a request for a "reasonable modification" to any "policy, practice, or procedure."

### B.   Plaintiffs Fail To Demonstrate A Genuine Dispute Of Fact About The Disproportionate Amount Defendants Lose On Each WAV Trip.

Defendants showed in great detail ████████████████████████████████████ █████████████████████████████████████  DSJ Br. 26–28; *see* DSJ Ex. 2–3. These are some of largest, most densely populated cities in the United States, and so are the places where a WAV ridesharing marketplaces is most likely to succeed.  Patel Decl. ¶ 59.  Yet Defendants ████████████████████████████████ *See id.* ¶¶ 51, 54; DSJ Exs. 2–3. ████ ████████████████████████████████████████████████████████████████████████

DSJ Br. 29; Patel Decl. ¶ 63.

Unable to dispute the actual numbers, Plaintiffs urge the Court to pay no attention to the disproportionate costs of Defendants' WAV efforts and instead "evaluate the revenue, potential revenue forgone, and the long-tern benefits of UberWAV."  PSJ Opp'n 32.  Plaintiffs do not have any evidence that the cost of providing a WAV trip could be lower than the rider price.  Nor, for that matter, do Plaintiffs offer any authority for their approach, which is not the law.  In assessing reasonableness, the Court must look at whether the cost is "disproportionate to the benefit." *Vande Zande v. Wis. Dep't of Admin*, 44 F.3d 538, 542 (7th Cir. 1995); *accord, e.g.*, *Indep. Living Res.*

---

DSJ Ex. C at 36:14–20 (Crawford testifying that he would only consider using the Uber Rider App to request WAV rides in D.C. if the rider price was less than standard D.C. taxi fares).

*Ctr. v. Lyft, Inc.*, 2020 WL 6462390, at *4 (N.D. Cal. 2020) (a $925 subsidy nearly 57 times what the rider is paying is not reasonable despite Lyft's $2.2 billion in revenue).

Plaintiffs' argument that the Court must consider "potential revenue forgone" and ephemeral "long-term benefits" offers only speculation and projections as a basis to dispute Defendants' evidence regarding actual costs. For instance, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. But neither such speculation nor real projections, even if written down by an employee, creates a genuine fact dispute when the record reflects hard, actual numbers. *Adler v. Berg Harmon Assocs.*, 892 F. Supp. 98, 104 (S.D.N.Y. 1995) ("[C]alculations, which are based on projections rather than actual operating results, do not constitute a sufficient showing of a genuine issue for trial.").

Plaintiffs' claims about Uber's revenue from WAV fare no better. Defendants have already demonstrated ████████████████████████████████████████████ As Plaintiffs concede in a footnote (PSJ Opp'n 32 n.159), Defendants have shown that ██████████ ████████████████████████████████████████████████████████ Patel Decl. ¶¶ 55–56; DSJ Ex. 3 (████████████████████████████████████ ████████████); *see also, e.g.*, DSJ Ex. 3 ██████████████████████████ ████████████████); DSJ Ex. 2 (████████████████████████████ ██████████████████████).[9] Defendants have also established that Uber receives only a small portion of the rider price; the *Driver* receives the bulk of it. *See* Patel Decl. ¶ 56.

Plaintiffs also misstate the evidence about Uber's capacity to generate revenue from WAV trips. Defendants did not "successfully *collect* millions of dollars" from an "accessibility fee" in

---

[9]    Plaintiffs' speculate the exemplar rider price Defendants' highlight in their brief, the average rider price in 2020 in San Francisco, is anomalous because of the pandemic. PSJ Opp'n 32 n.15 ████████████████ *Compare* DSJ Ex. 2 at 4 (████████████████ ████████████████) *with* DSJ Ex. 3 at 4 (████████████████████████

1    Chicago.  PSJ Opp'n 32 (emphasis added). ███████████████████. For years, the

2    City of Chicago required all transportation network companies to pay $0.10 per vehicle per ride to

3    fund the *City's* "accessibility fund."  *See* Chi. Muni. § Code 9-115-040(d).  It was not until very

4    recently that Uber became eligible to receive *any* subsidy for WAV rides completed on the Uber

5    platform from the City's accessibility fund ███████████████████████. *See*

6    DSJ Ex. 2 at 4 (███████████████████████████████); DSJ Ex. 3 at

7    3 (████████████████████████████████████████████████████

8    █████████).  Plaintiffs cannot dispute that the revenue from completed WAV rides does not

9    come close to covering the costs Uber incurs supporting the WAV marketplace.

10         Plaintiffs' attempts to draw different conclusions from the undisputed data fail.  Plaintiffs

11   ask the Court to ignore Defendants' per-WAV-trip costs in 2020 because of the pandemic.

12   Plaintiffs have not demonstrated that Defendants' costs would be materially lower in 2021.  And in

13   any event, ████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ███████████████ Patel Decl. ¶ 51; Ex. 2 at 4 ████████████████████

16   ████████████████████████████████████████████████████ Patel

17   Decl. ¶ 51; Ex. 2 at 4. █████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   Patel Decl. ¶ 56. ████████████████████████████████

21         Plaintiffs also highlight Phoenix, ████████████████████████████

22   ███████████████████████████████.  Plaintiffs do not provide any evidence (or

23   even argument) as to why Phoenix is a reasonable and appropriate comparator to New Orleans or

24   Jackson.  This is insufficient to defeat summary judgment.  *Lyft, Inc.*, 2020 WL 6462390, at *3

25   ("[A] modification cannot merely be reasonable because it has been made in other geographic

26   regions."); *see also* Final Pre-Trial Order, *Lyft*, Case No. 3:19-cv-01438, ECF No. 149 at 3:19–23

27   (requiring WAV plaintiffs to make "a case-by-case showing that the comparison jurisdiction is

28   sufficiently similar").  And, in fact, Phoenix is clearly not a relevant comparator: the WAV

marketplace in Phoenix supported by Uber's technology is for trips to and from the airport only. *See* Phoenix Muni. Code § 4-68.B-7.  It is also much larger than either Jackson or New Orleans.[10]

### C.     Plaintiffs' Speculation About Other Techniques To Support A WAV Marketplace Cannot Defeat Summary Judgment.

Plaintiffs largely copy and paste from their own summary judgment to argue that there are other techniques Uber could use to get third parties to offer WAV trips on the Uber platform in New Orleans and Jackson.  These arguments rely on nothing more than speculation and projections, and without any showing that the techniques Plaintiffs propose would redress their injuries and cause them to actually download and use the Uber Rider App.

### 1.     No reasonable factfinder could conclude it is reasonable to compel Defendants to partner with a leasing or rental company.

Plaintiffs insist that Defendants have failed to show that ███████████████████████████████████████████████████████████████████████████████ selling rides on the Uber platform is unreasonable as a matter of law.  Xchange Leasing is not before the Court.  Plaintiffs erroneously contend, without any basis, that Xchange Leasing and Defendants should be treated as a single entity.  But not even Xchange could lease vehicles without first purchasing them, and Plaintiffs know well that Section 12184 *does not* require entities to purchase WAVs.  And Defendants have shown—and Plaintiffs concede—that Xchange Leasing does not lease vehicles anymore.  PSJ Opp'n 28 ("Uber correctly states that Xchange Leasing … is no longer operating a leasing business.").

███████████████████████████████████████████████████████████████████████████████ The actual evidence does not support Plaintiffs' argument. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See generally* PSJ Ex. XX.

---

[10]     *Compare* https://www.census.gov/quickfacts/phoenixcityarizona (Phoenix had a population of 1,680,992 as of July 1, 2019), *with* DSJ Ex. I (New Orleans had a population of 390,144 as of July 1, 2019); DSJ Ex. K (Jackson had a population of 160,629 as of July 1, 2019). The Court may take judicial notice of U.S. Census data.  *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996).

In reality, Uber's experience has shown that "█████████████

████████████████████████████████████████████████

██████████████████████████████." Patel Decl. ¶ 85.

████████████████████████████████████████ Patel Decl. ¶ 82.

**2.    No reasonable factfinder could conclude it is reasonable to compel Defendants to partner with MV Transportation.**

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Plaintiffs do not respond to these facts.  Instead, Plaintiffs largely rely on the arguments they already made in their affirmative summary judgment motion.  Yet, fundamentally, Plaintiffs still fail to show that any commercial fleet provider exists and is willing to partner with Defendants in either New Orleans or Jackson; nor do Plaintiffs have any evidence as to what the actual costs and benefits of such a hypothetical partnership would be.  *See* DSJ Opp'n 21–22.   MV Transportation does not operate in either city, and MV Transportation never provided Defendants with a quote for even a small number of WAVs.  *See id.* And, as discussed, Plaintiffs have not shown that Uber can just raise prices indefinitely and without consequences. *See also id.* at 23–25.

**3.    No reasonable factfinder could conclude it is reasonable to compel Defendants to turn on WAV and offering incentives.**

Plaintiffs do not identify any specific incentives they want; nor do they offer any evidence as to how much any incentive should be, individually or in total, or about what would happen if incentives were offered in New Orleans and Jackson.  They thus fail to carry their burden to identify a specific modification and show that a reasonable factfinder could conclude it would be effective and otherwise reasonable.  Defendants, however, have demonstrated that simply turning on the WAV request option would be unreasonable because ████████████████████████████

████████████████████████████████████████████████████ DSJ

Br. 21–23; DSJ Opp'n 20–21.████████████████████

██████████████████████████████ Patel Decl. ¶ 74–77; DSJ Br. 26 n. 10; DSJ Opp'n 20–21.

Plaintiffs' sole response to highlight a sentence from the definitions section of their expert's report, where Dr. James Cooper says that "[a] relationship exists both between nascent demand, surpassed [sic] demand and developing supply." *Crawford*, ECF No. 154-1 (Cooper Report) at 14. As Defendants have shown in their Rule 702 motion, Dr. Cooper's testimony is inadmissible and should be excluded.  Setting aside the evidentiary issues, Dr. Cooper's vague statement is contrary to Defendants' *actual* experience and is a far cry from evidence about supply and demand for WAV rides in New Orleans or Jackson, the specific conduct Plaintiffs want the Court to order, what the actual costs of that conduct would be, and what the actual benefits of it would be, such that a reasonableness and redressability analysis could be started.

### 4. No reasonable factfinder could conclude it is reasonable to compel Defendants to offer a "dispatch" service.

Plaintiffs claim Defendants could offer a "dispatch" service to support a WAV marketplace in New Orleans or Jackson.  But Plaintiffs do not explain what a "dispatch" service means, and they lack any relevant evidence. Plaintiffs attempt to describe what Defendants do in New York City to comply with local regulatory requirements and simply say Defendants should do the same thing in Jackson and New Orleans.  PSJ Opp'n 43.  But, as discussed, Plaintiffs must offer *some* admissible evidence to show that what happens in New York City—the largest, most densely-populated cited in the country with limited car ownership—is relevant to assessing what would be reasonable in Jackson and New Orleans.  They fail to do so.

Plaintiffs best source for things New York, Meera Joshi, did not testify that any comparison between New Orleans and Jackson would be appropriate.  *See* PSJ. Ex. BBBB; PSJ Opp'n 40–43.[11] (Plaintiffs other source was another non-retained (and undisclosed) expert, "Jay-Z."  *See Crawford*, ECF No. 166 at 7 n.1.)  In fact, the urban, business, and regulatory environment in New York City make it the least relevant city in the United States to assessing WAV issues Jackson or New Orleans.[12]

---

[11]     While it does not create a dispute of any facts material to Defendants' motion for summary judgment, Plaintiffs rely on certain deposition testimony from Ms. Joshi that is inadmissible under Rule 611(c) because Plaintiffs extracted it through the use of leading questions.  *See* PSJ Opp'n 42 n.219 (quoting PSJ Ex. BBBB 52:1–18, which reflects contemporaneous leading objections).

[12]     As just one small example, in New York City, Drivers *and* vehicles must have a TLC license to lawfully provide for-hire vehicle service, including selling rides on ridesharing platforms.  And

Even assuming Plaintiffs had evidence to make the comparison reasonable, it would not be helpful to them. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Patel Decl. ¶¶ 51, 54; DSJ Ex. 2 at 4; DSJ Ex. 3 at 9.  The amount Uber spends remains a huge multiple of the limited revenue Uber receives from each completed WAV trip.

### 5. No reasonable factfinder could conclude it is reasonable to compel Defendants to deploy a "combination of methodologies."

Plaintiffs speculate that a "combination of methodologies" may be sufficient to support a WAV marketplace in a final, single paragraph—without any specificity, much less evidence, about the costs or expected results.  Specifically, Plaintiffs refer to the *Lyft* court's decision that a trial was needed on the issue of whether Lyft could provide WAV service in San Francisco and the surrounding counties by using a "'combination of the proposed methods.'"  PSJ Opp'n 43 (quoting *Lyft*, 2020 WL 6462390, at *5).  The evidence in that case is not before this Court.  And in this case, ███████████████████████████████████████████████████████████████████████████████████ DSJ Br.  26; Patel Decl. ¶¶ 73–89. ███████████████████████████████████████████████████████████████████████████████████████████ Plaintiffs have failed to produce any evidence from which a reasonableness determination could be made, and with uncontroverted evidence of such disproportionate costs, Defendants have negated it.  *See Lyft*, 2020 WL 6462390 at *4; *Vande Zande*, 44 F.3d at 542.

## V. PLAINTIFFS' OTHER ATTEMPTS TO AVOID SUMMARY JUDGMENT LACK MERIT.

Plaintiffs urge the Court (twice) to deny summary judgment because, in their view, Defendants also violated Section 12184 by imposing discriminatory eligibility criteria for would-be Drivers.  PSJ Opp'n 26, 45–46.  Plaintiffs have also moved for summary judgment on this ground.

---

since August 2018, New York City will not issue any new vehicle licenses, subject to limited exceptions such as WAVs.  *See* N.Y.C. Taxi & Limousine Comm'n, FHV License Review & Report Determination (Feb. 2021), https://www1.nyc.gov/assets/tlc/downloads/pdf/license-pause-report-2021-02.pdf.  The Court may take judicial notice of "laws, city ordinances and opinion letters."  *Rai v. Santa Clara Vall. Transp. Auth.*, 308 F.R.D. 245, 250 (N.D. Cal. 2015)

PSJ Br. 47–49.  As Defendants explained in their opposition, this unpleaded theory of liability is brand new and, therefore, not a proper ground for avoiding (or seeking) summary judgment.  DSJ Opp'n 25–26.  It's a theory Plaintiffs' lack standing to pursue, since none has ever even asserted an interest in being a rideshare driver.  *Id.* at 26.  And it is also meritless because Defendants' minimum vehicle requirements for Drivers seeking to sell rides on the Uber platform do not—explicitly or implicitly—exclude WAVs.  *Id.* at 26–27.

Lastly, Plaintiffs' objections to the Declaration of Niraj Patel lack merit.  They claim Mr. Patel's declaration includes undisclosed expert testimony, PSJ Opp'n 3–4, but Mr. Patel's declaration does not include expert testimony.  Indeed, Plaintiffs do not identify the testimony they seek excluded or offer any argument to support their assertion that Mr. Patel's declaration includes expert opinions.  Instead, Plaintiffs simply refer to their improper, separately filed motion to strike.  Defendants have already responded to that separate filing, which in addition to violating the local rules, fails as a matter of law.

Plaintiffs also complain that Mr. Patel's declaration is improper because Mr. Patel already testified as a corporate designee.  *Id.* at 4–5.  Plaintiffs base this argument on the general proposition that "because a Rule 30(b)(6) designee testifies on behalf of the entity, the entity is not allowed to defeat a motion for summary judgment based on an affidavit that *conflicts with* its Rule 30(b)(6) deposition *or contains information that the Rule 30(b)(6) deponent professed not to know*."  *Id.* at 4 (emphases added).  "This general proposition should not be overstated, however, because it applies only where the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict, *i.e.*, where it cannot be deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition."  *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018).  Plaintiffs do not identify any conflict between Mr. Patel's deposition testimony and his declaration testimony, so their objection fails.

## **CONCLUSION**

Summary judgment should be entered in Defendants' favor.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated: June 16, 2021

By:  s/ Anne Marie Estevez

Anne Marie Estevez
Stephanie Schuster
Patrick Harvey
Kathy H. Gao

*Attorneys for Defendants*