REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

**BIZER & DEREUS, LLC**
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
Admitted *Pro Hac Vice*
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

2

3

4

5

6

7

AQUA TERRA AERIS LAW GROUP
William Brock Most
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (650) 465-5023
williammost@gmail.com

8

9

10

11

PUBLIC JUSTICE, P.C.
Karla Gilbride
Stephanie K. Glaberson
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

12

13

14

15

16

*Attorneys for Plaintiffs*
*(Additional counsel listed in signature block)*

17

| | |
|---|---|
| SCOTT CRAWFORD | Case No.: 3:17-cv-02664-RS |
| Plaintiff, | |
| vs. | |
| UBER TECHNOLOGIES, INC. and RAISER, LLC, | **PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| Defendants | |
| STEPHAN NAMISNAK, *ET AL.*, | Case No.: 3:17-cv-06124-RS |
| Plaintiffs, | |
| vs. | |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | **PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| Defendants | |

18

19

20

21

22

23

24

i

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**<u>NOTICE OF MOTION</u>**

PLEASE TAKE NOTICE that, in the courtroom of the Honorable Richard Seeborg, located at 450 Golden Gate Avenue, San Francisco, CA 94102, on Thursday, July 15, 2021, at 1:30 p.m., or as soon thereafter as counsel may be heard, Plaintiffs Scott Crawford, Stephan Namisnak, and Francis Falls (together, "Plaintiffs") will move the Court for Summary Judgment in their favor.

As explained in the accompanying Memorandum of Points and Authorities, based on the facts obtained during discovery, Uber is covered by Title III of the Americans with Disabilities Act ("ADA") because Uber is a private entity primarily engaged in the business of transporting people and whose operations affect commerce. Further, for the reasons set forth in the accompanying Memorandum, Uber has violated 42 U.S.C. § 12184(b)(2)(A), 42 U.S.C. § 12184(b)(5), and 42 U.S.C. § 12184(b)(1). Plaintiffs have standing to pursue their claims and it would be reasonable for Uber to provide Plaintiffs' requested reasonable accommodation. Summary judgment should issue in favor of Plaintiffs.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, numerous exhibits, including various deposition excerpts, discovery materials, and three declarations, and any argument the Court may permit. For the aid of the Court, Plaintiffs' counsel has created and includes an appendix which correlates each of Plaintiff summary judgment exhibit to (1) the unified exhibit number used during the depositions and (2) the document's accompanying bates number, if applicable.

Dated: April 19, 2021.

By Plaintiffs, by and through their counsel,

[Signatures on following page]

ii

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

/s/ William Most_____

William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
williammost@gmail.com
(504) 509-5023

Karla Gilbride (CA # 264118)
PUBLIC JUSTICE, P.C.
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

/s/ Garret S. DeReus_____

Bizer & DeReus, LLC
Garret S. DeReus (LA # 35105)*
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)*
andrew@bizerlaw.com
*Admission pro hac vice

3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

iii

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## TABLE OF CONTENTS

**NOTICE OF MOTION** ................................................................................................. **ii**

**TABLE OF CONTENTS** ............................................................................................. **iv**

**TABLE OF AUTHORITIES** ...................................................................................... **vi**

**MEMORANDUM OF POINTS AND AUTHORITIES**………………………………**1**

**I.      SUMMARY OF FACTS**................................................................................... **2**

   **A. Uber Operates a Transportation System That Provides Millions of Trips Per Day** ... **2**

   **B. Uber Represented to this Court That it Did Not "Own, Lease, or Operate Any Vehicles." It Now Admits It Owned a Fleet of 30,000 Vehicles** ................................... **4**

**II.     LAW AND ANALYSIS** ................................................................................... **7**

   **A. Legal Standard.** ............................................................................................ **7**

   **B**. **Uber's Liability Under Title III of the ADA** ................................................ **8**

   **C. Plaintiffs Are Qualified Individuals With Disabilities, and Have Standing to Sue.** .. **12**

   **D. Uber is Covered by Title III Because it Provides Transportation Services.**............... **14**

      1. Uber Provides Transportation, as it Has Repeatedly Represented to the Public, State Legislatures, and to the SEC .............................................................................. 16

      2. Uber Provides Transportation Because it Controls Virtually Every Aspect of the Transportation its Riders Receive………………………………………………………20

         (i)   Uber Controls the Location of Service and What Trips Occur…………………..20

         (ii)  Uber Controls the Pricing of Rides…………………………………………21

         (iii) Uber Provides Insurance and Requires It of Drivers……………………………22

         (iv) Uber Controls What Vehicles Can be Used…………………………………22

         (v)  Uber Controls How Drivers Use and Maintain Their Vehicles…………………23

         (vi) Uber Controls Who Can Drive and Performs Ongoing Review of Its Drivers….24

         (vii) Uber Imposes Mandatory Training for Its Drivers……………………………24

         (viii)Uber Controls What Its Drivers and Riders Do During Trips…………………..25

(ix) Uber Has Deployed On-Site Personnel to Various Locations to Aid Its
Operations………………………………………………………………………25

3. Uber Provides Transportation Because It Owned a Fleet of Tens of Thousands of
Vehicles that Riders Rode In………………………………………………………26

4. Title III Also Applies to Entities that Provide Transportation through Third Parties...27

**E. Uber is Covered by Title III Because it is Primarily Engaged in the Business of
Transporting People** ......................................................................................... **27**

**F.   Uber is Covered by Title III Because Its Operations Affect Commerce……………31**

**G. Uber Violated Section 12184 by Failing to Make Reasonable Modifications to Its
Policies, Procedures, or Practices……………………………………………..32**

1. Plaintiffs' Requested a Modification and the Request Was Denied ............................ 32

2. Plaintiffs' Requested Modification Was Reasonable...................................................... 33

(i)     Through a Partnership with a Commercial Operator Like MV Transportation….35

(ii)   By Removing Restrictions and Creating an Incentive System………………….37

(iii) By Reinstating the Leasing Model that Uber Abandoned……………………….39

(iv) The Above Methods Are Equally Available in Jackson…………………………41

3. Providing UberWAV in New Orleans and Jackson Would Not Fundamentally Alter
Uber's Services, Programs, or Activities, or Constitute an Undue Financial Burden ... 41

**H. Uber Violated Section 12184 by Buying New Non-WAV Vans, Without Ensuring
that Its Entire System Provides Equivalent Service for Wheelchair Users**............... **46**

**I. Uber Violated Section 12184 by forbidding WAVs from operating on its platform in
New Orleans and Jackson.** .......................................................................... **47**

**III.     CONCLUSION** ........................................................................................... **49**

**CERTIFICATE OF SERVICE** .............................................................................. **50**

v

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>

*Banga v. Kanios*,
    2020 WL 1492694 (N.D. Cal. Mar. 27, 2020) ..................................................... 7

*Borkowski v. Valley Cent. Sch. Dist.*,
    63 F.3d 131 (2nd Cir. 1995) ..................................................................................... 10

*Cotter v. Lyft, Inc.*,
    60 F. Supp. 3d 1067 (N.D. Cal. 2015) ............................................................... 15, 16

*Disabled in Action v. Board of Elections in the City of New York*,
    752 F.3d 189 (2d Cir. 2014) ..................................................................................... 10

*Duvall v. Cty. of Kitsap*,
    260 F.3d 1124 (9th Cir. 2001) .................................................................................. 41

*EEOC v. Placer ARC*,
    114 F. Supp. 3d 1048 (E.D. Cal. 2015) .................................................................... 10

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
    823 F. Supp. 2d 995 (N.D. Cal. 2011) ..................................................................... 10

*Equal Rights Center v. Uber*,
    17-cv-01272-KBJ (D.D.C. March 15, 2021) ..................................................... 16, 19

*Fortyune v. Am. Multi-Cinema, Inc.*,
    364 F.3d 1075 (9th Cir. 2004) ............................................................................ 31, 43

*Guerra v. W. Los Angeles Coll.*,
    2017 WL 10562682 (C.D. Cal. June 14, 2017) ................................................. 10, 42

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ..................................................................................... 10

*Hodson v. Alpine Manor, Inc.*,
    512 F.Supp.2d 373 (W.D.Pa.2007) .......................................................................... 10

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015) ............................................................................... 43

*Independent Living Resource Ctr. v. Lyft, Inc.*,
    19-cv-01438-WHA (N.D. Cal., Nov. 3, 2020) ....................................... 1, 14, 25, 29, 31

vi

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*,
    725 F.3d 1088 (9th Cir. 2013) ........................................................................ 10

*Karczewski v. DCH Mission Valley LLC*,
    862 F.3d 1006 (9th Cir. 2017) ........................................................................ 31

*Kulin v. Deschutes Cty.*,
    872 F. Supp. 2d 1093 (D. Or. 2012) ............................................................. 10

*Lentini v. California Ctr. for the Arts, Escondido*,
    370 F.3d 837 (9th Cir. 2004) .......................................................................... 10

*Lewis v. Cain*,
    2021 WL 1219988 (M.D. La. Mar. 31, 2021) ............................................... 43

*Namisnak v. Uber Techs., Inc.*,
    444 F. Supp. 3d 1136 (N.D. Cal. 2020) ......................................................... 32

*Namisnak v. Uber Techs., Inc.*,
    971 F.3d 1088 (9th Cir. 2020) .................................................................. 12, 16

*NFB v. Uber*,
    14-cv-4086, (N.D. Cal., Dec. 23, 2014).......................................................... 27

*Noel v. New York City Taxi and Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012)................................................................................ 25

*O'Connor v. Uber Techs., Inc.*,
    82 F. Supp. 3d 1133 (N.D. Cal. 2015), .................................................... 16, 17

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001)........................................................................................... 25

*San Luis & Delta–Mendota Water Auth. v. United States*,
    672 F.3d 676 (9th Cir.2012) ............................................................................ 27

*School Bd. of Nassau County v. Arline*,
    480 U.S. 273 (1987)........................................................................................... 31

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)........................................................................................... 27

*Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*,
    385 F. Supp. 3d 491 (E.D. La. 2019) ............................................................. 26

*Staron v. McDonald's Corp.*,
    51 F.3d 353 (2d Cir.1995).................................................................................. 9

*Taylor v. Gilbert & Bennett,*
    1997 WL 30948 (N.D. Ill. Jan. 15, 1997) ....................................................................... 10

*Taylor v. Phoenixville Sch. Dist.,*
    184 F.3d 296 (3d Cir.1999)........................................................................................... 10

*Wickard v. Filburn,*
    317 U.S. 111 (1942)...................................................................................................... 30

*Wong v. Regents of the Univ. of Cal.,*
    192 F.3d 807 (9th Cir.1999) ...................................................................................... 9, 41

*Zukle v. Regents of Univ. of California,*
    166 F.3d 1041 (9th Cir. 1999) ...................................................................................... 32

**Statutes**

29 U.S.C. § 794.................................................................................................................... 9

42 U.S.C. § 12102.............................................................................................................. 12

42 U.S.C. § 12181.......................................................................................................... 8, 14

42 U.S.C. § 12182................................................................................................................ 7

42 U.S.C. § 12184.................................................................... 8, 9, 14, 27, 30, 31, 46, 47

**Regulations**

28 C.F.R. § 35.................................................................................................................... 26

28 C.F.R. § 36.................................................................................................................... 45

42 C.F.R. § 37.................................................................................................................... 27

49 C.F.R. § 37.................................................................... 8, 26, 27, 30, 46

56 Fed. Reg. 45584 ........................................................................................................... 26

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs are people who use motorized wheelchairs in New Orleans, Louisiana and Jackson, Mississippi. In some other U.S. cities, Defendants Uber Technologies, Inc. and Raiser, LLC (collectively "Uber") provide access to wheelchair accessible vehicles ("WAVs") through a program called UberWAV. But Uber does not operate UberWAV in New Orleans and Jackson. No WAVs are accessible through Uber's transportation platform in those cities. Because of this, Plaintiffs are not able to use Uber's transportation system at all.

When Plaintiffs asked Uber to modify its policies and provide UberWAV to their cities, Uber refused. Uber represented that it "does not own the vehicles Drivers choose to use," and that it was not a provider of transportation. Plaintiffs sue Uber under the Americans With Disabilities Act and allege that Uber's refusal to make its system accessible to Plaintiffs violates the law.

Plaintiffs now move for summary judgment, asking this Court for two determinations. First, they ask that the Court find that Title III of the ADA applies to Uber because Uber is a private entity primarily engaged in the business of transporting people and whose operations affect commerce. This request does not ask the Court to break new ground: Another section of this Court recently granted a plaintiff's summary judgment motion against Lyft (a company similar to Uber for all purposes relevant to this motion) and held that Lyft "is a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce, and is covered under Section 12184."[1] (Or alternatively, that Uber contracts with entities in the business of transporting people, which would also bring Uber under the ambit of the ADA.)

Second, Plaintiffs ask this Court to determine it to be reasonable, as a matter of law, for Uber to make UberWAV available in their city. The request is reasonable because it asks Uber

---

[1] *Independent Living Resource Ctr. v. Lyft, Inc.*, 19-cv-01438-WHA, R. Doc. 92 at *3 (N.D. Cal., Nov. 3, 2020).

1

only to provide in New Orleans and Jackson an accommodation which Uber already provides in many other U.S. cities. It is reasonable in terms of cost because Uber could pay out of pocket from its $50 billion in annual revenue, or alternatively Uber could levy an "Accessibility Fee" of 3-4 cents per trip (an amount that Uber's internal analyses concluded would "fully fund" the WAV program.) And it is reasonable because Uber has already concluded, internally, that "We should be offering an accessible service."

Summary judgment should issue for Plaintiffs.

## I.    SUMMARY OF FACTS[2]

**A.    Uber Operates a Transportation System That Provides Millions of Trips Per Day.**

Uber is a company that operates in over 700 cities on six continents.[3] It runs a transportation system that provides 14 million passenger trips per day, totaling over 10 billion trips over the last decade.[4] Since Uber's launch in 2010, Uber's gross income has grown exponentially, reaching $50 billion in annual gross bookings in 2018. See Fig. 1, right.[5] Uber estimates that consumers "traveled 16.5 billion miles on our platform in 2018."[6]

Uber's basic ride product is UberX, which it presently describes as a "private ride at an everyday price."[7] But that is not all Uber offers. According to Uber's CEO, what "began as 'tap a button and get a ride'



**Fig. 1:** Uber's Annual Gross Bookings, 2010 to 2018.

---

[2] Most of the facts are integrated into the body of the memorandum, below.
[3] Ex. A (Uber's Apr. 11, 2019 SEC Filing) at 001214; *see also*, Ex. JJJ and PP (affidavits of attorneys William B. Most and Garret S. DeReus authenticating exhibits).
[4] *Id*. at 001216.
[5] *Id*. at 001325.
[6] *Id*. at 001374.
[7] Ex. C (Uber's Website, "What is UberX"), at 002888, available at www.uber.com/us/en/ride/uberx.

2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

has become something much more profound: ridesharing and carpooling; meal delivery and freight; electric bikes and scooters; and self-driving cars and urban aviation."[8]

One of those other products is UberWAV, "a ride product to [Uber's] riders that allows for a wheelchair accessible ride."[9] With UberWAV, "[r]iders who use motorized wheelchairs or scooters can in certain cities request a ride in a wheelchair-accessible vehicle (WAV)."[10] UberWAV was first deployed in 2014, and then expanded to twelve U.S. cities and six countries.[11] UberWAV comes with "Specialized drivers," each of whom "has completed a certification course offered by a third party to help you enter and exit the vehicle."[12] According to Uber, "UberWAV at its core offers the wheelchair bound population the same access to new age transportation technology that the rest of the world is benefitting from."[13]

In total, UberWAV has had "[s]uccessful operations in over two dozen cities"[14] offering hundreds of thousands of rides per year; in 2019, Uber provided 290,000 WAV trips to 53,000 unique WAV riders.[15] As of Fall 2019, UberWAV operated in eleven U.S. cities and seven foreign cities, stretching from San Francisco to Newcastle, Australia.[16]

As of April 2020, Uber provided WAV service primarily through a partnership with a third-party WAV provider called MV Transportation.[17] According to a 2019 analysis commissioned by

---

[8] Ex. A at 001224.
[9] Ex. D (Uber 30(b)(6) Deposition, via Robert Rupp) at 21:2-4.
[10] Ex. E (Uber's Website, "What is UberWAV"), available at www.uber.com/us/en/ride/uberwav/ (last accessed April 10, 2021).
[11]Ex. F at 00006939.
[12] *Id.*
[13] Ex. G at 00011903. The phrase "wheelchair-bound" is a disfavored term because an individual with mobility limitations is not "bound" to their wheelchair. *See Guidelines for Writing About People With Disabilities*, ADA National Network, available at adata.org/factsheet/ADANN-writing. Plaintiffs do not ascribe malice or animus to Uber's use of this phrase; they merely point out the phraseology here for the benefit of the Court and other parties.
[14] Ex. G at 00011903.
[15] *See* Ex. H (Uber's "Accessibility Monthly Business Review," Jan. 22, 2020), at 00012522.
[16] Ex. F at 00006941.
[17] *See* Ex. I at 00019378 (listing current cities as of April 2020).

3

Uber, with the "introduction of more WAVs through the partnership with MV Transportation, average wait times for WAVs has been reduced to 15 minutes or less."[18]

In addition to its ride products, Uber also runs a "Vehicle Marketplace" website that "connects drivers who want to lease a vehicle with third-party vehicle leasing companies to lease them those vehicles."[19] In some cities, WAVs are available through the Vehicle Marketplace,[20] and Uber reaches out to the third-party leasing companies to make WAVs available on the Vehicle Marketplace.[21]

None of this, however, is accessible to Plaintiffs. Because Plaintiffs use motorized wheelchairs, they can only ride in a WAV.[22] But UberWAV is not available in Plaintiffs' cities, and so if Plaintiffs were to download and open the Uber app, they would have no way of obtaining a ride in a WAV through Uber. And as detailed below, not only has Uber failed to make WAVs available in Plaintiffs' cities, but most WAVs are also explicitly *forbidden* from participating in Uber in those cities.[23]

**B.    Uber Represented to this Court That it Did Not "Own, Lease, or Operate Any Vehicles." It Now Admits It Owned a Fleet of 30,000 Vehicles.**

As described above, when Uber denied Plaintiffs' request for accommodation, it made the argument that Uber is not a provider of transportation, and only "develops smartphone applications, software, and other technological solutions.[24]" Uber specifically represented that "Uber does not own the vehicles Drivers choose to use."[25]

---

[18] Ex. J ("Uber Wheelchair Accessible Vehicle (WAV) Study Proposal, April 9, 2019") at 008548.
[19] Ex. D (Rupp Dep.) at 93:4-13.
[20] *Id.* at 99:17-20.
[21] *Id.* at 103:20-104:7.
[22] *See, e.g.*, Ex. K (Crawford Dep.) at 14:18-22.
[23] *See* Section II(I), *infra* ("Uber Violated Section 12184 by forbidding WAVs from operating on its platform in New Orleans and Jackson").
[24] *Namisnak*, R. Doc. 98-1 (Nov. 13, 2019 Letter from Uber's Counsel).
[25] *Namisnak*, R. Doc. 98-1 ("Uber does not own the vehicles Drivers choose to use when they are logged on to the Uber Driver App and seeking and accepting ride requests. Drivers obtain those vehicles on their own.").

4

This is a common claim by Uber. In this and other cases, Uber has argued that it is not subject to the ADA and other anti-discrimination laws because it just developed a smartphone app, and is not a provider of transportation. Uber has repeatedly represented to this Court that it does not "own, lease, or operate any vehicles for transporting riders."[26] It has represented that "Uber, in fact, does not" own vehicles on the Uber App.[27] And Uber's counsel has represented that "they do not own any cars, they do not employ any drivers, they don't lease any cars."[28]

But Uber has been lying. It lied to this Court, and other courts. It lied to Plaintiffs. That is now clear because Uber has admitted, under oath, that during this litigation, it has owned **tens of thousands of vehicles.**[29]

Most of these vehicles were owned through Uber's subsidiary, Xchange Leasing, which it set up as "an auto leasing business."[30] According to Uber, Through Xchange Leasing, Uber

---

[26] *Greco v. Uber Tech. Inc*., N.D. Cal., 20-cv-02698 R. Doc. 42 at 1 (Joint CMC) ("Uber does not perform or provide any transportation itself, does not own, lease, or operate any vehicles for transporting riders, and does not employ drivers to operate vehicles, or contract with drivers to provide transportation on Uber's behalf."); *Namisnak v. Uber Tech., Inc*., 17-cv-06124-RS R. Doc. 102 at 8 (Order on Motion to Dismiss) ("Defendants point out they do not themselves purchase or lease vehicles, and thus argue the equivalent service' requirement does not apply to them."); *Crawford v. Uber Tech., Inc*., 17-cv-02664-RS, R. Doc. 63 at 33 (Motion for Judgment on Pleadings) ("Defendants operate a smartphone application, not any actual, physical place open to the public."); *Smith v. Uber Tech., Inc*., Alameda County Sup. Ct. Case No. RG18894507, April 20, 2018 Demurrer at pg. 8 ("Uber is a technology company that does not own or operate the vehicles Drivers use, and it does not employ Drivers."); *Equal Rights Center v. Uber Tech., Inc*., 17-cv-01272 (D.D.C.) at R. Doc. 19-1 at 10 (Motion to Dismiss) ("Uber does not own the vehicles Drivers use to provide rideshare services, and it neither employs nor controls any Drivers."); *id*. at 3 (Uber operates a smartphone application, not any real, physical space open to the public"); *SC Innovations, Inc. v. Uber Tech. Inc*., N.D. Cal. 18-cv-07440, R. Doc. 64 at 22 (Motion to Dismiss) ("Uber does not own cars, employ drivers or provide transportation.").

[27] *Crawford v. Uber Tech., Inc*., 17-cv-02664-RS, R. Doc. 63 at 10 (Motion for Judgment on Pleadings)

[28] Ex. L (Transcript of Motion Hearing in *Equal Rights Center v*. Uber, May 10, 2018) at 11.

[29] The sale of Xchange Leasing does not excuse Uber's false claims, as Uber represented it had no vehicles while it still possessed tens of thousands of vehicles. *Compare Crawford, supra*, R. Doc. 63 (Dec. 22, 2017) at 10 ("Uber does not own the vehicles Drivers use to provide rideshare services") with Ex. D (Rupp. Dep.) at 78:24-79:6 (Xchange Leasing "was sold in 2018.")

[30] Ex. D (Rupp. Dep.) at 77:2-4.

5

1  "bought vehicles and then leased them to Uber's driver partners."[31] Uber's Xchange Leasing fleet

2  of approximately **30,000 vehicles** was worth approximately **$400 million**.[32]

3      During the pendency of this lawsuit, Uber sold Xchange Leasing.[33] But it continued to own

4  hundreds of specialized SUVs through its self-driving car division, ATG, until December 2020.

5  And those vehicles were used for passenger rides: "Uber's self-driving vehicles have completed

6  over 30,000 real world passenger trips in places like Pittsburgh, PA and Tempe, AZ."[34] These

7  30,000 trips were driven in a car owned by Uber, with a human Uber employee behind the wheel.[35]

8  Most recently, Uber is poised to take possession of 24,000 more SUVs, in a deal with Volvo "said

9  to be worth about $1.4 billion."[36]

10

11      Uber's concession that it owns vehicles was summed up in the testimony of Uber's 30(b)(6)

12  witness, a Senior Manager for Strategy and Analytics for Uber's Vehicles Program. He testified

13  that:

14      Q.    Today an Uber subsidiary, ATG, owns approximately three to four hundred
15            physical vehicles, correct?

16      A.    That's correct.

17      Q.    And riders have taken approximately tens of thousands of trips in those vehicles?

18      A.    That's correct.

19
20      Q.    And until Uber's subsidiary Jump was sold, Uber through its subsidiary also had
            sixty to seventy thousand e-bikes and e-scooters, correct?

21
22      A.    That's correct.

23  _____

24  [31] *Id.* at 76:23 to 77:4.
    [32] *Id.* at 79:17-80:2.
    [33] *Id.* at 78:24-79:6 ("setting aside the date of incorporation, Xchange Leasing was getting up and running in 2015. It was operational through 2016. Towards the end of 2017, it was in maintenance mode and contracting and then was sold in 2018.")
    [34] Ex. M ("Engineering More Reliable Transportation with Machine Learning and AI at Uber") at 002230, available at https://eng.uber.com/machine-learning/.
    [35] Ex. N (Uber ATG 2020 Safety Report) at 002277.
    [36] Ex. D at 63:4-65:6.

6

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Q.   And until Uber sold Xchange Leasing in 2018, an Uber subsidiary also had approximately 30,000 automobiles, correct?

A.   Correct. Xchange Leasing owned 30,000 automobiles.

Q    Okay. So if Uber claimed that it and its subsidiaries do not own any vehicles that passengers ride in, that would be false, correct?

A.   Uber subsidiaries did own vehicles. Hopefully that answers your question or if you want to restate.

Q.   And still do?

A.   Correct. ATG still owns vehicles and it is an Uber subsidiary.[37]

Thus, Uber's repeated representations to this court that "they do not themselves purchase or lease vehicles" (R. Doc. 102 at 8) were false.[38] And as described below, this is relevant here because Uber's purchase of non-accessible vehicles for use in a generally non-equivalent-service system can trigger liability under the ADA. Further, Uber's purchase of thousands of vehicles, which were then used to transport people in exchange for money, further establishes that Uber is engaged in the business of transporting people and is not simply "an app."

## II.   LAW AND ANALYSIS

### A.   Legal Standard.

Plaintiffs reference and incorporate by reference this Court's statement of the legal standard applicable to motions for summary judgment in the case of *Banga v. Kanios*.[39]

### B.   Uber's Liability Under Title III of the ADA.

Title III of the ADA sets out a general rule that "[n]o individual shall be discriminated against on the basis of his disability. . ."[40] The Title III prohibition on discrimination applies to

---

[37] Ex. D (Rupp Dep.) at 101:16-103:2. (Uber subsequently sold its ATG division in December 2020, but kept a minority stake in the business.).
[38] Undersigned emailed and asked counsel for Uber to correct this misrepresentation. *See* Ex. JJJ. After finishing this motion, moments before filing, defense counsel finally responded, disputing that she had made misrepresentations and not offering to take any corrective action.
[39] No. 16-CV-04270-RS, 2020 WL 1492694, at *3 (N.D. Cal. Mar. 27, 2020).
[40] 42 U.S.C. § 12182(a).

7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

entities that provide "specified public transportation services." Specifically, Section 12184(a) of the ADA states that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce.

> "Specified public transportation services" are defined as any "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis."[41]

Notably, per 49 C.F.R. § 37.23(d), an entity cannot do through contract, or "other arrangement", that which the entity cannot do itself. If any entity sub-contracts its service out to another entity, the "parent" entity is still responsible for any transportation services provided by the sub-contracting entity.

Thus, Uber will be covered by Title III if it:

1. Provides transportation to the general public by non-aircraft conveyances on a regular and continuing basis OR contracts with a third party to do so;

2. Is primarily engaged in the business of transporting people; and

3. Has operations that affect commerce.

If Uber meets those criteria, then Uber's failure to make reasonable modifications to its policies, procedures, or practices for persons with disabilities constitutes unlawful discrimination.[42] It is also unlawful discrimination for such a private entity to buy or lease a new van with a seating capacity of less than 8 passengers, unless the van is a WAV or the system "when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service provided to the general public."[43] And it is also unlawful for such a private entity to apply

---

[41] 42 U.S.C. § 12181(10).
[42] 42 U.S.C. § 12184(b)(2)(A).
[43] 42 U.S.C. § 12184 (b)(5).

criteria that "screen out or tend to screen out" any "class of individuals with disabilities from fully enjoying the specified public transportation services" unless "necessary for the provision of the services being offered."[44]

Plaintiffs may then show that Uber has committed unlawful discrimination either by showing that Uber (a) has failed to make reasonable modifications to its policies, procedures, or practices;[45] (b) that Uber or its sub-entities have purchased a non-WAV van without ensuring equivalency of service for wheelchair users on their system as a whole, in violation of 42 U.S.C. § 12184(b)(3); or (c) has imposed criteria that "screen out or tend to screen out" any "class of individuals with disabilities from fully enjoying the specified public transportation services" unless "necessary for the provision of the services being offered."

"Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."[46] The standard for reasonableness under the ADA does not differ from the one employed under the Rehabilitation Act, 29 U.S.C. § 794.[47]

---

[44] 42 U.S.C. § 12184(b)(1).

[45] 42 U.S.C. § 12184(b)(2)(A).

[46] *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.1995); *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.1999) (stating that "the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might [be necessary to ensure his ability to enjoy a public accommodation]").

[47] *Wong*, 192 F.3d at 816 n. 26 ("Although Title [III] of the ADA uses the term 'reasonable modification' rather than 'reasonable accommodation,' these terms do not differ in the standards they create.").

9

What an entity has done in the past to accommodate others with disabilities is material to determine whether the requested modification is reasonable.[48] Courts have explained that, under the ADA, the covered entity "may not 'in the face of a request for accommodation, simply sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome.' "[49] As another circuit put it, " '[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits,' and once this is done 'the risk of nonpersuasion falls on the defendant.' "[50]

Fundamental alteration and undue burden are affirmative defenses.[51] The bar for undue hardship is "high."[52] "An accommodation imposes an undue financial or administrative burden if its costs are clearly disproportionate to the benefits it will produce."[53] "When a party has previously granted a specific accommodation that fact may 'undermine its showing of hardship.' "[54]

---

[48] *See, e.g.*, *Taylor v. Gilbert & Bennett*, No. 95 C 7228, 1997 WL 30948, at *2 (N.D. Ill. Jan. 15, 1997) ("Relevant to a determination of whether the accommodations made or refused in any particular case are reasonable is the employer's past actions towards employees who are in a similar situation to the plaintiff."); *Wong*, 192 F.3d at 820 ("We briefly note that both parties have met their burdens of production as to whether the accommodation was reasonable. Among other things, Wong has shown that the University granted this accommodation in the past.")

[49] *Hodson v. Alpine Manor, Inc.*, 512 F.Supp.2d 373, 392 (W.D.Pa.2007) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir.1999)).

[50] *Disabled in Action v. Board of Elections in the City of New York*, 752 F.3d 189, 202 (2d Cir. 2014) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) ).

[51] *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004)("Whether an accommodation fundamentally alters a service or facility is an affirmative defense."); see also, *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1101 (9th Cir. 2013) (describing fundamental alteration and undue burden as "defenses").

[52] *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 823 F. Supp. 2d 995, 1014 (N.D. Cal. 2011).

[53] *Kulin v. Deschutes Cty.*, 872 F. Supp. 2d 1093, 1100 (D. Or. 2012) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2nd Cir. 1995) ).

[54] *Guerra v. W. Los Angeles Coll.*, No. CV 16-6796-MWF (KSX), 2017 WL 10562682, at *11 (C.D. Cal. June 14, 2017) (quoting *EEOC v. Placer ARC*, 114 F. Supp. 3d 1048, 1059 (E.D. Cal. 2015) (denying summary judgment on defendant's undue hardship defense)).



**Figure 2: Summary of Legal Structure of Uber's Liability**

**C.      Plaintiffs Are Qualified Individuals With Disabilities, and Have Standing to Sue.**

Plaintiffs are qualified individuals with disabilities. The ADA defines "disability," in relevant part, as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"[55] Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working".[56]

Here, Mr. Falls was rendered disabled on December 13, 2004 during a robbery in which he was "shot in the head, throw[n] off a bridge and hit by a train."[57] He suffers from paralysis and is missing an arm.[58] Mr. Stephan Namisnak has muscular dystrophy,[59] and Dr. Crawford has multiple sclerosis.[60] For all three Plaintiffs, their disabilities impact their ability to walk, stand, lift, and care for themselves.[61] The Plaintiffs' conditions require them to use a motorized wheelchair for mobility.[62] Plaintiffs are qualified individuals with disabilities.

The Ninth Circuit held that Plaintiffs' allegation that they had actual knowledge that Uber does not provide UberWAV service was sufficient to constitute an injury in fact at the pleadings stage.[63] Now that the case has advanced to the summary judgment stage, Plaintiffs have proven their allegation. Mr. Falls explained that, prior to filing suit, he was aware that Uber does not have

---

[55] 42 U.S.C. § 12102(1).

[56] *Id.* at (2) (emphasis added).

[57] Ex. O (Plaintiff Francis Falls Dep.) at 11:13-15, 27:9-12.

[58] *Id.* at 11:4, 27:11.

[59] Ex. P (Plaintiff Namisnak Dep. Vol. II) at 14:14-15.

[60] Ex K (Plaintiff Crawford Dep.) at 13:9.

[61] *See* Ex. P at 14:16-18:5; *see* Ex. O at 11:9-11, 20:8-10 (Falls requires a caretaker to bathe and dress him, *etc*.).

[62] Ex. P at 14:16-22; Ex. O at 11:21-23; Ex. K at 13:11-16.

[63] *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1093 (9th Cir. 2020) ("Plaintiffs have actual knowledge that Uber does not provide its uberWAV service in New Orleans. That barrier to entry makes downloading the Uber App and creating an account a futile gesture, which Plaintiffs need not engage in to show injury in fact.").

12

UberWAV in New Orleans when he was stranded during an outing with friends.[64] His friends took an Uber home, and because Uber was not wheelchair-accessible, Mr. Falls had to wheel himself home – and was hit by a car.[65] Mr. Namisnak learned of Uber's non-compliance from internet research.[66] Dr. Crawford learned from friends in the disability community.[67] Plaintiffs are currently deterred from attempting to use Uber's service which they know to be inaccessible to them.[68]

The plaintiffs' pre-suit knowledge of the lack of UberWAV in New Orleans and Jackson has been further confirmed and solidified by Uber's affirmative statements during this ongoing litigation, during which Uber has repeatedly confirmed that UberWAV is not available and has refused to provide Plaintiffs' requested modification.[69] And Plaintiffs testified that they would use Uber if it were accessible to them.[70] As a report commissioned by Uber concluded, "On-demand WAV services hold promise in transforming the way individuals with wheelchairs travel, offering a level of freedom not previously possible."[71] Plaintiffs have thus proven that they are qualified persons with disabilities who suffered an injury-in-fact and, thus, have Article III standing to pursue their claim.

---

[64] Ex. O at 46:16 – 47:6.
[65] *Id.*
[66] Ex. Q (Namisnak Interr. Responses) at Response to Interrogatory No. 6.
[67] Ex. K at 47:12-21.
[68] Ex. K at 33:2-9 (Crawford has not used Uber because it is not accessible in Jackson, but would if it were); Ex. O at 47:16-48:6 (Falls has not used Uber because he was told Uber was not "handicap accessible"); Ex. P at 34:21-25 (Namisnak has not used Uber because he "can't use it to request WAV rides in New Orleans").
[69] *See, e.g., Namisnak,* R. Doc. 98-1 (Nov. 13, 2019 Letter from Uber's Counsel).
[70] Ex. K (Crawford) at 33:6-9 ("Q Okay. If there were a WAV option available in the Uber app in Jackson, you would download the Uber app? A Yes."); Ex. P (Namisnak) at 35:1-3 ("Q So you would download the Uber app if you could use it to request WAV rides; is that right? A Oh, yeah."); Ex. O (Falls) at 50:1-3 ("If they get [WAVs], yes, I'm gonna call them every day. I got something to do every day. I'm tired of being inside.").
[71] Ex. F at 00006936.

**D.      Uber is Covered by Title III Because it Provides Transportation Services.**

Under Title III of the ADA, an entity that "provides" the general public with "specified public transportation service" faces liability if it fails to take certain steps to make its system accessible for persons with disabilities or fails to make reasonable modifications to its policies, procedures, or practices.[72] "Specified public transportation" is defined to mean "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis."[73]

Here, the evidence collected in this case proves that Uber is more than a mere conduit, and is subject to Title III for four distinct, and independently sufficient, reasons: (1) because Uber repeatedly and publicly represents that it provides transportation; (2) because Uber controls virtually every aspect of its transportation system; (3) because Uber has owned a fleet of tens of thousands of vehicles used to transport riders; and (4) because Title III also attaches to entities that provide transportation through third parties.

Such a conclusion is in line with holdings of this Court. On November 3, 2020, this Court applied Section 12184 to Uber's competitor, Lyft, Inc., holding that:

> Lyft is a private entity that provides ridesharing services. Its mission is to "[i]mprove people's lives with the world's best transportation." This order finds that Lyft is a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce, and is covered under Section 12184.[74]

Here, just like Lyft, Uber is a private entity that provides transportation. Just like Lyft, its mission is "to make transportation as reliable as running water everywhere, for everyone."[75] And

---

[72] 42 U.S.C. § 12184.
[73] 42 U.S.C. § 12181(10).
[74] *Independent Living Resource Center v. Lyft, Inc.*, 19-cv-01438-WHA, R. Doc. 92 at *3 (N.D. Cal., Nov. 3, 2020) (citations omitted).
[75] Ex. R (Uber Website), at 002856, available at www.uber.com/blog/chicago/uberaccess/; Ex. S (Uber 30(b)(6) Dep. via Niraj Patel on Nov. 20) at 136:21-25 (describing the mission as "transportation as reliable as running water everywhere.").

14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

like Lyft, Uber provides transportation conveyances other than aircraft through its ride products UberX, UberSUV, UberWAV, and others.

In its filings to the Securities and Exchange Commission, Uber admits that its "Ridesharing products" are a "form of transportation," explaining that its "Ridesharing products" are "more convenient and cost-competitive versus other forms of Transportation."[76] And so to the SEC, Uber has conceded the obvious: that it is "subject to many U.S. federal, state, local, and foreign laws and regulations, including those related to . . . transportation services."[77]

But to this Court, Uber argues the opposite. It contends that Uber itself is *not* providing transportation, that instead the third-party drivers are providing the transportation.[78] No court has yet adopted that theory. And this Court has already rejected that argument with regard to Uber's competitor, Lyft:

> Under this theory, Lyft drivers perform services only for their riders, while Lyft is an uninterested bystander of sorts, merely furnishing a platform that allows drivers and riders to connect, analogous perhaps to a company like eBay. **But that is obviously wrong.**[79]

This Court should hold that Uber's claim to the same theory is likewise wrong. As the District of the District of Columbia held last month:

> [T]he "plain" or "ordinary" meaning of the word "provide" is merely "to supply *or make available*[.]" See Provide, Merriam-Webster Collegiate Dictionary (online ed. 2021) (emphasis added). And under that definition, an entity can "provide" a public transportation service without actually conveying or transporting people itself.
> . . .
>
> Uber's drivers are part of the Uber workforce, and they operate within a market that Uber itself created; Uber drivers do not exist independent of Uber's app, and this Court is hard-pressed to imagine how Uber drivers could continue to operate without the Uber app (or a competitor's service). Uber also controls the pricing of

---

[76] Ex. A (Uber SEC Filing) 001380.
[77] Ex. A at 001407 (emphasis added).
[78] Ex. T (Rosenthal Dep.) at 54:18-19 (Uber's "software and services just help [drivers] provide [riders] offers to provide transportation").
[79] *Cotter v. Lyft, Inc*., 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) (emphasis added).

15

its drivers' services, and it allegedly asserts far more control over its drivers than any traditional brokering service has over the relevant service providers. Thus, based on the allegations in ERC's complaint, Uber is much more than a mere "conduit" between riders and drivers.[80]

Likewise, in *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal. 2015), the Honorable Judge Edward M. Chen noted several "indicia of [Uber's] role as a transportation company rather than a software provider" and found Uber's characterization of its service "as merely a technological intermediary between potential riders and potential drivers" to be "fatally flawed" for the following reasons:

> [Although] Uber now disclaims that it is a "transportation company," Uber has previously referred to itself as an "On–Demand Car Service," and goes by the tagline "Everyone's Private Driver." Indeed, in commenting on Uber's planned expansion into overseas markets, its CEO wrote on Uber's official blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a transportation system in a city near you." Other Uber documents state that "Uber provides the best transportation service in San Francisco[.]" Moreover, Uber does not sell its software in the manner of a typical distributor. Rather, Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring their performance, disciplining (or terminating) those who fail to meet standards, and setting prices.[81]

The following evidence confirms that Uber provides transportation:

1. Uber Provides Transportation, as it Has Repeatedly Represented to the Public, State Legislatures, and to the SEC.

This Court has held that Uber's public representations about the nature of its business are legally relevant, holding that "Uber's claim that it is 'not a transportation company' strains credulity, given the company advertises itself as a 'transportation system.'"[82] And here, Uber repeatedly describes itself as "providing transportation." It has done so in public and in private, on

---

[80] *Equal Rights Center v. Uber*, 17-cv-01272-KBJ at *35, 37 (D.D.C. March 15, 2021).
[81] 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015); *see also Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) (calling "obviously wrong" Lyft's assertion that it "merely furnish[es] a platform that allows drivers and riders to connect").
[82] *Namisnak v. Uber*, 17-cv-06124-RS, R. Doc. 102 at pg. 7 (N.D. Cal., March 13, 2020).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

websites and in Securities and Exchange Commission ("SEC") filings, to state legislatures and in sworn testimony. For example, Uber has publicly represented that:

- "We are dedicated to **providing a seamless transportation option** for all and we are not about to stop."[83]

- "Uber is **not only transporting people**, but increasing the number of residents small businesses can serve in all areas of Columbus."[84]

- "Many people like to speculate as to whether or not Uber will eventually move beyond **transporting people**."[85]

- "Our work doesn't end with **transporting people**."[86]

- "We're finally **giving this city the transportation system** that it deserves."[87]

- "We are 'Everyone's Private Driver.' We are Uber and **we're rolling out a transportation system** in a city near you."[88]

- Uber "**provides** the city with **a more efficient transportation system**."[89]

- "Your Uber is arriving now, New Orleans. While it's been a long road to get here, we're SO pumped to be **providing** the Big Easy with reliable, safe, and **convenient transportation**…finally!"[90]

In testimony before the Maine state legislature, Uber testified that "**Uber provides transportation** to and from all neighborhoods, especially areas traditionally underserved by public transportation."[91] And Uber's former CEO explicitly and publicly rejected the idea that Uber *isn't* a transportation system:

---

[83] Ex. U (Uber.com, *You Requested, We Listened: Introducing uberX!,* June 19, 2014) at 002897.
[84] Ex. V (Uber.com, *Connecting Ohio's Capital City*, June 18, 2015) at 002812.
[85] Ex. W (Uber.com, *Uber's New BHAG: uberPOOL*, Feb. 3, 2015) at 002862.
[86] Ex. X (Uber.com, *Advanced Technologies Group,* Aug. 12, 2017) at 000333.
[87] Ex. Y (Uber.com, *Uber has launched in Mexico City!*, Aug. 2, 2013) at 000348.
[88] Ex. Z (Uber.com, *New Logo for Uber,* Dec. 5, 2011) at 000273; *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015).
[89] Ex. AA (Uber.com, *Delivering a New Choice to Jakarta*, Aug. 22, 2014) at 000242.
[90] Ex. BB (Uber.com, *Uber Makes a Jazzy Entrance into New Orleans,* Sep. 19, 2014) at 000370.
[91] Ex. CC (Uber's Testimony to the Maine Committee on Insurance and Financial Services, May 12, 2015) at 002868 (emphasis added).

Uber LA is officially rolling out its transportation system in this fine city. **Now, how is some on-demand town car service calling itself a transportation system?** And how are a bunch of limos going to make this city better? We've got a bunch of examples for you, but let me start with this: for every well utilized UberCar on the road, we're taking 6 cars off the road and out of parking garages.[92]

And while Uber tells this Court that it operates only "a smartphone application, not any actual, physical place open to the public"[93], it says something very different to everyone else:

The unique aspect of Uber is that **we exist in the physical world**. When you push a button on your phone, a car moves across the city and appears where you are. We exist in the place where bits and atoms come together. That is Uber. We are not just technology but technology that moves cities and their citizens.[94]

These representations are not mere puffery. In its filings with the SEC (which are relied upon by the government and Uber's investors), Uber explicitly says it is competing with more traditional forms of transportation:

- "For example, to rapidly scale our network in new cities by attracting consumers to our platform and away from personal vehicles or public transportation or to compete effectively in existing cities where competitors offer incentives, we often use Driver incentives."[95]

- "We believe that our growth depends on a number of factors, including our ability to: reduce the costs of our Personal Mobility offering to better compete with personal vehicle ownership and usage and public transportation."[96]

- "Our ability to increase our market share relative to other transportation options depends in part on our ability to reduce the average cost per mile traveled on our platform, including through the introduction of lower price-point products such as Express POOL and Uber Bus"[97]

Uber's own representatives conceded as much when questioned under oath. One representative conceded that Uber's riders consider Uber's services to compete against the

---

[92] Ex. DD (Travis Kalanick, Uber LA Officially Launched, March 8, 2012) at 000118 (emphasis added).
[93] *See Crawford*, 17-cv-02664, R. Doc. 63 at 33.
[94] Ex. EE (Travis Kalanick, *Celebrating Cities: A New Look and Feel for Uber*, Feb. 3, 2016) at 000487.
[95] Ex. A (Uber SEC Filing) at 001334.
[96] *Id.* at 001264.
[97] *Id.* at 001320.

alternatives of personal vehicle ownership and taxis.[98] And another confirmed that "Uber X, that's one of Uber's transportation options, but for-hire transportation has been around for a very, very long time."[99]

Thus, as the court in *ERC* held, "Uber advertises its service as having '[t]ap a button, get a ride' convenience, and that description indisputably entails providing transportation to the general public 'on a regular and continuing basis.'"[100] And so Uber cannot argue that it is not "providing transportation" when it represents to the public, state legislatures, and the SEC that it is doing exactly that.

> 2. <u>Uber Provides Transportation Because It Controls Virtually Every Aspect of the Transportation its Riders Receive.</u>

The fact that Uber controls virtually every aspect of the transportation that its riders receive further supports the conclusion that Uber provides transportation. Uber tries to portray itself as merely operating a smartphone application that provides a neutral medium for third parties to contract for transportation. But as detailed below, Uber controls the location of service, pricing, insurance, what vehicles and other tools can be used, how various tools can be used, who qualifies to drive, prerequisites to driving such as training and background checks, how drivers conduct themselves during trips, and managing safety issues and accidents. And far from being "just an app," Uber deploys actual, human, <u>in-person</u> staff to manage customer queues and traffic patterns.

(i). *<u>Uber Controls the Location of Service and What Trips Occur</u>*. Uber decides which cities and geographic areas will feature modes of transportation such as UberX, UberSUV, or UberWAV.[101] And on a more granular level, Uber exerts directing influence over where drivers

---

[98] Ex. LLL (Patel Dep. on Dec. 15) at 80:17-81:8.
[99] Ex. T (Rosenthal Dep.) at 14:3-14.
[100] *Equal Rights Center v. Uber*, 17-cv-01272-KBJ at *36 (D.D.C. March 15, 2021).
[101] *See* Ex. T (Rosenthal Dep.) at 43:16-44:2 ("For Uber XL in particular, assuming regulations permit the service, I think it would be us who determines whether or not that service would be

and riders make pickups. One way Uber does this is through geofencing. A "geofence" is a human defined geographic area.[102] Uber uses geofences to communicate to drivers that certain areas are not intended to be an area where a driver picks up a rider.[103] Uber has used geofences to enforce rules about areas where "riders aren't allowed to request" rides.[104]

Uber also uses contractual requirements to impose limitations on where drivers can / cannot refuse or cancel a trip. Uber prohibits drivers from intentionally refusing or cancelling trips or requests "for the purpose of avoiding a particular neighborhood due to the demographic characteristics of the people or businesses that are located in that area[.]"[105]

(ii). *Uber Controls the Pricing of Rides*. When a rider opens their Uber application, a quoted price for a ride will appear.[106] Uber's algorithm calculates the various components of a ride—time rate, distance rate, base rate, and taxes, tolls, and city fees—and then "displays the price on the app."[107] A rider can then accept the price or not take the ride.[108] The same is true for Uber drivers. Unlike a website such as Craigslist—where a seller can select their own price—in New Orleans and Jackson an Uber driver cannot unilaterally set their own price for a ride and the sole

---

available.") and 45:3-9 (when discussing UberX: "I do know that we are not a public utility, and it is our decision on whether or not where we want to operate."); *see also* Ex. FF at 00005073 (in 2017, Uber modified its Phase 2 WAV markets by adding some cities—such as San Francisco and Phoenix—and removing other cities, including New Orleans).

[102] Ex. LLL (Patel Dep. on Dec. 15) at 97:5-9.

[103] *Id*. at 98:9-18.

[104] *Id*. at 102:10-103:8. In New Orleans, for example, Uber has used a geofence at the airport and for events such as Jazz Fest, Voodoo Fest, and Essence Fest. Ex. GG (30(b)(6) Dep. of City of New Orleans via Wesley Pfieffer) at 15:4-20 (Uber used geofence for Jazz Fest); 34:17-25 (discussing Uber's use of geofence at VooDoo fest); 20:5-23 (discussing Uber's geofence related to Essence Festival). During Mardi Gras, Uber pushed out information related to parade routes that could not be crossed. *Id*. at 28:12-29:5.

[105] Ex. LLL (Patel Dep. On Dec. 15) at 52:9-53:19. Failure to abide by this rule can result in "a loss of access to the platform." *Id*. at 54:24-55:7; Ex. HH at 002744 ("Not following any of our guidelines may result in the loss of access to your Uber accounts.").

[106] Ex. S (Patel Dep. on Nov. 20) at 33:20-35:3.

[107] Ex. S (Patel Dep. On Nov. 20) at 36:11-37:3.

[108] *Id*. at 37:4-19.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

options are to either accept the ride or decline the ride.[109] Drivers cannot unilaterally set their own price for a ride.[110] Uber thus concedes it is "not like Craigslist" because any one specific driver is not setting a price that any one specific rider is choosing.[111] In sum, Uber sets the price of rides.

(iii).    _Uber Provides Insurance and Requires It of Drivers._ Uber requires that drivers maintain insurance in accordance with state and local laws.[112] But Uber also maintains additional insurance on the driver's behalf in the case of a covered accident.[113] Uber requires that drivers provide documentation of their vehicle registration, proof of insurance which must include the driver's name and the VIN of the vehicle, and depending on the geography, a vehicle inspection.[114]

(iv).    _Uber Controls What Vehicles Can be Used._ Uber controls what vehicles can be used by its drivers, by setting certain requirements for the vehicles.[115] If the vehicle does not meet Uber's requirements, it is not allowed to participate in Uber's products.[116] Uber maintains a set of age requirements for the vehicles that "are eligible to take trips on Uber[.]"[117] In some locations, such as New Orleans, the vehicle must undergo a physical inspection and a form is completed which the driver then uploads to Uber's onboarding app.[118] For UberX in New Orleans and Jackson, the vehicle must be a four-door vehicle, have five factory-installed seats, and have air

---

[109] _Id_. at 40:2-41:14. Uber has published a webpage entitled "How are fares calculated" with details. _Id_. at 46:6-9; 48:10-13.

[110] Uber also controls what is known as surge pricing. Where there are not enough drivers, the price for a ride "is dynamically increased for a period of time until the supply and demand balances out." _Id_. at 49:4-13. "It is Uber's technology that makes the assessment of the balance of supply and demand." _Id_. at 51:7-20.

[111] _Id_. at 57:7-14.

[112] Ex. D (Rupp Dep.) at 46:21-47:6.

[113] _Id_. at 43:12-21.

[114] _Id_. at 25:19-26:11.

[115] _Id_. at 23:11-14.

[116] _Id_. at 24:20-25.

[117] _Id_. at 23:20-24:6.

[118] _Id_. at 27:8-14.

1   conditioning. No aftermarket seating modifications are allowed, and no vans, box trucks, or similar

2   vehicles are permitted.[119]

3       (v).   _Uber Controls How Drivers Use and Maintain Their Vehicles_. Uber prohibits

4   drivers from allowing anyone other than the "rider and the rider's guests" in the vehicle and "[i]f

5   the rider were to report that there were people in the vehicle other than the driver and … the rider

6   and their party, that could result in a driver losing access to the platform."[120] Uber limits how

7   drivers can use cameras or other video or recording devices by prohibiting the "broadcasting [of]

8   a person's image, audio, or video recording[.]"[121] Uber drivers are obligated "to monitor for and

9

10  repair any parts that are recalled by your vehicle's manufacturer[.]"[122]

11      Uber is also involved in how drivers obtain their vehicles. Through Xchange Leasing, Uber

12  bought vehicles and leased them to Uber's driver partners.[123] On its website, Uber advises that

13  individuals who don't have a vehicle "can get a car from one of our vehicle partners or from a fleet

14  partner in select markets."[124] Through this program, individuals who don't have a vehicle but want

15  to be an Uber driver can go to Uber's Vehicle Marketplace and can rent a car from Hertz or Avis.[125]

16  Uber has committed "more than $800 million in resources to help hundreds of thousands of drivers

17  in the US, Canada and Europe" transition to Electric Vehicles by 2025.[126] As is discussed _infra_ at

18

19

20

21

---

22  [119] _Id_. at 28:18-29:7. Ex. FFF provides Uber's requirements for New Orleans. Ex. GGG provides
    Uber's requirements for Jackson, MS.
23  [120] Ex. LLL (Patel Dep. on Dec. 15) at 58:3-16.
    [121] _Id_. at 61:24-62:12. Deactivation is one of the possible outcomes if Uber learned of
24  impermissible broadcasting. _Id_. at 62:14-23.
    [122] _See_ Ex. II (Uber's "Platform Access Agreement" which incorporates Uber's "Community
    Guidelines" by reference, which drivers must confirm that they have "read, understand, and
    accept") (highlighting added by Plaintiff's counsel) at 00005464.
    [123] Ex. D at 76:23-77:4.
    [124] _Id_. at 95:18-25.
    [125] Ex. D (Rupp Dep.) at 98:15-20.
    [126] _See_ Ex. JJ (Dara Khosrowshahi, _Driving a Green Recovery_, Sep. 8, 2020) at 002758.

Section G(2)(ii), Uber has provided incentives related to WAVs, including bonuses, leasing assistance, and reduced Uber service fees.

Uber also exercises control over drivers regarding ADA issues. Under Uber's Community Guidelines, "Knowingly refusing a rider a trip because of their service animal will result in losing access to the Uber apps."[127] "If Uber were able to conclude that the driver knowingly refused a rider a trip because of a service animal, that would result in the loss of access to the platform."[128]

(vi).     *Uber Controls Who Can Drive and Performs Ongoing Review of Its Drivers.* According to Uber's "Platform Agreement," drivers are "required to pass various background, driving record and other checks both prior to the first time you access our Platform and from time to time thereafter[.]"[129] In New Orleans, Uber performed background checks on its drivers and Uber provided a statement that it certifying each driver.[130]

Uber reviews rider reports of collisions, traffic citations, and other reports of poor, unsafe, or distracted driving,[131] which can result in deactivation from Uber services, either permanently or temporarily.[132] Uber requires its drivers to notify Uber "within 24 hours" and provide Uber with information relating to any incident, [133] or if they are "arrested for, charged with, or convicted of a criminal offense." [134]

(vii).     *Uber Imposes Mandatory Training for Its Drivers.* According to a document published by Uber's Chief Legal Officer, Uber requires that its drivers undergo mandatory sexual assault and misconduct education.[135] According to Uber, if a driver did not want to "experience or

---

[127] Ex. LLL (Patel Dep. on Dec. 15) at 64:20-65:4.
[128] *Id*. at 65:24-66:8.
[129] *See* Ex. II at 00005464.
[130] Ex. GG (City of New Orleans Dep.) at 43:18-44:2.
[131] Ex. LLL (Patel Dep. on Dec. 15) at 63:10-17.
[132] *Id*. at 64:9-18.
[133] *See* Ex. II (Platform Access Agreement) at 00005465.
[134] *See* Ex. II at 00005465.
[135] Ex. LLL (Patel Dep. on Dec. 15) at 27:9-28:6.

listen to this, whatever form this sexual assault and misconduct education takes" then "their access to the platform may be impacted."[136]

(viii).  *Uber Controls What Its Drivers and Riders Do During Trips.* Uber monitors feedback from its riders on its drivers, reviews the feedback, and decides "if there is any action to be taken."[137] Through its "Community guidelines," Uber proscribes and dictates what behavior that can occur during trips. Uber prohibits drivers from touching "strangers or anyone you just met while using any of Uber's apps."[138] Commenting on an individual's appearance or asking whether they are single is prohibited and, if Uber receives credible information of a violation, then the driver could "lose access to the platform as a result."[139] Uber restricts gestures like "nudges, whistles, and winks,"[140] and prohibits drivers from commenting on appearance, perceived gender identity, or sexual orientation.[141]

(ix).   *Uber Has Deployed On-Site Personnel to Various Locations to Aid Its Operations.* Uber deploys on-site personnel to aid in its operations. Uber admitted that individuals bearing Uber insignia on clothing were deployed to airports to help "riders understand how to use Uber's technology to get a ride basically, to request a ride."[142] Uber admits that it deployed "people" on-site to airports to aid riders.[143] At those airports, riders and drivers form a physical queue, and Uber's "people" guide riders to cars,[144] aided by Uber's physical signage.[145]

---

[136] *Id.* 29:13-30:16.
[137] *Id.* at 9:5-18.
[138] *See* Ex. II at 00005461. Violating the Guidelines can result in deactivation, either as a driver or rider Ex. LLL at 38:24-39:17; 39:18-21 (basis for loss of access to Uber's "platform.").
[139] *Id.* at 39:25-40:22.
[140] *See* Ex. HH (Community Guidelines) at 002734.
[141] *See id.*; Ex. LLL (Patel Dep. on Dec. 15) at 47:16-48:10.
[142] Ex. S (Patel Dep. on Nov. 20) at 231:21-232:18.
[143] *Id.* at 232:23-235:3.
[144] *Id.* at 235:4-17.
[145] *See, e.g.*, Ex. LL at 000753 (photographs taken at New Orleans airport of individuals wearing Uber regalia working to direct riders in the midst of Uber signage and que); *see also*, Ex. JJJ, ¶ 11.

Likewise, Uber has deployed personnel on-site to music festivals. For example, Uber had "employees or contractors" on site at New Orleans festivals during at least the years of 2016, 2017, and 2018.[146] For one festival in 2019, Uber worked with the City of New Orleans to help create proposed traffic patterns.[147] Uber made requests to the New Orleans Police Department that certain streets be allowed to remain open for Uber drivers.[148] For that festival in 2018, the pickup location for Uber drivers was determined by Uber and Uber rented out a private lot.[149] Uber's representative communicated with the City of New Orleans concerning ingress and egress issues for its private lot.[150]

In sum, it is an undisputable fact that Uber "provides transportation," because (a) it says it does, (b) it has testified that it does, and (c) in practice it controls almost every aspect of the transportation that riders receive.[151]

     3.   <u>Uber Provides Transportation Because It Owned a Fleet of Tens of Thousands of Vehicles that Riders Rode In.</u>

In *Independent Living v. Lyft*, this Court granted plaintiffs' motion for summary judgment in part, holding that Lyft provides transportation and is covered by Title III. The Court reached

---

[146] Ex. GG (City of New Orleans Dep.) at 35:17-22.

[147] *Id*. at 33:9-14.

[148] *Id*. at 32:3-33:2.

[149] *Id*. at 30:20-31:7.

[150] *Id*. at 31: 9-12.

[151] Even if there was some doubt that Uber is in the business of transporting people, doubts should be resolved in favor of Plaintiffs here. That is because the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals."). As a result, "the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination." *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted).

25

1   that conclusion even though the parties stipulated that "Lyft does not own or lease any vehicles

2   used for ridesharing on the Lyft platform."[152]

3        Here, the case for Uber providing transportation is even stronger than it was for Lyft. That

4   is because during the pendency of this litigation Uber *has* owned and leased vehicles for use on its

5   transportation system. Specifically, Uber admits that it "bought vehicles and then leased them to

6   Uber's driver partners" through a subsidiary.[153] That fleet was made up of approximately 30,000

7   vehicles and worth approximately $400 million.[154] And although Uber sold that subsidiary and its

8   vehicles during the pendency of this suit, Uber continued to own at least "three to four hundred

9
10   physical vehicles" in which "riders have taken approximately tens of thousands of trips."[155]

11        Because Uber provides transportation, the motion should be granted.

12        4.   Title III Also Applies to Entities that Provide Transportation through Third Parties.

13
14   Even if Uber were correct that its drivers – and not Uber – provide transportation, that

15   would not allow Uber to escape coverage under Title III of the ADA. That is because the ADA

16   defines "operate" to include "the provision of transportation services by a … private entity itself

17   or by a person under a contractual or other arrangement or relationship with the entity."[156] This is

18   known as the "stand in the shoes" doctrine under the ADA.[157] As a result, an "entity must assure

19   that the same accessibility requirements are met by the [contracting] entity . . . as would apply if

20   the [principal] entity were operating the system [or portion thereof] itself."[158]

21

22

---

[152] *Independent Living v. Lyft, supra,* at R. Doc. 68 at 10.
23   [153] Ex. D (Rupp Dep.) at 76:20-77:4.
[154] *Id*. at 79:17-80:2.
24   [155] *Id*. at 101:13-103:1.
[156] 49 C.F.R. § 37.3.
[157] 76 Fed. Reg. 45588 (Sept. 6, 1991). By way of example, in the Title III/Title II physical barrier case of *Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, the district court found that the public entity could be responsible for discrimination that occurred at a concert even though the private entity was responsible for the day-of-event operations at the concert. 385 F. Supp. 3d 491, 499 (E.D. La. 2019) (evaluating 28 C.F.R. § 35.102(a)).
[158] 56 Fed. Reg. 45584, quoting H. Rept. 101-485, Pt. 1 at 26.

This doctrine applies to Uber. As the U.S. Department of Justice explained in a statement of interest regarding Uber:

> Thus, an entity may operate a demand responsive system even if it does not itself provide transportation services, if it does so through a contractual relationship with another entity **or even individual drivers**. Indeed, as explained in the DOT guidance, while an entity may contract out its service, it may not contract away its ADA responsibilities. *See* 49 C.F.R. pt. 37, app. D § 37.23; *see also* 49 C.F.R. § 37.23(d).

*NFB v. Uber*, 14-cv-4086, R. Doc. 29 at pg. 6 (N.D. Cal., Dec. 23, 2014) (emphasis added).[159]

Here, Uber has a contractual relationship with drivers.[160] And it contends that those drivers provide transportation.[161] Thus, per the "stand in the shoes" doctrine of 49 C.F.R. § 37.3, Uber is covered under Title III regardless of whether it provides transportation directly or through a contractual relationship with third parties.

**E.     Uber is Covered by Title III Because It is Primarily Engaged in the Business of Transporting People.**

Not only does Uber provide transportation, this transportation of people is Uber's "primary business." To be covered by Title III, Uber must be "primarily engaged in the business of transporting people," rather than transportation being "off to the side of to [sic] the main business . . . (*e.g.*, a hotel shuttle)."[162] And even if Uber as a whole is not primarily in that business, if a "subsidiary company or an operationally distinct segment" of Uber is primarily engaged in the business of transporting people, that company or segment will be subject to Title III. 49 C.F.R. 37.37 (f).

---

[159] To the extent it has the power to persuade, the DOJ's position is entitled to Skidmore respect. *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944); *see also San Luis & Delta–Mendota Water Auth. v. United States*, 672 F.3d 676, 708 (9th Cir.2012).
[160] Ex. T (Rosenthal Dep.) at 26:17-19 ("The Platform Access Agreement is an agreement that drivers enter into with Uber or one of its subsidiaries.")
[161] *Id.* at 54:18-19 (Uber drivers "provide transportation").
[162] 42 U.S.C. § 12184 (a), 42 C.F.R. § 37.29; Appendix D to 49 C.F.R. Part 37.

Here, Uber's documents show that it is primarily in the business of transporting people. According to its SEC filings, Uber divides its business into two operating segments: "Core Platform" and "Other Bets."[163] Core Platform "consists primarily of Ridesharing and Uber Eats."[164] Ridesharing refers to products that "connect consumers with Drivers who provide rides in a variety of vehicles, such as cars, auto rickshaws, motorbikes, minibuses, or taxis."[165] Other Bets consists primarily of Uber Freight and other miscellaneous products, such as dockless e-bikes and e-scooters.[166]

Of these segments, ridesharing is far and away Uber's primary business. According to its 2019 SEC filings, gross bookings "generate substantially all of [Uber's] revenue,"[167] and more than four-fifths of those gross bookings come from ridesharing alone. [168] (The remaining fifth comes from UberEats, UberFreight, *etc.*) In 2020, "Rides" made up 70% of Uber's revenue, with the remaining 30% coming from Eats, Freight, Other Bets, and Other Technology Programs.[169] As a result, a report Uber requested from Hogan Lovells and posted to its website concluded that "Uber's **primary business** involves connecting consumers looking for rides with available drivers."[170]

---

[163] Ex. A (Uber SEC Filing) at 001219-001220.
[164] *Id*. at 001219.
[165] *Id*. at 001228-001229-26.
[166] *Id*. at 001220.
[167] *Id*. at 001336.
[168] *Id*. at 001328; *see also* Ex. B (Uber SEC Filing) at 001645 ("The Company derives revenue primarily from fees paid by Rides Drivers for the use of the Company's platform(s) and related service to facilitate and complete ridesharing services").
[169] Ex. B at 001698.
[170] Ex. MM, *Review and Assessment of Uber's Privacy Program*, Jan. 2015, at 002816 (emphasis added).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Furthermore, this Court affirmatively held that another ridesharing company, Lyft, is "primarily engaged in the business of transporting people,"[171] and Uber acknowledges that Lyft is its competitor.[172]

And finally, expert testimony establishes that Uber is primarily engaged in the business of transporting people. Plaintiffs' retained expert, Dr. James Cooper,[173] performed a comprehensive review and determined that Uber is primarily engaged in the business of transporting people.[174] Dr. Cooper determined that Uber, corporately, controls the parameters of service provision to the extent permitted by law.[175] Likewise, Plaintiff's non-retained expert, Ms. Meera Joshi,[176] opined that Uber is primarily engaged in the provision of transportation.[177] Ms. Joshi explained that companies such as Uber are actually providing for-hire service because they set the price for trips, set standards for service, allocate rides according to proprietary algorithms, which may include or exclude certain drivers based on past performance, vet and monitor driver and passenger

---

[171] *Independent Living Resource Center v. Lyft, Inc.*, 19-cv-01438-WHA, R. Doc. 92 at *3 (N.D. Cal., Nov. 3, 2020).

[172] *See* Ex. B at 001724 (Uber competes "with other ridesharing companies . . . including Lyft.")

[173] Ex. III (affidavit of Dr. Cooper, a transportation professional specialized in ground transport, taxi and for hire vehicle analysis, accessible and social transportation, operation and policy development. He was the Head of Taxi Studies at Edinburgh Napier University. He has a Ph.D. in Taxi Licensing and Control and he has extensive publication on transportation related issues).

[174] *See* Exhibit NN at 25 ("It is my opinion that Uber is a transport company, being primarily engaged in the business of transporting people. The company provides a Demand Responsive Transportation product in both Jackson MS and New Orleans LA. It follows and can be argued separately or in tandem with the definition of product, that Uber is a transportation company offering services in both cities.").

[175] *See* Exhibit NN at 17.

[176] "Meera Joshi serves as the Acting Administrator of the Federal Motor Carrier Safety Administration. Most recently Joshi served as General Manager of the New York office of Sam Schwartz Transportation Consultants and visiting scholar at NYU's Rudin Center for Transportation policy. Previously, Joshi served as chief regulator of New York City's for hire vehicle industry. Under her leadership, New York City mandated the reporting of granular trip data from large app operators, which informed landmark data-driven safety reforms, enforceable pay standards for drivers and meaningful access to service for the disabled." www.transportation.gov/mission/meera-joshi (last accessed April 10, 2021).

[177] Ex. OO (Joshi Dep.) at 45:21-46:7 ("I regarded Uber as in the business of transporting people for hire and regulated them in accordance with that opinion.").

1    performance, and even remove participants from the system.[178] In contrast, Uber designated no

2    experts, thus, does not have any expert evidence or testimony to contradict the testimony of

3    Plaintiffs' experts.

4         But suppose, despite all of the above, Uber as a whole were not primarily in the business

5    of transporting people, that would still not exempt Uber from ADA coverage. That is because it is

6    certainly the case that at least Uber's Core Platform segment is primarily in the business of

7    transporting people.[179] And if the Core Platform segment is primarily in the business of

8    transporting people, then that segment of Uber is covered by Title III.[180]

9

10   **F.    Uber is Covered by Title III Because Its Operations Affect Commerce.**

11        To be covered by Title III, Uber's "operations" must also "affect commerce."[181] Commerce

12   means "travel, trade, transportation, or communication among the several states, between any

13   foreign country or any territory or possession and any state, or between points in the same state

14   but through another state or foreign country."[182]

15        There is no material dispute that Uber's operations affect commerce because even intra-

16   state activity falls within the ambit of the commerce clause.[183] Here, however, Uber's own

17

18   agreements expressly affirm that they are "transaction[s] involving interstate commerce."[184]

19   Moreover, Uber drivers regularly cross state lines. Mr. Brad Rosenthal, Uber's Director of

20   Strategic Initiatives, confirmed that there are many drivers whose trips take them from outside of

21

22

23   ---
     [178] *Id.* at 25:4-26:14; *see also id.* at 26:15-27:20.
24   [179] Approximately three-quarters of the Core Platform revenue comes exclusively from "Rides."
     Ex. B at 001698.
     [180] 49 C.F.R. 37.37 (f).
     [181] 42 U.S.C. § 12184 (a).
     [182] 49 C.F.R. §37.3.
     [183] *Cf. Wickard v. Filburn*, 317 U.S. 111 (1942).
     [184] *See Crawford*, 17-cv-02664, R. Doc. 26 at 92 ("This Arbitration Provision is governed by the
     Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the 'FAA') and evidences a transaction involving
     interstate commerce.").

California and into California.[185] Furthermore, this Court recently held that Lyft's "operations affect commerce,"[186] and Uber's market share is more than twice as large as Lyft's.[187]

For all the above reasons, Uber is covered by Title III of the ADA.

**G.    Uber Violated Section 12184 by Failing to Make Reasonable Modifications to Its Policies, Procedures, or Practices.**

Now that it has been established that Uber is covered by Title III, Plaintiffs will show that Uber has violated the anti-discrimination provisions of Section 12184.  Section 12184 of Title III prohibits discrimination "on the basis of disability in the full and equal enjoyment of specified public transportation services."[188] Under this section, discrimination includes, *inter alia*, the failure to make reasonable modifications.[189] To prevail, the plaintiff must show the defendant failed to make a "requested reasonable modification . . . necessary to accommodate the plaintiff's disability."[190]

Whether a proposed modification is reasonable requires consideration of the effectiveness of the modification in light of the nature of the disability in question.[191] The standard for reasonableness under the ADA is the same as under the Rehabilitation Act, and the Supreme Court has found in the context of the Rehabilitation Act, that an "[a]ccommodation is not reasonable if it . . . imposes 'undue financial and administrative burdens'. . . ."[192] The ADA regulations define

---

[185] Ex. T (Rosenthal Dep.) at 56:17-57:20.

[186] *Independent Living Resource Center v. Lyft, Inc.*, 19-cv-01438-WHA, R. Doc. 92 at *3 (N.D. Cal., Nov. 3, 2020).

[187] See Liyin Yeo, *Uber vs. Lyft: Who's tops in the battle of U.S. rideshare companies*, Second Measure (March 16, 2021), available online at https://secondmeasure.com/datapoints/rideshare-industry-overview/

[188] 42 U.S.C. § 12184(a).

[189] 42 U.S.C. § 12184(b)(2)(A).

[190] *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1010 (9th Cir. 2017) (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004)).

[191] *Fortyune* 364 F.3d at 1083.

[192] *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n. 17 (1987).

31

"undue burden" to mean a "significant difficulty or expense," taking into account a range of factors relating to the cost of the action compared to the entity's available financial resources.[193]

The burden is on the plaintiff to demonstrate that a modification is reasonable. Once the plaintiff has made an initial showing, the burden shifts to the defendant to demonstrate the modification is unreasonable in the sense that it would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodation.[194]

Here, this Court held that the facts alleged in the Amended Complaint, taken as true at the motion to dismiss stage, "establish Uber could reasonably assemble a fleet of WAVs in New Orleans and modify its app to provide UberWAV."[195] Thus, if Plaintiffs can prove the facts alleged in the Amended Complaint, then Plaintiffs will have established a *prima facie* claim of discrimination. And as detailed in the following sections, there is no doubt: Uber could reasonably assemble a fleet of WAVs in New Orleans and Jackson and modify its app to provide UberWAV – it just has chosen not to.

1.  Plaintiffs' Requested a Modification and the Request Was Denied.

On September 22, 2018, Mr. Falls and Mr. Namisnak, through their counsel, made a written "Request for Reasonable Modification / Reasonable Accommodation" to Uber.[196] In this correspondence, Plaintiffs explained that they were individuals with mobility-related disabilities, that they use motorized wheelchairs, and that they would like to use Uber's services in New Orleans, Louisiana.[197] Plaintiffs explained that the UberWAV function is not available in New Orleans, but is available in other locations.[198] By and through their letter, Plaintiffs requested that

---

[193] 28 C.F.R. § 36.104 (enumerating factors to consider in the undue burden analysis).
[194] *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999); 42 U.S.C. 12182(b)(2)(a)(ii).
[195] *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1142 (N.D. Cal. 2020).
[196] *See* Ex. QQ (Request for Reasonable Accommodation, Sep. 22, 2018) at 00796.
[197] *See id*. at 00796-97.
[198] *See id*. at 00797-98.

32

Uber "utilize its resources, internal knowledge, and business know-how to change its operational policies and provide WAV service in New Orleans, Louisiana and its surrounding areas."[199] Plaintiffs explained that they expected that Uber would ensure that a fleet of 30-60 WAVs are available in New Orleans.[200] Plaintiffs further explained that they cannot tell Uber "how it must change its internal business practices and operations to provide WAV service[,]" but Plaintiffs explained they were confident "that Uber can use its resources and problem-solving abilities to bring itself into compliance with the law without further delay.[201]

More than a year after sending the request, on November 13, 2019, Uber denied Plaintiffs' requested reasonable modification.[202] In denying Plaintiffs' requested modification, Uber claimed that it "does not provide vehicle service of any sort[.]"[203] Instead of making Plaintiffs' requested modifications, the response letter referred them to five alternative WAV service providers in the New Orleans area.[204]

Likewise, for Dr. Crawford, on October 4, 2018, counsel made a written "Request for Reasonable Modification / Reasonable Accommodation" to Uber that was almost identical to the request in the New Orleans case.[205] More than a year after sending the request, on May 1, 2020, Uber denied Dr. Crawford's requested reasonable modification.[206]

2. Plaintiffs' Requested Modification Was Reasonable.

Plaintiffs' requested modifications—for Uber to change its operational policies and provide UberWAV in New Orleans and Jackson—was reasonable. That is true most obviously

---

[199] See id. at 00798.
[200] See id. at 00798-99.
[201] See Ex. QQ (Request for Accommodation) at 00799.
[202] See Ex. SS (Letter from Uber's Counsel) at 00801.
[203] See id. at 00803.
[204] See id. at 00802-03.
[205] See Ex. HHH (Request for Accommodation) at 002541-2544.
[206] See Ex. RR at 002547.

because it is already something Uber does in other cities.[207] All Plaintiffs are asking Uber to do is to bring an already-existing accommodation to their city.

As a practical matter, there are many methods by which Uber could provide UberWAV in New Orleans and Jackson, any of which would be reasonable. For the purpose of this motion for summary judgment, however, Plaintiffs' will focus on three methods through which Uber could provide UberWAV service.[208]

    (i)    *Through a Partnership with a Commercial Operator Like MV Transportation.*[209]

In some cities, Uber makes UberWAV available by contracting with the third-party owners of WAVs, often through MV Transportation.[210] In partnering with MV Transportation, Uber "explore[d] whether a partnership with a commercial operator could result in bringing WAV supply to the platform in a way that made the service available to riders reliably."[211] Uber reached an agreement with MV Transportation and service was provided in seven locations: New York, Lost Angeles, San Francisco, Boston, Washington, D.C., Philadelphia, and Chicago.[212] The program was a success: in 2019 it provided 290,000 WAV trips to 53,000 unique WAV riders.[213]

---

[207] *See* Ex. I at 00019378 (listing current cities as of April 2020).

[208] If Uber files its own summary judgment motion, or if Plaintiffs' motion is denied and this action goes to trial on the merits, Plaintiffs will show that there are three additional methods through which Uber could ensure that WAVs are available on its platform. These are: (1) mandatory signup requirements; (2) a vehicle marketplace partnership with Hertz or Avis; or (3) enacting a dispatch system, such as in New York. In this motion, to eliminate unnecessary length, Plaintiffs will focus on the three simplest ways Uber could make its service accessible.

[209] In the next three sections, Plaintiffs focus largely on New Orleans. However, these methods are equally applicable to Jackson, but as is discussed *Infra* at (II)(G)(2)(iv) Uber has done absolutely nothing specifically related to investigating the Jackson market or making UberWAV available.

[210] *See* Ex. I at 00019378 (███████████████████████████████████████████████████████ ███████████████████████).

[211] Ex. S (Patel Dep. on Nov. 20) at 148:20-149:4.

[212] *See* Ex. I at 00019378.

[213] *See* H (Jan 2020 Uber Accessibility Review) at 00012522.

34

In regard to UberWAV, Uber concluded that it had "[d]eveloped a standardized approach to our fleet partnerships to optimize drivers performance and scale our ability to manage fleets[.]"[214]

In April of 2018, New Orleans was on a short list of cities where Uber would expand MV Transit's provision of WAV service.[215] Following an in-person meeting, MV Transportation offered to provide Uber with pricing for seven to ten vehicles for New Orleans.[216] Ultimately, however, Uber decided not to move forward with the MV Transportation option in New Orleans. Uber's explanation was cost – that "the amount that they need to provide service to make it work for their business doesn't work for Uber's business."[217] Uber's position is that, because of the price increases asked for by MV Transportation, "Uber is not able to invest in any sort of expansion at this time."[218] Thus, Uber declined to expand the MV Transportation option to New Orleans "because of the current state or status of the way the economics check out for both companies."[219]

But Uber has also made clear that cost is not truly an obstacle. Uber's own internal analyses showed a way that UberWAV could be funded *without* Uber paying out of pocket. According to Uber, an "Accessibility Fee" of only **3-4 cents** per trip levied on other riders could "**fully fund**" the WAV program.[220] When asked whether Uber has investigated the usage of an accessibility fee in combination with MV transportation in New Orleans, Uber's corporate representative admitted it had not even considered it, explaining that "That's not something that we have gone seriously down the route of considering such that we certainly wouldn't have gotten to the point where we evaluated an accessibility fee and MV Transit in a specific city all at once."[221] The failure to even

---

[214] *See id.* at 00012523.
[215] *See* Ex. TT at 0000858-59 (Email dated April 9, 2018 from Kimberly Harvish at Uber to MV Transit employees which states that New Orleans was slated for June/July of 2018).
[216] *See* Ex. UU at 0000789-80.
[217] Ex. S (Patel Dep. on Nov. 20) at 158:17-159:8.
[218] *Id.* at 159:9-160:11.
[219] *Id.* at 158:17-159:8.
[220] *See* Ex. VV (UberWAV Program Overview, June 2017) at 00014333 (emphasis original).
[221] Ex. S (Patel Dep. on Nov. 20) at 168:3-17.

*consider* this option is galling given that internal Uber employees have documented that UberWAV offers significant potential financial benefit to Uber.[222] And it is especially galling considering Uber frequently rolls out other kinds of fees on users, raising hundreds of millions of dollars per year.[223]

Thus, Uber knows that it could pay for UberWAV. It could pay out of pocket without putting a dent in its $50 billion per year revenue.[224] Or it could pass the cost along to users for 4 cents per ride or less. But it has simply chosen not to.

(ii)     *By Removing Restrictions and Creating an Incentive System.*

Another way Uber could provide UberWAV in New Orleans is through incentive programs, as it does in other U.S. cities.

In those US cities, Uber has offered drivers incentives to drive WAVs and provide such a service "on the Uber platform."[225] Such incentives include a sign-up bonus or a reduction in the fee that drivers pay to Uber. For example, in Philadelphia, Uber offered a $30.00 per-trip incentive for completing a WAV trip.[226] On a per-trip basis, under which the total cost was divided by the total number of rides in Philadelphia, the estimated cost of running this incentive program was 8 cents per trip.[227] In Portland and Chicago, Uber provided a $15 per trip subsidy for WAV rides.[228] Likewise, Uber personnel created a slide deck dated June 10, 2020, where the company admitted

---

[222] *Supra* at Section III(G)(iii), discussing how Uber has determined that UberWAV builds positive brand sentiment with riders, drivers, and the community, far "outweigh[s] the investment," and would "preempt" approximately $180 million per year in "training costs."

[223] Ex. B (Uber SEC Filing) at 001641 ("During the first quarter of 2020, the Company began charging end-users a fee for services in certain markets. . . . In the first quarter of 2020, the Company recognized total revenue of $137 million associated with these fees charged to end-users.")

[224] Ex. A (Uber SEC Filing) at 001325.

[225] Ex. S (Patel Dep. on Nov. 20) at 70:24-71:8; 71:23-72:6.

[226] *Id*. at 89:23-90:18.

[227] *Id*. at 91:4-93:13.

[228] *See* Ex. WW (Feb. 2019 Accessibility Review) at 00008099.

36

that "Uber could offer WAV renters a service fee reduction from 25 percent to 1 percent in order to improve driver earnings and WAV rental attractiveness."[229]

But according to Uber's corporate representative, this proposal has not been adopted in New Orleans.[230] Uber has not sent a message to existing drivers offering any sort of promotion or incentive related to WAVs.[231] Uber never actually tried to provide WAV incentives in New Orleans.[232] Additionally, making matters worse, in New Orleans Uber currently has two significant barriers that prevent WAV drivers from signing up with Uber. First, and most readily identifiable, is that Uber has not "turned on" the UberWAV function on its application. Uber confirmed that it can do "anything it wants" with its app[233] and, thus, Uber could turn on the UberWAV function. Without the function turned on, however, individuals who have a WAV cannot offer UberWAV trips. Second, but just as deleterious, is the fact that Uber actively advertises that vans and after-market modified vehicles are expressly prohibited in New Orleans and Jackson.[234] The vast majority of WAVs are going to be vans or after-market modified vehicles. Thus, Uber's explicit policy prohibits WAVs in the form of vans from registering.

When discussing the purported difficulty with adding UberWAV in New Orleans, Uber's corporate representative pointed to an email chain from 2017.[235] In this email chain, an Uber employee states that Uber's efforts to locate "both third party partners and some form of organic supply have proven challenging in the past."[236]  In this same email chain, however, an Uber

---

[229] Ex. S (Patel Dep. on Nov. 20) at 111:17-112:22; *see also* Ex. XX (June 2020 Vehicles Xfn Meeting) at 0000558.
[230] Ex. S (Patel Dep. on Nov. 20) at 112:24-113:5.
[231] *Id.* at 181:7-182:5.
[232] *Id.* at 178:23-179:19.
[233] *Id.* at 63:13-64:4.
[234] *Infra*, at Section II(I).
[235] Ex. S (Patel Dep. on Nov. 20), based on *errata*, at 180:4 ("What I am aware of was an email bearing bates UBER00005077…").
[236] *See* Exhibit YY at 00005077.

37

employee outlined that Uber had identified, in New Orleans, "~5 PTP drivers who own WAVs[.]"[237] The Uber employee further conceded that Uber originally slated New Orleans to be part of a Phase 1 launch of UberWAV, but Uber dropped New Orleans because "[f]inding a local partner would take too much leg work as seen by the ~6 months of work required in Toronto to sign a deal."[238] During his corporate deposition, Uber's representative did not identify any subsequent investigatory efforts by Uber in 2018 or 2019 specifically related to the supply of WAVs in New Orleans.[239]

In sum, Uber could have introduced UberWAV in New Orleans using its incentive programs, such as sign-up bonuses and reduced commission. Uber could have provided these incentives to the "~5 PTP drivers who own WAVs," along with the unknown number of prospective drivers who were either unaware of the opportunity to work as an Uber driver or were actively deterred by Uber's vehicle requirements barring vans. Unfortunately, Uber decided that providing accessibility would "take too much leg work[.]" Uber's failure to put in the necessary "leg work" is not a defense to this action. Summary judgment should issue for Plaintiffs.

(iii)    *By Reinstating the Leasing Model That Uber Abandoned.*

Another model that Uber used in the past to provide WAV was through its auto-leasing subsidiary, Xchange Leasing.[240] Under that model, Xchange Leasing would pay an auto manufacture $43,000.00 and the auto manufacturer would provide a vehicle to Xchange Leasing.[241] Uber would lease the WAV to a driver, and subsidize part of the lease.[242] Uber

---

[237] *See* Exhibit YY at 00005080 (the acronym PTP is believed to stand for "peer to peer" or "partner third parties." Either way, however, it appears that Uber located at least five drivers with WAVs).
[238] *See* Exhibit YY at 00005079.
[239] Ex. S (Patel Dep. on Nov. 20) at 114:13-115:18 (explaining that he was aware of two evaluations that were performed, one by the "local team" and a second evaluation in 2018-2019 where Uber considered "the commercial operator format").
[240] *Id.* at 73:11-20; *see also*, Exhibit 63, p. 14330.
[241] *Id.* at 74:11-25; 75:14-24.
[242] *Id.* at 75:6-13.

employees worked up promotions to get the target number of WAVs "on the road" through Xchange Leasing.[243] This arrangement was visually documented, in a 2017 slide deck, where Uber employees created a chart that summarized how the Xchange Leasing program worked in Chicago.[244] In the very same slide deck, Uber employees confirmed that "There are opportunities to <u>fully fund</u> the WAV program through Accessibility Fees or Accessibility Funds."[245] As Uber explained in two bullet points:

"  – Fund program costs through an Uber-collect per trip 'Accessibility Fee'

–   Given program cost estimates and current trip costs, an 'Accessibility Fee' of **$0.03 - $0.04 per trip** would <u>fully fund</u> the program[.]"[246]

Shortly before this lawsuit was filed, a "proposal was approved and the plan is to add an additional 800 WAV vehicles in 2017 and up to approximately 1,000 vehicles by midyear of 2018 through a combination of flexible leasing through a third party and [Xchange Leasing]."[247]

Before this solution was fully implemented, Uber sold Xchange Leasing and, thus, the project ended. However, the fact that the proposal was already approved internally at Uber demonstrates that this solution is reasonable. Of course, this solution would require upfront expenditure of capital by Uber. Again, however, all of the expenditure could be offset by an accessibility fee. Additionally, to the extent the cost is not fully offset by an accessibility fee, investment by Uber in the cost its drivers will incur for WAVs is equivalent to similar recent investments made by Uber. For example, Uber recently announced that it was "committing more than $800 million in resources to help hundreds of thousands of drivers in the US, Canada, and

---

[243] *See, e.g.*, Ex. ZZ at 0000490 ("As mentioned in our Uchat, the city team would like to run a promo with the Xchange Leasing LS team. We have a goal to hit 70 WAV Vehicles on the road by June 30th and we need the ACL team's assistance.").
[244] *See* Ex. VV at 00014329.
[245] *See* Ex. VV (UberWAV Program Overview, June 2017) at 00014333 (emphasis original).
[246] *See id*. (emphasis original).
[247] Ex. AAA at 00005274.

Europe transition to battery EVs by 2025."[248] If Uber can help its drivers transition to electric vehicles, it can also help some of its drivers transition to accessible vehicles – as required by Federal Civil Rights Law. Through this solution, Uber would simply be obligated to follow through with its own approved proposal to add ~1,000 WAVS by mid-year 2018 through a combination of flexible leasing and Xchange Leasing.[249]

Having developed and approved a reasonable means of providing accessibility, Uber cannot escape liability by selling off the internal unit that would have provided Plaintiffs' required modification.[250]

(iv)    *The Above Methods Are Equally Available in Jackson.*

Uber's efforts to make its service accessible in Jackson have been even more abysmal. While Uber employees engaged in an email discussion related to the supply of WAVs in New Orleans, Uber is "not aware of anything similar that was done for Jackson."[251] In fact, Uber readily conceded that it has not performed *any* investigations specifically related to Jackson.[252] Uber has not turned on UberWAV in Jackson to see if drivers sign up.[253] Since 2018, Uber has not, at any point, pushed out to the local market that drivers could sign up for UberWAV and get an incentive

---

[248] *See* Ex. JJ at 002759 (statement of Uber CEO).
[249] See Ex. AAA at 00005276 (email from Paige Tsai dated November 28, 2016).
[250] Unlike many other businesses, Uber is uniquely situated to identify which services generate a high profit margin and which would merely be cost-neutral. One of the Congressional purposes of the ADA was to root out and eliminate "isolation and segregation" of individuals with disabilities. 42 U.S.C. § 12101(a)(2). Uber's failure to follow through with its approved plans to expand UberWAV is the antithesis of Congressional intent in passing the ADA because it further "isolates and segregates" individuals with disabilities.
[251] Ex. S (Patel Dep. on Nov. 20) at 197:21-198:17.
[252] *Id*. at 193:14-194:6 (*see, e.g.*, "Q. Yes. What I mean by that is as I understand what we discuss ostensibly [sic] today is Uber has done high-level investigations, but what I am asking here is specifically related to Jackson, are you aware of any investigations specifically for Jackson, not the overall pilot, evaluation, etc.? A. No., I am not aware of any investigations of Jackson.").
[253] *Id*. at 192:16-21.

40

such as a sign-up bonus, a waived trip fee, etc.[254] Uber has not investigated providing UberWAV in Jackson in partnership with MV Transit.[255] Uber has not enacted an accessibility fee.[256]

Uber has several reasonable methods through which it could make UberWAV available in Jackson, but Uber failed to conduct any research in Jackson, Mississippi. It is well established that "the ADA imposes an obligation to investigate whether a requested accommodation is reasonable."[257] Likewise, the Ninth Circuit has observed that "mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary...."[258]

Given that Uber has provided the accommodation of UberWAV to other individuals with disabilities in the past, Plaintiffs have satisfied their burdens of production as to whether the accommodation was reasonable.[259] Uber abdicated its obligations under the ADA because it did not provide a needed and requested reasonable modification.

3. Providing UberWAV in New Orleans and Jackson Would Not Fundamentally Alter Uber's Services, Programs, or Activities or Constitute an Undue Financial Burden.

At this stage, it is Uber's obligation to show that implementing UberWAV in New Orleans and Jackson would constitute a "fundamental alteration." It is not Plaintiffs' obligation to preempt Uber's affirmative defenses.

Nonetheless, given that new materials in reply briefs are generally disfavored, Plaintiffs will briefly discuss how the provision of UberWAV could not possibly constitute a fundamental alteration to Uber's services, programs, or activities. Put simply, it is not unreasonable to ask Uber

---

[254] *Id*. at 192:22-193:4.
[255] *Id*. at 193:5-10.
[256] *Id*. at 108:4-20.
[257] *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1136–37 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).
[258] *Wong v. Regents of the University of California,* 192 F.3d 807, 818 (9th Cir. 1999).
[259] *Id*. at 820.

to provide an accommodation to Plaintiffs in New Orleans and Jackson which Uber already provides in other cities.[260] Indeed, an Uber employee confirmed that UberWAV is an "Opportunity" for Uber to "[f]urther deliver on our mission to provide access to reliable transportation to ***everyone***, everywhere."[261] In another internal Uber powerpoint, Uber noted that "[a]ccessibility is core to our business" and that "[i]f the Uber platform is not accessible to people with disabilities, then we are failing at our most basic task."[262] Indeed, in a slide about the various lawsuits concerning Uber, the Uber employees conceded that "[i]gnoring accessibility comes at reputational costs," where this text was situated against an image of a despondent man in a wheelchair behind the word "Uber."[263] *See* Fig. 3:



**Fig. 3**: "Ignoring accessibility comes at reputational cost."

---

[260] See also, *Guerra*, 2017 WL 10562682 at *11.
[261] *See* Ex. VV at 00014326 (emphasis original).
[262] *See* Ex. BBB (Accessibility at Uber) at 00014646.
[263] *See* Ex. BBB at 00014667.

While the takeaway from this slide needs no explanation, an Uber employee wrote it anyways: "**We should be offering an accessible service**[.]" [264]

Also, expanding UberWAV to New Orleans and Jackson cannot be a fundamental alteration because adding a thousand WAVs to its fleet was <u>Uber's own plan</u>. As discussed above, Uber developed and approved a plan "to add an additional 800 WAV vehicles in 2017 and up to approximately 1,000 vehicles by midyear of 2018 through a combination of flexible leasing through a third party and [Xchange Leasing]."[265] Specifically with regard to Louisiana, Uber estimated that the state had a "wheelchair bound market size roughly 53,000," including 14,000 in the New Orleans metropolitan area alone.[266]

Uber testified that this "did not come to pass" because by "2017, it had become clear that Xchange Leasing was losing a substantial amount of money on each lease that it originated. And so the decision was made by Uber to wind down the business of Xchange Leasing before this expansion was realized."[267] Asking Uber to follow through on its own plan, in an area that Uber says is "central" to its business and fulfills its mission, would not fundamentally alter the nature of the service provided by Uber.[268] By way of comparison, in a prison ADA case the court recently found that the entity's failure to follow its own, internal ADA directives and/or policies or failure of those policies to adequately remedy barriers to access was relevant to the overall determination of the method-of-administration claim.[269] While the regulation at issue is different, the takeaway

---

[264] *Id.*, emphasis added.
[265] Ex. D at 81:2-23, citing Ex. AAA at 00005276.
[266] Ex. CCC at 00019312.
[267] Ex. D (Rupp Dep.) at 81:15-82:10.
[268] *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004).
[269] *Lewis v. Cain*, 15-CV-318, 2021 WL 1219988, at *50 (M.D. La. Mar. 31, 2021) (citing *Holmes v. Godinez*, 311 F.R.D. 177, 219 (N.D. Ill. 2015) (discussed in context of a method-of-administration claim).

is the same: It is not unreasonable to Order an entity to follow through with its own, internal plan to achieve ADA compliance.

UberWAV would not be an "undue financial burden" because Uber, itself, has explained that the cost of UberWAV can be "fully funded" through an accessibility fee. Uber estimated that it could fully fund UberWAV by charging a 3-4 cents per trip accessibility fee.[270] Uber determined that "[p]roactively investing in a reliable WAV ridesharing program will build positive brand sentiment with riders, drivers, and the community…"[271] Uber determined that "the regulatory and legal value of a reliable WAV program far outweigh the investment."[272] Further, the provision of UberWAV would "preempt" approximately $180 million per year in "training costs."[273]

Nor can Uber claim that charging an "accessibility fee" would be an undue burden or would fundamentally alter Uber's business. First, Uber employees documented that UberWAV could be "fully funded" via an accessibility fee and these employees did not identify any negative repercussions to Uber of instituting such a fee.[274] Second, Uber is actively charging other "fees," such as a 50 cent per trip fee that is charged when a rider is in a hybrid or electric vehicle.[275]  If Uber can charge a 50 cent per trip fee for use of an electric vehicle, Uber can certainly charge 3-4 cents per trip to comply with the ADA.

The ADA regulations define "undue burden" to mean a "significant difficulty or expense," considering a range of factors relating to the cost of the action compared to the financial resources

---

[270] *See* Ex. VV (2017 UberWAV Program Overview) at 00014333.
[271] *See id.* at 00014326.
[272] *See id.* at 00014328.
[273] *See* Ex. VV at 00014326.
[274] *See, e.g.*, *id*. at 00014333. This is consistent with Uber's other market research. In Philadelphia, Uber identified that the cost of running UberWAV incentives would amount to 8 cents per ride, when divided by all Philadelphia riders. *See* Ex. S (Patel Dep. on Nov. 20) at 91:4-93:13.
[275] *See* Ex. JJ at 002760 ("In the US and Canada, hybrid and EV drivers will receive an extra $0.50 directly from the rider on every Uber Green trip completed.").

of the public accommodation.[276] If UberWAV was "fully funded," Uber would incur no financial burden, much less a "significant expense." Unfortunately, Uber never "seriously considered" the usage of an accessibility fee to fund UberWAV in New Orleans through MV Transit.[277] In fact, as is evidenced by Ex. VV (UberWAV Program Overview, June 2017), Uber weighed four different solutions to the WAV issue—including Uber "fully funding" a solution and an accessibility fee— and the fourth option listed on the slide was "Do nothing and bear the associated risk[.]"[278] *See* Fig 4



**Fig. 4.**     Uber identified options to "fully fund" the WAV program, or alternatively "do nothing and bear associate risks."[279]

In Plaintiffs' cities, Uber chose option four – "Do nothing and bear associated risks." In this lawsuit, that risk has become a reality. Summary judgment should issue.

---

[276] 28 C.F.R. § 36.104 (enumerating factors to consider in the undue burden analysis).
[277] Ex. S (Patel Dep. on Nov. 20) at 168:3-17.
[278] Ex. VV at 00014333.
[279] Ex. VV at 00014333; *see also*, Ex. KKK at 00008921 ("-In some cities (e.g., Chicago), we already contribute to a gov't-run Accessibility Funds the form of a regs mandated per trip fee" and noting Uber's collection of $4.4 million in accessibility fees in Chicago in 2016).

**H.   Uber Violated Section 12184 by Buying New Non-WAV Vans, Without Ensuring that Tts Entire System Provides Equivalent Service for Wheelchair Users.**

Uber also violated the ADA's anti-discrimination prohibition by buying new non-WAV vans. As this Court explained, Title III requires that "vehicles purchased or leased for 'specific public transportation' systems must be 'readily accessible to or usable by individuals with disabilities, including individuals who use wheelchairs,' unless the provider "can demonstrate that the [transportation] system…when viewed in its entirety, provides a level of service…equivalent to the level of service provided to the general public."'"[280] Specifically, this includes "vans," whether those vans have a capacity of more than eight passengers (42 U.S.C. 12184 (b)(3)) or less than eight passengers (42 U.S.C. 12184 (b)(5)).

Here, Uber concedes that it has owned tens of thousands of vehicles through its subsidiaries Xchange Leasing and ATG.[281] Through Xchange Leasing, Uber "bought vehicles and then leased them to Uber's driver partners" to be used for driving on the Uber app. [282] The vast majority of these vehicles were non-wheelchair accessible. Of the tens of thousands of vehicles, fewer than 50 were wheelchair accessible.[283] Specifically with regard to vans, Uber produced in discovery a list of 130 new vans that obtained by Xchange Leasing.[284] Through simple subtraction, it is clear that Uber acquired more than eighty new vans that were not accessible. Thus, Uber acquired new, inaccessible vans, in violation of 42 U.S.C. § 12184(b)(5).

---

[280] *Namisnak*, R. Doc. 102 at 8, citing 42 U.S.C. § 12184(b)(3); 42 U.S.C. § 12184(b)(5); 49 C.F.R. § 37.103.
[281] Ex. D (Rupp Dep.) at 52:14-25 ("owned 22,000 vehicles comprised mostly of compact and midsize vans as well as a small number of mini vans."). *Id*. at 79:17-21 ("Q. Okay. At least at some point while Xchange Leasing was a subsidiary of Uber it had a fleet of about 30,000 cars. Is that a fair estimate? A. I think that's a fair estimate.")
[282] *Id*. at 76:23-77:4.
[283] *Id.* at 80:16-21.
[284] *See* Ex. DDD (the number can be deducted by counting the lines, one-by-one); *see also*, Ex. EEE (see Request for Production No. 4, which specifically asks for a list of new vans that were acquired by Xchange Leasing).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1
2
3
4
5
6
7
8
9
10

        The ADA is clear – if a company is going to add new vans to its fleet, it must choose one of two options: (1) make the vans wheelchair accessible, or (2) achieve equivalent service across the whole system.[285] Here, Uber bought new vans but chose *neither* option. Thus, Uber violated the ADA. And the scope of this violation is staggering: Uber bought at least 21,000 non-wheelchair accessible vehicles. Per the text of Section 12184, "discrimination includes" the purchase "by such entity of a new van" under these circumstances. Ultimately Uber was obligated to ensure that either (1) all the vans it purchased were accessible; or (2) a sufficient portion of the 22,000 vehicles it purchased were accessible such that Uber achieved equivalent service across the whole system.[286] Summary judgment should issue for Plaintiffs.

11
12

I.    **Uber Violated Section 12184 by forbidding WAVs from operating on its platform in New Orleans and Jackson.**

13

        Uber is also violating the ADA by explicitly screening out WAVs from its platform.

14
15
16
17

        If an entity is covered by Title III of the ADA, then it is illegal discrimination for the entity to impose "eligibility criteria that screen out or tend to screen out" any "class of individuals with disabilities from fully enjoying the specified public transportation services" unless "necessary for the provision of the services being offered."[287]

18
19
20

        Here, Uber violates that provision. For each city where Uber operates, Uber sets out certain requirements for the vehicles that can be used on its platform.[288] And if "the vehicle does not meet

21
22
23
24

---

[285] 42 U.S.C. § 12184(b).
[286] Uber knows this. Uber's counsel explained at oral argument in *Equal Rights Center* that "if you buy [a new van] and you're primarily engaged in the business of transporting people, you do need to make that vehicle wheelchair accessible." *Equal Rights Center v Uber Tech MH.pdf* at 82:1-4.
[287] 42 U.S.C. § 12184(b)(1).
[288] Ex. D (Rupp Dep.) at 23:11-19.

Uber's requirements it's not allowed to participate in Uber's products."[289] Uber knows of "no exceptions."[290]

In New Orleans, for a vehicle to participate in UberX, Uber requires that the vehicle "must be a four-door vehicle, have five factory-installed seats, [and] air conditioning" and it explicitly prohibits "vans, box trucks, or similar vehicles, [and] aftermarket seating modifications."[291] If "a vehicle doesn't meet these criteria, Uber will not allow it to participate in Uber's UberX product."[292] Similarly, Uber's New Orleans UberXL product requires "seven seats, and no aftermarket modifications, and no vans."[293] These requirements have been in place since the inception of this lawsuit.[294] The same is true in Jackson, MS:

> Q.  So if a driver has a van they can't drive UberX in New Orleans?
>
> A.  That's correct.
>
> Q.  Okay. They similarly can't drive UberXL in New Orleans, correct?
>
> A.  That's correct. . . .
>
> Q.  So if someone is a prospective driver in Jackson, Mississippi, or New Orleans and they have a WAV vehicle that is a van, they would not be able to drive UberX or UberXL in either of those cities, correct?
>
> A.  As you described it, if the vehicle is a van, it would not meet the requirements for UberX. So according to those requirements, the vehicle wouldn't qualify.
>
> Q.  And same for UberXL?
>
> A.  Yes.[295]

---

[289] *Id.* at 24:20-23. *See also id.* at 51:2-6 ("Q. Okay. And Uber actually uses these requirements. If a vehicle doesn't meet these requirements, they are not allowed to drive for Uber's products, correct? A. That's correct.")

[290] *Id.* at 24:24-25 ("Q. No exceptions? A. Not to my knowledge.")

[291] *Id.* at 28:23-29:7. Ex. FFF provides Uber's requirements for New Orleans. Ex. GGG provides Uber's requirements for Jackson, MS.

[292] *Id.* at 29:8-11.

[293] *Id.* at 29:16-20.

[294] *Id.* at 45:14-18 (New Orleans).

[295] *Id.* at 39:22-40:2, 49:12-22

48

But crucially, most WAVs are vans that have been altered through after-market modifications to make them usable for persons with motorized wheelchairs.[296] As a result, Uber's "no vans" rule and its ban on "aftermarket seating modifications" screen out most WAVs, which prevents a "class of individuals" with disabilities – specifically those persons who use motorized wheelchairs – from fully enjoying the specified public transportation services.

And because Uber does not offer any reason why excluding WAVs is "necessary for the provision of the services being offered," Uber has violated 42 U.S.C. § 12184(b)(1).[297] Summary judgment should issue.

## III.    CONCLUSION

For the reasons above, this Court should grant Plaintiff's Motion for Summary Judgment.

By Plaintiffs, by and through their counsel,

/s/ William Most_____
William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
williammost@gmail.com
(504) 509-5023

Karla Gilbride (CA # 264118)
PUBLIC JUSTICE, P.C.
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

/s/ Garret S. DeReus_____
Bizer & DeReus, LLC
Garret S. DeReus (LA # 35105)*
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)*
andrew@bizerlaw.com
*Admission pro hac vice

3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

---

[296] Id. at 30:5-9 ("wheelchair accessible vehicles can be both vans . . . and in some cases minivans that have been retrofitted to include a ramp."); Ex. K (Crawford Dep.) at 14:11 ("Most [WAVs] are retrofitted.")
[297] See Equal Rights Center v. Uber, 17-cv-01272-KBJ at *43-44 (D.D.C. March 15, 2021) ("Uber's policies impos[ing] vehicle-type restrictions that actively discourage its drivers from acquiring and operating wheelchair accessible vehicles" stated claim for ADA violation).

49

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on April 19, 2021, a copy of the foregoing was filed electronically

3

with the Clerk of Court via the CM/ECF system.  Notice of this filing will be sent to all counsel

4

of record by operation of the court's electronic filing system.

5

6                                        _____/s/ William Most_____
                                              William Most
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

50