1
2
3
4
5
6
7  UNITED STATES DISTRICT COURT
8  NORTHERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| 10  SCOTT CRAWFORD, | Case No. 17-cv-02664-RS |
| 11           Plaintiff, | |
| 12      v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT; DENYING MOTIONS IN LIMINE AND MOTION TO STRIKE** |
| 13  UBER TECHNOLOGIES, INC., et al., | |
| 14           Defendants. | |

| | |
|---|---|
| 15  STEPHAN NAMISNAK, et al., | Case No. 17-cv-06124-RS |
| 16           Plaintiffs, | |
| 17      v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT; DENYING MOTIONS IN LIMINE AND MOTION TO STRIKE** |
| 18  UBER TECHNOLOGIES, INC., et al., | |
| 19           Defendants. | |

20

21

**I. INTRODUCTION**

22      Plaintiffs are three people using motorized wheelchairs who asked Defendants Uber

23  Technologies, Inc. and its subsidiary Rasier, Inc. (collectively "Defendants" or "Uber") to provide

24  wheelchair-accessible vehicle ("WAV") service ("UberWAV") in their home cities of New

25  Orleans, Louisiana and Jackson, Mississippi. After Uber declined, Plaintiffs brought this suit

26  accusing Uber of violating the Americans with Disabilities Act ("ADA"). Both parties now move

27  for summary judgment. Because many material facts remain in dispute, neither party is entitled to

28  summary judgment at this juncture. Both motions are therefore granted in part and denied in part.

United States District Court
Northern District of California

1    Both *motions in limine* and the motion to strike are also denied.

2                                          **II. BACKGROUND**

3          Uber operates a ride-for-hire service that utilizes a mobile phone app to connect riders with

4    drivers who have signed up with the app. The most popular type of ride is UberX, where drivers

5    provide trips in standard, four-door vehicles. Many drivers offer rides in their own, personal cars

6    resulting in a robust supply of UberX drivers, but these services vary from locality to locality. In

7    some cities, such as Portland, San Francisco, Los Angeles, and Washington, D.C., the app

8    includes "UberWAV," which offers app users the option to call a WAV. This option is not

9    available to Uber app users in New Orleans or Jackson.

10         Scott Crawford, Stephan Namisnak, and Francis Falls (hereinafter, "Plaintiffs") are persons

11   who use electric wheelchairs. Crawford lives in Jackson, Mississippi while Namisnak and Falls

12   live in New Orleans, Louisiana. None of the Plaintiffs have downloaded the Uber app, but have all

13   declared under oath that if Uber were to offer ride services that could accommodate electric

14   wheelchairs, they would use them.

15                                        **III. LEGAL STANDARD**

16         Summary judgment is proper "if the movant shows that there is no genuine dispute as to

17   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

18   The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or

19   defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party "always

20   bears the initial responsibility of informing the district court of the basis for its motion, and

21   identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions

22   on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine

23   issue of material fact." *Id.* at 323 (internal quotation marks omitted). If it meets this burden, the

24   moving party is then entitled to judgment as a matter of law when the non-moving party fails to

25   make a sufficient showing on an essential element of the case with respect to which it bears the

26   burden of proof at trial. *Id.* at 322–23.

27         To preclude the entry of summary judgment, the non-moving party must bring forth

28

United States District Court
Northern District of California

material facts, i.e., "facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The trial court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991). The court must then "determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

## IV. DISCUSSION

### A. Cross Motions for Summary Judgment

Plaintiffs move for summary judgment alleging Uber is subject to Title III of the ADA because it is a "private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Second, they seek a determination that Uber must "provide WAV service" in Jackson and New Orleans. Uber cross-moves, arguing (1) Plaintiffs lack standing because they did not download the Uber app, (2) it is not a transportation company subject to the ADA, (3) the ADA does not require the provision of WAV service as a matter of law, and (4) Plaintiffs cannot prove at trial that their requested outcomes are reasonable.

#### 1. Standing

Standing to pursue injunctive relief requires injury-in-fact, including a "real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc). However, at the summary judgment stage, plaintiffs need only show "there is a genuine question of material fact as to the standing elements." *Truth v. Kent Sch. Dist.*, 524 F.3d 957, 965 (9th Cir. 2008). Under the Ninth Circuit's "deterrent effect doctrine," a plaintiff has the requisite injury if "the plaintiff was deterred from attempting to visit a location or use a service because of alleged ADA noncompliance." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088,

United States District Court
Northern District of California

United States District Court
Northern District of California

1092 (9th Cir. 2020). To demonstrate this deterrence, a plaintiff must show that attempting to visit the location or use the service is a "futile gesture," *id*., and that the plaintiff intends to patronize the defendant's business once the alleged noncompliance has been removed, *Chapman*, 631 F.3d at 949–50.

Uber's standing argument is arguably foreclosed by the Ninth Circuit's affirmance of this Court's previous conclusion at the pleading stage that Namisnak and Falls could satisfy the injury-in-fact prong via the "futile gesture" doctrine. *See Namisnak*, 971 F.3d at 1093–94. In fact, the Ninth Circuit specifically noted that Plaintiffs alleged they were aware that Uber does not offer UberWAV in New Orleans, that they cannot use Uber because of this failure, that they plan to use the app if it offers accessible rides, and that they feared they would encounter mobility-related barriers were they to attempt to use Uber. *Id.* Because Plaintiffs had actual knowledge that Uber did not provide UberWAV in New Orleans, "[t]hat barrier to entry makes downloading the Uber App and creating an account a futile gesture." *Id.* at 1094. In coming to that conclusion, the Ninth Circuit specifically rejected Uber's invitation to follow a line of Seventh Circuit cases holding that attempting to use Uber was not a "futile gesture" for disabled plaintiffs in Chicago because the Uber app in that city included a WAV request option. *Id.* (referring to *Access Living v. Uber Techs., Inc.*, 958 F.3d 604, 614 (7th Cir. 2020)). The cases were distinguishable specifically because Uber does not offer UberWAV in New Orleans. *Id.*

Uber nonetheless urges a reconsideration of *Namisnak* based on a subsequent Supreme Court ruling, *Carney v. Adams*, 141 S.Ct. 493 (2020). In that case, Adams challenged Delaware's eligibility requirements for judicial office. *Id.* at 497. The Court held that his mere assertion that applying for a judgeship was futile did not demonstrate injury-in-fact unless Adams was "able and ready" to apply. *Id.* at 500. Adams' testimony that he "would apply" was on its own insufficient; the Court searched the record fruitlessly for another indication that his "intent" to apply was "concrete." *Id.* at 501–02.

Attempting to shoehorn those general findings into the specifics of this case, Uber argues that Plaintiffs' professed intent to use the Uber app, "without more and against all contrary

United States District Court
Northern District of California

evidence" cannot confer standing. *See id.* at 501. In support, it aggregates facts it believes contradicts Plaintiffs' stated intent to use the Uber app. Namisnak traveled to San Francisco, which he knew offered UberWAV, but chose to use a taxicab instead. He traveled mostly by bus and, at the end of his trip, used Lyft to call a standard vehicle, rather than a WAV, to the airport. He often travels to the airport using a folding wheelchair in a standard car and relying on the help of those who know how to help him enter and exit a standard car. Uber alleges he has not used for-hire transportation in and around New Orleans since 2010. Next, Uber asserts Crawford declined to use UberWAV even in Washington, D.C., where it is offered, invoking his statement that he did not check to see if UberWAV was available because there was a large supply of accessible taxis. He further claimed he did not need UberWAV because taxis worked. He admitted, in relation to a trip to San Francisco, that he preferred public transit if available. Lastly, Uber alleges Falls has never hired a WAV; the only accessible transportation he uses is the bus. He admitted at a deposition that he did not know whether there were providers of for-hire WAV services in New Orleans.

At a basic level, the facts here are distinguishable from *Carney*, which operated largely as an experiment. Adams became interested in the issue of Delaware's qualification scheme (which prohibits Independents from applying for judgeships) after reading about it in a law review. *Id.* at 500–01. He shortly thereafter registered as an Independent and eight days later filed suit. *Id.* The Supreme Court's probe beyond Adams' apparently insincere assertion that he intended to apply for a judgeship focuses on the disingenuous nature of his assertion. There is no reason to believe Plaintiffs are similarly simply testing the legal waters.

Even if Uber is correct that there is some relevance to Plaintiffs' decision not to use UberWAV when it was available to them in other cities, Uber's emphasis on cherry-picked incidents in which Plaintiffs relied on other forms of transportation is not convincing because it fails to grapple with relevant context. For instance, on his trip to San Francisco, Namisnak left transportation accommodation to his wife, so the decision to take a taxicab or standard Lyft, rather than an Uber, was not his. More broadly, Plaintiffs' decision to rely on transportation methods

with which they appear to be institutionally familiar does not contradict their stated interest in using an UberWAV in New Orleans. Crawford preferred a taxi in Washington D.C. because he prefers to "keep it simple and use the taxis cause [he] know[s] it works," whereas there are few accessible taxis in his hometown of Jackson. Opposition ("Opp.") to Defendants' Motion for Summary Judgment ("DSJ") Ex. RRR at 32. He would therefore welcome the opportunity to use another form of accessible transportation when he needs to get somewhere quickly and suddenly. Lastly, Falls recalls a specific incident in which he was out with friends and could not locate an accessible vehicle at the end of the night. Falls attempted to roll himself home and was hit by a car. Needless to say, Falls is likely to make use of on-demand WAV transport, just as he claimed in his deposition.[1] Uber's proffered bits of the record do not defeat a finding that Plaintiffs have standing.

### 2.  *ADA Claims*

Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Plaintiffs bring claims under three subsections of § 12184. First, they allege Uber imposed "eligibility criteria that screen[ed] out or tend[ed] to screen out an individual with a disability or [a] class of individuals with disabilities from fully enjoying the specified public transportation services[.]" *Id.* § 12184(b)(1). Second, they contend Uber has purchased "a new van . . . that is not readily accessible to or usable by individuals with disabilities" without providing "a level of service to such individuals equivalent to the level of service provided to the general public." *Id.* § 12184(b)(5). Third, they claim Uber failed to "make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii)." *Id.* § 12184(b)(2)(A). Section 12182(b)(2)(A)(ii) defines as discrimination the

---

[1] Uber's argument that Falls lost standing during the litigation because he was "totally bedbound" after a hospitalization and therefore could not have used a WAV because he would have required a vehicle that could accommodate a stretcher is not compelling. DSJ at 9.

"failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary . . . unless the entity can demonstrate that making such modifications would fundamentally alter the nature" of the goods or services provided.

### a. Defendants are Covered Entities[2]

In order to proceed under Title III, Plaintiffs must first establish Uber is an entity "primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Plaintiffs contend Uber is a covered entity for four distinct reasons: (1) Uber publicly represents that it provides transportation, (2) Uber controls "virtually every aspect of its transportation system," (3) Uber owns tens of thousands of vehicles used to transport riders, and (4) Title III attaches to entities providing transportation through third parties.[3] Plaintiffs' Motion for Summary Judgment ("PSJ") at 14. In its own motion for summary judgment, Uber notes that this Court earlier characterized the issue of whether Uber exerts dispositive control over its drivers as a mixed question of law and fact. While it does not concede it is a covered entity, it acknowledges that its arguments on this point rely on facts that are in dispute and does not seek summary judgment on this issue. In its opposition to Plaintiffs' motion, however, it contends Plaintiffs have not carried their burden to show it is a covered entity. The gravamen of Uber's opposition is its insistence that it sells technology, not transportation.

Though it considers the question in a different context, the court in *O'Connor v. Uber*

---

[2] At the outset, Defendants briefly contend Plaintiffs' motion must be denied as to Rasier because their arguments are singularly focused on Uber. To grant the motion as to Rasier, they argue, would pierce the corporate veil without basis. Moreover, the failure to address Rasier on its own requires the denial of the motion also as to Uber because Rasier, not Uber, is the permitted transportation network company in the relevant cities and licenses the Uber Driver app to drivers. Uber is thus even further removed from passenger transportation than Rasier. In response, Plaintiffs clarify that all their briefing applies to both entities. Without more from Defendants explaining why Plaintiffs' arguments cannot be applied to both entities, or how Rasier's business differs from Uber's, there is no basis to conclude Rasier is categorically immune from Plaintiffs' arguments aimed at both entities.

[3] Though Uber dedicates a large portion of its opposition to combatting the proposition that it "stands in the shoes" of its drivers, this theory is not discussed because Uber is a covered entity in its own right.

United States District Court
Northern District of California

*Technologies, Inc.* thoroughly considered and rejected the same argument Uber puts forth here. 82 F.Supp.3d 1133, 1141–42 (N.D. Cal. 2015). Namely, that it is a "technology company" that ought not be subject to regulations aimed at a "transportation company." There, Uber's framing of the technology versus transportation question turned on the mechanics of its platform, an "unduly narrow" basis on which to judge the content of its business. *Id.* at 1141. As *O'Connor* observed, if Uber is a technology company, so must be Yellow Cab, which uses radio technology to dispatch its taxis, and John Deere, which uses robots to manufacture lawn mowers. *Id.* If, under Uber's definition, "one focuses solely on *how* [entities] create or distribute their products," nearly all companies would be technology companies. *Id.* Though Uber has, obviously, supplied the method by which drivers and passengers connect, it is undeniable that "Uber does not simply sell software; it sells rides." *Id.* Uber's theory that merely "provid[ing] technology and services to people who are engaged in the business of transporting people" does not make it "so engaged" is therefore unpersuasive. Opposition to PSJ at 31.

Uber makes no compelling argument against this conclusion. Instead, it mainly asserts that the question ought not be called at this stage because it disputes the facts underlying the contentions that it advertises itself as a transportation system and exercises control over its drivers. Yet Uber does not appear to contest the facts Plaintiffs put forth on either point. First, Plaintiffs list many of the public and private places in which Uber refers to itself as a transportation company. An older mission statement explained Uber endeavored to "make transportation as reliable as running water everywhere, for everyone." PSJ Ex. R. In various posts on its website, it boasts about improving the transportation systems of various cities: "Uber is not only transporting people, but increasing the number of residents small businesses can serve in all areas of Columbus."; "We're finally giving [Mexico City] the transportation system that it deserves.";; "[W]e're SO pumped to be providing [New Orleans] with reliable, safe, and convenient transportation…finally!". PSJ Exs. V, Y, BB (ellipses in original). After the rollout of Uber LA, Uber's then-CEO declared: "[I]t is today that Uber LA is officially rolling out its transportation system in this fine city." PSJ Ex. DD. He acknowledged that consumers might not believe Uber

United States District Court
Northern District of California

1  was a transportation system and asked: "[H]ow is some on-demand town car service calling itself

2  a transportation system?", resolving the question by touting Uber's ability to decrease the number

3  of cars on the road. *Id.* Before the Maine legislature, Uber's written testimony represented that

4  "Uber provides transportation to and from all neighborhoods[.]" PSJ Ex. CC. In its filings to the

5  SEC, it appears to admit "ridesharing products" are a form of transportation, explaining the ways

6  in which it sought to "increase [its] market share relative to other transportation options[.]" PSJ

7  Ex. A at 001320. The list goes on.

8         Rather, Uber appears to challenge the weight Plaintiffs' facts should be accorded by

9  pointing to other instances in which it has publicly described itself as a technology company. To

10  the SEC, Uber described itself as a "technology platform that uses a massive network, leading

11  technology, operational excellence and product expertise to power movement from point A to

12  point B." PSJ Ex. B at 1639. Uber's terms of service require potential customers to acknowledge

13  that their "ability to obtain transportation, logistics and/or delivery services from third party

14  providers through the use of the Uber marketplace platform and services does not establish Uber

15  as a provider of transportation . . . or as a transportation or property carrier. Uber is not a common

16  or motor carrier, [and] does not transport you[.]" Opp. to PSJ Ex. 2 (decapitalized).

17         Uber's soundbites do not create a dispute as to the veracity of the facts set forth by

18  Plaintiffs. At best, they indicate a recent public relations shift. In years past, Uber freely described

19  itself as a transportation company. Now, it carefully delineates its technological boundaries.

20  Nonetheless, Uber cannot, for purposes of this litigation, retract its prior press releases, nor its

21  statements to legislatures or to the SEC. Absent some indication that it has changed the way it

22  operates in step with this public relations change, Uber has not demonstrated there is a genuine

23  dispute about whether it has held itself out to the public as a transportation company.

24         Uber similarly does not dispute that it exercises control over certain aspects of rides. It

25  seems instead to be making a legal, rather than factual, argument about how much control is

26  dispositive, i.e., makes drivers into an "extension" of the entity itself. Plaintiffs assert Uber exerts

27  control over the location of services and which products are offered (UberX, UberSUV,

28

ORDER

UberWAV, etc.), the price of rides, insurance requirements, which vehicles may be driven, the use and maintenance of vehicles, who can drive, driver training (including the enforcement of community guidelines aimed at preventing harassment), and the on-site personnel sometimes deployed to airports and music festivals. Uber presses on most of these points. It argues that many of the regulations concerning drivers, including mandatory background checks, non-discrimination policies, insurance guidelines, and vehicle requirements or inspections, are required by state and local laws and therefore do not demonstrate an exertion of control on Uber's part. The community guidelines do not demonstrate control, it asserts, because they set expectations for both drivers and riders; nor do the decisions about the cities in which Uber operates, the connection of potential drivers to car rental agencies, or the occasional deployment of personnel to large events. Perhaps most importantly, it contends that it does not simply set the price of rides, but instead collects a fee for helping drivers connect with, and charge, potential riders. That it is paid for these services does not demonstrate control. Lastly, and more broadly, it emphasizes it does not control when, where, and whether drivers decide to accept, decline, ignore, or cancel ride requests. Drivers are free to connect with riders using other methods, including those provided by Uber's competitors.

Again, none of these objections create a dispute about whether the facts set forth by Plaintiffs are, indeed, true. Even taking the facts in the light most favorable to the non-movant, it is clear that Uber (1) requires drivers to comply with state and local laws, (2) maintains behavioral expectations and enforces its community standards against drivers, (3) selects the cities in which it operates and which products are available, (4) connects potential drivers to rental car agencies, (5) oversees personnel deployed to airports and other large events to help riders, and (6) sets, without input from drivers, the prices of rides. That it does not regulate exactly when and where rides take place does not undermine the general conclusion that it asserts extensive control over drivers and the transportation system it operates.

Though earlier in the case this Court concluded the question was a mixed one of law and fact, Plaintiffs have set forth sufficient evidence of Defendants' transportation character that no reasonable jury could conclude they are not covered entities "primarily engaged in the business of

United States District Court
Northern District of California

1    transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a).

2          **b.  Plaintiffs Cannot Recover Under 42 U.S.C. § 12184(b)(1) or (b)(5)**

3          As set forth above, it would be discriminatory for a covered entity to impose or apply

4    "eligibility criteria that screen out or tend to screen out an individual with a disability or any class

5    of individuals with disabilities from fully enjoying the specified public transportation services

6    provided by the entity, unless such criteria can be shown to be necessary for the provision of the

7    services being offered[.]" *Id.* § 12184(b)(1). In each city in which it operates, Uber sets out vehicle

8    requirements for its various products – UberX, UberXL, etc. A driver whose vehicle does not meet

9    those standards may not use the app. For example, to offer an UberX ride in New Orleans, a

10    Driver must use a four-door vehicle with five, factory-installed seats and air conditioning. Because

11    most WAVs are vans with aftermarket alterations, Plaintiffs contend Uber's explicit prohibition of

12    the use of vans, box trucks, and aftermarket seating modifications in UberX rides in both Jackson

13    and Orleans, "screen[s] out . . . [a] class of individuals with disabilities." *See id.*

14          Uber argues this theory must fail because it is raised for the first time at summary

15    judgment; Plaintiffs do not refer to subsection (b)(1) in the operative complaint. *See Coleman v.*

16    *Quaker Oats Co.*, 232 F.3d 1271, 1292–93. Plaintiffs point to their allegation that "when a driver

17    with a wheelchair-accessible vehicle in a city without UberWAV contacts Uber, they are told that

18    they cannot participate in UberWAV." *Namisnak* Dkt. 86 ¶ 103. Though Plaintiffs reference this

19    technological impediment to the provision of UberWAV service in their complaint, their adjacent

20    theory on summary judgment laments the disparate effects of prohibiting drivers from offering

21    UberX rides in the types of vehicles most likely to facilitate accessible service. Though both

22    barriers to service are undoubtedly obstacles to the provision of accessible service, the second is

23    improperly raised for the first time here. Subsection (b)(1) therefore cannot provide a basis for

24    relief.

25          Subsection (b)(5) also does not provide Plaintiffs a basis for relief. The entirety of

26    subsection (b)(5) provides that discrimination includes:

27          the purchase or lease by such entity of a new van with a seating capacity of less than 8

28

United States District Court
Northern District of California

passengers, including the driver, which is to be used to provide specified public transportation and for which a solicitation is made after the 30th day following the effective date of this section that is not readily accessible to or usable by individuals with disabilities, including individuals who use wheelchairs; except that the new van need not be readily accessible to and usable by such individuals if the entity can demonstrate that the system for which the van is being purchased or leased, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service provided to the general public;

As Uber argues, it is obvious from the structure of the provision that a showing of equivalent service is a defense to a challenge of discrimination against a qualifying transportation entity that has purchased a new, non-accessible van. Plaintiffs' argument that transportation companies that, like Uber, purchase new vans must either make them accessible or achieve equivalent service across their whole system is unpersuasive and, more importantly, relies on facts Uber emphatically disputes. Specifically, Plaintiffs allege that through subsidiaries Xchange Leasing ("XL") and Advanced Technologies Group, Uber purchased tens of thousands of vehicles, including at least 130 vans (only 50 of which were wheelchair-accessible), and leased them to drivers.[4] The purchase of 80 non-accessible vans, Plaintiffs argue, triggers Uber's obligation to provide an equivalent level of service across its entire system. The argument fails for two reasons. First, this order does not, and indeed cannot, make a factual finding resolving the dispute over whether Uber currently, or historically, owns, owned, or purchased any vehicles. Second, it is extremely unlikely that Congress meant for the purchase of a single, non-accessible van to trigger what could be the gigantic undertaking of instituting equivalent service across the "entirety" of a transportation system. As the maxim goes, Congress tends not to "hide elephants in mouseholes." *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 468 (2001). This reading of subsection (b)(5) is therefore not viable and Plaintiffs cannot recover under this section.

### c.  Whether Plaintiffs' Proposed Modifications are Reasonable Must be Decided at Trial

Unlike the other subsections, (b)(2), which defines as discrimination the failure of an entity to "make reasonable modifications in policies, practices, or procedures" may provide a basis for

---

[4] Uber asserts it has since sold XL and, more importantly, never owned the vehicles itself.

relief. 42 U.S.C. § 12182(b)(ii)(A)(ii). Whether the requested relief is reasonable, however, turns on facts subject to genuine dispute and is therefore not amenable to disposition at this juncture.

At the outset, Uber attempts once again to establish that forcing it to provide WAV service cannot be a "reasonable modification" under § 12184(b)(2).[5] Yet earlier in this litigation, this Court concluded just the opposite. *Crawford* ECF 80 ("Uber could very well be required to provide WAV service through some mechanism in order to comply with the anti-discrimination provisions of Section 12184(b)(2)."). Further, this Court observed that "Uber's fixation on whether WAVs are specifically required by statute is unavailing in light of the broad language of the ADA." *Id.* Instead, a covered entity is subject to the "statute's broader anti-discrimination mandate." *Id.*

Now, in its motion for summary judgment, Uber argues that the institution of WAV service as a "reasonable modification" under subsection (b)(2) conflicts with subsection (b)(5)'s contemplation of when accessible vehicles are required. Because "the specific governs the general" under traditional rules of statutory interpretation, Uber argues, only subsection (b)(5) can mandate the establishment of WAV service. *See RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). It explains that if "Congress intended to compel entities that do not purchase or lease new vans to provide WAV service, it would not have done so by drafting WAV provisions (subsections (b)(3) and (b)(5)) that do not require WAV service and, instead, rely on a general provision that says nothing about WAVs (subsection (b)(2)) to nevertheless compel WAV service." DSJ at 15. It then urges comparison to Title II, which specifically provides that "[i]t shall be considered discrimination . . . for a public entity which operates a fixed route system . . . to fail to provide . . . paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12143(a). In other words, Congress knows how to require accessible service but has not done so under Title III. *See City of Columbus*

---

[5] Though Plaintiffs may be correct that these arguments constitute a motion for reconsideration, no discussion of the requirements for such a motion are discussed because the arguments are once again rejected on the merits.

*v. Ours Garage & Wrecker Serv., Inc.*, 536, U.S. 424, 433–34 (2002) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Similarly, to require covered entities to guarantee WAV service but, simultaneously, not require them to acquire WAVs would be absurd, Uber argues[6]. Uber contends there is no indication Congress intended to require entities to provide WAV service indirectly; they need only demonstrate accessible service as a defense in the context of the acquisition of a new inaccessible van.

Uber asserts the legislative history supports this view. A House Report provides:

[Section] 304(b)(2) [12184(b)(2)] lists further examples of discrimination, including: a failure [sic] such entity to make reasonable modifications consistent with those required under section 302(b)(2)(A)(ii); a failure to provide auxiliary aids and services consistent with the requirements of section 302(b)(2)(A)(iii); and a failure to remove barriers consistent with the requirements of section 302(b)(2)(A)(iv), (v), and (vi).

The examples of discrimination contained in section 304(b) are *intended to address situations that are not covered in the specific vehicle and system requirements for private entities primarily engaged in the business of transporting people included in sections 304(b)(3), 304(b)(4), 304(b)(5) and 306*. The general rule contained in paragraph (a) and the examples of discrimination contained in paragraph (b) are not intended to override the specific requirements contained in the sections referenced in the previous sentence. For example, an individual with a disability could not make a successful claim under section 304(a) that he or she had been discriminated against in the full and equal enjoyment of public transportation services on the grounds that an over-the-road bus was not wheelchair lift-equipped, if a lift was not required under 304(b)(4)[.]

H. Rep. No. 101-485(I), 101st Cong., 2d Sess., 1990 WL 10079987, at *16 (May 14, 1990) (emphasis added). It must be noted, however, that subsection (b)(4) references § 12186(a)(2), which sets out an exhaustive scheme of "[s]pecial rules for providing access to over-the-road buses." Subsections (b)(3) and (b)(5), however, appear to guide the inquiry only if their factual predicate is true, i.e., if an entity has purchased an inaccessible van. Just as this exceedingly

---

[6] On what basis Uber concludes § 12184 does or does not require covered entities to acquire WAVs it does not explain.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    narrow triggering event surely cannot require the provision of equivalent service across an entire

2    transportation system, it cannot preclude the institution of WAV service as a (b)(2) modification.

3           Uber nonetheless asserts just that. It points to a Department of Transportation's ("DOT")

4    decision not to operationalize a disability group's comment that "a taxi company is not accessible

5    when viewed in its entirety if it does not have access to accessible vehicles (either in its own fleet

6    or through arrangements with other entities)." *Transp. for Individuals with Disabilities*, 56 Fed.

7    Reg. 45584-01, 45590, 1991 WL 171006 (Sept. 6, 1991). This selective choice of quotes leaves a

8    misleading impression. The DOT went on to say: "We recognize that the availability of accessible

9    taxi service is important to individuals with disabilities, and believe that, as a matter of policy,

10   greater accessibility of taxi fleets should be encouraged. Given the absence of specific statutory

11   language requiring a mix of accessible vehicles in taxi fleets, we believe that to impose such a

12   requirement based only on a general concept of 'accessible in its entirety' would be

13   inappropriate." *Id.* at 45590–91. This legislative history thus does not support Uber's theory for at

14   least two reasons. First, a three-sentence analysis by an agency in 1991, decades before the peer-

15   to-peer model came into existence, concluding that the statute did not specifically require a mix of

16   accessible vehicles in taxi fleets does not preclude a court's conclusion that such a mix is a

17   reasonable modification. To impose a one-size-fits-all accessibility requirement on transportations

18   systems goes against the flexible standard of § 12184(b)(2)(A). Indeed, the very balancing of

19   necessity against fundamental alternation indicates an awareness that what might be "reasonable"

20   for one entity might be fatal for another. Second, the agency's reference to "accessible in its

21   entirety" language invokes the concept of the "entirety" defense in subsections (b)(3) and (b)(5). It

22   in no way suggests that WAV service could never be a reasonable modification. Uber has thus

23   again failed to put forth persuasive arguments that WAV service can never be a "reasonable

24   modification" under § 12184(b)(2).

25          Because Uber's threshold argument against recovery under subsection (b)(2) is not

26   convincing, the focus now turns to the reasonableness of Plaintiffs' request. Whether a proposed

27   modification is reasonable involves a "fact-specific, case-by-case inquiry that considers, among

28

other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune v. Am. Multi-Cinema, Inc*., 364 F.3d 1075, 1083 (9th Cir. 2004). An accommodation is not reasonable if it imposes undue financial or administrative burden. *Id.* The plaintiff "bears the burden of pointing to the existence of a reasonable accommodation." *Zukle v. Regents of Univ. of California,* 166 F.3d 1041, 1048 (9th Cir. 1999). After an initial showing, the burden shifts to the defendant to show the modification is unreasonable because it would fundamentally alter the nature of its goods or services. *Id.* Entities need not make "any and all possible accommodations," only those "accommodations that are reasonable." *Baughman v. Walt Disney World Co*., 685 F.3d 1131, 1135 (9th Cir. 2012).

Preliminarily, the parties appear to disagree about what modification Plaintiffs seek. Uber attacks what it understands to be Plaintiffs' three demands: (i) "turning on" UberWAV in New Orleans and Jackson, (ii) providing equivalent service, and (iii) providing a fleet of 20-60 WAVs in Jackson and 30-60 WAVs in New Orleans. Plaintiffs, in contrast, enumerate three ways by which Uber could "utilize its resources, internal knowledge, and business know-how to change its operational policies and *provide WAV service*," as requested in their initial letter: (i) by pursuing a partnership with a third-party commercial operator, (ii) by removing restrictions and creating an incentive system, and (iii) by reinstating the leasing model Uber previously tried and abandoned.[7] PSJ at 33. They clarify that "[i]n essence, Plaintiffs are asking that Uber bring the UberWAV practices of other cities to New Orleans and Jackson." Opp. to DSJ at 21.

At this stage, it is clear Plaintiffs are asking Uber to "provide WAV service" akin to the service provided in other cities. Though the exact contours of this proposal will likely benefit from additional explanation and development at trial, it clearly communicates a desire to use Uber to request and obtain a ride in an accessible vehicle. Plaintiffs moreover identify a variety of methods

---

[7] Plaintiffs identify three additional methods they would put forth at trial: (1) mandatory signup requirements, (2) a vehicle marketplace partnership with Hertz or Avis, and (3) a dispatch system similar to the one used in New York City.

1    to achieve this goal, the potential results of which (facilitating the availability of WAVs for hire)

2    endorse this reading of Plaintiffs' request.[8]

3         Uber contends this request amounts to an "outcome" rather than a "modification." A

4    "modification" is a change to an existing business practice; it does not require the provision of

5    "additional or different substantive benefits." *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir.

6    2000). By way of example, the Department of Justice provides three sample modification

7    situations: (1) a parking facility that purports to bar all vans or vans with raised roofs may be

8    required to modify the facility should a WAV wish to park there, (2) a department store permitting

9    only one person in a dressing room at a time should allow a companion to a person requiring

10   assistance, and (3) a hotel may be required to keep an accessible room unoccupied until an

11   individual with a disability properly requests the room. *Guidance on ADA Regulation on*

12   *Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial*

13   *Facilities*, 28 C.F.R. § Pt. 36, App. C (July 26, 1991).

14        The present case does not resemble the examples propounded by the DOJ, Uber argues,

15   because Plaintiffs have not identified a "policy, practice, or procedure," nor do they seek a

16   "moderate" change. For support, Uber relies on a case in which the Ninth Circuit held that Title III

17   "does not require provision of different goods or services, just nondiscriminatory enjoyment of

18   those provided. Thus, a bookstore cannot discriminate against disabled people in granting access

19   but need not assure that the books are available in Braille as well as print." *Weyer v. Twentieth*

20   *Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000). Uber implies that Plaintiffs'

21   demand is analogous and, in turn, that it weaponizes "reasonable modification" to swallow the

22   business of ridesharing whole.

23        This clunky analogy does not strengthen Uber's argument. A bookstore sells books. Uber

24

25   _____

26   [8] Plaintiffs only discuss the methods in the context of New Orleans but assert they would operate
     similarly in Jackson. On a broader geographic note, Uber is likely correct that Uber's
     implementation of UberWAV in other cities does not make it *per se* reasonable in every city. *See*

27   *Indep. Living Res. Ctr. v. Lyft, Inc.*, 2020 WL 6462390, at *5 (Nov. 5, 2020).

28

United States District Court
Northern District of California

sells rides. A demand that a bookstore sell every book in Braille would be akin to a demand that every driver utilize a WAV. Plaintiffs make no such demand. Rather, Plaintiffs ask that Uber "grant[] [them] access" to the rideshare marketplace. *See id.* Their request thus appears more similar to the DOJ's dressing room example than Uber's bookstore example. Indeed, DOJ recently brokered a settlement with Enterprise rental cars requiring the company to modify its "policy, practice, or procedure" to allow individuals who wish to rent a car with an adaptive driving device to do so at 25 different airports. While it is possible to view Plaintiffs' request as demanding an additional product, Plaintiffs make the good point that UberX and UberWAV are the same product – ridesharing – offered at the same price in the same line of business – for-hire transportation. Uber has thus failed to show Plaintiffs seek an outcome rather than a modification.

The question of whether the request and methods are reasonable, however, cannot be decided on the papers, both because facts remain in dispute and because neither party can tip the scale decisively. Each method is discussed in turn.

First, Plaintiffs urge Uber to contract with a commercial fleet operator, such as MV Transportation ("MVT"), to bring more accessible vehicles and drivers to New Orleans. Uber works with MVT in seven other cities; the partnership provided 290,000 WAV trips to 53,000 unique WAV riders in 2019. They explain that in 2018 Uber considered expanding its work with MVT to cover New Orleans, but ultimately decided not to move forward because of the costs. Yet in Plaintiffs' estimation, these concerns about costs are illusory – according to a selection of Uber's internal documents, an "accessibility fee" of 3–4 cents per trip could "fully fund" the WAV program. In opposition, Uber claims no commercial fleets operate in either Jackson or New Orleans, including MVT. Even if they did, however, Uber contests that such an arrangement could be economically reasonable. It alleges it has spent millions on its partnership with MVT alone, and that in other cities it spends many multiples of the cost a rider pays per WAV trip.[9] Most importantly, however, is its clarification that the 3–4 cent projection on which Plaintiffs rely is

---

[9] In what way this money is "spent" per trip, Uber does not explain.

based in a 2017 presentation that severely underestimated the cost of providing WAV service.

Second, Plaintiffs suggest Uber provide incentives, such as a sign-up bonus or a reduction in fees, to entice drivers to drive WAVs. In Philadelphia, Plaintiffs recount, Uber offered a $30 per-trip incentive for completing a WAV trip. Divided over the total number of rides in Philadelphia, the estimated cost of the incentive was about 8 cents per trip. Another internal presentation indicated "Uber could offer WAV renters a service fee reduction from 25 percent to 1 percent in order to improve driver earnings and WAV rental attractiveness." PSJ Ex. S at 111. Plaintiffs complain that Uber has not attempted to incentivize WAV service in either Jackson or New Orleans, nor has it "turned on" the UberWAV function, which would allow drivers with WAVs to connect with riders seeking accessible rides. This is especially deleterious, Plaintiffs argue, in light of the fact that a 2017 email chain reveals Uber had identified about five peer-to-peer drivers in New Orleans who owned WAVs. Relying on the proposition that a modification must be effective to be reasonable, Uber sets forth a few reasons an incentive scheme will not result in a meaningful supply of WAV drivers. *See Fortyune*, 364 F.3d at 1083. Both the supply of WAV drivers and demand for WAV rides is too low to facilitate a marketplace. High costs and low earning potential would likely dissuade drivers from providing WAV rides, and, according to Uber's 30(b)(6) person most knowledgeable Niraj Patel, past experience shows incentives are "largely ineffective at improving the reliability of the WAV marketplace." Declaration of Niraj Patel ("Patel Decl.") ¶ 75.[10]

Third, Plaintiffs contemplate a return to a leasing model Uber used in the past. Under its agreement with subsidiary XL, XL would pay an auto manufacturer $43,000 for a WAV, which Uber would then lease to a driver, subsidizing part of the lease. Shortly before this suit was filed, Uber had a plan in place to add 800–1000 additional WAVs through "a combination of flexible

---

[10] Uber contradicts itself on this point. In its registration statement filed with the SEC, it explains that it provides an efficient alternative to personal vehicle ownership and public transportation because it "can choose to use incentives, such as promotions for [d]rivers and consumers, to attract platform users on both sides of our network and increase engagement[.]" PSJ Ex. A at 001380.

United States District Court
Northern District of California

United States District Court
Northern District of California

leasing through a third party and [XL]." PSJ Ex. AAA. Before the plan was operationalized, however, Uber sold XL. Nonetheless, Plaintiffs argue that the plan's internal approval indicates it must be a reasonable solution. Though it would require upfront expenditure by Uber, those costs could be offset by the accessibility fee discussed above. To the extent it is not offset, Plaintiffs argue, Uber can likely bear the cost – Uber recently announced it was committing more than $800 million to help drivers in the United States, Canada, and Europe transition to electric vehicles by 2025. In its opposition, Uber stridently contests that it ever leased vehicles to drivers. Rather, it emphasizes its subsidiary XL leased vehicles, but went out of business in 2018. Though Uber searched, it was unable to find another "national leasing company ready and willing to provide financially attractive WAV leases to [d]rivers and potential [d]rivers." Patel Decl. ¶ 82. Plaintiffs provide no evidence such an entity exists. Lastly, Uber argues that compelling it to enter an entirely different industry is indisputably a fundamental alteration.

The parties present sharply diverging narratives relating to each of the three methods Plaintiffs propose. It follows that, at this stage, it is not feasible to determine as a matter of law whether Plaintiffs' request is reasonable. Because the question must be put to a fact finder, both motions for summary judgment are denied as to 42 U.S.C. § 12184(b)(2).

**B.  Motions in Limine**

Federal Rule of Evidence 702 provides that expert opinion testimony is admissible if: (1) the witness is qualified to testify about the topics to be addressed; (2) the expert's specialized knowledge will help the jury "to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the expert has reliably applied the principles and methods to the facts of the case." The proponent of evidence bears the burden of establishing its admissibility. *Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

*1.  Motion to Exclude Testimony of Meera Joshi*

Plaintiffs have disclosed Meera Joshi, former Chair and CEO of the New York City Taxi and Limousine Commission ("TLC") (currently the Deputy Administrator of the Federal Motor

Carrier Safety Administration in the Department of Transportation), as a non-retained expert. Plaintiffs indicate she will offer a range of opinions related to the transportation industry. Uber moves to exclude her as an expert, focusing on three of her opinions: (1) her opinion based on her time at the TLC that she "regarded" Uber as "in the business of transporting people for hire and regulated them in accordance with that opinion," Declaration of Stephanie Schuster ("Schuster Decl.") Ex. C at 46, (2) her opinion that Uber has the capacity to provide WAV service, and (3) her opinion that "Uber's failure/refusal to provide WAV service stems from a desire to avoid the issue, not from an inability to provide said service," Schuster Decl. Ex. A.

Joshi's opinions were solicited at her deposition which was taken by Plaintiffs, not Uber. At the deposition, Joshi confirmed that she did not review documents related to the case, did not know who the Plaintiffs were, and that she spent less than an hour preparing for the deposition. She also acknowledged she had no Jackson- or New Orleans-specific transportation expertise and that her interactions with Uber were limited to its operations in New York City.

Uber explains why the three opinions highlighted above are inadmissible. First, it contends Joshi's conclusion about Uber's industry impermissibly passes on a matter of law: whether Uber is "primarily engaged in the business of transporting people" and is thus subject to 42 U.S.C. § 12184(a). Uber contends this alleged legal conclusion will impede the factfinder's task by impermissibly substituting the expert's judgment for the factfinder's. Second, Uber argues Joshi is unqualified to opine on Uber's capabilities outside New York because her interactions with its business is limited to its operations in New York City. It also notes any testimony related to whether Uber could offer WAV service in New Orleans or Jackson must be excluded because it was not properly disclosed. Third, Uber contends Joshi may not speculate about Uber's state of mind. Specifically, she may not opine that the lack of WAV service is a consequence of Uber's "desire to avoid the issue." Schuster Decl. Ex. A.

In their opposition, Plaintiffs expound on Joshi's credentials and meet each of Uber's arguments. First, they explain that though the Ninth Circuit has recognized the interpretation of the ADA is a question of law, *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 (9th

Cir. 2020), this Court earlier in this litigation concluded that a determination of whether Uber is primarily a transportation entity is "a mixed question of law and fact." They also note Joshi intends to provide factual predicates for her conclusions; for example: Uber is a licensed for-hire vehicle provider in New York City and is subject to all attendant regulation. Second, they argue Joshi could reasonably draw inferences about New Orleans and Jackson based on her knowledge about Uber's operations in New York. Her fitness to comment on Uber's potential capabilities in other cities goes to the weight of her testimony, not admissibility. Third, Plaintiffs explain that they do not seek to provide evidence about Uber's state of mind. Rather, the idea that Uber's failure or refusal to provide service "stems from a desire to avoid the issue" is merely an analysis of the fact that Uber is *capable* of providing such service but has chosen not to.

While Plaintiffs meet and exceed each of Uber's arguments, they make the more incisive point that though it moves to exclude Joshi generally, Uber has only addressed three of the many opinions she provided at her deposition. Though Uber's first argument is presumably meant to target the requirement that an expert's testimony help resolve a question of fact, it has not shown that all of Joshi's contributions will be legal in nature. It does not indicate she refers to the ADA or that her conclusion specifically uses ADA language. Joshi's statement that she "regarded" Uber as "in the business of transporting people for hire" is her analysis and not exactly aligned with the legal conclusion that an entity is "primarily engaged in the business of transporting people." Thus, though it may ultimately be correct that her conclusion about the nature of Uber's business is inadmissible, Uber has not generally challenged Joshi's credentials, the data on which she relied, or the methods by which she arrived at her conclusions. On that basis alone its motion to exclude her entirely as an expert must be denied.

### 2. *Motion to Exclude Testimony of Dr. James Cooper*

James Cooper, PhD is Plaintiffs' retained expert. He has a doctorate in Taxi Licensing and Control from Edinburgh Napier University in Scotland. He is the director of Transport Research Partners and his research focuses on transportation operation and policy development, mostly abroad. Though Cooper's expert report is hard to parse, he appears to conclude that Uber is a

"transport company" "subject to equality legislation, in this instance the Americans with Disabilities Act." Declaration of Stephanie Schuster Ex. A. ("Cooper Report") at 27. He also states: "it remains to demonstrate that reasonable accommodation can be made," but notes that "infrastructure, potentially supply, and demand exist" in Jackson and New Orleans. *Id.* at 28. He finally states: "I conclude that the reasonable approach for Uber would indeed be to provide UberWAV in both cities." *Id*. Uber points out Dr. Cooper does not define what it means to "provide UberWAV," does not make any reference to Plaintiffs' specifically requested modifications, or acknowledge the cost, financial or administrative, to the provision of UberWAV.

It then distills Cooper's report down to four opinions it believes Cooper may attempt to offer at trial: (1) Uber is a "transport company, being primarily engaged in the business of transporting people;" (2) Uber has a "duty to provide accessibility under the meanings of the [ADA]" and providing UberWAV in Jackson and New Orleans would not "fundamentally alter" Uber's services and any failure to comply "constitutes a breach of disability legislation;" (3) that a supply of WAVs exist in both markets; and (4) that it would be a "reasonable approach" for Uber to provide UberWAV in both cities. *Id.* at 25–26, 28. It essentially argues that because all four opinions are inadmissible under Rule 702, he should be excluded from testifying completely.

The parties make essentially the same arguments about Cooper as about Joshi. Uber contends Cooper's conclusions are impermissibly legal in nature or, as regards his third conclusion, irrelevant.[11] While Plaintiffs acknowledge that, as enumerated, Cooper's second conclusion would be an improper legal conclusion, they contend the first question is mixed and the question of reasonableness is ordinarily factual. *See Sheehan v. City of S.F.*, 743 F.3d 1211, 1233 (9th Cir. 2014) *rev'd in part on other grounds*. More importantly, they argue that all of Uber's attacks on Cooper's conclusions go to the weight his testimony should be afforded, not to

---

[11] In its reply, Uber raises for the first time the idea that Cooper is inappropriately attempting to testify regarding facts about which he has no personal knowledge, such as Uber's corporate structure, the way it sets fares, or its use of dynamic pricing. Even if these are determined to be facts requiring personal knowledge, Uber could object to those particular parts of his testimony as inadmissible. The proffer of these "facts" cannot lead to Cooper's complete exclusion.

United States District Court
Northern District of California

1   whether he should be completely excluded as an expert. Again, Uber does not contend Cooper

2   lacks the credentials, data, or reliable methods to arrive at his conclusions. The motion is therefore

3   denied.

4   **C. Motion to Strike**

5       Plaintiffs move to strike the testimony of Niraj Patel, Uber's Director of Rider Operations

6   for the United States and Canada designated as a lay witness, on the theory that his declaration in

7   support of Uber's motion for summary judgment contains expert, rather than lay, opinion. In his

8   long declaration, Patel opines about drivers' potential economic motivations, Uber's potential

9   future behavior or what would be rational for Uber to do, what riders and individuals with

10  wheelchairs need, the potential effect of driver and rider behavior on the marketplace, and the

11  effects various modifications would have on Uber's business model and financial prospects. He

12  has worked for Uber since 2014 and Uber alleges during that time he has personally viewed and

13  become familiar with the documents on which he relies and Uber's business.

14      Uber preliminarily contends that this type of "stand-alone objection[]" to evidence

15  submitted in support of a motion "[is] improper" under Civil Local Rule 7-3(a) and on that basis

16  should not be considered. *See Salazar v. McDonald's Corp.*, 2017 WL 88999, at *3 n.1 (N.D. Cal.

17  Jan. 5, 2017). It also contends the appendix affixed to Plaintiffs' motion is argumentative and

18  should not be considered. Plaintiffs concede these points but urge consideration of their motion on

19  the merits to determine whether Patel is permitted to offer his opinion testimony at trial.

20      Though the motion will not be considered because it is indeed improper under Local Rule

21  7-3, it must be noted that Patel's declaration approaches the line separating lay and expert

22  testimony. Many of his opinions are based in "specialized" economic and technical, rather than

23  personal, knowledge. Furthermore, though he offers, for example, his opinion that a particular

24  potential accommodation would "simply destroy ridesharing," a conclusion predicated on Patel's

25  understanding of ridesharing economics and implementation, he provides no method by which to

26  evaluate the opinion. Patel Decl. ¶ 37. On the other hand, as Uber points out, courts have

27  distinguished "particularized knowledge that the witness has by virtue of his or her position in the

28

business" from the scientific, technical, or other specialized knowledge contemplated by Federal Rules of Evidence 701 and 702. *Open Text S.A. v. Box, Inc*., 2015 WL 393858, at *7 (N.D. Cal. 2015). Though Patel's declaration will not be excluded at this time, this issue may be raised again at trial.

## V. CONCLUSION

The questions these cross motions for summary judgment seek to resolve must be put to a fact finder. Accordingly, both motions are granted in part and denied in part. Both *motions in limine* and the motion to strike are denied.

**IT IS SO ORDERED**.

Dated: August 26, 2021

RICHARD SEEBORG
Chief United States District Judge