William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
T: (650) 465-5023
williammost@gmail.com

Karla Gilbride (CA # 264118)
PUBLIC JUSTICE, P.C.
1620 L St. NW, Ste. 630
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

Garret S. DeReus (LA # 35105)*
Andrew D. Bizer (LA # 30396)*
*Admitted *pro hac vice*
BIZER & DEREUS, LLC
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
gdereus@bizerlaw.com
andrew@bizerlaw.com

Attorneys for Plaintiffs Scott Crawford,
Stephan Namisnak, and Francis Falls

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT CRAWFORD,<br><br>                    Plaintiff,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>                    Defendants. | Case No. 3:17-cv-02664-RS<br><br>**Plaintiffs' Trial Brief**<br><br>Judge: Hon. Richard Seeborg<br>Courtroom #3, 17th Floor |
| STEPHAN NAMISNAK and FRANCIS FALLS,<br><br>                    Plaintiffs,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>                    Defendants. | Case No. 3:17-cv-06124-RS<br><br>**Plaintiffs' Trial Brief**<br><br>Judge: Hon. Richard Seeborg<br>Courtroom #3, 17th Floor |

## I.   INTRODUCTION

This Court is intimately familiar with this action and, additionally, Plaintiffs have filed a lengthy proposed Findings of Fact and Conclusions of Law. *Namisnak*, Dkt. 197. To avoid redundancy, Plaintiffs do not restate all facts and law that were set out in their Proposed Findings and Conclusions. Instead, Plaintiffs use this trial brief as an opportunity to provide a high-level assessment of their positions, including the evidence and testimony, to be developed at trial.

Plaintiffs Scott Crawford, Stephan Namisnak and Francis Falls are people with disabilities who live in Jackson, Mississippi and New Orleans, Louisiana, respectively. In recent years they have observed Uber becoming an increasingly popular transportation option in the cities where they live, offering the spontaneity and convenience of an on-demand ride at any time of day. But these benefits have been denied to Plaintiffs as users of motorized wheelchairs, because Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Uber") have chosen to exclude many wheelchair-accessible vehicles (WAVs) from the Uber platform. Moreover, Uber does not offer Uber riders in New Orleans or Jackson the option of summoning a WAV through the Uber app as riders in twelve other U.S. cities and six other countries can do (the UberWAV option).[1]

In 2018 Plaintiffs, through their counsel, sent letters to Uber asking the company to begin offering the UberWAV option in New Orleans and Jackson as a reasonable modification under the Americans with Disabilities Act, 42 U.S.C. § 12184(b)(2)(A).  Uber refused, and as of January 14, 2022, as this case prepares to go to trial, there is still no way to request a WAV in New Orleans or Jackson on the Uber platform. As a result, Plaintiffs seek a declaratory judgment that Uber's practices and policies violate the Americans with Disabilities Act ("ADA"), specifically, 42 U.S.C. § 12184(b)(1) and 42 U.S.C. § 12184(b)(2)(A). Plaintiffs also seek an

---

[1] Ex. PT-5 (Uber Wheelchair Vehicle Study) at 6.

injunction requiring Uber to change its eligibility criteria so that vans and minivans modified to serve as WAVs may participate on the UberX and UberXL platforms in New Orleans and Jackson, and also requiring Uber to begin offering UberWAV service in New Orleans and Jackson within six months.

Plaintiffs recognize that the wait times for WAVs may be longer than the wait times for standard vehicles, particularly as UberWAV is phased in over time. But Uber cannot simply continue operating a transportation service in New Orleans and Jackson that excludes people with disabilities who use motorized wheelchairs, like Plaintiffs, from participating in that service, without making any attempt to accommodate their needs. Uber's own employees tasked with investigating an expansion of UberWAV have accurately diagnosed the problem: at Uber, accessibility is considered an afterthought. In New Orleans, Uber began the process of implementing UberWAV because it thought a local mandate was imminent – and then cancelled the New Orleans UberWAV program *the day after* the mandate was withdrawn. The evidence will show that the withdrawal of the proposed local ordinance—not "cost" or "infeasibility"— was the impetus for Uber to walk back its plan to launch UberWAV in New Orleans.

In sum, Uber made a choice not to provide any WAV service whatsoever in New Orleans or Jackson. It made that choice not because WAV service would be infeasible or too costly, but because WAV service was not required by local ordinance. This Court has already held that the ADA applies to Uber. It should now find that the ADA requires Uber to make its services accessible to Plaintiffs.

## II.        FACTUAL BACKGROUND

**A.        Uber Uses Technological Innovation and Partnerships to Expand Rapidly and Frequently Offer New Services.**

Uber has grown quickly in the ten years between its founding and its launch as a publicly traded company in 2019: from the simple concept of "tap a button and get a ride," Uber has

evolved into a company that provides a wide range of services, "ridesharing and carpooling; meal delivery and freight: electric bikes and scooters; and self-driving cars and urban aviation."[2] Throughout this growth and diversification, the ridesharing aspect of Uber's platform has remained particularly lucrative, accounting for $9.2 billion in revenue in 2018.[3] Uber attributes its success to its "leading technology," including its "algorithmic decision engine" that matches driver supply with demand and its "proprietary matching and dispatching algorithms" that can "generate more than 30 million match pair predictions per minute."[4]

Uber often relies on partnerships to fill in gaps in supply and to attract and retain riders with unique promotions. For example, Uber previously operated a subsidiary called Xchange Leasing to increase the supply of vehicles on its rideshare platform. Xchange Leasing had a fleet of approximately 30,000 vehicles which it leased to drivers.[5] After it sold Xchange Leasing, Uber worked with other companies like MV Transportation, Avis, and Hertz to provide vehicles. In short, Uber constantly tweaks both the supply and demand sides of its transportation services with "driver incentives and consumer discounts and promotions" in order to "grow [its] business" and "maintain balance between driver supply and consumer demand."[6]

**B.**     **Uber Controls Which Transportation Options Are Available in Each City It Serves; In New Orleans and Jackson, Those Options Do Not Include UberWAV.**

Uber does not provide a single transportation service but rather a suite of options for those wishing to request, or offer, rides in different types of vehicles. The most popular option is UberX, a service for those wanting to request or offer a ride in a four-door sedan.[7] The UberXL option allows riders to request SUVs or other vehicles that can accommodate larger groups.[8]

---

[2] Ex. PT-1, SEC Registration Statement, at 001224.
[3] *Id.* at 001229.
[4] *Id.* at 001235-36.
[5] Patel Dep. on Nov. 20 at 76:23-77:4.
[6] Ex. PT-1 at 001235.
[7] Namisnak, Dkt. 127 (Patel Decl.) ¶6.
[8] Namisnak, Dkt. 187-2 (Patel Decl.) ¶5.

1
2
3
4
5
6
7
8

Uber establishes minimum requirements that vehicles must meet in order to participate in any of these rideshare markets. To offer UberX rides in New Orleans, for example, vehicles must have air conditioning, four doors, and "five factory-installed seats."[9] Vans are prohibited from participating in UberX, as are vehicles with after-market seating modifications; anyone with such a vehicle who signs up to drive for UberX will be denied.[10] To participate in UberXL in New Orleans, drivers must have a vehicle with seven seats; again, after-market modifications and vans are forbidden.[11]

9
10
11
12
13
14
15
16
17

Another option that Uber makes available on its platform in certain cities is UberWAV, through which riders who use motorized wheelchairs can request a vehicle with a ramp or lift that can accommodate their wheelchair.[12] According to internal Uber documents, UberWAV has "had successful operations in over two dozen cities"[13] and in 2019, 290,000 UberWAV rides were provided to 53,000 distinct riders.[14] As of May 2020, UberWAV was offered in twelve U.S. cities and six countries, mostly through a partnership with a company called MV Transportation.[15] However, the list of cities where UberWAV is offered does not include New Orleans or Jackson.

18
19
20
21
22

**C.   Plaintiffs Asked Uber to Provide UberWAV In New Orleans and Jackson as a Reasonable Modification Under the ADA.**

On September 22, 2018, Plaintiffs Stephan Namisnak and Francis Falls, through their counsel, sent Uber a letter that they identified as a "request for reasonable modification/reasonable accommodation."[16] The letter stated that Namisnak and Falls are people

23
24

---

[9] Rupp Dep. at 28:23-29:7.
[10] Rupp Dep. at 51:2-6.
[11] Rupp Dep. at 29:16-20.
[12] Ex. PT-4, Website, "What Is Uber-WAV?"
[13] Ex. PT-6, WAV Power Point, at 00011903.
[14] Ex. PT-7, Uber's "Accessibility Monthly Business Review," Jan. 22, 2020, at 00012522.
[15] Ex. PT-5 at 00006939.
[16] Ex. PT-27 at 00796.

with disabilities who live in New Orleans, that they use motorized wheelchairs for mobility, and that they wished to request wheelchair-accessible transportation through Uber in New Orleans comparable to that provided in other cities.[17] The letter suggested that Uber should be able to ensure a fleet of 30-60 WAVs in New Orleans, with the basis for this figure being that it was "less than the size of the [UberWAV] fleet that Uber provides in Chicago and Philadelphia."[18] The letter concluded that "Mr. Falls and Mr. Namisnak cannot tell Uber how it must change its internal business practices and operations to provide WAV service in New Orleans, Louisiana" but expressed confidence that "Uber can use its resources and problem-solving abilities to bring itself into compliance with the law without further delay."[19]

Over a year after receiving this letter, on November 13, 2019, Uber denied the request.[20] Its stated reason for the denial was that Uber does not provide transportation,[21] a position this Court has rejected as a matter of law. *Namisnak*, Dkt. 160.

On October 4, 2018, Dr. Crawford made a written "request for reasonable modification/reasonable accommodation" through counsel that was virtually identical to the Namisnak-Falls request except that it asked for UberWAV to be activated in Jackson.[22] Uber denied this request on May 1, 2020.[23]

**D.     Uber Investigated Providing UberWAV in New Orleans But Did Not Launch the Service Because Uber's Leadership Does Not Prioritize Accessibility in the Absence of an External Requirement.**

In early 2017, Uber was "starting to get regulatory pressure to launch WAV in New Orleans."[24] For that reason, New Orleans was added to the list of cities for the next phase of

---

[17] *Id.* at 00796-98.
[18] *Id.* at 00798-99.
[19] *Id.* at 00799.
[20] Ex. PT-28 at 00801.
[21] *Id.* at 00803.
[22] Ex. Pt-42.
[23] Ex. PT-28 at 002547.
[24] Ex. PT-35 at 5.

UberWAV rollout.[25] These "phase 2" cities were chosen not because of population size or density, but "based on regulatory requirements, autonomous operations, and legal / advocacy pressure."[26]

Uber assessed the existing WAV resources in New Orleans, and found that they were "sufficient to get this off the ground."[27] These resources included "five P2P [peer to peer] drivers who own WAVs," who could be offered incentives.[28] At the same time, Uber began talks with the local transit agency, TransDev, about forming a WAV partnership.

But then, on July 11, 2017, Uber's team members reported that "in light of our conversations with TransDev," the New Orleans City Councilmember pushing the regulatory WAV mandate had "agreed to defer the ordinance."[29]

With the regulatory pressure to provide WAVs gone, Uber took New Orleans off the list of cities to receive UberWAV – the **very next day**.[30] Explaining the situation, Conner Fagent stated that Uber decided to prioritize "must launch" cities and that New Orleans was "currently compliant" with local city code.[31]

Uber never launched UberWAV in New Orleans and the incentives were never offered to the existing five peer to peer WAV drivers Uber had identified there. Nor did Uber ever enter into the partnership with TransDev that it had used as a reason to forestall the regulatory requirement.

---

[25] Ex. PT-32 at 00014325.
[26] Ex. PT-32 at 00014325.
[27] Ex. PT-65 at 2.

[29] Ex. PT-78 at 1.
[30] Ex. PT-21.
[31] Ex. PT-21 at 00005073.

Uber evaluated New Orleans as a market for UberWAV again in 2018-2019, this time considering a potential partnership with MV Transportation.[32] Again, Uber chose not to provide the service, even though by that point this case had been filed and Mr. Falls and Mr. Namisnak had made their formal request for UberWAV as a reasonable modification. Uber's stated reason for not partnering with MV Transportation in New Orleans at that time was that MV Transportation was asking for too much money.[33] But Uber had previously concluded that an "accessibility fee" of three to four cents per trip levied on Uber riders would "fully fund" UberWAV without Uber having to pay for the program itself.[34] This accessibility fee was recommended for adoption by Uber's "Policy Team."[35] Yet Uber never "seriously investigated" using an accessibility fee to offset the cost of offering UberWAV in New Orleans through a partnership with MV Transportation.[36]

Uber's repeated failure to launch UberWAV in New Orleans is symptomatic of a larger pattern of failing to prioritize accessibility, a pattern recognized and criticized by Uber's own employees. In June of 2017 an Uber employee discussing the rollout of WAV noted that "[l]eadership alignment across the organization is needed before proceeding with uberWAV program expansion."[37]

Another slide deck from a different Uber employee on the state of accessibility at the company in May of 2017 lamented that this leadership alignment was lacking, observing that "no one is dedicated to accessibility" and that "accessibility = afterthought."[38] The Uber employee contrasted this dismissive view of accessibility with a quote attributed to Facebook indicating

---

[32] Patel Dep. on Nov. 20 at 114:13-115:18.
[33] *Id.* at 158:17-160:11.
[34] Ex. PT-32, UberWAV Program Overview, June 2017, at 0014333.
[35] Ex. PT-88 at 0000593.
[36] Patel Dep. on Nov. 20 at 168:3-17.
[37] Ex. PT-32 at 00014323.
[38] Ex. PT-38, Accessibility at Uber, at 00014659.

that a new product would not be launched if it failed an accessibility test.[39] Nearly two years later, little had changed; on another slide deck dated February 1, 2019 and entitled Accessibility Monthly Business Review, the employee preparing the slide deck noted that "[t]ech leadership denied request for dedicated accessibility headcount" and added, "Regrouping to determine path forward in order to staff for accessibility."[40]

Three more years have now passed, and accessibility appears to be no higher a priority for Uber in 2022 than it was in 2017. And as predicted five years ago, Uber's choice to ignore accessibility has "come at steep reputational, regulatory and legal costs."[41] Quite simply, Uber chose to "do nothing and bear the associated risk."[42]

**E.     Uber Never Even Investigated Providing an UberWAV Option in Jackson.**

Putting its disregard for accessibility into even sharper relief, Uber has provided no evidence that it ever investigated the feasibility or cost of providing UberWAV service in Jackson. To the contrary, when asked if such an investigation had ever occurred in Jackson, Uber's corporate designee indicated that it had not.[43] In other words, for nearly five years after Dr. Crawford filed suit, including during the nineteen months between the time Dr. Crawford sent his letter requesting a reasonable modification and the time Uber denied his request, Uber never invested any time or effort into determining whether it could grant Dr. Crawford's request or what providing UberWAV in Jackson would entail.

**III.     LEGAL ANALYSIS**

The Court should find that Uber violated the ADA with respect to provision of WAV service in New Orleans and Jackson in two distinct ways, 1) through its eligibility criteria that

---

[39] *Id.* at 00014664.
[40] Ex. PT-33 at 00008101.
[41] Ex. PT-38 at 00014669.
[42] Ex. PT-32, at 0014333; *see also*, Ex. PT-38 at 00014669.
[43] Patel Dep. on Nov. 20 at 193:14-194:6.

tend to screen out WAVs from participating in UberX and UberXL, in violation of 42 U.S.C. § 12184(b)(1); and 2) by denying Plaintiffs' requests for reasonable modification in violation of 42 U.S.C. § 12184(b)(2)(A). Plaintiffs are entitled to declaratory and injunctive relief on both of these claims. The injunctive relief they seek to remedy the § 12184(b)(2)(A) violation—an order that Uber be required to provide UberWAV service in New Orleans and Jackson where it has not previously provided that option on its platform in either city—is a "concrete proposal or modification," *see Indep. Living Res. Ctr. v. Lyft, Inc.*, 2021 WL 3910719, at *10 (N.D. Cal. Sept. 1, 2021) that is sufficiently specific to meet the requirements of Federal Rule of Civil Procedure 65.

**A.      Uber's Eligibility Criteria for Vehicles to Participate in UberX and UberXL in New Orleans and Jackson Tend to Screen Out WAVs, Which Makes It Less Likely that Plaintiffs Will Be Able to Obtain WAV Transportation on the Uber Platform.**

Private entities that provide "specified transportation services" may not impose "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully enjoying the specified public transportation services provided by the entity." 42 U.S.C. § 12184(b)(1); 49 C.F.R. § 37.5(i)(1). The eligibility criteria provision in 42 U.S.C. § 12184(b)(1) is identical to a provision codified at 42 U.S.C. § 12182(b)(2)(i) that prohibits the use of discriminatory eligibility criteria by places of public accommodation. Courts interpreting this provision have held that it is satisfied by "policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish an individual's chances of such participation." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 134-135 (D. Mass. 1997) (internal quotations omitted).

Uber's ban on "vans" and vehicles with after-market seating modifications from participating in the UberX and UberXL markets in New Orleans and Jackson screens out drivers of WAVs, or those who might choose to purchase or lease WAVs, from participating in Uber's platform as drivers, in turn reducing the number of WAVs available on that platform for

Plaintiffs and other wheelchair users to request as riders. *See equal Rights Ctr. V. Uber Techns., Inc.*, 525 F. Supp. 3d 62, 88 (D.D.C. 2021) (finding that Uber's "failure to address policies that may contribute to the purported dearth of wheelchair accessible vehicles in its fleet" could plausibly establish discrimination in violation of 42 U.S.C. § 12184(b)(1) and identifying as one such policy Uber's "vehicle-type restrictions that actively discourage its drivers from acquiring and operating wheelchair accessible vehicles").

Uber will likely argue at trial, as it argued in its recent motion for partial summary judgment on this claim, that Plaintiffs cannot prove these eligibility criteria caused their injury or that eliminating them would completely redress it, without Uber also enabling the UberWAV option on its platform. However, this Court has already ruled that Plaintiffs could achieve "some relief" through increasing the number of WAVs on the Uber platform, and they need not prove that removing each discriminatory barrier Uber has created would afford them complete relief. *Namisnak*, Dkt. 206. Rather, if Uber's discriminatory eligibility criteria "diminish [their] chances" of obtaining wheelchair-accessible transportation through Uber and eliminating those criteria would conversely improve their chances of participation, *see Guckenberger*, 974 F. Supp. At 135, Plaintiffs have met their prima facie burden under 42 U.S.C. § 12184(b)(1).

With Plaintiffs' prima facie burden met, the burden then shifts to Uber to show that the challenged eligibility criteria are necessary to its service. *Spector v. Norweigian Cruise Line Ltd.*, 545 U.S. 119, 129 (2005). Uber cannot meet this burden. While it may be able to show that a certain number of passenger seats is necessary for the UberX and UberXL services because such minimum passenger capacities have been advertised and are what customers have come to expect, Uber cannot show that a blanket ban on vehicles with after-market seating modifications is necessary to guarantee the required minimum number of seats.

In analyzing a similarly worded "eligibility criteria" provision under Title II of the ADA, a district court in this circuit has explained that defendants mounting a necessity defense face a two-step inquiry: first, they must identify the goal or objective the eligibility criteria is meant to serve, and then they must show that it is in fact necessary to meet that objective. *Hunsaker v. Cnty. Of Contra Costa*, 1997 WL 835164, at *7 (N.D. Cal. July 31, 1997). Uber cannot establish what legitimate objective its blanket ban on "vans" is intended to serve. And even if it can satisfy this first step,  it certainly cannot prove that its statement of that no-vans policy, which says nothing about an exception for minivans or other vehicles modified to accommodate wheelchairs, is the "best possible or even best available method" for accomplishing Uber's as-yet-unidentified objective. *Id.*

In short, Uber has imposed vehicle requirements for UberX and UberXL that tend to screen out the types of vehicles most commonly used as WAVs, and this in turn diminishes the chances that people with disabilities like Plaintiffs who use motorized wheelchairs and need WAVs will be able to participate in Uber's services. Because Plaintiffs will establish their prima facie case and Uber cannot show its eligibility criteria are necessary to any legitimate objective associated with providing UberX or UberXL service, the Court should rule for Plaintiffs on their § 12184(b)(1) claim.

**B.    Uber refused to Provide a Reasonable Modification to Its Policy and Practice of Offering No UberWAV Service in New Orleans and Jackson.**

To prevail on their claim under 42 U.S.C. § 12184(b)(2)(A),[44] Plaintiffs must show (1) that refusing to offer UberWAV in New Orleans and Jackson is a policy; 2) that Plaintiffs requested a modification of that policy that was necessary to accommodate their disabilities; and 3) that their requested modification was reasonable. *Fortyune v. Am. Multi-Cinema, Inc., Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004). Plaintiffs can meet all three of these elements, for refusing

---

[44] This provision cross-references 42 U.S.C. § 12182(b)(2)(A)(ii).

to offer UberWAV was a choice that Uber deliberately (and in the case of New Orleans, repeatedly) made; Plaintiffs requested a concrete modification to that policy necessary for them to benefit from Uber's services; and the modification Plaintiffs requested was effective and not unduly burdensome in light of Uber's resources and available funding mechanisms. Nor can Uber prevail on its affirmative defense that providing UberWAV in New Orleans and Jackson—as it already does in numerous other U.S. cities—would fundamentally alter its business.

First, Uber's failure to provide WAV service in New Orleans and Jackson is a policy. A "policy" is "a definite course or method of action selected from among alternatives . . . ."[45] Uber is solely responsible for whether the UberWAV function is enabled on its platform. *Namisnak v. Uber Techns., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020) ("Uber, and Uber alone, can rectify any alleged violation of the ADA by providing an uberWAV option."). Uber had an opportunity to consider the option of providing UberWAV service—in Jackson at least once the Crawford action was filed in May 2017, and in New Orleans on several occasions throughout 2017, based on internal Uber documents.[46] On each occasion, and in each city at issue, Uber has chosen the "definite course of action" of maintaining the inaccessible status quo, continuing to deny users of motorized wheelchairs in Jackson and New Orleans access to its transportation services. This is a policy.

Second, both Mr. Namisnak and Mr. Falls, in their September 2018 letter, and Dr. Crawford, in his October 2018 letter, requested modifications to this policy that are necessary to accommodate their disabilities. The letters explained that as motorized wheelchair users, they could only use Uber's transportation services if WAVs were provided on the

---

[45] "Policy." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/policy. Accessed 26 Apr. 2021.
[46] *See, e.g.*, Exs. PT-21, PT-32, PT-35, PT-65, PT-78.

platform.[47] Each Plaintiff requested that Uber modify its policy to "provide WAV service" similar to that already being provided in Chicago, Philadelphia, and other cities.[48] These written requests did not demand a specific number of vehicles or specific wait times, thus distinguishing this case from *Independent Living Resource Center San Francisco v. Lyft*, where the court considered projections of likely wait times in order to assess whether Lyft would be able to benefit from offsets available from the California Public Utilities Commission. 2021 WL 3910719, at *3-4. Here, in stark contrast, the modifications Plaintiffs requested were "straightforward and simple." *Id.*

Third, these requests were reasonable. Whether a proposed modification is reasonable involves a "fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune*, 364 F.3d  at 1083. An accommodation is not reasonable if it imposes undue financial or administrative burden. *Id.* By way of example, the Department of Justice explained that, as a reasonable modification, a grocery store would be obligated to ensure that an "adequate number of accessible check-out aisles is kept open during store hours, or must otherwise modify its policies and practices, in order to ensure that an equivalent level of convenient service is provided to individuals with disabilities as is provided to others."[49] Nothing in the DOJ's commentary suggests that it is appropriate to assess the

---

[47] Exs. PT-27, 42.

[48] *Id. The references to a range of WAVs that Plaintiffs "expect[ed]" Uber to onboard to its platform were derived from news accounts about the number of WAVs on the Uber platform in Chicago and Philadelphia, which is what informed Plaintiffs' notion that a comparable or smaller number of WAVs should be feasible for Uber to provide in Jackson and New Orleans as well.*

[49] ("Section 36.302 of the rule prohibits the failure to make reasonable modifications in policies, practices, and procedures when such modifications may be necessary to afford any goods, services, facilities, privileges, advantages, or accommodations, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. This prohibition is based on section

profitability of each customer with a disability and, on that basis, determine whether to keep the checkout aisle open. **In assessing reasonableness, the Ninth Circuit looks at facts beyond mere cost and, instead, looks at the actions the covered entity takes in other contexts or situations**. *Fortyune*, 364 F.3d at 1084 (finding that the modification was reasonable, in part, because the defendant had to take similar action to "assure conformity with local and state smoking ordinances, as well as its own internal policies regarding patrons who talk, use cell phones, or otherwise disturb others during a film's screening.").

Through the testimony and documentary evidence, Plaintiffs will prove that it would be reasonable for Uber to provide UberWAV in New Orleans and Jackson. One of the factors for the Court to assess is whether the modification is effective. Here, the requested modification is highly effective and would provide Plaintiffs with accessible, on-demand transportation unlike anything currently available in their home cities.[50] This conclusion is bolstered by admissions from Uber employees that the program is a "success" in those cities where it is already operating and the fact that Uber has continuously provided UberWAV in multiple cities and has not been forced to withdraw from those markets.[51] That UberWAV is effective is also evidenced by the testimony of Ms. Meera Joshi. Ms. Joshi was the head of the New York Taxi and Limousine Commission (TLC) from April 2014 to March 2019. The TLC required Uber and other rideshare companies to provide wheelchair-accessible service. Uber responded with a lawsuit, but ultimately settled and, since that time, has complied with and even exceeded the TLC's

---

302(b)(2)(A)(ii) of the ADA. … One example of application of this principle is specifically included in a new Sec.36.302(d) on check-out aisles. That paragraph provides that a store with check-out aisles must ensure that an adequate number of accessible check-out aisles is kept open during store hours, or must otherwise modify its policies and practices, in order to ensure that an equivalent level of convenient service is provided to individuals with disabilities as is provided to others.")

[50] *See* Namisnak Dep. 24-25, 28; Falls Dep. 27, 37-38; Crawford Dep. 33.

[51] *See, e.g.*, Ex. Pt-7 at 00012522.

regulatory requirements.[52] This demonstrates that, when Uber commits itself to providing UberWAV, it is fully capable of doing so effectively. Indeed, Uber has done so not only in New York City but in several other less densely populated cities as well. *Namisnak*, Dkt. 196, Uber's Proposed Findings of Fact and Conclusions of Law, Proposed Finding of Fact 102.

Providing UberWAV confers benefits for Uber as well, which must be factored into the reasonableness equation. An Uber employee estimated that UberWAV could save the company $170 million in training costs and "build positive brand sentiment."[53] And brand sentiment is an important asset to Uber, a consumer-serving company; in filings with the SEC, Uber has described "[m]aintaining and enhancing [its] brand and reputation [as] critical to [its] business prospects."[54]

Plaintiffs anticipate that Uber may point to the purported "limited supply" of WAVs and the marginal cost of UberWAV to challenge the reasonableness of the proposed modification. The notion that there is a finite and limited supply of WAVs will be debunked by Plaintiffs' expert, Dr. Cooper, who will explain that there is instead nascent demand that must be developed. Indeed, this dovetails with the fact that Uber's own vehicle requirements prohibit many WAVs from signing up for Uber's fleet. See part III-A, *supra*. As such, Uber's argument that there is insufficient WAV supply is unsupported by the evidence. In fact, in New Orleans Uber failed to even investigate whether a local partner was available because it would have taken "too much leg work[.]"[55] The lack of desire by Uber employees to put in the necessary "leg work" does not make Plaintiffs' requested modification unreasonable.

---

[52] Joshi dep. at 44:24-45:9.
[53] Ex. PT-32 at 00014326.
[54] Ex. PT-1 at 001240.
[55] Ex. PT-35 at 00005079.

As for the purported costs, Uber asks this Court to merely look at the marginal cost per WAV ride. But there is no precedent requiring this Court to pigeonhole its examination to the marginal profitability of disabled consumers.[56] And as is set forth above, UberWAV also confers significant benefits on Uber, and could be fully funded using a per-ride "accessibility fee," a potential funding mechanism Uber has never seriously investigated.[57] Moreover, Plaintiffs will show that the cost numbers used by Uber are flawed.

Finally, providing UberWAV in Jackson and New Orleans would not fundamentally alter the nature of Uber's services. To the contrary, Uber referred to its WAV service with pride in its 2019 registration statement with the SEC and announced that it planned to expand WAV service into even more cities in the coming years.[58] Uber employees have also described "[a]ccessibility [as] core to our business" in internal documents and added that "[i]f the Uber platform is not accessible to people with disabilities, then we are failing at our most basic task."[59] It is hard to imagine how Uber can credibly claim it would be a fundamental alteration for it to expand a service it is already providing, has described as core to its mission, and has publicly announced it plans to expand.[60]

---

[56] Moreover, the notion that each customer with a disability must be "profitable," on a marginal basis, finds no support in the text of the ADA or in regulatory guidance. (For example, courts do not divide the cost of a wheelchair-accessible bathroom stall by the number of bathroom trips to determine whether it is a reasonable modification.) Indeed, if serving an individual with a disability generates more revenue than cost, the result will be profit, and the ADA would not have been necessary in the first place.  The purpose of the ADA is to require businesses to make modifications even when doing so may result in burden or expense to the covered entity.

[57] Ex. PT-32 at 00014333.

[58] Ex. PT-1 at 001437.

[59] Ex. PT-38 at 00014646.

[60] In any event, Uber has waived its fundamental alteration defense by failing to include it in the Substance of the Action section of the joint pretrial order. *Namisnak*, Dkt. 190, pp. 5-6; *Bobo v. Clark Cty. Collection Serv., LLC*, No. 216CV02911APGCWH, 2018 WL 4778035, at *1 (D. Nev. Oct. 3, 2018).

**C.      The Injunctions Plaintiffs Request Are Sufficiently Specific.**

The injunctions Plaintiffs seek—an order requiring removal of Uber's discriminatory eligibility criteria and requiring that Uber provide UberWAV service in New Orleans and Jackson within a specified amount of time—are "concrete and specific," not "iterative" or "experimental." *Indep. Living Res. Ctr.*, 2021 WL 3910719, at *9-10. Plaintiffs are simply asking Uber to provide the same service in New Orleans and Jackson that it provides in other cities. How Uber goes about providing this service is up to Uber.

Plaintiffs need not tell Uber how to make a sufficient number of WAVs available on its platform in Jackson and New Orleans; the trial will show multiple ways Uber could do so, and Uber should have the freedom to choose among them. Federal Rule of Civil Procedure 65 requires injunctions "to describe in reasonable detail. . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). The proposed injunction described in the joint pretrial order meets this standard. *Namisnak* Dkt. 190.

It is well established that Defendants may be permitted the opportunity to implement their compliance with the ADA in the manner they see fit, based on options explained at trial. *Fortyune*, 364 F.3d at 1086 (instructing AMC theaters to "devis[e] such means" as to how to comply with the ADA, despite not providing "explicit instructions on the appropriate means to accomplish this directive… particularly in light of the numerous workable suggestions articulated at oral argument."). *See also Lemon v. Kurtzman*, 411 U.S. 192, 199–201, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944), (showing equitable relief is flexible and intended to be tailored to the circumstances).

Should the need arise, post-trial briefing can provide further specifics to the court about metrics for measuring performance under the injunction. *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1080 (N.D. Cal. 1997), (granting an injunction mandating ADA compliance and

requesting plaintiffs provide to the Court documents on elevator manufacturer specifications to inform compliance with the injunction). Plaintiffs have suggested a process through which the parties can meet and confer and jointly craft a proposed order outlining the parameters of the injunctive relief, including provisions for monitoring and enforcement, once the Court enters judgment in Plaintiffs' favor. *Namisnak*, Dkt. 197 at 67-68.

No greater specificity is required. In an ADA case over lack of an accessible ramp, the plaintiff would not be obligated to request that the defendant employ a specific contractor or use particular building materials. The plaintiff would merely seek the changed condition—an accessible ramp. And the legal analysis is no different just because this case involves alterations to a policy instead of physical alterations: it is still true that so long as the injunction is specific enough to put Uber on notice of what it must do or stop doing, it is for Uber, with its superior knowledge of its own technologies, partnerships and business practices, to determine how it wants to comply.

### IV.   Conclusion

For the reasons above, this Court should find that Defendants violated the ADA and grant Plaintiffs the declaratory and injunctive relief they seek at trial, as well as their reasonable attorneys' fees and costs (including expert fees) associated with pursuing this action.

By Plaintiffs, by and through their counsel,

/s/ *William Most*_____
William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
williammost@gmail.com
(504) 509-5023

Karla Gilbride (CA # 264118)
PUBLIC JUSTICE, P.C.

/s/ *Garret S. DeReus*_____
Bizer & DeReus, LLC
Garret S. DeReus (LA # 35105)*
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)*
andrew@bizerlaw.com
*Admission *pro hac vice*

3319 St. Claude Ave.
New Orleans, LA 70117

1620 L St. NW, Ste. 630                          T: 504-619-9999; F: 504-948-9996
Washington, DC 20036
T: 202-797-8600
kgilbride@publicjustice.net

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2022, a copy of the foregoing was filed electronically with the Clerk of Court via the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.


_____*/s/ William Most*_____
William Most