# EXHIBIT A

MEERA JOSHI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*****************************************************

SCOTT CRAWFORD and
JARVIS JERNIGAN,
JR.,
        Plaintiff,

VERSUS                    CASE NO: 3:17-cv-02664-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
        Defendants.

                          AND

STEPHAN NAMISNAK,
et al,
        Plaintiff,

VERSUS                    CASE NO: 3:17-cv-06124-RS

UBER TECHNOLOGIES,
INC. and RASIER,
LLC,
        Defendants.
*****************************************************

DEPOSITION OF MEERA JOSHI

TAKEN VIA ZOOM VIDEOCONFERENCE
ON WEDNESDAY, NOVEMBER 11, 2020
AT OR ABOUT 8:08 A.M. CST

AT COURT REPORTERS OF LOUISIANA, LLC
9522 BROOKLINE AVENUE - SUITE 217
BATON ROUGE, LOUISIANA 70809

REPORTED BY:  Janie J. Darby
Certified Court Reporter
Certificate No. 85140

11/11/2020

```
 1                    A P P E A R A N C E S

 2
     Representing Scott Crawford, Jarvis Jernigan,
 3   Jr., and Stephan Namisnak:

 4          BIZER & DEREUS
            By:  Garret S. DeReus, Esq.
 5          3319 St. Claude Avenue
            New Orleans, Louisiana 70117
 6          Telephone:  (504) 619-9999
            Gdereus@bizerlaw.com
 7

 8          PUBLIC JUSTICE, PC
            By:  Karla Gilbride, Esq.
 9          1620 L Street, NW, Suite 630
            Washington, DC 20036
10          Telephone:  (202) 797-8600

11
     Representing Uber Technologies, Inc.:
12
            MORGAN, LEWIS & BOCKIUS, LLP
13          By:  Stephanie Schuster, Esq.
            and Patrick Harvey, Esq.
14          1111 Pennsylvania Avenue, NW
            Washington, DC 20004
15          Telephone:  (202) 739-3000
            Stephanie.schuster@morganlewis.com
16

17

18

19

20

21

22

23

24

25
```

MEERA JOSHI

1                        I N D E X

2                                           Page

3    Caption                                   1

4    Appearances                              2

5    Agreement of Counsel                     4

6    Witness' Certificate                     80

7    Reporter's Certificate                   82

8

9               E X A M I N A T I O N

10
     EXAMINATION BY MR. DEREUS:                 5
11
     EXAMINATION BY MS. SCHUSTER:              53
12

13

14               E X H I B I T S

15
     Exhibit 51 - NYC Taxi and Limousine       23
16                 Commission Memo

17
     Exhibit 52 - Statement on Revised TLC     29
18                 Rules

19   Exhibit 58 - E-Mails                      55

20   Exhibit 59 - E-Mails                      66

21   Exhibit 61 - Notice of Nonretained        71
                   Expert Disclosure
22

23

24

25

MEERA JOSHI

11/11/2020
Page 4

```
1                S T I P U L A T I O N

2        It is stipulated and agreed by and

3    between counsel for the parties hereto that

4    the deposition of the aforementioned witness

5    is hereby being taken under the Federal Rules

6    of Civil Procedure, for all purposes, in

7    accordance with law;

8        That the formalities of sealing,

9    certification, and filing are specifically

10   waived;

11       That the formalities of reading and

12   signing are specifically not waived;

13       That all objections are hereby reserved

14   until such time as this deposition, or any

15   part thereof may be used or sought to be used

16   in evidence.

17

18                    *   *   *   *   *

19

20       Janie J. Darby, Certified Court Reporter,

21   in and for the State of Louisiana, officiated

22   in administering the oath to the witness.

23                  *   *   *   *   *

24

25
```

```
 1                    MEERA JOSHI,

 2        after first having been duly sworn, was

 3    examined and did testify as follows:

 4    EXAMINATION BY MR. DEREUS:

 5         Q.   Ms. Joshi, can you please go ahead

 6    and start by just stating your name for the

 7    record.

 8         A.   Meera Joshi.

 9         Q.   Okay.  Ms. Joshi, you are here

10    today because Plaintiff --

11         A.   I'm losing you.

12    MS. SCHUSTER:

13              Me too.

14    THE WITNESS:

15              Is he frozen for everybody else?

16    THE COURT REPORTER:

17              Yes, he is frozen.

18    MS. SCHUSTER:

19              Yes.

20    EXAMINATION BY MR. DEREUS:

21         Q.   And as we go if there are any

22    questions --

23    THE COURT REPORTER:

24              Garret.

25    MR. DEREUS:
```

MEERA JOSHI

11/11/2020
Page  6

```
1            Yes.
2        THE COURT REPORTER:
3            You froze.
4        MR. DEREUS:
5            Okay.  Can you hear me now?
6        THE WITNESS:
7            The last thing I heard was you are
8        here today.
9    EXAMINATION BY MR. DEREUS:
10            Q.    You are here today as a nonretained
11    expert and so I'm going to take your
12    deposition.  If at any point you need to take
13    a break, feel free to let me know.  The only
14    thing I would ask is that if there is a
15    question on the floor that you answer that
16    question and then we can take a break, okay?
17            A.    Okay.
18            Q.    As we go along if there are any
19    questions that don't make sense or you have
20    difficulty understanding, feel free to ask me
21    to rephrase it and I'll be happy to do so.
22    Fair enough?
23            A.    Yes.
24            Q.    All right.  And is there any reason
25    you couldn't answer my questions truthfully
```

Objection to the first sentence. Assumes facts not in evidence. States a legal conclusion.

1   today, any use of alcohol, drugs, medication,

2   or anything like that?

3        A.   No.

4        Q.   Okay.

5        A.   I had to think for a minute how you

6   phrased the question.  Sorry.

7        Q.   It's all good.  All right.  Could

8   we start off by you just briefly explaining

9   what is your educational background?

10        A.   My highest degree is a JD from

11   University of Pennsylvania Law School.

12        Q.   Okay.  And when did you graduate

13   from there?

14        A.   I believe 1995.

15        Q.   Okay.  And where did you go before

16   that?

17        A.   University of Pennsylvania for

18   undergraduate.

19        Q.   What kind of degree did you get

20   there?

21        A.   It's a BA in social -- Sociology, I

22   believe, was the major.

23        Q.   And after you got your JD, what did

24   you do after that?  What was your first

25   position out of law school?

MEERA JOSHI

```
 1         A.   I clerked for the Third Circuit
 2    proces, proces court.  I believe it's called
 3    the proces office.
 4              Have we lost Garret again?
 5         MS. SCHUSTER:
 6              I think we may have.
 7         THE COURT REPORTER:
 8              Garret, you're frozen.
 9    EXAMINATION BY MR. DEREUS:
10         Q.   Sorry.  I think I froze there.  Was
11    that like a law clerk sort of position?
12         A.   Yes.
13         Q.   Okay.  And I have here your CV.  I
14    found it online actually.  So it looks like
15    you actually worked for a few other positions
16    from 1995 until about 2002 for various law
17    firms and courts; is that right?
18         A.   That's correct.
19         Q.   Okay.  And then it looks like from
20    the CV that I downloaded online that in 2002
21    you started with the New York City,
22    Department of Investigations?
23         A.   That's correct.
24         Q.   Okay.  What is that?
25         A.   The Department of Investigations is
```

MEERA JOSHI

1    a city agency that has oversight authority

2    over every New York City agency excluding the

3    police department.

4         Q.    Okay.  And what did you do there?

5    What were your primary roles?

6         A.    I ran an office called the Office

7    of -- the Inspector General's Office for

8    Correctional Services where we had oversight

9    over Department of Corrections, Department of

10   Probations, and at times OEM, Office of

11   Emergency Management and Fire.

12        Q.    Okay.  Did your role relate to

13   transportation in that job?

14        A.    Not directly.  Although, you know,

15   the issues of transporting inmates comes up.

16        Q.    Okay.  Did you do a lot of work,

17   you know, investigating various issues and

18   that sort of thing?

19        A.    It was an investigative position.

20   So we received complaints, allegations of

21   corruption and criminality, and our duty was

22   to investigate them.

23        Q.    Okay.  Great.  And from looking at

24   the CV I've got, it looks like in 2008 to

25   2011 you went to the Civilian Complaint

MEERA JOSHI

1    **Review Board?**

2        A.    Correct.

3        Q.    **Okay.  And what does that encompass**

4    **just briefly?**

5        A.    The Civilian Complaint Review Board

6    is a mayoral agency.  Actually maybe it's not

7    mayoral.  Non-mayoral agency that

8    investigates certain allegations of police

9    misconduct.  They fall into four categories

10   having to do primarily with stop and frisk,

11   discourtesy, harassment, and some assault.

12       Q.    **Wouldn't you agree that's a very**

13   **research intensive sort of position?**

14       A.    It's an investigative position.

15       Q.    **Okay.  And then it looks like in**

16   **2011 that's when you transitioned over to the**

17   **New York City TLC?**

18       A.    Correct.

19       Q.    **Okay.  And for the record what does**

20   **the TLC stand for?**

21       A.    The New York City Taxi and

22   Limousine Commission.

23       Q.    **Okay.  And what was your first**

24   **position at the TLC?**

25       A.    I was hired as the TLC general

1    counsel.

2        Q.    Okay.  So what were your roles and

3    obligations as the general counsel?

4        A.    Your role is to advise the

5    commission as a whole on legal issues, and

6    you also report to the New York City Law

7    Department.  So as general counsel you have

8    two bosses essentially.  One is the agency

9    head that you work for and the second is the

10   head of the Law Department.  So you advise on

11   all legal matters, both proactively and

12   reactively.

13       Q.    And did that involve a lot of

14   transportation issues?

Objection.
Leading.

15       A.    All transportation issues.

16       Q.    Okay.  And in that first job were

17   you researching, you know, issues related to

18   taxis and companies such as Uber?

Objection.
Leading.
compound.

19       A.    You know, the job entails

20   understanding the landscape within which you

21   are either drafting regulation or defending

22   regulation.  So that's a natural consequence

23   of doing that work.

24       Q.    And so you started doing that in

25   2011 and you continued through 2014 as the

MEERA JOSHI

1    **general counsel, right?**

2          A.    I left in early 2014 as a small

3    break in my city service about two to three

4    months in January 2014, I believe, until

5    about April 2014 when I left for the -- I

6    worked at NYU running security for NYU's

7    campuses and then came back to TLC as chair

8    in April 2014.

9          **Q.    And what were your responsibilities**

10   **as the chair?**

11         A.    You're chair and CEO.  So you're

12   chair of the commission as a whole which

13   decides all decisions that rise to the level

14   of needing a commission approval, that the

15   large majority of those are rules.  You are

16   also CEO.  So you are the chief operating --

17   chief executive officer and you are

18   responsible for day-to-day management of the

19   agency, which is about 600 people with a

20   licensing division, an enforcement division,

21   an inspections division, a legal division,

22   HR, policy, operations, all the sort of

23   normal divisions within a full-service

24   agency.

25         Q.    Okay.  And to get that position as

1    chair and CEO, was there like an application

2    process?  I assume you didn't just land it by

3    happenstance, right?

4        A.   You get that position at request of

5    the administration.  So the new

6    administration came in and contacted me and

7    asked me if I was interested in the position.

8        Q.   And did they vet your background

9    before, you know, you went undertook that

10   position?

11       A.   Yes.  You have a -- an

12   administration -- The administration does a

13   background check.  DOI, the investigative arm

14   of the city does a background check.  There

15   is also a city council vetting process.  So

16   before you are appointed you have to go

17   through a hearing with New York City Council.

18   So in addition to the public hearing, the New

19   York City Council does their own background

20   check.

21       Q.   Okay.  While you were at the TLC,

22   did you do any sort of, you know, on-the-job

23   training that equipped you for your role as

24   commissioner?

25       A.   I think every day was on-the-job

1    training.

2         Q.    Okay.   What do you mean by that?

3         A.    Every day you are making decisions

4    and assessing the landscape and, you know,

5    determining what the prudent path forward is.

6    It's a large industry in a quick city.   So

7    that's every day.

8         Q.    Okay.   Perfect.   And none of these

9    are trick questions, you know.   I'm just

10   trying to flesh out your background for the

11   record, you know, because the judge doesn't

12   really know who you are.   So we are just

13   trying to lay the framework.

14               While you were at the TLC, did you

15   participate in any seminars or anything like

16   that related to transportation?

17        A.    Many.

18        Q.    Okay.   And why do you say that?

19        A.    Because these are timely topics and

20   New York is a big city.   So people often look

21   to New York to see either what's happening or

22   not happening.   So either members of the TLC

23   are called to join on panels or we, you know,

24   listen in and observe them because they're

25   topical.

1       Q.    In your time at TLC, did you

2   participate in any panels or speaking events

3   related to transportation?

4       A.    Often, yes.

5       Q.    How frequently just generally

6   speaking?

7       A.    I'm going off of my memory.   I

8   would say probably once a month we did

9   something or I did something.   It ebbs and

10  flows.

11      Q.    Okay.   And while you were at the

12  TLC, did you conduct any research related to

13  transportation?

14      A.    I don't think I quite understand

15  the question.   Every day you have to research

16  everything before you make a decision.   So if

17  that qualifies as research, yes, every day.

18      Q.    Did you review say, you

19  know, briefings or research memos, etc., that

20  your staff had prepared at various times?

21      A.    Yes.   That's part of

22  decisionmaking.

23      Q.    And would you agree that your time

24  at the TLC primarily related to

25  transportation and transportation-related

Objection.
leading.

1    issues?

2        A.    Yes.

3        Q.    Okay.  Do you consider yourself an

4    expert related to transportation and

5    transportational issues?

Objection. Leading.
Calls for a legal
conclusion.
Argumentative.

6        MS. SCHUSTER:

7            Objection, calls for a legal

8        conclusion.

9        THE WITNESS:

10           Yes.

11    EXAMINATION BY MR. DEREUS:

12        Q.    Okay.  And could you just -- Why is

13    that?

Objection.
Foundation (calls for
testimony based on
an answer from a
leading question)

14        A.    I have intimate knowledge of a

15    large sector of the industry and how it

16    operates in New York and how it -- and it

17    similarly operates across other large cities

18    and across the world.

19        Q.    Is it fair to say that at your time

20    at the TLC that you set and ensured

Objection.
Leading.

21    compliance with the regulatory framework that

22    governs the daily transportation of over a

23    million people?

24        A.    Yes.

25        Q.    Is it fair to say that you helped

MEERA JOSHI

1    set the regulations for over 130,000 vehicles

2    ranging from taxis to Uber and Lyft vehicles?

3        A.    Yes.

4        Q.    All right.   Your responsibilities

5    at the TLC, how did they relate specifically

6    to how for-hire transportation companies

7    operate in New York?   Can you just give us a

8    general understanding of what that framework

9    is like in New York?

10        A.    The charter mandate for the city --

11    the charter mandate for the agency is to set

12    the ground rules for for-hired

13    transportation, which includes in New York

14    City several categories:   Yellow taxi, green

15    taxi, paratransit, Ambulette, luxury limo,

16    black car, and Liberty.   So for-hire vehicles

17    are considered -- they fall -- the two

18    categories, Liberty, black -- actually three,

19    Liberty, black car, and luxury limousine fall

20    under the for-hire vehicle category.

21        Q.    And what do you mean by a for-hire

22    vehicle?   Just break that down.

23        A.    It means that the driver is paid to

24    use a vehicle to transport a passenger from

25    point A to point B.

MEERA JOSHI

```
 1        Q.    So that wouldn't include, for
 2   example, you know, a friend just giving
 3   another friend a ride, you know, just
 4   casually, right?  That's not within the
 5   regulation?
 6        A.    No.  What it covers is when you're
 7   paid a fee for service.  So there is a fee
 8   involved for transportation using a vehicle.
 9        Q.    So it sort of covers a commercial
10   enterprise essentially?
11        A.    Yes.
12        Q.    And what about Uber?  Did that
13   company fall under your jurisdiction at the
14   TLC?
15        A.    Several bases in New York City do
16   business under the name Uber, and they fall
17   under delivery category, the black car
18   category, and the luxury limousine category.
19        Q.    Now, when you say several bases,
20   what do you mean by that?
21        A.    All for-hire vehicles need to be
22   affiliated with a base, and their -- the base
23   is the dispatching entity.  It's the entity
24   that's responsible for sending trips to the
25   driver, passenger requests.  And so under the
```

1    New York City regulations, every vehicle is

2    attached to the base, and there is probably

3    about 900 bases in existence in New York

4    City.

5         Q.   So if I'm understanding you

6    correctly, in New York someone can't just

7    fire up an Uber app and start driving.  They

8    have to in some way become associated with

9    one of these bases?

10        MS. SCHUSTER:

11             Objection, leading.

12        THE WITNESS:

13             Can you repeat the question.

14   EXAMINATION BY MR. DEREUS:

15        Q.   Sure.  So I guess I'm trying to

16   understand how these bases work.  I mean is

17   there like one sort of company that's

18   associated with other transportation

19   companies?

20        A.   So in New York City everybody who

21   provides for-hire service has to be licensed

22   by the TLC.  So the driver has to be licensed

23   and they get a TLC driver's license.  The

24   vehicle has to be licensed.  They get a

25   for-hire vehicle license.  And then the

MEERA JOSHI

1    entity that's sending them trips is called

2    the base, and they also have to be licensed

3    by the TLC and they get a TLC base license.

4         Q.   And did Uber have some of these TLC

5    base licenses?

6         A.   Yes.

7         Q.   How many in -- When you became

8    commissioner and from your time you were

9    commissioner until the time you left,

10    approximately how many did --

11         A.   It varied.  You know, it varied and

12    grew over time.  I can't -- you know, they

13    started with one and probably are up to, you

14    know, 25 now.  I don't have an exact number.

15         Q.   Okay.  And the various vehicles

16    that were actually on the road, they would be

17    associated with those bases?  Is that how it

18    worked?

19         A.   Yes.  But it's a little more

20    complicated because you can send trips to

21    cars that are not affiliated with your base

22    as well.  So the number of cars affiliated

23    with a particular base doesn't necessarily

24    tell you the scope of service that a company

25    can offer.

```
 1            licensed for-hire vehicle provider in
 2            New York City demonstrating that they
 3            are paying -- you know, passengers are
 4            paying a fee for service and are subject
 5            to all the regulations attendant with
 6            that.
 7     EXAMINATION BY MR. DEREUS:
 8            Q.   And I think you mentioned before
 9     that y'all had about 600 employees; is that
10     right?
11            A.   Yes.  I don't know with budget cuts
12     if that's less now, but yes.
13            Q.   But I guess what I'm getting at is
14     that this opinion here, it wasn't just some
15     sort of slapdash opinion, right?  I mean
16     there were folks that were researching this
17     and investigating before this memorandum was
18     drafted, right?
19            MS. SCHUSTER:
20                 Objection, leading.
21            THE WITNESS:
22                 Yes.  This is based on expertise
23            and practical knowledge and experience.
24     EXAMINATION BY MR. DEREUS:
25            Q.   I want to show you what I've
```

Objection.
Foundation.
Vague. Leading.

1      A.   He is probably referencing the rule

2   making process where we take in public

3   comment, written and verbal, and to the

4   extent we think it's relevant, we incorporate

5   it into ruling it.

6      Q.   Was Mr. Mohrer regularly

7   interacting with you on Uber's behalf?  I

8   mean were they advocating for various

9   positions, things like that?

10      A.   Yes.

11      Q.   Is it fair to say that they were

12   actively involved with the process?

13      A.   Yes.

14      Q.   Okay.  Do you know -- and if you

15   don't know, that's perfectly fine.  Do you

16   know how many employees Uber had in New York

17   at that time?

18      A.   I don't know.

19      Q.   Did you ever have any conversations

20   with Mr. Mohrer about whether to expand the

21   availability of something called UberWAV?

22      A.   I don't recall.  I may have.

23      Q.   Okay.  And when I say UberWAV, I

24   mean a wheelchair accessible -- wheelchair

25   accessible vehicle.  Does that make sense?

MEERA JOSHI

1      A.   Yes.

2      Q.   Okay.  When you were Commissioner

3   of the TLC, were there any steps that you

4   took to try to -- Well, first of all, let's

5   back up.  When you started as commissioner,

6   was there an UberWAV offering in New York?

Objection. Leading.

7      A.   I don't recall on their app whether

8   they had that offering.

9      Q.   And while you were the

10  commissioner, did you seek to expand the

11  provision of UberWAV service?

Objection. Leading.

12     A.   So as commissioner my focus is on

13  the industry as a whole, not a particular

14  company.  And there was industry lack of

15  wheelchair accessible vehicles in the

16  for-hire vehicle sector.  Companies like Uber

17  had a large half and still have a large

18  market presence in that sector.

19     Q.   And so did you seek to expand the

20  provision of wheelchair accessible vehicle

21  service for, you know, companies such as Uber

22  or Lyft, etc.?

Objection. Leading.

23     A.   Yes.  To understand the landscape

24  and then take corrective action where it

25  needed to be taken.

1          Q.   Okay.  And when you first started,
2    what did you understand the landscape to be?
3          A.   Our understanding, and also I
4    believe looking at TLC vehicle records, was
5    that there were very few wheelchair
6    accessible vehicles in the entire for-hire
7    vehicle fleet.
8          Q.   And what steps did you take to
9    correct that issue?
10         A.   So let me clarify.  For wheelchair
11   accessible vehicles, under the TLC definition
12   that is vehicles that can accommodate a
13   motorized wheelchair.  So that a vehicle can
14   accommodate a foldable wheelchair does not
15   mean it meets the requirements of a
16   wheelchair accessible vehicle because many
17   users of wheelchairs use motorized
18   wheelchairs.  They don't use foldable.  Some
19   use foldable, but there is a large portion
20   that don't.
21              So one understanding from review of
22   our own vehicle records what the number was
23   and my recollection -- it could be wrong --
24   it was very, very low.  Probably around 70
25   vehicles.  And then we also wanted to

MEERA JOSHI

1    understand that even though there may be a

2    low number of vehicles were requests for

3    service being responded to.

4             So I believe, and I can't recall

5    the year, we did an initiative where we

6    contacted every base.  I think there's about

7    between 850 -- around 850 bases, to find out

8    whether they could be respond to a request

9    for wheelchair accessible service and

10   probably upwards of 95 percent of them could

11   not.

12        Q.   And what did you do with that

13   information once you learned that 95 percent

14   or so approximately could not respond to

15   service?

16        A.   Then we understood as our -- as the

17   TLC's mandate, as part of our mandate that we

18   would have to take corrective action to

19   ensure that people who used motorized

20   wheelchairs in New York City could avail

21   themselves of for-hire vehicle service.

22        Q.   And what sort of actions did you

23   take?

24        A.   Ultimately, we passed a rule

25   requiring all for-hire vehicle providers to

1    provide wheelchair accessible service in

2    accordance with service standards set forth

3    in the rule, which are somewhat detailed, not

4    too detailed, but I can go into them if

5    that's what you are interested in.

6         Q.    Can you just give me the general

7    summary of what those rules were?

8         A.    Sure.  So under the rules, every

9    wheelchair -- every for-hire vehicle base has

10   to meet one of two sets of standards in order

11   to meet -- to provide wheelchair accessible

12   service in accordance with TLC rules.

13             One is called the trip mandate, and

14   over the course of, I believe, four years

15   they have to gradually increase the number of

16   trips that they dispatch using a wheelchair

17   accessible vehicle till they reach the point

18   where 25 percent of their trips are

19   dispatched in a wheelchair accessible vehicle

20   or they can meet what's called the trip

21   mandate and that -- I'm sorry, the dispatch

22   mandate and that instead of a percentage of

23   trips being provided in a wheelchair

24   accessible vehicle requires that companies

25   meet specified response times that over the

Objection. Hearsay.
Ms. Joshi is
testifying about what
the rules
propounded by the
TLC say.

MEERA JOSHI

1    years get increasingly shorter.   The ultimate

2    goal is to provide equivalent service.

3          So someone who is requesting, say,

4    Uber or Lyft and doesn't need a wheelchair is

5    able to get it -- the response time and rates

6    for that passenger are the same as someone

7    who is requesting a wheelchair accessible

8    vehicle.

9    Q.    All right.   And so if I'm

10   understanding correctly, there are

11   essentially two paths.   There is make a

12   certain percentage accessible or go down this

13   accelerating response time path?

14   A.    Yes.

15   Q.    Okay.   I've looked up some stuff

16   online.   Was there initially -- Is that what

17   y'all initially passed or was there

18   originally a 25 percent mandate that resulted

19   in some sort of lawsuit?

20   MS. SCHUSTER:

21          Objection, leading.

22   THE WITNESS:

23          So originally the rule was passed

24          alongside -- the rule was passed with a

25          25 percent trip mandate along with a

*Objection.  Leading. Assumes facts not in evidence.*

*Objection. Leading. Assumes facts not in evidence.*

*Move to strike the answer as non-responsive.*

1    simultaneous pilot, which allowed

2    companies to opt out of the trip mandate

3    and instead join a pilot from which they

4    could reach -- They would be considered

5    in compliance with the wheelchair

6    accessible requirements of the TLC by

7    participating in a pilot where they

8    would be judged on their ability to

9    respond to requests according to a

10   framework of response times that got

11   increasing shorter as years went by.

12         There was a lawsuit filed by the --

13   I'm using app companies to say it was

14   Uber, Lyft, may have been Via as well as

15   some other traditional black car company

16   challenging that rule.  In essence, they

17   wanted the pilot to be memorialized as

18   part of the rule so that it became I

19   think -- I think their understanding was

20   that it would be then harder to change

21   because there are more administrative

22   processes to changing a rule versus

23   changing a pilot.

24   MR. DEREUS:

25         Hold on one second.

MEERA JOSHI

```
 1          (DISCUSSION HELD OFF THE RECORD.)

 2     EXAMINATION BY MR. DEREUS:

 3          Q.   All right.   So this lawsuit is

 4     filed.   What was the lawsuit about just

 5     generally?

 6          A.   I don't remember the specific legal

 7     claims.   I do remember that the goal of the

 8     lawsuit was to convert the pilot part of the

 9     rule into a permanent rule.

10          Q.   Okay.   Were the companies that were

11     suing trying to stop the WAV mandate from

12     going into place or do you not recall?

13          A.    They wanted the -- They did not

14     want the WAV mandate to go ahead in the form

15     that it was passed.   They -- You know what?

16     I would have to look at the actual claim.   I

17     know their concern was that the pilot did not

18     have as many procedural steps to change -- to

19     be amended and they sought that it be

20     memorialized as a permanent rule.

21          Q.   Gotcha.   And to the best of your

22     ability to recall, I mean what happened in

23     response to that?  Was there ultimately some

24     sort of resolution or agreement that was

25     reached?
```

Objection. Calls for hearsay testimony.

Objection leading. Calls for speculation. Calls for hearsay testimony.

Objection. Leading. Compound.

MEERA JOSHI

1          A.    There was a settlement, an ironic

2   settlement because I think the TLC made out

3   better in the settlement, which isn't usually

4   the case.   There was a settlement and the

5   agreement was that the pilot would be

6   converted into part of the permanent rule as

7   well as the companies would have to provide

8   the TLC with response time information not

9   only for wheelchair accessible trips, but for

10  standard non-wheelchair accessible trip

11  requests too, so that the TLC could monitor

12  the delta between the two response time

13  groups.   And I believe that the requirement

14  to provide service was extended for an

15  additional year, and there were -- the

16  response time requirements were also made

17  more stringent.

18          Q.    Okay.   So under this settlement

19  were the companies that were suing, were they

20  obligated to provide WAV service?

Objection.
Leading.

21          A.    Yes.

22          MS. SCHUSTER:

23              Objection.

24  EXAMINATION BY MR. DEREUS:

25          Q.    Okay.   Why do you say that?



1          A.   Because that's what the rule --

Move to strike.
Hearsay.
Testifying about
the contents of a
published rule.

2    Yes.  Because there was a rule passed that

3    said you must provide WAV service.  They

4    settled and agreed to withdraw a lawsuit

5    challenging that rule in exchange for a

6    proposed rule that I believe the draft -- we

7    did the drafting as part of the settlement --

8    would not only require them to provide

9    wheelchair accessible service, but it also

10   had additional service requirements making a

11   higher level of service, a higher level of

12   transparency and adding another year of their

13   obligation to provide service.

14        Q.   Was Uber one of the companies that

Objection
leading.

15   was at the table for these negotiations?

16        A.   Yes.

17        Q.   And do you recall if they were part

Objection.
Leading.

18   of this, you know, sort of resolution at that

19   time?

20        A.   Yes.

21        Q.   Okay.  When did that occur?  Do you

Objection.
compound.

22   recall?

23        A.   It occurred probably late 2017,

24   early 2018.

25        Q.   So that was when you were still at

Objection
leading.

1    the commission?

2        A.    Yes.

3        Q.    Okay.  Did you at your time at the

    *Objection. Leading. Compound.*

4    commission ever identify any information that

5    would suggest that it would be technically

6    infeasible for Uber or companies like Uber to

7    provide WAV service?

8        MS. SCHUSTER:

9            Objection, leading.

10       THE WITNESS:

11           No.

12   EXAMINATION BY MR. DEREUS:

13       Q.    Why do you say that?

    *Objection. Foundation (question rests on testimony based on leading question).*

14       A.    There was nothing that was ever

15   presented to me or that I ever found on my

16   own that would suggest they were incapable of

17   providing this service.

18       Q.    Was there anything that y'all's

19   office with 600 approximate employees found

20   suggesting it was infeasible?

21       MS. SCHUSTER:

22           Objection, leading.

23   EXAMINATION BY MR. DEREUS:

24       Q.    Sorry.  I didn't hear that.

25       A.    Could you repeat the question.  I

```
 1   didn't hear the end of it.
 2       Q.   Sure.   Was there anything that
 3   y'all's -- the TLC with its approximate 600
 4   employees ever found suggesting that it would
 5   be technically infeasible for companies such
 6   as Uber and Lyft to provide WAV service?
 7       MS. SCHUSTER:
 8           Objection, leading.
 9       THE WITNESS:
10           No.
11   EXAMINATION BY MR. DEREUS:
12       Q.   Under your tenure as commissioner,
13   was New York the first city in the nation to
14   mandate the reporting of trip data from large
15   companies such as Uber and Lyft?
16       A.   Yes.   Chicago also required it
17   around the same time, but different data
18   points.
19       Q.   And what was the purpose of getting
20   that data from those companies?
21       A.   Accountability.
22       Q.   What do you mean by that?
23       A.   As we talked about earlier, they
24   dispatched trips to multiple -- To cars
25   affiliated with many bases, not just their
```

Objection.
Leading.
Argumentative.

```
 1              Thank you.
 2              Objection, leading, compound.
 3              Thank you.
 4       THE WITNESS:
 5              Yes.
 6   EXAMINATION BY MR. DEREUS:
 7       Q.   Ms. Joshi, do you recall if there
 8   were any instances where Uber told the
 9   commission that it would not be feasible to
10   expand the provision of WAV service?
11       MS. SCHUSTER:
12              Objection, leading.
13       THE WITNESS:
14              I can't recall specifically, but I
15       do have a general recollection that they
16       opposed the expansion of WAV service.
17   EXAMINATION BY MR. DEREUS:
18       Q.   But would you agree ultimately they
19   did agree to expand WAV service, them and
20   other companies, through the settlement,
21   right?
22       A.   They were required to in order to
23   operate in New York City.
24       Q.   Okay.  And between the time that
25   they agreed to that requirement and by the
```

Objection.
Leading.

MEERA JOSHI

1    time that you left, to your knowledge were

2    they in compliance with that requirement?

3         A.   Yes.  I think they increased the --

4    I don't have the specific numbers, but my

5    recollection is that they were actively

6    increasing the number of accessible vehicles

7    that they brought on and actively increasing

8    the number of trips that they were providing

9    to people that used wheelchairs.

Objection.
Leading.
Vague.
Foundation.

10        Q.   When you were Commissioner of the

11   TLC, what opinions did you reach as to what

12   type of business companies such as Uber and

13   Lyft were operating?

14        MS. SCHUSTER:

15             Objection, calls for a legal

16        conclusion.

17        THE WITNESS:

18             They're operating for-hire vehicle

19        transportation.

20   EXAMINATION BY MR. DEREUS:

21        Q.   When you were at the TLC, did you

22   reach any opinion as to whether Uber was

23   primarily engaged in the business of

24   transporting people?

25        MS. SCHUSTER:

```
 1   EXAMINATION BY MR. DEREUS:
 2        Q.   Okay.  And was that based on that
 3   trip data and other information that y'all's
 4   office was able to gather?
 5        A.   It was based on -- and this is a
 6   non-exhaustive list.  It was based on our
 7   understanding of the vehicles being used that
 8   they dispatched for passengers.  It was based
 9   on information from those seeking wheelchair
10   accessible trips from Uber and unable to
11   access them.  It was based on hours of public
12   testimony surrounding the rules.  It was
13   based on customer complaints.  It was based
14   on the -- the sort of cold calling we did to
15   bases to see if they could provide it.  So it
16   was, you know, cumulative based on
17   information from multiple sources.
18        Q.   Okay.
19        A.   I would say there was no debate.
20        Q.   When you were at the TLC, what
21   opinion did you reach, if any, as to whether
22   Uber could provide a better service for
23   individuals with mobility-related
24   disabilities?
25        MS. SCHUSTER:
```

Objection.
Foundation.
Argumentative.
Vague.  Improper
opinion
testimony.

MEERA JOSHI

1          Objection, calls for a legal

2          conclusion, vague.

3          THE WITNESS:

4              I was of the opinion that they

5          could provide that service for people

6          who needed wheelchair accessible

7          vehicles.  They had a history of -- not

8          just Uber, but Lyft as well and Via of

9          providing customized service for other

10         needs, car seats, high-end vehicles,

11         shared rides, and they're clearly

12         sophisticated and had the means to

13         provide wheelchair accessible service as

14         well.

15     EXAMINATION BY MR. DEREUS:

16         Q.    And we generally discussed this,

17     but when you were at the TLC, did Uber ever

18     provide you with any conclusive evidence that

19     providing wheelchair accessible service was

20     infeasible?

Objection.
Leading.
Argumentative.

21         MS. SCHUSTER:

22             Objection, leading.

23         THE WITNESS:

24             I don't believe so.  They may have

25         taken that position, but I never saw,

1       you know -- It's an odd position to

2       take.  It's an obligation under the ADA

3       to provide accessible service.  You are

4       licensed by a regulatory agency that

5       requires you to provide it.  So to do

6       business in public -- in the for-hire

7       vehicle space, you must provide

8       accessible service.

9  EXAMINATION BY MR. DEREUS:

10      Q.   Would you agree that Uber's

11  expansion of WAV service was a result of the

12  -- ultimately a result of that settlement or

13  the regulation and then attendant settlement

14  that followed?

15      A.   It was a result of TLC rulemaking,

16  yes.

17      Q.   Okay.  Ms. Joshi, prior to this

18  deposition, have you received any

19  compensation from Plaintiffs?

20      A.   Plaintiffs?  Sorry.  That would be

21  you?

22      Q.   Myself.

23      A.   Okay.  No.

24      Q.   Okay.  And other than your normal

25  hourly rate for appearing at this deposition,

Move to strike lines 2-3 as legal conclusion.

MEERA JOSHI

```
 1    are you anticipating any other compensation?

 2         A.   No.

 3         Q.   Okay.  The opinions that you

 4    expressed earlier, are those a result of your

 5    past interactions and experiences of the TLC?

 6         A.   Yes.

 7         Q.   Okay.  Are they a result of any --

 8    Are any of those opinions a result of any

 9    documents I provided to you or any

10    conversations that we have had?

11         A.   No.

12         Q.   Is it fair to say that the opinions          Objection.
                                                             Leading.
13    you expressed today at this deposition are            Argumentative.

14    the opinions that you have formed as a result

15    of your education, background, and your

16    experience and work at the TLC?

17         MS. SCHUSTER:

18              Objection, leading.

19         THE WITNESS:

20              Yes.

21              I apologize.  Would you like to

22         repeat the objection?

23         MS. SCHUSTER:

24              Objection, leading.

25              Thank you.
```

MEERA JOSHI

1      Q.   One last question, Ms. Joshi,

2   before I tender you as a witness.   Based on

3   your time at the TLC after Uber entered into

4   the settlement, was it your experience that

5   Uber was able to meet its obligations under

6   the settlement to provide wheelchair

7   accessible service in New York --

*Objection. Leading. Foundation.*

8      MS. SCHUSTER:

9           Objection, leading.

10   EXAMINATION BY MR. DEREUS:

11      Q.   -- under those terms?

*Objection. Leading. Foundation.*

12      MS. SCHUSTER:

13           Apologies.   Objection, leading.

14      THE WITNESS:

15           And I think even exceed some of the

16      response times.   So they -- my

17      understanding is they performed very

18      well under the new requirement.

19      MR. DEREUS:

20           Okay.   Great.   Thank you so much

21      for being here.   I'm going to tender you

22      as a witness.

23           It's 9:20.   I'll note that,

24      Stephanie, it's Plaintiffs' position

25      that if Uber chooses to ask questions

```
 1          that any -- Uber will be responsible for
 2          any expert time associated after 9:20
 3          p.m. -- or a.m.
 4     MS. SCHUSTER:
 5              For the witness you've called?
 6     MR. DEREUS:
 7              Yes.  If you choose to ask
 8          questions.
 9     MS. SCHUSTER:
10              Okay.  Well, I object and disagree
11          for the record, and we can have that out
12          afterwards.
13     MR. DEREUS:
14              Fine.
15     MS. SCHUSTER:
16              But our position is that this is
17          your witness.  You called the witness.
18          Your obligation.
19     EXAMINATION BY MS. SCHUSTER:
20          Q.    Okay.  Ms. Joshi, I will have not
21     too many questions for you.  We will start
22     with this case.  Actually it's two cases.  Do
23     you have a general understanding of what
24     these two lawsuits are about?
25          A.    Very general understanding that
```

MEERA JOSHI

1   they relate to the ability -- or I guess two

2   things.  Whether they are providing --

3   Whether Uber is providing accessible services

4   in the relevant jurisdictions and their

5   ability to provide accessible service in the

6   relevant jurisdictions.

7       Q.   And have you reviewed any documents

8   relating to this case whether filed in or

9   about this case?

10      A.   No.

11      Q.   Do you know who the Plaintiffs in

12  these cases are?

13      A.   I don't know who the Plaintiffs

14  are.

15      Q.   And you know that Mr. DeReus who

16  was questioning you previously represents the

17  Plaintiffs in these cases?

18      A.   Yes, I do.

19      Q.   And you've spoken with Mr. DeReus

20  before today; is that right?

21      A.   Yes.

22      Q.   Have you spoken with any other

23  attorneys that is represent Plaintiffs before

24  today?

25      A.   No.

MEERA JOSHI

1      Q.    And Mr. DeReus reached out to you

2  about potentially obtaining your testimony

3  for these cases, correct?

4      A.    Correct.

5      Q.    Okay.  I'm going to show you a

6  document I believe we have marked, let's see,

7  as Exhibit 58.

8      MS. SCHUSTER:

9           Pat, are you able to pull that up.

10          Thank you.

11  EXAMINATION BY MS. SCHUSTER:

12      Q.    Okay.  The document I'm showing you

13  -- Can you see it all right?

14      A.    Yes.  Can you -- or I'll lean in.

15  "Have you time next week?  I'm available to

16  discuss."  Yes.

17      Q.    Okay.  So this is the document that

18  was produced to the Defendants in this case

19  starting with the Bates Number

20  P_Crawford_Namisnak 002075.  Do you recognize

21  this document?

22      A.    I recognize the Sam Schwartz logo.

23  So I assume it is an e-mail chain, but I'm

24  looking at excerpts of the document.

25      Q.    Okay.  Why don't we just take a

MEERA JOSHI

1    minute to review and then you can tell me if

2    you recognize it.

3        A.    Sure.

4        Q.    And we can scroll down at your

5    request.

6        A.    Yes.  That's what I was going to

7    ask.  Do you mind scrolling down a bit.

8            Okay.  Is there more to it?

9            Okay.

10           Okay.  Could you scroll down a bit.

11           Could you scroll down.

12           Could you scroll down.

13           Okay.  Could you -- Let me see.

14           Okay.  Could you scroll down.

15           Could you scroll up again.  I think

16   I missed a little bit of it.

17           Could you scroll down, please.

18   Yes.  Stop there.  Could you scroll up.

19   Thank you.

20           Can you scroll down, please.

21       Q.    I believe that's the end.

22       A.    Okay.  Yes, I recognize this.

23       Q.    Okay.  And what is it?

24       A.    It is e-mail correspondence between

25   me and Plaintiffs' attorneys about scheduling

MEERA JOSHI

1    a time to speak.

2        MS. SCHUSTER:

3            And then, Pat, if you can just

4        scroll up a bit so we can see the

5        beginning of this e-mail.

6    EXAMINATION BY MR. DEREUS:

7        Q.   It looks like on August 7, 2020,

8    Mr. DeReus e-mailed to you explaining he was

9    searching for an expert who can opine on

10   whether it would be feasible for Uber to add

11   wheelchair accessible vehicles to its fleet;

12   is that right?

13       A.   That's correct.  I mean I have to

14   reread.  Let's see.  "We are searching for an

15   expert who can opine on whether it would be

16   feasible for Uber to add wheelchair

17   accessible vehicles to its fleets -- to its

18   fleet."

19       Q.   That's what the document says.

20   Okay.  And then on August 8 you responded

21   that you were available to speak with Mr.

22   DeReus?

23       A.   I respond on August 8, "Yes, I'm

24   available and knowledgeable about how it can

25   be done."  I can continue to read or you can

1       Q.   Do you have a recollection of it?

2       A.   I do have a recollection of

3  speaking to Plaintiffs' counsel, yes.  So I

4  assume that that conversation happened, but I

5  can't say for sure.

6       Q.   All right.  How many times have you

7  spoken with Plaintiffs' counsel over the

8  phone?

9       A.   I would say based on this I've

10  probably spoken to Plaintiffs' counsel twice.

11      Q.   Okay.  And is that based on your

12  recollection or just the document?

13      A.   That's based on my recollection.

14      Q.   Okay.  And do you recall when the

15  first conversation was?

16      A.   I would assume based on this

17  document the first conversation was in and

18  around the times -- the dates referenced in

19  the document.

20      Q.   And do you have a recollection of

21  that call?

22      A.   I do have a vague recollection of

23  that call, yes.

24      Q.   Who was on the call?

25      A.   I believe it would be myself and

MEERA JOSHI

```
 1    Plaintiffs' counsel.  There may have been
 2    others, but I don't recall.
 3          Q.    By Plaintiffs' counsel, you mean
 4    Mr. DeReus?
 5          A.    Yes.
 6          Q.    How long did the call last?
 7          A.    I don't recall it being lengthy at
 8    all.
 9          Q.    Maybe ten minutes?
10          A.    I don't know.  I mean it was months
11    ago now.
12          Q.    Is it less than 15 minutes?
13    MR. DEREUS:
14                Objection, calls for speculation.
15          THE WITNESS:
16                I couldn't say.  I don't remember
17          it being a long call.
18    EXAMINATION BY MS. SCHUSTER:
19          Q.    Okay.  Do you recall what you
20    discussed?
21          A.    To the best of my recollection, he
22    gave me some specifics, gave me like the gist
23    of the complaint, and I think that was it.  I
24    mean we may have discussed -- I'm sure we may
25    have discussed other things.  I can't recall
```

MEERA JOSHI

```
 1    now.  But I do recall him giving me the gist
 2    of the complaint.
 3         Q.   What do you mean when you say he
 4    gave you the gist of the complaint?
 5         A.   What the primary allegations in the
 6    complaint that he was representing Plaintiffs
 7    in was.
 8         Q.   Did you discuss potentially giving
 9    testimony in this case?
10         A.   He did call and ask about giving
11    testimony, yes.  So, yes, we did.
12         Q.   Did you discuss the nature of the
13    testimony you would give in this case?
14         A.   I believe he was looking for
15    opinions on the feasibility of companies like
16    Uber to provide accessible service.  That was
17    the nature of the testimony he was looking
18    for.
19         Q.   And did you request any further
20    information from Plaintiffs' counsel either
21    before or during that call?
22         A.   Not that I recall.  I may have
23    asked to see the complaint, but that's the
24    most I can recall.
25         Q.   Do you recall reviewing the
```

MEERA JOSHI

1   complaint?

2        A.   I don't.  I apologize.  I may have.

3   I may not have.  But, you know, it's been

4   busy.

5        Q.   Do you know whether it was provided

6   to you?

7        A.   I don't know.  I can't recall.

8        Q.   When was the second discussion you

9   had about this case?

10       A.   Prior to this deposition?

11       Q.   Yes.

12       A.   Yes.  Within like a week or so of

13  this deposition.

14       Q.   Okay.  And who was on that call?

15       A.   I believe it was just myself and

16  Plaintiffs' counsel.

17       Q.   Mr. DeReus?

18       A.   Yes.

19       Q.   Do you recall how long that call

20  lasted?

21       A.   It was a brief call.  Maybe 15, 20

22  minutes.

23       Q.   And what did you discuss?

24       A.   He explained what a nonretained

25  expert witness is.  And then I know he

1    requested something about service, accepting

2    electronic service, I think, and then

3    logistics, you know, scheduling.

4         Q.    What did he explain about

5    nonretained expert witnesses?

6         A.    That I would basically, you

7    know, testify about what I know on the

8    subject.

9         Q.    Okay.  And other than those two

10   phone calls, you've had no further

11   communications with Mr. DeReus via telephone?

12        A.    I don't believe so.

13        Q.    Okay.  If you had reviewed any

14   documents relevant to this case, would you

15   have records of that?

16        A.    I can't under -- Could you repeat

17   the question.

18        Q.    You said earlier that you don't

19   recall whether you reviewed the complaint,

20   correct?

21        A.    Right.

22        Q.    If you had reviewed it, would there

23   be a record of that somewhere?

24        A.    If I had reviewed it and I had

25   gotten it from Plaintiffs' counsel, I assume

1    it may have been an e-mail referencing that,

2    but again I don't know that I reviewed the

3    complaint.

4         Q.    Did you do any independent research

5    about this litigation?

6         A.    No, not that I recall.

7         MS. SCHUSTER:

8              Okay.  Pat, can you scroll up to

9         2076.

10   EXAMINATION BY MS. SCHUSTER:

11        Q.    Okay.  Ms. Joshi, here shown on the

12   screen and this is on page Bates stamp ending

13   2076.  It appears to be an August 25, 2020,

14   e-mail from you to Mr. DeReus.  Do you see

15   that?

16        A.    Yes.

17        Q.    And you say, "Hope all is well.

18   Just checking in and confirming that you had

19   a chance to speak to Jeremiah."  Is that

20   right?

21        A.    Correct.

22        Q.    Who is Jeremiah?

23        A.    Jeremiah is an attorney who has

24   retained me to provide expert testimony and

25   reports in a litigation relating to pay of

1    very high level?

2         A.   It is the adequacy of pay for Papa

3    John's drivers who are entitled to minimum

4    wage but are also responsible for paying all

5    their vehicle expenses and the effect that

6    that vehicle expense responsibility has on

7    their actual pay rate.

8         Q.   And were you retained by the

9    plaintiff or the defendant?

10        A.   Plaintiff.

11        Q.   Does that case involve the

12   Americans with Disabilities Act?

13        A.   No, it does not.

14        Q.   Does it involve wheelchair

15   accessible vehicles?

16        A.   No, it does not.

17        Q.   All right.   I'm going to show you a

18   document that we have previously marked as

19   Exhibit 59.   This is a document beginning

20   Bates Stamp P_Crawford_ Namisnak_002090.

21        A.   Okay.

22        Q.   Do you recognize this document?

23        A.   I would have to have time to read

24   it.  I see the --

25        Q.   Take your time.

1        A.   Yes.  So if you could scroll up to
2   the top.  "Quick phone call.  Less than 15
3   minutes."  Okay.  You can scroll down.  Okay.
4   If you could scroll slowly because I can't
5   follow it that quickly.  You've got to start
6   at the top again.  Could you scroll down
7   slowly so I -- Okay.  Thank you.
8            Okay.  Could you scroll down slowly
9   a little bit more.
10            Could you slow down slowly a little
11   bit more.  Okay.  Stop.  Could you scroll up
12   because I think I'm missing some part.
13   Scroll up, please.  "In terms of --"  Okay.
14   Yes.  Now, if you scroll down slowly.  I just
15   want to make sure I'm getting the continuous
16   conversation.
17            Okay.  Scroll down, please.  Scroll
18   down, please.  Okay.
19        MS. SCHUSTER:
20            Pat, if you could go to the October
21        5 e-mail.
22   EXAMINATION BY MS. SCHUSTER:
23        Q.   Before we look at that, do you
24   recognize this document?
25        A.   Yes, I do.

1      Q.    What is it?

2      A.    It's an e-mail, which I can read to

3   you.  It says, Garret, I --

4      Q.    I don't need you to read it.  I

5   just want to make sure you recognize it.

6      A.    Okay.  I recognize it as an e-mail.

7      Q.    An e-mail between whom?

8      A.    Seems to be between me and Garret

9   DeReus.

10      Q.    In this e-mail you write,

11   "Preparation for deposition is $400 and

12   actual deposition hour is $450."  Do you see

13   that?

14      A.    Yes, I do.

15      Q.    Okay.  And so that $400 for

16   preparation, is than an hourly rate or flat

17   rate?

18      A.    It's an hourly rate.

19      Q.    Okay.  How did you come up with the

20   amount $400 per hour for time spent preparing

21   for the deposition?

22      A.    I consulted with -- I work for the

23   firm of Sam Schwartz who is the entity

24   charging for my hourly time.  It's in my

25   capacity as a -- you know, extension of my

1    transportation and landings.

2         Q.   And do you have an ownership

3    interest in Sam Swartz?

4         A.   No, I do not.

5         Q.   Okay.  And how many hours did you

6    spend preparing for this deposition?

7         A.   Probably less than an hour.  Maybe

8    about 45 minutes.

9         Q.   What did you do in that 45 minutes

10   to prepare?

11        A.   I refreshed my recollection on the

12   rules that were passed and read a June 2019

13   report that came out of the TLC about the

14   accessibility program.

15        Q.   What was the name of that report?

16        A.   I don't know the name.  I think

17   it's called the June 2019 Accessibility

18   Report.

19        Q.   Did you do anything else?

20        A.   No.

21        Q.   And have you invoiced Plaintiffs

22   for that preparation time yet?

23        A.   No, I have not.

24        Q.   Do you intend to?

25        A.   Yes.

MEERA JOSHI

1   visibility of various segments of the

2   transportation industry within a city.

3           Q.    Do you also hold a position with

4   the New York University?

5           A.    I was until early 2020 a visiting

6   scholar at the NYU Rudin Center for

7   Transportation policy.

8           Q.    Did you teach courses in that role?

9           A.    No.  I led a research -- a group of

10  -- I led a group of students doing a research

11  project.

12          Q.    And what was that research project?

13          A.    It was a study of e-hail

14  regulations in large global cities.

15          Q.    Do you recall which cities?

16          A.    No, not off the top of my head.

17  But I believe it's publically available.

18          Q.    Do you recall if New Orleans,

19  Louisiana, was one of those cities?

20          A.    I don't believe it was.

21          Q.    Do you recall if Jackson,

22  Mississippi, was one of those cities?

23          A.    I don't believe it was.

24          Q.    Your interaction with Uber that you

25  testified to today all concerned interactions

MEERA JOSHI

1    you had with respect to Uber's operations in
2    New York City, correct?
3         A.   Correct.
4         Q.   Your role at the TLC concerned only
5    for-hire vehicle services and other
6    transportation issues for New York City,
7    correct?
8         A.   Correct.
9         Q.   You never had a regulatory position
10   governing transportation or anything else in
11   the City of New Orleans?
12        A.   No, I have not.
13        Q.   And you never held a regulatory
14   position governing transportation or anything
15   else in the City of Jackson, Mississippi?
16        A.   Correct.  I have not.
17        Q.   Would you agree that New York City
18   is the largest for-hire market in the nation?
19        A.   I would agree that New York City is
20   the largest for-hire vehicles in the service
21   market in the nation, yes.
22        Q.   At your time at the TLC, did you
23   form any opinion as to the relative size of
24   the for-hire vehicle market in New Orleans,
25   Louisiana?

1      A.    No, I did not.

2      Q.    At your time at the TLC, did you

3  form any opinion as to the relative size of

4  the for-hire vehicle market in Jackson,

5  Mississippi?

6      A.    No, I did not.

7      Q.    Did you bring any notes with you

8  today to review during the deposition?

9      A.    No, I did not.

10     Q.    I just want to take a five-minute

11  break if that's all right.

12     A.    Sure.  Can we just go on mute and

13  video off?

14     Q.    Yes.

15  MS. SCHUSTER:

16         We will go off the record for five

17     minutes and come back around 11:00.

18     (At this time a recess was taken.)

19  MS. SCHUSTER:

20         I have no further questions.

21  MR. DEREUS:

22         I have no additional questions.

23              * * * * * * * *

24     (Whereupon, the testimony of the witness

25  was completed at 10:03 a.m.)

REPORTER'S PAGE

I, JANIE J. DARBY, Certified Court
Reporter in and for the State of Louisiana,
the officer as defined in Rule 28 of the
Federal Rules of Civil Procedure and/or
Article 1434(B) of the Louisiana Code of
Civil Procedure, before whom this proceeding
was taken, do hereby state on the record:

That due to the interaction in the
spontaneous discourse of this proceeding
dashes (--) have been used to indicate
pauses, changes in thought, and/or talkovers;
that same is the proper method for a Court
Reporter's transcription of a proceeding, and
that dashes (--) do not indicate that words
or phrases have been left out of this
transcript;

That any words and/or names which
could not be verified through reference
material have been denoted with the phrase
"(phonetically spelled)."

```
 1              C E R T I F I C A T E

 2         This certification is valid only for a
      transcript accompanied by my original
 3    signature and original required seal on this
      page.
 4         I, Janie J. Darby, Certified Court
      Reporter, in and for the State of Louisiana,
 5    as the officer before whom this testimony was
      taken, do hereby certify that MEERA JOSHI,
 6    after having been duly sworn by me upon the
      authority of R.S. 37:2554, did testify as
 7    hereinbefore set forth in the foregoing 81
      pages; that the testimony was reported by me
 8    in the stenotype reporting method, was
      prepared or transcribed by me or under my
 9    personal direction and supervision, and is a
      true and correct transcript to the best of my
10    ability and understanding; that the
      transcript has been prepared in compliance
11    with the transcript format guidelines
      required by statute or by rules of the board,
12    that I have acted in compliance with the
      prohibition on contractual relationships, as
13    defined by Louisiana Code of Civil procedure
      Article 1434 and in rules and advisory
14    opinions of the board, and that I am not
      related to counsel or the parties herein, nor
15    am I otherwise interested in the outcome of
      this matter.
16
           I hereby certify that the foregoing
17    transcript has been signed and stamped by me
      on December 6, 2020.
18

19

20

21

22              JANIE J. DARBY
                CERTIFIED COURT REPORTER
23              CERTIFICATE NUMBER 85140

24

25
```

 Gmail

**Garret DeReus <gdereus1@gmail.com>**

## Non-Retained Expert Testimony Regarding Uber

Garret DeReus <gdereus@bizerlaw.com>    Tue, Oct 13, 2020 at 2:59 PM
To: Meera Joshi <mjoshi@samschwartz.com>
Cc: Joanne Pantin <jpantin@samschwartz.com>, William Most <williammost@gmail.com>, Karla Gilbride
<KGilbride@publicjustice.net>, Stevie Glaberson <sglaberson@publicjustice.net>

Hi Joanne,

Could you please advise when Ms. Joshi is available for a quick phone call this week (less than 15 minutes) and when
she is available from November 10-13 for a deposition? (I anticipate that Plaintiffs won't have more than 2 hours of
questions; I cannot say if Uber will have a lengthy set of questions).

Very truly yours---Garret

Garret DeReus
Bizer & DeReus
3319 St. Claude Ave.
New Orleans, LA 70117
Main: 504-619-9999
Direct: 504-324-8369
Fax: 504-948-9996
www.bizerlaw.com
*Licensed Attorney in Louisiana and Missouri*

On Fri, Oct 9, 2020 at 11:42 AM Meera Joshi <mjoshi@samschwartz.com> wrote:
Garret-
I have added my colleague Joanne to schedule a call for next week.
All the best,
Meera
Get Outlook for iOS

---

**From:** Garret DeReus <gdereus@bizerlaw.com>
**Sent:** Friday, October 9, 2020 12:01:01 PM
**To:** Meera Joshi <mjoshi@samschwartz.com>
**Cc:** William Most <williammost@gmail.com>; Karla Gilbride <KGilbride@publicjustice.net>; Stevie Glaberson
<sglaberson@publicjustice.net>
**Subject:** Re: Non-Retained Expert Testimony Regarding Uber

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize
the sender and know the content is safe.

Thanks Meera. I just emailed Uber's counsel to see if they have availability during the weeks of October 26th or
November 9th.

In terms of reimbursement for prep time associated with the subpoena, can we jump on the phone to discuss? What is
your availability today for a very quick call?

Very truly yours---Garret


**EXHIBIT**
Deposition 58

Garret DeReus
Bizer & DeReus
3319 St. Claude Ave.
New Orleans, LA 70117

P_Crawford_Namisnak_002090

Main: 504-619-9999
Direct: 504-324-8369
Fax: 504-948-9996
www.bizerlaw.com
*Licensed Attorney in Louisiana and Missouri*


On Mon, Oct 5, 2020 at 10:20 AM Meera Joshi <mjoshi@samschwartz.com> wrote:

> Garret,
>
> I think this approach makes sense. I could essentially talk about the work we did in NYC and the results, which are
> good. Then talk about feasibility of doing a similar program in other jurisdictions. Does that makes sense?
> Preparation for deposition is $400 and actual deposition hours $450. I do have availability the last week of October,
> however I would need some time to brush up beforehand, if that's when you are contemplating scheduling the
> deposition.
>
> All the best,
>
> Meera
>
>
> _____
>
>
> **Meera Joshi**
>
> **Principal + New York Office General Manager**
> office: 347.991.6612
>
> mobile: 917.771.7185
> samschwartz.com
>
>
> _____
>
>
>
> ----------------------------------------
>
> **From:** Garret DeReus <gdereus@bizerlaw.com>
> **Sent:** Friday, October 2, 2020 2:24 PM
> **To:** Meera Joshi <mjoshi@samschwartz.com>
> **Cc:** William Most <williammost@gmail.com>; Karla Gilbride <KGilbride@publicjustice.net>; Stevie Glaberson
> <sglaberson@publicjustice.net>
> **Subject:** Non-Retained Expert Testimony Regarding Uber
>
>
> ┌────────────────────────────────────────────────────────────────────────────┐
> │ CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless │
> │ you recognize the sender and know the content is safe.                      │
> └────────────────────────────────────────────────────────────────────────────┘
>
>
>
> Hi Meera,
>
>
> I hope you are doing well. I am sorry we weren't able to connect via phone.
>
>
> After thinking about it, my thought is that plaintiffs would like to call you as a "non-retained expert" pursuant to
> F.R.C.P. 26(a)(2)(C). That is, we will not be asking you to review any new materials or offer any opinions beyond
> those which you already have. Instead, we would ask you to submit to a deposition where you would give your

P_Crawford_Namisnak_002091

testimony about your prior interactions with Uber, your opinions as to the feasibility of Uber offering WAV services, etc.

My read of F.R.C.P. 26(d)(4)(E) is that we would be required to pay "a reasonable fee for time spent in responding" to the discovery. (In this case submitting to a deposition).

Please advise if you are agreeable to this, what your reasonable hourly rate is, and if you have any availability during the last week of October. Thanks!

Very truly yours---Garret

Garret DeReus

Bizer & DeReus

3319 St. Claude Ave.

New Orleans, LA 70117

Main: 504-619-9999

Direct: 504-324-8369

Fax: 504-948-9996

www.bizerlaw.com

*Licensed Attorney in Louisiana and Missouri*

P_Crawford_Namisnak_002092

# Bizer & DeReus

3319 St. Claude Avenue, New Orleans, LA 70117

Andrew D. Bizer, Licensed in LA, NY
Garret S. DeReus, Licensed in LA, MO
Emily A. Westermeier, Licensed in IL, LA

phone: 504.619.9999
fax: 504.948.9996
www.bizerlaw.com

---

**VIA EMAIL (mjoshi@samschwartz.com) ONLY**

October 23, 2020

Ms. Meera Joshi
Sam Schwartz Engineering
322 Eighth Avenue, 5th Floor
New York, NY 10001

RE:   *Crawford; Namisnak v. Uber Technologies, Inc.*, et. al., U.S.D.C. for the N.D. of Ca., No.
      17-cv-2664; 17-cv-6124

Dear Ms. Joshi,

　　　Great speaking with you today. As discussed, attached is a subpoena which we are sending to you via email for your deposition on <u>November 11, 2020, at 9:00 a.m.</u> Eastern Standard Time. Please confirm that you accept electronic service in lieu of physical, hand-delivery.

　　　You have stated that your expert rates are $400.00/hour for deposition prep and $450.00/hour for deposition time. Pursuant to F.R.C.P. 26(b)(4)(E), we will reimburse you for your "reasonable fee for time spent in responding" to the discovery which, in this case, is a subpoena for a deposition.

　　　Finally, as discussed, we are not requesting that you perform new research, evaluation, assessment, etc. The deposition will be focused on your time at the New York Taxi & Limousine Commission and the facts and expert opinions you formed during that time.

　　　　　　　　　　Very truly yours,

　　　　　　　　　　/s/ Garret S. DeReus
　　　　　　　　　　Garret S. DeReus

**EXHIBIT
Deposition 59**

1

P_Crawford_Namisnak_002068