MORGAN, LEWIS & BOCKIUS LLP
Anne Marie Estevez (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001
annemarie.estevez@morganlewis.com

Stephanie Schuster (*pro hac vice*)
Patrick A. Harvey (*pro hac vice*)
1111 Pennsylvania Avenue NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
stephanie.schuster@morganlewis.com
patrick.harvey@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
Ethel J. Johnson (*pro hac vice*)
1000 Louisiana street, suite 400
Houston, TX 77002-5005
T: (713) 890-5000
F: (713) 890-5001
ethel.johnson@morganlewis.com

Kathy H. Gao (CA Bar No. 259019)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
T: (213) 612-2500
F: (213) 612-2501
kathy.gao@morganlewis.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT CRAWFORD, <br><br> Plaintiff, <br><br> v. <br><br> UBER TECHNOLOGIES, INC. *et al.*, <br><br> Defendants. | Case No. 3:17-cv-02664-RS <br><br> **DEFENDANTS' FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| STEPHAN NAMISNAK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UBER TECHNOLOGIES, INC. *et al.*, <br><br> Defendants. | Case No. 3:17-cv-06124-RS <br><br> **DEFENDANTS' FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

PROCEDURAL HISTORY ........................................................................................ 1

FINDINGS OF FACT ............................................................................................... 4

   I.     UBER'S RIDESHARE BUSINESS ................................................................ 4

   II.    WHEELCHAIR ACCESSIBLE TRANSPORTATION ............................. 7

       A.     WAVs Generally ................................................................................. 7

       B.     Available Transportation Options For Persons Who Use Motorized Wheelchairs ........................................................................................... 8

       C.     WAV In The Rideshare Context .......................................................... 9

       D.     Uber's Experience Supporting On-Demand WAV Ridesharing Marketplaces.... 10

   III.   WHAT PLAINTIFFS WANT ..................................................................... 15

   IV.   WHAT IT WOULD TAKE FOR UBER TO MEET PLAINTIFFS' DEMAND THAT UBER "PROVIDE UBERWAV IN NEW ORLEANS AND JACKSON".... 16

       A.     Based On Uber's Experience, A Commercial Fleet Partnership Is Uber's Best Option If Uber Were To Launch WAV In New Orleans And Jackson ........ 16

       B.     Based On Uber's Experience, Launching In New Orleans And Jackson Will Cause Uber To Lose Hundreds Of Dollars On Each WAV Trip. ......................... 18

       C.     Plaintiffs' Suggested Alternative Techniques To Support Supply Are Implausible, Impossible, Or Ineffective. ............................................... 21

   V.    THE UBERX AND UBERXL VEHICLES REQUIREMENTS DO NOT PROHIBIT WAVS ....................................................................................... 26

CONCLUSIONS OF LAW ...................................................................................... 28

   I.     DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR AS TO PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 12184(b)(2)(A). ................................ 28

       A.     Plaintiffs Ask For A Performance Standard Rather Than A Modification To A Policy, Practice, Or Procedure. ................................................... 30

       B.     Plaintiffs Have Not Demanded A Sufficiently Concrete Modification To Enable The Court To Determine The "Reasonableness" Of The Demand Or Enter An Injunction That Would Comply With Rule 65. ................................ 32

           1.    Plaintiffs' demand is not concrete enough for the Court to determine its reasonableness. ...................................................................... 32

           2.    Plaintiffs' requested injunction cannot comply with the specificity requirements of Rule 65(d) ...................................................... 34

       C.     Plaintiffs' Requested Injunction Is Overly Broad. ............................... 35

       D.     Plaintiffs Failed To Show Their Demand is Reasonable, And Therefore, Uber Did Not Engage In Discrimination By Declining To Meet It. .................... 36

E.    Plaintiffs' Demand Would Require Uber To Fundamentally Alter Its Business.. 42

F.    Title III Of The ADA Does Not Require Covered Entities To
Guarantee WAV Service...................................................................................... 43

II.   DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON
PLAINTIFFS' CLAIM UNDER 42 U.S.C. § 12184(b)(1). ...................................... 47

A.    Uber's Vehicle Requirements Do Not Prohibit WAVs. ....................................... 47

B.    Uber's Vehicle Requirements Are Necessary To The Provision Of Its
Ridesharing Services In Any Event. ..................................................................... 49

C.    Changing Uber's UberX and UberXL Vehicle Requirements Would Not
Benefit Plaintiffs, And They Lack Constitutional And Statutory Standing.......... 50

III.  PLAINTIFFS ARE NOT ENTITLED TO DECLARATORY RELIEF .................... 51

CONCLUSION ......................................................................................................................... 52

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Anderson v. Franklin Inst.*,
4    185 F. Supp. 3d 628 (E.D. Pa. 2016) ................................................................. 39

5

*Auer v. Robbins*,
    519 U.S. 452 (1991) ........................................................................................... 44
6

*Bailey v. Bd. of Comm'rs*,
7    484 F. Supp. 3d 346 (E.D. La. 2020) ........................................................... 33, 34

8

*Bank of Am. Corp. v. City of Miami*,
9    137 S. Ct. 1296 (2017) ....................................................................................... 50

10

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131 (9th Cir. 2012) ..................................................................... 37, 42
11

*Bayer v. Neiman Marcus Grp.*,
12    861 F.3d 853 (9th Cir. 2017) ............................................................................. 52

13

*Bresgal v. Brock*,
14    843 F.2d 1163 (9th Cir. 1987) ........................................................................... 35

15

*Canyon Cty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ............................................................................. 50
16

*Chevron, Inc. v. NRDC*,
17    467 U.S. 837 (1984) ........................................................................................... 44

18

*City & Cty. of San Francisco v. Trump*,
19    897 F.3d 1225 (9th Cir. 2018) ........................................................................... 35

20

*City of Oakland v. Wells Fargo & Co.*,
    14 F.4th 1030 (9th Cir. 2021) ............................................................................ 50
21

*Columbia Pictures Indus. v. Fung*,
22    710 F.3d 1020 (9th Cir. 2013) ........................................................................... 35

23

*D.L. ex rel. A.L. v. Walt Disney Parks & Resorts, Inc.*,
24    469 F. Supp. 3d 1280 (M.D. Fla. 2020) ............................................................ 41

25

*Dahlberg v. Avis Rent A Car Sys., Inc.*,
    92 F. Supp. 2d 1091 (D. Colo. 2000) ............................................................... 37
26

*Del Webb Communities, Inc. v. Partington*,
27    652 F.3d 1145 (9th Cir. 2011) ........................................................................... 35

28

Case No. 3:17-cv-02664-RS
Case No. 3:17-cv-06124-RS

iii

DEFENDANTS' FINAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

*Doud v. Yellow Cab Co.*,
  2014 WL 4302552 (D. Nev. 2014) ........................................................ 30, 33, 39

*E. Bay Sanctuary Covenant v. Barr*,
  934 F.3d 1026 (9th Cir. 2019) .......................................................................... 36

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................................ 35

*Fortyune v. Am. Multi-Cinema, Inc.*,
  364 F.3d 1075 (9th Cir. 2004) ............................................................... 33, 37, 39

*Indep. Living Resource Ctr. v. Lyft, Inc.*,
  2021 WL 3910719 (N.D. Cal. 2021) .......................................................... *passim*

*J.D. ex rel. Doherty v. Colonial Williamsburg Found.*,
  925 F.3d 663 (4th Cir. 2019) ............................................................................ 37

*Jama v. I.C.E.*,
  543 U.S. 335 (2005) ................................................................................... *passim*

*Johnson v. Gambrinus Co./Spoetzl Brewery*,
  116 F.3d 1052 (5th Cir. 1997) .......................................................................... 37

*Kennedy v. Shubhango Inc*,
  2021 WL 4494606 (C.D. Ill. 2021) ................................................................... 35

*Larsen v. Carnival Corp.*,
  242 F. Supp. 2d 1333 (S.D. Fla. 2003) ............................................................. 37

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .......................................................................................... 50

*Lopez v. Catalina Channel Express, Inc.*,
  974 F.3d 1030 (9th Cir. 2020) .......................................................................... 36

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................... 50

*Mannick v. Kaiser Found. Health Plan*,
  2006 WL 2168877 (N.D. Cal. 2006) ................................................................. 37

*Miller v. Fed. Land Bank of Spokane*,
  587 F.2d 415 (9th Cir. 1978) ............................................................................ 11

*Nat'l Fed'n of the Blind v. Lamone*,
  438 F. Supp. 3d 510 (D. Md. 2020) .................................................................. 39

*Noel v. NYC TLC*,
  687 F.3d 63 (2d Cir. 2012) ............................................................................... 44

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ........................................................................................ 41

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001) .......................................................................... 30, 33, 38

*RadLAX Gateway Hotel v. Amalgamated Bank,*
    566 U.S. 639 (2012) ........................................................................................ 44

*Roberts ex rel. Roberts v. KinderCare Learning Ctrs.,*
    896 F. Supp. 921 (D. Minn. 1995) ............................................................ 31, 42

*Russello v. United States,*
    464 U.S. 16 (1983) .......................................................................................... 45

*Sandison v. Mich. High Sch. Athletic Ass'n,*
    64 F.3d 1026 (6th Cir. 1995) ......................................................................... 30

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) .................................................................................. 34, 35

*Toomer v. City Cab,*
    443 F.3d 1191 (10th Cir. 2006) ..................................................................... 44

*United States v. Corrales-Vazquez,*
    931 F.3d 944 (9th Cir. 2019) ......................................................................... 45

*United States v. Thompson,*
    728 F.3d 1011 (9th Cir. 2013) ....................................................................... 46

*US Airways, Inc. v. Barnett,*
    535 U.S. 391 (2002) ........................................................................................ 37

*Vande Zande v. State of Wis. Dep't of Admin.,*
    44 F.3d 538 (7th Cir. 1995) ........................................................................... 37

*Weyer v. Twentieth Century Fox Film Corp.,*
    198 F.3d 1104 (9th Cir. 2000) ....................................................................... 31

*Williams v. Gaye,*
    895 F.3d 1106 (9th Cir. 2018) ....................................................................... 30

*Wisc. Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ................................................................................... 45

*Wong v. Regents,*
    192 F.3d 807 (9th Cir. 1999) ......................................................................... 37

**STATUTES**

42 U.S.C. § 12143(a) ............................................................................................................. 8, 45

42 U.S.C. § 12182 ...................................................................................................................... 1

42 U.S.C. § 12182(b)(2)(A)(ii) ...................................................................................... 2, 28, 36

42 U.S.C. § 12184(b) ............................................................................................................... 45

42 U.S.C. § 12184(b)(1) .................................................................................................... *passim*

42 U.S.C. § 12184(b)(2)(A) ............................................................................................... *passim*

42 U.S.C. § 12184(b)(2)(B) ....................................................................................................... 2

42 U.S.C. § 12184(b)(2)(C) ....................................................................................................... 2

42 U.S.C. § 12184(b)(3) ........................................................................................................... 43

42 U.S.C. § 12184(b)(5) ............................................................................................................. 1

42 U.S.C. § 12186(a)(1) ........................................................................................................... 43

D.C. Code § 50-301.25a(b-1) ................................................................................................... 13

La. Stat. Ann. § 45:201.6 ................................................................................................... 27, 49

Miss. Code. Ann. § 77-8-15 ..................................................................................................... 49

Phoenix Muni Code § 4-68.B-7 ............................................................................................... 20

Tex. Occ. Code Ann. § 2402.113(a) ........................................................................................ 14

**REGULATIONS AND REGULATORY GUIDANCE**

28 C.F.R., Pt. 36, App. C ......................................................................................................... 39

28 C.F.R. § 36.301 ................................................................................................................... 49

28 C.F.R. § Pt. 36, App. C .................................................................................................. 30, 33

49 C.F.R. § 37.5(f) ............................................................................................................. 33, 49

49 C.F.R. § 37.29(b) ................................................................................................................ 43

49 C.F.R.§ 37.123(e) ................................................................................................................. 8

49 C.F.R. § 37.125 ..................................................................................................................... 8

49 C.F.R. § Pt. 37, App. D ....................................................................................................... 43

1

49 CFR § 37.105 ............................................................................................ 4, 15

2

*Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 1991 WL 171006 (Sept. 6, 1991) ...................................................................................................... 44, 47

3

4

**OTHER AUTHORITIES**

5

City of Chicago Public Vehicle Industry Notice No. 20-012 ...................................... 14

6

Fed. R. Civ. P. 54(b) .................................................................................... 30

7

Fed. R. Civ. P. 65(d)(1) ................................................................................ 34

8

Fed. R. Civ. P.65(d)(1)(C) ............................................................................. 32

9

H. Rep. No. 101-485(I), 101st Cong., 2d Sess. .................................................. 46, 47

10

N.Y.C. Rules, tit. 35, § 59B-17(c), (f) ............................................................... 25

11

Portland Bureau of Transportation, Policy No. TRN-14.30 ...................................... 14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-cv-02664-RS
Case No. 3:17-cv-06124-RS

vii

DEFENDANTS' FINAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Following a consolidated bench trial in both cases that began January 19, 2022, the Court issues these Findings of Fact and Conclusions of Law.

## **PROCEDURAL HISTORY**

1.     In these related cases three individuals with disabilities who use motorized wheelchairs sue Uber Technologies, Inc. and its subsidiary Rasier, LLC under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*  (Uber Technologies and Rasier are referred to as "Defendants" or simply "Uber" herein unless the distinction is necessary.)

2.     Plaintiff Scott Crawford (No. 3:17-cv-02664) lives in and asserts claims concerning the services available on Uber's platform in Jackson, Mississippi, while Plaintiffs Stephan Namisnak and Francis Falls (No. 3:17-cv-06124) live in and assert claims concerning the services available on Uber's platform in New Orleans, Louisiana.

3.     Crawford's operative complaint is his Second Amended Complaint (*Crawford*, ECF No. 218), and Namisnak and Falls's operative complaint is their Third Amended Complaint (*Namisnak*, ECF No. 181), both filed on October 20, 2021.  Defendants answered both complaints on November 3, 2021.  *Crawford*, ECF No. 219; *Namisnak*, ECF No. 182.

4.     The Court has issued various interlocutory rulings that narrowed the issues to be tried in these cases.  Specially, the Court ruled:

     a.    Plaintiffs have Article III standing to pursue their claim under 42 U.S.C. § 12184(b)(2)(A).  *Crawford*, ECF No. 254; *Namisnak*, ECF No. 213.

     b.    Defendants are covered entities under 42 U.S.C. § 12184(a).  *Crawford*, ECF No. 197; *Namisnak*, ECF No. 160.

     c.    Plaintiffs' claims under 42 U.S.C. § 12184(b)(5) fail as a matter of law. *Crawford* ECF No 197; *Namisnak*, ECF No. 160.

     d.    Crawford's claims under California's Disabled Persons Act and Unfair Competition Law fail as a matter of law.  *Crawford*, ECF No. 80 at 8–10

     e.    Namisnak and Falls's claims under 42 U.S.C. § 12182 fail as a matter of law. *Namisnak*, ECF No. 84 at 5–10.

f.    Namisnak and Falls's claims that Defendants failed to provide auxiliary aids and services in violation of 42 U.S.C. § 12184(b)(2)(B) fail as a matter of law. *Namisnak*, ECF No. 102 at 8–11.

g.    Namisnak and Falls's claims that Defendants failed to remove barriers in violation of 42 U.S.C. § 12184(b)(2)(C) fail as a matter of law. *Namisnak*, ECF No. 102 at 11–12.

5.    Two claims survived for trial. First, Plaintiffs claim that Defendants' decision not to subsidize third parties to provide wheelchair-accessible vehicle ("WAV") ridesharing services on Uber's platform in Jackson, Mississippi and New Orleans, Louisiana constitutes a failure to make reasonable modifications to policies, practices, and procedures in violation of 42 U.S.C. § 12184(b)(2)(1). Second, Plaintiffs allege that Uber's vehicle requirements in Jackson and New Orleans prohibit WAVs, which they claim violates 42 U.S.C. § 12184(b)(1).

6.    Section 12184(b)(2)(A), by way of cross-reference to 42 U.S.C. § 12182(b)(2)(A)(ii), requires a covered to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

7.    Section 12184(b)(1) prohibits "the imposition or application by a [covered] entity … of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully enjoying the specified public transportation services provided by the entity, unless such criteria can be shown to be necessary for the provision of the services being offered."

8.    The issues that remained to be resolved and that were allowed to be presented at the bench trial were: (i) whether Plaintiffs' demand that Uber "provide UberWAV in New Orleans and Jackson" seeks a reasonable modification of Uber's policies, practices, or procedures; (ii) whether Plaintiffs' demand that Uber "provide UberWAV in New Orleans and Jackson," if reasonable,

seeks a fundamental alteration of Uber business or the services it provides; (iii) whether Uber's vehicle requirements for drivers are eligibility criteria that screen out or tend to screen out persons with disabilities; and (iv) whether Uber's vehicle requirements are necessary to the provision of the services Uber offers.

9.   In the Final Pretrial Statement, Plaintiffs made the following prayer for relief:

    a.   That this Court declare that Defendants' policies, procedures, and services[1] in New Orleans, LA and Jackson, MS have been provided in a discriminatory manner in violation of 42 U.S.C. § 12184.

    b.   That this Court declare that Defendants violated 42 U.S.C. § 12184(b)(2) by failing to provide Plaintiffs with a reasonable modification.

    c.   That this Court declare that Defendants violated 42 U.S.C. § 12184(b)(1) by screening out WAVs from its fleet.

    d.   That this Court Order injunctive relief to require Defendants to bring their application and transportation services into compliance and remain in compliance with the requirements of the ADA. To that end, Plaintiffs pray that Uber be ordered to provide UberWAV in New Orleans and Jackson, and/or eliminate the ban on vans and after-market modifications, and minimum seating requirements, that prevent drivers of WAVs from participating in Uber's transportation services in New Orleans and Jackson.

    e.   That this Court supervise the injunctive relief entered and ensure that Uber complies with the requested injunctive relief within a reasonable period of time, to be determined by this Court.

    f.   That this Court award reasonable attorneys' fees and costs (including expert fees) and other expenses of suit.

---

1   Notably, this requested declaration does not track the statute's requirements.  And more accurately, Plaintiffs' claims relate to services that are not available for request on Uber's platform, not the manner in which services that are available were presented.

1

        g.  That this Court award such other and further relief as it deems necessary, just,

2

            proper, and appropriate.

3

        h.  Should Plaintiffs prevail in establishing Defendants' liability, it is Plaintiffs'

4

            position that the parties will provide briefing to the Court about proposed

5

            specific language for the injunction that will issue. Plaintiffs expect that the

6

            injunction would require Uber to provide UberWAV in New Orleans and

7

            Jackson in a fashion comparable to its service in the cities where UberWAV is

8

            currently operated, as Plaintiffs prayed for in their Complaints. Plaintiffs will

9

            suggest that the Court's injunction provide specific metrics for Uber to attain by

10

            certain points in time, but not that the Court order Defendants to use any

11

            particular methodology or financing structure to achieve those metrics.

12

            Plaintiffs will suggest to the Court that 49 CFR § 37.105 provides a potential

13

            source of metrics to use in specifying what Defendants must achieve. Plaintiffs

14

            will further request that the Court specify a system of monitoring and reporting

15

            to ensure compliance with the Court's order.

16

*Crawford,* ECF No. 230, *Namisnak*, ECF No. 190 ("Final Pretrial Statement") § B.I.

17

## FINDINGS OF FACT

18

## I.    UBER'S RIDESHARE BUSINESS

19

        10.    Uber develops and markets smartphone applications and technology platforms,

20

including Uber Freight (connecting shippers and carriers), Uber Eats (connecting consumers,

21

restaurants, and delivery drivers), and, for the ridesharing industry, the Uber Driver App and Uber

22

Rider App (together, the "Uber Apps"). Trial Exhibit ("Ex.") 1 at 001228–1231; Trial Transcript

23

("Tr.") 315:15–18 (Rosenthal).

24

        11.    For ridesharing, Uber's business provides technology that, when combined with and

25

used by drivers and riders, supports a "digital marketplace … of buyers and sellers of

26

transportation"—riders and drivers, respectively. Tr. 315:4–10 (Rosenthal).

27

        12.    In its publicly available U.S. Terms of Use for riders, Uber defines its business as

28

follows: "Uber provides a personalized multipurpose digital marketplace platform ('Uber

Marketplace Platform') that enables you [*i.e.*, the user] to conveniently find, request, or receive transportation, logistics and/or delivery services from third-party providers that meet your needs and interests." Ex. 506 § 1.

13.     Drivers use the Uber Driver App to seek rideshare requests from riders who use the Uber Rider App, and they earn money by completing trips on the platform.  Tr. 325:10–11 (Rosenthal); Ex. 505.

14.     Drivers obtain a software license to use the Uber Driver App by registering for an Uber Driver account.  Ex. 501 § 2.1 ("Subject to the terms of this Agreement, Uber hereby grants you a non-exclusive … license, during the term of this Agreement, to use our Platform (including the Driver App) ….."); *id.* § 2.4(a) ("To provide Rides you must create and register an account.").

15.     Defendant Rasier, LLC licenses the Uber Driver App to drivers in New Orleans and Jackson.  Ex. 501 at 1 ("This Platform Access Agreement (this 'PAA') is by and among you and your company/business … and the following entity as applicable, based on the region specified: … Rasier, LLC in all other U.S. states ….").

16.     The marketplaces facilitated by the Uber Apps in New Orleans and Jackson are open—drivers can enter and leave the marketplaces at any time by going online or offline using the Uber Driver App, and riders can enter the marketplace using the Uber Rider App.  Tr. 319:12–25 (Rosenthal).

17.     Each individual rider and driver makes his, her, or their own decisions about when to enter the marketplace, and thus the number of riders requesting rides in any time and place, and the number of drivers available to receive requests at any time and place, is determined by the collective decisions of riders and drivers.  *See* Tr. 319:09–320:12 (Rosenthal); Ex. 501 § 1.2 ("[Uber] do[es] not, and ha[s] no right to, direct or control [drivers].  Subject to Platform availability, [drivers] decide when, where and whether (a) [they] want to offer [ride] Service facilitated by [Uber's] Platform and (b) [they] want to accept, decline, ignore, or cancel a Ride … request.").

18.     For this reason, there is no guarantee that any rider will get his or her ride request accepted, nor is there any guarantee that any driver will receive a ride request and thus no guarantee of any earnings or earnings in any particular amount. Tr. 320:01–14 (Rosenthal).

19.     Each driver decides what vehicle(s) to use when accessing the ridesharing platform from a wide range of options.  Considering makes, models, years, and trim levels, there are hundreds of permitted vehicles. Tr. 317:16–318:8, 323:22–23 (Rosenthal); *see also* Exs. 538, 539.

20.     The Uber Apps include different ride request options that vary from city to city. Tr. 315:05–08, 327:04–18 (Rosenthal).

21.     The most widely available option is called "UberX," which "is generally considered low-cost vehicles that seat four passengers in addition to the driver." Tr. 316:16–21 (Rosenthal).

22.     In the UberX and UberXL marketplaces, when a rider creates a ride request using the Uber Rider App, Uber's technology identifies an appropriate online driver based on the driver's location relative to the rider's location and sends the rider's ride request to that driver.  Tr. 319:9–25 (Rosenthal).

23.     Within each ride request option, the ride request is not sent to a driver based on the specific type of vehicle the driver may be driving.  In the context of UberX or UberXL, there is no way for a rider to limit his or her request to a specific type of vehicle, like a minivan or specific make or model.  Rather, which driver receives a rider's request is determined by their respective locations, not by the type of vehicle the driver is driving.  Tr. 325:21–326:8 (Rosenthal)

24.     The UberX and other non-WAV marketplaces have succeeded in large part because drivers can utilize vehicles they already own and which they may also use when they are not providing ridesharing services.  There is generally a ready supply of drivers interested in participating in the non-WAV marketplaces, and in possession of the tools required.  Tr. 341:03–09 (Patel).

25.     Likewise, there is generally a substantial and steady demand for rides from persons who have signed up for a rider account.  *See* Tr. 340:17–341:19.

26.     These ridesharing marketplaces work for the three parties involved—riders, drivers and Uber—because riders are willing to pay enough on enough rides for drivers to cover their expenses and earn money while having sufficient money to pay service fees to Uber such that Uber can hope to be profitable.  As explained below, this is not the situation in the WAV context.  *See* Tr. 340:17–341:9 (Patel).

## II.    WHEELCHAIR ACCESSIBLE TRANSPORTATION

### A.    WAVs Generally

27.     Each Plaintiff uses a motorized wheelchair for mobility.

28.     Motorized wheelchairs weigh hundreds of pounds and cannot be stowed in the trunk of a car.  Tr. 39:12–17 (Crawford).  By contrast, a manual wheelchair typically can be folded and stowed in the trunk of a car.  *See, e.g.*, Tr. 376:05–06 (Patel) ("UberX … is accessible to people using folding wheelchairs not motorized chairs.").

29.     Wheelchair accessible transportation on the road requires a ramp or lift, as well as space and a mechanism to safely secure the wheelchair with the user seated in the chair.  Tr. 39:18–23 (Crawford); Tr. 66:7–13 (Cooper); Tr. 409:21–410:08 (Fagent).

30.     Some personal vehicles can be wheelchair accessible vehicles, or "WAVs."  *See* Tr. 66:6–9.

31.     WAVs are typically vans or minivans that are purpose-built and manufactured as WAVs or converted into WAVs.  Tr. 149:21–150:08 (Rupp); Tr. 66:7–13, 67:1–14 (Cooper).

32.     New WAVs can cost $45,000–$60,000 or more.  Tr. 51:01–09 (Crawford).

33.     The cost to convert a vehicle to a WAV is approximately $20,000, on top of the cost of the pre-conversion vehicle, such as a minivan.  Tr. 51:18–52:03 (Crawford).

34.     Compared to standard vehicles, WAVs require higher operating and maintenance costs, higher fuel costs because of poor fuel efficiency, and the payment of higher liability insurance premiums.  Tr. 341:10–14 (Patel).

1

2

**B.     Available Transportation Options For Persons Who Use Motorized Wheelchairs**

3

35.     Vehicle transportation options for users of motorized wheelchairs are limited.  Tr. 355:4–8 (Patel).

4

5

36.     Many public transportation buses are wheelchair accessible, but they operate on fixed routes and schedules, and their service area and hours of availability are limited.  *See* Tr. 54:9–22 (Crawford); *Namisnak*, ECF No. 211-4 at 37:1–14 (Falls).

6

7

8

37.     Public entities provide paratransit services as a supplement to fixed-route public transportation.  Paratransit services are required to be accessible to users with motorized wheelchairs and are expressly required by the ADA.  *See* 42 U.S.C. § 12143(a).

9

10

38.     Eligibility for paratransit service is limited, *see* 49 C.F.R.§ 37.123(e), and use of paratransit "requires precertification" that the user is "paratransit eligible," which is "a complicated process," Tr. 41:4–9 (Crawford); *see* 49 C.F.R. § 37.125.

11

12

13

39.     Paratransit services are not available on demand or on a schedule; the service requires reservations days in advance.  Tr. 41:15–16 (Crawford).

14

15

16

40.     There are few providers of on-demand, for-hire WAV transportation in New Orleans or Jackson.  In Jackson, providers tend to be small (1 to 2 vehicles and drivers), struggle to stay in business, and some charge very expensive fares.  For instance, "Tim Transportation" used to provide WAV transportation within the city limits of Jackson, but its sole driver was "harassed by city policy" for operating a taxi service without prior authorization.  *Crawford*, ECF No. 252-1 at 27:7–28:22 (Crawford).  Another service, "Tee's [*i.e.*, Keyes] transport service," operated in Jackson in 2019 but discontinued service after the sole WAV driver got a full time job.  *Id.* at 28:23–29:9.

17

18

19

20

21

22

23

41.     One provider of wheelchair accessible service in Jackson, Michael Jordan Transportation Services, has survived, but its fares were double that of its competitors.  *Id.* at 29:14–30:14.  Crawford testified Michael Jordan's Transportation was too expensive for him.  *See id.*

24

25

26

27

28

42.     Neither Namisnak nor Falls were able to identify any providers of on-demand WAV transportation in New Orleans. *See Namisnak*, ECF No. 211-4 at 38:16–39:5 (Falls); *Namisnak*, ECF No. 211-3 at 23:1–15, 26:4–21 (Namisnak).

**C.     WAV In The Rideshare Context**

43.     There are critical differences between a ridesharing marketplace for rides in standard vehicles, like sedans, and for WAVs. Tr. 340:17–341:9 (Patel).

44.     On the rider side, demand for WAV rides is lower than demand for UberX rides. Tr. 341:7–9 (Patel).

45.     There tends not to be a meaningful, existing supply of WAVs in a given area, whereas there are large numbers of personal vehicles per household that qualify for other rideshare options, like UberX, in the U.S. Tr. 241:3–6, 235:15–18, 341:03–09 (Patel).

46.     People who already own WAVs tend to own them because they have a family member who uses a motorized wheelchair. Not everyone who owns a WAV has time or desire to sell rides on a ridesharing platform. For example, Mr. Namisnak owns a WAV his wife uses to drive him. *Namisnak*, ECF No. 211-3 at 18:8–17, 19:5–8 (Namisnak). Dr. Crawford once owned a WAV himself and knows multiple people who own WAVs. Tr. 45:24–46:2, 48:18–49:12 (Crawford). But both Crawford and Namisnak were unable to identify a single person who wants to drive a WAV on the Uber platform. *Crawford*, ECF No. 252-6 (Crawford response to Rog. 6); *Namisnak*, ECF No. 211-10 (Namisnak response to Rog. 6).

47.     WAVs are expensive for drivers to acquire, more expensive than typical rideshare vehicles. Tr. 51:01–09, 51:18–52:03 (Crawford); Tr. 341:20–24 (Patel).

48.     WAVs come with higher operating, maintenance, and insurance costs. *See* Finding of Fact ("FoF") ¶ 34.

49.     Due to higher costs and lower rider demand, the earning potential for a WAV driver is lower than the earning potential for an UberX driver. Tr. 341:25–342:4 (Patel).

50. On the Uber platform, where UberWAV is available, the rider prices for UberX and WAV trips are the same, but those fares are not enough to cover drivers' costs in providing WAV rides. Tr. 340:21–341:2 (Patel).

51. Thus, contrary to the ride option UberX, wherein riders will pay a price for a ride that is sufficient to cover a driver's costs and provide for driver earnings, as well as provide for a chance of profit for Uber, in the WAV context Uber has to "subsidize the difference … between what riders are willing to pay" for WAV rides and "what the supplier needs to make their acquisition and operating costs." Tr. 342:5–11 (Patel). That substantial financial spend by Uber to prop up and subsidize supply is necessary in the WAV context, but not other ridesharing marketplaces, like UberX. *See* Tr. 340:19–341:9 (Patel).

52. In short, a WAV marketplace cannot be viable on its own. It is not enough for Uber to merely "turn on" the WAV request option. Tr. 341:03–09 (Patel).

53. Uber spends a lot of money supporting WAV marketplaces, which it does not recoup and therefore loses. Tr. 354:5–8, 364:24–365:2 (Patel).

**D.    Uber's Experience Supporting On-Demand WAV Ridesharing Marketplaces.**

54. Uber has extensive experience over the course of years with ridesharing marketplaces for on-demand rides in WAVs for the benefit of persons who use motorized wheelchairs. Tr. 378:11–379:14 (Fagent)

55. For several years, Uber has been propping up and subsidizing supply in a marketplace for on-demand WAV ridesharing in certain cities; it has invested significant time and money, "tried a lot [of] different experiments, … different supply models, different pilots" in its efforts to support a reliable WAV ridesharing marketplace. Tr. 412:17–413:3 (Fagent). In the cities where Uber has done so, riders can request a ride in a WAV using a ride option called "UberWAV" or "WAV" and such requests are sent only to drivers in a WAV.

56. Over the last three years alone, Uber has devoted approximately $150 million to this effort, without any prospect of realizing any return on that investment, "and despite not being a company that's consistently turned a profit." Tr. 354:5–8 (Patel); *see id.* at 364:24–365:2 (Patel).

57.     For some WAV rides, Uber does not even try to bring in any revenue to offset its substantial costs—*e.g.*, where Uber waives its service fee as an incentive for drivers to provide WAV rides. Tr. 401:18–402:02 (Fagent).

58.     That substantial spend supports WAV supply on the Uber platform in eleven U.S. cities: New York, NY, Chicago, IL, Los Angeles, CA, Washington, DC, San Francisco, CA, Boston, MA, Philadelphia, PA, Houston, TX, Austin, TX, Portland, OR, and Phoenix, AZ. Tr. 350:21–351:4 (Patel).

59.     In 2019, Uber spent more than $53 million supporting WAV marketplaces in those eleven cities, Ex. 502 (2019 WAV Budget) (Tab – "Forecast vs Actual (Monthly)," Cell V28), an average of $4,819,310.65 per city.[2]

60.     In 2020, Uber spent more than $56 million supporting WAV marketplaces for the same 11 U.S. cities, Ex. 503 (2020 WAV Budget) (Tab – "Forecast vs Actual (Monthly)," Cell U31), an average of $5,111,705.24 per city.[3]

61.     Uber will have to continue to subsidize any WAV marketplace indefinitely. Tr. 342:12–15 (Patel).

62.     Uber's Director of Rider and Airport Operations for the U.S. and Canada, Niraj Patel, explained that "Uber and ridesharing generally have been transformative for people with disabilities" and "have been really impactful," particularly for persons with vision impairments and mobility disabilities, and that Uber "recognize[s] and very much acknowledge[s] the fact that people who use motorized wheelchairs still face a lot of outsi[zed] challenges when accessing mobility." Tr. 354:23–355:7 (Patel).  He further explained that this is "why we continue to work on this [WAV] program, to invest our time, our people, money, into trying to make this program work, and we're going to keep doing that." Tr. 355:8–11 (Patel).

---

[2]     This is the sum of Uber's actual spend in the 11 U.S. cities, Ex. 502 (Tab – "Forecast vs Actual (Monthly)," Cells V14–V24), divided by 11.  The Court may take judicial notice of math. *See Miller v. Fed. Land Bank of Spokane*, 587 F.2d 415, 422 (9th Cir. 1978).

[3]     This is the sum of Uber's actual spend in the 11 U.S. cities, Ex. 503 (Tab – "Forecast vs Actual (Monthly)," Cells U12–U30)) divided by 11.

11

DEFENDANTS' FINAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

63.     The Uber platform is a "leader when it comes to on-demand WAV rides" access, having facilitated "more than 300,000" WAV rides on its platform in 2021 alone.  Tr. at 354:12–15 (Patel); *see* Tr. 412:25–413:01 (Fagent) (Uber "has worked really hard to try to figure out something that no other company has figured out").

64.     Because of the substantial financial losses Uber sustains in connection with WAV with no expectation of ever getting a return on its spend, Uber reasonably has had to limit and prioritize the cities where it offers a WAV option in the Uber Apps.  Tr. 352:6–11 (Patel).

65.     Uber prioritizes cities for inclusion in the WAV program "based on a variety of factors," including whether local regulations require Uber to have a WAV option in a city, whether the city offers public funding to help offset the significant costs associated with a WAV option, and whether the city has a sufficiently large and dense population that enables Uber to better "understand WAV demand patterns" and "learn more about what it would take to potentially have a self-sustaining [WAV] marketplace," which is what Uber hopes to someday "see brought to life."  Tr. 352:6–11 (Patel).

66.     The cities where Uber currently supports WAV marketplaces are some of the most heavily and densely populated in the country, and are significantly more heavily and densely populated than New Orleans and Jackson:

| City | Population | Population/Square Mile |
|---|---|---|
| New York City | 8,336,817 | 27,012.4 |
| Los Angeles | 3,979,576 | 8,092 |
| Chicago | 2,693,976 | 11,841.8 |
| Houston | 2,320,268 | 3,501.5 |
| Phoenix | 1,680,992 | 2,797.8 |
| Philadelphia | 1,584,064 | 11,379.5 |
| Austin | 978,906 | 2,653.2 |
| San Francisco | 851,549 | 17,179.2 |
| Washington, D.C. | 705,749 | 9,856.5 |
| Boston | 692,600 | 12,792.7 |
| Portland | 654,741 | 4,375.3 |
| New Orleans | 390,144 | 2,029 |
| Jackson | 160,628 | 1,562.5 |

*See* Exs. 509–21.

67.     Many of the cities where Uber supports WAV are also among the top ten cities in terms of the number of UberX trips being completed on the Uber platform.  The same is not true of New Orleans and Jackson.  Based on the number of UberX rides completed in each city, New Orleans is not among the top 30 cities, and Jackson is not among even the top 150 cities.  Tr. 352:22–353:8 (Patel).

68.     At trial, Plaintiffs tried to make two conflicting points.  They argued that Uber has had lots of success supporting WAV marketplaces and has taken many steps to help make an on-demand WAV marketplace work, and thus can do the same things in New Orleans and Jackson. At the same time, Plaintiffs argued that Uber treats WAV as an "afterthought."  To this latter theme, Plaintiffs repeatedly suggested that Uber only offers WAV where it is forced to do so by local law and, in those places, that Uber does the bare minimum.  This latter theme highlights a weakness in Plaintiffs' position because if they were correct that the ADA requires Uber to "provide WAV" the local regulations would be unnecessary.  In any event, the evidence does not support Plaintiffs' narrative.

a.     Uber supports a WAV option and marketplace in Los Angeles and San Francisco, yet it has no obligation to do so either city.  Neither California law nor local laws require transportation network companies ("TNCs") to provide or facilitate WAV options.  California law does provide that *if* a TNC is able to demonstrate certain conditions, the TNC may apply for reimbursement of its WAV costs; any such reimbursements come from a legally mandated government-controlled account that is funded by a mandatory surcharge on all rides completed on each TNC's platform and remitted to the California Public Utilities Commission.  Cal. Pub. Util. Code. § 5440.5(a)(1)(B)(ii).

b.     Uber supports a WAV option and marketplace in Washington, D.C., yet it has no obligation to do so.  *See* D.C. Code § 50-301.25a(b-1).

c.     Uber supports a WAV option and marketplace in both Houston and Austin, yet it has no obligation to do so.  Texas law requires that TNCs operate a WAV

1     "pilot program" only "in one of the four largest markets in which the company

2     operates in [Texas]" and only "for a period of two years." Tex. Occ. Code Ann.

3     § 2402.113(a).  Thus, for example, Uber could run a WAV pilot program in

4     Austin but not Houston, but Uber does both, and it has done so for more than

5     two years.  *See* Exs. 502, 503.

6     69.     In the following cities where Uber supports a WAV option and marketplace, TNCs

7     have or have had access to public funding or reimbursement to help offset WAV losses: San

8     Francisco, Los Angeles, Boston, Chicago, and Portland.     *See* Cal. Pub. Util. Code.

9     § 5440.5(a)(1)(A)–(K); MBTA Press Release, *MassDOT & the MBTA to Partner with*

10    *Transportation Network Companies to Support More Wheelchair-Accessible Vehicles* (Apr. 1,

11    2019);[4] City of Chicago Public Vehicle Industry Notice No. 20-012, *Increased WAV Service*

12    *Incentives for Transportation Network Providers (TNP)* (Apr. 6, 2020);[5] Portland Bureau of

13    Transportation, Policy No. TRN-14.30.[6]

14    70.     These jurisdictions require <u>all</u> TNCs to collect a surcharge on each ride completed

15    on their platforms and remit those collections to a regulator.  *E.g.*, Cal. Pub. Util. Code.

16    § 5440.5(a)(1)(B)(i)–(ii) ("The commission shall require each TNC by July 1, 2019, to pay on a

17    quarterly basis to the commission an amount equivalent to, at minimum, 0.05 dollars ($0.05) for

18    each TNC trip completed."); Portland Bureau of Transportation, Policy No. TRN-14.30 ("The Fee

19    is outlined in Administrative Rule TRN 3.450 and makes up part of the City of Portland

20    Surcharge.").  Because the government requires all TNCs to charge and collect the same surcharge,

21    no one TNC is at a competitive disadvantage.

22    71.     Uber does not collect surcharges for accessibility unless Uber and its competitors

23    are required to do so by local law.  Tr. 289:02–14 (Patel).

24    ――――――――――――

[4]     https://www.mbta.com/news/2019-04-01/massdot-and-the-mbta-partner-transportation-
25    network-companies-support-more

26    [5]     https://www.chicago.gov/content/dam/city/depts/bacp/publicvehicleinfo/publicvehicleindu
      strynotices/2020/pvnotice20012tnpwavincreasedincentives.pdf

27    [6]     https://www.portland.gov/policies/transportation/private-hire-transportation/trn-1430-
28    accessible-service-fund-accessible

72.     Uber does not support a WAV option and marketplace in New Orleans, LA, Jackson, MS, or hundreds of other cities and towns in the United States.  Tr. 350:21–351:4 (Patel).

73.     Neither Mississippi nor Louisiana law requires TNCs to support WAV marketplaces.  *See* Miss. Code. Ann. § 77-8-1, *et seq.*; La. Stat. Ann. § 45:201.1 *et seq.*; La. Stat. Ann. § 48:2191 *et seq*.

74.      Neither Mississippi nor Louisiana law offers TNCs access to public funding to support WAV efforts.  *See id.*

## III.     WHAT PLAINTIFFS WANT

75.     By letter dated September 22, 2018, Namisnak and Falls asked Uber to "utilize its substantial resources, internal knowledge, and business to know-how to change its operational policies and provide WAV service in New Orleans, Louisiana and its surrounding areas."  Ex. 27 at 00798.  In particular, Namisnak and Falls asked that Uber (i) "within seven (7) days of receipt of [their letter], … begin providing WAV service in New Orleans, Louisiana … [and] ensure that a fleet of approximately 30-60 WAV vehicles [sic] are [sic] available in New Orleans, Louisiana"; and (ii) "work to ensure that any UberWAV service Uber provides in New Orleans, Louisiana meets the equivalency standard of 49 C.F.R. § 37.105."  *Id.* at 00798–99.

76.     By letter dated October 4, 2018, Crawford asked Uber to "utilize its substantial resources, internal knowledge, and business to know-how to change its operational policies and provide WAV service in Jackson, Mississippi and its surrounding areas."  Ex. 42 at 002543.  In particular, Crawford asked that Uber (i) "immediately turn on the 'UberWAV' option in Jackson, Mississippi; (ii) "within seven (7) days of receipt of [his letter], … begin providing WAV service in Jackson, Mississippi … [and] ensure that a fleet of approximately 20-60 WAV vehicles [sic] are [sic] available in Jackson, Mississippi"; and (iii) "work to ensure that any UberWAV service Uber provides in Jackson, Mississippi meets the equivalency standard of 49 C.F.R. § 37.105."  *Id.* at 002543–44.

77.     In their depositions, Crawford testified that he wants "wrap-around equivalent service," *Crawford*, ECF No. 252-1 at 62:2–19 (Crawford); Namisnak testified that he wants "equivalency of service," *Namisnak* ECF No. 211-1 at 55:20–57:18 (Namisnak); and Falls testified

that he wants WAV service available 24 hours a day, seven days a week, *Namisnak* ECF No. 211-4 at 62:9 (Falls).

78.     In the Final Pretrial Statement, Plaintiffs modified their request to the following: that Uber "provide UberWAV in New Orleans and Jackson."  Final Pretrial Statement § B.I.

79.     At trial, Crawford testified that he wants Uber to "provide equivalent or close-to-equivalent service."  Tr. 42:15–20 (Crawford). Namisnak testified that Uber should provide "comparable service to what Uber provides able-bodied patrons."  Tr. 134:15–22 (Namisnak).

80.     Plaintiffs have not used the Uber Rider App, downloaded the Uber Rider App, or signed up for Uber Rider accounts.

81.     Plaintiffs assert they are "deterred" from downloading and using the Uber Rider App because there is no "WAV" option in the App in their cities.  Plaintiffs state that they will continue to be deterred from downloading and using the Uber Rider App until WAV is offered in their cities and is highly reliable in terms of being able to get a WAV ride when requested.  *Crawford*, ECF No. 252-1 at 43:7–16 (Crawford) (testifying he would download if "Uber had wheelchair-accessible service and it were reliable, and mostly equivalent"); *Crawford*, ECF No. 252-4 at 57:13–58:2 (Falls) (testifying he wants a service is "reliable").

## IV.     WHAT IT WOULD TAKE FOR UBER TO MEET PLAINTIFFS' DEMAND THAT UBER "PROVIDE UberWAV IN NEW ORLEANS AND JACKSON."

### A.     Based On Uber's Experience, A Commercial Fleet Partnership Is Uber's Best Option If Uber Were To Launch WAV In New Orleans And Jackson.

82.     Plaintiffs' demand that Uber "provide UberWAV" is a misnomer.  Uber itself does not own vehicles, including WAVs, nor does it employ drivers to drive vehicles.  For both the UberX and UberWAV ride options, third parties own the vehicle, drive the vehicles, and provide transportation to riders.  Tr. 319:09–320:12 (Rosenthal).

83.     What Plaintiffs seek is that Uber take steps such that third parties, whether they are individual drivers or commercial fleets, obtain WAVs (including through other third parties, like car rental companies), drive them, and be available on the Uber platform.  Plaintiffs do not dispute this and did not present evidence related to any request that Uber actually provide rides itself.

DEFENDANTS' FINAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

84.     Plaintiffs have asked that Uber use its "internal knowledge" and "business know-how" to ensure UberWAV in their cities.  Ex. 27 at 00798; Ex. 42 at 002543; *see* Final Pretrial Statement § B.I (stating Plaintiffs' suggested injunction will not include "that the Court order Defendants to use any particular methodology or financing structure to achieve those metrics").

85.     Based on Uber's several years of experience with various techniques to support WAV supply, both Uber's Director of Rider Operations, who oversees the WAV team, and the WAV team manager testified that, if Uber were to launch a WAV marketplace in New Orleans or Jackson, they would do so via a partnership with a commercial fleet operator.  Tr. 342:19–21 (Patel); Tr. 378:11–379:4, 382:17–21, 383:8–10 (Fagent).

86.     In Uber's experience, "commercial fleet partnerships are the best way to get a consistent and steady amount of WAV hours on the platform for riders to then request."  Tr. 342:22–25 (Patel); *see* Tr. 383:11–384:5 (Fagent).

87.     Under these agreements, the third-party commercial fleet operator's own employees drive WAVs, owned by the fleet operator, and use the Uber Driver App to receive ride requests.  Tr. 345:23–346:5 (Patel).  In addition to the money the commercial fleet operator earns from providing rides on the Uber Driver App, Uber pays the operator additional sums to ensure the operator's overall compensation is a guaranteed hourly amount for each hour the operator's drivers and vehicles are available on the Uber platform.  Tr. 384:06–22 (Fagent).

88.     These arrangements with commercial WAV fleet operators—in which Uber guarantees payments regardless of the number of rides completed on the platform—are a significant deviation from Uber's business model, under which drivers earn what they earn based on the number of trip requests they complete, if any.  *Compare* Tr. 382:24–383:07 (Fagent) (describing Uber payments and driver earnings under WAV fleet model) *with* Tr. 325:09–11 (Rosenthal) (describing same under Uber's standard business model).

89.     In commercial fleet arrangements, the commercial fleet's drivers and WAVs can either receive only WAV ride requests, or they can be "cross-dispatched," meaning they would

receive WAV ride requests but also UberX ride requests.  Cross-dispatching lowers Uber's total cost per supply hour because the WAV would be receiving the more frequent UberX requests and thus earning money by completing UberX trips, offsetting the amount Uber must pay to achieve the fleet's guaranteed minimum earnings per hour.  However, cross-dispatching causes lower reliability for WAV riders because when a rider requests a ride in a WAV, the WAV may be en route to or completing an UberX request, or may be far away as a result of completing an UberX trip.  Conversely, limiting WAVs to receive only WAV requests increases Uber's costs because WAV requests are infrequent and thus the drivers are earning less, but increases reliability. *See* Tr. 385:17–386:19 (Fagent)

90.    In Jackson and New Orleans, Uber would use a WAV-only model in a commercial fleet agreement. Tr. 386:20–387:16 (Fagent).

**B.    Based On Uber's Experience, Launching In New Orleans And Jackson Will Cause Uber To Lose Hundreds Of Dollars On Each WAV Trip.**

91.    Uber acquired quotes from TowerWAV, a commercial fleet operator with which it has done business as Uber's partnership with MV Transportation has dwindled, for providing WAV supply in New Orleans and Jackson.  Exs. 546, 547; Tr. 388:7–389:12 (Fagent).

92.    TowerWAV provided a quote for 100, 200, and 300 "supply hours" per week in each city, at rates of about $60.83 per hour (for 100 weekly hours); $54.55 per hour (for 200 weekly hours); and $52.51 per hour (for 300 weekly hours).  Ex. 547 at 20211 (quote for New Orleans); *see id.* at 20209 (clarifying that quoted rates for Jackson and New Orleans are the same).

93.    A "supply hour" is a metric that represents an hour a vehicle is online and available to receive and complete ride requests. Tr. 383:18–21 (Fagent).

94.    The supply hour is the most relevant metric for measuring supply and superior to metrics such as the number of vehicles, as suggested by Plaintiffs in their pre-suit demand letters. *See* Tr. 390:8–14 (Fagent).   For example, there could be ten drivers with a WAV signed up, but if each driver drives his or her WAV for 1 hour per week, those ten vehicles would provide only ten supply hours total.  That would do less to provide reliability than 2 drivers with WAVs who each drive their WAVs for twenty hours per week for a total of forty supply hours.

95.     TowerWAV's quote was limited to making either 1, 2, or 3 WAVs and drivers available on the Uber platform, each for 16 hours per day Monday through Friday and 10 hours per day on Saturday and Sunday.  Ex. 547 at 20210.  One vehicle operating 16 hours per day, five days a week, and 10 hours per day two days a week, is 100 supply hours; 2 vehicles operating the same schedule would be 200 supply hours; and 3 vehicles would be 300 supply hours.  *See id.* at 20211.

96.     Uber's WAV team manager testified that 300 supply hours per week (at $52.51 per hour), *i.e.*, 3 WAVs on the platform for 100 hours each per week, would be the "absolute bare minimum" arrangement necessary for a functional on-demand WAV marketplace in New Orleans. Tr. 391:10–24 (Fagent).  The reliability of the option, even at 300 supply hours per week, would "be pretty low" because TowerWAV's proposal has three vehicles providing those weekly hours with limited availability each day.  Tr. 394:24–396:18 (Fagent).

97.     For Jackson, Uber could launch with 200 supply hours per week (at $54.55 per hour), but it would not be "confident" in the reliability of the marketplace.  Tr. 399:10–16 (Fagent).

98.     Taking into account the 300-supply-hour quote (for New Orleans) and 200-supply-hour quote (for Jackson), potential driver earning offsets, and even using a generous and optimistic estimate of the number of WAV trips likely to be completed in both cities, Uber's WAV team manager testified that Uber's costs per WAV trip would be at least the following:

| Jurisdiction | Estimated Per-WAV-Trip Cost |
|---|---|
| Jackson, MS | $1,000.00 |
| New Orleans, LA | $400.00 |

Tr. 393:3–394:16, 400:1–15 (Fagent).

99.     Those estimated costs to Uber per WAV trip are "astronomically higher" than the price the rider would pay for the same trip, much less the small fraction of the rider price Uber retains as revenue.  Tr. 397:1–10 (Fagent).

100.    Uber's WAV team manager estimates that the TowerWAV proposal would cost Uber approximately $550,000 each year in Jackson and approximately $800,000 each year in New Orleans.  Tr. 393:3–12 (Fagent).  These estimates reflect the total amount guaranteed to Tower under the proposal each year, less estimated earnings on completed WAV trips—the difference

being the amount Uber pays out-of-pocket.  For New Orleans, the total amount guaranteed to Tower each year would be $819,156 ($52.51 (per hour) x 300 (hours per week) x 52 (weeks per year)), of which Uber likely would pay at least $800,000 per year.  For Jackson, the total amount guaranteed to Tower each year would be $567,320 ($54.55 (per hour) x 200 (hours per week) x 52 (weeks per year)), of which Uber likely would pay at least $550,000.  Tr. 392:18–393:9, 399:17–25 (Fagent).

101.    Of course, reliability would be zero during the hours when no WAVs were online.  This solution would provide much lower reliability than what Plaintiffs testified they want.  *See supra*, ¶¶ 75–81.  To achieve what Plaintiffs demanded, would require more supply hours and thus significantly higher costs.  Tr. 395:19–396:3.

102.    The evidence regarding Uber's expected per-WAV-trip costs in New Orleans and Jackson is consistent with the evidence regarding Uber's per-WAV-trip costs in cities where it currently supports WAV marketplaces.

103.    In 2019, Uber's per-WAV-trip costs were as follows: [7]

| Jurisdiction | Per-WAV-Trip Cost |
|---|---|
| San Francisco | $398.04 |
| Austin | $158.22 |
| New York City | $197.72 |
| Boston | $222.45 |
| Chicago | $121.95 |
| Washington, D.C. | $353.65 |
| Los Angeles | $328.49 |
| Philadelphia | $222.79 |
| Phoenix | $67.04[8] |
| Portland | $239.96 |
| Houston | $213.60 |

104.    In 2020, Uber's per-WAV-trip costs increased:[9]

| Jurisdiction | Per-WAV-Trip Cost |
|---|---|
| San Francisco | $806.28 |
| Austin | $327.45 |

---

[7]    Ex. 502 (Tab – "Forecast vs Actual (Monthly)," Cells AN14–AN27).

[8]    In Phoenix, Uber's WAV option is limited to airport trips.  *See* Tr. 351:25–352:01 (Patel); Phoenix Muni. Code § 4-68.B-7.

[9]    Ex. 503 (Tab – "Forecast vs Actual (Monthly)," Cells AM12–AM30).

| New York City | $203.56 |
|---|---|
| Boston | $247.09 |
| Chicago | $158.84 |
| Washington, D.C. | $602.28 |
| Los Angeles | $464.77 |
| Philadelphia | $205.61 |
| Phoenix | $196.43 |
| Portland | $305.23 |
| Houston | $346.91 |

105.    These per-WAV-trip costs do not reflect the full amount Uber spends to support the supply of WAV for the benefit of riders who need a WAV; they do not account for the significant costs of developing and maintaining Uber's software and hardware, overhead associated with supporting the marketplace, such as insurance, legal and regulatory costs like background checks, and working with partners to provide safety training, and the costs of employees who manage Uber's efforts to support WAV.  Tr. 407:24–408:11 (Fagent).

106.    These amounts that Uber spends to subsidize each WAV ride dwarf what Uber receives in revenue for any trip.  The average driver fare for a WAV trip in 2019 was $19.33, and $19.20 in 2020.  Ex. 502 (Tab – "Forecast vs Actual (Monthly)," Cell AB28); Ex. 503 (Tab – "Forecast vs Actual (Monthly)." Cell AA31).

107.    The driver fare is not Uber's revenue per trip.  Uber's revenue is limited to a small service fee charged to the driver that Uber usually, but not always, collects from the driver.  Ex. 505; Tr. 401:20–22 (Fagent).

**C.    Plaintiffs' Suggested Alternative Techniques To Support Supply Are Implausible, Impossible, Or Ineffective.**

108.    Despite claiming to defer to Uber's business know-how, Plaintiffs elicited conclusory testimony from their retained expert that Uber effectively could support WAV supply in New Orleans and Jackson in other ways, including by offering incentives to individual WAV drivers, Tr. 84:1–14 (Cooper), partnering with car rental and leasing companies to facilitate WAV rentals and leases, Tr. 84:15–85:13 (Cooper), partnering with local transit and health agencies, Tr. 90:1–4 (Cooper), collaborating with its competitors (*e.g.*, Lyft) to pool resources and jointly provide a centralized WAV platform similar to how a regulatory regime operates in New York

City, Tr. 90:5–91:22 (Cooper), and increasing non-WAV ride prices with an "accessibility fee" earmarked to "promote WAV drivership," Tr. 91:23—92:1 (Cooper). These are briefly discussed below.

109. **Incentives.** Uber has offered monetary incentives in efforts to encourage drivers to provide WAV supply hours, including a "keep the service fee" incentive—where drivers kept the small service fee that Uber usually retains on trips as revenue—and "per-completed-WAV-trip" incentives, which provided "an additional dollar amount" to the driver per WAV trip. Tr. 401:18–402:2 (Fagent).

110. In Uber's experience, incentives to drivers in the UberX context can be effective "when there is a sufficient existing base of both supply and customers to bring into [the Uber] marketplace." Tr. 234:13–17 (Patel). Because "there's not a large existing supply of people with personal WAVs, … there's not people for those incentives to reach." Tr. 344:9–17 (Patel).

111. In Uber's experience, incentives have not proven effective at increasing WAV supply on the platform—neither by causing persons who already have WAVs to sign up or provide more rides nor by causing people to go out and buy WAVs or convert existing minivans and use them on the Uber platform. Tr. 402:3–10 (Fagent); Tr. 343:24–7 (Patel); *see also* Tr. 344:18–21 (Patel) (explaining that these incentives are not significant "enough to account for the difference in acquisition cost" of a WAV versus a standard vehicle).

112. People who already own a WAV may not have time or desire to sell rides on their WAV on a rideshare platform, including because they may have caretaker duties. An incentive may not change that fact. Or their WAVs may be too old to qualify for Uber's platform. For example, Namisnak owns a WAV but it is a model year 2004. *See Namisnak*, ECF No. 211-3 at 18:8–17 (Namisnak). And even if they do want to drive on the Uber platform, there is no guarantee that they drive enough to provide enough supply hours to make a platform reliable. As stated above, even if ten individuals who already own WAVs were encouraged by incentives to drive on the Uber platform, they may drive five hours a week each, whereas a commercial fleet can simply put its drivers and WAVs on the platform for 300 supply hours a week. Such individuals, even with

1  incentives, may not provide the "consistent number of hours and steady number of hours" that a

2  commercial fleet can provide. Tr. 342:22–343:5 (Patel) (explaining that commercial fleet

3  partnerships are the "best way to get a consistent number of hours and steady number of hours").

4     113.   In terms of encouraging drivers who already own a minivan to convert that minivan

5  into a WAV, or to encourage drivers to buy a minivan and then convert it, simple math illustrates

6  the issue.  Making up the cost of a $20,000 vehicle conversion would take 1,000 completed trips

7  with a $20 incentive attached.

8     114.   Dr. Cooper provided high-level testimony to the effect that incentives have been

9  used and could work, but he did not testify in meaningful detail about what incentives would be

10  required to cause reliable WAV supply in Jackson or New Orleans, how much it would cost, or

11  how such incentives would be communicated to drivers. He did not testify to any calculations

12  showing that incentives would make it feasible or rational for a driver to obtain a WAV.  *See* Tr.

13  82:19–84:14 (Cooper).

14     115.   **Leasing and Rental Partnerships.** Uber previously made significant payments to

15  Xchange Leasing, LLC, which was a vehicle leasing company and a subsidiary of Uber

16  Technologies, Inc., to get Xchange Leasing to purchase WAVs and then lease them to drivers and

17  potential drivers. Tr. 345:03–13 (Patel); *see also* Tr. 346:6–13 (Patel) ("In a leasing model, we

18  would partner with a company that would buy the vehicles, and then they would just lease them to

19  drivers who were interested.  And Uber's role in that was to connect drivers who are interested in

20  driving on the platform but didn't have a vehicle to the leasing program for them to be able to get a

21  vehicle. And in the WAV case, we would subsidize part of the amount that the leasing company

22  would be spending to purchase the WAV."); *see also* Ex. 32 at 14430 (showing diagram

23  summarizing leasing model with Xchange Leasing).

24     116.   After "losing quite a lot of money," Xchange Leasing's "operations were shut down,

25  its assets were sold off," and it "is no longer an existing entity."  Tr. 345:6–13 (Patel); *see*

26  Tr. 180:13–19 (Rupp) ("[Xchange Leasing] was very unprofitable to manage … so the business

27  was sold.").

28

117.   Before Xchange Leasing shut down, Uber observed that "leases were not particularly attractive to prospective drivers."  Tr. 347:1–10 (Patel).

118.   Plaintiffs did not adduce evidence at trial showing how Uber could or would form a new leasing company, whether there exists an existing leasing company for Uber to partner with, how such a partnership would work, whether such a partnership would be effective, or what such a partnership would cost Uber.  To the extent Plaintiffs contend Uber should start a new leasing company, that company would then have to purchase WAVs.  The ADA is clear that no entity is required to purchase accessible vehicles.

119.   For short-term rentals, Uber recently developed a two-city pilot program with Avis, where Uber made significant financial payment to Avis and Avis obtains WAVs and rents them to interested drivers.  Tr. 268:17–19; 270:1–4 (Patel).

120.   The Avis pilot is new.  The pilot launched in Washington, D.C. and Boston in 2020 and 2021, respectively.  Tr. 268:23–24, 270:1–4 (Patel).

121.   Uber is not yet attempting to expand the Avis pilot because, thus far, in the pilot markets, Uber has "not been able to conclude that [the Avis/rental partnership] is an effective method for getting WAVs onto the platform"; Uber has not "been able to conclude that the economics are interesting for Avis"; Uber has not "been able to conclude that there is sufficient driver demand"; and Uber has not "been able to conclude that drivers, if they did rent these vehicles, would keep them."  Tr. 269:4–25 (Patel).

122.   Indeed, Avis "is not particularly interested in expanding because [it] do[es]n't own these vehicles for [its] retail rental business, and the vehicles that [it] ha[s] offered in these two cities have not been very popular among drivers.  In fact, [Avis has] had difficulty maintaining a profitable or satisfactory level of utilization on the vehicles."  Tr. 175:17–22 (Rupp).

**123.   Partnering With Local Transit And Health Agencies.**  Plaintiffs adduced no evidence at trial demonstrating a plausible partnership between Uber and any transit or health agency in New Orleans or Jackson.  Nor did Plaintiffs adduce any evidence as to how such a partnership would increase WAV supply on the Uber platform, as opposed to an arrangement where

1  Uber's platform is used to supplement an already limited service, like paratransit.  (Plaintiffs also

2  adduced no evidence as to the negative consequences of such a partnership, somehow,

3  cannibalizing existing paratransit and health transport.)  Nor did Plaintiffs adduce any evidence

4  regarding the costs to Uber of such a partnership.

5      124.  **Central Dispatch.**  In New York City, per a unique regulatory structure, every

6  single "base" (and there are hundreds) must either be a central "Accessible Vehicle dispatcher" or

7  affiliate with a central "Accessible Vehicle dispatcher."  N.Y.C. Rules, tit. 35, § 59B-17(c),

8  (f)  Uber and Lyft serve as central WAV dispatchers for WAV rides requested by riders through

9  the bases that are affiliated with them, respectively.  Tr. 281:22–282:23 (Patel).

10      125.  Plaintiffs did not adduce evidence at trial as to whether any transportation providers

11  or other entities in New Orleans or Jackson would be interested in voluntarily developing, outside

12  the confines of mandatory regulation, a similar central dispatch model in those cities—that is, a

13  model where these other providers or entities would contribute resources to Uber.  Uber cannot

14  compel third parties to provide their resources to Uber, whereas in New York all bases are legally

15  required to participate in the regulatory regime.  Plaintiffs did not produce evidence that there are

16  any entities or companies willing and able to join in a dispatch program.  Nor did Plaintiffs adduce

17  evidence showing that such a model would work in New Orleans and Jackson the same way it

18  works in America's largest city, how effective it would be, or what it would cost.

19      126.  **"Accessibility Fee."** An "accessibility fee" is not a technique to support or boost

20  the supply of WAVs in a ridesharing marketplace.  It is a notion of how a business could generate

21  funds from its customers by unilaterally imposing a fee on them.  Plaintiffs relied on the notion of

22  an "accessibility fee" including relying heavily on a 2017 presentation in which an Uber employee

23  suggests that Uber could "fully fund" UberWAV with a 3–4 cent "accessibility fee"—i.e., a price

24  increase on non-WAV rides.

25      127.  This calculation is not accurate.  *See supra*, ¶¶ 59–66.

26      128.  No one at trial endorsed that calculation.

27

28

129.     The evidence shows that the calculation was based upon a projection that Uber would spend $15.2 million per year on WAV.  Ex. 32 at 14329.   Uber has actually spent more than $53 million per year on WAV.  *See supra*, ¶¶ 59–66.

130.     Uber's Director of Rider and Airport Operations explained that a unilateral price increase per ride likely would result in riders using competitors' ridesharing platforms instead.  *See* Tr. 294:1–295:21 (Patel).

131.     In undisclosed opinion testimony, Plaintiffs' expert testified that he believes a $0.10 price increase per trip in New Orleans would fund WAV efforts in New Orleans under the TowerWAV proposal.  He did not provide similar testimony for Jackson.  This undisclosed testimony should be stricken and is unhelpful and unreliable in any event.  Using some basic arithmetic, Uber's WAV team manager demonstrated that a $0.10 price increase per trip would come up about $300,000 short per year in New Orleans for even a bare-bones program with lower reliability than plaintiffs have requested.   Tr. 398:22–399:02 (Fagent); *see also* Tr. 295:12–21 (Patel).

## V.     THE UBERX AND UBERXL VEHICLES REQUIREMENTS DO NOT PROHIBIT WAVS.

132.     Two ride request options on the Uber platform in New Orleans and Jackson are UberX (affordable rides in standard vehicles) and UberXL (rides in larger vehicles that can seat a greater number of riders).

133.     In New Orleans and Jackson, Uber's generally applicable vehicle requirements require a minimum of five seats (including the driver) for the UberX marketplace and a minimum of seven seats (including the driver) for the UberXL marketplace.   Exs. 526, 527.

134.     The generally applicable vehicle requirements for UberX and UberXL also prohibit "vans, box trucks, or similar vehicles" and vehicles with "aftermarket seating modifications, such as installed seats, seat belts, or BedRyder systems."  *Id.*

135.     The prohibition on "vans" does not prohibit minivans.  Uber's website includes a list of vehicles that satisfy the generally applicable vehicle requirements, and that list identifies

many minivans as "eligible vehicles" for UberX and UberXL—like the Toyota Sienna, the Chrysler Pacifica, the Kia Carnival, the Honda Odyssey, and the Dodge Caravan.  Exs. 538, 539.

136.    WAVs can be manufactured (and therefore purchased new) without requiring after-market modifications.  Tr. 66:18–67:14 (Cooper).

137.    Uber determines whether a vehicle meets its vehicle requirements.  Uber does not regard its generally applicable vehicle requirements, including the rule prohibiting vans and the rule prohibiting vehicles with "after-market seating modifications," as prohibiting WAV minivans from the UberX or UberXL marketplace.  Tr. 163:19–164:04 (Rupp); Tr. 275:17–23, 276:5–10, 279:14–15 (Patel).

138.    If a driver with a WAV were confused as to whether the vehicle requirements prohibit WAVs and inquired, Uber would inform the driver that the WAV could be onboarded so long as the WAV and driver met Uber's specific WAV safety requirements.  Tr. 183:16–19 (Rupp); Tr. 410:19–412:1 (Fagent).

139.    Certain of Uber's generally applicable vehicle requirements are required by Uber's regulators, Tr. 150:21–151:3, 181:3–6 (Rupp), and exist for the safety of Uber's customers, so they can have "a reliable, repeatable experience that's safe," Tr. 181:7–9 (Rupp).

140.    Certain of Uber's generally applicable vehicle requirements are necessary for Uber to maintain its insurance policies.  Uber is required to insure trips and drivers while they're actively using the Uber Driver App.  Tr. 181:10–13 (Rupp).  In Louisiana and Mississippi specifically, Uber must maintain insurance to operate.  La. Stat. Ann. § 45:201.6 19; Miss. Code. Ann. § 77-8-15.

141.    In particular, the restrictions regarding factory-installed seats, the number of factory-installed seatbelts, and aftermarket seating modifications are required by Uber's insurers.  Tr. 185:20–186:16 (Rupp).

142.    Where Uber supports a WAV marketplace, Uber imposes WAV-specific safety requirements for WAVs and WAV drivers: (i) drivers must demonstrate that their WAVs are certified compliant with the National Mobility Equipment Dealers Association quality assurance

program; and (ii) drivers must demonstrate proof that they completed a WAV securement training course.  Tr. 409:9–410:18 (Fagent).

143.    Plaintiffs do not intend to sign up to sell WAV rides using Uber's platform.  Because of his disability, each Plaintiff is unable to operate a vehicle.  Crawford SAC ¶ 1; Namisnak TAC ¶ 3; *Crawford*, ECF No. 252-7 at 3 (Crawford Resp. to RFA Nos. 1–2); *Crawford*, ECF No. 252-11 at 3 (Namisnak & Falls Resp. to RFA Nos. 1–2).

144.    Plaintiffs were not deterred from using the Uber Driver App. *Crawford*, ECF No. 252-7 at 3 (Crawford Resp. to RFA Nos. 1–2); *Crawford*, ECF No. 252-11 at 3 (Namisnak & Falls Resp. to RFA Nos. 1–2).

145.    Plaintiffs have not downloaded the Uber Driver App.  *Crawford*, ECF No. 252-7 at 3 (Crawford Resp. to RFA Nos. 1–2); *Crawford*, ECF No. 252-11 at 3 (Namisnak & Falls Resp. to RFA Nos. 1–2).

146.    At trial, Plaintiffs failed to adduce any evidence of any person that wanted to sell WAV rides on the UberX or UberXL marketplaces but was prohibited or deterred from doing so by the generally applicable vehicle requirements.  *See also Crawford*, ECF No. 252-7 at 4 (Crawford Resp. to RFA No. 4); *Crawford*, ECF No. 252-11 at 4 (Namisnak & Falls Resp. to RFA No. 4).

147.    At trial, Plaintiffs did not testify that they want to be able to request trips using the UberX or UberXL ride options on the off chance that a driver in a WAV happens to be the nearby driver that receives their ride request.

## CONCLUSIONS OF LAW

**I.    Defendants Are Entitled To Judgment In Their Favor As To Plaintiffs' Claims Under 42 U.S.C. § 12184(b)(2)(A).**

1.    Plaintiffs have alleged that Uber has violated 42 U.S.C. § 12184(b)(2)(A) by failing to make a reasonable modification requested by the Plaintiffs.

2.    Section 12184(b)(2)(A), by way of cross-reference to 42 U.S.C. § 12182(b)(2)(A)(ii), provides that prohibited discrimination includes a covered entity failing to "make reasonable modifications in policies, practices, or procedures, when such modifications are

necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

3.      Although the contours of the demand have changed throughout this litigation, Plaintiffs' final demand is that Uber "provide UberWAV in New Orleans and Jackson."  Final Pretrial Statement § B.I.4.

4.      Plaintiffs have to some degree acknowledged that an injunction to "provide UberWAV" is insufficient and attempted to state that at some point after trial they would identify certain "service metrics," presumably standards of reliability and wait times, but at no point to date have they done so.

5.      Plaintiffs have refused and disclaimed any intention to provide additional detail or information about what specific actions Uber would be asked to or compelled to take to comply with their demand. Final Pretrial Statement § B.I.8.[10]

6.      Plaintiffs' approach in this regard is expressly rejected.  Bifurcation of liability and remedy cannot work because the "reasonableness" of any modification depends on its costs and effectiveness. Liability and remedy cannot be separated in an ADA "reasonable modification" case. A Plaintiff must identify the specific action it wants taken, so the cost and effectiveness of that specific action can be assessed.  And adding "service metrics" will likely change the cost required to achieve the metrics.  The Court will not hold another trial analyzing the cost or effectiveness of some specific action later requested or necessary to guarantee some metrics that have not been presented.

7.      Accordingly, the Court analyzes the legal validity of Plaintiffs' stated demand in the Final Pretrial Statement—for Uber to "provide UberWAV in New Orleans and Jackson."

---

[10]      Plaintiffs appear to propose in the Pretrial Order some type of bifurcated trial with two phases—one focused on liability and another focused on remedy (the specifics of the injunction). However, they also stated "[b]ifurcation or a separate trial of specific issues is not feasible or desired."  Final Pretrial Statement § K.

DEFENDANTS' FINAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

8.     Judgment should be entered in Uber's favor as to Plaintiffs' reasonable modification under Section 12184(b)(2)(A) for the reasons set forth below.[11]

**A.     Plaintiffs Ask For A Performance Standard Rather Than A Modification To A Policy, Practice, Or Procedure.**

9.     Plaintiffs have not identified any "policy, practice, or procedure" within the meaning of the statute to which they have then proposed a "modification."  The "policies, practices, and procedures" at issue relate to general rules and policies, not the types of products or services offered.  *See, e.g.*, 28 C.F.R. § Pt. 36, App. C (a "rule barring all vans or all vans with raised roofs"; department store "policy of only permitting one person at a time in a dressing room"); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001) (golf competition policy requires contestants to walk); *Doud v. Yellow Cab Co.*, 2014 WL 4302552, at *9 (D. Nev. 2014) (taxi company had policy that riders with mobility scooters had to ride in WAV and not taxi).

10.     A modification "connotes moderate change."  *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1036–37 (6th Cir. 1995) (emphasis added).  Plaintiffs testified at trial that they sued Uber because they wanted Uber to "provide equivalent service or close-to-equivalent service." FoF ¶ 79.  In pre-trial filings, they conceded for the first time that after trial they would suggest platform performance "metrics" that Uber would be required to ensure.  Final Pretrial Statement at § B.I. ¶ 8.  Try as they may to fit their demand into the rubric of a "policy" "modification," Plaintiffs' demand that Uber "provide UberWAV" and their admission that they will attempt to have certain "service metrics" dictated by Court order confirms that what Plaintiffs seek is in fact an "outcome" (as Uber argued at summary judgment), a "goal" (how the Court described it at summary judgment, *Crawford*, ECF No. 197 at 17), or a "performance standard" (how Judge Alsup described a similar request in a case involving Lyft).  Stated differently, they do not want Uber to,

---

[11]     Uber recognizes that the Court denied its motion for summary judgment as certain issues presented in its Conclusions of Law.  However, the Court is free to reassess its interlocutory decisions at any time prior to final judgment.  *See* Fed. R. Civ. P. 54(b).  Defendants also present these issues to ensure they are preserved for appeal.   See Ortiz v. Jordan, 562 U.S. 180, 183–84 (2011); *Williams v. Gaye*, 895 F.3d 1106, 1122 (9th Cir. 2018) (recognizing that Ortiz may have called into question the Ninth Circuit's exception for preservation of "purely legal" issues denied at summary judgment, but declining to decide the issue).

for example, offer incentives, enter into commercial fleet deals, or start a dispatch system, just for the sake of doing those things; they only want the end result—the service metrics.  This request is completely unmoored from the statutory text.[12]

11.   Compounding this problem, in order to achieve this goal or performance standard, Plaintiffs would have this Court order Uber to subsidize third parties to provide a new product that they and Uber do not offer in New Orleans or Jackson, no different than a bookstore being forced to sell Braille books.  The ADA does not require entities to offer new products or services that they do not offer, let alone compel third to parties to offer them.  *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).  A demand that some drivers utilize a WAV is akin to a demand that a bookstore sell some books in Braille.  The ADA does not require a bookstore to sell *any* Braille books.  A bookstore cannot refuse to sell the books it does sell to a person with a disability, but it is not required to have *a single* Braille book.  *Id.* at 1115.

12.   The "reasonable modification" provision, by its plain terms and the case law applying it, is not intended to allow Plaintiffs to compel Uber to "modify its policy" of not subsidizing UberWAV in their cities any more than a plaintiff could ask a bookstore to "modify its policy" of not stocking any Braille books.  The ADA and the "reasonable modification" provision do not require entities to go into lines of business they have chosen not to enter, or to sell products or services they have chosen not to sell.  Permitting Plaintiffs to use the "reasonable modification" provision to force Uber to enter into a line of business it has chosen not to enter in New Orleans and Jackson would mean any plaintiff could swallow a fundamental component of ADA law with a new "policy modification" exception.  *See, e.g.*, *Roberts ex rel. Roberts v. KinderCare Learning Ctrs.*, 896 F. Supp. 921, 926 (D. Minn. 1995) (refusing to force provider of group childcare services to provide one-on-one, rather than group, childcare services for an individual with a disability because doing so would force the provider "into a childcare market it did not intend to enter").

---

[12]   Defendants respectfully recognize this issue was raised during summary judgment and rejected by the Court. However, this issue has become even more crystallized at this stage in the proceedings given Plaintiffs' failure to clarify their requested "modification" after the Court's summary judgment order and their concession that they will seek "service metrics."

13.     Plaintiffs cannot compel Uber to "modify its policy" of not subsidizing UberWAV in their cities any more than a plaintiff could ask a bookstore to "modify its policy" of not stocking *any* Braille books.  The ADA does not require entities to go into lines of business they choose not to enter, or to sell products or services they choose not to sell.  Permitting Plaintiffs to use the "reasonable modification" provision to force Uber to enter into a line of business it has chosen not to enter in New Orleans and Jackson would mean any plaintiff could swallow a fundamental component of ADA law with a new "policy modification" exception.

**B.     Plaintiffs Have Not Demanded A Sufficiently Concrete Modification To Enable The Court To Determine The "Reasonableness" Of The Demand Or Enter An Injunction That Would Comply With Rule 65.**

14.     Plaintiffs demand that Uber "provide UberWAV in New Orleans and Jackson." Final Pretrial Statement § B.I.4.  They have repeatedly and affirmatively avoided identifying what steps they believe Uber must take.  This demand fails as a matter of law.  Section 12184(b)(2)(A) requires a fact-based inquiry into whether the modification is "reasonable," and a sufficiently concrete proposal is necessary to conduct that inquiry.  And even aside from the requirements under the ADA, an injunction requiring Uber to "provide UberWAV in New Orleans and Jackson" would not comply with Rule 65's requirement that any injunction "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P.65(d)(1)(C).

**1.     Plaintiffs' demand is not concrete enough for the Court to determine its reasonableness.**

15.     Following a bench trial in a recent case involving Uber's competitor, Lyft, raising very similar issues relating to WAV transportation, Judge Alsup held that plaintiffs demanding a "reasonable modification" under 42 U.S.C. § 12184(b)(2)(A), like Plaintiffs here, "are required to propose a concrete modification rather than merely propose that the district court order a defendant to undertake an iterative trial-and-error process to try to find a proposed modification."  *Indep. Living Resource Ctr. v. Lyft, Inc.*, 2021 WL 3910719, at *10 (N.D. Cal. 2021).

16.     As Judge Alsup explained, a "proposal must have enough meat on its bones to allow a fact finder to rate it as 'reasonable' (or not), as the statute requires."  *Id.*   The proposed

1  modification must not only be "concrete and specific" but should also be "straightforward and

2  simple." *Id.*

3      17.    Judge Alsup's reasoning is well-grounded.  As another federal district court recently

4  explained, a reasonable modification must be "a specific solution which would rectify the plaintiff's

5  grievances." *Bailey v. Bd. of Comm'rs*, 484 F. Supp. 3d 346, 432 (E.D. La. 2020).  Federal courts

6  have only required defendants to make modifications when the proposal was concrete and simple.

7  *See, e.g.*, *PGA Tour*, 532 U.S. at 690 (affirming injunction for waiver of policy requiring golfers to

8  walk to permit professional golfer to use golf cart); *Fortyune*, 364 F.3d at 1082 (affirming

9  injunction requiring movie theater to amend its policy to ensure a companion seat is available for

10  an individual with a disability who requires a companion); *Doud*, 2014 WL 4302552, at \*9

11  (entering preliminary injunction requiring taxicab company to no longer refuse plaintiffs' requests

12  to travel in typical cab when their motorized scooters fit in the trunk of a standard taxi).  "No federal

13  court has ever held that an iterative, experimental, or trial-and-error proposal constituted a

14  reasonable modification to a policy, practice, or procedure under Title III."  *Lyft*, 2021 WL

15  3910719, at \*9–10 (collecting cases).

16      18.    The Department of Justice's guidance about "policies, practices, and procedures,"

17  and "modifications" to them, provide further support for the notion that modification requests be

18  both concrete and simple.[13]  As DOJ explains: (i) where a parking facility has a "rule barring all

19  vans or all vans with raised roofs," that facility may need to "modify" that rule "if an individual

20  who uses a wheelchair-accessible van wishes to park in that facility; (ii) "[a] department store may

21  need to modify a policy of only permitting one person at a time in a dressing room, if an individual

22  with [a cognitive impairment] needs and requests assistance in dressing from a companion"; and

23  (iii) "a hotel may need to adopt a policy of keeping an accessible room unoccupied until an

24  individual with disability arrives at the hotel, assuming the individual has properly reserved the

25  room."  28 C.F.R. § Pt. 36, App. C.

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [13]    The DOJ's regulations and guidance for reasonable modification claims for public
accommodations are adopted by the Department of Transportation for reasonable modification

28  claims under 42 U.S.C. § 12184(b)(2)(A).  49 C.F.R. § 37.5(f).

19.     Plaintiffs' demand that Uber "provide UberWAV in New Orleans and Jackson" is neither concrete nor simple.  Plaintiffs do not offer "a specific solution which would rectify [their] grievances."  *Bailey*, 484 F. Supp. 3d at 432.  To the contrary, Plaintiffs affirmatively disclaim any request for an injunction that would require "Defendants to use any particular methodology or financing structure to achieve [to-be-suggested] metrics."  Final Pretrial Statement § B.I.8.

20.     Plaintiffs' requested modification is even less concrete than the modification the *Lyft* plaintiffs demanded, which Judge Alsup found lacking.  The *Lyft* plaintiffs suggested metrics before trial, requesting an injunction requiring Lyft to meet specific "wait time benchmarks" tied to metrics proposed by a California regulator (the *Lyft* case concerned WAV service in certain California cities).  *Lyft*, 2021 WL 3910719, at *11.  Judge Alsup rightly rejected this demand as a "performance standard" that "begs the question of how it could be done."  *Lyft*, 2021 WL 3910719, at *11.

21.     Here, Plaintiffs have avoided identifying a "performance standard" and just say they will provide it later.  Not only would suggested metrics not make the requested demand sufficiently concrete or simple, but any post-trial effort to clarify their demand comes too late.  At the time of trial (and still today), there was nothing concrete about Plaintiffs' demand for this Court to evaluate for reasonableness.

22.     The absence of a concrete proposal is "dispositive" of Plaintiffs' claim.  *Id.* "No federal court has ever held that an iterative, experimental, or trial-and-error proposal constituted a reasonable modification to a policy, practice, or procedure under Title III."  *Lyft*, 2021 WL 3910719, at *9–10 (collecting cases).  This Court will not be the first.

### 2.     Plaintiffs' requested injunction cannot comply with the specificity requirements of Rule 65(d).

23.     Rule 65 requires an injunction to, among other things, "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1). These are not "mere technical requirements."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  They are designed "to prevent uncertainty and confusion on part of those faced with injunctive orders.  *Id.*

1   24.   "The benchmark for clarity and fair notice is not lawyers and judges, who are

2   schooled in the nuances of the law." *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145,

3   1150 (9th Cir. 2011). The "ordinary person" must be "able to ascertain from the [injunction order]

4   itself exactly what conduct is proscribed." *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1047–

5   48 (9th Cir. 2013).

6   25.   As explained above, the Court rejects Plaintiffs' proposal to add substantive changes

7   regarding the nature and substance of the relief sought after the trial, and as explained, liability

8   cannot be assessed without knowing the cost and effectiveness of the modification requested. The

9   Court therefore analyzes whether an injunction "requiring Uber to 'provide UberWAV" would

10  satisfy Rule 65.

11  26.   It does not. Such an injunction does not include the necessary specificity for Uber

12  to understand what conduct was proscribed. *See Kennedy v. Shubhango Inc*, 2021 WL 4494606,

13  at *4 (C.D. Ill. 2021) (rejecting entry of default judgment when plaintiff "offer[ed] little indication

14  as to what Defendant must do to comply" with a proposed injunction).

15  27.   The Court therefore declines to enter such a vague injunction, which would put Uber

16  at risk of a contempt citation, "on a decree too vague to be understood." *Schmidt*, 414 U.S. at 476.

17  **C.   Plaintiffs' Requested Injunction Is Overly Broad.**

18  28.   It is well-established that injunctive relief should be "no more burdensome to the

19  defendant than necessary to provide complete relief to the plaintiffs before the court." *E. Bay

20  Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021). Although there is not a "general

21  requirement that an injunction affect only the parties in the suit, *Bresgal v. Brock*, 843 F.2d 1163,

22  1169–1170 (9th Cir. 1987), injunctions that extend relief beyond the parties are "exceptional," *City

23  & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

24  29.   Plaintiffs never pleaded this case as a putative class action or moved to certify a

25  class under Rule 23. Therefore, there is no evidence in the record about how many people in New

26  Orleans and Jackson use motorized wheelchairs, whether they want to take ridesharing WAV trips,

27  or when, where and how frequently they would use the Uber Rider App. These are all important

28

1   facts to assess the costs required to meet whatever demand may exist and the effectiveness of

2   techniques.  Nor have Plaintiffs demonstrated that this is an "exceptional case" that warrants relief

3   beyond that necessary to redress the injuries of the named parties.

4          30.     The relief Plaintiffs want—their own ability to request a WAV ride using the Uber

5   Rider App and obtain it—does not require the class-wide relief they seek for all of New Orleans

6   and Jackson (and, perhaps, beyond).  Instead, Plaintiffs could have demanded narrower relief

7   individual to them (*e.g.*, a driver with a WAV available only to them on the Uber platform) but

8   instead opted for apparent class-wide relief requiring Uber to "provide UberWAV in New Orleans

9   and Jackson."  Because Plaintiffs could receive less burdensome relief from Uber without seeking

10  class-wide relief, the injunction is not "narrowly tailored to remedy the specific harm shown."

11  *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019).

12         31.     Plaintiffs attempt to analogize their request for relief to an order requiring a

13  restaurant to install an entrance ramp, which would benefit persons other than the plaintiff who

14  sued for it.  That analogy is unpersuasive.  Such a ramp is necessary and narrowly tailored to remedy

15  the specific harm to a plaintiff who sues over its absence, and while the installation of a ramp may

16  very well benefit others, those benefits are merely incidental to the relief tailored to the plaintiff's

17  injury.  Here, by contrast, Plaintiffs seek to compel conduct by Uber that is far more than necessary

18  to remedy their specific alleged harm.  Plaintiffs' claim here is more akin to a single plaintiff

19  seeking to compel the construction of wheelchair ramps at one restaurant he would go to, but also

20  all other restaurants that may be under common ownership even if the plaintiff has no intention of

21  ever visiting them, because other individuals not before the court may go to those other restaurants.

22  Such relief would be overbroad in that hypothetical case for the same reasons it is overbroad here.

23         **D.     Plaintiffs Failed To Show Their Demand is Reasonable, And Therefore, Uber
               Did Not Engage In Discrimination By Declining To Meet It.**

24

25         32.     Setting aside numerous legal infirmities with Plaintiffs' demand that Uber "provide

26  Uber WAV" in New Orleans and Jackson, Plaintiffs must prove by a preponderance of the evidence

27  that it is "reasonable" for Uber to meet their demand.  42 U.S.C. § 12184(b)(2)(A); *see* 42 U.S.C.

28  § 12182(b)(2)(A)(ii); *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1036 (9th Cir.

2020).  Plaintiffs failed to carry that burden of proof at trial.  In the ADA, "reasonable" is a term of limitation.  *McGary*, 286 F.3d at 1270.  The ADA does not require covered entities "to make any and all accommodations"; it requires only those "accommodations that are reasonable." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). "A modification is not reasonable if it imposes 'undue financial and administrative burdens." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004) (quoting *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 n.17 (1987)).  Reasonableness turns on, among other things, "the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Id.*; *see Baughman*, 685 F.3d at 1135 (other relevant factors include "disruption of [the defendant's] business and safety").  Reasonableness is also grounded in what other courts or agencies have required.  *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 403–04 (2002) (assessing reasonableness with reference to what other courts have done, *i.e.*, in the "run of cases").[14]  As the Fifth Circuit put it, Plaintiffs must show that their proposed modification "is reasonable in the general sense, that is, reasonable in the run of cases." *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997); *see also Lyft*, 2021 WL 3910719, at *11 (analyzing reasonableness with reference to the "run of cases").

33.      Key to the reasonableness inquiry is whether the cost is "disproportionate to the benefit." *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995).   In short, a modification that comes with burdens that are disproportionate to the benefit is not reasonable. *Id.* This remains true even where the defendant is large or has lots of resources.  As Judge Alsup put

---

[14]      *Barnett* concerned a "reasonable accommodation" claim under Title I, rather than a "reasonable modification" claim under Title III.  The Ninth Circuit has made clear that the standard for reasonableness does not differ among the various disability access statutes that refer to "reasonable accommodations" and "reasonable modifications." *Fortyune*, 364 F.3d at 1083; *Wong v. Regents*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).  Relying on *Barnett*, courts regularly apply its cases-based standard in Title III cases to assess the "reasonableness" of a requested modification. *See e.g.*, *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 674 (4th Cir. 2019); *Mannick v. Kaiser Found. Health Plan*, 2006 WL 2168877, at *12 (N.D. Cal. 2006); *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1342 (S.D. Fla. 2003); *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1108 (D. Colo. 2000).

1    it, a "vast bottom line does not transform exorbitant modifications into reasonable ones." *Lyft*,

2    2021 WL 3910719, at *16.

3        34.    This Court agrees with Judge Alsup that an analysis of Uber's "cost per WAV ride"

4    provides the best insight into whether the proposed modification here is burdensome in a way that

5    is proportionate to the benefit and, therefore, reasonable.

6        35.    Uber incurs losses of hundreds of dollars on each individual WAV ride in

7    jurisdictions where it supports a WAV marketplace. *See* FoF ¶¶ 103–107.  This Court further finds

8    that supporting a WAV marketplace in New Orleans or Jackson would be more difficult and more

9    expensive than in the large, densely populated cities where Uber currently supports a WAV option.

10   *Id.* ¶¶ 66, 103–107.  Indeed, the evidence at trial showed that, even using optimistic projections for

11   the number of completed WAV trips, Uber's losses per each completed WAV trip would be at least

12   $400 per WAV trip in New Orleans and more than $1,000 per WAV trip in Jackson.  *Id.* ¶ 98.

13       36.    Requiring Uber to subsidize the rides of individuals with disabilities to the tune of

14   at least a hundred dollars per ride—and it in fact much more—reflects disproportionate burdens.  If

15   Congress intended the ADA to impose such extreme obligations on a private entity, it would have

16   said so expressly.

17       37.    Nor is the absolute cost of Plaintiffs' demand reasonable.  Uber has spent tens of

18   millions of dollars a year supporting WAV marketplaces.  *Id.* ¶¶ 56–60.  The evidence at trial

19   established that the recurring costs of supporting WAV in New Orleans or Jackson would be much

20   too burdensome to be reasonable.  To the extent Uber has had more success than Lyft in more

21   efficiently supporting WAV marketplaces, the Court refuses to punish Uber for that success.

22       38.    In those few instances where a modification was found "reasonable," the

23   modifications have not required the defendants to make *any* expenditures.  The PGA did not need

24   to spend a cent to permit Casey Martin to use a golf cart instead of walking in certain golf

25   tournaments.  *See PGA Tour*, 532 U.S. at 682 (explaining that the PGA did not even dispute the

26   modification was "reasonable").  AMC did not have to incur any direct costs to "ensure[]

27   companion seating will be made available to the individuals for whom they are designed: the

28

companions of wheelchair-bound patrons," the injunction the Ninth Circuit approved in *Fortyune*. *Fortyune*, 364 F.3d at 1084.  It likewise cost nothing for the taxi company in *Doud* to provide rides in the standard cabs it already operated to persons whose motorized scooters would fit in the trunk. *Doud*, 2014 WL 4302552, at *9.

39.    Likewise, none of the examples provided by the DOJ requires a covered entity to make any direct outlays to make the "reasonable" modification.  *See* 28 C.F.R., Pt. 36, App. C. Permitting the occasional van into a parking facility, the occasional extra patron in a dressing room, or saving the accessible room for an individual with a disability with an existing reservation, does not require the covered entity to spend any money up front.  *See id.*

40.    To the extent a modification that requires an entity to spend any money can be "reasonable" at all, caselaw shows that "reasonable" costs are limited to those that are unusually minimal.  *See, e.g.*, *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628 (E.D. Pa. 2016) (modification requiring Philadelphia science museum to permit free admission to IMAX Theater and special exhibitions for "government-funded personal care attendants" of individuals with disabilities because it does not represent a genuine "opportunity cost" and an "occasional $1 loss" is not an "unreasonable cost or an undue financial burden").

41.    By contrast, modifications that come with a high price tag are facially unreasonable. *See Lyft*, 2021 WL 3910719, at *16 & n.4 (concluding that per-WAV-ride costs of $311 and $622 are unreasonable); *Nat'l Fed'n of the Blind v. Lamone*, 438 F. Supp. 3d 510, 538–40 (D. Md. 2020) (holding modification that would cost the defendant $5 million per year to implement is unreasonable).  Such high price tags are unreasonable even if the defendant is a large company with a deep pocket: "Even a vast bottom line does not transform exorbitant modifications into reasonable ones." *Lyft*, 2021 WL 3910719, at *16.

42.    Plaintiffs have failed to show their demand is reasonable in light of the established case law.  No court has ever held "reasonable" a modification that would directly cost the defendant hundreds of thousands of dollars, much less millions of dollars, year after year.

43.     Plaintiffs at trial did not adduce any material evidence related to how much it would cost for Uber to meet their demand.  They did not provide an absolute annual cost, nor did they provide any evidence of the costs per completed trip. The closest they came was in undisclosed opinion testimony, in which Plaintiffs' expert testified that he believes a $0.10 price increase per trip in New Orleans would fund WAV efforts in New Orleans under the TowerWAV proposal.  He did not provide similar testimony regarding Jackson.  This testimony was not helpful.  Using some basic arithmetic, Uber's WAV team manager demonstrated that this $0.10 price increase per trip would come up about $300,000 short per year for even a basic bare-bones commercial fleet arrangement with low reliability.  FoF ¶ 131.  Plaintiffs' failure of proof on the cost of the demand alone is enough to grant judgment for Uber.

44.     Plaintiffs' approach to the cost issue is largely to sidestep it with a novel theory that is not grounded in any case law.  Specifically, Plaintiffs argue that Uber could impose a so-called "accessibility fee" on every non-WAV trip, and if it did so, it would generate more revenues, which it could earmark for WAV.  According to Plaintiffs' view, "providing UberWAV" was actually free.

45.     The Court rejects this approach for several reasons.  First, it is not supported by any case law.  Second, it clashes with basic economics; raising prices does not always increase revenues and in fact it may decrease demand and, therefore, decrease revenues.  This is especially relevant given Uber's testimony about the competition between it and other TNCs like Lyft for riders.  It is not a guarantee that simply raising prices would generate more money for Uber.  To the extent Plaintiffs ask the Court to find that Uber is not attempting to maximize its revenues, or could increase revenues by raising prices, they failed to provide the complex expert testimony that would be required to support such a finding.  Third, Plaintiffs' theory ignores that any additional money Uber could raise through a marginal price increase would still be money in Uber's pocket; losing that money on expanding WAV is no less of an economic loss to Uber than the tens of millions it has already lost out of its pockets supporting WAV.  If Uber could raise revenues by tacking on a fee, Uber could invest that money in money-making ventures or use it toward profitability.

Plaintiffs cannot sidestep their obligation and burden of proof on cost with an "accessibility fee" theory.

46.     Plaintiffs' primary hook and best evidence for their theory is that an Uber employee prepared a presentation in 2017 that floated the concept of an "accessibility fee" but that would need to be diligenced.  That employee suggested that Uber could "fully fund" UberWAV with a 3–4 cent accessibility fee—that is, with a $0.03–$0.04 increase in the price charged to all riders who use the Uber Rider App.

47.     Plaintiffs have not shown that this four-year-old projection by an unknown employee was even accurate at the time—let alone an accurate estimate of the accessibility fee today.  And, in fact, it was inaccurate: the projection was based on an estimated annual spend on WAV of $15.2 million, whereas Uber actually has spent more than $53 million per year on WAV.  FoF ¶ 129.  Nor did Plaintiffs make any showing that Uber could unilaterally charge an accessibility fee without losing business to its competitors.

48.     More fundamentally, Plaintiffs' approach here proves too much.  A "modification" carrying a financial burden so substantial as to require the defendant to increase prices across the board is not moderate, *de minimis*, or inexpensive.  A modification requiring a price increase to pay for it lies so far outside the mine run of cases that it cannot be reasonable.

49.     While Plaintiffs have speculated there may be other methods to support a WAV marketplace in New Orleans or Jackson, they have not produced evidence that those methods are feasible or would be effective in New Orleans or Jackson.  Nor have Plaintiffs adduced evidence of what those methods would cost.

50.     Finally, in determining reasonableness, the Court declines to take a myopic approach that examines the significant losses required to meet Plaintiffs' demand in New Orleans and Jackson only.  *See, e.g.*, *D.L. ex rel. A.L. v. Walt Disney Parks & Resorts, Inc.*, 469 F. Supp. 3d 1280, 1313–14 (M.D. Fla. 2020) (rejecting argument that reasonableness of a demand for an individual modification can be viewed in isolation when other individuals with disabilities will make the same demand); *see also See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 604 (1999)

1    (considering what requiring modification would mean for the defendant's other operations);

2    *Baughman*, 685 F.3d at 1135 (modifications that are disruptive to the defendant's business are not

3    reasonable).

4          51.     There is nothing special about New Orleans and Jackson in terms of WAV issues.

5    The Court is cognizant that any rationale that would support forcing Uber to meet Plaintiffs'

6    demands in New Orleans and Jackson would apply equally to virtually any city or town in the USA.

7    As a result, even if it were reasonable to require Uber to spend such significant sums in New Orleans

8    or Jackson every year—and to be clear, the Court holds that it is not—then the potential cumulative

9    costs of having to provide UberWAV in cities across the country would make Plaintiffs' demand

10   unreasonable.

11         **E.      Plaintiffs' Demand Would Require Uber To Fundamentally Alter Its Business.**

12         52.     Even if Plaintiffs' demand were reasonable (it is not), Uber cannot meet it without

13   fundamentally altering its business and the services it provides.  Plaintiffs demand at its heart is for

14   Uber to offer or make others offer additional services that are not currently offered. That is a

15   fundamental alteration.  And further, to begin to meet Plaintiffs' demand, Uber would partner with

16   a commercial fleet operator, like TowerWAV.  Such partnerships are a substantial deviation from

17   Uber's business model.  FoF ¶ 88.  Uber does not typically guarantee any number of drivers on the

18   platform or any time or pay guaranteed sums to drivers.  FoF ¶ 18.  Uber has had to use that supply

19   technique in the markets where it has a live WAV option precisely because the techniques Uber

20   typically uses to promote its ridesharing platform—incentives and vehicle solutions—do not work

21   in the WAV rideshare marketplace.  FoF ¶¶ 26, 55.

22         53.     That Uber has experimented with this aberrant supply technique—at a complete and

23   significant financial loss—in other cities, does not make the technique part of Uber's business

24   model or service offerings anywhere, and certainly not in Jackson or New Orleans.  Thus, the relief

25   Plaintiffs seek would fundamentally alter Uber's business model in New Orleans and Jackson.  *See,*

26   *e.g.*, *KinderCare* 896 F. Supp. at 926 (forcing provider of group childcare services to provide one-

27   on-one, rather than group, childcare services for an individual with a disability would

28

fundamentally alter provider's business because it would force the provider "into a childcare market it did not intend to enter").

### F. Title III Of The ADA Does Not Require Covered Entities To Guarantee WAV Service.

54. As stated above, the costs of subsidizing an on-demand WAV marketplace are too extreme to impose on a single private entity where not expressly required by statute. However, the ADA is not silent on the issue of WAV transportation. What the Act does provide further confirms that Plaintiffs' reasonable modification claim must fail.

55. Section 12184(b)(3) explains why Section 12184 as a whole does not require WAV service at all. This provision, which specifically addresses WAVs, makes clear that providing transportation in "automobiles" that are inaccessible to passengers in wheelchairs (*i.e.*, that are not WAVs), is *not* discrimination. 42 U.S.C. § 12184(b)(3). Indeed, Section 12184(b)(3) and (b)(5) together identify the only circumstances where the statute mandates WAV service: when a covered entity purchases or leases a new van to provide specified public transportation. As a result of these provisions, the Department of Transportation and courts have interpreted Section 12184 as *not* requiring covered entities to purchase or lease *any* WAVs. Plaintiffs' use of the "reasonable modification" provision is an attempted end-run around these provisions that the court should not countenance.

56. DOT, to which Congress delegated authority to promulgate regulations to implement Section 12184, *see* 42 U.S.C. § 12186(a)(1), has issued regulations crystalizing the implication Sections 12184(b)(3) has on Section 12184 generally: "[p]roviders of taxi service are not required to purchase or lease accessible automobiles," or "to purchase vehicles other than automobiles in order to have a number of accessible vehicles in [their] fleet[s]." 49 C.F.R. § 37.29(b);[15] *see* 49 C.F.R. § Pt. 37, App. D ("Under the ADA no private entity is required to purchase an accessible automobile."). And, in explaining the regulation, DOT opined that "if a taxi

---

[15] DOT has explained that for purposes of this regulation, "taxi service" means any for-hire vehicle service. 49 C.F.R. § Pt. 37, App. D.

1    company acquires only automobiles, it need never obtain an accessible vehicle." *Transp. for*
2    *Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45590 (Sept. 6, 1991).

3        57.    DOT's reasonable interpretations of Section 12184 and of its own regulations are
4    due deference. *See Chevron, Inc. v. NRDC*, 467 U.S. 837, 844 (1984); *Auer v. Robbins*, 519 U.S.
5    452, 461 (1991).  No court has rejected the validity or reasonableness of the agency's
6    interpretations.  To the contrary, courts have agreed that a for-hire vehicle service may maintain a
7    "fleet consisting entirely of non-accessible vehicles [and] be in accord with the ADA." *Toomer v.
8    City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) (emphasis added) (citing 42 U.S.C. § 12184(b)(3));
9    *Noel v. NYC TLC*, 687 F.3d 63, 73–74 (2d Cir. 2012) ("[T]he ADA, *as a whole*, does not require
10   the ... taxi industry to provide accessible taxis.") (emphasis added).  This Court has fully agreed:
11   "an entity may maintain a fleet of exclusively non-accessible vehicles without violating the ADA."
12   *Crawford*, ECF No. 80 at 8.

13       58.    Plaintiffs posit that the above authorities are wrong or that there is a significant
14   caveat to their holdings such that, for example, the Tenth Circuit in *Toomer* really meant a for-hire
15   vehicle service may maintain a "fleet consisting entirely of non-accessible vehicles [and] be in
16   accord with the ADA" *unless the plaintiff asks for WAV service and, in that case, it depends.*  This
17   position has no support in the case law, and no court has ever compelled an entity under Section
18   12184 to "provide" WAV service or cause third-parties to provide it.

19       59.    Section 12184's specific provisions relating to WAVs and WAV service
20   (subsections (b)(3) and (b)(5)) control the statute's general provisions (subsection (b)(2)).  This
21   construction follows from the "well established canon of statutory interpretation" that "the specific
22   governs the general." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).
23   When "a general permission or prohibition is contradicted by a specific prohibition or
24   permission, ... the specific provision is construed as an exception to the general one." *Id.*  The
25   "general language of a statutory provision, although broad enough to include it, will not be held to
26   apply to a matter specifically dealt with in another part of the same enactment." *Id.* at 646.  This
27   specific/general canon eliminates contradictions and superfluities. *Id.* at 645–46.  While not "an

28

absolute rule," the canon provides "a strong indication of statutory meaning, especially when, as here, the two provisions are interrelated and closely positioned, both in fact being parts of the same statutory scheme." *United States v. Corrales-Vazquez*, 931 F.3d 944, 950–51 (9th Cir. 2019). Applying the specific/general canon, subsection (b)(2)'s general requirement that covered entities make "reasonable modifications" yields to the specific provisions of subsections (b)(3) and (b)(5) when it comes to WAV-related requirements.

60.     Had Congress intended to compel private entities that do not purchase or lease new vans to provide WAV service (or made others provide for them), it would not have done so by drafting specific WAV provisions (subsections (b)(3) and (b)(5)) that do not require WAV service and, instead, rely on a general provision that says nothing about WAVs (subsection (b)(2)) to nevertheless compel WAV service on a case-by-case basis.  This is clear based on what Congress required under in Title II of the ADA and the language it used.  Title II expressly and affirmatively requires public entities to provide WAV service by defining the failure to do so as "discrimination": "It shall be considered discrimination … for a public entity which operates a fixed route system … to fail to provide … paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12143(a).  Title II shows that Congress knows how to mandate WAV service, but Congress did not do so in Section 12184.  *See* 42 U.S.C. § 12184(b).

61.     It is a well-settled rule of statutory interpretation that textual differences in related or parallel statutes—especially statutes enacted by the same Congress and the same Act—are meaningful and must be respected.  *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071–72 (2018).  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Jama v. I.C.E.*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows

how to make such a requirement manifest.").  Thus, that Congress specifically included in Title II an express requirement for covered entities to provide equivalent service confirms that Congress's decision to omit such a requirement from Section 12184, in the same Act, was intentional.[16]

62.     This interpretation of Section 12184 also avoids absurd results.  *See United States v. Thompson*, 728 F.3d 1011, 1018 (9th Cir. 2013).  It would be incongruous for Section 12184 to both require covered entities to guarantee WAV service and, simultaneously, not require them to acquire WAVs.  There is no indication in the statute's text, the regulations, or legislative history, nor in any case law, that Congress intended to require covered entities to do what Plaintiffs request here, which is to make the defendant cause other entities to acquire WAVs and then use them to provide WAV service, even though they are not required to provide such service directly, except in one narrow circumstance expressly contemplated by the statute: raise equivalent service as a defense to the acquisition of a new inaccessible van.

63.     In fact, the opposite is true.  Legislative history confirms that Congress intended the specific provisions in subsections (b)(3) and (b)(5) to govern the general provisions of subsection (b)(2):

> [Section] 304(b)(2) lists further examples of discrimination, including: a failure such entity to make reasonable modifications consistent with those required under section 302(b)(2)(A)(ii); a failure to provide auxiliary aids and services consistent with the requirements of section 302(b)(2)(A)(iii); and a failure to remove barriers consistent with the requirements of section 302(b)(2)(A)(iv), (v), and (vi).

> *The examples of discrimination contained in section 304(b) are intended to address situations that are not covered in the specific vehicle and system requirements for private entities primarily engaged in the business of transporting people included in sections 304(b)(3), 304(b)(4), 304(b)(5) and 306.  The general rule contained in paragraph (a) and the examples of discrimination contained in paragraph (b) are not intended to override the specific requirements contained in the sections referenced in the previous sentence.*  For example, an individual with a disability could not make a successful claim under section 304(a) that he or she had been

---

[16]     Congress has explained that it treated public and private entities differently with regard to accessible transportation in the ADA because private entities "do not receive the high levels of federal subsidies that publicly provided services do," and so the requirements applicable to private entities "vary according to the size and type of vehicle, as well as according to the type of system on which the vehicle operates."  H. Rep. No. 101-485(I), 101st Cong., 2d Sess., 1990 WL 10079987, at *2 (May 14, 1990).

discriminated against in the full and equal enjoyment of public transportation services on the grounds that an over-the-road bus was not wheelchair lift-equipped, if a lift was not required under 304(b)(4) or 306(a)(2).

H. Rep. No. 101-485(I), 101st Cong., 2d Sess., 1990 WL 10079987, at *16 (May 14, 1990) (emphasis added).

64.     Like Congress, DOT has interpreted Section 12184 as not requiring covered entities to provide WAV service at all.  Not only did DOT issue regulations and guidance stating that covered entities need not acquire accessible vehicles themselves; DOT specifically considered, and specifically rejected, a rule requiring taxi companies to at least "have access to accessible vehicles (either in its own fleet *or through arrangements with other entities*)." *Transp. for Individuals with Disabilities*, 56 Fed. Reg. 45584-01, 45590, 1991 WL 171006 (Sept. 6, 1991) (emphasis added). Such a rule was inappropriate, DOT explained, because of "the absence of specific statutory language requiring a mix of accessible vehicles in taxi fleets." *Id.*  Thus, DOT has made clear that covered entities need not acquire their own accessible vehicles or otherwise provide access to accessible vehicles (save in the limited circumstance, not present here, where a covered entity chooses to purchase or lease new vans for specified public transportation, *see* 42 U.S.C. § 12184(b)(3), (b)(5)).

65.     In sum, the rules of statutory construction show, unambiguously, that neither the specific prohibitions in Section 12184(b)(3) and (b)(5) nor the general prohibition in (b)(2) require the provision of WAV service absent the purchase or lease of a new van.  And were the statute ambiguous on this point, DOT regulations and guidance (entitled to deference), as well as legislative history resolve that ambiguity.  Thus, Plaintiffs' claim that Uber is obligated to provide or make others provide WAV service as a "reasonable modification" under Section 12184(b)(2) fails as a matter of law.

**II.     Defendants Are Entitled To Judgment In Their Favor On Plaintiffs' Claim Under 42 U.S.C. § 12184(b)(1).**

    **A.     Uber's Vehicle Requirements Do Not Prohibit WAVs.**

66.     Plaintiffs' theory of liability under 42 U.S.C. § 12184(b)(1) is that Uber's generally applicable vehicle requirements "screen out most WAVs" from the UberX and UberXL ridesharing

marketplaces.  Crawford SAC ¶ 146; Namisnak TAC ¶ 153.  Specifically, Plaintiffs challenge the vehicle requirements prohibiting "vans" and "after-market seating modifications" and requiring a minimum number of seats (4 for UberX and 7 for UberXL).  Crawford SAC ¶¶ 142–43, 146; Namisnak TAC ¶¶ 148–49, 153.  Plaintiffs' "screen out" theory, however, is unsupported by any actual evidence.  On the contrary, the uncontroverted evidence at trial shows that Uber's generally applicable vehicle requirements do not, in fact, prohibit WAVs.

67.     While Plaintiffs have asked that Uber activate the UberWAV marketplace such that they can create a ride request that is sent *only* to drivers who are driving WAVs, it is not clear how Plaintiffs would benefit if there were WAVs on the UberX and XL platforms, but with Plaintiffs having no ability to limit their trip requests to *only* those WAVs.

68.     Plaintiffs' "screen out" theory, however, is unsupported by any actual evidence.  On the contrary, the uncontroverted evidence at trial shows that Uber's generally applicable vehicle requirements do not, in fact, prohibit WAVs.

69.     Plaintiffs failed to offer any evidence of any would-be WAV driver who was prohibited, or dissuaded, by the challenged vehicle requirements from using a WAV to sell UberX or UberXL rides.  This is despite the fact that Plaintiffs know multiple people who own WAVs.  FoF ¶¶ 40–41.

70.     Plaintiffs offer only speculation and improperly undisclosed testimony from their retained expert that drivers with WAVs would, upon reading the challenged vehicle requirements, be deterred from signing up to provide UberX or UberXL rides but never ask Uber about it through available customer service channels.  That speculation is not evidence, and, therefore, insufficient to satisfy Plaintiffs' burden of proof.

71.     The actual evidence in the record disproves Plaintiffs' speculation.  Uber does not have a "no WAV" rule.  Nor does Uber interpret its rules prohibiting "vans" and vehicles with "after-market seating modifications" to screen out WAVs.

72.     Most WAVs are minivans, not vans.  Uber's website makes clear that minivans meet the UberX and UberXL vehicle requirements. Plaintiffs themselves distinguish between vans and

minivans. *See, e.g.*, *Crawford*, ECF No. 252-1 at 15:23–16:11. Plaintiffs' expert distinguishes between vans and minivans. Tr. 72:16–73:12 (Cooper).

73.    Uber's rule prohibiting vehicles with "after-market seating modifications, such as installed seats, seatbelts, and BedRyder systems" is directed at added seats, not vehicles converted to WAVs. Moreover, Plaintiffs' own evidence shows that WAVs can be manufactured (and thus purchased new), without requiring any after-market modifications of any sort. FoF ¶ 136.

74.    Plaintiffs failed to adduce any evidence relating to their theory that the minimum seating requirements for UberX and UberXL screen out WAVs. These minimum requirements are essential, defining features of the UberX and UberXL ridesharing marketplaces. (Riders expect an UberX ride to be offered in a vehicle that can seat at least four riders, and they expect an UberXL ride to be offered in a vehicle that can seat at least six rides.).

**B.    Uber's Vehicle Requirements Are Necessary To The Provision Of Its Ridesharing Services In Any Event.**

75.    Even if certain eligibility criteria would tend to screen out individuals with disabilities, a showing that the criteria are "necessary for the provision of the services being offered" is a complete defense. 42 U.S.C. § 12184(b)(1). Necessity can come in many forms, such as "legitimate safety requirements that are necessary for safe operation." 28 C.F.R. § 36.301; *see* 49 C.F.R. § 37.5(f) (incorporating DOJ's regulations concerning eligibility criteria for entities covered under Section 12184).

76.    Uber showed at trial that its vehicle requirements were necessary for the operation of its marketplaces. In particular, the restrictions regarding factory-installed seats, the number of factory-installed seatbelts, and aftermarket seating modifications were all required by Uber's insurers, and Uber must maintain insurance policies that insure trips and drivers while using the Uber platform. FoF ¶¶ 139–141; *see, e.g.*, La. Stat. Ann. § 45:201.6; Miss. Code. Ann. § 77-8-15

77.    Plaintiffs' suggestion that Uber add a disclaimer to its website clarifying that the vehicle requirements do not, in fact, prohibit WAVs, creates additional problems. Where Uber supports a WAV marketplace, Uber reasonably imposes unique safety requirements to ensure both that the WAVs are safe and that the drivers are trained to safely secure WAV passengers.

FoF ¶ 142.  Plaintiffs have failed to show that Uber could safely allow drivers with WAVs on the UberX and UberXL platform in New Orleans and Jackson via a simple website change.

**C.      Changing Uber's UberX And UberXL Vehicle Requirements Would Not Benefit Plaintiffs. And They Lack Constitutional And Statutory Standing.**

78.     Somehow making it more clear that a driver could onboard a WAV on to the UberX or UberXL platforms would provide no benefit to the Plaintiffs and not help them obtain a ride in a WAV.  This means Plaintiffs cannot did not prove at trial either the "fairly traceable" causation necessary for Article III standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), or the more-demanding proximate causation necessary for statutory standing, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014); *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).  The causal chain is necessarily attenuated here.  The statute prohibits eligibility criteria that "screen out … individuals with disabilities," not criteria that screen out particular types of vehicles.  42 U.S.C. § 12184(b)(1).  Plaintiffs do not claim that the vehicle requirements have screened them out from eligibility: Plaintiffs are unable to drive.  That negates statutory standing, which requires a "direct relationship between the injury asserted and the injurious conduct alleged."  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017); *see City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1036 (9th Cir. 2021) (en banc).  Statutory standing generally fails where, as here, the alleged "harm is purely derivative of misfortunes visited upon a third person by the defendant's acts." *Lexmark*, 572 U.S. at 133. Indeed, Plaintiffs' claimed injury is deterrence from using the Uber Rider App because they are unable to use it to make WAV ride requests in the WAV marketplace reliably and with "equivalent" or "near equivalent service."

79.     There is no link between Plaintiffs' claimed deterrence and the challenged vehicle requirements for UberX and UberXL.  Plaintiffs want a WAV-specific option where they can create a ride request that is sent only to driers in a WAV; not the highly unlikely chance that an UberX or UberXL trip will randomly be provided by a driver who has a WAV because such a driver happens as a matter of random chance to be the nearest.  Plaintiffs have admitted from the inception of these lawsuits that it is the absence of the specific "WAV" option that has caused their alleged injuries:

As a result of Uber's refusal to make UberWAV available, persons with disabilities

in Jackson have no ability to call a wheelchair accessible vehicle or specially trained driver through the Uber app. *Even if there are drivers on the road who have such a vehicle or training, there is no way for Jackson users with a disability to find a trained driver or accessible vehicle through the app. For this reason, Dr. Crawford is excluded from Uber's services.*

Crawford SAC ¶ 6 (emphasis added); Namisnak TAC ¶ 9 (same for Namisnak, Falls, and New Orleans).

80.     Notably at trial, Plaintiffs testified about what they want, and they did not offer any testimony to the effect that they want or would benefit to the extent any one was able to onboard a WAV but only receive UberX and UberXL ride requests. *See* Tr. 36:13–56:20 (Crawford); 126:21– 138:20 (Namisnak); 139:16–144:9 (Falls).

81.     That admission shows Plaintiffs' deterrence is not even "fairly traceable" to the challenged requirements for UberX and UberXL vehicles, so Plaintiffs lack Article III standing. Similarly, the admission shows that Plaintiffs' deterrence was not "proximately caused" by the requirements for UberX and UberXL vehicles, so Plaintiffs' lack statutory standing as well.

### III.     Plaintiffs Are Not Entitled To Declaratory Relief.

82.     Plaintiffs also request a variety of declarations that Uber has violated the law, including declarations that "Defendants' policies, procedures, and services in New Orleans, LA and Jackson, MS *have been* provided in a discriminatory manner in violation of 42 U.S.C. § 12184," Final Pretrial Statement § B.I.1 (emphasis added); that "Defendants *violated* 42 U.S.C. § 12184(b)(2) by failing to provide Plaintiffs with a reasonable modification," *id.* § B.I.2 (emphasis added); and that "Defendants *violated* 42 U.S.C. § 12184(b)(1) by screening out WAVs from its fleet." *Id.*§ B.I.3 (emphasis added).

83.     For the reasons discussed above, Defendants are entitled to judgment as to all of Plaintiffs' claims brought under 42 U.S.C. § 12184.  Because Plaintiffs have not demonstrated any violation of the Americans with Disabilities Act by Defendants, they are not entitled to any relief, including declaratory relief.

84.     Plaintiffs' request for declaratory relief fails for the additional reason that it is impermissibly retroactive.  "[A] declaratory judgment merely adjudicating past violations of federal

1   law—as opposed to continuing or future violations of federal law—is not an appropriate exercise

2   of federal jurisdiction." *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 868 (9th Cir. 2017).

3                                             <u>**CONCLUSION**</u>

4          For the foregoing reasons, Plaintiffs have not carried their burden to prove that Uber

5   discriminated against individuals with disabilities in violation of Title III of the ADA. Plaintiffs

6   have therefore failed to establish any entitlement to relief.  Judgment will be entered solely in favor

7   of Uber.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28